IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | |
|---|---|
| BARBARA M. JEFFERS and | ) |
| JOAN M. CRAIG, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) CIVIL ACTION NO. 3:06 CV 685 CSC |
| | ) |
| RUSSELL COUNTY BOARD OF | ) |
| EDUCATION and CHARLES NACRELLI, | ) |
| | ) |
| Defendants. | ) |

## RUSSELL COUNTY BOARD OF EDUCATION'S EVIDENTIARY SUBMISSION IN SUPPORT OF IT MOTION FOR SUMMARY JUDGMENT.

Comes now the Defendant Russell County Board of Education, through the undersigned counsel, and submit this Evidentiary Submission is support of its Motion for Summary Judgment.

1. Exhibit A – Affidavit of Rebecca S. Lee

2. Exhibit B – Affidavit of John Rudd

3. Exhibit C – Excerpts from Deposition of Barbara Jeffers

4. Exhibit D – Excerpts from Deposition of Joan Craig

5. Exhibit E – Excerpts from Deposition of Charles Nacrelli

6. Exhibit F – Excerpts from Deposition of Rebecca Lee

7. Exhibit G – Excerpts from Deposition of Lillian Baker

7. Exhibit H – Excerpts from Deposition of Brenda Coley

8. Exhibit I – Excerpts from Deposition of Dewilda (Dillie) Elliott

This the 14th day of December, 2007.

SMITH & SMITH

A PROFESSIONAL CORPORATION

BY: /s/ Sydney S. Smith

Sydney S. Smith
Attorney for Defendant
Russell County Board of Education
1503 Broad Street
Phenix City, Alabama 36867
(334) 298-2679
ASB-4248-582S

## **CERTIFICATE OF SERVICE**

I hereby certify that I have filed today, December 14, 2007, by CM/ECF, the above and foregoing with copies being served upon:

W. Don Eddins, Esq.
doneddins@charter.net
      and
Matthew C. Williams, Esq.
matt@esw-law.com

/s/ Sydney S. Smith

# EXHIBIT A

# AFFIDAVIT OF DR. REBECCA S. LEE

**AFFIDAVIT**

STATE OF ALABAMA,

COUNTY OF RUSSELL:

My name is Dr. Rebecca S. Lee, and I was the Superintendent of the Russell County Public Schools for the Russell County Board of Education. I began that position in late April 2004, and my contract began on July 1, 2004. I resigned that position effective as of October 20, 2006. I relinquished all of my official duties as superintendent on July 17, 2006.

I make this Affidavit in responses to claims made by Barbara M. Jeffers and Joan Craig of sexual harassment by Charles Nacrelli, former Principal of Ladonia Elementary School. Ms. Jeffers and Mrs. Craig filed suit in the United States District Court for the Middle District of Alabama on August 3, 2006, in case number 3:06-cv-685-WKW. I also make this Affidavit for all other purposes allowed by law.

The Russell County Board of Education has a policy regarding sexual harassment. A copy of Policy GAJDBH is attached hereto and also as Plaintiff's Exhibit 1 to my deposition of October 30, 2007. Copies of the Board Policy Manual are placed in all schools and school facilities throughout the school district. All school principals and building supervisors are instructed to familiarize their staffs with these Board Policies.

In addition to the official Board Policy, a summary of the Board's sexual harassment policy dealing mainly with sexual harassment of students, but also addressing all employees in general terms, is distributed to employees and parents in a booklet entitled "Student Academic Plan & Statement of Responsibilities, A Handbook for School Personnel, Parents & Students." Copies of the booklet cover and the enclosed sexual harassment policy are attached hereto for the School Years 2004-2005 and 2005-2006. Copies of this handbook are distributed at the beginning of each year.

I first became aware of allegations of sexual harassment against Mr. Charles Nacrelli on September 20, 2005. On that date the Plaintiff, Barbara Jeffers, came to see me. She described to me incidences of alleged sexual harassment by Mr. Nacrelli both at Ladonia Elementary School and at a party at Mr. Nacrelli's home.

1

Later in the day on September 20, 2005, I instructed Assistant Superintendent for Personnel, Lillian Baker, to assist me in investigating these allegations. Mrs. Baker began on September 21, 2005 to interview Ms. Jeffers and other school employees and to obtain statements from them. Attached hereto is my letter to Mr. Nacrelli of September 23, 2005, placing him on indefinite paid leave pending the outcome of the investigation of those allegations. Mr. Nacrelli was instructed to have no contact with anyone at Ladonia Elementary School except for Ms. Grant, the Assistant Principal. To my knowledge Mr. Nacrelli complied with my directive as I have had no information from any employees that he had contact with them following September 23, 2005. To my knowledge Mr. Nacrelli never returned to the school campus except on one occasion on a day when no school personnel were present to remove personal items from his office while in the presence of the School Board attorney.

On September 29, 2005, I met with Mr. Nacrelli in my office to allow him the opportunity to respond to the allegations. Also present during that meeting was the School Board attorney, Sydney S. Smith. On October 17, 2005, I provided notice to Mr. Nacrelli of my intention to recommend cancellation of his contract of employment. Mr. Nacrelli's attorney in a letter dated October 21, 2005 contested the proposed termination of employment but waived an appearance before the Board for a hearing. On November 9, 2005, I made my recommendation to the Board to terminate Mr. Nacrelli. The Russell County Board of Education, in official session on November 15, 2005, voted 6-0 (with one Board Member absent) to approve my recommendation of termination. On November 18, 2005 I wrote to Mr. Nacrelli and advised him that the Board had voted to terminate his contract.  Mr. Nacrelli, through his attorney, contested the termination. Alabama tenure law was followed and an arbiter was appointed. Subsequently, a settlement was negotiated and Mr. Nacrelli resigned on February 15, 2006, effective March 19, 2006. The Russell County Board of Education, in official session on February 28, 2006, accepted Mr. Nacrelli's resignation.

I had no knowledge of any allegations of sexual harassment by Mr. Nacrelli prior to my meeting with Ms. Jeffers on September 20, 2005. I then took immediate steps to investigate and remove Mr. Nacrelli from the school system.

I have searched my files seeking to determine when Mrs. Craig first attempted to contact me regarding her allegations of sexual harassment by Mr. Nacrelli. To the best of my recollection Mrs. Craig did not request a meeting with me until almost a month after Ms. Jeffers

2

had met with me and first made allegations against Mr. Nacrelli. My calendar indicates that Mrs. Craig had scheduled an appointment with me for the first time on Wednesday, October 19, 2005, at 9:00 AM. I recall that her request was during the time I was out of town. I had my secretary Barbara Gunter reschedule Mrs. Craig as soon as possible. Mrs. Gunter offered to have Mrs. Craig meet with another administrator, but Mrs. Craig stated that she wished to wait and see me. My calendar for Tuesday, October 25, 2005, shows that I met with Ms. Craig on that date at 11:30 AM.

During that meeting Mrs. Craig made her allegations against Mr. Nacrelli. I asked her why she had not reported these allegations earlier. She stated that she did not think she would be believed. Mrs. Craig never told me that she had reported these allegations of sexual harassment by Mr. Nacrelli to anyone. Specifically, she did not tell me that she had reported these allegations to Mrs. Baker while Mrs. Baker was at Ladonia Elementary School in August 2005. Mrs. Craig never told me that no action had been taken as a result of her report. I asked her to give me a written statement outlining those allegations, but she failed to do so.

I don't recall having ever personally met Mrs. Craig before our meeting of October 25, 2005. I may have seen her in transportation meetings or other in-service programs, but I had not had any direct contact with her.

By the time Mrs. Craig met with me, Mr. Nacrelli had already been removed from his position at Ladonia Elementary. He had been removed prior to her efforts to arrange a conference with me in October 2005.

Regardless of her allegations Ms. Jeffers has not suffered any tangible adverse employment actions as a result of the alleged sexual harassment of her by Mr. Nacrelli. Ms. Jeffers remains a certified, tenured employee of the Russell County Board of Education in her position as Counselor at Ladonia Elementary School. She has suffered no reduction in pay and, in fact, has and will continue to receive raises as they are approved by the Alabama Legislature and the Russell County Board of Education. The terms of her employment continue the same with no transfers to other locations; no change in benefits and no substantial change in the number of students she counsels at any particular period.

Ms. Jeffers is now alleging that she was forced to work under an unreasonable and unlawful schedule that was prepared for her by Mr. Nacrelli. I was the person who initiated the changes in the schedules for the elementary school counselors for the school year 2005-2006. In

3

late spring 2005 (probably in May) I discussed the schedules for elementary school counselors with all the elementary school principals. Prior to this discussion those elementary school counselors had a very unstructured schedule. My expectation was that the counselors would have a more structured schedule so that all of the students could benefit from their services. So there was to be a more of a structured schedule that the counselors had been used to before that. The schedule that Mr. Nacrelli gave to Ms. Jeffers would have been the result of my directive. Mr. Nacrelli had told me at the time of my directive that Mrs. Jeffers would fight the change in her schedule because she did not want to have students assigned to her.

And regardless of her allegations Mrs. Craig has not suffered any tangible adverse employment actions as a result of the alleged sexual harassment of her by Mr. Nacrelli. Mrs. Craig is a non-certified employee who remains a non-probationary (tenured) employee of the Russell County Board of Education in her position as a bus driver assigned to Ladonia Elementary School. She has suffered no reduction in pay and, in fact, has and will continue to receive raises as they are approved by the Alabama Legislature and the Russell County Board of Education. The terms of her employment continue the same with no transfers to other locations, with the same bus route assignments and with no change in benefits.

Mrs. Craig is now alleging that she has suffered a reduction in pay because she gave up extra bus trips. Mrs. Craig made this decision herself, unilaterally. Her extra work was not terminated as a result of any action of her supervisor, John Rudd. Mr. Rudd was, and still remains to be the best of my knowledge, the Transportation Supervisor for the Russell County Board of Education. As her supervisor, Mr. Rudd was the only person who could make any recommendations regarding the continuation and terms of Craig's employment. Mr. Nacrelli had no supervisor duties over Mrs. Craig.

4

I am making this affidavit based upon my best recollection and the records I have been able to locate of this date. The above information is true and correct based upon my knowledge and beliefs.

This the 12th day of December, 2007.

_Rebecca S. Lee_
**Rebecca S. Lee**

STATE OF ALABAMA,

COUNTY OF RUSSELL:

I, the undersigned, a Notary Public in and for said County in said State, hereby certify that Rebecca S. Lee, whose name is signed to the foregoing Affidavit, and who is known to me, acknowledged before me on this day, that being informed of the contents of same, he executed the same voluntarily on the day the same bears date.

Given under my hand and seal this the 12th day of December, 2007.

_Melinda H. Hamill_
Notary Public
My Commission Expires: 12|13|08



5

FILE: GAJDBH

## SEXUAL HARASSMENT

I.  POLICY
   A.  It is the policy of the Board to maintain a learning and working-environment that is free from sexual harassment. No employee of the School System shall be subjected to sexual harassment.
   B.  It shall be a violation of this policy for any employee of the School System to harass another staff member or student through conduct or communications of a sexual nature as defined in Section II below.
   C.  Each administrator shall be responsible for promoting understanding and acceptance of, and assuring compliance with, state and federal laws and board policy and procedures governing sexual harassment within her or his school or office.
   D.  Violations of this policy or procedure will be cause for disciplinary action.

II.  DEFINITION
   A.  Sexual harassment means unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature when:

      1)  submission to such conduct is made either explicitly or implicitly a term or condition of a person's employment or advancement or of a student's participation in school programs or activities; or
      2)  submission to or rejection of such conduct by an employee or student is used as the basis for decisions affecting the employee or student; or
      3)  such conduct has the purpose or effect of unreasonably interfering with an employee's or student's performance or creating an intimidating, hostile, or offensive work or learning environment.

   B.  Sexual harassment, as set forth in Section II-A, may include, but is not limited to, the following:
   1. verbal harassment or abuse; 2. pressure for sexual activity; 3. repeated remarks with sexual or demeaning implications; 4. unwelcome touching; and 5. sexual jokes, posters, etc. suggesting or demanding sexual involvement, accompanied by implied or explicit threats concerning one's grades, job, etc.

III.  REPORTING PROCEDURES
   A.  Any employee who feels he/she has been sexually harassed by another employee(s) or student(s) of the School System should present the complaint directly to the School System Title IX Coordinator (Personnel Director). The complaint should be filed as soon as possible after the incident or the latest occurrence if a series of incidents are involved.
   B.  The complaint should be made to the Title IX Coordinator (Personnel Director) and may be made in person or in writing. If the initial complaint is made in person, the

Page 1 of 2

FILE: GAJDBH
(Continued)

complainant will then be responsible for preparing a signed, written complaint detailing the events/occurrences giving rise to the sexual harassment charge.

C.  Such complaint of sexual harassment will not reflect upon the complainant's status, nor will it affect future employment, or work assignments.

INVESTIGATION - HEARING PROCEDURES

A.  The Title IX Coordinator (Personnel Director) or the Superintendent's designee will promptly initiate an investigation of the allegation. Due process shall be accorded to all parties involved in the allegation throughout the investigation. The person(s) accused will be given an opportunity to present a written, signed statement detailing his/her recall of the events/occurrences leading to the sexual harassment complaint against him/her.

B.  When the investigation is completed the person conducting the investigation shall report the findings to the Superintendent. The findings of the investigation shall then be reduced to writing and copies presented to the complainant and the accused employee(s). The Superintendent and investigating officer shall meet with the complainant and accused employee to attempt to resolve the complaint.

C.  If the complaint cannot be resolved as noted above, the Superintendent shall report the matter to the Board. The Board will conduct a hearing in accordance with applicable laws and attempt to resolve the complaint.

D.  If the complaint cannot be resolved by the Board, the complainant may seek redress in an appropriate court.

E.  In all situations, the confidentiality of the complainant and the accused will be respected consistent with the School System's legal obligations and with the necessity to investigate fully any allegations of misconduct and to take corrective action when it is determined that sexual harassment has occurred.

V.  SANCTIONS
A substantiated charge against an employee of the School System shall subject that employee to disciplinary action, up to and including discharge.

VI.  NOTIFICATION
This policy will be placed in the School System policy manual.

SOURCE:  Russell County Board of Education, Phenix City, AL
ADOPTED:
LEGAL REF.:  The Code of Alabama: 16-8-23; Meritor Savings Bank FSB v. Vinson, 477 U.S. 57 (1986); Civil Rights Act of 1964, Title VII; EEOC Guidelines. Equal Employment Opportunities Commission (EEOC), Minnesota Department of Education; and Programs for Educational Opportunity (PEO), Univ. of Michigan, Ann Arbor, Michigan;

Page 2 of

# Academic Plan & Statement of Responsibilities



RUSSELL COUNTY SCHOOLS

A Handbook for School Personnel Parents & Students

2004-05

# APPENDIX II

## RUSSELL COUNTY BOARD OF EDUCATION

## STATEMENT OF SEXUAL HARASSMENT POLICY

*Anti-Harassment Policy*

The Russell County Board of Education is committed to maintaining an educational environment free of sexual harassment. In keeping with this commitment, the Board will not tolerate harassment of employees or students by anyone, including supervisors, teachers, students, vendors, or other customers of the Board. Sexual harassment violates Title VII of the Civil Rights Act of 1964, as amended, and is unlawful and contrary to Board policy. Any Board employee or student who engages in sexual harassment violates this policy and the law.

Unwelcome sexual advances, requests for sexual favors and any other physical, verbal, or visual conduct of a sexual nature is sexual harassment when such conduct creates an intimidating, hostile, or offensive educational environment.

Sexual harassment may include, but is not limited to, unwelcome sexual propositions; sexual innuendoes; suggestive remarks; vulgar or sexually explicit comments, gestures, or conduct; obscene or sexually explicit pictures; sexually oriented "kidding," teasing, or practical jokes; and physical contact, such as patting, pinching, or brushing against another's body. In third-party situations, sexual harassment may also be present if one individual is offended by the sexual interaction, conduct, or communications between others.

All Board employees are responsible for maintaining an educational environment free of sexual harassment and intimidation. In this role, the responsibilities of all Board supervisors and managers include, but are not limited to, the following:

1.    Assure that students are not required to endure insulting, degrading, or exploitative sexual treatment.

2.    Immediately report any complaints concerning sexual harassment received from students to the principal or appropriate school official.

Any student experiencing or witnessing sexual harassment should immediately notify the school secretary, any teacher, any assistant principal or the principal,

The confidentiality of all harassment complaints is guaranteed. Personnel violating confidentiality will be disciplined appropriately. Communications will be made to others only on a limited "need to know" basis. There will be no retaliation against a student for filing complaints of sexual harassment.

Sexual harassment offenses allegedly committed by adults against students will be promptly investigated within 30 days and/or will be reported to appropriate law enforcement officials.

Sexual harassment offenses allegedly committed by students may be classified as minor, intermediate, or major offenses under the provisions of the Code of Student Conduct. The Student Code of Conduct procedures will be followed in deciding the appropriate discipline for such offenses.

The right of confidentiality, both of the complainant and of the accused, will be respected consistent with the Board's legal obligations, and with the necessity to investigate allegations of misconduct. All allegations of sexual harassment shall be investigated fully and appropriate corrective or disciplinary action shall be initiated. Appropriate documentation shall be maintained on all allegations of sexual harassment. A substantial charge against an employee shall subject such person to disciplinary action, including discharge. A substantiated charge against a student shall subject that student to disciplinary action including suspension or expulsion.

05-06

# Student Academic Plan
# &
# Statement of Responsibilities



# A Handbook for
# School Personnel
# Parents & Students

## APPENDIX II

## RUSSELL COUNTY BOARD OF EDUCATION

## STATEMENT OF SEXUAL HARASSMENT POLICY

*Anti-Harassment Policy*

The Russell County Board of Education is committed to maintaining an educational environment free of sexual harassment. In keeping with this commitment, the Board will not tolerate harassment of employees or students by anyone, including supervisors, teachers, students, vendors, or other customers of the Board. Sexual harassment violates Title VII of the Civil Rights Act of 1964, as amended, and is unlawful and contrary to Board policy. Any Board employee or student who engages in sexual harassment violates this policy and the law.

Unwelcome sexual advances, requests for sexual favors and any other physical, verbal, or visual conduct of a sexual nature is sexual harassment when such conduct creates an intimidating, hostile, or offensive educational environment.

Sexual harassment may include, but is not limited to, unwelcome sexual propositions; sexual innuendoes; suggestive remarks; vulgar or sexually explicit comments, gestures, or conduct; obscene or sexually explicit pictures; sexually oriented "kidding," teasing, or practical jokes; and physical contact, such as patting, pinching, or brushing against another's body. In third-party situations, sexual harassment may also be present if one individual is offended by the sexual interaction, conduct, or communications between others.

All Board employees are responsible for maintaining an educational environment free of sexual harassment and intimidation. In this role, the responsibilities of all Board supervisors and managers include, but are not limited to, the following:
1.    Assure that students are not required to endure insulting, degrading, or exploitative sexual treatment.
2.    Immediately report any complaints concerning sexual harassment received from students to the principal or appropriate school official.

Any student experiencing or witnessing sexual harassment should immediately notify the school secretary, any teacher, any assistant principal or the principal,

The confidentiality of all harassment complaints is guaranteed. Personnel violating confidentiality will be disciplined appropriately. Communications will be made to others only on a limited "need to know" basis. There will be no retaliation against a student for filing complaints of sexual harassment.

Sexual harassment offenses allegedly committed by adults against students will be promptly investigated within 30 days and/or will be reported to appropriate law enforcement officials.

Sexual harassment offenses allegedly committed by students may be classified as minor, intermediate, or major offenses under the provisions of the Code of Student Conduct. The Student Code of Conduct procedures will be followed in deciding the appropriate discipline for such offenses.

The right of confidentiality, both of the complainant and of the accused, will be respected consistent with the Board's legal obligations, and with the necessity to investigate allegations of misconduct. All allegations of sexual harassment shall be investigated fully and appropriate corrective or disciplinary action shall be initiated. Appropriate documentation shall be maintained on all allegations of sexual harassment. A substantial charge against an employee shall subject such person to disciplinary action, including discharge. A substantiated charge against a student shall subject that student to disciplinary action including suspension or expulsion.

37



**RUSSELL COUNTY BOARD OF EDUCATION**
506-14TH STREET
POST OFFICE BOX 400
PHENIX CITY, ALABAMA 36868-0400
TELEPHONE: (334)298-8791  FAX: (334)448-8825

Ralph Jordon, President
Joseph Williams, Vice-President
Kenneth Barnes
Dillie Elliott
Alphonso Johnson
Charles Johnson
Keith Mitchell

Dr. Rebecca S. Lee, Superintendent

| | |
|---|---|
| **Date:** | September 23, 2005 |
| **To:** | Mr. Charles Nacrelli<br>Principal, Ladonia Elementary |
| **From:** | Dr. Becky Lee<br>Superintendent, RCSD |
| **Re:** | Paid Administrative Leave pending Investigation of Allegations |
| **Cc:** | Personnel File |

This letter is to officially inform you that you are placed on indefinite paid administrative leave pending the outcome of allegations made against you by members of your staff at Ladonia Elementary. These allegations relate to sexual harassment.

As superintendent, I am obligated to investigate any charges that are brought against you by staff members. You will be informed of the results of the investigation at the earliest date. While on administrative leave, you should not have contact with the staff at Ladonia, with the exception of Ms. Jacqueline Grant.



PLAINTIFF'S
EXHIBIT

*Lee*

PENGAD 800-631-6989

*An Equal Opportunity Institution*
*Safe Schools Hotline (888) 728-5437*
*All Schools Accredited by the Southern Association of Colleges and Schools*

Nacrelli/Jeffers
Nacrelli00052

# EXHIBIT A

EXHIBIT B

AFFIDAVIT OF JOHN RUDD

## AFFIDAVIT

STATE OF ALABAMA,

COUNTY OF RUSSELL:

My name is John Rudd, and I am Transportation Supervisor for the Russell County Board of Education. I have held this position during all times relevant herein. I make this Affidavit in response to claims made by Barbara M. Jeffers and Joan Craig of sexual harassment by Charles Nacrelli, former Principal of Ladonia Elementary School. Ms. Jeffers and Mrs. Craig filed suit in the United States District Court for the Middle District of Alabama on August 3, 2006, in case number 3:06-cv-685-WKW. I also make this Affidavit for all other purposes allowed by law.

I met Mrs. Craig when her daughter was a student in the Russell County Schools. Her daughter had been in a fight, and Mrs. Craig boarded a school bus intending to beat up the child who had fought with her daughter. I got her off the bus, and I told her to meet me at the Middle School to discuss this situation. She and her husband did so and during that conversation I told Mrs. Craig that if she thought driving a bus was so easy why didn't she take a job as one. She accepted, and I assisted her in obtaining her Commercial Driver's License. I have worked closely with Mrs. Craig. Mrs. Craig is very outspoken and will tell you exactly what is on her mind. She is not a person who is intimidated by others.

Mrs. Craig's performance as a school bus driver has been very good. She takes care of her students and insures that the students behave while on her bus. I am not aware of anything that prevented Mrs. Craig from properly performing her job during any of the term of her employment. To my knowledge nothing has interfered with her job performance.

The first date on which Mrs. Craig informed me of her allegations of sexual harassment by Mr. Nacrelli was Thursday, February 9, 2006. Mrs. Craig was at the bus shop for a routine monthly school bus inspection. While she was waiting she and I had an informal conversation. During that conversation, Mrs. Craig told me that she and another individual, Ms. Barbara Jeffers, were the individuals that had filed charges against Mr. Nacrelli and that she was to "go to court" in the near future. Mrs. Craig was relaxed and laughing.

During this conversation I told Mrs. Craig that she had never mentioned any sexual harassment by Mr. Nacrelli to me. Mrs. Craig told me that she was uncomfortable around Mr. Nacrelli, and that she preferred working with Mrs. Coley, the Assistant Principal. The primary reason was that she and the other bus drivers got better support on bus discipline matters from Mrs. Coley. She indicated that Mrs. Coley would remove the student from a bus for disciplinary reasons and that Mr. Nacrelli would put the student back on the bus. I remember Mrs. Craig telling me about the discipline problems prior to February 9, 2006, but I had never been told anything about sexual harassment prior to February 9, 2006. By this time, Mr. Nacrelli had been removed as principal of Ladonia Elementary. It is my understanding that he was removed as principal in late September 2005. By February 9, 2006 I understood that Mr. Nacrelli had been terminated by the Russell County Board of Education.

I hold an in-service training session at the beginning of each school year, and I deal with harassment of all types, including sexual harassment, and the reporting procedures. I also issue a new Transportation Handbook to the drivers each year and that handbook contains a section that deals with harassment; the seriousness of it; and the procedures for dealing with those situations. This applies to all students and employees who may be subjected to harassment. This Harassment policy in the Transportation Handbook is in addition to the Board Policy GAJDBH entitled Sexual Harassment. I require that the Transportation Handbook be kept on each bus during the entire school year so that the procedures are available if needed by a bus driver. A copy of the relevant portions of the Transportation Handbook is attached hereto.

Mrs. Craig alleges that she suffered a loss of income because she did not want to take field (extra-curricular) trips. On February 9, 2006, Mrs. Craig first told me that she had stopped taking field trips in an effort to avoid Mr. Nacrelli. This had never been mentioned to me earlier, and it was assumed that Mrs. Craig quit taking extra-curricular trips because of personal family reasons and did not have the time. Mrs. Craig has had to deal with family members' illnesses over the past years. Her brother has lived with her and has required numerous daily visits to the hospital. Mrs. Craig has also helped with her husband's business by delivering payroll to his employees in other cities and states. During this time Mrs. Craig was working in Columbus, Georgia at a business that prepares tax returns. Nothing has ever been said to me or, to my

knowledge, any other transportation employee, that Mrs. Craig was no longer taking extra-curricular trips because of the alleged sexual harassment by Mr. Nacrelli.

Mrs. Craig alleges in her Complaint that she was informally in charge of scheduling Ladonia bus driver' for extra-curricular trips. (Doc. #1, Paragraph 36). This is not a part of her job description and is not exactly correct since it is my job to assign drivers for field trips. However, it is true that Mrs. Craig would inform me of extra-curricular trips at Ladonia Elementary School and would also tell me which drivers wanted to take a particular trip. Although the assignment is my ultimate responsibility, I would usually follow her suggestions. She never told me that she did not want to take an extra-curricular trip or that the reason was because of her concern of being in contact with Mr. Nacrelli. I do not know why she did not report her allegations to me prior to February 9, 2006.

Extra-curricular assignments are voluntary, and are not something to which bus drivers are entitled. It is my understanding that Mr. Nacrelli would not be on extra-curricular trips because, as a general rule, principals do not take the extra-curricular trips. Ladonia Elementary is a large school, and Mr. Nacrelli would be required to remain at the school and oversee the educational process for the remaining students. Therefore, I do not understand her concern about contact with Mr. Nacrelli on an extra-curricular trip. Nor, do I understand her statement that she stopped taking extra-curricular trips in an effort to avoid Mr. Nacrelli. I know Mrs. Craig to be an outspoken individual who does not back down from anything.

As Transportation Supervisor it is my responsibility to supervise, evaluate and recommend to the Superintendent the hiring, discipline and firing of school bus drivers. The principal of a school has no input into those actions unless a principal wishes to discuss a matter with me regarding a particular driver. Charles Nacrelli has never talked to me about Joan Craig. Specifically, he has never made a recommendation to me regarding Mrs. Craig about her conduct; her evaluations; any type of reprimand or discipline; or any type of reduction in either her duties or her pay. Throughout her employment, the pay of Mrs. Craig has never been reduced and has, in fact, increased with "each step" and each increase in wages from the local Board and/or the State of Alabama. Further, throughout her employment with the Russell County Board of Education Mrs. Craig has run the same bus route with minor modifications to adjust in student riding load.

I am making this affidavit based upon my best recollection and the records I have been able to locate of this date. The above information is true and correct based upon my knowledge and beliefs.

This the 11th day of December, 2007.

**John Rudd**

STATE OF ALABAMA,

COUNTY OF RUSSELL:

I, the undersigned, a Notary Public in and for said County in said State, hereby certify that John Rudd, whose name is signed to the foregoing Affidavit, and who is known to me, acknowledged before me on this day, that being informed of the contents of same, he executed the same voluntarily on the day the same bears date.

Given under my hand and seal this the 11th day of December, 2007.

Notary Public
My Commission Expires: 3/1/2008

# Russell County Board of Education

## Transportation Department
## Handbook



*The Russell County Board of Education is a drug-free workplace and an equal opportunity employer and does not discriminate in employment on the basis of age, gender race, religion, national origin, creed, or physical disability.  The Russell County Board of Education applies the same equal opportunity standards when determining student transportation needs.*

*Revised: June 2005*




Conduct referrals. The referral and video (set at the time of the incident) should be turned into the principal for action.

5.  Only the principal, transportation supervisor, bus driver or designee should review the tape. Parental conferences will focus only on the portion of the tape applicable to the problem. Random viewing by parents or other personnel is prohibited. Do not review videos at home with anyone present but yourself.

## HARASSMENT

Harassment is the use or tolerance of verbal or physical behavior which serves to threaten, demean, annoy or torment another person. Harassment would include unwarranted activities or comments based on race, gender and personal attributes, as determined in local policy.

School bus drivers must take appropriate action to prevent its continued use. Harassment should not be tolerated by anyone. Actual or suspect harassment is to be reported to the school principal as soon as possible.

Disciplinary and corrective actions should be taken by the school administration. Bus drivers should use all practical means to stop the incidents until action is taken by the school.

## DISCIPLINE

1.  Bus drivers are responsible for controlling their bus. Student control is accomplished by being firm but fair to all students. Drivers should practice assertive discipline techniques to gain student control and cooperation.

2.  Students who continue to be disruptive should be turned in to the principal. The bus conduct form must be filled out **in detail** giving the principal as much information as possible. When profanity is the issue the actual words or language used should be documented.

3.  Bus drivers should use the student academic plan & statement of responsibilities as the guide for acceptable and unacceptable behavior.

4.  Bus drivers are not allowed to suspend students or refuse to let them ride. Any disruptive student that the driver cannot handle should be turned over to a school administration or a transportation department representative. Do not put the student off and tell him to "go to the office".

7

EXHIBIT C

EXCERPTS FROM THE DEPOSITION OF

BARBARA JEFFERS

BARBARA M. JEFFERS - 10/15/2007

Page 73

1  you were talk with Ken Coley?
2  A.   Right.
3  Q.   What other incidences did you see
4  prior to the final incidence, which
5  we'll come to in a minute?
6  A.   He -- he grabbed Brenda Coley and
7  kissed her in the mouth.
8  Q.   And where did that happen?
9  A.   Out by pool.
10  Q.   And where were you; were you --
11  A.   Standing right there in front of them.
12  Q.   Okay.  Who else did you see?
13  A.   That's all I saw.
14  Q.   Okay.  Other than those two incidences
15  involving other people and him having
16  touched you from behind?
17  A.   Right.
18  Q.   That's all you are aware of?
19  A.   That's correct.
20  Q.   And you were behind the bushes most of
21  the time with Ms. Nacrelli and the
22  daughter, Amber?
23  A.   Well, part of the time.  I won't say

Page 74

1  most of the time.  Part of the time it
2  was -- I remember it was very hot
3  outside.  And so part of the time all
4  of us were in the kitchen like around
5  the food.  And they had a karaoke
6  machine, and singing karaoke, and that
7  kind of stuff.
8  Q.   Why was Amber confiding in you about
9  her personal matter whatever it was?
10  A.   I have no idea.
11  Q.   Did you know Amber previously?
12  A.   I had met her before.
13  Q.   And why was Jerry Nacrelli confiding
14  in you about Amber's situation?
15  A.   I have no idea.
16  Q.   Do you know if they considered you a
17  friend?
18  A.   Obviously.
19  Q.   Throughout the night then, did you eat
20  at party?
21  A.   Uh-huh.
22  Q.   Did you participate in the karaoke?
23  A.   No.  I watched.

Page 75

1  Q.   Did you have anything to drink at the
2  party?
3  A.   All I want -- I probably had a cup of
4  beer.  I took a lot of pictures.
5  Q.   Pictures?
6  A.   Uh-huh.
7  Q.   You have those pictures?
8  A.   Uh-huh.
9  Q.   You have them with you today?
10  A.   Nope.
11  Q.   Okay.  What are the pictures of?
12  A.   Everybody at party.
13  Q.   Okay.
14  A.   People at the party.
15  Q.   Were all the people at the party
16  affiliated with the school?
17  A.   Yes.  Basically.  Now, I think there
18  were a couple of people who -- who
19  maybe brought somebody else with them
20  that wasn't necessarily invited.  But
21  like I do remember a couple of people
22  that brought someone with them because
23  they happened to visiting or whatever.

Page 76

1  I don't know what reason.
2  Q.   Was your attendance at this party
3  voluntary?
4  A.   It was not mandatory.
5  Q.   And did you drive yourself?
6  A.   I did.
7  Q.   Did anybody prohibit you from leaving
8  the party at any time?
9  A.   Jerry asked me not to leave at one
10  point in time.
11  Q.   Prior to Jerry asking you not to
12  leave, did it -- did -- were you free
13  to go if you had wanted to do so?
14  A.   I guess so.
15  Q.   Even when Jerry asked you, you were
16  still free to go?
17  A.   Uh-huh.
18  Q.   All right.  Tell me then what happened
19  about Jerry asking you to stay and
20  Mr. Nacrelli apparently appearing
21  behind you in an undressed state; tell
22  -- describe that as best you can?
23  A.   Okay.  I was leaving the party,

19 (Pages 73 to 76)




BARBARA M. JEFFERS - 10/15/2007

Page 89

1   A.   Uh-huh.
2   Q.   Was that her last time as an assistant
3   principal at Ladonia?
4   A.   That was her last time as assistant
5   principal at Ladonia and she was I
6   guess a 10-month employee.
7   Q.   Okay.  Just like you?
8   A.   Uh-huh.
9   Q.   So her last day would have been then
10  June 5th was the last day for 10 --
11  months?
12  A.   (The witness nods head.)
13  Q.   And after that she was going to be the
14  principal at Oliver?
15  A.   Uh-huh.  Yes.
16  Q.   Do you know if she had the gun or --
17  or do you know, you may not, do you
18  know when she began working at Oliver?
19  A.   No, I don't.
20  Q.   And at the time of the party, was she
21  at Oliver?
22  A.   I don't believe so.
23  Q.   Are principals on 10-month or

Page 90

1   12-month?
2   A.   Mr. Nacrelli was on 11-month.
3   Q.   All right.  Do you know what Ms. Coley
4   was going to be on?
5   A.   I believe probably 11.  I don't know
6   though.
7   Q.   Now, did you do next?  You said you
8   left the party; what did you do?
9   A.   I went out of his subdivision and I
10  pulled off the road and I called
11  Brenda Coley on her cell phone.
12  Q.   Okay.  And where was Brenda at the
13  time you called her?
14  A.   She was on her way home.
15  Q.   And I believe you testified that her
16  husband, Ken, had been with her?
17  A.   Yes.
18  Q.   Well, was she and Ken in the same
19  vehicle?
20  A.   Yes.
21  Q.   And what did you tell her?
22  A.   I told her what had happened.
23  Q.   All right.  Tell me what you told her?

Page 91

1   A.   I told her I said you're not going to
2   believe what Mr. Nacrelli has done
3   now.  And she said what.  And I told
4   her that he had taken his bathing suit
5   off and was standing there naked.
6   Q.   Okay.  What else did you tell her?
7   A.   That's all.  That's what I told her.
8   Q.   What did she say?
9   A.   At first she -- I mean, she said you
10  got to be kidding.  I said no, I'm not
11  kidding you.  He did that.  And she --
12  she said can I tell Ken?  I said tell
13  him.  And she was just incredulous
14  that he had known that really because
15  she laughed.  I said Brenda, it's not
16  funny.  I said I'm shaking so, I don't
17  even know if I can get home.  I said I
18  am very upset about this.
19  Q.   Okay.  Did you say anything to her
20  about not telling anyone?
21  A.   No.
22  Q.   You didn't?
23  A.   No.

Page 92

1   Q.   You didn't ask Brenda Coley not to
2   tell?
3   A.   No.
4   Q.   Did you tell her at that time you
5   wanted a transfer?
6   A.   No, I didn't tell her that night on
7   the phone I wanted a transfer.
8   Q.   All right.  What else was said during
9   that phone conversation?
10  A.   That's about it.  You know I just told
11  her what had happened.
12  Q.   Okay.  Did you call anybody else that
13  night?
14  A.   I don't remember that I called anybody
15  else that night.
16  Q.   Did you manage to get home by yourself
17  that night?
18  A.   I did.
19  Q.   And you don't recall telling this
20  story to anybody else that night?
21  A.   Not that night.
22  Q.   All right.  When did you tell the
23  story again?

23 (Pages 89 to 92)




BARBARA M. JEFFERS - 10/15/2007

Page 105

1  called Ms. Elliot at home --
2  MR. EDDINS: We've been going
3  for about an hour and
4  40 minutes or something
5  can we take a break?
6  MS. SMITH: Sure.
7      (Brief recess was taken at
8      11:54 a.m., and deposition
9      testimony reconvened at
10     12:05 p.m.)
11 Q.  Now, let's talk about the phone call
12 to Ms. Elliot about Mr. Nacrelli. You
13 told me you thought it was several
14 days later; is that the best you can
15 place it?
16 A.  That's the best I can remember.
17 Q.  And you said it was in the evening?
18 MR. EDDINS: She testified it
19 was a couple of days.
20 MS. SMITH: A couple of days,
21 okay.
22 MR. EDDINS: Uh-huh.
23 Q.  You don't remember what day of the

Page 106

1  week it was, do you?
2  A.  I don't.
3  Q.  Okay. Tell me what you told her?
4  A.  I told her what had happened about
5  Mr. Nacrelli and what he had done.
6  Q.  All right. Tell me in the words as
7  best you can remember?
8  A.  Exactly as I testified to you as to
9  what had gone on, is basically what I
10 told her.
11 Q.  And what did she say in response?
12 A.  She was horrified. She couldn't
13 believe it.
14 Q.  What did she say? Did she say I'm
15 horrified or did she say I can't
16 believe it or what did she say?
17 A.  I don't remember her exact words. She
18 was just -- I just remember that she
19 was shocked that he had done that.
20 And she also said -- you
21 know I had asked her -- as she
22 testified, I did ask her not to tell
23 anybody. What I was really wanting to

Page 107

1  do was for her to see if she could
2  have me transferred.
3  Q.  So you specifically told her not to
4  tell anybody?
5  A.  I did.
6  Q.  And what did she say in response to
7  that?
8  A.  She said she wouldn't.
9  Q.  And what was your purpose?
10 A.  I wanted to be moved to Oliver.
11 Q.  And why did you want to be moved to
12 Oliver?
13 A.  Because I did not want go back to
14 Ladonia with him there.
15 Q.  Did you say to her, I want to be moved
16 or did you say I want to transfer?
17 A.  I told her I wanted to be moved to
18 Oliver.
19 Q.  What did she say?
20 A.  She said she'd look into it. I think
21 she -- we'll see if there was a chance
22 that that could happen.
23 Q.  She told you that?

Page 108

1  A.  Yes, ma'am.
2  Q.  Did she get back to about it?
3  A.  No, she didn't.
4  Q.  Did you ever file a request for a
5  transfer?
6  A.  No, I didn't.
7  Q.  Did you ever request a transfer from
8  either the superintendent or the
9  assist superintendent?
10 A.  No.
11 Q.  Are you aware of the transfer policy
12 that the Russell County Board of
13 Education has?
14 A.  I guess -- no. I'm not sure.
15 Q.  Okay. How do you about go about
16 requesting a transfer?
17 A.  Well, back in the spring you get a
18 letter of intent. You can do it on
19 that or you can wait and just ask to
20 be transferred.
21 Q.  You just wait and ask to be
22 transferred?
23 A.  Well, you could wait and ask to be

27 (Pages 105 to 108)




Page 189

1 had always been.
2 Q.   Uh-huh?
3 A.   But when he passed this out in
4 facility was the first time I knew
5 anything about this.
6 So, see, I would not have
7 even made out my schedule the year
8 before until after all the
9 registration -- after school had
10 started.
11 And I went around and the
12 way I did it, I asked the teachers
13 when would you like for me to come.
14 What's a good time for me to come.
15 Q.   Uh-huh?
16 A.   That's the way I establish my large
17 group and it was every other week for
18 K through 3.  As a matter of fact, at
19 that time I only did part of three.
20 Ms. Chaparro part of three and she did
21 four, five and six.  Because there
22 aren't as many teachers in four, five
23 and six as there were in K one and

Page 190

1 two.  There was six or seven in each
2 grade and only four in the higher
3 grades.
4 Q.   So you were given there I think we
5 established on?
6 A.   Probably the 5th.
7 Q.   On the 5th.  But you didn't raise any
8 issues about it until sometime in
9 September?
10 A.   Until I had a chance, whenever that
11 was.
12 Q.   All right?
13 A.   Probably toward the end of August.
14 Q.   Okay.  And what did you do then when
15 you had -- when you saw it?  What did
16 -- when y'all were -- did you -- did
17 you meet with Ms. Hornsby and
18 Ms. Poole's class together?
19 A.   No.  No.  I didn't start a large group
20 at that time because I was doing
21 registration.
22 Q.   Okay.  When -- at any time, did you
23 ever have Ms. Hornsby and Ms. Poole's

Page 191

1 group together?
2 A.   No.
3 Q.   Did -- at any time, did you ever have
4 Ms. Williams and Ms. Miles -- and I'm
5 assuming all of these are women, and
6 if they're not, please tell me.  But
7 did you ever have Ms. William and
8 Ms. Miles group together?
9 A.   No.
10 Q.   How about Ms. Giles and Ms. Dias'
11 group together?
12 A.   No.
13 Q.   Roberts and Lane, did you have them
14 together?
15 A.   No.
16 Q.   Atkins and Bussy, did you have them
17 together?
18 A.   No.
19 Q.   Loe, L-O-E, and E Lewis, did you ever
20 have those two classes together?
21 A.   No.
22 Q.   All right.  Well, when did it get
23 changed so that you didn't have these?

Page 192

1 A.   Later -- whenever we had the chance,
2 after the registration, Ms. Chaparro
3 and I went in and told Mr. Nacrelli
4 that this was not a satisfactory
5 schedule.
6 Q.   Uh-huh.
7 A.   That he had us with these combined
8 classes and that we were not -- our
9 curriculum from the State Department
10 says that we cannot have a ratio
11 that's any different from the
12 teachers.  And he said you'll have to
13 show me in writing.  And I said well,
14 I'll get it and show it to you.
15 Q.   Okay.
16 A.   I got it and showed it to him.
17 Q.   Okay.
18 A.   Got it and showed it to him.
19 Q.   Okay.
20 A.   So then he made out another schedule
21 as I remember, and I don't even
22 remember what it looked like.  But
23 finally he just said, y'all just make

334.262.7556    Reagan Reporters, LLC    334.262.4437
www.ReaganReporters.com



BARBARA M. JEFFERS - 10/15/2007

Page 193

1  out your schedule like you've done in
2  the past. So we made out our
3  schedule.
4  Originally, what he had
5  said about this was that because of
6  the Alabama Reading Initiative, the
7  teachers have to have an hour planning
8  period for Alabama Reading Initiative.
9  Q.  Uh-huh.
10  A.  So his plan was that we were going to
11  be their planning period.
12  Q.  Okay. So after you finished
13  registration, then you and
14  Ms. Chaparro went to him and told him
15  that this violated your curriculum
16  from the State Department?
17  A.  Uh-huh.
18  Q.  And he asked to see it and you showed
19  it to him, correct?
20  A.  Uh-huh.
21  Q.  And he made a change?
22  A.  Not a satisfactory change, but he made
23  the change.

Page 194

1  Q.  So you were not longer in violation of
2  the curriculum?
3  A.  We ended up with three schedules that
4  year before we got the final schedule.
5  Q.  Okay. Did you ever work under this
6  schedule?
7  A.  Huh-uh.
8  Q.  Did you ever work under the second
9  schedule?
10  A.  I don't believe so.
11  Q.  And I believe you told me a few
12  minutes ago that he finally just said
13  for you and Ms. Chaparro to make up
14  your schedule and that's the one you
15  worked under?
16  A.  Correct.
17  Q.  Okay. All right. Now would all this
18  have occurred before you went to see
19  Dr. Lee -- before you and Ms. Chaparro
20  went to see Dr. Lee?
21  A.  All of what occurred.
22  Q.  The changing of the --
23  A.  The changing of the schedules?

Page 195

1  Q.  Yes, ma'am.
2  A.  I believe so.
3  Q.  During the time that -- well, let me
4  ask you this: Have -- you're tenured,
5  are you not?
6  A.  Yes.
7  Q.  Or on continuing service status?
8  A.  Uh-huh.
9  Q.  Has that ever been changed in any way?
10  Once you obtained tenure you've always
11  had it?
12  A.  Uh-huh.
13  Q.  Continuing service status?
14  A.  Uh-huh.
15  Q.  Have you always received the
16  appropriate benefits; and when I say
17  benefits, I'm talking about personal
18  leave days, the entitlement to
19  insurance, any of those type --
20  sick days?
21  A.  You talking about just like sick days
22  and stuff?
23  Q.  Yes, ma'am.

Page 196

1  A.  Yes.
2  Q.  Okay. And have you ever had your
3  salary decreased?
4  Well, let me put it
5  this --
6  A.  My salary has been decreased before.
7  Q.  All right. When did that happen?
8  A.  Well, my salary was decreased when I
9  came from 10 and a half back to
10  10 months.
11  Q.  Okay. When did that happen?
12  A.  When I left the ALC and went to
13  Ladonia.
14  Q.  Okay. But you requested that
15  transfer, didn't you?
16  A.  Right.
17  Q.  Okay. As I understand salaries
18  they're on -- they're set by the State
19  and you're on steps or something like
20  that based on your years of experience
21  and your degrees. And have you always
22  been paid on the appropriate salary
23  level for your experience and degrees?

49 (Pages 193 to 196)



BARBARA M. JEFFERS - 10/15/2007

Page 197

1  A.   I hope so.  I mean, one time we got
2  extra money because we were not paid
3  at 100 percent of the matrix.
4  Q.   Okay.
5  A.   You know what I'm talking about?
6  Q.   Yes, ma'am.  But to your knowledge
7  you've never lost any benefits or lost
8  any salary, other than that change
9  from 10 and a half months back to 10?
10  A.   As far as I can remember.  I'm not
11  sure if I've lost salary because of
12  not having sick days to cover or not.
13  Q.   Okay.
14  MS. SMITH:  Exhibit 9, is it
15  floating around?
16  Q.   We talked about your medicals earlier.
17  And you told me that you had the visit
18  to St. Francis, and you told
19  Dr. Chokkar.  Have you had any other
20  hospital-related visits or hospital
21  visits or doctor's visits that you
22  attribute to Mr. Nacrelli's actions?
23  A.   Yes.

Page 198

1  Q.   And what are those?
2  A.   Back in that spring before I went to
3  hospital I went to see Dr. Law in
4  Auburn.
5  Q.   Uh-huh.  And what was that about?
6  A.   I told her that I was stressed out.
7  And I didn't tell her anything about
8  sexual abuse or anything like that.
9  And she sent me for blood test and all
10  that kind of thing, then put me
11  through some other tests, and put me
12  on Wellbutrin.  And I can't remember
13  if she put me on anything else at that
14  time.
15  Q.   I'm going to show you what was
16  supplied to me by your attorney as
17  medical records.  There's an East
18  Alabama Medical Center, a pharmacy and
19  Auburn Primary Care.  Is Auburn
20  Primary Care where you saw the
21  Dr. Law?
22  A.   It is.
23  Q.   Was that her office?

Page 199

1  A.   It is.
2  Q.   And I'm going to ask you to look at
3  those and see if there's anything
4  that's -- it's hard to say what's
5  missing, but are there any records
6  that you have, other than the
7  St. Francis records that aren't
8  contained in those records?
9  A.   Do I have any records other than the
10  St. Francis and these records?
11  Q.   Right?
12  A.   No, I don't.
13  Q.   Okay.
14  A.   I don't.
15  Q.   All of your medicals then that are
16  related to this case are confined to
17  the St. Francis records that I haven't
18  seen yet and these records?
19  A.   Uh-huh.  Yes.
20  Q.   Okay.
21  MS. SMITH:  I'd like to
22  introduce -- mark those
23  as Defendant's Exhibit 10

Page 200

1  and introduce them into
2  evidence.  Any objection?
3      (The referred-to document was
4      marked for identification as
5      Defendant's Exhibit No. 10.)
6  MR. EDDINS:  No objection.
7  MR. WILLIAMS:  My only
8  objection would be to the
9  extent to which the
10  plaintiff has the burden
11  to any civil case to
12  prove any reasonableness
13  and necessity of medical
14  bills.  If had any bills
15  contained therein, I
16  would object on that
17  bases.  Otherwise, I have
18  no objection.
19  MS. SMITH:  There's not.
20  These are just the
21  records themselves.
22  Let's stick this on
23  there and, Ms. Jeffers,

50 (Pages 197 to 200)



BARBARA M. JEFFERS - 10/15/2007

Page 317

1  spelling bee earlier. You have the
2  school spelling bee and then you go to
3  the district spelling and in between
4  you practice with the kids.
5  Q.  What about the building base
6  committee, when did that start?
7  A.  That's an all-year thing.
8  Q.  Did you actually start doing it while
9  Mr. Nacrelli was there?
10 A.  I can't remember when building -- but
11 first that year.
12 Q.  Emotion and retention committee, what
13 is that?
14 A.  When you get together at the end of
15 the year and you look at the kids that
16 the teachers are wanting to retain,
17 and you decide whether or not to
18 retain them or pass them -- promote
19 them.
20 Q.  So that would have been in spring of
21 '06 duty?
22 A.  Correct.
23 Q.  All right. Intercom would have

Page 318

1  started when the kids got back,
2  correct?
3  A.  Correct.
4  Q.  Did you ever complain to the -- the
5  interest groups that he replaced,
6  Mr. DeCruse?
7  A.  Mr. DeCruse replaced Mr. Screws.
8  Q.  Oh, he did?
9  A.  Uh-huh.
10 Q.  Who took over for Mr. Nacrelli?
11 A.  Jacquelyn Grant, who was the assistant
12 principal, was like the acting
13 principal.
14 Q.  All right. Well, did you ever
15 complain to Ms. Grant about these
16 extra duties after Mr. Nacrelli left?
17 A.  No.
18 Q.  Why not?
19 A.  I didn't think it did any good. I
20 already had them.
21 Q.  All these extra duties you just told
22 me about were assigned to you before
23 you ever afforded anything to Dr. Lee;

Page 319

1  is that correct?
2  A.  That's correct.
3  Q.  The schedule that you talked about
4  concerning your counselor student
5  ratio for your large groups. That
6  schedule is posted before you went to
7  report anything to Dr. Lee, correct?
8  A.  Yes. It was given out at the first
9  teacher meeting.
10 Q.  How many days do you claim -- strike
11 that. That's a bad question.
12 Aren't you claiming in
13 this lawsuit that you've lost any
14 income from your job as a result of
15 the sexual harassment alleged by you
16 because of Mr. Nacrelli?
17 A.  No. I'm not claiming I've lost income
18 per se.
19 Q.  You are going to be asked at some
20 point during the trial in this case to
21 explain to the jury how you've been
22 damaged. Can you tell me how you've
23 been damaged?

Page 320

1  A.  Yes. I feel like I have been damaged
2  my self esteem -- my self esteem has
3  been damaged. I feel like I've been
4  damaged emotionally. I think it took
5  a physical toll on me. I think it
6  caused me some health problems.
7  That's basically what I feel.
8  Q.  Is there anything else?
9  A.  Not that I can think of at this point
10 in time.
11 Q.  And did Sidney cover all the health
12 problems that you are complaining of
13 with the medical records?
14 A.  Yes.
15 Q.  Can you describe for me the physical
16 toll? Was that the same as the health
17 problem?
18 A.  That's the same.
19 Q.  All right. The self esteem and the
20 emotional history, are those one in
21 the same or are they two separate
22 items in this case?
23 A.  One in the same.

80 (Pages 317 to 320)




EXHIBIT D

EXCERPTS FROM THE DEPOSITION OF

JOAN CRAIG

JOAN K. CRAIG - 10/16/2007

Page 57

1  hours?
2  A.   Sometimes they would have them that
3  would be over -- stay overs.  But I
4  didn't do none of them.
5  Q.   Stay-overs, meaning an overnight?
6  A.   Uh-huh.
7  Q.   Okay.  You never --
8  A.   4-H camp, stuff like that.  I didn't
9  do them.
10 Q.   Now, how -- how many drivers serviced
11 Ladonia?
12 A.   All right.  Let me count them on my
13 fingers.
14 In the beginning --
15 Q.   All right.
16 A.   There was four.  All right.  Then six
17 come in.
18 Q.   And did that happen that year you got
19 the new bus; the '98 -- your bus 98-4?
20 A.   Within hat time frame, somewhere
21 about.  Yeah.  I think the other two
22 come in.
23 Q.   All right.  Did it change again?

Page 58

1  A.   Uh-huh.
2  Q.   When did it change again?
3  A.   Let me count them.  There was -- in --
4  I'll say maybe four years ago.
5  Q.   Okay.  What happened, did it go up or
6  down?
7  A.   More drivers.
8  Q.   Four years ago -- four school years
9  ago?
10 A.   Yeah.
11 Q.   Are we counting this school year?
12 A.   Yeah.  Cause -- 2000 -- this is
13 seven-eight, six-eleven, five-six
14 four-five.  '04/'05?
15 It might have been
16 '03/'04, somewhere about there.  But
17 --
18 Q.   How many did you go to?
19 A.   There's seven of us.
20 Q.   Are they're still seven now?
21 A.   Right today; yes, ma'am.
22 Q.   When you started there were four, then
23 we added two more?

Page 59

1  A.   Uh-huh.
2  Q.   Then we added another one?
3  A.   Uh-huh.
4  Q.   A total of seven?
5  A.   Yes, ma'am.  See, there have been so
6  many different drivers up there.
7  Q.   Uh-huh.
8  A.   Some that come in to replaced the ones
9  that's gone, stuff like that.
10 Q.   Yes, ma'am.
11 A.   So, you know, you have to kind of
12 figure time frame, it's hard to say.
13 Q.   I understand.  The increase I'm
14 assuming would be due to increase
15 student enrollment -- number of kids
16 you had to transport?
17 A.   I don't know.  I suppose.  I don't
18 know.  I can't really say.  I know how
19 my route runs, as far as how it
20 fluctuates, give or take a few.
21 Q.   Who sets up those routes each year?
22 A.   Make out our runs?
23 Q.   Yes, ma'am.

Page 60

1  A.   John Rudd.
2  Q.   Does he consult with you about your
3  runs?
4  A.   What are you -- what are you talking
5  about when you say consult and I'll
6  tell you.
7  Q.   Okay.  Well, let me just use an
8  example.  For this year --
9  A.   Uh-huh.
10 Q.   '07/'08 school year --
11 A.   Uh-huh.
12 Q.   He set up your route?
13 A.   Pretty much.
14 Q.   Did you have any -- did you give him
15 any suggestions or have anything to --
16 that influenced that route?
17 A.   Any input on it?
18 Q.   Yes, ma'am?
19 A.   I sure did.
20 Q.   Okay.  And did he incorporate or do
21 you --
22 A.   Me and Ms. -- me and Ms. Oaks had to
23 go down to bus shop in July of this

15 (Pages 57 to 60)




JOAN K. CRAIG - 10/16/2007

Page 61

```
1   year before we picked our buses up in
2   August and go over the route
3   descriptions with them.
4   Q.   Okay.
5   A.   So, I guess that's consult; right?
6   Q.   Yes, ma'am.
7   A.   All right.
8   Q.   Did -- did -- were any changes made
9   when y'all went down to the bus stop?
10  A.   Oh, yeah.
11  Q.   Okay.  Is that -- has that type of
12  process been used every year?
13  A.   Sometimes and sometimes not.
14  Q.   All right.  When it wasn't used, what
15  would be the process to establish a
16  bus route?
17  A.   How he'd give us our routes?
18  Q.   Yes, ma'am.
19  A.   Okay.  He gave us a piece of paper
20  where we was going to run.  Mine is
21  Woodland Drive from Sanford Road, from
22  this point A to B point.  I turn
23  around and I start coming back and
```

Page 62

```
1   pick up everything and anything
2   standing outside the road; whether
3   it's the high school or elementary.
4   Because they're standing there for a
5   bus.  And we're not allowed to leave
6   them beside the road having to pick
7   them up.
8   Q.   When you say he, are you referencing
9   Mr. Rudd?
10  A.   John Rudd.
11  Q.   Has Mr. Rudd been the bus supervisor
12  the entire time that you have been --
13  A.   He hired me.
14  Q.   Okay.  And he's always maintained that
15  position?
16  A.   Superintendent of all bus driver's
17  routes.
18  Q.   Did Mr. Nacrelli ever have any input
19  into your bus routes?
20  A.   Discipline on the routes area, yes.
21  Q.   Did he have any input, for lack of a
22  better term -- did he have any say so
23  about where you stopped on each route?
```

Page 63

```
1   What I'm trying to
2   establish is, did Mr. Nacrelli have
3   any involvement with you and Mr. Rudd
4   to establish your bus route for each
5   year?
6   A.   Okay.  Let me explain it like this to
7   you.
8   Q.   Okay.
9   A.   All right.  How do I want to say this?
10  If we was -- for instance, if we're
11  picking up the kids -- loading and
12  unloading kids at their house, and the
13  student is not out there.  For
14  instance, I'm going -- I'm going to
15  put in lay terms.
16  All right.  The students
17  not outside at their bus sop.
18  Q.   Yes, ma'am?
19  A.   Right.  And you go by and you stop,
20  open and close the door, and proceed.
21  Well, that student is not out.  So you
22  discuss it with Mr. Nacrelli, or the
23  -- whoever is going to do the
```

Page 64

```
1   discipline for that day; whether it's
2   Nacrelli, Ms. Grant, or Mr. Harper,
3   whoever is going to do the discipline
4   on the kids you discuss it with them.
5   They tell you well, don't pick them
6   up.  If they're not out there, don't
7   pick them up.
8   Then you got somebody
9   over here telling you, you stop at
10  that stop and that child is not out
11  there, do your normal thing of picking
12  up a student, and you pop your brake,
13  open your door.  If they're not there
14  you put your door -- don't shut it,
15  you pull it because you break in and
16  shut it and then go.
17  All right.  Nacrelli does
18  have a little say when you take it in
19  there and present it to him.  So,
20  yeah, I guess you could say he does
21  have a little bit of say about the bus
22  stops.
23  Q.   Okay.  But that's his only involvement
```




JOAN K. CRAIG - 10/16/2007

Page 65

1  then is what goes on at a bus stop?
2  A.  Once you unload, he can't -- he can
3  tell you -- when he unloads -- when
4  you unload the kids -- once the kids
5  unload and safely away from the bus,
6  then it's not Russell County's
7  responsibility.
8  When you pick them up,
9  from the time you get them until you
10  drop them off to their mom and daddy's
11  you're totally responsible for them.
12  Q.  Okay.  My question is --
13  A.  If it's unsafe bus stop and you take
14  it to him yeah, he has a say so, well,
15  don't do that.  Yeah, he'll have a
16  say.
17  Q.  Did he ever meet with you and Mr. Rudd
18  to you knowledge, or -- well, when you
19  and Mr. Rudd were together, did Mr.
20  Nacrelli ever meet with the three of
21  you-all to discuss what route -- the
22  two of you-all discuss what route you
23  would have for that year?

Page 66

1  A.  I don't recall.
2  Q.  You don't recall or you don't know
3  whether he met with -- he didn't, or
4  you just don't recall?
5  A.  I don't recall.  We've had so many
6  meetings for different things and
7  stuff.  It's hard to say specifically.
8  Your asking a specific question.  So I
9  don't recall.
10  Q.  Now, the field trips, how are they
11  assigned?
12  A.  To the drivers?
13  Q.  Yes, ma'am?
14  A.  All right.  The field trips goes
15  through a chain-of-command and
16  different folks have to sign off on
17  it.  The teachers does it -- starts it
18  and then it passes, and passes.
19  Okay.  Then when it's
20  related to the bus shop, they tell
21  them how many drivers they need.  Then
22  Teresa Smice or Patsy Prescott would
23  called me and tell me, Joanie, Ladonia

Page 67

1  is having a field trip.  They need
2  four drivers.  I'll say okay, I'll get
3  them for you.  So, when I'd go to
4  school that afternoon -- because they
5  called during the day, I'd go to the
6  school because we all congregate
7  together and we'd stand and I'll say
8  they're needing four drivers on field
9  trips, who wants to take it.  Anybody
10  could say I do, I do.  And if the say
11  well, are you going to take it?  I'll
12  say yeah, I'm taking it.
13  All right.  I will take
14  it.  Ms. McDaniels will take it,
15  Deborah Hensley would take it,
16  Julie Hearn would take it.  If they
17  needed four.  You know, whoever said
18  they wanted it, would go.
19  Well, then, the next go
20  around -- now, that's like if we was
21  going on a big one.  The next one
22  going around -- if it was a big one,
23  I'd go to them and say look, I'm not

Page 68

1  going to take one.  I'll let one of
2  y'all take it, whoever wants it.  And
3  then, whoever wanted to take it, is
4  the way we would do it.
5  Q.  Would the procedure or the process was
6  it that Teresa or Patsy would call you
7  and tell you that they needed
8  delivers?
9  A.  It wasn't a procedure or a process.  I
10  guess you would say it was something
11  that they go every field trip.
12  Q.  Every field trip then --
13  A.  The secretary of John Rudd calls a
14  certain bus driver at the school
15  system, whichever one it is.
16  Like right now, Tina is
17  calling Ms. Oaks.  And Ms. Oaks comes
18  out there and tells whoever about a
19  field trip.
20  Q.  Okay.  Well, from how many years did
21  -- were you the person they called?
22  How many years were you the contact?
23  A.  From the year I started it.

17 (Pages 65 to 68)

JOAN K. CRAIG - 10/16/2007

Page 69

1  Q.   From '92/'93 -- all right.  When did
2  Ms. Oaks become the person they
3  called?
4  A.   The last field trip I took is either
5  2002/2003 to Patterson Tree Farm Road.
6  And then after that, I ain't done
7  another one.  But I'm doing one this
8  Friday.  It's not a field trip though.
9  I'm doing a special run.
10  Q.   My question though is --
11  A.   When I quit doing them.
12  Q.   After the trip to --
13  A.   Patterson's Farm.
14  Q.   Did anybody from the bus shop call you
15  to tell you to set up -- that you had
16  -- you needed so many drivers?
17  In other words, when did
18  you seize to be or stop being the
19  person that the bus shop called to
20  arrange the drivers at Ladonia?
21  A.   When I probably went down there after
22  Patterson's Tree Farm -- went down
23  there for my monthly, I think Ladonia

Page 70

1  had another field trip, and I told
2  Tina -- I don't know her last name.
3  It used to be -- I can't pronounce it,
4  so I'm not going to try too.
5  Q.   What did you tell Tina?
6  A.   I told her -- she said, Joan, I got a
7  field trip going from Ladonia if you
8  want to take it.  I said I ain't
9  taking no more trips.  I -- I ain't
10  taking no more.
11  And I told Ms. McDaniels.
12  And they called her and asked her.
13  And she told no, she wasn't taking
14  none.  And she told them the reason
15  she wasn't taking none for the simple
16  reason she started her -- I guess
17  Social Security retirement.
18  Q.   Uh-huh.
19  A.   And started getting that, so she quit
20  doing them, too.
21  Q.   Did you tell Tina why you weren't
22  doing them anymore?
23  A.   No.  Sure didn't.  Just told her I

Page 71

1  wasn't taking them anymore.
2  Q.   Did you tell Mr. Rudd?
3  A.   No.  I didn't take it no more.
4  Q.   So, it's your testimony for the jury
5  that from 1992 to 1993 school year
6  until the trip to Patterson's farm, you were
7  Patterson's farm, you were the person
8  -- the contact person to determine who
9  would take what bus -- what bus driver
10  would take a field trip at -- from
11  Ladonia?
12  A.   Re -- re-say that again?
13  Q.   From 1992, 1993 school year?
14  A.   Uh-huh.
15  Q.   From that period of time until the
16  trip to Patterson Farm you were the
17  person that the bus shop would contact
18  and ask to arrange drivers for field
19  trips?
20  A.   Not ask me to arrange -- to ask me to
21  find out who would do it.
22  Q.   Okay.  All right.
23  A.   They asked me if I wanted it, I would

Page 72

1  tell them yeah.  If they ask me if I
2  wanted it and I would tell them no.
3  There was some trips I'd take, some
4  trips I wouldn't to give the other
5  drivers a chance.  I didn't hog them.
6  Q.   Right.  I understand.
7  A.   I tried to spread it around equally to
8  everybody who wanted it.  Stenson, we
9  asked him every time.  He never took
10  the field trips.  He said no, I don't
11  want none.  Hensley started taking
12  them.  She drives for Dixie now.  And
13  she does a lot of nursery.
14  Q.   So the -- but my question is:  From
15  '92/'93 until the Patterson, you were
16  the contact person?
17  A.   They could -- they'd call me and get
18  hold of me, and say, Joanie, we need
19  some drivers.  I would go to the
20  school that day and ask, yes.
21  Q.   Any and then after the trip to Rudd --
22  A.   Either in 2002 or 2003, I haven't done
23  any more.

18 (Pages 69 to 72)




JOAN K. CRAIG - 10/16/2007

Page 89

1  Q.   I'm talking about of a sexual nature?
2  A.   And he was talking about my legs. And
3  he talked about how he'd like to get
4  with me. That me and him could have a
5  good time. About how he would --
6  could turn me every which way but
7  loose, stuff like that.
8  Q.   All that occurred at this time on that
9  -- on that bus ride; is that correct?
10  A.   Pretty much, yeah.
11  Q.   Can you think of anything else he said
12  to you or did to you on that
13  particular bus ride?
14  A.   We left there at the stop sign when we
15  got back to Ladonia, and when I opened
16  the door and told him to get off he
17  closed the door and he told me that I
18  knew I really didn't want him to get
19  off. That I wanted him. I don't like
20  talking about this.
21  Q.   And I understand that but you've got
22  to tell me this morning about
23  everything that happened?

Page 90

1  A.   And I told him I said, Mr. Nacrelli, I
2  said, just get off of the bus. I need
3  to go home. Then he reached over and
4  put his hands on my hair talking about
5  what pretty hair I had -- have and all
6  this and how he'd like to get me in
7  bed.
8  So I went home and I
9  called my best friend and I told her
10  and she come over.
11  Q.   Who is your best friend?
12  A.   Cheryl Garry, but she's married. Her
13  name is Cheryl Turk.
14  Q.   And what did you and she discuss?
15  A.   I told her about Mr. Nacrelli and what
16  he'd done. And she wanted me to --
17  she told me that I should call and
18  report it. And I told her no, I
19  couldn't, I'd lose my job.
20  So we talked about it.
21  She stayed at the house with me until
22  it was time for me to go do my
23  afternoon run.

Page 91

1  Q.   Is there anything else you can
2  remember that Mr. Nacrelli --
3  A.   I remember a lot. I mean, I don't
4  remember specific dates, times. I
5  know where they happened, when they
6  happened. Some of it I remember the
7  dates.
8  Q.   Yes, ma'am. And what I'm trying to
9  establish is to have you tell me what
10  you're going to testify to at the time
11  we try this case. I believe in March?
12  I've asked you the
13  question and I want you to tell me
14  everything that you're going to say
15  about that incident?
16  A.   That one incident?
17  Q.   Yes, ma'am. I want you to tell me --
18  here today, everything you're going to
19  say about that one incident when we
20  get in the courtroom?
21  A.   We talked about how sick he was me.
22  And my friend, Cheryl, talked about
23  how sick Nacrelli was. And she told

Page 92

1  me that I should call and talk to
2  somebody. I told her no, I couldn't.
3  She says, well, why don't you call
4  your doctor and talk? I said no, you
5  can't do that.
6  Q.   Why couldn't you call your doctor?
7  A.   Because they'd probably want to put me
8  on pills and you can't take pills and
9  drive a bus.
10  Q.   Is there anything else you can
11  remember that Mr. Nacrelli said to
12  you?
13  A.   That day?
14  Q.   Yes, ma'am?
15  A.   That was it.
16  Q.   And you -- have you told me everything
17  that you said --
18  A.   That I can remember and everything I
19  told him.
20  Q.   You've told me everything that you can
21  remember that you told him that day?
22  A.   I told him to get off and leave me
23  along. I told him to keep his hands

23 (Pages 89 to 92)



JOAN K. CRAIG - 10/16/2007

Page 137

1  driver's kids. So, they switched them
2  up just a tad -- roadway or something.
3  I don't know. So, they done that.
4  Well, we went to school
5  the first day. That afternoon the
6  teacher brings her kids out. We load
7  up. And some of them didn't get home
8  like they were supposed to. So, I
9  guess somebody is in trouble. In
10 other words, parents calling because
11 their baby ain't got there.
12 Well, it kindly got next
13 to Mr. Rudd about it. And Ms. Oaks
14 told him that you was there. You know
15 the change was made and it wasn't --
16 it was a communication problem between
17 Rudd, Oaks, and Ladonia and whoever.
18 Because I wasn't in it.
19 All right. So they
20 called a meeting. John Rudd did at
21 Ladonia and he wanted get it straight.
22 All right. So he brought the big
23 county map, a big one. And we do

Page 138

1  color coordinate. I'm purple. All
2  right. And we all pick out our
3  colors. So what he wanted us to do is
4  to make our route description, so we
5  did.
6  All right. It was
7  John Rudd, me, Ms. McDaniels, all of
8  us drivers for Ladonia, Nacrelli and
9  Ms. Grant. All right. They got a
10 table like this sitting in a
11 conference room. There's a chair
12 there, two here, two there one there.
13 Ms. Grant was sitting here, Nacrelli
14 was sitting here and John Rudd was
15 standing -- standing at -- he was
16 sitting at that end down there. All
17 right. We all come in and Sara Allen
18 was there, I think Ms. McDaniels and
19 Ms. Baker, and I --
20 Q.   We're talking about bus driver, Ms.
21 Baker; not --
22 A.   Not that one.
23 Q.   Okay?

Page 139

1  A.   This here is the driver Baker,
2  Shirley Baker.
3  Q.   Okay?
4  A.   We all go in and as I come in,
5  Nacrelli stands up and says here, you
6  can sit here, Ms. Craig. So I walked
7  around behind Ms. Grant to sit down.
8  Al right. When I sit down they have
9  these chairs with arms and the chair
10 is on wheels. He gets behind me and
11 starts massaging my shoulders. So, I
12 just take his hand and kindly just
13 throw it off of me like that. Like,
14 get off of me.
15 Well, he walks around and
16 he goes over there where they have
17 these -- a love seat sitting over
18 here. So, he goes around there and he
19 sits over there. And Ms. Oaks she's
20 kindly talking and cutting up to him
21 and going over -- Mr. Rudd and all of
22 us sitting there talking and
23 everything, then we went over our

Page 140

1  routes.
2  All right. So, after
3  that that was the next time.
4  Q.   All right. Let me say -- that was on
5  August 8th or was it after that?
6  A.   It was after the eighth.
7  Q.   Okay. Do you recall, was it still in
8  August?
9  A.   It was either the ninth -- ninth or
10 10th. It was either the day after --
11 let me -- let me explain it like this
12 to you. We done the kids -- took them
13 home. And like I said, they didn't
14 get home like they were supposed to.
15 Q.   Right?
16 A.   So, I don't know if it was the next
17 day that we met or it was the next
18 weekday. Because it might have fell
19 on the weekend. See, that's what I'm
20 trying to say.
21 Q.   Okay. August '05, the eighth was a
22 Monday. So, it would have happened
23 that week then?

334.262.7556      Reagan Reporters, LLC      334.262.4437
www.ReaganReporters.com



JOAN K. CRAIG - 10/16/2007

Page 141

1  A.   So that -- it was probably that
2  Tuesday.
3  Q.   Okay.  Did Mr. Nacrelli do anything
4  other than massage your shoulders?
5  A.   No.  Because I reached up -- I took my
6  hand like this and done like that.
7  Q.   Did he say anything's to you?
8  A.   Huh-uh.
9  Q.   Did you say anything to him?
10  A.   Huh-uh.
11  MR. WILLIAMS:  Is that no,
12  just for the record?
13  THE WITNESS:  No.  No.  No.
14  No.
15  Q.   Okay.  And then what's the next time
16  then?
17  A.   That was the last.
18  MR. WILLIAMS:  I'm about to
19  eat this table soon.
20  MS. SMITH:  Uh?
21  MR. WILLIAMS:  If that's a
22  good stopping point, I
23  would suggest it's a

Page 142

1  great time to do it.  But
2  I'll leave it up to you.
3  MS. SMITH:  Okay.
4  A.   That was the last.
5  Q.   That was the last.  So, that would
6  have happened about August 9 or 10?
7  Okay.  And you've told me
8  -- I'll do this:  I'll ask you when we
9  get back, if you remember any other
10  instances.  But I think we've -- at
11  that point, we've covered everything
12  you can remember?
13  A.   That was pretty much --
14  Q.   Okay?
15  A.   To the best of my knowledge.
16  Q.   Okay?
17  MS. SMITH:  Y'all want me to
18  give y'all the Minnie's
19  address?
20  MR. WILLIAMS:  Yeah.
21  MS. SMITH:  Let me do that so
22  y'all can go find it.
23

Page 143

1       (Brief recess was taken at
2        12:24 p.m., and deposition
3        testimony reconvened at
4        1:35 p.m.)
5  Q.   Okay.  Ms. Craig, while we're on our
6  lunch break, did you think of any more
7  incidents of times when you felt that
8  Mr. Nacrelli had sexual harassed you?
9  A.   That was the last.
10  Q.   Okay.  So you didn't think of anything
11  else?
12  A.   No.
13  Q.   Now, did you report these allegations
14  to the school system?
15  A.   Well -- all right.  After I -- after
16  that meeting in August is around the
17  second to the last week of August when
18  I seen Ms. Baker at Ladonia, this
19  superintendent acting, assistant --
20  right now, this Ms. Baker.
21  Q.   Uh-huh.  Right.  Right.  Okay.
22  Ms. Lillian Baker?
23  A.   Lillian Baker, right.

Page 144

1  Q.   Okay?
2  A.   All right.  I seen her.  And I'd been
3  in Ms. Grant's office talking to her,
4  and she told me that I could go on in
5  there and talk to Ms. Baker.  So --
6  because she was in Mr. Nacrelli's
7  office, and I don't know where he was.
8  So I went in there and she was sitting
9  in Mr. Nacrelli's chair behind the
10  desk and I told her I needed to talk
11  to her.
12  Then -- so, I told her
13  that I felt like I was being -- that I
14  had been sexually harassed.  And she
15  asked me by who and I told her
16  Mr. Nacrelli.  And I was telling her
17  some of the incidents and stuff about
18  sitting in that room with Ms. Grant
19  and everybody and him putting his
20  hands on me there.  And I told her
21  about him standing in front of me at
22  that meeting on August the 3rd.  And so
23  while I was telling her, she's sitting

36 (Pages 141 to 144)




JOAN K. CRAIG - 10/16/2007

Page 145

```
1   in the chair, and it was like -- I
2   don't know if she was comprehending
3   what I was saying that -- when
4   somebody is telling you something like
5   that you need to stay awake; to me
6   it's important.
7   Q.   Uh-huh?
8   A.   And she sit there and nod off.  And I
9   told Ms. Baker -- I said to her, I
10  said Ms. Baker, I says I don't know
11  what to do.  She says -- she says,
12  Ms. Craig, she says I'll check into
13  all this and I'll get back with you.
14  So, I left assuming that she was going
15  to get back with me.  Well, nothing
16  occurred.  All right.  And --
17  Q.   Why was -- let me just stop you there?
18  A.   I don't know what she was doing, why
19  she was there, but she was.
20  Q.   Was this --
21  A.   It was in August.
22  Q.   August of '05?
23  A.   Right.
```

Page 146

```
1   Q.   Okay.  Do you know roughly when in
2   August early, late?
3   A.   It was in -- closer towards September.
4   Q.   Okay.  Okay.  Go ahead.  Excuse me?
5   A.   All right.  So in September I hadn't
6   heard nothing.  So -- all right.  In
7   October I come to the central
8   office -- wait a minute -- wait a
9   minute.  Let me back that up.
10  I went in there and I was
11  talking to Ms. Grant.  I didn't come
12  out and tell her nothing that I had
13  told Ms. Baker and I didn't tell
14  Ms. Grant what I went through.  I told
15  Ms. Grant that I wanted to know who
16  was the steward rep for the Union.
17  And she said that she believed it was
18  Barbara Jeffers, or I could go ask
19  Ms. Jeffers, or whatever, or
20  Ms. Parish; Ida.  Is it Illa or Ida?
21  Q.   Illa?
22  A.   Illa Parish.  All right.  So I went in
23  the front office and asked Ms. Parish
```

Page 147

```
1   because I knew that she used to be it
2   up at Ladonia.  All right.  And I
3   asked her -- I said Ms. Parish, are
4   you still the steward rep for the
5   Union.  She says huh-uh.
6   Gwendolyn Lewis.  I says all right.
7   She says you got a problem?  I said
8   no.  That's all right.  I was just
9   wondering who it was.  So, I walked
10  down to Ms. Lewis' room.
11  And I can't recall if
12  Coach Ross was either in there or he
13  come in there while me and her were
14  talking.  I think he might have been
15  in there.  And when me and her were
16  talking, I was telling her about it.
17  And she told me to call Dr. Lee.  I
18  said okay.
19  She said go call Dr. Lee
20  -- go talk to Dr. Lee.  So --
21  Q.   When was this, best you can place it;
22  August, September, October, when?
23  A.   I believe it was the first part of
```

Page 148

```
1   October.
2   Q.   Okay?
3   A.   Because I hadn't heard back from
4   Ms. Baker.
5   All right.  So, I went to
6   Dr. Lee's office and she wasn't there.
7   She was gone.
8   All right.
9   Barbara Gunter set me up an
10  appointment for Wednesday.
11  Q.   What day?
12  A.   The 12th.
13  Q.   October 12?
14  A.   Right.
15  Q.   Okay?
16  A.   All right.  October the 12th -- and
17  the reason I know it was October the
18  12th that was mine and my ex-husband's
19  anniversary.  October the 12th, I went
20  down there -- no.  No.  No.
21  Q.   Okay?
22  A.   Okay.  October the 12th, I was on my
23  school bus.  And John Rudd called me
```

334.262.7556        Reagan Reporters, LLC        334.262.4437
www.ReaganReporters.com



JOAN K. CRAIG - 10/16/2007

Page 153

1  is as important -- should be as
2  important to you, as it is if I was on
3  of your teachers or somebody. Because
4  after all, I do haul the kids to and
5  from school. So, I was felt like she
6  was avoiding me.
7  All right. So, finally,
8  I go meet with her.
9  Q.   And what --
10  A.   October the 25the, is when I get my
11  meeting.
12  Q.   Why was the 19th --
13  A.   I have no idea.
14  Q.   Well, how did you find out it was
15  cancelled?
16  A.   Barbara called.
17  Q.   Barbara called you?
18  A.   (The witness nods head.)
19  Q.   When did Barbara call you?
20  A.   During the day -- that day -- the day
21  before I think.
22  Q.   Okay?
23  A.   All right.

Page 154

1  Q.   Did she tell you why?
2  A.   No. She just said that -- that she
3  would have to reschedule. That
4  Dr. Lee wouldn't be in the office.
5  Q.   All right. Excuse me. I didn't mean
6  to interrupt. Go ahead?
7  A.   All right. So, I go meet with Dr. Lee
8  on the 25th. But I told Barbara that
9  I didn't care if I seen her in the
10  office or wherever that I'd go to a
11  board meeting and just let everybody
12  know that I was fed up. I needed to
13  see her; is what I said.
14  All right. So, I did get
15  to see her, but it wasn't one-on-one.
16  She asked if I mind if this lady sit
17  in there with us, named Walmack or
18  something like that. I didn't have a
19  problem with it because I needed to
20  let somebody know what I've been going
21  through. I mean, I was to the point I
22  had to let somebody know.
23  Q.   What time of day did y'all meet?

Page 155

1  A.   Well, we were supposed to meet at nine
2  o'clock. But according to her, I got
3  there early, and I did get there
4  early. I got there at 8:30, quarter
5  till. Because as soon as I dropped my
6  bus at the house, I hopped straight in
7  my vehicle, went straight down there.
8  Because I was in urge to see her. And
9  so I had to sit out in the little
10  waiting room until she finished. So,
11  I believe I got in her office about 10
12  after 9:00. But she let me know I was
13  early that -- for my appointment. But
14  then on the book I think it said that
15  I was supposed to be there at 11:30.
16  Q.   Okay. So, you met with her about
17  9:10; right?
18  A.   Between 9:00 and 9:30, yeah -- yes,
19  yes.
20  Q.   Was it 9:10, or --
21  A.   Around 9:10 she called me. I think
22  took me to her office.
23  Q.   Okay. And you say Ms. Walmack was

Page 156

1  there?
2  A.   Uh-huh. Yes, ma'am.
3  Q.   Janet Walmack?
4  A.   Yes, ma'am. I guess that's her name.
5  Q.   How long where you in there; if you
6  can recall?
7  A.   Long enough for me to tell her some of
8  the incidences. And she told me she'd
9  get back with me.
10  Q.   Tell me as best you can what that --
11  what she said and what you said, and
12  did Walmack -- did Dr. Janet Walmack
13  say anything?
14  A.   She just sat there.
15  Q.   Okay. So, we can say that --
16  Dr. Walmack didn't participate?
17  A.   She didn't.
18  Q.   She just listened?
19  A.   No. She just listened.
20  Q.   Okay. All right. Well, what did --
21  what did you tell Dr. Lee and what --
22  A.   I told Dr. Lee that I was having
23  problems with Mr. Nacrelli. And that

39 (Pages 153 to 156)




EXHIBIT E

EXCERPTS FROM THE DEPOSITION OF

CHARLES NACRELLI

**American Court Reporting**
**toll-free (877) 320-1050**     *Nacrelli Deposition*

Page 41

1  somewhere, I'm sure, that if I couldn't
2  find it somewhere -- so that's possible,
3  yes.
4       Q.  And would you have had a list
5  at the school?
6       A.  Of all the addresses?  Not
7  necessarily.  I might have had their phone
8  numbers, but not their addresses.
9       Q.  At the school, would you have
10  had the address of Ms. Jeffers?
11      A.  I'm sure it was there
12  somewhere, yeah.
13      Q.  What about Ms. Gaston?
14      A.  I'm sure.  Like I said, if I
15  had one, I'm sure I could find any of
16  them, yes, sir.
17      Q.  Now, you say you could look it
18  up in the phonebook?
19      A.  Right.
20      Q.  Would Ms. Jeffers' name be
21  listed in the phonebook?  Do you know?
22      A.  Probably not.
23      Q.  Do you know if most of these

Page 42

1  females would be listed?  Would there be
2  an Allison Gentry listed in the phonebook?
3       A.  Well, no.  I mean, some, I know
4  the husbands, so I would know it.  I would
5  just find the address wherever I could
6  find the address to compose the list, and
7  if it was at school that we found it, then
8  yes.
9       Q.  Well, did you find some at the
10  school?  That's my question.
11      A.  Probably.
12      Q.  Okay.  Do you know an Emily
13  Jones?
14      A.  I do.
15      Q.  How do you know her?
16      A.  Emily was a teacher at Ladonia
17  Elementary, and then I believe she is now
18  a teacher at Oliver Elementary.  She
19  transferred over there.
20      Q.  Was she a teacher at Ladonia
21  Elementary Brenda Coley's last year as
22  assistant principal?
23      A.  Yes, sir.

Page 43

1       Q.  And did you send her an
2  invitation to this party in July of 2005?
3       A.  As far as I know, I sent all of
4  the teachers invitations, and then even
5  some of the ones that had transferred to
6  other schools that Brenda said, hey,
7  you know, can you invite such and such or
8  one teacher -- my wife was taking a class
9  at a community college, and she said, I
10  want to come, and she said, well, what's
11  your address and I'll make sure, you know,
12  you get the --
13      Q.  Who prepared the invitations?
14      A.  My wife and I.
15      Q.  All right.  Where did you
16  prepare them?
17      A.  At home.
18      Q.  Was it on card stock or just a
19  piece of paper?
20      A.  I think that Jerrie, my wife,
21  made something on the computer, some kind
22  of design, and then we mailed that out.
23      Q.  Okay.  And where did you get

Page 44

1  the stamps?
2       A.  The post office.
3       Q.  Who paid for them?
4       A.  Oh, I did.  Yes, sir.
5       Q.  Okay.  Where did you get the
6  envelopes?
7       A.  Again, my house.  I paid for
8  that.  This was not a school function.
9  This was mine, so it was my money.
10      Q.  Do you know a Bertha Alexander?
11      A.  I do.
12      Q.  How do you know her?
13      A.  She is a first grade teacher, I
14  think, retired from Ladonia Elementary.
15      Q.  Okay.  When did she retire?
16      A.  She retired June before I left.
17  So I left in September, so she retired
18  that June.  That was her last year.
19      Q.  June before the July party?
20      A.  Yes, sir.  Yes, sir.
21      Q.  And did you send her an
22  invitation to this party?
23      A.  As far as I know.  I thought --

11 (Pages 41 to 44)



**American Court Reporting**
**toll-free (877) 320-1050** Nacrelli Deposition

Page 53

1    A.  No, not that I remember.
2    Q.  Okay.  How was the food paid
3  for, other than what was brought by
4  guests?
5    A.  Not counting what the guests
6  brought, my wife and I.
7    Q.  Okay.  Do you recall, were
8  there any members of the PTA who were
9  there who were not teachers or staff,
10 Ladonia PTA?
11   A.  I don't believe so, no, sir.
12   Q.  Were there any PTA funds used
13 in any way for the party?
14   A.  No, sir.
15   Q.  Okay.  Was there any school
16 money used in any way for the party?
17   A.  No, sir.
18   Q.  Did any individual contribute
19 any money toward the expenses for the
20 party, other than you and your wife?
21   A.  No, sir.
22   Q.  Do you remember what Brenda
23 Coley was wearing that night at the party?

Page 54

1    A.  Not off the top of my head.
2  Slacks and a shirt.
3    Q.  Okay.  How about Jamie Evans?
4  Do you remember what she was wearing?
5    A.  She wore shorts and a shirt.  I
6  think she also was swimming, so she had a
7  bathing suit on also.
8    Q.  Do you recall what color the
9  shirt was?
10   A.  No, sir.
11   Q.  Do you remember what your wife
12 was wearing?
13   A.  No, sir.  I -- no.
14   Q.  There have been a lot of
15 allegations about your conduct that night.
16 I'm just going to ask you some specific
17 things, and I want you to tell me if you
18 did or did not do them and whether you
19 remember or whatever.
20       Ms. Coley testified that you
21 kissed her out by the pool.  She said that
22 under oath.  Is that true or false?
23   A.  That is true.

Page 55

1    Q.  Okay.  Tell me about it.  What
2  did you do and why did you do it?
3    A.  I believe it's after -- toward
4  the end of the party, and she and her
5  husband were leaving, and my wife gave her
6  husband Ken a kiss and a hug goodbye, and
7  we were congratulating them, and I did the
8  same thing to Brenda.
9    Q.  Your wife kissed Mr. Coley?
10   A.  Yes.
11   Q.  Did she kiss him on the mouth
12 or on the lips?
13   A.  Probably.
14   Q.  You don't remember?
15   A.  Specifically, no.
16   Q.  Okay.  Did you stick your hand
17 down Allison Gentry's blouse or top?
18   A.  No, not that I remember.
19   Q.  Not that you remember.  You
20 just said you had five or six drinks.
21   A.  Yes, sir.
22   Q.  Were you drunk?
23   A.  Yes, sir.

Page 56

1    Q.  You were drunk?
2    A.  Yes, sir.  I believe that would
3  be a good way to describe it, yes, sir.
4    Q.  Okay.  In that case, you
5  wouldn't deny that you stuck your hand
6  down Allison Gentry's top?
7    A.  You're asking me to make a
8  guess at something I do not remember one
9  way or the other.  So I'm not able to say
10 yes or no.
11   Q.  All right.  I'm just asking you
12 would you deny that you stuck your hand
13 down Ms. Gentry's top?
14   A.  I'm not going to deny it, no.
15   Q.  Okay.  Do you recall pulling
16 the top down on Jamie Evans' swimsuit?
17   A.  I do not recall that, no.
18   Q.  Do you recall attempting -- or
19 pulling the bottom down on her two-piece
20 swimsuit?
21   A.  I do not recall that, no.
22   Q.  Okay.  Do you recall grabbing
23 Jason Hopper in the crotch that evening?

14  (Pages 53 to 56)




**American Court Reporting**
**toll-free (877) 320-1050**

*NACRELLI Deposition*

---

Page 89

1  Ms. Joanie Craig?
2      A.  Correct.
3      Q.  Did you know her as a teacher
4  when you were a teacher or just when you
5  were principal?
6      A.  I knew her as a bus driver.  I
7  believe she was a bus driver even when I
8  was a teacher, yes, sir.
9      Q.  I'm sorry.  I was talking about
10  when you were a teacher.  Did you know her
11  at that time?
12      A.  I believe she was -- yeah, she
13  was a bus driver at that time.
14      Q.  Okay.  There was some
15  discussion this morning about scheduling
16  and positioning of buses and things like
17  that.  What part did you, as principal,
18  play in deciding where buses would line up
19  and that sort of thing?
20      A.  None.  I did not schedule that.
21  That was either set by the bus drivers
22  themselves or Mr. Rudd, and they would
23  line up according to who would go out

Page 90

1  first and turn in what direction and
2  wouldn't have to turn against the flow and
3  what was the most optimal.  So I had
4  nothing to do with the buses, how they
5  lined up.
6      Q.  Did you go out there in the
7  morning or afternoons when the buses --
8      A.  I tried to go out at one time
9  or another, according to how I set my
10  schedule up.
11      Q.  At one time or another.  Now,
12  do you mean once a day, or what do you
13  mean by one time or another?
14      A.  If my schedule was set up --
15  and the last several years, what I tried
16  to do is, so that I could see all the
17  children -- the buses that came in in the
18  morning, as much as possible, I would be
19  outside, so I could see the kids when they
20  got off in the morning.  But then in the
21  afternoon, I would be at the car rider
22  section so I could see those children that
23  went back and forth by cars.  This way, I

Page 91

1  was able to have as much exposure to the
2  children as possible each day.
3      Q.  How many bus routes were there
4  that went to and from Ladonia Elementary?
5      A.  Five or six.  I do not remember
6  exactly.
7      Q.  Were the bus drivers assigned
8  to a particular school?
9      A.  Yes, sir, they were.
10      Q.  Now, I think it was discussed
11  at some point earlier or I had some
12  information anyway that there were seven
13  bus drivers assigned to Ladonia?
14      A.  There may be.  There may be.
15      Q.  Now, would you know all seven
16  of those persons personally?
17      A.  At that time, I would.  It's
18  been two years, so I don't remember a lot
19  of them, but --
20      Q.  When you were principal, did
21  you know all the bus drivers personally?
22      A.  Yeah, I did.
23      Q.  Now, were bus drivers evaluated

Page 92

1  at all?
2      A.  I'm assuming they were, yes.
3      Q.  Did you ever have any input
4  into any evaluations?
5      A.  No.
6      Q.  Mr. Rudd would never call you
7  and say, how is so-and-so doing?
8      A.  No.
9      Q.  Do you know if Ms. Coley ever
10  had any input into any evaluations?
11      A.  I do not know.
12      Q.  You never assigned her the task
13  of helping in the evaluation of the bus
14  drivers?
15      A.  No.  We don't evaluate bus
16  drivers.  That was Mr. Rudd's job.
17      Q.  Do you recall at some point in
18  time when you were principal at Ladonia,
19  riding with Ms. Craig to a bus stop where
20  she had reported to you that students were
21  disrupting or were not getting on in the
22  right order or something like that?
23      A.  That's possible.

23 (Pages 89 to 92)

**www.AmericanCourtReporting.com**
**October 30, 2007**




EXHIBIT F

EXCERPTS FROM THE DEPOSITION OF

REBECCA LEE

# American Court Reporting
## toll-free (877) 320-1050

*Lee Deposition*

---

Page 13

1  lawsuit had been filed. But while you were
2  superintendent, do you ever recall a class
3  on sexual harassment?
4      A.  Well, again, we covered it
5  usually on institute day where all the
6  employees were there and everybody would
7  have been given the benefit of that.
8      Q.  There was a specific class in
9  2006. Did you have one in 2004 or 2005?
10     A.  When you say specific class,
11 what do you --
12     Q.  An hour or so with literature
13 dedicated specifically to sexual harassment?
14     A.  Well, employees were given
15 information on it. It was addressed in the
16 policy manual and it was addressed in the
17 handbook.
18     Q.  Well, I asked for documents from
19 any sexual harassment seminars that y'all
20 had had in Russell County in the last -- I
21 can't remember -- but I didn't receive any
22 from the time that you were superintendent.
23 Did Ms. Smith overlook something?

Page 14

1      A.  Well, I don't know. All I can
2  tell you is that we would typically address
3  it during institute where you have various
4  speakers. While everyone was in the general
5  session or all employees were there, we
6  would typically cover it in that way. But
7  to have a separate session, I don't recall
8  doing that.
9      Q.  If you run across any material
10 or anything that was handed out at any time
11 while you were state superintendent, would
12 you give it -- not state -- I mean --
13     A.  I wish I were.
14     Q.  I mean, Russell County
15 superintendent. Are you sure you wish you
16 were?
17     A.  It's a challenge.
18     Q.  If you run across any of that or
19 if you will look for it, would you give it
20 to Ms. Smith to give to me?
21     A.  I will.
22     Q.  Now, do you know, when you were
23 Russell County superintendent, if the

Page 15

1  Russell County Board of Education had a
2  policy on sexual harassment, had a specific
3  policy?
4      A.  Yes, there was a policy.
5      Q.  On discovery Ms. Smith presented
6  me with --
7          MR. EDDINS:  Would you mark that
8  Plaintiffs' Exhibit 1?
9          (Whereupon, a document was
10 marked as Plaintiffs' Exhibit 1 and is
11 attached to the original transcript.)
12     Q.  (By Mr. Eddins)  What we marked
13 as Plaintiffs' Exhibit 1, would that be the
14 sexual harassment policy that was in place
15 while you were Russell County
16 superintendent?
17     A.  It looks like the correct
18 policy.
19     Q.  Would you look at the second
20 page? It says this was a -- I thought
21 someplace it said it was adopted in 1995.
22 But, at any rate, this is the policy that
23 Russell County Board of Education had on

Page 16

1  sexual harassment; is that correct?
2      A.  Yes.
3      Q.  And it's listed as file number
4  or policy number GAJDBH; is that correct?
5      A.  That's correct.
6      Q.  And in Paragraph 1A, it says no
7  employee of the school system shall be
8  subjected to sexual harassment. Just tell
9  me in lay terms what that means.
10     A.  Tell me where you're referring
11 again. Where on here?
12     Q.  Where it says 1A -- actually,
13 the second sentence. Just generally tell me
14 -- what I'm asking is what the sexual
15 harassment policy states.
16     A.  The policy, as best I can tell,
17 is saying that no employee should be
18 subjected to sexual harassment on the job,
19 that it shouldn't be permitted.
20     Q.  Does this policy relate to both
21 students and employees or just employees?
22     A.  This policy was employees, as
23 far as I know. Now, we have -- the students

4 (Pages 13 to 16)




**American Court Reporting**
**toll-free (877) 320-1050**

*Lee Deposition*

---

Page 41

1  schedule had been changed at the beginning
2  of the 2005-2006 year?
3      A.  I think she referenced that,
4  yes.
5      Q.  Did your investigation indicate
6  that that charge was substantial?
7      A.  There would have been a change
8  that year with counselors in all the
9  elementary schools.  So I'm sure hers was
10  also changed as well, because she was
11  counselor at elementary.
12      Q.  What changes would have been
13  made by all?
14      A.  What we had looked at in the
15  elementary schools -- and I had addressed
16  this with the elementary principals prior to
17  this.  We were looking at a more structured
18  schedule for counselors in trying to provide
19  -- in Russell County because we are not a
20  wealthy district, we didn't have a lot of
21  support personnel.  So we were trying to
22  assure that all of the children were
23  receiving the counseling services that we

Page 42

1  felt like they needed.  So there was more of
2  a structured schedule than the counselors
3  had been used to before that.
4      Q.  Well, specifically, Ms. Jeffers
5  had taught skills classes in previous years,
6  hadn't she?  Do you know?
7      A.  I'm sure she had, yes.
8      Q.  In this particular year, her --
9  the number of students that she had
10  basically was doubled, and I think her
11  complaint was that it was -- that she was
12  forced to teach classes larger than are
13  allowed by law.  Do you remember or do you
14  recall anything about that?
15      A.  I don't recall specific numbers
16  on the class size that Ms. Jeffers had.  I
17  will say this.  In terms of numbers for
18  classes, the way that the state looks at it
19  is, if you're within your -- if you've got
20  your earned units in place, then class caps
21  are flexible.  In other words, there's not
22  an automatic cutoff for how many -- and this
23  would apply for teachers as well.  In other

Page 43

1  words, if the class cap says 18 but you've
2  got all your units in place, they can have
3  more than that, and you're not in violation.
4      Q.  In a particular class.  Is that
5  what you're saying?  School-wide, if you
6  have 18, then one class could have 20 and
7  one class 16.  Is that what you're saying?
8      A.  You would want to balance that
9  if that was the case.  But what I'm saying
10  is, teachers or counselors, if the person
11  had more than their 18 that the law -- that
12  the provision -- it's within the
13  administrative code.  If it would -- if they
14  had more than 18, which is the preferred
15  class cap in K through 3, they could.  They
16  could have that.
17      Q.  Could they have two classes, a
18  counselor teach two elementary classes if
19  the teacher -- one teacher had 16 students
20  and the other had 18, could a counselor then
21  have 34?
22      A.  Well, I don't think you would
23  want to do that.  I'm just saying you could

Page 44

1  exceed the 18.  It was not unusual for
2  teachers and/or counselors to have more than
3  the 18, depending on the staff available.  I
4  think you would reach a point that would be
5  excessive, that you would not want to go
6  above.
7      Q.  Would you say double classes
8  would be excessive?
9          MS. SMITH:  Object to the form
10  of the question.
11      A.  I'd have to know -- rather than
12  -- what number are we talking about?  Then
13  you can deal with it a little more
14  effectively.
15      Q.  Okay.  In Paragraph 4 it says:
16  Your actions have presumably violated the
17  constitutional rights of certain employees
18  of Russell County Board of Education.  Now,
19  what did you mean by that?
20      A.  There appeared that there had
21  been a violation of laws that govern, at the
22  federal level, sexual harassment.
23      Q.  Okay.  Your notice goes on to

11 (Pages 41 to 44)




# EXHIBIT G

# EXCERPTS FROM THE DEPOSITION OF

# LILLIAN BAKER

**American Court Reporting** BAKER DEPOSITION
**toll-free (877) 320-1050**

Page 17

```
1    Q.   Okay.  What various sites?
2    A.   School sites.  Because there
3  are policies -- there should be two
4  policy manuals in each -- at each site,
5  one in the principal's office and one
6  accessible to the employees at the
7  school, probably in the library, the most
8  accessible place.
9    Q.   So the only way a teacher, for
10 instance, would know that there is a
11 policy on, say, smoking on school
12 grounds, they would have to go to the
13 library and look at the policy?
14   A.   No.  Remember what I said to
15 you.
16   Q.   Okay.
17   A.   That every time there was a
18 proposed policy, it is posted in -- at
19 every site.  Now, we can't make teachers
20 go there and read them, but they are
21 posted.
22   Q.   Oh, they are posted?  They're
23 not --
```

Page 18

```
1    A.   Yes.  At every site.
2    Q.   So they are not actually given
3  to a teacher --
4    A.   And then --
5    Q.   -- or a support person?
6    A.   -- after the policy has been
7  approved, it is placed into the policy
8  manual.  Okay.  And every teacher knows
9  and has access to a copy of the policy.
10 There is one in the principal's office;
11 there is one in the library.  We don't
12 give every teacher a copy of the policy
13 manual book because it's spoken.
14   Q.   So in other words, the teacher
15 or the support people are not given
16 actual copies of the --
17   A.   Of the manual.
18   Q.   -- policies?
19   A.   Of the policy manual.  But
20 it's accessible.
21   Q.   Okay.  Are the teachers and
22 support people of Russell County given
23 copies of policies of the School Board?
```

Page 19

```
1    A.   Not in --
2    Q.   That's a yes or no question.
3  You can explain it.  But...
4    A.   Not every teacher is given a
5  copy of the manual that contains the
6  policies.
7    Q.   Thank you.
8        Now, are some -- are any
9  policies distributed to the teachers and
10 parents or --
11   A.   The teachers and parents get a
12 copy of the student code of conduct.
13   Q.   Okay.  I'm going to show you a
14 document that -- I'm going to introduce
15 part of it in evidence in just a minute
16 -- which is entitled Student Academic
17 Plan and Statement of Responsibilities, A
18 Handbook for School Personnel, Parents
19 and Students.
20   A.   Yes.
21   Q.   And this particular one has
22 2007-2008.  Now, is this document
23 distributed to all the teachers --
```

Page 20

```
1    A.   Yes.
2    Q.   -- in this system?
3    A.   Yes.
4    Q.   Is it distributed to all of
5  the support people?
6    A.   Yes.
7    Q.   Okay.  So --
8    A.   Let me tell you this:  The
9  copies are sent to the principals for
10 distribution.
11   Q.   Okay.  And it's the
12 responsibility of the principal to make
13 certain --
14   A.   To get them out.
15   Q.   Okay.  Does Russell
16 County generally -- would you say that
17 the school system has a very strong
18 principal system?
19      MR. SMITH:  Object to the form
20 of the question.
21      You can answer it if you know.
22   A.   Repeat your question.
23   Q.   I'll just rephrase it.  Do
```

**www.AmericanCourtReporting.com**
**October 17, 2007**




**American Court Reporting** BAKER Deposition
**toll-free (877) 320-1050**

Page 85

1  object to the question and instruct her
2  not to answer unless you're going to
3  include the fact in your question
4  applicable laws of which she has
5  knowledge.
6      MR. EDDINS:  Okay.
7      Q.  Involving any applicable laws
8  of which you have knowledge.
9      A.  I don't have knowledge of what
10  applicable laws you're referring.  I
11  don't know what applicable laws you are
12  referring.
13     Q.  Well, I mean, you're the
14  personnel director, the Title IX
15  Coordinator who's in charge of
16  investigating these complaints and you
17  don't know what applicable laws in this
18  policy relates to --
19     A.  I'm not sure.
20     MS. SMITH:  Object to the form
21  of the question.
22     Q.  Is that correct?
23     A.  I'm not sure of the applicable

Page 86

1  laws you are referring.
2      Q.  You said you were not involved
3  in the investigation of Ms. Craig's
4  complaint; is that right?
5      A.  That is correct.  I wasn't.
6      Q.  Who investigated that
7  complaint?
8      A.  Dr. Lee spoke with Ms. Craig.
9  I've never spoken with Ms. Craig
10  regarding the allegations.
11     Q.  Well, did anybody interview
12  any potential witnesses or anything like
13  that?  Do you know?
14     A.  Potential witnesses?
15     Q.  Right.
16     A.  Witnesses for what?
17     Q.  To any of the alleged
18  incidents of sexual harassment.
19     A.  I instigated --
20     MS. SMITH:  Excuse me.  I
21  object to the form of the question.
22  Which sexual harassment?
23  Ms. Craig?  Ms. Jeffers?

Page 87

1      MR. EDDINS:  I said Ms. Craig.
2  We were talking about Ms. Craig.
3      A.  I don't know.  I wasn't
4  involved in Ms. Craig's investigation.
5      Q.  But you're the Title IX
6  Coordinator.
7      A.  I wasn't directed to
8  investigate her.
9      Q.  Okay.  But you were directed
10  to investigate Ms. Jeffers, weren't you?
11     A.  I have statements from
12  Ms. Jeffers.
13     Q.  But you didn't consider
14  Ms. Craig's to be --
15     A.  I was not directed to
16  investigate Ms. Craig.
17     Q.  Okay.
18     A.  I did as directed.
19     MS. SMITH:  Object to the form
20  of the question regarding whether she
21  considered it to be important or not.
22     Q.  Do you know Joan Craig?
23     A.  Yes.

Page 88

1      Q.  Do you know Barbara Jeffers?
2      A.  Who?
3      Q.  Barbara Jeffers.
4      A.  Yes.
5      Q.  Do you know Charles Nacrelli?
6      A.  Yes.
7      Q.  Okay.  How do you know
8  Ms. Craig?
9      A.  The bus driver.
10     Q.  How long have you known her?
11     A.  I've known her for years.
12     Q.  Do you see her often?
13     A.  Not often.
14     Q.  Do you recall a time in August
15  of 2005 meeting with Ms. Craig at Ladonia
16  School about the allegations of sexual
17  harassment by Mr. Nacrelli?
18     A.  No.
19     Q.  You don't recall that?
20     A.  No.
21     Q.  Are you saying that it never
22  took place?
23     A.  I have never spoken with

22  (Pages 85 to 88)

**www.AmericanCourtReporting.com**
**October 17, 2007**

**American Court Reporting** ~Bakcen Deposition~
**toll-free (877) 320-1050**

Page 89

1  Ms. Craig regarding allegations of
2  Mr. Nacrelli.
3      Q.   You're certain of that?
4      A.   I'm sure of that.
5      Q.   Well, she testified yesterday
6  that y'all spoke.  And was she lying?
7      A.   I have never spoken with her
8  regarding allegations of Mr. Nacrelli.
9      Q.   What did you say?  I'm sorry.
10     A.   I said I have never spoken
11  with regarding allegation of
12  Mr. Nacrelli.
13     Q.   Do you frequently go to the
14  schools?
15     A.   I'm in the schools pretty
16  often.
17     Q.   Have you ever met with
18  Ms. Craig individually for any reason?
19     A.   I met with her regarding an
20  issue with a student.
21     Q.   Okay.  When was that?
22     A.   That was in '05 at Ladonia.
23     Q.   What was that issue?

Page 90

1      A.   I think a parent had accused
2  her of not letting a child get on the
3  bus.  It was something regarding the
4  student on the bus and the mom was upset.
5      Q.   What was the result of that
6  meeting?
7      A.   I think the mother was okay
8  with it after we tried to explain to her
9  that Ms. Craig was concerned about the
10  safety of the children.
11     Q.   Well, I mean, did you take any
12  action?  Did you talk with the mother or
13  talk with Ms. Craig later or do anything?
14     A.   I talked with both.
15     Q.   Did you take any action?  Did
16  the Superintendent or the principal take
17  any action after the meeting?
18         MS. SMITH:  Object to the form
19  of the question.
20         You can answer.
21     Q.   If you know.
22     A.   I can't remember all the
23  details.  It's been two years ago.

Page 91

1      Q.   I mean, after -- is two years
2  too long for you to remember about a
3  meeting?
4      A.   I met with Ms. Craig and with
5  the mother, the parent.  We resolved the
6  issue, hopefully.
7      Q.   How did you resolve it?  That
8  was my question.
9      A.   Well, I talked with the mother
10  and I explained to the mother that
11  Ms. Craig's concern was the safety of her
12  children, in which -- the accusation she
13  made of Ms. Craig was that Ms. Craig did
14  not like her child, something like that.
15  But I convinced her that she was
16  concerned about her child and the child's
17  well-being.
18     Q.   Okay.  Could the meeting that
19  Ms. Craig testified to, could it have
20  happened and you just don't remember it?
21     A.   It didn't happen with me.
22     Q.   Okay.  Let me ask you to
23  explain what Title IV Coordinator is.

Page 92

1  What are the responsibilities of the
2  Title IX Coordinator?
3      A.   To deal with issues regarding
4  the students and personnel.
5      Q.   Why is it termed Title IV
6  Coordinator?  What does Title IX refer
7  to?
8      A.   It has to do with the students
9  regarding anything that occurs as far
10  as -- for an example, we have the teams
11  and one team is getting more favored than
12  the other team.  We deal with that sort
13  of thing, anything that has to do with
14  discrimination.
15     Q.   Discrimination relating to
16  students; right?  Isn't that what Title
17  IX is about?
18     A.   Yes.
19     Q.   Does it relate to
20  discrimination relating to employees?
21     A.   Uh-huh.
22     Q.   To discrimination relating to
23  employees?

23 (Pages 89 to 92)

**www.AmericanCourtReporting.com**
**October 17, 2007**




# EXHIBIT H

# EXCERPTS FROM THE DEPOSITION OF

# BRENDA COLEY



**American Court Reporting**
**toll-free (877) 320-1050**   *Coley Deposition*

---

Page 45

1  didn't stay very long at the party, so it
2  was -- I would consider that early.
3      Q.   Did Mr. Nacrelli -- when he
4  was sitting there talking to you or
5  standing --
6      A.   He was standing.
7      Q.   -- there talking to you giving
8  you these accolades, did he seem lucid or
9  did he seem drunk or how did -- how would
10 you describe his general demeanor?
11     A.   He was out of character a
12 little.  You know, I think he -- you
13 know, I'm assuming he had been drinking.
14     Q.   Did he seem totally drunk?
15     A.   No.  I don't think he was
16 totally drunk, because, I mean, he knew
17 me.  He was -- no.
18     Q.   He was talking more or less
19 normally.  Is that what you're saying?
20     A.   Well, he seemed out of
21 character because he was...
22     Q.   He'd had a little too much to
23 drink --

Page 46

1      A.   Right.  He was talking a lot.
2      Q.   Yeah.  Okay.
3      A.   But I'm not going to say he
4  was drunk.  I mean, he was just -- he
5  wasn't totally disoriented or anything
6  because he was alert.
7      Q.   And did you welcome the kiss,
8  or did you feel offended by it or what?
9      A.   I didn't welcome the kiss.  I
10 was just kind of surprised.  Shocked, I
11 guess, is a better way to describe it.
12     Q.   Did he do anything else
13 inappropriate towards you --
14     A.   No.
15     Q.   -- touch you in any manner?
16     A.   No.
17     Q.   Make any sexual comments?
18     A.   No.
19     Q.   What time would you say it was
20 that you left?
21     A.   I'm just kind of bad with
22 time.  I just don't remember the time,
23 but I know I didn't stay very long.

Page 47

1      Q.   And you arrived late you said?
2      A.   Right.
3      Q.   The party was for you?
4      A.   That's correct.
5      Q.   Do you remember -- after the
6  party do you recall having a telephone
7  conversation with Ms. Jeffers?
8      A.   Yes.
9      Q.   Where were you when you had
10 that conversation?
11     A.   I was in bed.
12     Q.   You were already in bed?
13     A.   Yes.
14     Q.   Okay.  And tell us if you
15 would the gist of that conversation.
16     A.   She called -- and, of course,
17 my husband and I were in bed -- and she
18 said, Brenda, I have something I have to
19 tell you.  She said, you are not going to
20 believe this.  She said, but you have to
21 swear that you're not going to tell
22 anyone, that you're going to say anything
23 about this.  And I said -- and she said,

Page 48

1  you've got to promise me; you've got to
2  swear that you're not going to tell
3  anyone.
4           And I said, well, do you
5  mind -- I have to tell Ken.
6           And she said okay; it's okay;
7  you can tell Ken.  And then she proceeded
8  to tell me that after I left, after most
9  of the guests had left, that Mr. Nacrelli
10 had stripped.  And I just kind of
11 laughed.  And I said, are you serious;
12 what?  And she said, I just -- you know,
13 she just went on to kind of tell me,
14 like, she was in shock, you know, that
15 she was upset about what he had done.
16 And then I asked her where was his wife,
17 and she said she was there.  And I just
18 don't remember the whole conversation,
19 but that was basically what was said.
20     Q.   Do you recall her saying that
21 she was shaking so hard that she was
22 having difficulty driving?
23     A.   I don't -- no, I don't recall.

12 (Pages 45 to 48)

# American Court Reporting *Coley Deposition*
## toll-free (877) 320-1050

Page 57

1 the afternoons. I would go out in the
2 afternoons, and he would go out to the
3 car riders.
4    Q.   What happened in the morning?
5    A.   I think he -- I just don't
6 remember. I think he stood out by the
7 buses in the mornings.
8    Q.   Okay. Do you remember an
9 incident in Ms. Jeffers' office in which
10 Ms. Jeffers commented to you that
11 Mr. Nacrelli was looking at your behind?
12    A.   Yes.
13    Q.   And do you recall discussion
14 about -- with Ms. Jeffers about the fact
15 that you all were of the opinion that
16 Mr. Nacrelli had an erection on while he
17 was doing that?
18    A.   Now, she said that. I didn't
19 see that. She told me that. But she
20 said that.
21    Q.   Okay. When did that incident
22 occur? Do you remember what year?
23 That's all I want to get. Just what

Page 58

1 school term --
2    A.   What school term?
3    Q.   Yes. Your last year there
4 or --
5    A.   I don't remember when that
6 happened, but it was in her office.
7    Q.   Okay. Now, when Ms. Jeffers
8 called you after the party that one night
9 and told you that Mr. Nacrelli had
10 exposed himself to her, did you take any
11 action subsequent to that phone
12 conversation? Did you report it? For
13 instance, Did you report it to any other
14 school official?
15    A.   No, I did not.
16    Q.   Why wouldn't you report it?
17    A.   Why wouldn't I report it?
18    Q.   Uh-huh.
19    A.   Well, first of all, you know,
20 she told me as a friend. She told me to
21 swear that I wouldn't tell it. And
22 second of all, you know, it happened at
23 his house. And I don't -- I mean, I'm

Page 59

1 not saying that I don't trust Barbara or
2 anything, but I don't -- I mean, I don't
3 know whether there was any kind of -- you
4 know, she said everybody else was gone,
5 and I did not question whether or not it
6 actually happened. But, you know, it was
7 a party. It was at his house. You know,
8 I don't know. She -- I didn't feel --
9 you know, she told me not to say anything
10 about it, to swear not to say anything
11 about it. It was like she was confiding
12 in me as a friend at that point.
13    Q.   Is that the reason you didn't
14 report it is because she told you not to
15 say anything about it?
16    A.   Well, I guess I'm just not --
17 you know, I don't -- will you tell me why
18 should I have reported it?
19    Q.   I can't testify. I'm asking
20 the question.
21    A.   I mean, I don't -- they were
22 at a party. You know, she was drinking;
23 he was drinking. I mean, so do I know

Page 60

1 that there was any validity in what she
2 was really saying at that point. I mean,
3 she didn't say it to me as if it was a --
4 you know, like it was a harassment or
5 anything like that. She said his wife
6 was sitting right there, so -- I don't
7 know.
8    Q.   What do you mean by
9 harassment? She didn't say it to you as
10 a harassment. Are you saying exposing
11 your genitals doesn't constitute as
12 harassment?
13    A.   No, I'm not saying that.
14    Q.   Do you not feel as an educator
15 you have any -- or an administrator that
16 you have an obligation to report sexual
17 harassment?
18    A.   I feel like I do have an
19 obligation to report sexual harassment.
20    Q.   But you didn't report that?
21    A.   No, I did not report that.
22    Q.   Okay.
23       MR. EDDINS: I have no

15 (Pages 57 to 60)

## www.AmericanCourtReporting.com
## October 17, 2007

EXHIBIT I

EXCERPTS FROM THE DEPOSITION OF

DEWILDA (DILLIE) ELLIOTT

**American Court Reporting**
**toll-free (877) 320-1050**    *Elliott Deposition*

---

Page 29

1  you that you would have deemed
2  inappropriate sexually?
3      A.   No.
4      Q.   After you spoke with
5  Ms. Jeffers, do you remember -- well,
6  first of all, do you remember when that
7  conversation was when you had the
8  telephone conversation with Ms. Jeffers?
9      A.   It -- I just remember it was
10  late one evening during the middle of the
11  week.  I don't remember how -- it was not
12  like the night the incident took place.
13  It was probably two or three days, four
14  days after the incident took place, from
15  what I remember.
16      Q.   Well, do you remember if it
17  was June, July, August?
18      A.   It was in August, yes.
19      Q.   August of 2005?
20      A.   Yes.
21      Q.   Okay.  Now, after that
22  conversation, did you take any action
23  yourself?  Did you report the incident to

Page 30

1  the superintendent or to anybody -- any
2  staff member?
3      A.   No.  Because she had asked me
4  not to report it.
5      Q.   Did you report it to another
6  board member or --
7      A.   No, I did not.
8      Q.   The only person you discussed
9  it with was your husband?
10      A.   Yes.
11      Q.   Did you ever speak with
12  Dr. Lee about this?
13      A.   Not until she called me after
14  Ms. Jeffers went to her office.
15      Q.   Okay.  And what did you and
16  Dr. Lee talk about?
17      A.   Dr. Lee asked me was I aware
18  of the incident at Mr. Nacrelli's house,
19  and I told her that I was.  And she said,
20  did you know that another incident had
21  taken place?  And I told her no, that I
22  did not -- I was not aware of that.  And
23  she stated to me that in her conversation

Page 31

1  with Ms. Jeffers that Ms. Jeffers had
2  said that she had told me but that she
3  had also told me not to report it.
4  And --
5      Q.   Did Dr. Lee tell you that you
6  should have reported it?
7      A.   I believe she probably did.
8      Q.   And what was your response to
9  that?
10      A.   That I was torn between
11  betraying a confidence of a friend to
12  doing -- I just didn't want to report it
13  if she did not want me to, because I had
14  told her that if anything else happened
15  she needed to report it.
16      Q.   But the school policy would
17  have been that you should have reported
18  it to Dr. Lee; is that correct?
19          MS. SMITH:  Object to the form
20  of the question.
21      Q.   That's what you testified to
22  earlier.
23      A.   Yes.

Page 32

1          MS. SMITH:  I object to the
2  form of the question.  Assuming facts not
3  in evidence.
4      Q.   Okay.
5          MR. EDDINS:  I don't know that
6  you got the yes.
7      Q.   But did you say -- answer yes
8  when I asked you under the school policy
9  should you have reported this
10  conversation to the superintendent?
11      A.   According to board policy, the
12  person claiming assault, sexual
13  harassment, whatever, is supposed to
14  report it to the personnel director
15  directly.  And I did not realize as a
16  board member that it was my
17  responsibility to turn it over to the
18  superintendent.
19      Q.   Well, you testified earlier
20  that any problems under the school board
21  policy you are obligated to report to the
22  superintendent --
23          MS. SMITH:  Object to the form

**www.AmericanCourtReporting.com**
**October 11, 2007**

