IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| BARBARA M. JEFFERS and<br>JOAN K. CRAIG, | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | **Civil Action Number:** |
| | ) | **CV 3:06CV685-CSC** |
| RUSSELL COUNTY BOARD OF | ) | |
| EDUCATION and CHARLES | ) | |
| NACRELLI, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

---

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

### NARRATIVE SUMMARY OF UNDISPUTED FACTS AND
### BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Comes now the Defendant, Charles Nacrelli, and submits the following narrative summary of undisputed facts and Brief in Support of his Motion for Summary Judgment and hereby respectfully requests that this Honorable Court enter summary judgment in favor of the Defendant, Charles Nacrelli as to all claims stated by the Plaintiffs.

### INTRODUCTION

The Plaintiffs, Barbara M. Jeffers (hereinafter referred to as Plaintiff Jeffers) and Joan Craig (hereinafter referred to as Plaintiff Craig) seek to hold Defendant, Mr. Nacrelli (hereinafter referred to as Mr. Nacrelli) liable for assault and battery and the tort of outrage, as a result of the alleged sexual harassment. Both Plaintiffs are employed at Ladonia Elementary school, where, at all relevant times, Mr. Nacrelli was the still the principal. As discussed below, Plaintiffs

Jeffers and Craig are unable to prove that there is a genuine issue of material fact that would preclude summary judgment for Mr. Nacrelli and he is due to be granted judgment as a matter of law.

## NARRATIVE SUMMARY OF UNDISPUTED FACTS
## PLAINTIFF JEFFERS

Mr. Nacrelli and Plaintiff Jeffers worked together at Ladonia Elementary School for nearly fifteen (15) years. (See Jeffers' Depo., pg. 9, attached hereto as Exhibit "A"). Plaintiff Jeffers and Mr. Nacrelli had a very tight, working relationship nearly the whole time they worked together. Plaintiff Jeffers describes him as " jovial, happy, full of life, always telling stories/jokes. (See Jeffers' Depo. pg. 276: 2-14, attached hereto as Exhibit "A"). While Plaintiff Jeffers emphatically disagreed with some of Mr. Nacrelli's discretionary policies, she wrote him a glowing letter of recommendation for the job opening for principal of Ladonia Elementary. (See Jeffers' Letter of Recommendation, attached hereto as Exhibit "B"). Plaintiff Jeffers conceded that she, not only wrote this letter, but also admitted that the words contained therein were true.

Plaintiff Jeffers alleges the following:

In July of 2005 Mr. Nacrelli hosted a "going away" party at his home, honoring Brenda Coley's, the vice principal at Ladonia, promotion to Principal at Oliver Elementary. (See Jeffers' Depo., pg. 67, attached hereto as Exhibit "A"). This pool party started in the afternoon, and lasted until 9 or 10 p.m. that night. (See Jeffers' Depo., pg. 68, attached hereto as Exhibit "A"). There was food, and a keg of beer under a small tent in the backyard. (See Jeffers' Depo., pg. 68 and 72, attached hereto as Exhibit "A"). Some people swam, and some people watched,

mingled, or played games. Plaintiff Jeffers spent the majority of the night sitting on the stairs of the back porch, smoking cigarettes. (See Jeffers' Depo., pg. 71, attached hereto as Exhibit "A").

Plaintiff Jeffers claims that Mr. Nacrelli "rubbed up" on her behind several times that night.

> Q.     . . . describe the party, starting from the first event that you consider to be of a sexual harassing nature . . .
>
> A.     . . . kept coming up behind me and rubbing me on the butt.
>
> (See Jeffers' Depo., pg. 69:11-14 and pg. 70:13-15, attached hereto as Exhibit "A").

He has no recollection of this. Plaintiff Jeffers admits that she, herself, was flirting with men that night, yet maintains that Mr. Nacrelli's conduct was unwanted and offensive. However, she never specifically told him to stop.

At the end of the party, Mr. Nacrelli's wife asked Plaintiff Jeffers to stay for a few minutes, as Mrs. Nacrelli wanted to talk to her. (See Jeffers' Depo., pg.77:4-6, attached hereto as Exhibit "A"). They sat on the steps of the back porch while Mrs. Nacrelli confided in Plaintiff Jeffers. (See Jeffers' Depo., pg. 78, attached hereto as Exhibit "A"). Then, Plaintiff Jeffers alleges that Mr. Nacrelli came up behind her and his wife, as they sat on the steps, and unrobed himself right behind her. (See Jeffers' Depo., pg. 79:4-12, attached hereto as Exhibit "A"). She claims that she turned around and saw him standing there nude, however she does not remember any details of the incident. (See Jeffers' Depo., pg.279:7-9, attached hereto as Exhibit "A"). Then, Mr. Nacrelli allegedly "stumbled and stepped over her," while still nude, then jumped in the pool via a leap frog maneuver. (See Jeffers' Depo., pg. 79:9-12, attached hereto as Exhibit "A").

This pool party was the first of the "harassing" incidents reported by Plaintiff Jeffers. This party was in July of 2005, yet she did not report anything about any of this "harassment" until two months later, September 20, 2005. (See Jeffers' Depo., pg. 161, attached hereto as Exhibit "A").

The next alleged "harassing" incident occurred on August 10, 2005. Mr. Nacrelli was carrying a kindergartener down the hall, who was kicking and screaming. (See Jeffers' Depo., pg. 131:13-17, attached hereto as Exhibit "A"). He told Plaintiff Jeffers, as he walked by in the hallway, that he could handle this carrying this kid because his wife's breasts weighed more than he did. (See Jeffers' Depo., pg. 133:19-21, attached hereto as Exhibit "A"). Plaintiff Jeffers claims that she was "shocked" by his comment, which seems disingenuous. (See Jeffers' Depo., pg. 133:22, attached hereto as Exhibit "A"). Especially since she admits to telling a joke about a "tattoo of a mouse," on her behind, while she pulled down her pants asking people if they wanted to see it, and then telling them, "that pussy ate it already." (See Jeffers' Depo., pg. 228:11-12 and pg. 229:3-8, attached hereto as Exhibit "A"). She admits that this joke does not refer to a feline, but instead to her own female genitalia. (See Jeffers' Depo., pg. 300:4-7, attached hereto as Exhibit "A"). Objectively, it seems difficult to reconcile, that a reasonable person would be "shocked" about an analogizing comment, comparing the weight of a women's breasts, yet at the same time, tell disgusting, undoubtedly offensive "pussy" jokes.

The next alleged "harassing" incident occurred on September 6, 2005, when Plaintiff Jeffers complained to Mr. Nacrelli that the kickstand on the inside of the school door was too short to reach the floor, and thus the door was shutting, when Plaintiff Jeffers wanted to prop it open. (See Jeffers' Depo., pg. 135:3-6, attached hereto as Exhibit "A"). Nacrelli is alleged to

4

have·responded, "I don't like it when you talk to me about it being too short." (See Jeffers'

Depo., pg. 135:10-11, attached hereto as Exhibit "A").    Mr. Nacrelli is a 5"4'tall male, while

Plaintiff Jeffers towers over him, at almost six (6) feet tall with heels.  Plaintiff Jeffers constantly

made derogatory comments to Mr. Nacrelli, in a veiled attempt to make fun of him for his size.

She preyed on his insecurities, and Mr. Nacrelli specifically told her that he "did not like it"

when she said that.  *Id.*  This behavior seems to lack a harassing spirit.  Even if Plaintiff Jeffers

subjectively thought that Mr. Nacrelli was speaking with some sort of sexual innuendo or

undertone, which apparently she did, a reasonable person would not understood this comment to

be of a sexual or offensive nature.

A few days later, September 9, 2005, the third "harassing" incident alleged to have taken

place. (See Jeffers' Depo., pg. 136, attached hereto as Exhibit "A").    After school, Plaintiff

Jeffers and another teacher were working in a classroom.  Mr. Nacrelli walked in the classroom,

and talked with the teachers for a few moments.  *Id.*  Mrs. Jeffers then told Mr. Nacrelli, "you

can't pick me up." (See Nacrelli Depo., pg. 73:7-9, attached hereto as Exhibit "D" and Jeffers'

Depo., pg. 136:19-22, attached hereto as Exhibit "A").    Jeffers alleges Nacrelli grabbed her back

and the back of her legs and wept her up into his arms, in a cradle position, as if her was carrying

her across a threshold. (See Jeffers' Depo., pg. 137:10-23, attached hereto as Exhibit "A").  Mr.

Nacrelli then accidentally nipped the cloth of Plaintiff Jeffers' shirt in the process of picking her

up. (See Jeffers' Depo., pg. 287, attached hereto as Exhibit "A").   The Plaintiff concedes that

his teeth only touched her shirt.  Her breasts were not touched with his mouth or teeth, only her

shirt was touched.

Q. When he bit you, did he bite material or did he bite skin?

A. It wasn't like he bit me heard. . .   I mean, there was saliva on my . . .

Q. On your clothes?

A. Uh-huh.

Q. So he didn't bit you on bare skin; right?

A. No. No.

(See Jeffers' Depo., pg. 138-139, attached hereto as Exhibit "A").

She further admits that this did not physically harm her in any way.  (See discussion infra).

On September 20, 2005, Plaintiff Jeffers reported all of the aforesaid "harassing" incidents to Dr. Lee, the Russell County School Board Superintendent.  She reports these happenings, as well as other purely hearsay, uncorroborated accounts.

Plaintiff Jeffers filed a claim of sexual harassment against the Russell County Board of Education and with the Equal Opportuiny Employment Commission on December 23, 2005. This charge was dismissed on December 29, 2005.  Thereafter Plaintiff Jeffers filed an Amended Charge of Discrimination on January 19, 2006.

## NARRATIVE SUMMARY OF UNDISPUTED FACTS
## PLAINTIFF CRAIG

Plaintiff Craig alleges the following "harassing" incidents:

Sometime in 2000, 2001, or possibly 2002, she cannot specifically remember, Plaintiff Craig informed Mr. Nacrelli about problems she was having with the Hancock bus stop.  (See Craig Depo., pg. 79, attached hereto as Exhibit "C").  Mr. Nacrelli offered to ride with her on the bus, to assess the problem.  (See Craig Depo., pg. 84:16-17, attached hereto as Exhibit "C"). While at the bus stop, Mr. Nacrelli was allegedly standing in the stairway of the bus, and told

6

Plaintiff Craig "whew you sure do got some nice legs."    (See Craig Depo., pg. 85:19-22 and pg.

87:15-19, attached hereto as Exhibit "C"). Mr. Nacrelli allegedly rubbed her legs while she was

sitting in the driver's seat of her bus, and he was still standing in the stairway of the bus. The

Plaintiff responded to his behavior by saying, "I says man, don't even go there." *Id.*

   Once they arrived back at the school, Mr. Nacrelli allegedly refused to get off the bus, and

told Plaintiff Craig, "lets go somewhere. . . you know you want me." *Id.*  Craig claims she

pushed him away, and told him no, "keep your hands to yourself," and to get off her bus. (See

Craig Depo., pg. 92:22 - 93:1, attached hereto as Exhibit "C"). Plaintiff Craig also alleges that

Mr. Nacrelli said, "I want you to get with me, you and I could have a good time." (See Craig

Depo., pg. 89:3-5, attached hereto as Exhibit "C").  After Mr. Nacrelli was rebuffed, he left the

bus.

      Plaintiff Craig alleges that she has suffered severe emotional distress as a result of this

incident, although she cannot remember what year this happened, much less a specific month or

date; sometime between 2000 and 2002.  (See Craig Depo., pg. 41;6-7, 250:15-17, attached

hereto as Exhibit "C").  Nevertheless, she claims that the stress of this incident caused her to get

shingles, at least a year later, in 2003. (See Craig Depo., pg. 189:20-23, attached hereto as

Exhibit "C").  She did not even report it to her husband until a year later in 2003. (See Craig

Depo., pg. 255:15, attached hereto as Exhibit "C").  She also contends that her Doctor prescribed

her Xanax in 2006, at least four years after this occurrence, as a result of the her stress. (See

Craig Depo., pg. 192:7-11, attached hereto as Exhibit "C").  She does not attribute her being

prescribed Wellbutrin to Mr. Nacrelli. (See Craig Depo., pg. 257:21-23, attached hereto as

Exhibit "C").

7

The next alleged "harassing" incident was approximately two weeks later; sometime between 2000 and 2002. Mr. Nacrelli approached her and asked "if everything was okay," to which she responded, "everything's." (See Craig Depo., pgs. 94-96, attached hereto as Exhibit "C"). She claims that Nacrelli did this to see how she would react in front of other people, in terms of her potentially revealing the alleged prior sexual harassment. She admitted that there was no overt sexual harassment during this incident.

The next "harassing" event happened approximately two weeks later, again, sometime between 2000 and 2002. She was having a problem with a student, and Nacrelli came out to her bus to help out. (See Craig Depo., pg. 96, attached hereto as Exhibit "C"). After asking all the children to leave the bus, Nacrelli stayed and talked to the student to resolve the situation. (See Craig Depo., pg. 98:8-11, attached hereto as Exhibit "C"). Thereafter, the student left the bus, and Mr. Nacrelli turned to Craig and rubbed her neck and said, "I want to get you in bed . . . you have nice breasts. . . I want to caress them." (See Craig Depo., pg. 100:10-13, attached hereto as Exhibit "C"). Plaintiff Craig responded "please let me go home," to which Mr. Nacrelli responded, "you haven't told me no yet, so you must really want it." (See Craig Depo., pg. 18 - 21, attached hereto as Exhibit "C"). Plaintiff Craig responded, "I don't want to lose my job." Mr. Nacrelli responded," I will see you next time," to which Plaintiff Craig testified that she simply rolled her eyes. (See Craig Depo., pg. 101:4-5, attached hereto as Exhibit "C"). Thereafter, Plaintiff Craig claims Nacrelli began to tell her about Italian men and that she had a wild streak and he would like to tame her. (See Craig Depo., pg. 101:8-12, attached hereto as Exhibit "C"). She responded, "I bet you would." (See Craig Depo., pg. 101:17, attached hereto as Exhibit "C").

8

Though she could not identify a specific time period, Craig claims that from time to time, Nacrelli would get her attention and taunt her by "adjusting his penis" and making suggestive faces at her. (See Craig Depo., pg. 104-105, attached hereto as Exhibit "C"). Although she did not report his behavior to the Russell County Board of Education until 2005, she admitted that she told other co-workers, in a veiled and passive-aggressive cry for help, such things as: "One day I'm going to hall off and cold-cock this son of a bitch;" (See Craig Depo., pg. 108:11-12, attached hereto as Exhibit "C"). "He need to go to the bathroom . . . he needed to go jack-off . . . because he needed to get his rocks off." (See Craig Depo., pg. 111:7-10, attached hereto as Exhibit "C"). "He runs around here like he is horny;" (See Craig Depo., pg. 109:20, attached hereto as Exhibit "C"). "He must not be getting anything at home;" "This man needs desperately to find him a woman." (See Craig Depo., pg. 109:18-20, attached hereto as Exhibit "C").

In December of 2003, the next alleged "harassing" experience happened when she was at a school Christmas Program. Plaintiff Craig alleges that after the program, Mr. Nacrelli came up to her and put his arm around her. Though there was nothing blatantly sexual or offensive about the fact that he put his arm around her, she said she felt humiliated and thought other people might think they are having and affair, because all the prior alleged bad acts came rushing up from her memory.

In March of 2004, the next alleged "harassing" event occurred when Plaintiff Craig went to Ladonia during regular school hours to have lunch with her two nephews. While walking out of the school from the lunchroom, Craig was wearing a dew rag. She claims that Nacrelli came out of his office and "pats her on the behind" and said "you can't do that in the school." (See

Craig Depo., pg. 113:6-9, attached hereto as Exhibit "C"). She said, "Yes I can, because I'm not

on school hours. I'm riding my motorcycle." (See Craig Depo., pg. 113:11-13, attached hereto

as Exhibit "C"). Nacrelli walked outside with Craig to see her motorcycle. Craig was being

escorted by her adult nephew, who conveniently did not hear Mr. Nacrelli tell Plaintiff Craig, that

he could rid [her motorcycle] "and hold onto your breasts." (See Craig Depo., pg. 115:18-22,

attached hereto as Exhibit "C").

The last two (2) alleged"harassing" episodes happened in August of 2005. (See Craig

Depo., pg. 133, attached hereto as Exhibit "C"). The first was during a staff in-service meeting,

just prior to the open of the 2005 school year. Plaintiff Craig claims that Mr. Nacrelli, while

leading a meeting, was standing so close to her that if she had turned her head, he would be able

to "pull it out and put it in her mouth," referring to his penis. (See Craig Depo., pg. 127:4-9,

attached hereto as Exhibit "C"). She said his "standing in her space" made her feel very

uncomfortable. (See Craig Depo., pg. 127:4-5, attached hereto as Exhibit "C"). At this time she,

again, in a passive aggressive manner, told him that "we'll play strictly by the book" in response

to a new student discipline policy being announced by Mr. Nacrelli. (See Craig Depo., pg.

127:7-8, attached hereto as Exhibit "C"). Apparently, she intended to convey to Mr. Nacrelli that

his behavior was "unwelcome," by her oblique comments to him.

The last alleged "harassing" event happened several weeks later, in August of 2005. (See

Craig Depo., pg. 136:6, attached hereto as Exhibit "C"). She attended a meeting with all the

other bus drivers and Mr. Nacrelli. During this meeting, Craig alleges that Nacrelli massaged her

shoulders and she brushed his hands off. (See Craig Depo., pg. 139:10-13, attached hereto as

Exhibit "C"). She said she felt humiliated and she was paranoid that other people in the room

would think that they were having an affair, again because of all the prior alleged acts that had represented themselves in her memory. (See Craig Depo., pg. 157:14-15, attached hereto as Exhibit "C").

Plaintiff Craig claims that she was "uncomfortable" around Mr. Nacrelli because of his "offensive" conduct. (See Craig Depo., pg. 263, attached hereto as Exhibit "C"). Plaintiff Craig alleges that she has been emotionally harmed , and that "he left scars in my mind." Objectively, her alleged emotional reaction seems disingenuous. Especially in light of the fact that Plaintiff Craig admits to telling a friend that she was going to " haul off and clock that son of a bitch," referring to Mr. Nacrelli. (See Craig Depo., pg. 108:11-12, attached hereto as Exhibit "C"). Plaintiff Craig also admits to telling her daughter that she was going to "come over there and whip her ass. . . and she had me put I jail." (See Craig Depo., pg. 228:18-23, attached hereto as Exhibit "C").

Plaintiff Craig filed a claim of sexual harassment against the Board of education and with the EEOC on January 19, 2006. The Plaintiffs filed suit in this Court on August 3, 2006.

## STANDARD FOR GRANTING DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT

Courts should grant summary judgment when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment bears "the initial responsibility of informing the . . . Court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

In determining whether the moving party has met its burden, the court views the evidence in the light most favorable to the non-moving party. *Adickes v. S.H. Kress and Co.*, 398 U.S. 144, 158-59 (1970). Moreover, "[r]easonable doubts as to the facts should be resolved in favor of the nonmoving party," *Borg-Warner Acceptance Corp. v. Davis*, 804 F.2d 1580, 1582 (11th Cir.1986). "For factual issues to be considered genuine, they must have a real basis in the record." *Hairston v. Gainesville Sun Publishing Co.,* 9 F.3d 913, 919 (11th Cir.1993). Additionally, issues of fact are genuine only if "they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986). The unsupported, self-serving statements of the party opposing summary judgment are insufficient to avoid summary judgment. *Midwestern Waffles, Inc. v. Waffle House, Inc.,* 734 F.2d 705, 714 (11th Cir.1984).

Whether facts are material is determined by the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue is not genuine if it is created by evidence that is "merely colorable" or is "not significantly probative." *Id.* at 249-50. In the present case, the facts will prove that Defendant Nacrelli has met the initial burden, so  the burden shifts to Plaintiffs Jeffers and Craig, to demonstrate that there is indeed a material issue of

12

fact that precludes summary judgment." *Clark v. Coats & Clark,* 929 F.2d 604, 608 (11th

Cir.1991).

### ASSAULT & BATTERY

**1.  Defendant Nacrelli Did Not Commit Assault or Battery Against Plaintiff Jeffers or Plaintiff Craig Because Both Plaintiffs Failed to Prove That His Conduct Occurred in a Harmful or Offensive Manner.  Plaintiff Jeffers Never Specifically Told Mr. Nacrelli That His Conduct Was Unwelcome, and She Did Not Report These Incidences until Almost Two Months after the Last Alleged "Offensive" Incident Occurred.**

" 'Assault' is an intentional, unlawful, offer to touch the person of another in a rude or

angry manner under such circumstances as to create in the mind of the party alleging the assault a

well-founded fear of an imminent battery, coupled with the apparent present ability to effectuate

the attempt, if not prevented." *Wood v. Cowart Ent., Inc.,* 809 So. 2d 835, 837 (Ala. Civ. App.

2001).

In a civil case, the elements of battery are: (1) that the defendant touched the plaintiff; (2)

that the defendant intended to touch the plaintiff; and (3) that the touching was conducted in a

harmful or offensive manner. *Wood v. Cowart Ent., Inc.,* 809 So. 2d 835, 837.

> The Alabama Supreme Court has explained that " '[a] battery consists in an injury actually done to the person of another in an angry or revengeful or rude or insolent manner, as by spitting in the face, or in any way touching him in anger, or violently jostling him out of the way, or in doing any intentional violence to the person of another.  The wrong here consists, not in the touching, so much as in the manner or spirit in which it is done, and the question of bodily pain is important only as affecting damages. Thus, to lay hands on another in a hostile manner is a battery, although no damage follows; but to touch another, merely to attract his attention, is no battery and not unlawful. And to push gently against one, in the endeavor to make way through a crowd, is no battery; but to do so rudely and insolently is and may justify damages proportioned to the rudeness. . ."

13

*Surrency v. Harbison*, 489 So.2d 1097, 1104 (Ala.1986) (quoting *Singer Mach. Co. v. Methvin*, 63 So. 997, 1000 (1913)).

· In order to succeed on her assault claim against Mr. Nacrelli, Plaintiff Jeffers and Craig must establish that: (1) Mr. Nacrelli touched her; (2) he intended to touch her; and (3) the touching was conducted in a harmful or offensive manner. *Ex parte Atmore Community Hosp.*, 719 So.2d 1190, 1194 (Ala.1998). A successful assault becomes a battery, which consists of the touching of another in a hostile manner. *Wright v. Wright*, 654 So.2d 542, 544 (Ala.1995).

In *Simmons v. Mobile Infirmary Medical Center*, a strikingly similar case, the Court held that the Plaintiff, a female employee, did not establish that a male supervisor's alleged conduct, i.e., touching her breasts on four to five occasions over period of about eight months, occurred in offensive or harmful manner. 391 F. Supp. 2d 1124 (S.D. Ala. 2005). The employee did not complain until almost two months after last alleged incident, she never advised her supervisor that his alleged conduct was unwelcome, and she did not feel physically threatened or humiliated. *Id.* Therefore, the Plaintiff failed to establish that the Defendant's conduct was harmful or offensive, thus not satisfying a requisite element of the tort of battery under Alabama law. *Id.*

In *Simmons,* the Plaintiff alleges that her supervisor sexually harassed her with remarks, grabbing her buttocks and other sexual advances through unwanted conduct. *Id.* at 1127. Then, several months later, he allegedly fondled her breasts. *Id.* Simmons also testified that on one occasion he came up behind her, put his hands on her hips, said something in her ear and then pressed his body against hers. *Id.* at 1128. The last, and only other, alleged incident of sexual

14

harassment, was when Roberts gave Simmons her yearly evaluation. *Id.* On that occasion, she stated that he pulled his chair up next to hers and he touched her leg with his leg. *Id.* at 1128

The Court held that Simmons' failure to complain, report, or otherwise protest her supervisor's alleged conduct, **at the time it occurred**, suggests that she did not, for whatever reason, perceive the conduct as offensive at the time. *Simmons* at 1130. (emphasis added).  See e.g., *Paraohao v. Banker's Club, Inc.*, 225 F. Supp. 2d 1353, 1359 (S.D. Fla. 2002)("The correct inquiry is whether the [plaintiff] by her conduct indicated that the [complained-of behavior] was unwelcome.") quoting, *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 68 (1986).

Simmons did not complain about Roberts' conduct until almost two months after the last "offensive" conduct occurred. Moreover, she never advised Roberts in any manner that his conduct was unwelcome. *Simmons* at 1131.  The Court rejected Simmons' contention that she subjectively believed at the time the Supervisors' conduct occurred, that it was offensive or that she perceived it to be "sexually harassing." *Id.* at 1131.

## ASSAULT & BATTERY
## PLAINTIFF JEFFERS

Plaintiff Jeffers specifically claims that Mr. Nacrelli: leap-frogged over her; made comments about his wife's breasts; made a comment about a door's kickstand  being too short; and picked up, cradled, and accidentally nipped the Plaintiff.  Assuming, for the purpose of summary judgment,  that all of Plaintiff Jeffers' allegations are true, they are not harmful or offensive enough to meet the minimum threshold to maintain a cause of action for assault and battery.

In the present case, the allegedly "sexually harassing" conduct in question is similar to the conduct in *Simmons*; sexual remarks, grabbing her buttocks, sexual advances, fondling of her breasts, standing close behind, putting his hands on her hips, whispering in her ear and pressing his body against her body, touching of her leg with his leg. However, the allegations in *Simmons* are more numerous and more severe than the Plaintiffs' allegations in the present case.

Therefore, because the aforementioned incidents in *Simmons* was not enough to make a prima facie case of assault and battery, Mr. Nacrelli's conduct certainly does not meet that threshold of harmful and offensive, so as to support a claim of assault and battery. Accordingly, Summary Judgment should be entered on behalf of Mr. Nacrelli.

Mr. Nacrelli picking up Plaintiff Jeffers was in response to her telling him that he "couldn't lift her." (See Nacrelli Depo., pg. 73:7-9, attached hereto as Exhibit "D"; Jeffers Depo., pg. 136:19-22, attached hereto as Exhibit "A"). Plaintiff Jeffers provoking Mr. Nacrelli, and his reaction was justified. See *McCart v. Devine*, 288 So. 2d 739 (Ala. Civ. App. 1973) (allowing evidence of provocation or justification is proper, so long as it is immediately preceding and connected with the assault as to constitute a part of the transaction.)

Plaintiff Jeffers admits that this biting incident did not harm her in any way:

> Q.     Did Mr. Nacrelli bare his teeth?
>
> A.     No.
>
> Q.     Was it more his lips or his teeth that touched your clothing?
>
> A.     Like lips. He – there as a little nip to it.

16

Q.    Did you have any bruising?

A.    No.

Q.    Any bleeding?

A.    No.

Q.    No injury at all?

A.    No.

Q.    Was Mr. Nacrelli being playful when he picked you up?

A.    I suspect so, yeah.

Q.    Was he trying to punish you in any way?

A.    No.

Q.    Was he being his usual jovial self?

A.    Well, he'd never pick me up in his usual jovial self.

Q.    Well, let's put it this way: Aside from the fact that he picked you up, was there anything from a vibe you got from him or any words or feeling you got from him that he was out of the ordinary?

A.    No.

Q.    Or that he was mad at you?

A.     No. . . .

Q.     . . . Did you have any fear of physical harm when he picked you up?

A.     No.

Q.     Did you have any fear of physical harm when his lip touched the cloth around your breast?

A.     Physical harm?

Q.     Physical harm?

A.     No.

(See Jeffers' Depo., pg. 286-289, attached hereto as Exhibit "A").

Plaintiff Jeffers did not report the alleged sexual harassment until nearly two months after the last incident in August of 2005. Her failure to report any of the incidents **at the time the occurred** indicates that she did not perceive the Mr. Nacrelli's conduct as offensive at the time, thus negating the offensive requirement. Plaintiff Jeffers has failed to prove a requisite element of assault and battery, that Mr. Nacrelli's conduct was harmful or offensive, at the time it occurred. Therefore, Plaintiff Jeffers' claim fails as a matter of law, and Summary Judgment should be entered on behalf of Defendant, Mr. Nacrelli.

## ASSAULT & BATTERY
## PLAINTIFF CRAIG

The Plaintiff in *Simmons* presented no evidence that she was physically threatened or humiliated, and she testified that she was not fearful of her Supervisor ever physically harming her. *Simmons*, 391 F. Supp. 2d at 1131. When asked, "Well, did you ever think he was going to physically harm you?", Simmons answered, "Physically, No." *Id.* at 1131.

Similarly, in the present case, Plaintiff Craig admitted that she was not physically harmed by Mr. Nacrelli. (See Craig Depo., pg 226:18-23, attached hereto as Exhibit "C"). Additionally, Plaintiff Craig did not report any of her sexual harassment allegations until two (2) months after the last alleged incident occurred, in August of 2005. The alleged "harassing" events occurring in August of 2005, were Mr. Nacrelli standing close to her at an in-service meeting, and Mr. Nacrelli massaging her shoulders in a staff meeting a few weeks later. The Plaintiff admits that neither of these incidents were overtly sexual, and from an objective viewpoint, not offensive.

Assuming that Plaintiff Craig's allegations are true, the only incidences of overt sexual harassment, and arguably harmful conduct occurred at least three (3) years before she reported it. These incidences include: complimenting and touching her legs, rubbing her neck, adjusting his penis in his pants, putting his arm around her, patting her behind, and telling her he would like to ride her motorcycle and hold onto her breasts.

The *Simmons* Court held that a two (2) month delay in reporting harassing conduct suggests that the Plaintiff did not perceive the conduct to be threatening at the time. *Simmons* at 1130. By analogy, if a two (2) month delay in reporting an incident indicates a Plaintiff's subjective absence of being physically threatened at the time it occurred, then a delay of reporting for at least three (3) years certainly creates doubt that Plaintiff Craig was actually physically

threatened at the unknown time that Mr. Nacrelli allegedly "harassed" her. Therefore, Summary Judgment should be granted on behalf of Defendant Nacrelli.

Plaintiff Craig claims that she was "uncomfortable" around Mr. Nacrelli because of his offensive conduct. Craig Depo. pg 263. Plaintiff Craig alleges that she has been emotionally harmed , and that "he left scars in my mind." From an objective point-of-view, her alleged emotional reaction seems disingenuous. Especially in light of the fact that Plaintiff Craig admits to telling a friend that she was going to " haul off and clock that son of a bitch," referring to Mr. Nacrelli. Plaintiff Craig also admits to telling her daughter that she was going to "come over there and whip her ass. . . and she had me put I jail" (See Craig Depo., pg 277:16-20, attached hereto as Exhibit "C"). It is difficult to reconcile these combative and threatening statements made by Plaintiff Craig, with the fact that she was, allegedly, so offended by Mr. Nacrelli's conduct; especially since she did not report it until at least three (3) years later.

Plaintiff Craig has failed to prove the requisite element of the Plaintiff's perception of Mr. Nacrelli's conduct being harmful and offensive, at the time it happened. Therefore, the Plaintiff Craig's claims fail, as a matter of law, and so  summary judgment is appropriate.

## TORT OF OUTRAGE

### II. Defendant is not liable to the Plaintiffs for the tort of outrage. both Plaintiffs failed to prove that Mr. Nacrelli's conduct was extreme and outrageous. The tort of outrage claim must fail, as a matter of law, for not meeting the requisite level of "outrageousness" necessary to maintain this tort action.

An independent cause of action for sexual harassment does not exist; instead, claims of sexual harassment are maintained under common-law tort theories such as assault and battery,

20

invasion of privacy, negligent training and supervision, and outrage. *Stevenson v. Precision Standard, Inc.*, 762 So. 2d 820 (Ala. 1999).

Under Alabama law, to present jury question regarding the tort of outrage, or intentional infliction of emotional distress, Plaintiffs Jeffers and Craig must present sufficient evidence that Mr. Nacrelli's conduct: (1) was intentional or reckless; (2) was extreme and outrageous; and (3) caused emotional distress so severe that no reasonable person could be expected to endure it. *Peterson v. BMI Refractories*, 132 F.3d 1405 (11th Cir. 1998).

The emotional distress, caused by Mr. Nacrelli's conduct, must be "so severe that no reasonable person could be expected to endure it." His conduct must have been "so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society." *American Road Service Co.*, 394 So. 2d at 365; citing Restatement (Second) of Torts, § 46, Comment (d) (1965). Alabama has recognized that the plaintiff's burden is heavy in such cases. *Garvin v. Shewbart*, 442 So.2d 80 (Ala.1983).

In *Potts v. Hayes*, the Alabama Supreme Court observed: "The tort of outrage is an extremely limited cause of action. It is so limited that this Court has recognized it in regard to only three kinds of conduct: (1) wrongful conduct in the family-burial context; (2) barbaric methods employed to coerce an insurance settlement; and (3) egregious sexual harassment. 771 So.2d 462, 465 (Ala.2000).

This Court first recognized the tort of outrage in *American Road Service Co. v. Inmon*, 394 So.2d 361 (Ala.1981). In that case *Inmon*, who had formerly been employed by American

21

Road Service Company, sued his former employer and presented evidence establishing that he had been harassed, investigated without cause, humiliated, accused of improper dealings, treated uncustomarily, and terminated without justification. *Inmon*, 394 So.2d at 367. In recognizing the tort of outrage, the Court emphasized the extreme nature of a defendant's conduct that would be sufficient to constitute the tort, and the severity of the emotional distress that would entitle a person to recover for that tort *Id*. at 365.

In *Thomas v. BSE Industrial Contractors, Inc.*, the Alabama supreme court explained that the tort of outrage is an extremely limited cause of action. 624 So.2d 1041 (Ala.1993). In the 12 years since *Inmon* was decided, all cases in which this Court has found a jury question on an outrage claim have fallen within only three categories: 1) cases having to do with wrongful conduct in the context of family burials, see *Whitt v. Hulsey*, 519 So.2d 901 (Ala.1987) (reckless desecration of family burial ground by adjacent landowner sufficient to present a jury question as to claim of outrage), *Levite Undertakers Co. v. Griggs*, 495 So.2d 63 (Ala.1986) (defendant undertaker's wrongful retention of the remains of plaintiff's husband to force payment of funeral expenses sufficient to present a jury question as to claim of outrage), and *Cates v. Taylor*, 428 So.2d 637 (Ala.1983) (defendant's withdrawal of permission to use a burial plot 30 minutes before the planned burial sufficient to present a jury question on claim of outrage); 2) a case where insurance agents employed heavy-handed, barbaric means in attempting to coerce the insured into settling an insurance claim, *National Security Fire & Cas. Co. v. Bow*en, 447 So.2d 133 (Ala.1983); and 3) a case involving egregious sexual harassment, *Busby v. Truswal Systems Corp.*, 551 So. 2d 322 (Ala. 1989)( explaining that a claim of sexual harassment *could* present a jury question).

22

"This Court has consistently held that the tort of outrage is a very limited cause of action" and, "[a]s a consequence, this Court has held in a large majority of the outrage cases reviewed that no jury question was presented." *Thomas.* 624 So. 2d at 1044.

Three of the four cases in which this Court has held that the evidence presented a jury question on the tort of outrage have involved corporate defendants: *Levite Undertakers Co. v. Griggs*, 495 So.2d 63 (Ala.1986); *National Security Fire & Casualty Co. v. Bowen*, 447 So.2d 133 (Ala.1983); and *Ridout's-Brown Service, Inc. v. Holloway*, 397 So.2d 125 (Ala.1981). In each of those cases, the outrageous conduct was perpetrated as a means to further the defendant corporation's business.

Although egregious sexual harassment can amount to the tort of outrage, Alabama has never found a Defendant personally liable under the Tort of Outrage for sexual harassment, without the issue of an employer's vicarious liability being the primary inquiry. Only a few Alabama cases even entertain the possibility of recovery for sexual harassment, *Busby v. Truswal Systems Corp.*, 551 So. 2d 322 (Ala.1989) & *Henry v. Georgia-Pacific Corp.*, 730 So. 2d 119 (Ala. 1998)(recognizing that egregious sexual harassment can amount to the tort of outrage).

In *Henry*, summary judgment on a tort of outrage sexual harassment claim was reversed. 730 So. 2d 119 (Ala. 1998). This case is factually distinguishable because the case was predicated on whether the Plaintiff's employer had knowledge that she was being sexually harassed in mandatory counseling sessions. *Henry* a vicarious liability case, and had no application in the case at hand.

23

In *Busby*, however, the Court affirmed summary judgment on behalf of the Defendant, a company that employed a supervisor who repeatedly subjected the plaintiffs to sexually harassing comments. The following facts were alleged in *Busby*, yet the Court granted summary judgment; The harasser:

> (1) invited the Plaintiffs to swim in his pool in the nude with him; (2) told a Plaintiff that his hands were cold and asked if he could put them in her pockets to keep them warm; (3) told the plaintiffs that he would "put a stick on their machines" so they could masturbate while working; (4) said that he could perform intercourse as fast as one of the machines at the plant could operate; (5) said that he wished that the plaintiffs would come to work braless and wear less clothing; (6) told one of the plaintiffs that if she had not stayed up all night having sex she could do her work properly; (7) told one employee that if she would give him 30 minutes with her that he would fill her pants in nine months for her; (8) acted as if he was going to pinch one plaintiff's breasts with a pair of pliers and with his hands; (9) said that he should send one of the plaintiffs across the street to where a group of men were standing because she stayed sexually aroused all of the time; (10) told one of the plaintiffs that he was very tired and asked her if she would accompany him to the restroom and hold his penis while he urinated; (11) told one of the plaintiffs that her nipples were as large as another employee's entire breasts; (12) attempted to follow one of the plaintiffs into the restroom and when she asked him where he was going, said that he was going to help her; (13) followed one of the plaintiffs one night; (14) said that a table in his office had been damaged when one of the plaintiffs and a male co-employee had sex on top of it; (15) openly stared at the plaintiffs' sexual anatomy; (16) put his arm around the plaintiffs, grabbed their arms, and stroked their necks; and (17) made other lewd remarks and gestures to the plaintiffs.

*Busby*, 551 So. 2d 332 at 324.

Because the aforementioned behavior does not allow recovery under the Tort of Outrage, by analogy, Mr. Nacrelli's behavior certainly is not egregious, severe, or pervasive enough to warrant any recovery for the Plaintiffs. Therefore, summary judgment is appropriate for the Plaintiffs' claims of Tort of Outrage.

A similar Alabama case held that several requests by an employer for a female employee to have dinner with him, to kiss him, or to have an affair with him would not support a claim for

outrageous conduct. *McIsaac v. WZEW-FM Corp.*, 495 So.2d 649 (Ala.1986). "There were several incidences that I would qualify as suggestive lurks or little innuendoes.... I mean I can't tell you specific times and dates of the way that he would look at me or smile at me or wink at me or touch me, just like touch me on my arm or put his arm around me or something like that." *Id.* at 650.  The Court affirmed summary judgment for these "mere insults, indignities, threats [and] annoyances," as the law will not hold one liable in tort for such.  *Id.* at 651.

In *Surrency v. Harbison,* an analogous case, the Court affirmed the grant of directed verdict on outrageous conduct count, based on the following facts: numerous incidents occurred over approximately a two-year period indicating that the Plaintiff was unpopular among management and among some of his own co-employees.  489 So. 2d 1097 (Ala. 1986) He was cursed by other employees, shoved against a wall, bumped in his chest and stomach in a threatening way, told that it would be the happiest day of his manager's like, if the Plaintiff were injured on the job, shoved while drinking coffee, spilling it on another employee, and hit in the back of the head with the arm of a coal-mining machine. *Id* at 1100.  However, the Court held that "the incidents were just that-incidents." *Id.* at 1105.  They were "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. The rough edges of our society are still in need of a good deal of filing down, and in the meantime plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language and to occasional acts that are definitely inconsiderate and unkind." *Surrency* at 1106; quoting Restatement torts 2d § 46.

**TORT OF OUTRAGE**

**PLAINTIFF JEFFERS**

25

Plaintiff Jeffers claims that Mr. Nacrelli: leap-frogged over her; made comments about his wife's breasts; made a comment about a door's kickstand being too short; and picked up, cradled, and accidentally nipped Plaintiff Jeffers. These incidents are not nearly severe and pervasive enough that no reasonable person would be expected to endure. They are just that-incidents. They fall within the category of mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities, and thus preclude recovery, and justify granting summary judgment on behalf of Mr. Nacrelli. See *Surrency*, 489 So. 2d 1097 at 1106.

## TORT OF OUTRAGE
### PLAINTIFF CRAIG

Plaintiff Craig alleges that she was subjected to the following behavior by Mr. Nacrelli: complimenting and touching her legs; rubbing her neck; adjusting his penis in his pants; putting his arm around her; patting her behind; telling her he would like to ride her motorcycle and hold onto her breast; standing close to her; and massaging her shoulders. Like Plaintiff Jeffers' allegations, these incidents are just that-incidents. These incidents are not beyond all possible bounds of decency, and do not rise to the level of atrocious and utterly intolerable behavior. Therefore, Plaintiff Craig's Tort of Outrage claim fails as a matter of law, and summary judgment should be granted in favor of Mr. Nacrelli.

To the extent that many of Plaintiff Craig's allegations occurred more than two (2) years before August of 2005, the date of the last alleged "harassing" incident, her tort of outrage claim is time-barred by the statute of limitations. Every one of the events that Plaintiff Craig claims

were overtly harassing, occurred in sometime between 2000 and 2002, as the Plaintiff admits, she does not remember. See *Archie v. Enterprise Hospital & Nursing Home*, 508 So. 2d 693, 695 (Ala. 1987)(suggesting that all tort of outrage claims are governed by the two-year statute of limitations) See Ala. Code (1975) § 6-2-38( l)("All actions for any injury to the person or rights of another not arising from contract and not specifically enumerated in this section must be brought within two years.").   As a result, Defendant, Mr. Nacrelli deserves Summary Judgment be entered on his behalf.

As previously discussed, Plaintiffs in Tort of Outrage cases, have an extremely high threshold of production.  In this case, neither Plaintiff has met this burden, and thus summary judgment is due as a matter of law.

**WHEREFORE, PREMISES CONSIDERED,** the Defendant respectfully requests this Honorable Court grant summary judgment in its favor as a matter of law for that there is no genuine issue as to any material fact and judgment is due to be granted as a matter of law.

**ORAL ARGUMENT REQUESTED**

Respectfully Submitted,

*/s/ Matthew C. Williams*
Matthew C. Williams (WIL260)
Estes, Sanders & Williams, LLC.
3800 Colonnade Parkway, Suite 330
Birmingham, Alabama 35243
Telephone:(205)949-5500
Facsimile:(205)949-5505

## CERTIFICATE OF SERVICE

       I hereby certify that on the 17th day of December 2007, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following:

W. Don Eddins, Esq.
Attorney at Law
337 E Magnolia Avenue, Suite #3
Auburn, Alabama 36830-3133
doneddins@charter.net
*Attorney for Plaintiffs,*
*Barbara M. Jeffers and Joan K. Craig*

Sydney S, Smith, Esq.
Smith & Smith
1503 Broad Street
Phenix City, Alabama 36867
ssmith4843@aol.com
*Attorney for Defendant,*
*Russell County Board of Education*


                                    /s/  Matthew C. Williams
                                      OF COUNSEL

# EXHIBIT "B"

# Ladonia Elementary School



9 Woodland Drive
Phenix City, AL 36869

297-7313

April 3, 2002

To Whom It May Concern:

If you are looking for an energetic, innovative, enthusiastic principal who also is a curriculum specialist (in my opinion), I would like to recommend my principal, Charles Nacrelli.

Let me name some of the new programs that he has initiated since becoming the principal here at Ladonia Elementary. He started a tutoring program both before and after school for students. He set up an extended day program for our students whose parents need after school day care. He started a "Caught in the Act" reward program for students caught doing good deeds. At the end of each semester, he has an assembly and gives away prizes to students who have been caught in the act. He had a nutrition program and served lunches to students during the summer vacation. This year for the first time he is running a summer school program for our students.

Mr. Nacrelli has made reading a top priority in our school. Every morning from 8:30 until 9:00 we have DEAR which stand for drop everything and read. During this time there can be no interruptions in a class and the halls must be empty. Late students are sent to the cafeteria and read there until 9:00. This policy emphasizes the importance of reading to both students and teachers, and also allows students to be 30 minutes late and not miss instructional time!

The Accelerated Reading Program is emphasized by Mr. Nacrelli. The teachers turn in monthly group reports and he reviews the reports for progress and offers suggestions to the teachers. Accelerated Reading parties are a great motivator for our students.

Mr. Nacrelli has worked hard to get parents involved in our school. We have a beautiful parent conference room here that is available for use by our parents. His first year as principal he took parents who had previously been "problem" parents for us and used them as morning and afternoon hall monitors. What an excellent way to show them "the other side of the fence" and to change their negative attitude into a positive attitude.

**Where We Are Committed To Academic Excellence**

As part of his parental involvement program, the teachers are required to make at least three parental contacts weekly and to turn in documentation of the contacts with lesson plans. Parents are encouraged to visit classrooms and to volunteer to come and read to the children. Teachers also encourage parents to come and have lunch with the class.

We have a beautiful outdoor classroom that Mr. Nacrelli designed with a brick walkway made with bricks purchased by businesses and patrons in the Ladonia area. Mr. Nacrelli has worked hard to involve the community and to get community support for our school.

I also worked with Mr. Nacrelli when he was a sixth grade teacher here. As a final tribute to him, I can say that previous students who visit often tell me that Mr. Nick was their favorite teacher. Mr. Nacrelli works with teachers and students to make us all better at what we do.

Please feel free to call me at (334)297-7313 if I can give you additional information.

Sincerely,

*Barbara M. Jeffers*

Barbara M. Jeffers
Counselor

# EXHIBIT "D"

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

CIVIL ACTION NUMBER
3:06-cv-685-WKW

BARBARA JEFFERS and JOAN CRAIG,
   Plaintiffs,
vs.
RUSSELL COUNTY BOARD OF EDUCATION,
et al.,
   Defendants.

DEPOSITION TESTIMONY OF:
CHARLES M. NACRELLI

OCTOBER 30, 2007
9:50 a.m.

COURT REPORTER:
JENNIFER DAVIS, CCR

Page 3

1 the time of trial or at the time said
2 deposition is offered in evidence, or prior
3 thereto.
4
5
6            I N D E X
7 EXAMINATION BY:         PAGE NO.
8 Mr. Eddins           5-118
9 Certificate          119
10
11       INDEX OF EXHIBITS
12 EXHIBITS          PAGE NO.
13 Plaintiffs' 1 - drawing     71
14 Plaintiffs' 2 - composite   108
15
16
17
18
19
20
21
22
23

Page 2

1     S T I P U L A T I O N
2     IT IS STIPULATED AND AGREED by and
3 between the parties through their respective
4 counsel that the deposition of CHARLES M.
5 NACRELLI may be taken before Jennifer Davis,
6 Certified Court Reporter and Notary Public,
7 State at Large, at the offices of W. Don
8 Eddins, 337 East Magnolia Avenue, Auburn,
9 Alabama, on October 30, 2007, commencing at
10 approximately 9:50 a.m.
11     IT IS FURTHER STIPULATED AND AGREED
12 that the signature to and the reading of the
13 deposition by the witness is hereby waived,
14 the deposition to have the same force and
15 effect as if full compliance had been had
16 with all laws and rules of Court relating to
17 the taking of depositions.
18     IT IS FURTHER STIPULATED AND AGREED
19 that it shall not be necessary for any
20 objections to be made by counsel to any
21 questions, except as to form or leading
22 questions, and that counsel for the parties
23 may make objections and assign grounds at

Page 4

1     A P P E A R A N C E S
2 FOR THE PLAINTIFFS:
3   W. DON EDDINS, ESQUIRE
    Attorney at Law 337
4   East Magnolia Avenue
    Auburn, Alabama 36830
5
6
7 FOR THE DEFENDANT RUSSELL COUNTY BOARD OF
  EDUCATION:
8
    SYDNEY S. SMITH, ESQUIRE
9   Smith & Smith
    1503 Broad Street
10   Phenix City, Alabama 36867
11
12 FOR THE DEFENDANT CHARLES NACRELLI:
13   MATTHEW C. WILLIAMS, ESQUIRE
    Estes, Sanders & Williams
14   3800 Colonnade Parkway
    Suite 330
15   Birmingham, Alabama 35243
16
17 ALSO PRESENT:
18   BARBARA JEFFERS
19   JOAN CRAIG
20   REBECCA LEE
21
22
23

1 (Pages 1 to 4)

Page 5

1    I, Jennifer Davis, a Certified
2  Court Reporter of Millbrook, Alabama, and
3  a Notary Public for the State of Alabama
4  at Large, acting as Commissioner, certify
5  that on this date, pursuant to the Federal
6  Rules of Civil Procedure, and the
7  foregoing stipulation of counsel, there
8  came before me at the offices of W. Don
9  Eddins, 337 East Magnolia Avenue, Auburn,
10  Alabama, commencing at approximately 9:50
11  a.m. on October 30, 2007, CHARLES M.
12  NACRELLI, witness in the above cause, for
13  oral examination, whereupon the following
14  proceedings were had:
15
16    CHARLES M. NACRELLI,
17  having first been duly sworn, was examined
18  and testified as follows:
19    EXAMINATION
20  BY MR. EDDINS:
21    Q.  All right, sir.  Please just
22  state your name for the record, your full
23  name.

Page 6

1    A.  Charles Michael Nacrelli.
2    Q.  Where do you live,
3  Mr. Nacrelli?
4    A.  I live at 1207 Catherine Drive
5  in Opelika.
6    Q.  How long have you lived there?
7    A.  Since December of last year.
8    Q.  2006?
9    A.  Yes.  Yes, sir.
10    Q.  Where did you live before that?
11    A.  I lived at 1402 Douglas Street,
12  also in Opelika.
13    Q.  Okay.  Are you presently
14  employed?
15    A.  I am.
16    Q.  And where are you presently
17  employed?
18    A.  I work at Benteler Automotive
19  in Opelika.
20    Q.  Is that B-E-N-T-L-E-R?
21    A.  B-E-N-T-E-L-E-R.
22    Q.  Have you ever had your
23  deposition taken before?

Page 7

1    A.  No, sir.
2    Q.  Like we were doing this
3  morning, we're going to be pretty
4  informal.  But if you don't understand any
5  question that I ask, just stop me and ask
6  me to explain, and I certainly will do the
7  best I can.
8    A.  Okay.
9    Q.  You can confer with your
10  attorney as you need to.  I'd ask that you
11  didn't do it right in the middle of a
12  question, but, you know, anytime you need
13  to confer with your attorney or take a
14  break or whatever, we'll be pleased to
15  accommodate you.
16    Let's just start with high
17  school and give us your educational
18  background.
19    A.  I went to high school, Wilson
20  Memorial High School, in Waynesboro,
21  Virginia.  I attended Jacksonville State
22  University for my undergraduate degree,
23  and I got my master's degree at Troy State

Page 8

1  University in Phenix City.
2    Q.  How did you get from Virginia
3  to Jacksonville?
4    A.  My parents were living in
5  Jacksonville at the time, and I had gotten
6  a divorce.  And I had started back to
7  school, and my father just mentioned
8  there's a college here, and it will be
9  easy.  That way, you can, like, live here,
10  and it won't cost you as much to get
11  started and get back into school
12  full-time, which is what I did.
13    Q.  Okay.  Let's start with your
14  first full-time job when you got out of
15  college and give us your professional
16  background.
17    A.  Okay.  My first full-time job
18  was at Ladonia Elementary in 1991.  I was
19  a sixth grade teacher.  I generally taught
20  math and science.  I did teach social
21  studies one year.  I did teach English one
22  year.
23    Q.  When did you graduate from

2  (Pages 5 to 8)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 9

1    Jacksonville?
2        A.    1990, December of '90.
3        Q.    Okay. So that fall, you went
4    to work at Ladonia?
5        A.    Well, actually, yeah, a week --
6    two weeks later, actually.
7        Q.    Okay. I'm sorry. Go ahead.
8        A.    Okay. And then I went to
9    Oliver Elementary for one year as an
10    assistant principal. Was it '99? I think
11    it was 1999. And then I went back to
12    Ladonia Elementary as -- I was hired back
13    there, I guess, as the assistant
14    principal, but the principal left, so it
15    was just me and, I think, a Ms. Dansby
16    until, like, November.
17        Q.    What year would that have been?
18        A.    I'm thinking it is -- it had to
19    be 1999. I'm thinking it's 1999, at the
20    beginning of that school year.
21        Q.    Okay.
22        A.    And then I became principal
23    November of that year.

Page 10

1        Q.    So you were assistant principal
2    at the beginning of the year?
3        A.    Yes, sir. I was transferred
4    back there as the assistant principal, and
5    then they transferred the principal out.
6    So there was no principal for the first
7    two or three months of school.
8        Q.    At the beginning of the year,
9    they had already transferred the principal
10    out?
11        A.    They transferred the principal
12    out probably a couple of weeks after they
13    transferred -- you know, announced that my
14    transfer was there. So when I actually
15    started back there -- because, you know,
16    the assistant principal is only a
17    ten-month contract. When I actually
18    started back there, there was no principal
19    or anybody else. It was just me.
20        Q.    Okay. Who was the principal
21    who was transferred out?
22        A.    Larry Screws.
23        Q.    Where was Mr. Screws

Page 11

1    transferred to?
2        A.    I believe he went to the
3    Alternative Learning Center as the
4    principal over the ALC.
5        Q.    If you would, just from a
6    personal perspective, state your very best
7    attributes as a principal with the Russell
8    County Board of Education.
9        A.    I felt like I went in there and
10    -- at least more so at the beginning,
11    maybe not at the end, I gave teachers a
12    lot more choices than what they were used
13    to.
14        Q.    Why would you say that?
15        A.    Mr. Screws was a very, very
16    good principal, but it was basically -- he
17    had his one way, and that was it, and you
18    didn't veer to the right or veer to the
19    left of that. I don't think you really
20    got to put in a lot of input in that
21    sense, and I wasn't like that as much. I
22    felt like I gave teachers more input. I
23    didn't mind, you know, what's the old

Page 12

1    saying, changing courses in midstream. If
2    somebody showed me something better, I
3    would change it. You know, I didn't have
4    a problem with that.
5        Q.    So more choices for teachers.
6    What else?
7        A.    I just -- I think every
8    principal is just different, just a
9    different person. The teachers at Ladonia
10    were good teachers anyway. They didn't
11    need me to be good teachers. They were
12    already good teachers. My job was just to
13    support them and help them do their job.
14        Q.    If you had to name your worst
15    shortcomings as a principal, what would
16    they be?
17        A.    Oh, a job interview. I haven't
18    thought about this, and so I -- sometimes
19    I think that I would shift gears too
20    quickly and not include everybody in on
21    that. If you change something, it may be
22    a good idea, but, you know, looking back
23    now and different things, I think that if

3  (Pages 9 to 12)

**www.AmericanCourtReporting.com**
**October 30, 2007**

Page 17

1 them -- like, when she brought that in,
2 instituted that, and we did give it to
3 the -- the teachers would get a stack of
4 material at the beginning of the year, and
5 they would get enough of those to give out
6 to every one of their students. It went
7 home. Then the following year, we may not
8 have given that out again except to,
9 maybe, new students because the
10 information didn't change. But it was
11 available that if a parent had lost one,
12 we would have extras where we would give
13 it to them.
14    Q.    What about to the teachers?
15    A.    All the teachers -- well, they
16 had one they were given, too, that they
17 just kept in their own room, you know.
18    Q.    Support people and --
19    A.    Everybody, yes.
20       MR. WILLIAMS:  You're doing a
21 really good job, but let him finish his
22 question just for her sake.
23       THE WITNESS:  Oh, I'm sorry.

Page 18

1       MR. WILLIAMS:  Because she is
2 typing down everything that we're saying.
3 You're really good at anticipating the
4 question, but let him finish before you
5 answer just for her sake. It will read
6 better in the transcript. I'm sorry to
7 interrupt.
8       MR. EDDINS:  That's okay.
9    Q.    (By Mr. Eddins)  Now, other
10 than that document that we just spoke of,
11 can you think of any other policies and
12 procedures that you would have handed out
13 to the staff and support people and
14 teachers and counselors, any staff
15 members?
16    A.    At the beginning of every year,
17 we had -- or I would hand out such as the
18 schedules for the year that we'd come up
19 with, so that way we knew when they were
20 going to PE, when they were going to
21 lunch, when Ms. Jeffers would see them for
22 counseling, or when they'd go to the
23 library, that kind of stuff. You know, we

Page 19

1 would do -- I'd hand those out, so if
2 that's what you're asking.
3    Q.    Well, just anything --
4    A.    Yeah.  I mean, everything like
5 that, we tried to go over the stuff.
6    Q.    Those schedules, were they in a
7 booklet form, or how did you give them --
8 was it a different sheet of paper for each
9 teacher, or how did you inform them of the
10 schedule?
11    A.    I had a booklet, and we bound
12 it up, so that way, it had every schedule.
13 So every teacher's schedule was in there.
14 So it would have, like, by grade all the
15 PE schedule, all the rules, any forms,
16 things like that.  So every teacher got
17 the exact same thing, including --
18    Q.    Is that what's basically done
19 in all schools in Russell County?  Do you
20 know?
21    A.    I do not know.  I learned that
22 through the principal, Mr. Screws, because
23 that's where I basically mentored under,

Page 20

1 you know, that --
2    Q.    What about at Oliver?  Did
3 Oliver have a --
4    A.    I do not know.
5       MR. WILLIAMS:  If you don't
6 know, that's the end of the answer.
7       THE WITNESS:  Okay.  Thank you.
8       MR. EDDINS:  Well, I mean, he
9 can explain his answer.
10    Q.    (By Mr. Eddins)  You were
11 assistant principal at Oliver, weren't
12 you?
13    A.    For one year, yes, sir.
14    Q.    And do you recall how the
15 policies and procedures were given out to
16 the teachers?
17    A.    No, sir.
18    Q.    Okay.  Did you ever attend a
19 workshop that you can recall while you
20 were an administrator for the Russell
21 County Board of Education specifically on
22 sexual harassment?
23    A.    Not that I recall.

5  (Pages 17 to 20)

Page 21

```
1        Q.   Do you ever recall any training
2    that was given to teachers, support
3    people, counselors, or staff members
4    specifically on sexual harassment while
5    you were employed by the Russell County
6    Board of Education?
7        A.   No, sir, not that I recall.
8        Q.   To you, what constitutes sexual
9    harassment from your training as an
10   administrator?
11            MR. WILLIAMS:  I object to the
12   form of the question to the extent that it
13   calls for a legal conclusion.  But with
14   that, you can answer.
15       A.   I always assumed sexual
16   harassment would have been asking for
17   sexual favors of an employee.  I guess
18   it's called, what, quid pro quo, if that's
19   correct to use that terminology, or the
20   fact that you are harassing a person, that
21   they just -- you know, they have told you,
22   hey, I don't like your comments or I don't
23   like your jokes or I don't like your
```

Page 22

```
1    references, so you need to stop, and then
2    if you continue, then you are sexually
3    harassing them.
4        Q.   (By Mr. Eddins)  Okay.  How
5    many years did you serve as assistant
6    principal?
7        A.   One year.
8        Q.   And then at Ladonia, you had
9    the title of assistant principal for a
10   while?
11       A.   Yes, sir, for about three
12   months.
13       Q.   Who recommended you for the job
14   as principal at Ladonia?
15       A.   Lee Henderson was the
16   superintendent at that time.
17       Q.   Okay.  Just tell me basically,
18   as you perceive them to be, what are the
19   duties of a principal in the Russell
20   County School System?
21       A.   The principal is to make sure
22   that teachers are basically on task,
23   giving them materials and supplies they
```

Page 23

```
1    need in order to teach the children, to
2    handle the parents, you know, to talk to
3    them.  If there's a problem with that, you
4    would talk to the parents.  Discipline
5    with the children, you would handle that
6    aspect of it.  Basically, making sure that
7    the school day flows as smooth as possible
8    so that the teachers can teach and the
9    students can learn.
10       Q.   So the principal basically
11   would handle any type of problem that
12   arose at the school?
13       A.   It would ultimately always fall
14   back on me, but not necessarily.  A lot of
15   times, it may have been that the teacher
16   handled the problem themselves, and it
17   didn't come to me or something, so -- but
18   if there was something that they couldn't
19   handle, then it would come back to me.
20       Q.   Well, if there were a problem
21   between two teachers, who would
22   potentially solve the problem?
23       A.   That would be me, if they
```

Page 24

```
1    couldn't handle it.
2        Q.   During the time that you were
3    principal and assistant principal at
4    Ladonia, could you tell me who the Title
5    IX coordinator for the school system was?
6        A.   No, I could not.
7        Q.   Okay.  I'm just going to ask
8    you some people and ask you if you know
9    them, and if so, I want you to tell me how
10   you know them.  Do you know Jamie Evans?
11       A.   I do.
12       Q.   How do you know her?
13       A.   Jamie is a teacher at
14   Ladonia -- or, I assume, was a teacher at
15   Ladonia, taught fourth grade, taught first
16   grade, and she was a rotating teacher.
17   She was one of the teachers that would
18   shift up a grade with a whole entire class
19   and then would shift back the next year.
20   So she would have the same class for two
21   years.
22       Q.   Do a lot of teachers at Ladonia
23   do that?
```

6 (Pages 21 to 24)

Page 25

1        A.   No.  I only had a group that
2   was a program -- something I was trying to
3   do that -- so that the children would not
4   fall as far behind from year to year
5   because they had already had the same
6   teacher, they already knew the same rules,
7   they sat in the same desk, basically, and
8   the teacher knew exactly where she left
9   off with those children.  So that way when
10  they came back in -- I was trying to show
11  that it would be better for the children
12  in the long run.
13       Q.   Do you consider Ms. Evans to be
14  a friend?
15       A.   I consider her a coworker.  I
16  wouldn't necessarily call her a friend.
17  It was not somebody that I ever talked
18  with outside of work.  I respect, you
19  know, Ms. Evans.  I think that she is a
20  good teacher.
21       Q.   Did you consider her to be an
22  honest person?
23       A.   I had no reason to doubt her

Page 26

1   honesty.
2        Q.   If she testified under oath in
3   a court of law, would you believe what she
4   said?
5        MR. WILLIAMS:  Object to the
6   form of the question.  It calls for
7   speculation and conjecture.  He's already
8   answered the question about her voracity.
9   You can answer.  I mean, you're asking him
10  to commit now would he believe what she
11  says in court when we don't know what
12  she's going to say in court because she's
13  not been deposed, nor have I seen any
14  affidavit where she's given any testimony
15  under oath.  So I think it's unfair to ask
16  that question.
17       MR. EDDINS:  I think the rules
18  say that I can ask somebody if they
19  consider another person to be honest, and
20  specifically I can ask them in court would
21  they believe somebody's testimony under
22  oath in court.  That's what I want him to
23  say.

Page 27

1        MR. WILLIAMS:  I'm not arguing
2   that.  I'm not arguing that.
3        MR. EDDINS:  I can show you the
4   rules if you want me to.
5        MR. WILLIAMS:  Well, if you
6   want to, if you're hell bent on doing it,
7   go ahead.  My point is it is an unfair
8   question and an improper question to ask
9   somebody would you believe them in open
10  court because it begs the question as to
11  what.
12       MR. EDDINS:  Well, it may be
13  unfair.  I'm just stating that the rules
14  specifically say that I can ask that.
15  That's one of the few character traits you
16  can ask about.
17       MR. WILLIAMS:  And he already
18  answered the question --
19       MR. EDDINS:  All right.
20       MR. WILLIAMS:  -- which was I
21  have no reason to doubt her truthfulness.
22       Q.   (By Mr. Eddins)  Okay.  Would
23  you believe her testimony under oath in a

Page 28

1   court of law?
2        MR. WILLIAMS:  Same objection.
3   You can answer.
4        A.   Yes.
5        Q.   (By Mr. Eddins)  Okay.  That's
6   all I need.
7        Do you know Allison Gentry?
8        A.   I do.
9        Q.   How do you know her?
10       A.   Allison is a third grade
11  teacher at Ladonia Elementary, and she's
12  been there before I started, I believe,
13  even as a teacher.  She was there before I
14  was.
15       Q.   Do you consider her to be a
16  friend?
17       A.   I think at one time we had a
18  close relationship, her and my wife and
19  her husband and I.  But that was maybe ten
20  years ago.
21       Q.   Okay.  Would you consider her
22  to be an honest person?
23       A.   As far as I know, yes, sir.

7  (Pages 25 to 28)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 29

1    Q.   Would you believe her testimony
2  under oath in a court of law?
3        MR. WILLIAMS:  Same objection.
4  Object to form.  You can answer if you
5  know.
6    A.   I have no reason to doubt her.
7    Q.   (By Mr. Eddins)  Okay.  That's
8  fair enough.
9    A.   Okay.  Yes, sir.
10   Q.   Do you know Ms. Gentry's
11 husband?
12   A.   Neil Gentry.
13   Q.   How do you know him?
14   A.   The same thing, through just a
15 casual relationship.  Their son, Jimmy,
16 was one of my students in sixth grade, and
17 that's how I got to know Neil Gentry.  And
18 for a period of time, we did -- I'd say,
19 you know, before I had a child, we all did
20 go out, like I say, on a Friday night
21 maybe to a restaurant to eat, and we did
22 that, you know, several times.
23   Q.   Do you know if Mr. Gentry has

Page 30

1  ever expressed to you any anger or
2  displeasure about anything involving his
3  wife, Mrs. Gentry?
4    A.   Not to me.
5    Q.   Have you ever heard that he
6  expressed that to anybody else?
7    A.   No.
8    Q.   Do you know a Kelly Brantley
9  Howard?
10   A.   I do.
11   Q.   How do you know her?
12   A.   She is a kindergarten teacher
13 at Ladonia Elementary.
14   Q.   Okay.  Do you consider her to
15 be a friend?
16   A.   Work acquaintance.  Again, I
17 never had anything to do with her outside
18 of work.
19   Q.   Do you consider her to be an
20 honest person?
21   A.   As far as I know.  I have not
22 had any reason to doubt the honesty of
23 people, but I don't know what can cause a

Page 31

1  person to lie or not lie.
2    Q.   I understand.  Would you
3  believe the testimony under oath of
4  Ms. Howard in a court of law?
5        MR. WILLIAMS:  Same objection.
6  I think it's an unfair question without
7  knowing what specific testimony you're
8  going to attribute to the witness.  But
9  you can answer it if you know.
10   A.   Yeah.  It would depend on what
11 she said.  I'd have to -- I don't have any
12 reason to doubt her.
13   Q.   (By Mr. Eddins)  That's fair
14 enough.
15       Do you know Beth Gaston?
16   A.   I do.
17   Q.   How do you know her?
18   A.   Beth was a PE coach at Oliver
19 Elementary the one year I was there, and
20 then she transferred over to Ladonia
21 Elementary.  I believe she was only there
22 one year before I left.  It may have been
23 two.  I can't remember, but one year --

Page 32

1    Q.   Do you consider her to be a
2  friend?
3    A.   No.  Just, again, work
4  acquaintances.
5    Q.   Do you consider her to be an
6  honest person?
7    A.   I don't know her that well
8  enough to say one way or the other,
9  honestly.
10   Q.   Would you believe her sworn
11 testimony under oath in a court of law?
12       MR. WILLIAMS:  Same objection.
13 You can answer if you know.
14   A.   Yeah.  Again, I don't know her
15 well enough to know if she would tell the
16 truth or not tell the truth.
17   Q.   (By Mr. Eddins)  Okay.  Do you
18 know Barbara Jeffers?
19   A.   I do.
20   Q.   How do you know her?
21   A.   Barbara is a counselor at
22 Ladonia Elementary.  I've known her for
23 about 15 years.

8 (Pages 29 to 32)

Page 37

1  your house, I think in July of 2005, in
2  which there were some people from Ladonia
3  there? Do you recall that party?
4      A.   Yes, sir, I do.
5      Q.   Okay. Tell me what you recall
6  about it. What was the purpose of it, to
7  begin with?
8      A.   Brenda was --
9      Q.   Brenda Coley?
10     A.   Brenda Coley -- excuse me; I'm
11 sorry -- was moving out of our school.
12 She had -- was going to take over her own
13 school in August as a principal, and she
14 had just made the comment -- because the
15 teachers, I think, had already left for
16 the year. She says, I've been working
17 here all these years and -- you know, and
18 didn't get to really have a party and say
19 goodbye or something --
20     Q.   When was that conversation?
21     A.   Probably the early part of
22 June. The teachers were already gone by
23 then. Brenda was still on a ten-month

Page 38

1  contract, so she would still be there.
2      Q.   Was that conversation at the
3  school?
4      A.   Probably, or it could have been
5  at lunch. It could just have been a
6  conversation -- because we didn't really
7  socialize outside of school except there.
8  It was just casual, just talking about
9  something, so --
10     Q.   So, then, would it have been at
11 school?
12     A.   Possibly, yes, sir.
13     Q.   Okay. Go ahead.
14     A.   And we just talked about that,
15 and I went home and said something to my
16 wife and said that, you know, we've never
17 had, you know, a function at the house
18 where I invited people that I work with
19 and other people, and let's go ahead and
20 invite them. And we chose a time in July
21 after I had got back from vacation from
22 seeing my parents and just had a pool
23 party, and we invited -- just sent out

Page 39

1  invitations to anybody who wanted to come
2  to the party, and then some other people
3  who actually didn't even work at the
4  school also showed up also.
5      Q.   Okay. You sent out
6  invitations?
7      A.   Uh-huh.
8      Q.   To whom did you send
9  invitations?
10     A.   I just sent them out to the
11 people that worked at school that I knew
12 of, those teachers and their husbands
13 and/or wives, whichever the case may be.
14     Q.   Did you send them out from any
15 sort of list or anything like that?
16     A.   Well, I just knew who I had at
17 the school that was still working. If --
18 some of them had -- people that had worked
19 with Brenda Coley that actually were maybe
20 at another school --
21     Q.   Let me ask you this: Allison
22 Gentry, what is her address?
23     A.   I do not know off the top of my

Page 40

1  head.
2      Q.   How did you get the address to
3  send her an invitation, then?
4      A.   How? You would look it up in
5  the phonebook.
6      Q.   Is that what you did?
7      A.   Yeah. I could look up stuff in
8  phonebooks. I could look up --
9      Q.   How did you do it?
10     A.   We all --
11          MR. WILLIAMS: Let him finish
12 his answer.
13     A.   I mean, I'm just saying
14 there's -- I can get on the internet. If
15 I had a list at the house -- you know,
16 just wherever I could from different
17 people. I may have asked, you know,
18 somebody's address.
19     Q.   (By Mr. Eddins) All right.
20 Did you look in the school computer for
21 addresses?
22     A.   I don't know if our computer
23 had that. I'm sure we had a list

10 (Pages 37 to 40)

Page 41

1  somewhere, I'm sure, that if I couldn't
2  find it somewhere -- so that's possible,
3  yes.
4      Q.   And would you have had a list
5  at the school?
6      A.   Of all the addresses?  Not
7  necessarily.  I might have had their phone
8  numbers, but not their addresses.
9      Q.   At the school, would you have
10 had the address of Ms. Jeffers?
11     A.   I'm sure it was there
12 somewhere, yeah.
13     Q.   What about Ms. Gaston?
14     A.   I'm sure.  Like I said, if I
15 had one, I'm sure I could find any of
16 them, yes, sir.
17     Q.   Now, you say you could look it
18 up in the phonebook?
19     A.   Right.
20     Q.   Would Ms. Jeffers' name be
21 listed in the phonebook?  Do you know?
22     A.   Probably not.
23     Q.   Do you know if most of these

Page 42

1  females would be listed?  Would there be
2  an Allison Gentry listed in the phonebook?
3      A.   Well, no.  I mean, some, I know
4  the husbands, so I would know it.  I would
5  just find the address wherever I could
6  find the address to compose the list, and
7  if it was at school that we found it, then
8  yes.
9      Q.   Well, did you find some at the
10 school?  That's my question.
11     A.   Probably.
12     Q.   Okay.  Do you know an Emily
13 Jones?
14     A.   I do.
15     Q.   How do you know her?
16     A.   Emily was a teacher at Ladonia
17 Elementary, and then I believe she is now
18 a teacher at Oliver Elementary.  She
19 transferred over there.
20     Q.   Was she a teacher at Ladonia
21 Elementary Brenda Coley's last year as
22 assistant principal?
23     A.   Yes, sir.

Page 43

1      Q.   And did you send her an
2  invitation to this party in July of 2005?
3      A.   As far as I know, I sent all of
4  the teachers invitations, and then even
5  some of the ones that had transferred to
6  other schools that Brenda had said, hey,
7  you know, can you invite such and such or
8  one teacher -- my wife was taking a class
9  at a community college, and she said, I
10 want to come, and she said, well, what's
11 your address and I'll make sure, you know,
12 you get the --
13     Q.   Who prepared the invitations?
14     A.   My wife and I.
15     Q.   All right.  Where did you
16 prepare them?
17     A.   At home.
18     Q.   Was it on card stock or just a
19 piece of paper?
20     A.   I think that Jerrie, my wife,
21 made something on the computer, some kind
22 of design, and then we mailed that out.
23     Q.   Okay.  And where did you get

Page 44

1  the stamps?
2      A.   The post office.
3      Q.   Who paid for them?
4      A.   Oh, I did.  Yes, sir.
5      Q.   Okay.  Where did you get the
6  envelopes?
7      A.   Again, my house.  I paid for
8  that.  This was not a school function.
9  This was mine, so it was my money.
10     Q.   Do you know a Bertha Alexander?
11     A.   I do.
12     Q.   How do you know her?
13     A.   She is a first grade teacher, I
14 think, retired from Ladonia Elementary.
15     Q.   Okay.  When did she retire?
16     A.   She retired June before I left.
17 So I left in September, so she retired
18 that June.  That was her last year.
19     Q.   June before the July party?
20     A.   Yes, sir.  Yes, sir.
21     Q.   And did you send her an
22 invitation to this party?
23     A.   As far as I know.  I thought --

11  (Pages 41 to 44)

Page 45

1  now, I may not have, because I know that
2  when we were sending out the invitations
3  that I talked to my wife about it, saying
4  that teachers that had already retired and
5  already had said goodbye to Brenda or
6  something like that, that we weren't going
7  to go ahead and necessarily send them out.
8  But as far as I know, like I said, I sent
9  them out to --
10      Q.   Is she African-American or
11  Caucasian?  Do you recall?
12      A.   She is African-American.
13      Q.   Okay.  Do you know a
14  Ms. Tarver, another black teacher that
15  retired, that same year?
16      A.   I do.  I do.
17      Q.   What is her first name?
18      A.   Yvonne.
19      Q.   Yvonne Tarver.  Did you send
20  her an invitation?
21      A.   Again, as far as I know.  I
22  sent out invitations, I thought, to all
23  the teachers.

Page 46

1      Q.   Well, you just said you didn't
2  send --
3      A.   Well, again, you're asking me
4  to remember something specifically two
5  years ago, and I don't have an answer.  As
6  far as I know, I sent them out, but I do
7  know in the back of my mind, too, that I
8  remember thinking, okay, if they are a
9  retired teacher, you know, why send
10  them -- that kind of stuff.  And I
11  remember having that discussion -- I can't
12  remember with who.  My wife and I may have
13  had that discussion there, so --
14      Q.   How many invitations, do you
15  remember, were actually sent out?
16      A.   I do not remember the exact
17  number.
18      Q.   Do you know the approximate
19  number?
20      A.   30.
21      Q.   Okay.  Do you remember anybody
22  being there who was not an employee of the
23  Russell County Board of Education or a

Page 47

1  guest of an employee of the Russell County
2  Board of Education that is not related to
3  you?
4      A.   If you weren't a guest or
5  employee, you would have just been a
6  stranger who crashed a party.  So the
7  answer would have been no.
8      Q.   So it was a party for employees
9  and their guests?
10      A.   It was a party for Brenda Coley
11  to celebrate her being promoted.
12      Q.   Okay.  Did y'all bring any
13  chairs or tents or anything?
14      A.   I had gotten a -- borrowed a
15  pop-up tent from a friend of mine down the
16  street, so that way, we'd have cover.  I
17  got chairs from the house.
18          MR. WILLIAMS:  I think he was
19  asking you a different question.
20          THE WITNESS:  Okay.
21          MR. WILLIAMS:  You kind of cut
22  him off.
23          THE WITNESS:  I'm sorry.

Page 48

1          MR. EDDINS:  Well, that's --
2          MR. WILLIAMS:  I didn't know if
3  you meant to ask him from the school,
4  but --
5          MR. EDDINS:  Yeah.  Well, I was
6  just asking it open-ended.
7          THE WITNESS:  Okay.
8          MR. WILLIAMS:  Sorry to
9  interrupt.  I just thought I'd clarify it.
10          MR. EDDINS:  That's okay.
11      Q.   (By Mr. Eddins)  Was there any
12  alcohol served at the party?
13      A.   Yes, there was.
14      Q.   What kind of alcohol was
15  served?
16      A.   I had beer, I had wine, and I
17  also had sodas for those that didn't
18  drink.
19      Q.   Beer, wine, and sodas?
20      A.   Yes, sir, and water.
21      Q.   What kind of beer?
22      A.   Just a keg beer.
23      Q.   How many gallons are in a keg?

12  (Pages 45 to 48)

American Court Reporting
toll-free (877) 320-1050

Page 49

1　Do you know?
2　　A.　I do not know.  It was just a
3　keg beer.
4　　Q.　Where did you get the keg?
5　　A.　I believe Wal-Mart.
6　　　(A discussion was held off the
7　record.)
8　　Q.　(By Mr. Eddins)  Did you
9　personally consume any alcohol at the
10　party?
11　　A.　I did.
12　　Q.　How much did you consume?
13　　A.　I would guess five or six cups
14　of beer.
15　　MR. EDDINS:  Do you have those
16　photos that I loaned you?
17　　MR. WILLIAMS:  We do.
18　　MR. EDDINS:  Could I see them?
19　　MR. WILLIAMS:  Let's take a
20　break.  They're in the truck.  I'll get
21　them out.  I need to take a break anyway.
22　　MR. EDDINS:  Okay.
23　　　(Brief recess.)

Page 50

1　　Q.　(By Mr. Eddins)  Mr. Nacrelli,
2　I think we were talking about a party in
3　July of 2005 at your house.
4　　A.　Yes, sir.
5　　Q.　How were you dressed at that
6　party?
7　　A.　My bathing suit.  Sometimes I
8　wore a shirt, sometimes I didn't,
9　depending on whether I had just gotten in
10　or out of the pool.
11　　Q.　So part of the time, you were
12　walking around without a shirt on; is that
13　correct?
14　　A.　That is correct.
15　　Q.　Why would you do that?
16　　A.　It's a pool party.  If I swim
17　in a shirt, I can't move my arms as well.
18　　Q.　Well, when you were inside, did
19　you have on --
20　　A.　Yes, sir.  Yes.
21　　Q.　You had on a shirt when you
22　were inside?
23　　A.　No, sir.

Page 51

1　　Q.　Okay.
2　　A.　I'm sorry.  I've got to let you
3　finish your question.  I'm sorry.  I'm bad
4　about that.
5　　Q.　Well, when you were not
6　swimming and not needing to move your
7　arms, did you, on occasion, have your
8　shirt off?
9　　A.　Yes, sir.
10　　Q.　Did other people at the party
11　have their shirts off inside?
12　　A.　Those that were swimming that
13　were males, I would assume.  It was a pool
14　party.  Now, not a lot of people showed up
15　to swim, and so, therefore, there weren't
16　a lot of people in their bathing suits.
17　　Q.　Okay.  Can you name any other
18　male that was actually inside without his
19　shirt on?
20　　A.　No.  Not off the top of my
21　head, no, sir.
22　　Q.　Okay.  So you had wine and
23　beer.  Did you have any whiskey at the

Page 52

1　party?
2　　A.　I don't believe so.  I did not
3　purchase any.
4　　Q.　Did you personally drink any
5　whiskey at any time that night?
6　　A.　No, not that I know of, not
7　that I remember.
8　　Q.　Do you drink whiskey?
9　　A.　I have -- I do drink it from
10　time to time.
11　　Q.　Okay.  Now, was there food
12　served?
13　　A.　Yes, sir.
14　　Q.　What type of food was it?
15　　A.　There was a smorgasbord of
16　food.  Everybody pretty much brought food.
17　I believe we had said bring a covered dish
18　or bring a dish of food, and then we also
19　had some different foods.  So a lot of
20　different finger foods.
21　　Q.　Did you have a particular meat,
22　like a huge roast or turkey or anything
23　like that?

13　(Pages 49 to 52)

Page 53

1    A.    No, not that I remember.
2    Q.    Okay.  How was the food paid
3  for, other than what was brought by
4  guests?
5    A.    Not counting what the guests
6  brought, my wife and I.
7    Q.    Okay.  Do you recall, were
8  there any members of the PTA who were
9  there who were not teachers or staff,
10  Ladonia PTA?
11    A.    I don't believe so, no, sir.
12    Q.    Were there any PTA funds used
13  in any way for the party?
14    A.    No, sir.
15    Q.    Okay.  Was there any school
16  money used in any way for the party?
17    A.    No, sir.
18    Q.    Did any individual contribute
19  any money toward the expenses for the
20  party, other than you and your wife?
21    A.    No, sir.
22    Q.    Do you remember what Brenda
23  Coley was wearing that night at the party?

Page 54

1    A.    Not off the top of my head.
2  Slacks and a shirt.
3    Q.    Okay.  How about Jamie Evans?
4  Do you remember what she was wearing?
5    A.    She wore shorts and a shirt.  I
6  think she also was swimming, so she had a
7  bathing suit on also.
8    Q.    Do you recall what color the
9  shirt was?
10    A.    No, sir.
11    Q.    Do you remember what your wife
12  was wearing?
13    A.    No, sir.  I -- no.
14    Q.    There have been a lot of
15  allegations about your conduct that night.
16  I'm just going to ask you some specific
17  things, and I want you to tell me if you
18  did or did not do them and whether you
19  remember or whatever.
20    Ms. Coley testified that you
21  kissed her out by the pool.  She said that
22  under oath.  Is that true or false?
23    A.    That is true.

Page 55

1    Q.    Okay.  Tell me about it.  What
2  did you do and why did you do it?
3    A.    I believe it's after -- toward
4  the end of the party, and she and her
5  husband were leaving, and my wife gave her
6  husband Ken a kiss and a hug goodbye, and
7  we were congratulating them, and I did the
8  same thing to Brenda.
9    Q.    Your wife kissed Mr. Coley?
10    A.    Yes.
11    Q.    Did she kiss him on the mouth
12  or on the lips?
13    A.    Probably.
14    Q.    You don't remember?
15    A.    Specifically, no.
16    Q.    Okay.  Did you stick your hand
17  down Allison Gentry's blouse or top?
18    A.    No, not that I remember.
19    Q.    Not that you remember.  You
20  just said you had five or six drinks.
21    A.    Yes, sir.
22    Q.    Were you drunk?
23    A.    Yes, sir.

Page 56

1    Q.    You were drunk?
2    A.    Yes, sir.  I believe that would
3  be a good way to describe it, yes, sir.
4    Q.    Okay.  In that case, you
5  wouldn't deny that you stuck your hand
6  down Allison Gentry's top?
7    A.    You're asking me to make a
8  guess at something I do not remember one
9  way or the other.  So I'm not able to say
10  yes or no.
11    Q.    All right.  I'm just asking you
12  would you deny that you stuck your hand
13  down Ms. Gentry's top?
14    A.    I'm not going to deny it, no.
15    Q.    Okay.  Do you recall pulling
16  the top down on Jamie Evans' swimsuit?
17    A.    I do not recall that, no.
18    Q.    Do you recall attempting -- or
19  pulling the bottom down on her two-piece
20  swimsuit?
21    A.    I do not recall that, no.
22    Q.    Okay.  Do you recall grabbing
23  Jason Hopper in the crotch that evening?

14  (Pages 53 to 56)

Page 57

1    A.   I do not.
2    Q.   Do you recall squeezing Barbara
3 Jeffers' buttocks one or more times during
4 the evening?
5    A.   I do not, no.
6    Q.   Do you recall appearing naked
7 in Ms. Jeffers' presence that evening?
8    A.   I do not.
9    Q.   Do you recall jumping over her
10 into the pool without your clothes on?
11    A.   No, I do not.
12    Q.   Okay.  Other than your wife or
13 your attorneys -- I'm talking about any
14 attorney, previous attorney or
15 Mr. Williams -- do you recall talking with
16 anybody about the events of the party,
17 what went on at the party anytime after
18 the party that evening?
19    MR. WILLIAMS:  You understand
20 he does not want to know, nor is he
21 entitled to know, anything that you've
22 told me or Jerry or Bill Patty, who was
23 your lawyer before me.

Page 58

1    THE WITNESS:  Okay.
2    MR. WILLIAMS:  He's asking
3 other than those three people or Rebecca
4 Lee.
5    THE WITNESS:  Okay.
6    MR. WILLIAMS:  All right?
7    THE WITNESS:  All right.
8    A.   The only person I can remember
9 having any conversation with was -- may
10 have been with Dr. Lee and Sydney Smith,
11 and I remember them asking the question
12 about did you appear naked, and I think my
13 answer was the fact that I don't look that
14 good with my clothes off, I don't think
15 so, and I remember Dr. Lee laughing
16 saying, yeah, clothes are a good thing,
17 so --
18    Q.   (By Mr. Eddins) Do you
19 remember anything else about your
20 conversation with Dr. Lee?
21    A.   She asked me that question.
22 She -- what else was it?  I think she
23 asked if I had pulled Jamie Evans' bathing

Page 59

1 suit, at which time I also told her the
2 same thing, I don't remember doing that.
3 And then she'd asked something about
4 picking Barbara up and slinging her around
5 and biting her on the breast, and I told
6 her I remember what she was talking about
7 with that.
8    Q.   That's a different issue.  Now,
9 we'll get to that soon.
10    A.   Okay.  But that's all I
11 remember her asking me about.
12    Q.   About the party --
13    A.   Right.
14    Q.   -- do you remember anything
15 else?  Did she ask you about Ms. Gentry?
16    A.   No, sir.
17    Q.   Now, can you think of any
18 friends that you might have talked with
19 about the party after the party?
20    A.   No, sir.
21    Q.   Did you ever talk with
22 Mr. Hopper about it, Jason Hopper?
23    A.   Not that I recall.  Jason was

Page 60

1 at the middle school, so I really did not
2 see him very often.
3    Q.   Okay.  Well, before or after
4 the party, anytime when you were principal
5 or assistant principal at Ladonia
6 Elementary School, I want you to tell us
7 if you recall some of these things.
8 Telling Ms. Jeffers that you were like
9 your father, a chip off the old block and
10 sexually very virile and your Italian
11 background, do you recall discussing
12 anything like that with her?
13    A.   Not specifically, no.
14    Q.   Okay.  Do you recall telling
15 Ms. Coley specifically that -- referring
16 to yourself as the "Italian Stallion"?
17    A.   No.
18    Q.   Did you tell Ms. Jeffers that
19 you and your wife Jerrie have sex every
20 night?
21    A.   I'd be lying.  No.  No.  I'm
22 sorry.
23    Q.   Did you tell her that you and

15 (Pages 57 to 60)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 61

1   your wife sit around naked every night?
2       A.   We used to pre-Charlesy
3   (phonetic), pre my daughter.
4       MR. WILLIAMS:  The question is
5   did you tell Ms. Jeffers that, not did you
6   sit around naked with your wife.  Did you
7   tell her that?
8       A.   I don't remember.
9       Q.   (By Mr. Eddins)  Okay.
10      A.   Okay.
11      Q.   Now, about how much do you
12  weigh right now?
13      A.   I would say about 220.
14      Q.   What is the most that you have
15  ever weighed?
16      A.   About 250.
17      Q.   When did you lose the 30
18  pounds?
19      A.   I had a stent put in my heart
20  in 2004, and the doctor told me I needed
21  to lose weight.  So I actually went from
22  250 down to about 180.
23      Q.   Wow.  Now, how did you do that?

Page 62

1       A.   It was following a strict diet,
2   watching what I ate and drank, and alcohol
3   was not one of my things because it's
4   fattening.
5       Q.   Was exercise a part of the
6   routine to lose weight?
7       A.   Yes, sir.  Yes, sir.
8       Q.   Do you ever recall telling
9   Ms. Jeffers how jealous your wife was that
10  you were losing weight?
11      A.   Not that I remember.
12      Q.   Okay.  Do you recall telling
13  her that you worked at a pizza parlor a
14  few years earlier?
15      A.   I may have, yes.
16      Q.   Do you recall telling her that
17  while you worked at the pizza parlor, that
18  y'all had sex on the table in there?
19      A.   No, I did not.
20      Q.   The employees had sex on the
21  table?
22      A.   No.
23      Q.   Okay.

Page 63

1       A.   That was impossible.  There
2   were no tables.  I'm sorry.
3       MR. WILLIAMS:  The question
4   is --
5       THE WITNESS:  Did I -- I know.
6       MR. WILLIAMS:  -- not did you
7   have sex on the table, but did you tell
8   her that you had sex --
9       THE WITNESS:  Okay.  I
10  understand.
11      (A discussion was held off the
12  record.)
13      Q.   (By Mr. Eddins)  Do you know
14  Mignon Thornton (phonetic)?
15      A.   I do.
16      Q.   How do you know her?
17      A.   She is a fourth grade teacher
18  at Ladonia.  I assume she is still a
19  fourth grade teacher.
20      Q.   Was she a teacher when you were
21  principal?
22      A.   Yes, sir.
23      Q.   Do you recall telling her that

Page 64

1   you don't know why you've never been
2   charged with sexual harassment before
3   because you would be guilty if you were
4   charged with it?
5       A.   No, sir.
6       Q.   Okay.  At this point, do you
7   regard her as being an honest person?
8       A.   I imagine she is to a point,
9   yes.
10      Q.   Do you know why she would make
11  a statement like that --
12      A.   I --
13      Q.   -- if it were not true?
14      MR. WILLIAMS:  Let him finish.
15  You can answer it.  I'm sorry.
16      THE WITNESS:  Okay.
17      MR. WILLIAMS:  You were
18  pouncing, and he was still talking.
19      THE WITNESS:  Okay.  Yeah.  I
20  understand that.
21      A.   I don't know why anybody would
22  make a false statement, no.
23      Q.   (By Mr. Eddins)  Okay.  She has

16  (Pages 61 to 64)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 65

1 no vendetta against you that you know of;
2 is that correct?
3     A.   Not -- not that I am aware of.
4     Q.   Okay.  That party was in July
5 of 2005; is that correct?
6     A.   That is correct.
7     Q.   When did the school term start
8 for most teachers and students that next
9 year?
10     A.   August, the first week of
11 August, I would say.
12     Q.   Would that have been early
13 August or late August or what?
14     A.   Early August, the first week of
15 August.
16     Q.   Now, as I understand and
17 Dr. Lee has testified and various others,
18 that some employees in the Russell County
19 School System were on ten-month contracts
20 and some nine and some 11 and some 12.
21 What contract were you on when you were
22 principal at Ladonia, how many months?
23     A.   I was on an 11-month contract.

Page 66

1     Q.   When did you start back for
2 that term?  When the teachers started the
3 first week in August, when did you start?
4     A.   Probably would be about the
5 third to fourth week in July.  I usually
6 started a week or two before they did.
7     Q.   When you started back, was
8 there any other employee that started back
9 at the same time as you with the school
10 system at Ladonia?
11     A.   No, sir.  Just me.
12     Q.   When did Ms. Jeffers normally
13 start?
14     A.   Ms. Jeffers was a ten-month.
15 It varied from year to year.  It depended
16 on when they would end their contract as
17 to when they would start.  They'd have to
18 work so many days.  So usually it would be
19 within a couple of weeks, you know, a
20 week -- you know, well, usually I would
21 say -- it's hard to tell.  Sometimes the
22 teachers would be as -- you know, as few
23 as a couple of weeks after we started back

Page 67

1 and the ten-month, maybe a week after
2 that, but there was -- you know, they
3 would just depend on the schedule.  So I
4 couldn't remember exactly, but we didn't
5 start at the same time, and it could have
6 been as much as a week later that they
7 started back.
8     Q.   And were there any other
9 employees at Ladonia who were on anything
10 other than nine-month contracts, to your
11 knowledge?
12     A.   Yes, sir.
13     Q.   Who was that?
14     A.   The assistant principal was a
15 ten-month contract.  The counselors were a
16 ten-month contract.  The school secretary
17 usually was also on a ten-month contract.
18     Q.   And when would they normally
19 report?
20     A.   Again, it would depend, but
21 they all reported back the same day.  All
22 the ten-month came back and left on the
23 same day, usually.

Page 68

1     Q.   Now, just in proximity, how
2 close was your office to Ms. Jeffers'
3 office at Ladonia school?
4     A.   30 or 40 feet.
5     Q.   If you would, just draw it out
6 so I can get it clear in my own mind.
7     A.   Okay.  My office was right
8 about here.
9     Q.   Okay.  Put a front door on
10 there so we will know --
11     A.   Okay.  We'll put a front door,
12 let's say, right there.  Ms. Jeffers'
13 office was down here, so --
14     Q.   Where was the main front door
15 to the building?
16     A.   It was right here.  This was
17 the --
18     Q.   Just write on there --
19     A.   I guess that would be the main
20 office.  This would be the assistant
21 principal's office.
22     Q.   Okay.
23     A.   And that would be my office.

17 (Pages 65 to 68)

**www.AmericanCourtReporting.com**
**October 30, 2007**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 69

1  This would be -- I'm trying to remember.
2  I think this was -- there was a bathroom
3  in there. There used to be an old
4  teacher's lounge, but now it's more just a
5  computer lab or computer junk.
6      Q.   Okay.
7      A.   This was the janitor's room,
8  and then this was another hallway, and
9  Ms. Jeffers' office was on another
10  hallway.
11     Q.   Now, how did the students come
12  in the building?
13     A.   It would depend. The students
14  that rode a bus would come in through the
15  bottom. There's two hallways. You either
16  come in through the bottom hallway, come
17  in through the main hallway, or there was
18  another section of buildings right there,
19  which is the kindergarten and first grade
20  buildings, and they may come in on that
21  hallway. And then the car riders would
22  come in through the main door because they
23  drop off out front. So they actually had,

Page 70

1  like, several different access points.
2      Q.   Is there a hall on either side
3  of these offices?
4      A.   Yes, sir. There's a hallway
5  right here, and that's the schoolyard, and
6  then the lunchroom was over here, and
7  there were some buildings right here and a
8  hallway going out to that new building.
9  And then that was a hallway right there,
10  and then you'd go down outside, and then
11  there was another hallway down there and
12  another set of buildings. The building
13  was like -- the school was built -- I
14  guess because it was such an old building,
15  they had, like, one section, then they
16  built another section, and then they built
17  another section, and they were connected
18  by sidewalks.
19     Q.   Okay.
20     A.   So, I mean, it was a completely
21  separate building. That was a completely
22  separate building. This -- well, the main
23  building was a completely separate

Page 71

1  building, but they were all connected by
2  sidewalks.
3      Q.   Put your name and date on
4  there, and we will offer that as an
5  exhibit.
6      (Whereupon, a document was
7  marked as Plaintiffs' Exhibit 1 and is
8  attached to the original transcript.)
9      Q.   (By Mr. Eddins) Okay. Let's
10  discuss some other things that you may
11  have talked about with Dr. Lee. The
12  complaint in the case mentions something
13  that Ms. Jeffers kind of found offensive.
14  It was a day when you were carrying a
15  child under your arms and the child was
16  crying and kicking and you made a
17  statement. Do you recall that incident?
18     A.   Can you refresh my memory?
19     Q.   Okay. Did you make the
20  statement, something to the effect -- and
21  I'm paraphrasing -- Andrew, I can handle
22  you, my wife's breasts weigh more than you
23  do. Do you recall that?

Page 72

1      A.   Yeah. I believe I do.
2      Q.   Is that a statement that you
3  made?
4      A.   Probably close.
5      Q.   Is that appropriate for a
6  principal to be making a statement like
7  that?
8      A.   No, sir.
9      Q.   Do you remember an incident on
10  or about September 9, 2005, in which
11  Ms. Jeffers and Kelly Brantley Howard were
12  in the student council room counting the
13  money for the Katrina hurricane victims?
14     A.   (Witness nods head.)
15     Q.   Okay. Tell us what you
16  remember about that incident.
17     A.   I remember picking up Barbara,
18  and we were just --
19     Q.   Just tell us --
20     A.   Okay.
21     Q.   Start from the --
22     A.   I'm trying to remember. I --
23      THE WITNESS: I'm sorry.

18  (Pages 69 to 72)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 73

1    MR. WILLIAMS: No. I was going
2  to ask Don just to let you finish your
3  answer.
4    A.  Oh, I remember just that -- you
5  know, I always would joke around with
6  Barbara, you know, and I remember her
7  saying something about, can't pick me up
8  or something like this, you know, just
9  teasing, something like this. And I was
10  saying, you know, I can pick up my wife, I
11  know I can. I think I was proud of myself
12  at that point in time. I had lost a bunch
13  of weight, and I was exercising, and I
14  felt better, and I just -- you know, and I
15  remember picking her up and just slinging
16  her around some, and I remember that --
17    Q.  (By Mr. Eddins) How did you
18  pick her up and sling her around?
19    A.  I just kind of cradled her,
20  because Barbara is taller than I am, so I
21  had to cradle her to pick her up like
22  that.
23    Q.  Which arm did you cradle her

Page 74

1  under?
2    A.  I would think -- I'm
3  right-handed. I would guess her legs
4  would be under my right arm, I guess.
5    Q.  I was going to ask you, if
6  you'd just start at the very beginning and
7  tell us when you went in there, why you
8  went in there, and just sort of work up to
9  the incident. Were you just passing by
10  the --
11    A.  It was -- it was after school.
12  We were getting ready to go home, and she
13  was in there, and I just stopped in there
14  to see -- just to see what was going on.
15  It was the teacher's lounge near the
16  office -- or the parents' conference room
17  near the office, and then --
18    Q.  You saw Ms. Howard and
19  Ms. Jeffers in there?
20    A.  Yeah, and just -- right.
21    Q.  Did you go in at that point?
22    A.  Sure.
23    Q.  Did y'all have any

Page 75

1  conversation?
2    A.  I'm sure we did.
3    Q.  Do you remember what you talked
4  about?
5    A.  No, sir.
6    Q.  Okay. At some point, you just
7  reached down and picked her up; is that --
8    A.  Well, I remember, you know,
9  teasing with her and joking about it, and
10  she was saying how you couldn't pick me
11  up, and I said I could pick you up, and I
12  did.
13    Q.  And she says that when you
14  picked her up, you rolled her toward you;
15  is that correct?
16    A.  Well, I don't know if that's
17  fair. The only way I know to pick someone
18  up that's -- because of her stature, I
19  would have to be like that to arch my back
20  backwards there. So, yes, I guess that
21  would be correct.
22    Q.  You testified that you were
23  cradling her?

Page 76

1    A.  Right. You know, I guess is
2  that -- you know, how you hold her up with
3  two arms like that.
4    Q.  And do you recall at some point
5  in time her breast making contact with
6  your lips?
7    A.  I do.
8    Q.  And did you do that
9  intentionally?
10    A.  No, sir.
11    Q.  Did you bite her?
12    A.  Not that I'm aware of. I could
13  have nipped at her shirt. I remember the
14  incident, because I remember it was like
15  one of those, oh-crap type of things. I
16  guess that's the best way to put it.
17  Like, you know, you did that and like --
18  and it wasn't an intentional thing, and I
19  remember -- because I remember Barbara
20  going, you know, Nick -- she called me
21  Nick -- and go like this and go like this
22  and laughing some. I went, ooh, you know,
23  oh, crap, sorry, but, you know, that was

19 (Pages 73 to 76)

**www.AmericanCourtReporting.com**
**October 30, 2007**

Page 77

1 it. As far as I know, I don't remember,
2 like I say, chomping down on her or
3 anything like that, no, sir. But how I
4 did that, I do not have an answer. It
5 just --
6 Q. Is that appropriate conduct for
7 a principal to be picking up a school
8 counselor and cradling her and rolling her
9 to the point where you touch her breast
10 with your lips?
11 A. No. That would not be, for a
12 principal and a counselor.
13 Q. Do you remember Ms. Jeffers
14 screaming at any point?
15 A. Screaming?
16 Q. When your lips touched her
17 breast.
18 A. I remember her saying Nick and,
19 like, laughing or something like that, and
20 that's all I remember. Never --
21 Q. Okay. Do you remember an
22 incident that happened, I think, later
23 that month in September 2005 in which a

Page 78

1 young man brought a drawing to school that
2 had something on it, apparently was a
3 drawing of a female with a penis?
4 A. It was.
5 Q. And it was titled "Chicks with
6 Dicks." Do you remember that?
7 A. I remember that.
8 Q. Tell us everything you remember
9 about it first.
10 A. I remember a -- and I do not
11 remember the teacher's name. It was her
12 first year there. It was an older lady.
13 She had just started first grade, and she
14 brought me the picture, and it was a
15 picture out of a magazine, and it was a
16 picture that a young boy in first grade
17 had brought to school. And, you know, I
18 just saw it, and she handed it to me, and
19 the picture was folded up, and there's a
20 woman with -- you know, that was well
21 built and no clothes on. Then when you
22 opened it up, it was a man that was well
23 built with no clothes on, and that's why

Page 79

1 it was entitled -- and I remember that.
2 And I remember -- actually, it was after
3 school at a staff meeting we were talking
4 about it. We were talking about different
5 things, and I made the comment that poor
6 Ms. Such and Such, you know, got her
7 education, you know, and I mentioned the
8 picture, that, you know --
9 Q. Ms. Jeffers said that your
10 comment was her breasts were bigger than
11 my wife's and her dick was bigger than
12 mine. Do you remember that comment?
13 A. No. I know that I don't use
14 the word dick.
15 Q. Okay.
16 A. You know, I may have said
17 penis. Now, I may have said that. I may
18 have said that, yes -- you know, the
19 picture, I said, yeah -- I said, they're
20 better than -- you know, bigger than my
21 wife's or the penis was larger than mine,
22 but I don't use the word dick, no.
23 Q. Okay. Well, the title of the

Page 80

1 picture was "Chicks with Dicks."
2 A. "Chicks with Dicks," right. I
3 understand that.
4 Q. Okay. Did you make a similar
5 statement to that which you've just
6 described in a teacher's meeting that
7 afternoon?
8 A. Yes. That's where that
9 statement was made, yes, sir.
10 Q. Okay. What magazine was that
11 out of?
12 A. I do not know.
13 Q. Do you subscribe to any
14 pornographic magazines?
15 A. I do not.
16 Q. Was this, like, a centerfold?
17 A. It was just a -- it looked like
18 the little boy had cut it out of a
19 magazine, a picture. So I don't think it
20 was a whole-page size. It may have only
21 been maybe that size, like a picture of
22 a -- you know, like a picture size.
23 Q. Which would be about a

20  (Pages 77 to 80)

Page 81

```
1    five-by-seven or something?
2        A.   Possibly.  I don't know.  I did
3    not measure it.
4        Q.   Had he folded it double?
5        A.   I'm assuming that's how he put
6    it in his pocket, yes, sir.
7        Q.   Now, during the time when you
8    were principal at Ladonia, how many
9    counselors were there?
10       A.   I believe just two.
11       Q.   Who would those have been?
12       A.   Ms. Jeffers and Ms. Chaparro.
13   I can't remember if there was a third
14   person there between Ms. Chaparro and --
15   Ms. Jeffers was always there.  There was
16   somebody -- I can't remember her name, but
17   not when I was principal, though.  It was
18   when I was a teacher, and I don't remember
19   her name.
20       Q.   Okay.  Generally, what were the
21   duties of the counselors at Ladonia?
22       A.   Students that are having
23   problems would sit down and talk with the
```

Page 82

```
1    counselor.  Parents that had problems with
2    students would also talk with a counselor.
3    If a teacher was having problems with a
4    student, we would also refer them to a
5    counselor.  A counselor also taught some
6    classes, whether it be conflict, you know,
7    how to deal with anger issues, test-taking
8    skills, things of that sort.
9        Q.   So there was individual
10   counseling?
11       A.   There was individual, yes, sir.
12       Q.   Did y'all have any sort of
13   group counseling?
14       A.   Yes, sir.
15       Q.   How many students normally
16   would be in one of those groups?
17       A.   She would -- Ms. Jeffers or
18   Ms. Chaparro would take a -- whatever the
19   class size, she would go into a particular
20   teacher's classroom.
21       Q.   And that's when they would
22   teach anger management and test-taking --
23       A.   Yes, sir, different --
```

Page 83

```
1    different topics.
2        Q.   Now, do you recall a discussion
3    you had early in the 2005-2006 year with
4    Ms. Jeffers about that schedule and her
5    classes?
6        A.   Yes, sir.
7        Q.   Tell us what you recall about
8    that conversation.
9        A.   I believe Ms. Jeffers and
10   Ms. Chaparro were both there, and I had
11   made up a schedule, and it was a tougher
12   schedule.  I had just gone through Alabama
13   Reading Initiative, which is a state
14   program that our school had not gone
15   through, and they had said that I had to
16   have joint teaching time -- or excuse
17   me -- planning time for teachers in grade
18   levels.  Our school is big, and in order
19   to do that, I sat and played with
20   schedules.  I -- we sat at the ARI with
21   different teachers.  I believe Kelly
22   Brantley -- or Kelly Howard at the time, I
23   guess; I don't know which it was --
```

Page 84

```
1    helped.  We tried to come up with
2    different things.  That's part of what
3    we -- what we were required to do when we
4    were at that workshop.  And so I tried to
5    figure out ways so that I could give all
6    the first grade -- once a week gave a 30-
7    or a 40-minute planning time, because the
8    object was for these teachers to help each
9    other with students.  If I had a student
10   that I could not seem to reach
11   academically or wasn't getting the reading
12   skills, you may have some strategies that
13   will work.  And in order to do it,
14   everybody was taking ownership of
15   everybody else's children.  It wasn't like
16   usual, you know, this is my class, I have
17   20 kids, that's it.  It was everybody.
18   And so in order to do that, we had to come
19   up with a schedule, and the only way to
20   accommodate that, because of the size, was
21   to use the counselors more where I could
22   take a class, maybe split it and have, you
23   know, Ms. Chaparro take one group of this
```

21 (Pages 81 to 84)

Page 85

1 class and Ms. Jeffers take another group
2 of that class, plus another class. I
3 mean, that was the initial idea.
4     Q.   Okay. Now, you mentioned joint
5 planning time. Now, you're not talking
6 about a teacher's planning period, are
7 you?
8     A.   Uh-huh. Well, yes, we were
9 trying to come up with planning periods
10 that would accommodate the teachers so
11 that they could plan all together at one
12 time.
13    Q.   That was not the teacher's
14 duty-free period, was it?
15    A.   Planning period is a -- is a
16 different, I guess, time. I don't
17 remember how that was set up. It's been
18 too long.
19    Q.   The law requires --
20    A.   Right.
21    Q.   -- that a teacher has a
22 duty-free period?
23    A.   Right.

Page 86

1     Q.   Did you require them --
2     A.   No. No. That was -- that
3 was -- it was trying to set up a joint
4 planning time with the teachers all
5 together.
6     Q.   Well, was that joint planning
7 time their duty-free period?
8     A.   Well, I couldn't make them plan
9 during their duty-free period, no. So I
10 was trying to set up something that --
11    Q.   So that was a different period?
12    A.   Yes. Then I guess that's
13 correct.
14    Q.   Okay.
15         (A discussion was held off the
16 record.)
17    Q.   (By Mr. Eddins) You say that
18 you made out the schedule, and it was a
19 tougher schedule. Tougher compared with
20 what?
21    A.   I would say in the past year or
22 two, compared to schedules, because I had
23 not put as many classes on them in that

Page 87

1 sense. They didn't have -- they had a lot
2 more freedom and flexibility in their
3 classes.
4     Q.   Now, the previous couple of
5 years before this 2005-2006 year, who made
6 up the counselors' schedule?
7     A.   A lot of times the counselors
8 would make up their own schedules. They
9 would work it around my master schedule.
10    Q.   And this was the first time you
11 had ever made up the counselors' schedule?
12    A.   Well, I had made up schedules
13 before, but the schedule wasn't always set
14 in stone. A lot of times when I would
15 make it up, the library or PE, something,
16 we -- they may change something around
17 because it's a lot of different things to
18 look at at one time on a sheet, and all of
19 a sudden, you realize this didn't fit or
20 they brought in a music teacher and that
21 didn't fit or this teacher -- I miscounted
22 the number of minutes, and she only had 20
23 minutes of free time, not 30 minutes, as

Page 88

1 required. So schedules would change some.
2 So, yes, I might have made it up
3 sometimes, but that didn't mean Barbara
4 would let me keep it.
5     Q.   Well, in this particular year,
6 after the discussion with Ms. Jeffers, did
7 the schedule change?
8     A.   Yes.
9     Q.   And how did it change?
10    A.   I believe Barbara and
11 Ms. Chaparro sat down and redid it more so
12 or -- and I believe I was part of that
13 too. I did back off on a lot of it.
14 Yeah, we had a good heated discussion, I
15 think, a little bit about it. I was
16 trying to set it.
17         MR. EDDINS: Do y'all want to
18 take a break?
19         MR. WILLIAMS: Yeah, about five
20 minutes.
21         (Brief recess.)
22    Q.   (By Mr. Eddins) I think you
23 testified earlier that you knew a

22 (Pages 85 to 88)

Page 89

1    Ms. Joanie Craig?
2        A.   Correct.
3        Q.   Did you know her as a teacher
4    when you were a teacher or just when you
5    were principal?
6        A.   I knew her as a bus driver.  I
7    believe she was a bus driver even when I
8    was a teacher, yes, sir.
9        Q.   I'm sorry.  I was talking about
10   when you were a teacher.  Did you know her
11   at that time?
12       A.   I believe she was -- yeah, she
13   was a bus driver at that time.
14       Q.   Okay.  There was some
15   discussion this morning about scheduling
16   and positioning of buses and things like
17   that.  What part did you, as principal,
18   play in deciding where buses would line up
19   and that sort of thing?
20       A.   None.  I did not schedule that.
21   That was either set by the bus drivers
22   themselves or Mr. Rudd, and they would
23   line up according to who would go out

Page 90

1    first and turn in what direction and
2    wouldn't have to turn against the flow and
3    what was the most optimal.  So I had
4    nothing to do with the buses, how they
5    lined up.
6        Q.   Did you go out there in the
7    morning or afternoons when the buses --
8        A.   I tried to go out at one time
9    or another, according to how I set my
10   schedule up.
11       Q.   At one time or another.  Now,
12   do you mean once a day, or what do you
13   mean by one time or another?
14       A.   If my schedule was set up --
15   and the last several years, what I tried
16   to do is, so that I could see all the
17   children -- the buses that came in in the
18   morning, as much as possible, I would be
19   outside, so I could see the kids when they
20   got off in the morning.  But then in the
21   afternoon, I would be at the car rider
22   section so I could see those children that
23   went back and forth by cars.  This way, I

Page 91

1    was able to have as much exposure to the
2    children as possible each day.
3        Q.   How many bus routes were there
4    that went to and from Ladonia Elementary?
5        A.   Five or six.  I do not remember
6    exactly.
7        Q.   Were the bus drivers assigned
8    to a particular school?
9        A.   Yes, sir, they were.
10       Q.   Now, I think it was discussed
11   at some point earlier or I had some
12   information anyway that there were seven
13   bus drivers assigned to Ladonia?
14       A.   There may be.  There may be.
15       Q.   Now, would you know all seven
16   of those persons personally?
17       A.   At that time, I would.  It's
18   been two years, so I don't remember a lot
19   of them, but --
20       Q.   When you were principal, did
21   you know all the bus drivers personally?
22       A.   Yeah, I did.
23       Q.   Now, were bus drivers evaluated

Page 92

1    at all?
2        A.   I'm assuming they were, yes.
3        Q.   Did you ever have any input
4    into any evaluations?
5        A.   No.
6        Q.   Mr. Rudd would never call you
7    and say, how is so-and-so doing?
8        A.   No.
9        Q.   Do you know if Ms. Coley ever
10   had any input into any evaluations?
11       A.   I do not know.
12       Q.   You never assigned her the task
13   of helping in the evaluation of the bus
14   drivers?
15       A.   No.  We don't evaluate bus
16   drivers.  That was Mr. Rudd's job.
17       Q.   Do you recall at some point in
18   time when you were principal at Ladonia,
19   riding with Ms. Craig to a bus stop where
20   she had reported to you that students were
21   disrupting or were not getting on in the
22   right order or something like that?
23       A.   That's possible.

23  (Pages 89 to 92)

Page 93

1    Q.   Do you recall?  I think it was
2    the Hancock stop.  Does that --
3        A.   That name is familiar, but I do
4    not recall, no.
5        Q.   But if a bus driver came to you
6    and said, I'm having problems with the
7    students on Hancock Street, would you have
8    gotten on the bus and gone over there and
9    talked with them?
10       A.   I have ridden other buses, yes.
11       Q.   How many times can you think of
12   that you actually rode a school bus when
13   you were principal?
14       A.   Maybe only a half a dozen
15   times.
16       Q.   Give us examples.
17       A.   I remember a Mr. -- I want to
18   say Dutton, but it's not Dutton.  It was
19   Mr. -- I can't remember his name right
20   this second.  I remember the gentleman was
21   having problems constantly with children.
22   He had a very rough route of children, so
23   I rode the bus with him one day after

Page 94

1    school so I could see and see what was
2    going on and see his interaction with the
3    children.
4        Q.   Okay.  The children were
5    actually on the bus when you were riding?
6        A.   Yes.  Yes.
7        Q.   Now, in that situation, who was
8    basically in charge?
9        A.   Well, I think that anytime a
10   principal gets on the bus, the kids get
11   quiet because they assume, for the most
12   part -- the ones that have fear of the
13   principal, let's put it that way, they're
14   going to be quiet because they don't know
15   what's going on because they'll know that
16   they can't tell me a different story than
17   what the bus driver would tell if they
18   were to go to the office.
19       Q.   Okay.  Did you have the
20   authority to tell the bus driver, stop, I
21   want to talk to so-and-so?
22       A.   I don't -- would I have ever
23   stopped the bus or him stopped the bus,

Page 95

1    no.
2        Q.   No.  That's not what I asked.
3        A.   Do I have the authority to tell
4    them to stop the bus?
5        Q.   Right.
6        A.   I could suggest it.  The bus
7    driver is in charge of the bus.
8        Q.   If the bus driver said, no, I'm
9    not going to stop, you're telling me you
10   wouldn't have demanded that he stop?
11       A.   No.
12       Q.   Okay.  Now, on this trip to
13   Hancock Street -- do you ever recall
14   riding on a bus with Ms. Craig?
15       A.   I believe I did, yes.
16       Q.   Would that have been to Hancock
17   Street?
18       A.   That's possible.
19       Q.   Okay.  Ms. Craig's testimony
20   was that during that trip, that you told
21   her that you liked her legs and you sure
22   would like to get between them.  Do you
23   recall telling her that?

Page 96

1        A.   That's not true.
2        Q.   You're denying that?
3        A.   I deny that.
4        Q.   Do you recall telling her about
5    how well an Italian person could perform
6    sexually?
7        A.   I deny that also.
8        Q.   Have you ever told her that?
9        A.   No.
10       Q.   Okay.  Do you recall telling
11   her that you knew that she wanted you?
12       A.   I deny that.
13       Q.   Do you deny telling her that
14   she could have you?
15       A.   No.  I did not have that
16   conversation with her.
17       Q.   Do you ever recall rubbing
18   Ms. Craig's legs --
19       A.   I do not.
20       Q.   -- on the bus?
21       A.   I do not.
22       Q.   Okay.  Do you ever recall going
23   down to the area where the buses were

24 (Pages 93 to 96)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 97

```
1   parked and Ms. Craig was there?
2        A.   I'm sure I did. That's where
3   all the buses were parked, and so I would
4   be down in that area, again, whether it be
5   before school or after school.
6        Q.   Do you recall whether
7   Ms. Craig's bus was the first to arrive in
8   the morning?
9        A.   She was the last bus.
10       Q.   Now, what about in the
11  afternoon, was she the last to leave or
12  the first to leave?
13       A.   Depending on where she lined
14  up. I do not know. I would imagine if
15  she's the last to arrive in the morning,
16  she's probably the last bus in the
17  afternoon.
18       Q.   Okay. Do you remember an
19  occasion when Ms. Craig came to the school
20  with her nephew to have lunch with her two
21  grandnephews and she was riding her
22  motorcycle?
23       A.   I remember her riding a
```

Page 98

```
1   motorcycle one time. I do.
2        Q.   Do you remember a conversation
3   that you all had that day?
4        A.   I remember going out and
5   looking at her motorcycle.
6        Q.   Okay.
7        A.   I don't remember anything
8   inappropriate.
9        Q.   You don't remember squeezing
10  her backside or touching her buttocks out
11  there?
12       A.   No. I did not.
13       Q.   Okay. What was she driving?
14  Do you remember what kind of motorcycle?
15       A.   No. I'm not familiar enough
16  with different motorcycles to know.
17       Q.   Okay. Do you remember
18  following her out and talking with her
19  after her nephew cranked his bike?
20       A.   I remember going outside to
21  look at the bike, and, yes, she was out
22  there, and, yes, the other person was out
23  there. And I don't believe I was the only
```

Page 99

```
1   adult -- excuse me -- yeah, that was out
2   there.
3        Q.   The other person, was he
4   driving a motorcycle?
5        A.   Yes. There were two
6   motorcycles.
7        Q.   Okay. Do you remember telling
8   Ms. Craig that you wanted her to take you
9   for a ride?
10       A.   No.
11       Q.   Do you remember telling her
12  that you wanted to hold her breasts?
13       A.   No.
14       Q.   Okay. Do you remember rubbing
15  her legs?
16       A.   No.
17       Q.   Okay. The complaint also
18  alleges that at a staff meeting with these
19  bus drivers -- I think seven bus drivers
20  and a couple of supervisors, including
21  yourself were in a staff meeting in August
22  or September of 2005 to discuss some
23  routes or something like that. Do you
```

Page 100

```
1   remember that meeting?
2        A.   Every year we met bus drivers
3   before school with the principal, and
4   usually the assistant principal, discussed
5   routes or -- it was a meeting Mr. Rudd
6   had, and he invited the principals to that
7   meeting and/or -- and the assistant
8   principal.
9        Q.   Okay. And who was in that
10  meeting? Who do you recall --
11       A.   Every bus driver in the system
12  was in that meeting. Mr. Rudd was in that
13  meeting. A representative, a principal or
14  assistant principal, from each of the
15  schools were at that meeting.
16       Q.   Now, the complaint alleges that
17  you stood very close to Ms. Craig's face,
18  that you almost had your crotch in her
19  face. Do you recall that?
20       A.   No.
21       Q.   Do you recall her --
22       A.   I --
23       Q.   Go ahead. I'm sorry.
```

25  (Pages 97 to 100)

Page 101

1    A.   I'm sorry.  I apologize.
2  Finish your question.
3    Q.   Do you recall her leaning over
4  and complaining to another bus driver
5  about your behavior during the meeting?
6    A.   No.  I know that the bus
7  drivers were in a group.  There was a
8  bunch of them, and we would get them
9  around in a group and would talk to them
10  and go over rules.  I know that Ms. Craig,
11  yeah, would say stuff to other people, but
12  that was just common, you know, and she
13  wasn't the only one.  I'm not saying that.
14  Other people would talk to each other,
15  that kind of stuff, so --
16    Q.   Now, you're talking about the
17  in-service meeting with all the bus
18  drivers, aren't you?
19    A.   That's correct.
20    Q.   Okay.  Now, do you recall
21  anything about a second meeting with just
22  the Ladonia bus drivers because of a
23  problem where some students had not gotten

Page 102

1  on the right bus and had not gotten home
2  at the beginning of the 2005-2006 school
3  year?
4    A.   I'm not saying that meeting
5  didn't occur, but I don't specifically
6  remember a meeting.  Was Mr. Rudd at that
7  meeting?  Usually he would be the one
8  holding those meetings.
9    Q.   I don't know.  I wasn't there.
10    A.   Okay.  I would assume that if
11  there was a meeting with all the bus
12  drivers, it was Mr. Rudd's meeting.
13  Again, I didn't call meetings with the bus
14  drivers.  He did.
15    Q.   Okay.  Do you remember coming
16  up and standing behind Ms. Craig and her
17  actually having to take your hands off the
18  back of her shoulder?
19    A.   It could have happened, yes,
20  sir.  That could be possible.
21    Q.   But you don't remember it?
22    A.   No, sir.  If I put my hand on
23  her shoulder, it was not in a romantic way

Page 103

1  at all, anymore than putting my hand on
2  this gentleman's shoulder would be in a
3  romantic way.  And if she moved by hand
4  off, I wouldn't have put it back on.
5    Q.   You wouldn't remember if she
6  had to remove your hand?
7    A.   No, sir.  I wouldn't have
8  remembered something like that because it
9  wasn't something that would have
10  registered as a problem to me.  It was
11  just something that's being -- something
12  that -- I don't know.  I guess you could
13  say just as a group, people that you know.
14    Q.   All right.  When was the very
15  first time that you remember that there
16  were any allegations of sexual harassment
17  or conduct that would rise to the level of
18  sexual harassment being leveled against
19  you?
20    A.   That was on that Friday, the
21  day Dr. Lee sent me home and said
22  that, I'm going to suspend you out of
23  school.  That's when -- the first time I

Page 104

1  was told of anything.
2    Q.   That was on September 23, 2005?
3    A.   I'll take your word on that,
4  yes, sir.  If that was a Friday, then,
5  yes, that was the day.
6    Q.   Give us your best recollection
7  of what happened in that meeting with
8  Dr. Lee.
9    A.   That particular meeting was on
10  a Friday.  Dr. Lee called me to her
11  office.  I went there, and she said
12  that -- that's when she had told me that
13  there was a -- some, you know, sexual
14  harassment there, the charges made by a
15  staff member and that she was going to go
16  ahead and suspend me out of school, off
17  the job just temporarily.  She told me
18  it'll be an out-of-sight/out-of-mind thing
19  and we'll investigate it, and this thing
20  will be fine and it'll blow over, I'm sure
21  we can come to, you know, terms with this
22  or whatever and I will call you up.  And
23  that was on a Friday afternoon, maybe

26 (Pages 101 to 104)

Page 105

1  about two o'clock. I went back to work.
2  She told me to go ahead and just go on
3  back to work, don't say anything to
4  anybody, and then just go ahead and go
5  home at the regular time at the end of the
6  day, and that's what I did, except I did
7  call my wife on the way home and let her
8  know what was going on.
9       Q.    So after the meeting with
10  Dr. Lee, you actually went back to
11  Ladonia?
12      A.    Yes, sir, I did.
13      Q.    Did you report for work the
14  following Monday?
15      A.    No, sir.
16      Q.    Did you go back to the school
17  anytime after that meeting?
18      A.    I never went back to the
19  school, except in March, April, I believe
20  it was, something like this, to retrieve
21  items out of my office at the time. I
22  never went back to school after that.
23      Q.    Okay. Did anyone accompany you

Page 106

1  in March or April?
2       A.    I met Sydney Smith at the
3  school. It was after hours, and I went in
4  and packed up a few of my stuff, just
5  personal stuff. A lot of the stuff, I
6  just left just to leave for the next
7  person coming in, thought they could use
8  it, and just -- and then put them in my
9  van and went home.
10      Q.    Okay. And that trip to Ladonia
11  was for the sole purpose of retrieving
12  your personal items?
13      A.    Yes, sir.
14      Q.    Okay. Do you recall meeting
15  with Dr. Lee a second time after she told
16  you that you could go on to the school?
17      A.    Yes, sir. That was the
18  following week.
19      Q.    The following week? The very
20  next week?
21      A.    I believe it was the following
22  week, if I'm not mistaken. Her
23  secretary -- I think it was Barbara

Page 107

1  Gunther -- called me up and asked me to
2  come to school, and I can't remember the
3  specific day. I'm thinking it was
4  Wednesday or Thursday. It was a very long
5  week to me. She told me to be there
6  before eight. So I just assumed -- I
7  still had no idea, really, what was going
8  on in that sense. I just assumed whatever
9  it was, it had been taken care of, and I
10  went to work, and that's when Dr. Lee and
11  then Sydney Smith met me in their office,
12  and they talked to me for about 20
13  minutes.
14      Q.    Okay. And did they confront
15  you with the results of the investigation?
16      A.    They mentioned just those two
17  or three things that we had discussed,
18  about the pool party, possibly being naked
19  at the party, possibly pulling at Jamie
20  Evans' bathing suit, and flinging Barbara
21  around in the teacher's conference room,
22  talked about that.
23      Q.    Did you deny any of those

Page 108

1  incidents?
2       A.    I didn't agree or deny at that
3  time. To be honest, I was a little bit in
4  shock, and I was upset.
5       Q.    Did you tell Dr. Lee that you
6  were just drunk at the party and that's
7  the reason you did those things?
8       A.    I think I used the words, I was
9  buzzing pretty good, yes.
10      MR. EDDINS: Now, I guess we
11  need to make this Exhibit 2 to both
12  depositions.
13      (Whereupon, a document was marked
14  as Plaintiffs' Exhibit 2 and is attached
15  to the original transcript.)
16      Q.    (By Mr. Eddins) Okay.
17  Mr. Nacrelli, I'm going to show you what
18  has been collectively identified as
19  Plaintiffs' Exhibit 2 to Nacrelli's
20  deposition. The first page is the notice
21  to you from Dr. Lee indicating that you're
22  officially placed on indefinite paid
23  administrative leave.

27 (Pages 105 to 108)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 109

1    A.   Uh-huh.
2    Q.   Did you receive that document
3  on September 23, 2005, when you were
4  talking with Dr. Lee?
5    A.   I did not receive it, I don't
6  believe, that day.  I know that Ricky
7  Martin, who is -- what does Ricky do now?
8  He is dealing with safety or something
9  like this, and I think an Officer
10  Gordon -- I believe two different times
11  they came to my house in Opelika and
12  delivered something and had me sign for
13  it, and this may have been one of them, as
14  far as I know.  There was a couple of
15  different times that they delivered --
16  hand-delivered something from Dr. Lee.  It
17  may have been mailed also to me, but I
18  think they hand-delivered it to me and had
19  me sign for it, and this may have been one
20  of them.
21    Q.   Do you recall if it would have
22  been delivered sometime after the meeting
23  with Dr. Lee?

Page 110

1    A.   It's possible.  It is possible,
2  yes, sir.
3    Q.   You didn't receive it before
4  the meeting, did you?
5    A.   Before the meeting?
6    Q.   Right.
7    A.   No, sir.  No, sir.
8    Q.   Okay.  So if you received it,
9  you would've had to have received it after
10  the meeting; would that be correct?
11    A.   Right.  Yes, sir.
12    Q.   Okay.  Now, turn to the second
13  page.
14    A.   Okay.
15    Q.   This is a notice to the board
16  and employee, and earlier I went through
17  some of these items with Dr. Lee, and I
18  want to just go through and ask you if you
19  have any knowledge what Dr. Lee is talking
20  about in this notice.  And this notice, I
21  think, was given pursuant to 16-24-8 to
22  the Code of Alabama of 1975.  Do you know
23  what that statute being quoted is?

Page 111

1      MR. WILLIAMS:  I object to the
2  form of the question, to the extent it
3  asks for a legal conclusion, but you can
4  answer if you know.
5    A.   No, I do not.
6    Q.   (By Mr. Eddins)  Are you
7  generally familiar with the Alabama
8  Teacher Tenure Act?
9    A.   I have a basic knowledge of it,
10  yes, sir.
11    Q.   Okay.  I think this code
12  section relates to procedures under that
13  act, but I'm just going to ask you, first
14  of all, it alleges that you failed to
15  follow the policies of the Russell County
16  Board of Education relating to your
17  actions as a school administrator,
18  specifically as principal of Ladonia
19  Elementary School and your intentions with
20  your fellow employees and subordinates.
21  Do you know what she's talking about
22  there?
23    A.   I'm assuming that all of this

Page 112

1  has to do with the fact that I was accused
2  of sexually harassing someone, and that's
3  what this is.
4    Q.   Did you make any response to
5  Dr. Lee?
6    A.   This was not sent to me.  This
7  was probably sent to Bill Patty, who was
8  the attorney at the time, and he either
9  answered it or didn't answer it.  I met
10  with Mr. Patty one time, and then we
11  talked like --
12      MR. WILLIAMS:  Don't talk about
13  what you talked about with Mr. Patty.
14      THE WITNESS:  Oh, I'm sorry.
15    Q.   (By Mr. Eddins)  So you never
16  discussed any of the allegations in the
17  notice with Dr. Lee?
18    A.   No.
19    Q.   Didn't you testify that you met
20  with her after you received the notice?
21    A.   I met with her that one time
22  within a week after she suspended me, with
23  her and Sydney Smith, and we talked for

28  (Pages 109 to 112)

**www.AmericanCourtReporting.com**
**October 30, 2007**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 113

1  about 20 minutes, and that's where I got
2  this one, and then I never have -- I
3  haven't talked to Dr. Lee again until she
4  was here.
5      Q.  Okay.  And you didn't have this
6  notice at the time?
7      A.  No.  I believe this was dated
8  in October.
9      Q.  All right.  Look at the third
10  page.  This is the letter to you
11  indicating that you're given notice that
12  the Russell County Board of Education
13  voted to uphold Dr. Lee's recommendation
14  to cancel your employment with the Russell
15  County Board of Education.  Did you
16  receive that notice?
17      A.  I assume that, yes, Mr. Patty
18  did, yes.
19      Q.  All right.  You can't send it
20  to Mr. Patty, now.  You had to receive it,
21  or it wasn't valid notice.  Do you
22  recall --
23      A.  Then I could have received a

Page 114

1  copy of it.  I know that Mr. Patty also
2  would send me different things also, so
3  I -- where I got it from -- but, yes, I am
4  aware of this paper, if that's what you're
5  asking.
6      Q.  All right.  Look at the last
7  page.  I, Charles Nacrelli, hereby resign
8  my position with the Russell County Board
9  of Education effective March 19, 2006.
10      A.  Yes, sir.
11      Q.  Did you sign that letter?
12      A.  I did.
13      Q.  Is that your signature on it?
14      A.  It is.
15      Q.  And it's dated February 15,
16  2006?
17      A.  Correct.
18      Q.  Why in the world would you
19  resign from the Russell County Board of
20  Education if you didn't do any of these
21  things that you're accused of?
22      MR. WILLIAMS:  I'm going to
23  object to the question and instruct the

Page 115

1  witness not to answer because for him to
2  divulge the reason would require him to
3  waive the attorney/client privilege
4  concerning his discussions with Bill
5  Patty.
6      Q.  (By Mr. Eddins)  Well,
7  excluding any discussions with Mr. Patty,
8  just generally why would you resign?
9      MR. WILLIAMS:  Same objection.
10  I'm instructing the witness not to answer.
11  Do not answer.
12      THE WITNESS:  Okay.  Thank you.
13      MR. EDDINS:  Okay.  Well, we
14  might be back here.
15      MR. WILLIAMS:  That's fine.
16      MR. EDDINS:  It's all fun and
17  games.
18      MR. WILLIAMS:  If you would
19  like to call the judge right now, we can
20  do that.
21      MR. EDDINS:  I'm not going to
22  call him right now.
23      MR. WILLIAMS:  All right.

Page 116

1      Q.  (By Mr. Eddins)  Do you
2  understand that under the law, you're
3  entitled to a hearing before a fair and
4  impartial arbitrator?
5      A.  Yes, sir.  I understood that.
6      Q.  And you waived that right to a
7  hearing?  You decided you didn't want to
8  go to the hearing?
9      A.  Yes, sir, I did.
10      Q.  Okay.  Well, at the time that
11  you resigned, did you have another job?
12      A.  Yes, I did.
13      Q.  What job was that?
14      A.  The one I'm at presently.
15      Q.  On February 15, 2006, you
16  already had that job?
17      A.  Yes, sir, I did.
18      Q.  Okay.  Now, what is your salary
19  at your present position?
20      A.  I think it's 47,000 even.
21      Q.  And what was your salary as
22  principal with the Russell County Board of
23  Education?

29  (Pages 113 to 116)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 117

1    A.  I believe it was 61, right
2  around there.
3         MR. EDDINS:  Okay.  Let's have
4  a short break.
5         (Brief recess.)
6    Q.  (By Mr. Eddins)  Mr. Nacrelli,
7  do you remember at some point in time when
8  the pick up locations were changed for the
9  students, drop off and pick up from the
10  front of the school to the back of the
11  school?
12    A.  I do.
13    Q.  Okay.  Tell us about that.
14  What do you remember about that?
15    A.  I believe it's because they
16  paved the parking lot in the back.  We
17  had -- the county had paved that whole
18  area, and I think we had it originally
19  with the cars, and it was very difficult
20  controlling the parents with the cars
21  because of the fact that you could fit
22  more than two -- one car side by side,
23  sometimes two cars and three cars, and

Page 118

1  when a parent got their child, they were
2  done, they didn't care about anybody else.
3  Other kids are running in between cars and
4  all, and we would -- you know, I had at
5  that time a gentleman named Ron Shepherd
6  who was ex-military, and he would stand
7  out and holler and scream and direct
8  traffic and all, but it was dangerous.
9  And so we decided to try changing it to
10  the back, and I think that was something
11  that we discussed with Mr. Rudd, and he
12  thought of how to line the buses up and
13  how to do it and how to go in and out.
14         MR. EDDINS:  That's all the
15  questions I have.
16         MS. SMITH:  I have nothing.
17         MR. WILLIAMS:  No questions.
18
19
20         10:50 a.m.
21
22
23  FURTHER THE DEPONENT SAITH NOT

Page 119

* * * * * * * *
REPORTER'S CERTIFICATE
* * * * * * * *

STATE OF ALABAMA
COUNTY OF ELMORE
      I, Jennifer Davis, Certified Court
Reporter and Notary Public in and for the
State of Alabama at Large, do hereby
certify that on October 30, 2007, I
reported the deposition of Dr. Rebecca S.
Lee, who
was first duly sworn by me to speak the
truth, the whole truth, and nothing but
the truth, in the above-styled cause, now
pending in the United States District
Court, Middle District of Alabama, Eastern
Division; that the foregoing 86
computer-printed pages contain a true and
accurate transcription of the examination
of said witness by counsel for the parties
set out herein; that the reading and
signing of said deposition was waived by

Page 120

witness and counsel for the parties.
      I further certify that I am neither
of kin nor of counsel to the parties to
said cause, nor in any manner interested
in the results thereof.
      This 8th day of November 2007.


         Jennifer Davis, CCR
         CCR License #161

30  (Pages 117 to 120)

**www.AmericanCourtReporting.com**
**October 30, 2007**

# EXHIBIT "A"

# BARBARA M. JEFFERS and JOAN CRAIG

# v.

# RUSSELL COUNTY BOARD OF EDUCATION and CHARLES NACRELLI

# BARBARA M. JEFFERS

## October 15, 2007

**Reagan Reporters, LLC**
**Phone: 334.262.7556**
**Fax: 334.262.4437**

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA


BARBARA M.
JEFFERS and
JOAN K. CRAIG,
Plaintiffs,

vs.                      CIVIL ACTION NO.
3:06CV685-CSC
RUSSELL COUNTY
BOARD OF
EDUCATION AND
CHARLES NACRELLI,
Defendants.

        *    *    *    *    *    *

DEPOSITION OF

BARBARA M. JEFFERS,

taken pursuant to notice and

stipulation on behalf of the

Defendant, in the Law Offices of

Smith & Smith, 1503 Broad Street,

Phenix City, Alabama, before Mishan

Williamson, Certified Shorthand

Reporter and Notary Public in and for

the State of Alabama at Large, on

October 15, 2007, commencing at

approximately 10:15 a.m.

BARBARA M. JEFFERS – 10/15/2007

| Page 2 |
|---|
| 1   APPEARANCES |
| 2 |
| 3   FOR THE PLAINTIFF: |
| 4        W. DON EDDINS, ESQ. |
| 5        Attorney at Law |
| 6        337 E. Magnolia Avenue |
| 7     Auburn, Alabama 36830 |
| 8 |
| 9   FOR THE DEFENDANT RUSSELL COUNTY BOARD |
| 10   OF EDUCATION: |
| 11        SIDNEY SMITH, ESQ. |
| 12        Smith & Smith |
| 13        1503 Broad Street |
| 14        Phenix City, Alabama 36867 |
| 15 |
| 16   FOR THE DEFENDANT CHARLES NACRELLI: |
| 17        MATTHEW C. WILLIAMS, ESQ. |
| 18        3800 Colonnade Parkway |
| 19        Suite 330 |
| 20        Birmingham, Alabama 35243 |
| 21 |
| 22   ALSO PRESENT: |
| 23        JOAN K. CRAIG |
|          REBECCA LEE |

| Page 4 |
|---|
| 1   hereto and the witness, that the |
| 2   signature of the witness to this |
| 3   deposition is hereby waived |
| 4 |
| 5   * * * * * * * * |
| 6   INDEX |
| 7 |
| 8   EXAMINATION            Page |
| 9   MS. SMITH...................... 6 |
| 10   MR. WILLIAMS.................... 215 |
| 11   MS. SMITH...................... 322 |
| 12   MR. EDDINS..................... 328 |
| 13   MR. WILLIAMS................... 341 |
| 14   MS. SMITH...................... 342 |
| 15   MR. EDDINS..................... 347 |
| 16 |
| 17   PLAINTIFF'S EXHIBITS        Page |
| 18 |
|      1    (Student Academic Plan &  348 |
| 19   Statement of |
|      Responsibilities, |
| 20   2007-2008) |
| 21 |
|      DEFENDANT'S EXHIBITS        Page |
| 22 |
|      1    (Russell County Board of  110 |
| 23   Education Transfer of |

| Page 3 |
|---|
| 1   STIPULATIONS |
| 2 |
| 3         It is stipulated and agreed |
| 4   by and between counsel representing |
| 5   the parties that the deposition of |
| 6   BARBARA M. JEFFERS may be taken before |
| 7   Mishan Williamson, Certified Shorthand |
| 8   Reporter and Notary Public in and for |
| 9   the State of Alabama at Large, without |
| 10   the formality of a commission; and all |
| 11   formality with respect to other |
| 12   procedural requirements is waived; |
| 13   that objections to questions, other |
| 14   than objections as to the form of the |
| 15   questions need not be made at this |
| 16   time, but may be reserved for a ruling |
| 17   at such time as the deposition is |
| 18   offered in evidence or used for any |
| 19   other purpose by either party as |
| 20   provided by the Federal Rules of Civil |
| 21   Procedure. |
| 22         It is further stipulated and |
| 23   agreed by and between the parties |

| Page 5 |
|---|
| 1   GBM) |
|      2    (Memorandum from         116 |
| 2   Ms. Jeffers dated |
|      February 2, 1983) |
| 3    3    (Letter to Ms. Jeffers  118 |
|      from Mr. Siniard dated |
| 4   June 16, 1988) |
|      4    (Letter to Mr. Siniard  120 |
| 5   from Ms. Jeffers dated |
|      January 10, 1990) |
| 6    5    (Letter to Mr. Siniard  122 |
|      from Ms. Jeffers dated |
| 7   March 7, 1990) |
|      6    (Memorandum from         124 |
| 8   Ms. Jeffers to |
|      Dr. Thacker dated |
| 9   March 8, 1991) |
|      7    (Letter to Dr. Thacker  125 |
| 10   from Ms. Jeffers dated |
|      April 12, 1993) |
| 11   8    (Memorandum to          175 |
|      Mrs. Baker from |
| 12   Ms. Jeffers dated |
|      September 26, 2005) |
| 13   9    (Ladonia Elementary     180 |
|      School Teacher |
| 14   Handbook, 2005/2006) |
|      10    (East Alabama Medical  200 |
| 15   Center Document, |
|      Clinical Laboratory |
| 16   Results) |
|      11    (Letter of            244 |
| 17   Recommendation dated |
|      April 3, 2002) |
| 18   12    (Handwritten Notes of  259 |
|      Ms. Jeffers) |
| 19   13    (Sexual Harassment     343 |
|      Policy) |
| 20   14    (Student Academic Plan &  350 |
|      Statement of |
| 21   Responsibilities |
|      2004/2005) |
| 22   15    (Student Academic Plan &  350 |
|      Statement of |
| 23   Responsibilities, |

2 (Pages 2 to 5)

BARBARA M. JEFFERS - 10/15/2007

Page 6

1      BARBARA M. JEFFERS, of
2  lawful age, having first been duly
3  sworn, testified as follows:
4
5  MS. SMITH: All right. We
6  have usual stipulations?
7  MR. WILLIAMS: That's fine.
8  MS. SMITH: Don?
9  MR. EDDINS: Oh, yeah, I'm
10 sorry.
11 EXAMINATION
12 BY MS. SMITH:
13 Q.   Ms. Jeffers, I'm going to try to call
14 you Ms. Jeffers throughout today and
15 be formal.  If I lapse, please excuse
16 me.
17 A.   Certainty.
18 Q.   As you know, we're here today to take
19 your deposition regarding the
20 allegations in this lawsuit.  I expect
21 us to be here a pretty good while, but
22 it just depends on how much you can
23 remember and how much you can tell me

Page 7

1  back and -- as we go through these
2  matters.
3       If I ask you something
4  you don't understand, please feel free
5  to stop me and say I don't understand
6  what you're asking me, and I'll be
7  happy to try to rephrase it.  As you
8  experienced last week, you will note
9  that there may be objections
10 throughout your testimony.  So if
11 you'll wait and let the court reporter
12 get it down, and then Mr. Eddins will
13 probably enter his objections and then
14 tell you to go ahead and answer.
15 Like I said, I would
16 anticipate us being here awhile.
17 Hopefully, we can resolve this fairly
18 expeditiously.  If you need a break at
19 any time, just let -- let us know.
20 MS. SMITH: And, Don, I've
21 asked the lady to keep
22 the hours, the time, so I
23 don't anticipate having a

Page 8

1  problem with the
2  seven-hour limit.  But if
3  we do, then she's going
4  to keep the time.
5  Q.   All right.  Ms. Jeffers, if you would,
6  please give me your full name.
7  A.   Barbara Morris Jeffers.
8  Q.   All right.  Now, you and I are
9  familiar with one another throughout
10 the years as I've served as the board
11 attorney and you've been an employee
12 of the board.
13 A.   Uh-huh.
14 Q.   I have a lot of your background
15 information from your file, and so I'm
16 not going to go into that.  I really
17 want to start when you became a
18 counselor at Ladonia.
19 Do you remember the year
20 -- the school year?
21 A.   No.  I think this is my 15th year at
22 Ladonia.
23 Q.   As a counselor?

Page 9

1  A.   Uh-huh.
2  Q.   All right.  '92, '93, does that sound
3  familiar?
4  A.   Yes.
5  Q.   Okay.  And you're going to have to
6  speak up so she can take it down.  She
7  can't take down a nod.
8  A.   Okay.
9  Q.   But '92, '93 sounds reasonable as the
10 year you became a counselor; is that
11 correct?
12 A.   That's correct.
13 Q.   And I believe you transferred there
14 from the Alternative Learning Center;
15 is that correct?
16 A.   That's correct.
17 Q.   And when you came to Ladonia in -- for
18 the '92, '93 school year, who was the
19 principal then?
20 A.   Larry Screws.
21 Q.   And was Charles Nacrelli a teacher at
22 that time?
23 A.   Yes.

3 (Pages 6 to 9)

BARBARA M. JEFFERS - 10/15/2007

Page 10

1    Q.   And I understand he was a 6th grade
2    teacher?
3    A.   Correct.
4    Q.   How long did Mr. Screws remain as your
5    principal?
6    A.   A good while. I'm not sure. I can't
7    tell you how many years -- until he
8    was transferred.
9    Q.   And where was he transferred to?
10   A.   Well, let's see -- where did he go
11   first? I think he went first to
12   Mt. Olive.
13   Q.   Okay. And when he was transferred,
14   who came in as the principal there?
15   A.   Mr. Nacrelli.
16   Q.   I think you indicated in something
17   that I've read that Mr. Nacrelli was
18   there as an assistant principal for a
19   period of time; is that correct?
20   A.   (No response.)
21   Q.   Did he ever serve in that capacity?
22   A.   I think maybe he did. I'm trying to
23   remember, because -- and I don't

Page 11

1    remember -- let's see -- yes, he was.
2    Q.   Do you remember when that occurred?
3    Would he have been the assistant
4    principal under Mr. Screws?
5    A.   I believe so.
6    Q.   Do you recall how many years he would
7    have -- months he would have served as
8    the assistant principal?
9    A.   No, I don't.
10   Q.   Did Mr. Nacrelli become the principal
11   immediately upon the change when
12   Mr. Screws was transferred?
13   A.   Yes.
14   Q.   And how long did you work under
15   Mr. Nacrelli as the principal?
16   A.   Three or four years, I think.
17   Q.   Now, tell me as best you can what --
18   you're the school counselor. Tell me
19   what those duties entail?
20   A.   As the school counselor, I see my main
21   duty as an advocate for the children,
22   which puts me, like -- I try to help,
23   you know, with the parents and with

Page 12

1    the teachers, but I see my main job as
2    an advocate for children.
3    Q.   Now, how do you come to that position
4    of being an advocate? How do know
5    that there are matters that you need
6    to be an advocate for?
7    A.   It comes from -- we have a policy
8    that's put out by the State Board of
9    Education, like a curriculum for
10   counselors.
11   Q.   Yes, ma'am. And what does that
12   curriculum basically entail?
13   A.   The duties and responsibilities of a
14   counselor, like doing large group,
15   individual, small group.
16   Q.   Is that three different things?
17   A.   Personal counseling --
18   Q.   Large group, individual, and small
19   group, those are three different
20   areas?
21   A.   Uh-huh.
22   COURT REPORTER: Yes?
23   THE WITNESS: Yes.

Page 13

1    Q.   Okay. When you set up a schedule for
2    a year, how is it determined?
3    A.   Well, originally, I would get with
4    Mr. Screws, and we would set up my
5    schedule for the year. But then when
6    Mr. Nacrelli became principal, the
7    first year or two, I set up my own
8    schedule, and then he set up my
9    schedule that last year.
10   Q.   All right. The last year?
11   A.   He was there.
12   Q.   That would have been?
13   A.   '05/'06.
14   Q.   Okay. Now, what -- what's on your
15   schedule? What does it consistent of?
16   A.   He set up mainly the times that I
17   would do the large group counseling
18   and other duties that I had.
19   Q.   All right. So the principal -- you
20   say "he." Are we talking about one in
21   particular, or are we just talking
22   about the principal whomever it is?
23   A.   The principal.

4 (Pages 10 to 13)

BARBARA M. JEFFERS - 10/15/2007

Page 14

1  Q.  And they would set up the large group?
2  A.  (The witness nods head.)
3  Q.  Now, what -- what does the large group
4  consistent of?
5  A.  Going to classrooms.
6  Q.  So it would be a classroom?
7  A.  Yes.
8  Q.  And how many classrooms would you
9  visit a day?
10  A.  Well, it just depended on the schedule
11  that they set up.  It's different --
12  and it's not even consistent
13  throughout the county, as far as what
14  counselors do.  Mr. Nacrelli had me
15  going to the classes every other week,
16  but we have a counselor and a half at
17  Ladonia.  So I had been doing K
18  through 3, and she was doing 4, 5, and
19  6 is the way we had done it until the
20  year he set it up.
21  Q.  So let me digress just a minute then.
22  K through 6 is what the classrooms
23  consist of at Ladonia?

Page 15

1  A.  That's correct.
2  Q.  And through the school year 2005/2006,
3  from 1992 through that period of time,
4  it had been K through 6th?
5  A.  No.  It had been K through 5 at one
6  point, and they moved the 6th grade
7  back.
8  Q.  All right.  Was that during the time
9  you were the counselor?
10  A.  Yes.
11  Q.  Who was the principal at the time they
12  moved the 6th grade back?
13  A.  Nacrelli was, I believe.
14  Q.  Now, you said you had a counselor and
15  a half.  Is that Nuria Chaparro, if I
16  correctly pronounced her name?
17  A.  AKA Ann Murphy?
18  Q.  Right.  I knew her as Ann Murphy when
19  we were in high school.
20  A.  Yes, it is.  It's Nuria Chaparro.
21  Q.  All right.  Correct me if I don't
22  pronounce her name correctly.
23  So she's the other half

Page 16

1  counselor?
2  A.  That's correct.
3  Q.  Now, you would then see K through 3,
4  and you would be in the large groups
5  every other week; is that correct?
6  A.  I saw K through 3 every other week.
7  Q.  All right.  And on the off weeks, what
8  did you do?
9  A.  Well, you're seeing classes every day.
10  It's just that you don't go into every
11  class, except every other week.  So it
12  wasn't that I wasn't seeing large
13  groups every day, I was.
14  Q.  Okay.  That's what I'm trying to get
15  at.
16  A.  Yeah, I was.
17  Q.  Tell me what your day starts out and
18  go through it.
19  A.  Okay.  I was seeing classes like --
20  like now, I see three classes a day or
21  maybe four, and Mr. Hopper made up my
22  schedule this year.
23  Q.  Uh-huh.

Page 17

1  A.  And I don't see any classes -- large
2  groups on Friday.  Nuria doesn't see
3  any large groups -- she sees one on
4  Thursday, and I think she does two on
5  Friday.  That's all she does at
6  Ladonia.
7  Q.  All right.  And tell me what the
8  difference is then between being in
9  the classroom and then seeing large
10  groups.  Now, you tell me that you're
11  in the classrooms every day.
12  A.  Well, I do guidance-type things in the
13  classroom.
14  Q.  Okay.  Tell -- what is that?
15  A.  Okay.  Learning to live, learning to
16  earn, and learning to learn, those are
17  the three basic areas: you do self
18  esteem, you do work study, you do
19  career.
20  Q.  Okay.  And is that -- do you do that
21  every day in a classroom?
22  A.  Yes -- or in several classrooms.
23  Q.  And is there a period of time that you

5 (Pages 14 to 17)

BARBARA M. JEFFERS - 10/15/2007

Page 18

1 come in and do that, or do you just
2 float and then when you show up the
3 teacher allows you the opportunity?
4 A.   No.  I have scheduled time to go in --
5 Q.   Okay.
6 A.   -- for 30 minutes.
7 Q.   And so just say a day, you would be in
8 three classrooms for 30 minutes?
9 A.   Uh-huh.
10 Q.   And how is that distinguished from a
11 large group?
12 A.   It's not.  That is the large group.
13 Q.   Well, I'm confused now because you
14 tell me that you see a large group --
15 A.   A large group is a classroom.
16 Q.   Okay.
17 A.   That's called a large group.
18 Q.   Okay.  Well, we'll come back to the
19 scheduling later.  But what I'm trying
20 to just establish are -- what are your
21 responsibilities -- what's the
22 responsibility of a counselor on a
23 daily basis.

Page 19

1 A.   Okay.
2 Q.   And what is that?
3 A.   Well, at Ladonia, I have the
4 responsibility of a lot of secretarial
5 work.
6 Q.   Okay.
7 A.   For example, we have a great turnover
8 at Ladonia.  We probably have two or
9 three children -- hundred children who
10 come in a year and 2 or 300 that go
11 out.
12 Q.   Okay.
13 A.   So part of the year, I do registration
14 until I start large group.
15 Q.   Okay.
16 A.   When you register, there's quite a
17 paperwork there.  When school starts
18 and I start doing the large groups, I
19 don't actually register them.  But I
20 am responsible for doing the key
21 records for each one of them that come
22 in.  And I have to request the
23 records, receive the records, review

Page 20

1 the records, and be sure that the
2 child is placed in the correct class.
3 Okay.  When a children
4 leaves, I'm responsible for
5 duplicating those records and
6 forwarding that on to the school that
7 they've gone to.  All right.  That's
8 one thing I do.
9 I'm the building test
10 coordinator.  That takes up
11 approximately 40 days a year for me.
12 Q.   Okay.
13 A.   As the building test coordinator, I'm
14 responsible for the DIBELS testings,
15 which is given three times a year.
16 I'm responsible for the SAT, and the
17 ARM that is given in spring.  The
18 actual giving of the test takes about
19 seven days, but the preparation to
20 give it takes me about 10 days.
21 Q.   Okay.  What does SAT stand for?
22 A.   Standard Achievement Test.
23 Q.   All right.  And what grades is that

Page 21

1 given to?
2 A.   That is given in 2 through 6.
3 Q.   Each year?
4 A.   Uh-huh.
5 Q.   Okay.  And the other one you had an
6 acronym for, ARM?
7 A.   Uh-huh.
8 Q.   What?
9 A.   Alabama Reading and Math test.
10 Q.   Okay.  And go ahead and explain that
11 then.
12 A.   Well, the ARM is part of the SAT.
13 They give -- we give them at the same
14 time.
15 Q.   Okay.  And that's two through six?
16 A.   Uh-huh.
17 Q.   Every year?
18 A.   Uh-huh.
19 THE COURT REPORTER:  Did you
20 say yes?
21 THE WITNESS:  Oh, yes.
22 Q.   Okay.  In addition to the testing
23 coordinator, what are the other

6  (Pages 18 to 21)

BARBARA M. JEFFERS - 10/15/2007

Page 22

```
*1   responsibilities a counselor has at
 2   Ladonia?
 3   A.   Okay.  I work a great deal with DHR.
 4   We have a good number of children who
 5   are involved with DHR.
 6   Also, disability
 7   determination, I do records for
 8   them -- get records to the teachers
 9   for them.  Then I have individual
10   students that I see.  I do small
11   groups.  Small groups are generated
12   based on -- I hate -- I don't want to
13   say problems, but circumstances.
14   Like, if I have a number of students
15   whose parents are divorcing and
16   they're upset, I might have a small
17   group where I get them together, or a
18   death of parent or a loved one, we
19   might have that kind of group.  We do
20   a fair amount of individual
21   counseling.  I do a fair amount of --
22   I try to have a Newcomers Club, too,
23   for the kids who come in new.  I'll
```

Page 23

```
 1   meet with them in small groups.
*2   Q.   Are you the person who determines if
 3   there's a small group need?
 4   A.   Yes.
 5   Q.   So you would see a group of -- a grief
 6   situation or a divorce situation and
 7   then you would determine to set up a
 8   small group?
 9   A.   Right.  I also see fair amount of
10   parents.
11   Q.   Okay.
12   A.   I have parents who call and make
13   appointments to come in.
14   Q.   And what are those parents seeking
15   from you?
16   A.   Well, they may have family
17   circumstances that they want me to see
18   the children about.  You know, they
19   might make the referral or teachers
20   make referrals or the administration
21   make referrals.  It's gotten this year
22   anytime anybody goes to the office for
23   a disciplinary problem, they refer
```

Page 24

```
 1   them to the counselor.
 2   Q.   And what are you to do with that?
 3   A.   I'm not quite sure.
 4   Q.   Okay.  Is this the first time that's
 5   happened?
 6   A.   Uh-huh.
 7   Q.   What kind of --
 8   A.   Yes.
 9   Q.   Every discipline?  Every discipline?
10   A.   Yes.
11   Q.   On an average, if you can tell me, of
12   a week, how many small groups might
13   you have?
14   A.   Okay.  I haven't had any this year.
15   I've not started them.  I haven't had
16   a chance to start them.  On a average,
17   I might have three small groups.
18   Q.   All right.  On an average, how many
19   would you counsel individually in a
20   week?
21   A.   On an average, probably 20 students.
22   Q.   Okay.  And how long would you see each
23   of those students?
```

Page 25

```
 1   A.   It just depends.  I don't usually see
 2   them more than about 30 minutes.
 3   Q.   Do they come to your office?
 4   A.   They do.
 5   Q.   And I came to your office the other
 6   day.  Is that the office they come to?
 7   A.   Right.
 8   Q.   Let me go back to the registering of
 9   students.  You then are responsible
10   for all new students; is that correct?
11   A.   I am until the time that I start doing
12   large group.  And I usually don't
13   start doing large group until
14   September because I'm registering and
15   also because we do DIBELS.
16   Q.   When do you do DIBELS?
17   A.   We do DIBELS in August.  It has to be
18   done the first 20 days of school.
19   Then we do DIBELS in December, and do
20   DIBELS again toward the end of the
21   year, like March or April.
22   Q.   And, for the record, explain what
23   DIBELS -- what the test is or what
```

7 (Pages 22 to 25)

BARBARA M. JEFFERS - 10/15/2007

Page 26

1   you're attempting.
2   A.   Well, I don't do the DIBELS testing.
3   I'm responsible for the administration
4   of the testing.  There's a team that
5   tests.
6   Q.   Now, what is DIBELS seeking to
7   measure?
8   A.   Reading skills.
9   Q.   When you say you administer the test,
10  what does that involve?  I mean, you
11  don't give the test --
12  A.   I don't give the test.  I am
13  responsible for the test booklets, the
14  security of the test, and for
15  distributing the test to the testing
16  team that is testing.  And they come
17  back and forth during the day to check
18  tests in, check tests out, and I have
19  to be in my office.  I'm not supposed
20  to do anything else while any testing
21  is going on, but sit in my office.  I
22  also put the scores in the computer
23  for all the children who are testing.

Page 27

1   We do DIBELS testing from K through 4.
2   Q.   Are you a 10-month employee?
3   A.   Yes.
4   Q.   And when does your work year start?
5   A.   I believe it started this year like
6   July 26 -- 27th.
7   Q.   All right.  Do you remember when it
8   started in the 2005/2006 school year?
9   A.   I don't remember.  Probably the first
10  of August -- somewhere around the
11  first of August, maybe.  I don't
12  remember if it was July that year or
13  not.
14  Q.   I have a school calendar.  I think it
15  dates -- it's the 2005/2006 school
16  calendar.  I think the dates down here
17  are wrong, but it shows that
18  July 20th, 2005, would have been the
19  first day for 10-month personnel,
20  which was a Wednesday; does that seem
21  reasonable?
22  A.   July the what?
23  Q.   20th.

Page 28

1   A.   May I see that?
2   Q.   Sure.  Let me show you just for
3   clarification, this the 2004/'05.
4   This is the '05/'06.  I think they've
5   carried over the '04/'05 years, but
6   have changed the dates.
7   A.   That's what it says.
8   Q.   Okay.  And that would have been a
9   Wednesday then?
10  A.   Yes.
11  Q.   So you would have started on
12  Wednesday, July 20, as an employee in
13  -- for the 2005/2006 school year; is
14  that correct?
15  A.   Yes.
16  Q.   Now, did you have DIBELS in 2005/2006?
17  A.   Yes.
18  Q.   And you say that they last until
19  around the end of August; is that
20  correct?
21  A.   It's supposed to be done the first 20
22  days of school.  That's when the
23  students start back when it starts at

Page 29

1   the 20 days.  So I don't remember
2   exactly what the date was we did
3   DIBELS that year.
4   Q.   All right.  If you can look at that
5   calendar then and tell me what day the
6   kids came back for 2005/2006?
7   A.   August the 8th.
8   Q.   So that's when the children would have
9   returned.  Now, you've got 20 days
10  after that date to administer DIBELS?
11  A.   (The witness nods head.)
12  Q.   So it would have been after August 28
13  and the conclusion of DIBELS that you
14  would have started your schedule, I
15  assume; is that correct?
16  A.   That's correct.
17  Q.   All right.  Now, then, let's go to the
18  matters at hand, so to speak.  I want
19  you to go through each incident that
20  you allege constituted sexual
21  harassment by Mr. Nacrelli starting
22  with the earliest one.  I want you to
23  give me the date, as best you can, and

8 (Pages 26 to 29)

BARBARA M. JEFFERS - 10/15/2007

| Page 30 |
|---|
| 1  all of the circumstances surrounding |
| 2  it. And so start at what you feel is |
| 3  the first time that Mr. Nacrelli was |
| 4  guilty of sexual harassment. |
| 5  A.   I can't give you a specific date, but |
| 6  from the years that he was principal, |
| 7  there was a barrage of incidents and |
| 8  occurrences when he would make sexual |
| 9  remarks, sexual jokes throughout the |
| 10  year. |
| 11  Q.   Okay. Well, did this occur when he |
| 12  served as the assistant principal? |
| 13  A.   I don't remember it occurring as much |
| 14  when he was the assistant principal, |
| 15  but I'm -- I'm sure he probably did |
| 16  make sexual remarks. |
| 17  Q.   All right. Now, I don't mean to be |
| 18  argumentative with you, Ms. Jeffers, |
| 19  but when we get to the trial of this |
| 20  case -- |
| 21  A.   Uh-huh. |
| 22  Q.   -- you're going to have to outline |
| 23  each incident and describe it in |

| Page 31 |
|---|
| 1  detail and place it in a time frame, |
| 2  and that's what I'm asking you to do |
| 3  this morning for each incidence. And |
| 4  so starting when he became -- well, |
| 5  let me say this, did -- were there any |
| 6  incidences where he sexually harassed |
| 7  you while he was a sixth grade |
| 8  teacher? |
| 9  A.   No. |
| 10  Q.   Then starting with the time frame in |
| 11  which he was the assistant principal, |
| 12  tell me specifically what dates and |
| 13  what he did. |
| 14  A.   I can't remember anything specifically |
| 15  that he would have been done when he |
| 16  was assistant principal. |
| 17  Q.   Okay. And you can't remember them |
| 18  today. Do you think you're going to |
| 19  remember them at the time of trial? |
| 20  A.   I don't know. Not unless I get |
| 21  hypnotized. |
| 22  Q.   Okay. So that's your -- I mean, |
| 23  you're telling me the truth; as we sit |

| Page 32 |
|---|
| 1  here today, you cannot remember any |
| 2  specific instances of him having |
| 3  sexually harassed you during the time |
| 4  he was the assistant principal? |
| 5  A.   No, I cannot. |
| 6  Q.   All right. Then let's go to when he |
| 7  became the principal -- and let me |
| 8  establish this: Did he become the |
| 9  principal at the beginning of a school |
| 10  year? |
| 11  A.   Yes. I believe he did. |
| 12  Q.   All right. So starting with the |
| 13  beginning of that school year, tell me |
| 14  in as much detail each incident of |
| 15  sexual harassment? |
| 16  A.   I can't tell you any specific dates. |
| 17  I can tell you the types of things |
| 18  that he said and what he would do. |
| 19  Q.   All right. Starting then with the |
| 20  earliest recollection that you have, |
| 21  tell me what that was. |
| 22  A.   Okay. Mr. Nacrelli started out, and |
| 23  he would tell in front of me and |

| Page 33 |
|---|
| 1  sometimes in front other people -- he |
| 2  liked to talk about his father. He |
| 3  would tell me about his father |
| 4  sexually harassing his wife and the |
| 5  things that he would do, like feel her |
| 6  breasts and this kind of thing. |
| 7  Q.   This would be Mr. Nacrelli's father |
| 8  vis-à-vis Mr. Nacrelli's wife? |
| 9  A.   Right. |
| 10  Q.   Okay. All right. |
| 11  A.   Okay. He started out telling things |
| 12  like that. He also liked to tell that |
| 13  he and Jerry had sex, like, every |
| 14  night. He would tell things like that |
| 15  they sat around naked all the time; |
| 16  that they didn't wear clothes. |
| 17  He would tell about his |
| 18  first wife and that she had gotten |
| 19  pregnant and that they had gotten |
| 20  married and that they had divorced. |
| 21  He would tell about when |
| 22  he worked in a Pizza Hut wherever he |
| 23  was in school -- I think Jacksonville |

9 (Pages 30 to 33)

BARBARA M. JEFFERS - 10/15/2007

Page 34

1  State or whatever -- and how they
2  would like close up the Pizza Hut at
3  night and then they would like have
4  sex with people on tables and this
·5  kind of thing.  He was always telling
6  tales like that.  That's how it
7  started out, more or less all his
8  sexual episodes either involving Jerry
9  or his father-in-law and -- you know.
10  Q.  His father or his father-in-law?
11  A.  Father -- father.
12  Q.  And tell me when -- when and where you
13  would remember these statements being
14  made.  In other words, were they made
15  in faculty meetings?  Were they made
16  in halls?  Were they made in
17  classrooms?  Were they made in his
18  office?
19  A.  His office and hallways, my office, in
20  front me, in front of me and others.
21  I mean, there are -- there are several
22  teachers that, you know, would say
23  that they've heard all of this also.

Page 35

1  Q.  And who are those teachers?
2  A.  I believe Allison Gentry would say she
3  had heard it.  I believe Brenda Coley
4  would say that she's heard that.  I
5  think Rose Fowles has heard it.
·6  THE COURT REPORTER: Rose who?
7  THE WITNESS: Rose Fowles.
8  Q.  F-O-W-L-E-S.
9  A.  I believe Emily Jones has heard it.  I
10  believe Dale Amerson has heard it.  I
11  believe Cill Parish has heard it.  I
12  don't believe --
13  MR. WILLIAMS: I'm sorry to
14  interrupt, but how do you
15  spell that name you just
16  said?
17  MS. SMITH: C-I --
18  THE WITNESS: It's Lucille.
19  It's Lucille and
20  P-A-R-I-S-H.
21  MR. WILLIAMS: Thank you.
22  A.  I believe Jamie Evans has heard it.
23  And as far as sexual remarks, I do

Page 36

1  remember one time in a faculty meeting
2  he made a sexual remark, and I cannot
3  remember what it was.  But I know
4  everybody was just kind of looking
5  around like I can't believe he said
6  that.  I don't remember what the
7  statement was.  But that was the first
8  year that he was principal.
9  Q.  Now, during that first year, did you
10  ever tell him you didn't appreciate
11  those comments?
12  A.  No.  I basically just didn't make any
13  comment back to him about any of the
14  things that he would -- you know, all
15  that he would tell.
16  Q.  Did you ever tell him it offended you?
17  A.  No.
18  Q.  Did, in your presence, any of these
19  people who you've just named ever tell
20  him that they -- that they were
21  offended by his comments?
22  A.  No.
23  Q.  Did you ever report it to anyone?

Page 37

1  A.  No.
2  Q.  Anyone of a supervisory capacity?
3  A.  No.
4  Q.  That was the first year.  Let's go to
5  the second year.  If you would,
6  describe to me again, give me dates as
7  best you can, and circumstances --
8  MR. EDDINS: I object to the
9  form now.  She doesn't
10  say all of that was the
11  first year.  She just
12  said it was continual.
13  MS. SMITH: No.  I think she
14  did say that was
15  everything that happened
16  the first year.
17  MR. EDDINS: All right.  Just
18  ask her again.
19  MS. SMITH: All right.  Let's
20  go back then.
21  Q.  Those incidences you've described, is
22  that what happened the first year?
23  A.  That's what happened up until the time

10 (Pages 34 to 37)

BARBARA M. JEFFERS - 10/15/2007

Page 38

```
1   that he had the party for Brenda Coley
2   for the years that he was principal.
3   Q.   Okay.  So these events then covered a
4   span of years?
5   A.   Yes.
6   Q.   How many years?
7   A.   I'm not sure how many years he was
8   principal.  I don't remember.
9   Q.   All right.  Then up until -- all
10  right.  Let's take the time up -- from
11  the time he became principal, up until
12  the party --
13  A.   Uh-huh.
14  Q.   -- have you described every situation
15  where he, in your opinion, was guilty
16  of sexual harassment?
17  MR. EDDINS: You can have a
18  copy of this.  You have
19  it already.  But y'all
20  are welcome to the copy.
21  A.   Okay.  This starts from the time of
22  the party, but -- it would be hard
23  from me to say that I am remembering
```

Page 39

```
1   every thing that he did up until that
2   time.  I know --
3   Q.   Well, --
4   A.   Mr. Nacrelli, in the spring of the
5   year before the party, it seemed that
6   it escalated.  Mr. Nacrelli started
7   losing a lot of weight.  He would tell
8   me about going to the health spa and
9   how the women were all lusting after
10  him, so to speak.  And that it had
11  gotten to where he couldn't go at the
12  same time his wife did because she
13  would get jealous and that they would
14  have to go on separate occasions and
15  not to mention about -- you know, he
16  didn't like to mention his weight loss
17  because she was not losing the amount
18  of weight that he was losing and it
19  was beginning to become a problem and
20  that it was affecting their sex life.
21  All of this -- he would tell me things
22  like that back in the -- back in the
23  spring before the summer.
```

Page 40

```
1   Q.   All right.  Let's just establish then,
2   just for the record, that the party
3   occurred in July of 2005.
4   A.   That's correct.
5   Q.   All right.  So we're describing events
6   that occurred prior to July 2005?
7   A.   Right.
8   Q.   Now, where would he tell you these
9   things?
10  A.   The hall, the lunchroom, his office,
11  my office.
12  Q.   Again, I'm going to ask you, did you
13  ever make any comment to him that
14  those statements offended you in any
15  way?
16  A.   No.
17  Q.   Did you ever asked him not to make
18  those kind of statements in front of
19  you?
20  A.   I don't know that I simply said don't
21  make those kinds of statements in
22  front of me, no.
23  Q.   Did you ever report those statements
```

Page 41

```
1   -- his actions or those statements
2   that he made, that you've just
3   described, to anybody in a supervisory
4   capacity?
5   A.   No.
6   Q.   Now, tell me how -- prior to the party
7   in July, tell me how those statements
8   affected your ability to work?
9   A.   It got to the point where it -- where
10  it was such that at one point at the
11  school back in the spring, I actually
12  feel like I was under so much stress I
13  thought I was having a heart attack.
14  Q.   Uh-huh.
15  A.   And I went up there and told him, I
16  said, I think I'm having a heart
17  attack.  And I left and went to
18  St. Francis Hospital.  It was just
19  very stressful.  I did not want to
20  come to school.  As soon as I got a
21  sick day, I took a sick day.  It was
22  not a place I wanted to be.
23  Q.   When you told him you thought you were
```

11 (Pages 38 to 41)

BARBARA M. JEFFERS - 10/15/2007

Page 42

1  having a heart attack, did you tell
2  him that it was based on the stress
3  from his sexual comments?
4  A.   No, I did not.
5  Q.   Did you tell anyone that your stress
6  at that point in time was caused by
7  his sexual comments?
8  A.   Yes.
9  Q.   Who did you tell?
10  A.   Nuria Chaparro.
11  Q.   Yes, ma'am.
12  A.   Brenda Coley, Larry Jeffers, my
13  sister, Margaret Bane.
14  Q.   Uh-huh.  And that's when you went to
15  St. Francis, I believe?
16  A.   Yes.
17  MS. SMITH: Those are the
18  records we don't have?
19  MR. EDDINS: I don't think. I
20  don't believe we have
21  them -- those records.
22  MS. SMITH: Do you intend to
23  have them prior to trial?

Page 43

1  MR. EDDINS: Absolutely. You
2  can get the same way --
3  same as I did. But I'll
4  be happy to get them for
5  you.
6  MS. SMITH: I requested
7  them --
8  MR. EDDINS: All you have to
9  do is subpoena them.
10  That's the way I normally
11  get records. But I'll
12  get them for you.
13  MS. SMITH: I requested them
14  under the production
15  request. And you've
16  indicated to me on more
17  than one occasion that as
18  soon as they were
19  available, you would
20  prove those to me.
21  Are you telling me
22  now that I'm going to
23  have to subpoena them?

Page 44

1  MR. EDDINS: No. I'm just
2  telling you could have
3  gotten them the same way
4  I did.
5  I sent the same
6  transits -- the same form
7  that I sent everybody in
8  the world. They waited
9  about a month or two and
10  sent it back and said we
11  have to have our forms.
12  So I had to get
13  Ms. Jeffers to come up
14  there and sign that form,
15  which I sent back also
16  with their own record
17  forms.
18  And finally,
19  Thursday, I think it was,
20  they sent me a note
21  saying you can have the
22  records, send us a check.
23  I have been tied up ever

Page 45

1  since. I will get the
2  check to them this week.
3  And as soon as I get the
4  records, you won't have
5  to subpoena them.
6  MS. SMITH: I think under the
7  HIPAA laws they won't
8  give them to me unless
9  it's subpoena. And
10  St. Francis is Georgia
11  corporation. I'll have
12  to go through the Georgia
13  courts to get a subpoena
14  to get them to produce it
15  if they refuse to do so,
16  just for your knowledge.
17  MR. EDDINS: I apologize. I
18  should have already
19  gotten it. I've never
20  dealt with anybody like
21  that.
22  Q.   So that was in the spring of 2005
23  then?

12 (Pages 42 to 45)

BARBARA M. JEFFERS - 10/15/2007

Page 46

1    A.    That's correct.
2    Q.    And what month?
3    A.    I'm not sure.  Probably April.
4    Q.    Who was your doctor?
5    A.    In the hospital, the doctor that I saw
6    -- I went to the emergency room, and I
7    ended up seeing Chokkar?
8    THE COURT REPORTER:  Who?
9    THE WITNESS:  Chokkar,
10   C-H-O-K-K-A-R, I believe.
11   Q.    And you saw her in the emergency room;
12   is that correct?
13   A.    Initially, I saw a man -- another one,
14   I think, that was in with her group in
15   the emergency room.  And then I saw
16   Chokkar the next day.  They kept me
17   over night.
18   Q.    And what -- how long did you stay?
19   A.    One night.
20   Q.    And what -- how long did you stay?
21   A.    One night.
22   Q.    And what did Dr. Chokkar diagnose?
23   A.    It was not a heart attack.  It was not

Page 47

1    heart problems.
2    Q.    Did she tell you, if anything, what
3    she thought it was?
4    A.    She thought it was like bronchitis or
5    pleurisy.
6    Q.    Okay.  Now, was -- is it your
7    testimony that the bronchitis or
8    pleurisy were caused by Mr. Nacrelli's
9    actions?
10   A.    No.  I was having chest pains.  And I
11   felt -- I thought I was having a heart
12   attack.
13   Q.    And that's because of Mr. Nacrelli's
14   actions?
15   A.    Yes.  Stress.
16   Q.    And you never told Mr. Nacrelli that?
17   A.    No.
18   Q.    Did you tell Dr. Chokkar that?
19   A.    No.  I didn't tell Chokkar that.
20   Q.    Did you tell anybody -- would that
21   show up on the records upon your
22   admission at St. Francis?
23   A.    No.  I didn't tell them I thought I

Page 48

1    was having chest pains because I had
2    been sexual harassed.
3    MS. SMITH:  Well, once we get
4    those records, depending
5    on what they say, I may
6    want to reconvene this
7    deposition to ask her
8    about those.
9    MR. EDDINS:  No problem.  For
10   that purpose certainly.
11   Q.    All right.  We've talked about then
12   the events up until the party in July
13   of 2005.  Is there any other event
14   that you can remember that occurred
15   prior to -- the party in July of 2005?
16   A.    No.  I don't remember anything.
17   Q.    Was there any inappropriate touching
18   of you?
19   A.    No.  There were times that he would --
20   he would say things about the clothing
21   that I wore or, you know, you look
22   good in those pants and this kind of
23   thing.

Page 49

1    Q.    But he never physically touched you?
2    A.    No.
3    Q.    And you never complained to him up
4    until that time frame?
5    A.    There were other things that he --
6    that he did, too.  Like he would -- he
7    would act seductively maybe at
8    another teacher or something and look
9    at me and make faces, like letting me
10   know.
11   He did it one time about
12   Jamie Evans when she was in the office
13   signing in.  I do remember that
14   specifically.  He did it with
15   Brenda Coley one time, specifically,
16   in my office.
17   Q.    And how did that cause you stress?
18   A.    He was in my office and Brenda had
19   walked over like -- that she was going
20   out of my office and she had on a pair
21   of pants and a top.  And he was
22   looking at her making faces and stuff
23   about her rear end.  And I said,

13  (Pages 46 to 49)

BARBARA M. JEFFERS - 10/15/2007

Page 50

1    Brenda Mr. Nacrelli is making sexual
2    gestures and stuff behind your back.
3    And so she turned around and she said
4    what are you doing, Mr. Nacrelli; do
5    you like what I've got on; you think I
6    look hot in this?
7    And he had an erection.
8    And he turned red and I did, too. And
9    I said you just need to get out of my
10   office.
11   Q.   Okay. And that happened prior to --
12   to July?
13   A.   Yes, ma'am.
14   Q.   And that caused you stress?
15   A.   Yes. It embarrassed me to death.
16   Q.   Okay. Now, you're pretty specific
17   about that incident. So can we --
18   A.   Yeah. I do remember that one,
19   specifically.
20   Q.   All right. Do you remember any other
21   that specifically?
22   A.   I do remember when Jamie Evans was
23   pregnant and she was walking up the

Page 51

1    hall, and he and I were walking up the
2    hall behind her, and he said to me she
3    look like she's pregnant in her butt.
4    Q.   Okay. Did that cause you stress?
5    A.   Yes. It embarrassed me that he would
6    be a principal and talk about a
7    teacher like that.
8    Q.   But you never confronted him about any
9    of those things?
10   A.   No, i didn't. Another time he came to
11   me about Jamie Evans, it was that
12   Jamie Evans was teaching fourth grade
13   at the time. This was during that
14   period of time that he -- first year
15   or so that he was the principal --
16   probably the first year -- and he
17   asked me if I thought that Jamie Evans
18   wore provocative clothing. And I said
19   not that I've noticed. And he said
20   that, apparently -- I don't know if a
21   teacher had said something to him
22   about what she wore or if this was his
23   idea or what.

Page 52

1    And he said -- I said why
2    do you think she wears provocative
3    clothing?
4    And he said, well, not
5    really. I said, you know Jamie's got
6    a good figure. And I said, you know,
7    I don't think she can help that.
8    But I really and truly
9    think he got it in his mind that maybe
10   she had a figure or something that
11   fourth graders would be interested in.
12   He moved her to another grade the next
13   year.
14   He also said something
15   about, well, that the teachers or
16   somebody had mentioned that she wore
17   throng underwear. And that sometimes
18   if she bent over or whatever, you
19   could see it. And I told him, I said,
20   I have not noticed that.
21   Q.   And those comments caused you stress?
22   A.   Uh-huh.
23   THE COURT REPORTER: Yes?

Page 53

1    THE WITNESS: Yes.
2    Q.   Anything else, specifically?
3    A.   Let me think. Mr. Nacrelli would
4    compare teachers. He -- well, he told
5    me -- he would do things like this:
6    When it came to the placement of
7    students one time, I remember -- I
8    don't remember what grade this was --
9    I think it was second grade. He had
10   the father of a parent who he felt
11   like came on to teachers. He moved
12   that child, and I can't even remember
13   the child's name or the father's name.
14   But he told me he was doing this
15   from -- I believe it was Ms. Evans'
16   class to Ms. Crenshaw's class because
17   he said Ms. Crenshaw was not
18   attractive, and the parent would not
19   sexually come on or make any remarks
20   to that particular teacher. That was
21   another.
22   Q.   Okay.
23   A.   Okay. He also said that he felt like

14 (Pages 50 to 53)

BARBARA M. JEFFERS - 10/15/2007

Page 54

.1  Ms. Gentry had become jealous of
2  Jamie Evans because Jamie was so much
3  younger than Ms. Gentry, and Ms.
4  Gentry had lost her sex appeal because
5  of her age.
6  Q.   All right.
7  A.   I can remember those specifically.
8  Q.   These are comments he made to you?
9  A.   Yes.
10  Q.   Where did he make these comments?
11  A.   In the hall or my office or his
12  office.
13  Q.   And what would your response be to
14  these comments?
15  A.   I didn't have a response to be honest
16  with you.
17  Q.   What else can you remember?
18  A.   I can't really remember anything else
19  right this minute specifically.
20  Q.   Okay.
21  A.   I don't believe.
22  Q.   And this is from the time he became
23  principal up until July of 2005 at the

Page 55

1  time of the party?
2  A.   That's correct.
3  Q.   And you've told me then everything
4  that you can remember that occurred
5  over that time frame that in your
6  judgment constituted sexual harassment
7  of you?
8  A.   That I'm remembering at this moment,
9  yes.
10  Q.   When these -- when you talked with me
11  several years ago about this, I think
12  it was January of '06, you said that
13  you had a notebook with a log in it
14  that had this information.  Have you
15  found that notebook?
16  A.   No, I haven't.
17  Q.   You said you had moved at that time --
18  have moved since then, so you've not
19  found it?
20  A.   No, I haven't.
21  Q.   All right.
22  A.   I haven't even looked for it really.
23  Q.   If you should happen to locate that, I

Page 56

1  would greatly appreciate it if you
2  intend to use it at the time of this
3  trial, if you would let me know that
4  so that we can go over that and
5  discuss it then.
6  A.   Okay.
7  Q.   All right.  Let's go then -- so let me
8  -- let me make sure I'm comfortable
9  with this.  Up until the party in July
10  2005, you had never reported any of
11  these comments by Mr. Nacrelli to
12  anyone in a supervisory capacity?
13  MR. EDDINS:  Object to the
14  form.  That's the fourth
15  or fifth time you asked
16  that.
17  Go ahead and answer
18  it.
19  A.   Not in a formal way.  But at the time
20  that Ms. Coley was the assistant
21  principal, she knew the things that he
22  was saying and doing.  I did not
23  report as a report to her, but we

Page 57

1  would talk about it.  I would tell
2  her.
3  Q.   And what would you tell her?
4  A.   And she would -- well, you know just
5  what she had said or what had
6  happened.
7  Q.   Did you ever tell her that you felt
8  this was sexual harassment against
9  you?
10  A.   I didn't tell her specifically that I
11  felt it was sexual harassment against
12  me.  She knew I did not want to be at
13  that school.  She knew that it was
14  stressful for me.
15  Q.   When did she know that?
16  A.   Whole time she was assistant
17  principal, I imagine.
18  Q.   Now, how did she know that?
19  A.   Because we would talk about it.
20  Q.   And where did you want to be?
21  A.   Anywhere but where I was.
22  Q.   Did you --
23  A.   But there were also other problems

15  (Pages 54 to 57)

BARBARA M. JEFFERS - 10/15/2007

| Page 58 | Page 60 |
|---|---|
| 1  with Mr. Nacrelli also. | 1  A.  Time and place.  And it did have some |
| 2  Q.  Of a sexual nature? | 2  -- I really don't remember.  I haven't |
| 3  A.  Not of a sexual nature. | 3  looked at the invitation since then. |
| 4  Q.  Did you ever put in for a transfer? | 4  Q.  Was it a preprinted invitation?  Was |
| 5  A.  No.  I had not at that time. | 5  it handwritten? |
| 6  Q.  Then let's go to the party on July of | 6  A.  I believe that Jerry Nacrelli probably |
| 7  2005.  Do you remember what the date | 7  typed it up; done it on a computer or |
| 8  of that party was? | 8  something. |
| 9  A.  I do not remember the specific date. | 9  Q.  Was it on a card? |
| 10  Q.  Do you remember if it was the | 10  A.  I believe so. |
| 11  beginning of July or the end of July? | 11  Q.  And had the time and location? |
| 12  A.  I don't remember. | 12  A.  Correct. |
| 13  Q.  Was school out at the time? | 13  Q.  And what was the location? |
| 14  A.  I was out. | 14  A.  Charles Nacrelli's house in Opelika. |
| 15  Q.  You were out? | 15  Q.  Where does Mr. Nacrelli live in |
| 16  A.  Yes. | 16  Opelika or did he live at that time? |
| 17  Q.  And you were on a 10-month contract. | 17  A.  You take a right and go up by the high |
| 18  According to this calendar that I had | 18  school, I believe; somewhere up there |
| 19  earlier, it shows June 5 was the last | 19  in that neighborhood.  I couldn't tell |
| 20  day for 10-month personnel; does that | 20  you how to get there now. |
| 21  sound reasonable? | 21  Q.  Had you been to his house before? |
| 22  A.  It does. | 22  A.  Yes. |
| 23  Q.  How were you made aware of this party? | 23  Q.  How many times? |

| Page 59 | Page 61 |
|---|---|
| 1  A.  I received an invitation. | 1  A.  I believe once. |
| 2  Q.  A written or oral invitation? | 2  Q.  And what -- when had that occurred? |
| 3  A.  A written invitation. | 3  A.  A Christmas party that year before. |
| 4  Q.  What did it say? | 4  Q.  Christmas of 2004? |
| 5  A.  That they were having a party for | 5  A.  I believe so. |
| 6  Ms. Coley for leaving as assistant | 6  Q.  And that was at his home? |
| 7  principal and getting a principalship, | 7  A.  Yes. |
| 8  you know, at another school so they | 8  Q.  And let's talk about that party first? |
| 9  were having a party. | 9  Did you get an invitation to that |
| 10  Q.  All right.  Who did the invitation | 10  party? |
| 11  come from? | 11  A.  Uh-huh. |
| 12  A.  Charles Nacrelli. | 12  Q.  And where did that invitation come |
| 13  Q.  Did it come from his home? | 13  from? |
| 14  A.  Uh-huh. | 14  A.  I don't know.  I'm sure it came from |
| 15  Q.  What -- do you have this invitation? | 15  him. |
| 16  A.  Not with me I don't. | 16  Q.  Oral or written? |
| 17  Q.  You do have it? | 17  A.  I don't remember. |
| 18  A.  I don't -- I don't have an invitation | 18  Q.  And who was present at that party? |
| 19  that I know of with me.  I'm sure | 19  A.  Some of the teachers. |
| 20  somebody does. | 20  Q.  What kind of party was it? |
| 21  Q.  And what did else -- what the | 21  A.  A Christmas party for employees. |
| 22  invitation say, as best you can | 22  Q.  And it was at his home? |
| 23  recall? | 23  A.  Yes. |

16 (Pages 58 to 61)

BARBARA M. JEFFERS - 10/15/2007

Page 62

1   Q.   How many people were there?
2   A.   I don't remember.
3   Q.   Were you invited individually, or were
4   you told you could bring your family
5   or friends or an escort?
6   A.   I don't remember.
7   Q.   And what time of day was it?
8   A.   It was at night.
9   Q.   Was there drinking that night?
10  A.   Uh-huh.
11  Q.   Did he supply the alcohol?
12  A.   Yes.
13  Q.   Did you take any alcohol?
14  A.   No.
15  Q.   What type of alcohol was available?
16  A.   I don't remember that either; probably
17  beer and wine.
18  Q.   Was food served?
19  A.   Yes.  We brought food, I think.
20  Q.   Was this during the Christmas
21  holidays?
22  A.   Yes.
23  Q.   School was out for the holidays?

Page 63

1   A.   Well, uh-huh.  I think so.  I don't --
2   I don't remember that either.
3   Q.   How long were you at that house that
4   time?
5   A.   Probably a couple of hours.
6   Q.   Did you have anything to drink at
7   that --
8   A.   I probably did have a glass of wine.
9   I do remember that I played board
10  games with Charlsey, their daughter,
11  and Jerry and a couple of other
12  people, we played some board games.
13  Q.   Did Mr. Nacrelli drink in excess on
14  that occasion?
15  A.   I don't remember.
16  Q.   Did Mr. Nacrelli sexually harass you
17  in any way on that occasion?
18  A.   No.
19  Q.   And the daughter, is that his daughter
20  with his current wife, or is that a
21  daughter from prior a marriage?
22  A.   This was his daughter with his current
23  wife.

Page 64

1   Q.   And what's her name again?
2   A.   Charlsie.
3   Q.   It's C-H-A-R-L-S-E-Y?
4   A.   C-H-A-R -- I don't remember how to
5   spell it.  I think it's S-I-E on the
6   end.
7   Q.   And how old is she?
8   A.   I think now she's in the fifth grade.
9   At the time, I think she was probably
10  in the second grade or first grade.
11  Q.   Okay.  Did you have an occasion to be
12  around Mr. Nacrelli at any other
13  social event prior to July -- the July
14  party of 2005?
15  A.   Well, the Christmas party.
16  Q.   Yes, ma'am, other than that?
17  A.   Not that I remember.
18  Q.   What's his wife's name?
19  A.   Jerry.
20  Q.   Did you ever see Jerry outside of the
21  school setting?
22  A.   No.
23  Q.   You saw her at the party in December

Page 65

1   of '04?
2   A.   Jerry would come to the school on
3   occasions.  And if we had PTA
4   meetings, like, she would come over at
5   night because Charslie was in school
6   there.  So we saw her at school a good
7   bit.
8   Q.   But did you ever see her in any social
9   setting, other than the party of
10  December 2004, and then the June party
11  in 2005?
12  A.   Not that I remember.
13  Q.   Did you consider her a friend?
14  A.   Yes.
15  Q.   And in what sense?  I mean, how did
16  you relate -- what was your
17  relationship based on?
18  A.   That she was Mr. Nacrelli's wife.  I
19  mean, she wasn't a close friend or
20  someone I saw on a social basis.
21  Q.   Did you consider Mr. Nacrelli a
22  friend?
23  A.   That's a hard question.  Not a friend;

17  (Pages 62 to 65)

BARBARA M. JEFFERS - 10/15/2007

| Page 66 | Page 68 |
|---|---|

**Page 66**

1  not really.
2  Q.    But you considered his wife a friend?
3  A.    Well, she was an acquaintance.  We
4  weren't enemies.
5  Q.    Were you enemies with Mr. Nacrelli?
6  A.    No.
7  Q.    Okay.  Let's go back then -- well, let
8  me say this:  You can't remember any
9  other social event involving
10  Mr. Nacrelli, other than the December
11  2004 party?
12  A.    Well, no.  That's not true.  Because I
13  think we probably did have, like,
14  Christmas parties out somewhere where
15  maybe they had been there.  I don't
16  remember specifically.  But I mean
17  there probably was one.
18  Q.    And where would it have been held?
19  A.    At a restaurant in Columbus.
20  Q.    And do you remember which restaurant?
21  A.    No, I don't.
22  Q.    Who would have been present?  Who
23  would have made up the guest list?

**Page 67**

1  A.    It would have been -- he would have
2  made up the guest list.  It would have
3  been for teachers like a Christmas
4  party or a group of teachers had
5  planned it or whatever.
6  Q.    Would there be alcohol served at that
7  party?
8  A.    Well, I mean, you could order a drink
9  if you wanted one.
10  Q.    And you feel like there was one.  Do
11  you feel like there was more than one?
12  A.    I don't remember.
13  Q.    Let's go back then to July of 2005.
14  You think that Ms. Nacrelli probably
15  did the invitation on a card of some
16  type?  Typed it up?
17  A.    Uh-huh.
18  Q.    What did the invitation say?  You said
19  it was for a party for Ms. Coley; is
20  that correct?
21  A.    Uh-huh.
22  Q.    What specifically was the language?
23  A.    I don't remember.

**Page 68**

1  Q.    Did it indicate it was going to be a
2  pool party?
3  A.    I don't remember.
4  Q.    Were you to bring any food?
5  A.    No.  I don't believe so.
6  Q.    Were you to bring any alcohol?
7  A.    No.
8  Q.    What time was it to begin?
9  A.    I don't remember that either.
10  Q.    Did it begin in -- during daylight
11  hours?
12  A.    It was during daylight hours that it
13  began.
14  Q.    And then did it go into the night?
15  A.    Uh-huh.
16  Q.    How long were you there?
17  A.    That would be hard for me to say.  I
18  don't remember.  I know I got there
19  when it was daylight, and I know I was
20  the last one to leave.
21  Q.    Okay.  Do you recall if anyone was
22  there when you got there?
23  A.    Yes.  There was some people there.  I

**Page 69**

1  was not the first one there.
2  Q.    Did you swim?
3  A.    No.
4  Q.    You seem emphatic about that.  Did you
5  -- you just don't swim?
6  A.    No.  I do swim.  I would not have put
7  on a bathing suit at his house.
8  Q.    Okay.  Did you have anyone go with you
9  as your guest?
10  A.    No.
11  Q.    Okay.  Starting -- let's describe the
12  party, starting from the first event
13  that you consider to be of a sexual
14  harassing nature, and tell me what
15  happened that night.
16  A.    That I consider being a sexually
17  harassing event for me or that he did
18  sexual things to other people?
19  Q.    Both.
20  A.    Both, okay.
21  Q.    And define.  Tell me which one
22  affected you and which one affected
23  someone else.

18 (Pages 66 to 69)

BARBARA M. JEFFERS - 10/15/2007

| Page 70 |
| --- |

1    A.    Okay. I'll just tell you what I
2    observed. I observed him doing things
3    of a sexual nature or whatever. The
4    first thing I can remember him doing
5    was early on he -- he chased Cill
6    Parish around in the kitchen trying to
7    grab her and, like, kiss her. And she
8    was screaming at him stay away from
9    me.
10    Q.    Okay.
11    A.    Okay. That was the first thing. The
12    first thing for me was I was standing
13    -- talking with Ken Coley, and he kept
14    coming up behind me and rubbing me on
15    the butt.
16    Q.    Okay.
17    A.    And I ignored him.
18    Q.    You didn't tell him to quit?
19    A.    I finally did.
20    Q.    Okay.
21    A.    He came up behind me. He did it again
22    and I was talking to Ken Coley and he
23    says -- let's see what I wrote he

| Page 71 |
| --- |

1    said.
2    "You're not even paying
3    any attention to what I've been
4    doing."
5    I said, "No, I'm trying
6    to ignore you, hoping you'll go away."
7    Q.    Okay.
8    A.    And I think Ken Coley heard that
9    conversation. He -- as far as what he
10    did with -- what else went on there, I
11    don't know. I know that several of
12    them put on bathing suits and went
13    swimming. And he put on a bathing
14    suit and went swimming.
15    Now, what I did most of
16    time at that party was -- I smoke and
17    Jerry Nacrelli sneaks around and
18    smokes, as does her -- his older
19    daughter, Amber, who was there. I
20    actually spent a good part of the
21    night hid in the bushes in the back of
22    the pool with Jerry and Amber so that
23    we could smoke -- so that they could

| Page 72 |
| --- |

1    smoke. And also there was something
2    going on with Amber that Jerry had
3    been telling me about and that Amber
4    was telling me about.
5    Q.    Of a personal nature?
6    A.    Of a personal nature, uh-huh.
7    Q.    Okay.
8    A.    So I really missed out on a lot of the
9    rest of went long -- what went on
10    around the pool, except there was a
11    good bit drinking at points.
12    Q.    And drinking by whom?
13    A.    They had a keg -- they had a keg of
14    beer. And there were some people who
15    participated in like who could drink a
16    glass of beer the fastest. That kind
17    of thing.
18    Q.    And you've told me you witnessed him
19    chasing Cill Parish?
20    A.    I did.
21    Q.    Through the kitchen?
22    A.    (The witness nods head.)
23    Q.    And then he came up behind you while

| Page 73 |
| --- |

1    you were talk with Ken Coley?
2    A.    Right.
3    Q.    What other incidences did you see
4    prior to the final incidence, which
5    we'll come to in a minute?
6    A.    He -- he grabbed Brenda Coley and
7    kissed her in the mouth.
8    Q.    And where did that happen?
9    A.    Out by pool.
10    Q.    And where were you; were you --
11    A.    Standing right there in front of them.
12    Q.    Okay. Who else did you see?
13    A.    That's all I saw.
14    Q.    Okay. Other than those two incidences
15    involving other people and him having
16    touched you from behind?
17    A.    Right.
18    Q.    That's all you are aware of?
19    A.    That's correct.
20    Q.    And you were behind the bushes most of
21    the time with Ms. Nacrelli and the
22    daughter, Amber?
23    A.    Well, part of the time. I won't say

19 (Pages 70 to 73)

BARBARA M. JEFFERS - 10/15/2007

Page 74

1  most of the time. Part of the time it
2  was -- I remember it was very hot
3  outside. And so part of the time all
4  of us were in the kitchen like around
5  the food. And they had a karaoke
6  machine, and singing karaoke, and that
7  kind of stuff.
8  Q.    Why was Amber confiding in you about
9  her personal matter whatever it was?
10  A.    I have no idea.
11  Q.    Did you know Amber previously?
12  A.    I had met her before.
13  Q.    And why was Jerry Nacrelli confiding
14  in you about Amber's situation?
15  A.    I have no idea.
16  Q.    Do you know if they considered you a
17  friend?
18  A.    Obviously.
19  Q.    Throughout the night then, did you eat
20  at party?
21  A.    Uh-huh.
22  Q.    Did you participate in the karaoke?
23  A.    No. I watched.

Page 75

1  Q.    Did you have anything to drink at the
2  party?
3  A.    All I want -- I probably had a cup of
4  beer. I took a lot of pictures.
5  Q.    Pictures?
6  A.    Uh-huh.
7  Q.    You have those pictures?
8  A.    Uh-huh.
9  Q.    You have them with you today?
10  A.    Nope.
11  Q.    Okay. What are the pictures of?
12  A.    Everybody at party.
13  Q.    Okay.
14  A.    People at the party.
15  Q.    Were all the people at the party
16  affiliated with the school?
17  A.    Yes. Basically. Now, I think there
18  were a couple of people who -- who
19  maybe brought somebody else with them
20  that wasn't necessarily invited. But
21  like I do remember a couple of people
22  that brought someone with them because
23  they happened to visiting or whatever.

Page 76

1  I don't know what reason.
2  Q.    Was your attendance at this party
3  voluntary?
4  A.    It was not mandatory.
5  Q.    And did you drive yourself?
6  A.    I did.
7  Q.    Did anybody prohibit you from leaving
8  the party at any time?
9  A.    Jerry asked me not to leave at one
10  point in time.
11  Q.    Prior to Jerry asking you not to
12  leave, did it -- did -- were you free
13  to go if you had wanted to do so?
14  A.    I guess so.
15  Q.    Even when Jerry asked you, you were
16  still free to go?
17  A.    Uh-huh.
18  Q.    All right. Tell me then what happened
19  about Jerry asking you to stay and
20  Mr. Nacrelli apparently appearing
21  behind you in an undressed state; tell
22  -- describe that as best you can?
23  A.    Okay. I was leaving the party,

Page 77

1  everybody was leaving at the same
2  time, and Jerry came back and I -- we
3  had -- I had carried a lawn chair, and
4  I was getting my chair up and she said
5  don't leave I need to talk to you.
6  And I said what about. And she said
7  wait just a minute. She said I've
8  done something terrible, Chick --
9  that's what she calls Jerry -- is
10  going to be so mad with me. And I
11  said okay. So we sat down on the
12  steps.
13  Q.    Which steps?
14  A.    Outside on their deck. The deck, the
15  steps and then the pool. And I said
16  what have you done? And she said I
17  told Cill Parish, who had ridden with
18  Allison and Mel Gentry that Chick was
19  glad that Emily Jones had left Ladonia
20  and transferred, because he didn't
21  like her anyway. And I said well, you
22  know you really haven't said anything
23  that I guess most of us didn't know

20 (Pages 74 to 77)

BARBARA M. JEFFERS - 10/15/2007

Page 78

1  anyway.
2  And so we were sitting
3  there talking about that. And she
4  asked me for a cigarette and I gave
5  her a cigarette. So she was smoking a
6  cigarette. Mr. Nacrelli had come up
7  behind me and I guess Jerry and I were
8  -- well, I don't remember how many
9  steps there are going down. Maybe
10 from the deck the one step to one
11 step, to the concrete. We were not
12 sitting on the top step, we were
13 sitting on the next step. He sat down
14 behind me and had his legs wrapped
15 around my waist while I was sitting
16 there talking to her or she was
17 talking to me. And he -- she asked
18 him twice why are you sitting there
19 with your legs around her like that.
20 So the second time she
21 said it, he stood up behind us. He
22 reached over to Jerry and he got that
23 cigarette that she had. We kept

Page 79

1  talking. And in a minute she says,
2  Chick, give me that cigarette. You,
3  you don't even smoke anyway. And we
4  turned around and looked. And at that
5  point, he had taken off his bathing
6  suit and was standing there in the
7  nude. And so I screamed. And when I
8  did, he was standing right behind me.
9  He pushes my head down like this and
10 jumps over me, and like kind of
11 stumbled on the steps and jumped on in
12 the pool.
13 Q.  Okay. Then what happened?
14 A.  Jerry said to him you shouldn't have
15 done. She's going to tell everybody.
16 And so I said no, I'm not. So I get
17 up immediately and I get my things and
18 I go in the kitchen and I am about to
19 exit through the front door. He comes
20 to the door between the kitchen and
21 the den where I was leaving, and he
22 has bathing suit on inside out with
23 the red net on the outside.

Page 80

1  Q.  Okay.
2  A.  And I just -- I mean, I was just
3  embarrassed to death really. I was
4  embarrassed for me. I was embarrassed
5  for her. Meanwhile her daughter,
6  Amber, was not there when he had done
7  that but Amber come into the kitchen.
8  And she says to Amber, you're not
9  going to believe what your daddy has
10 done. She said what, did he get naked
11 again? I don't know what did again
12 means.
13 Q.  What time of night was it when you
14 started to leave, if you recall?
15 A.  I'd say probably about nine o'clock or
16 10: 00. I don't really know. I do
17 -- I really don't know.
18 I do remember, too that
19 while Jerry and I were out in the
20 backyard smoking that the neighbors
21 had called the police and the police
22 had come. I didn't know that until we
23 went back up there and they were

Page 81

1  talking about that the police had come
2  over, so that he had talked to them.
3  Q.  What did police come for, if you know?
4  A.  I think too much noise.
5  Q.  How long had you and Jerry been
6  sitting on the deck smoking before he
7  came up behind you and sat?
8  A.  Just a minute or so. Because I had
9  walked out front and was getting my
10 stuff up about to leave. I actually
11 saw Jerry over at the car talking to
12 Cill Parish and Allison McNeal Gentry,
13 and I was about to get in my car. And
14 she said no, don't leave. I've got to
15 tell you something. I'm going to be
16 in so much trouble. So everybody was
17 leaving. That was like the last ones.
18 So Jerry and I walked back around and
19 sat down on the deck and he
20 immediately came around there.
21 Q.  Did you -- did everybody park by the
22 front door or out the front area?
23 A.  Yeah. Basically. And Charles had

21 (Pages 78 to 81)

BARBARA M. JEFFERS - 10/15/2007

Page 82

1  been there, too. I don't know what
2  she was at that time. I guess she was
3  in the house.
4  Q.    When you were getting ready to leave,
5  had you gotten to your car?
6  A.    I was headed that way.
7  Q.    Were you headed through the house or
8  was there a way to get there around
9  the house?
10  A.    Around the house.
11  Q.    Did you see Mr. Nacrelli at that point
12  in time?
13  A.    Don't remember seeing him, no.
14  Q.    Describe his bathing suit for me?
15  A.    It was -- the outside was like Navy
16  blue, I believe. But I can tell you
17  that net lining in it was red.
18  Q.    Had he been swimming earlier?
19  A.    Uh-huh.
20  Q.    He'd been in the pool?
21  A.    Uh-huh. He had also -- I do remember
22  that he had done this. I believe he
23  pushed Jamie Evans in the pool and she

Page 83

1  had on white pants. And I don't
2  remember what the top looked like, but
3  you could see through the white pants.
4  And that was when Jamie put on her
5  bathing suit. Or at least I -- I was
6  told he had pushed her into the pool.
7  I didn't see it.
8  Q.    When he came behind you and sat down
9  and you said put his legs, did he lock
10  them around you or did he slide them
11  by you?
12  A.    He was -- he -- he just slid up behind
13  me. And his legs around the sides of
14  me.
15  Q.    All right?
16  A.    Like I'm sitting between his legs.
17  Q.    Okay. Did he have on his bathing suit
18  at that period of time?
19  A.    Uh-huh.
20  Q.    You --
21  A.    Yes.
22  Q.    You did see his bathing suit at that
23  stage?

Page 84

1  A.    I wasn't making pictures of him in his
2  bathing suit.
3  Q.    No. But, I mean, when he's sitting
4  behind you, he has on his bathing
5  suit?
6  A.    Yes.
7  Q.    Then you said that he got up and then
8  he didn't have on his bathing suit.
9  How long?
10  A.    He got up he stood behind us. He took
11  the cigarette from Jerry. Jerry and I
12  continued talking. And after a couple
13  of minutes she said to him, Chick,
14  give me that cigarette. You don't
15  smoke anyway. And at that point, when
16  we turned around, he was standing
17  there in the nude.
18  Q.    And you said a couple of minutes he
19  had the cigarette for a couple of
20  minutes?
21  A.    Uh-huh.
22  Q.    Did you see his bathing suit upon the
23  ground or anything?

Page 85

1  A.    After I saw him standing there naked,
2  I didn't see anything else.
3  Q.    Okay. Now, you said he pushed your
4  head down?
5  A.    And jumped over me.
6  Q.    All right. Did he hit --
7  A.    Actually he fell over me; is more like
8  it.
9  Q.    Did he hit the deck or did he hit the
10  pool?
11  A.    He stumbled and jumped into the
12  shallow end of the pool.
13  Q.    Did he stumble on the deck, did he
14  stumble on the apron of the pool, or
15  do you remember?
16  A.    No. He was to the concrete deck.
17  Q.    Did he hit it?
18  A.    Yeah.
19  Q.    All right. Did he hit his knees or
20  was he standing?
21  A.    No. When I was standing and he jumped
22  in the pool.
23  Q.    All right. What -- how long was he in

22  (Pages 82 to 85)

BARBARA M. JEFFERS - 10/15/2007

Page 86

1  the pool?
2  A.  I have no idea.  I got my stuff and
3  went in the house and through the
4  kitchen and was leaving.
5  Q.  Okay.  So you -- instead of going
6  around the house that time, you were
7  going through house?
8  A.  I went through the house.
9  Q.  Okay.
10  A.  I don't remember if my chair was in
11  the house at that point or not.  Maybe
12  my purse was in the house in the den.
13  Q.  How -- what period of time -- you got
14  up immediately after that?
15  A.  Uh-huh.
16  Q.  Was he still in the pool when you got
17  up?
18  A.  Uh-huh.  Yes.  I'm sorry.
19  Q.  And then the next time you see him
20  he's where?
21  A.  He's standing at the door of the den
22  between the den and the kitchen.
23  Q.  And he has on his bathing suit?

Page 87

1  A.  Inside out.
2  Q.  Does he's say anything to you at that
3  stage?
4  A.  No.
5  Q.  Did you say anything to him?
6  A.  Yes.
7  Q.  What did you say?
8  A.  I said well, if you're going fishing
9  and you can't catch them, maybe you
10  can net them, and I walked out.
11  Q.  Did you say anything to anybody else?
12  A.  Huh-uh.
13  Q.  Did he respond to you in any way?
14  A.  No.
15  Q.  And you left?
16  A.  Right.
17  Q.  Have you got pictures of him in the
18  bathing suit wrong side out?
19  A.  No.
20  Q.  Have you got pictures of him in the
21  nude?
22  A.  No.
23  Q.  At this point -- this was a party for

Page 88

1  Ms. Coley, correct?
2  A.  That's correct.
3  Q.  And where was she being -- why was she
4  leaving?
5  A.  She got a principalship.
6  Q.  At where?
7  A.  Oliver Elementary.
8  Q.  When did that happen?
9  A.  I don't know.
10  Q.  She had -- did she work her last day
11  at Ladonia at the end of the 2004/2005
12  school year?
13  MR. EDDINS: If you know.
14  THE WITNESS: Yes.
15  MR. EDDINS: If you can answer
16  if you know, if you don't
17  know.
18  THE WITNESS: I don't know.
19  Q.  Well, yes or you don't know?
20  A.  What was your question again?
21  Q.  When the -- let me rephrase it?
22  A.  Okay.
23  Q.  When the 2004/2005 school year ended?

Page 89

1  A.  Uh-huh.
2  Q.  Was that her last time as an assistant
3  principal at Ladonia?
4  A.  That was her last time as assistant
5  principal at Ladonia and she was I
6  guess a 10-month employee.
7  Q.  Okay.  Just like you?
8  A.  Uh-huh.
9  Q.  So her last day would have been then
10  June 5th was the last day for 10 --
11  months?
12  A.  (The witness nods head.)
13  Q.  And after that she was going to be the
14  principal at Oliver?
15  A.  Uh-huh.  Yes.
16  Q.  Do you know if she had the gun or --
17  or do you know, you may not, do you
18  know when she began working at Oliver?
19  A.  No, I don't.
20  Q.  And at the time of the party, was she
21  at Oliver?
22  A.  I don't believe so.
23  Q.  Are principals on 10-month or

BARBARA M. JEFFERS - 10/15/2007

Page 90

1  12-month?
2  A.  Mr. Nacrelli was on 11-month.
3  Q.  All right.  Do you know what Ms. Coley
4  was going to be on?
5  A.  I believe probably 11.  I don't know
6  though.
7  Q.  Now, did you do next?  You said you
8  left the party; what did you do?
9  A.  I went out of his subdivision and I
10  pulled off the road and I called
11  Brenda Coley on her cell phone.
12  Q.  Okay.  And where was Brenda at the
13  time you called her?
14  A.  She was on her way home.
15  Q.  And I believe you testified that her
16  husband, Ken, had been with her?
17  A.  Yes.
18  Q.  Well, was she and Ken in the same
19  vehicle?
20  A.  Yes.
21  Q.  And what did you tell her?
22  A.  I told her what had happened.
23  Q.  All right.  Tell me what you told her?

Page 91

1  A.  I told her I said you're not going to
2  believe what Mr. Nacrelli has done
3  now.  And she said what.  And I told
4  her that he had taken his bathing suit
5  off and was standing there naked.
6  Q.  Okay.  What else did you tell her?
7  A.  That's all.  That's what I told her.
8  Q.  What did she say?
9  A.  At first she -- I mean, she said you
10  got to be kidding.  I said no, I'm not
11  kidding you.  He did that.  And she --
12  she said can I tell Ken?  I said tell
13  him.  And she was just incredulous
14  that he had known that really because
15  she laughed.  I said Brenda, it's not
16  funny.  I said I'm shaking so, I don't
17  even know if I can get home.  I said I
18  am very upset about this.
19  Q.  Okay.  Did you say anything to her
20  about not telling anyone?
21  A.  No.
22  Q.  You didn't?
23  A.  No.

Page 92

1  Q.  You didn't ask Brenda Coley not to
2  tell?
3  A.  No.
4  Q.  Did you tell her at that time you
5  wanted a transfer?
6  A.  No, I didn't tell her that night on
7  the phone I wanted a transfer.
8  Q.  All right.  What else was said during
9  that phone conversation?
10  A.  That's about it.  You know I just told
11  her what had happened.
12  Q.  Okay.  Did you call anybody else that
13  night?
14  A.  I don't remember that I called anybody
15  else that night.
16  Q.  Did you manage to get home by yourself
17  that night?
18  A.  I did.
19  Q.  And you don't recall telling this
20  story to anybody else that night?
21  A.  Not that night.
22  Q.  All right.  When did you tell the
23  story again?

Page 93

1  A.  I'm sure it was probably the next day.
2  Q.  And who did you tell it to?
3  A.  I told my sister.  I told -- I know
4  it's hard to remember who I told when.
5  I told several people.
6  Q.  Did you tell anybody with the school
7  system the next day?
8  A.  I probably told Allison Gentry.
9  Q.  Would you and Allison have been at
10  work?
11  A.  No.  We were not back at work.  And I
12  probably told Yvonne Amerson?
13  Q.  And how would you have conveyed that
14  to them?
15  A.  Over the phone.
16  Q.  You and Ms. Gentry called one another?
17  A.  Not a whole lot, but sometimes we do.
18  Q.  All right.  Did you call her that
19  time?
20  A.  I don't remember.
21  Q.  Do you remember calling anyone
22  involved with the school system the
23  next day?  And when I say school

24 (Pages 90 to 93)

BARBARA M. JEFFERS - 10/15/2007

## Page 94

1   system I mean, any of the school
2   personnel; be it teachers, supervisory
3   people, board members, anybody?
4   A.   I don't remember.
5   Q.   Maybe Allison Gentry?
6   A.   Maybe Allison Gentry.
7   Q.   You called her the next day you think?
8   A.   I think I probably did.
9   Q.   And who was the other lady you named?
10  A.   Yvonne Amerson, who was retired.
11  Q.   Retired from where?
12  A.   Ladonia.
13  Q.   How long had she been retired?
14  A.   At that time that was probably a year.
15  Q.   All right. When did you next speak
16  with anyone involved with Russell
17  County school system?
18  A.   You mean teachers or anybody?
19  Q.   Anybody?
20  A.   I don't remember that -- when I next
21  spoke to somebody.
22  Q.   Well, who -- who did you next speak
23  to?

## Page 95

1   A.   I don't remember who I next spoke
2   with.
3   Q.   Well, tell me then who all you shared
4   this information with?
5   A.   I told my sister. I told my board
6   friend. I told my ex-husband. I told
7   Allison Gentry. I had told
8   Brenda Coley. I told Nuria Chaparro.
9   Q.   All right. Who else?
10  A.   That's all I remember right now.
11  Q.   When did you tell you Nuria?
12  A.   I probably told her the next day, if I
13  could get hold of her I did.
14  Q.   Okay. And who else with the school
15  system do you remember telling?
16  A.   I called Ms. Elliot.
17  Q.   When did you call Ms. Elliot?
18  A.   I believe I called Ms. Elliot a couple
19  of days later.
20  Q.   Where was Ms. Elliot when you called
21  her?
22  A.   At her home.
23  Q.   Do you remember what time of day it

## Page 96

1   was?
2   A.   No, I don't.
3   Q.   Was it morning?
4   A.   No. It was -- I believe it was in the
5   evening.
6   Q.   When you say evening after
7   five o'clock, six o'clock?
8   A.   Uh-huh. Probably so.
9   Q.   Had you called Ms. Elliot at home
10  before?
11  A.   Yes.
12  Q.   Was it a common -- well, let me
13  rephrase that. How many times had you
14  called Ms. Elliot at her home before?
15  A.   I have no idea. Not -- somewhere
16  probably between three and 10 times.
17  Because Ms. Elliot was also the
18  secretary part of the time when I was
19  at Ladonia. And she testified to. We
20  had children that were friends.
21  I don't remember how many
22  times I called Ms. Elliot at home. I
23  know her phone number. It's almost

## Page 97

1   like mine.
2   Q.   Okay. So you knew her phone number
3   from memory then?
4   A.   I looked it up.
5   Q.   It was almost like yours; you're
6   talking about in terms of the numbers?
7   A.   Right.
8   Q.   Okay.
9   A.   I had forgotten which number was not
10  like mine.
11  Q.   Okay. I'm sorry. I misunderstood
12  you.
13  A.   Uh-huh.
14  Q.   During the time that Ms. Elliot had
15  been a member of the school board?
16  A.   Uh-huh.
17  Q.   Up until this phone call, we're going
18  to come to in a minute, how many times
19  had you called her?
20  A.   Well, she said the other day two.
21  That's -- that's the only two I
22  remember.
23  Q.   So whatever she testified to the other

25 (Pages 94 to 97)

BARBARA M. JEFFERS - 10/15/2007

Page 98

1    day is what you remember?
2    A.   That's right.
3    Q.   And I believe she testified that on
4    those two phone calls you were
5    reporting something that had happened
6    at the school?
7    A.   Correct.
8    Q.   And I believe she testified that on
9    each of those occasions she had then
10   gone to the superintendent and
11   reported whatever you had reported to
12   her?
13   A.   I don't know.
14   Q.   Okay.  But you're -- let me make sure
15   then that your purpose in calling her
16   was to tell her something that had
17   happened at -- at the school?
18   A.   Correct.
19   Q.   All right.  Do you remember what you
20   told her on each of those occasions?
21   A.   Basically.  I mean, I don't remember
22   word for word what I told her.
23   Q.   Okay.  Well, tell me the first one

Page 99

1    what?
2    A.   Okay.  She said I called her one time
3    about the time.  And --
4    Q.   About the time?
5    A.   That school started.
6    Q.   Okay.
7    A.   Like the school board has -- I believe
8    a set time for when school starts.
9    And I think it's 8:30, which means
10   that -- to me, if school starts at
11   8:30, it would not -- you wouldn't --
12   couldn't be tardy until like 8:40.
13   But that's not the way
14   Mr. Nacrelli had it.  He had -- he
15   rang a bell at 8:20, and had the kids
16   late at 8:30.  The only problem with
17   that is -- what upset me about that
18   was that school -- he let them in
19   school to come eat breakfast at
20   eight o'clock.  And at that time we
21   had seven or 800 kids.  It's hard to
22   feed kids from eight o'clock or after
23   and have them out of the lunchroom at

Page 100

1    8:20 that many children.
2    Q.   All right?
3    A.   And the teachers that he had on duty
4    in the lunchroom would shuffle the
5    kids out and not let them eat like
6    their second bowl of children -- I
7    mean, cereal.  And that would upset me
8    because I knew that that might be the
9    only thing the kids had had since they
10   left school the day before.
11   Q.   And so you related this to Ms. Elliot?
12   A.   Uh-huh.
13   Q.   Was anything done in response?
14   A.   No.
15   Q.   Did Mr. Nacrelli continue to ring the
16   bell at 8:20?
17   A.   Yes.
18   Q.   Throughout the school year?
19   A.   Uh-huh.
20   Q.   The second time you talked to
21   Ms. Elliot, what did you relate to
22   her?
23   A.   I told her that Mr. Nacrelli had let

Page 101

1    Jerry Nacrelli come up and put the
2    DIBELS scores in the computer; the
3    scores of the children, including the
4    scores of the children whose room that
5    her daughter was in.
6    Q.   Now, I believe you testified earlier
7    that that was your responsibility?
8    A.   Well, this was the first year that it
9    had been done.  It was not my
10   responsibility at that time.  I have
11   done it since then.
12   Q.   What year was that?
13   A.   The first year that we gave DIBELS,
14   whatever.  I don't know what year that
15   was.
16   Q.   And so at that point in time, you had
17   not been assigned the task of putting
18   the DIBELS scores in the computer?
19   A.   Correct.
20   Q.   And Mr. Nacrelli had his wife, Jerry,
21   put them in?
22   A.   Correct.
23   Q.   And you told this to Ms. --

26  (Pages 98 to 101)

BARBARA M. JEFFERS - 10/15/2007

Page 102

1   A.   Elliot.
2   Q.   Elliot?
3   And what was the purpose
4   in telling her?
5   A.   Let me back up just one -- the first
6   year that the DIBELS score -- that the
7   DIBELS test given, we were told by the
8   system test coordinator, Jean Jones,
9   that the principal and two other
10  people would be given this code that
11  you type in on the computer in order
12  to access the student's name and this
13  kind of thing, to put in DIBELS
14  scores.  Mr. Nacrelli was aware of
15  this.  The first thing he does is he
16  is going to let a teacher who taught
17  fourth grade -- at that time we didn't
18  give DIBELS in fourth grade, he was
19  going to let Ms. Bassey take the
20  scores home and put them in.
21  I said Mr. Nacrelli, you
22  cannot do that.  You know that the
23  DIBELS scores have to be put in by

Page 103

1   you, or me, or Ms. Huckabee were the
2   two that had the codes.  And so low
3   and behold, the next thing I know --
4   you know teachers are saying you're
5   not going to believe what Mr. Nacrelli
6   is doing.  I said what?  Said he's got
7   Jerry up there in his office and she's
8   putting in DIBELS scores.  Which, you
9   know, that's a secure test.  And
10  because of FERBER that's not to be
11  shared with anybody, much less the
12  principal's wife.  Well, I was pretty
13  horrified about that.  And Brenda
14  Coley -- I said Brenda, you know what
15  he's doing?  And she said yes.  So I
16  called Ms. Elliot and reported it.
17  Q.   And you apparently had confronted
18  Mr. Nacrelli about it?
19  A.   I had already confronted him about who
20  was to put in the DIBELS scores.
21  Q.   After your phone call to Ms. Elliot,
22  do you know if anything was changed,
23  or done, or corrected?

Page 104

1   A.   She didn't put anymore DIBELS scores
2   in the next day.
3   You know DIBELS is done
4   individually.  And so I don't know
5   what happened.  I'm sure that the
6   superintendent or somebody -- I don't
7   know how that went down exactly, told
8   him that he could not do that.
9   Because it was certainly against
10  FERBER for her to do that.
11  And it was very
12  unprofessional of him, in my opinion,
13  to let his wife put in the DIBELS
14  scores of his child and the other
15  children in her classroom.
16  And like the teachers
17  said that day, he'll be -- she'll be
18  around the school before the day is
19  over comparing her child to the rest
20  of the children; and sure enough she
21  was, and their scores.
22  Q.   Okay.  All right.  We've described
23  those two situations where you've

Page 105

1   called Ms. Elliot at home --
2   MR. EDDINS:  We've been going
3   for about an hour and
4   40 minutes or something
5   can we take a break?
6   MS. SMITH:  Sure.
7   (Brief recess was taken at
8   11:54 a.m., and deposition
9   testimony reconvened at
10  12:05 p.m.)
11  Q.   Now, let's talk about the phone call
12  to Ms. Elliot about Mr. Nacrelli.  You
13  told me you thought it was several
14  days later; is that the best you can
15  place it?
16  A.   That's the best I can remember.
17  Q.   And you said it was in the evening?
18  MR. EDDINS:  She testified it
19  was a couple of days.
20  MS. SMITH:  A couple of days,
21  okay.
22  MR. EDDINS:  Uh-huh.
23  Q.   You don't remember what day of the

27 (Pages 102 to 105)

BARBARA M. JEFFERS - 10/15/2007

Page 106

1  week it was, do you?
2  A.  I don't.
3  Q.  Okay.  Tell me what you told her?
4  A.  I told her what had happened about
5  Mr. Nacrelli and what he had done.
6  Q.  All right.  Tell me in the words as
7  best you can remember?
8  A.  Exactly as I testified to you as to
9  what had gone on, is basically what I
10  told her.
11  Q.  And what did she say in response?
12  A.  She was horrified.  She couldn't
13  believe it.
14  Q.  What did she say?  Did she say I'm
15  horrified or did she say I can't
16  believe it or what did she say?
17  A.  I don't remember her exact words.  She
18  was just -- I just remember that she
19  was shocked that he had done that.
20  And she also said -- you
21  know I had asked her -- as she
22  testified, I did ask her not to tell
23  anybody.  What I was really wanting to

Page 107

1  do was for her to see if she could
2  have me transferred.
3  Q.  So you specifically told her not to
4  tell anybody?
5  A.  I did.
6  Q.  And what did she say in response to
7  that?
8  A.  She said she wouldn't.
9  Q.  And what was your purpose?
10  A.  I wanted to be moved to Oliver.
11  Q.  And why did you want to be moved to
12  Oliver?
13  A.  Because I did not want go back to
14  Ladonia with him there.
15  Q.  Did you say to her, I want to be moved
16  or did you say I want to transfer?
17  A.  I told her I wanted to be moved to
18  Oliver.
19  Q.  What did she say?
20  A.  She said she'd look into it.  I think
21  she -- we'll see if there was a chance
22  that that could happen.
23  Q.  She told you that?

Page 108

1  A.  Yes, ma'am.
2  Q.  Did she get back to about it?
3  A.  No, she didn't.
4  Q.  Did you ever file a request for a
5  transfer?
6  A.  No, I didn't.
7  Q.  Did you ever request a transfer from
8  either the superintendent or the
9  assist superintendent?
10  A.  No.
11  Q.  Are you aware of the transfer policy
12  that the Russell County Board of
13  Education has?
14  A.  I guess -- no.  I'm not sure.
15  Q.  Okay.  How do you about go about
16  requesting a transfer?
17  A.  Well, back in the spring you get a
18  letter of intent.  You can do it on
19  that or you can wait and just ask to
20  be transferred.
21  Q.  You just wait and ask to be
22  transferred?
23  A.  Well, you could wait and ask to be

Page 109

1  transferred, yes.
2  Q.  Did you?
3  A.  You have to have an opening first.
4  Q.  Okay.  Did you ask on form in the
5  spring that you wanted to be
6  transferred?
7  A.  No.  Because to my knowledge there was
8  not a vacancy.
9  Q.  All right.  When you asked Ms. Elliot,
10  was there a vacancy?
11  A.  Yes.  I thought there was.
12  Q.  What in what?
13  A.  At Oliver.
14  Q.  As a counselor?
15  A.  As a counselor.
16  Q.  Who had left?
17  A.  Shirley Smith, whose a counselor at
18  Russell County had had two schools at
19  that time.  She had had Oliver and
20  Mount Olive.  And Mount Olive school
21  population was enough this particular
22  year for her to only be at one school.
23  And that left an opening at Oliver.

28  (Pages 106 to 109)

BARBARA M. JEFFERS - 10/15/2007

Page 110

1   Because Oliver had the population to
2   have a full-time counselor at that
3   time also.
4   Q.   I'm going to show you, please, ma'am,
5   what is Russell County Board of
6   Education Board's Policy GBM, and ask
7   if you've ever seen that -- just have
8   you ever seen it?
9       (The referred-to document was
10      marked for identification as
11      Defendant's Exhibit No. 1.)
12  A.   Not that I recall.
13  Q.   Have you ever requested transfers in
14  the past?
15  A.   I have asked. I asked to be
16  transferred from the ALC to -- I
17  applied for the job. I wasn't really
18  -- is what I call it. Because when I
19  had ALC -- I was the director of the
20  ALC. And at that time Ms. Greathouse
21  resigned and I asked to be transferred
22  from the director of the ALC to
23  Ladonia as counselor.

Page 111

1   Q.   All right. And that's the only time
2   you recall requesting a transfer?
3   A.   I asked to be transferred from Chavala
4   to the vocational school that was on
5   Poorhouse Road one time as vocational
6   business office education.
7   Q.   And when you say you asked, how did
8   you go about it?
9   A.   I just verbally asked.
10  MR. WILLIAMS: Let me see
11  that. Do you mind
12  marking that?
13  MS. SMITH: I'd be happy too.
14  MR. EDDINS: Would you get us
15  a copy of that?
16  MS. SMITH: Yes, sir. Let me
17  -- I'm going to mark it
18  as Defendant's Exhibit 1
19  to the deposition. I'll
20  make you copies of all of
21  them. You want it now or
22  do you want it later?
23  MR. EDDINS: I'd like to have

Page 112

1   one now. And I'd like to
2   state on record that I
3   have requested in my
4   discovery request a copy
5   of all the policies that
6   would impact this case,
7   and we were not furnished
8   that transfer policy.
9   MS. SMITH: Let's hold up just
10  a minute.
11      (Brief recess was taken at
12      12:12 p.m., and deposition
13      testimony reconvened at
14      12:16 p.m.)
15  MS. SMITH: Your request No. 6
16  for production says,
17  produce a copy of the
18  Russell County Board of
19  Education Employee
20  Handbook or any policy in
21  effect during the past
22  five school years which
23  that relate to sexual

Page 113

1   harassment of any school
2   system employee.
3   I don't see a
4   request here for all
5   policies, which would
6   apply to this case. So I
7   would like to have that
8   on record, please, ma'am.
9   Q.   Let me ask you this, Ms. Jeffers:
10  This, what has been marked as
11  Defendant's Exhibit 1, do you have any
12  reason to believe that that is not a
13  policy of the Russell County Board of
14  Education?
15  A.   No.
16  Q.   It says certified personnel, which
17  you're one, may request transfer to
18  other employment positions for which
19  they are qualified. Such written
20  requests shall be submitted to the
21  superintendent or designee?
22  Now, did you comply with
23  this policy relative to seeking the

29  (Pages 110 to 113)

BARBARA M. JEFFERS - 10/15/2007

Page 114

1  position at Oliver?
2  A.   Not before July the first.  But, no, I
3  don't know that before July the first
4  that I knew that Shirley Smith was in
5  fact, not going to be counselor at
6  Oliver.
7  Q.   Okay.  I think that the July 1 date is
8  how you are given notice if the board
9  wants to transfer you.  They have to
10  give you notice by July 1; is that
11  what you understand?
12  MR. EDDINS:  If you know.
13  A.   I didn't know.
14  Q.   Okay.  The part you're reading from
15  says, in accordance with the Code of
16  Alabama, certified personnel on
17  continuing service status, which is
18  you?
19  A.   Uh-huh.
20  Q.   May be transferred for any succeeding
21  year from one position, school or
22  grade to another by being giving a
23  written notice of such intention to

Page 115

1  transfer by July 1, based upon the
2  written recommendation of the
3  superintendent and approval of the
4  board, except that such transfer may
5  not be for political or personal
6  reasons.
7  In your layman's terms,
8  does that require that any request for
9  you to transfer be done by July 1?
10  A.   I don't understand your question.
11  Q.   Well, I think the policy will speak
12  for itself.  I'd like to introduce
13  that into evidence?
14  MR. DEFENDANT #1:  I object to
15  the form, too.  I mean,
16  she's asking for a legal
17  opinion and it says in
18  accordance with the Code
19  of Alabama.  It doesn't
20  cite the Code section,
21  but it paraphrases the
22  Code section.
23  MS. SMITH:  All right.  I

Page 116

1  asked her what she
2  understood in her
3  layman's terms would
4  require?
5  Q.   But you don't despite that the last
6  paragraph says that a written request
7  will be submitted to the
8  superintendent or the designee?
9  A.   No.  I don't despite it.
10  Q.   All right.  And do you -- you don't
11  dispute the fact that you didn't make
12  any written request to the
13  superintendent or the superintendent's
14  designee?
15  A.   I don't.
16  Q.   Okay.  I'm going to mark as Exhibit 2
17  -- Defendant's Exhibit 2, a document I
18  want you to look at and see if you can
19  identify, please, ma'am.  Is that a
20  document that you wrote?
21       (The referred-to document was
22        marked for identification as
23        Defendant's Exhibit No. 2.)

Page 117

1  A.   Yes, it is.
2  Q.   And what is the purpose of that
3  document?
4  A.   To transfer from the high school from
5  Chavala to the Vocational Center.
6  Q.   All right.  What's the date of that?
7  A.   February 2, 1983.
8  Q.   Who is it addressed to?
9  A.   It is addressed to Mr. Siniard,
10  Mr. Weatherly, Mr. McKay and Mr. Frey.
11  Q.   All right.  What was Mr. Siniard at
12  the time?
13  A.   Is was the superintendent.
14  Q.   All right?
15  MS. SMITH:  I move that be
16  admitted into evidence.
17  Don, you have a copy
18  of that?  I don't know
19  that you do.  This was in
20  her personnel file.
21  Q.   I'm going to show you what I'm going
22  to mark as Defendant's Exhibit 3 and
23  ask you if you can identify that

30  (Pages 114 to 117)

BARBARA M. JEFFERS - 10/15/2007

|  | Page 118 |
|---|---|
| 1 | document? Have you ever seen that |
| 2 | document before? |
| 3 | (The referred-to document was |
| 4 | marked for identification as |
| 5 | Defendant's Exhibit No. 3.) |
| 6 | A.  I'm sure I have. |
| 7 | Q.  Okay. |
| 8 | MR. EDDINS: Read the whole |
| 9 | thing now. |
| 10 | THE WITNESS: Okay. |
| 11 | Q.  And what's the date of that document? |
| 12 | A.  June the 16th, 1988. |
| 13 | Q.  And whose is it addressed to? |
| 14 | A.  It's addressed to me. |
| 15 | Q.  From whom? |
| 16 | A.  Mr. Siniard. |
| 17 | Q.  And what was Mr. Siniard's capacity at |
| 18 | that time? |
| 19 | A.  He was the superintendent. |
| 20 | Q.  All right.  Read me that first |
| 21 | paragraph, please, ma'am? |
| 22 | A.  Thank you for submitting an |
| 23 | application for the intended |

|  | Page 119 |
|---|---|
| 1 | supervisory position that us currently |
| 2 | vacant in this school system. |
| 3 | However, do some uncertainties, the |
| 4 | position will not be filled until late |
| 5 | summer or early fall. |
| 6 | Q.  Okay.  So you were currently employed |
| 7 | with the school system? |
| 8 | A.  I was. |
| 9 | Q.  So you were requesting to go from your |
| 10 | current position to the position of |
| 11 | vocational director; is that correct? |
| 12 | A.  Do what now?  Say that again? |
| 13 | Q.  You had apparently requested that you |
| 14 | have the position of attendance |
| 15 | supervisor; is that correct? |
| 16 | A.  I had 1pparently completed an |
| 17 | application for that position. |
| 18 | Q.  All right.  And he's telling you that |
| 19 | it's not available at the time? |
| 20 | A.  Until late summer or earlier fall. |
| 21 | Q.  All right? |
| 22 | MS. SMITH: I move the |
| 23 | introduction of that |

|  | Page 120 |
|---|---|
| 1 | document into evidence. |
| 2 | Any objection? |
| 3 | MR. WILLIAMS: I have no |
| 4 | objection. |
| 5 | MR. EDDINS: No objection. |
| 6 | Q.  All right.  I'm going to show you |
| 7 | what's marked as Defendant's Exhibit 4 |
| 8 | and ask you -- it's a two-page |
| 9 | document, and ask you to identify that |
| 10 | document.  Look at it and see if you |
| 11 | can identify it? |
| 12 | (The referred-to document was |
| 13 | marked for identification as |
| 14 | Defendant's Exhibit No. 4.) |
| 15 | A.  Yes.  I recognize it. |
| 16 | Q.  All right.  And what is it, please, |
| 17 | ma'am? |
| 18 | A.  It's asking for a position as director |
| 19 | of the ALC. |
| 20 | Q.  And once we get it back, I'm going to |
| 21 | have you identify it? |
| 22 | To whom is it addressed? |
| 23 | A.  It's addressed to Mr. Siniard, who was |

|  | Page 121 |
|---|---|
| 1 | the superintendent. |
| 2 | Q.  What's the date of it? |
| 3 | A.  The date is January 10, 1990. |
| 4 | Q.  All right.  Sir -- excuse me, ma'am? |
| 5 | And you were asking -- |
| 6 | you were in the system at that time; |
| 7 | you were an employee at that time? |
| 8 | A.  Yes. |
| 9 | Q.  And you're asking to be going to the |
| 10 | position of either counselor at the |
| 11 | new high school or the director for |
| 12 | the alternative learning center? |
| 13 | A.  Actually, Mr. Siniard had come to see |
| 14 | me about the director's job and asked |
| 15 | me to take it.  He told me to write |
| 16 | the letter. |
| 17 | Q.  Okay.  Why did he tell you to write |
| 18 | the letter? |
| 19 | A.  I guess to make it formal. |
| 20 | Q.  Okay.  Because that's the way you do |
| 21 | it, isn't it, to ask for a transfer; |
| 22 | is you put in writing to the |
| 23 | superintendent? |

31 (Pages 118 to 121)

BARBARA M. JEFFERS - 10/15/2007

Page 122

1   A.   Uh-huh.
2   Q.   Okay. I'll show what's mark as
3   Defendant's Exhibit 5. And ask you to
4   look at that and if you see it -- if
5   you've seen it and identify it -- -
6   can identify it?
7       (The referred-to document was
8       marked for identification as
9       Defendant's Exhibit No. 5.)
10  A.   Yes.
11  Q.   And who is it addressed to, please,
12  ma'am?
13  A.   It's addressed to Mr. Siniard.
14  Q.   And what's the date?
15  A.   March 7th, 1990.
16  Q.   And are you asking for another
17  position there?
18  A.   I believe that's the letter that he
19  asked me to write explaining my
20  qualifications.
21  Q.   You believe it's something he asked
22  you to write. Did he ask you or did
23  he not ask you?

Page 123

1   A.   He asked me to write it.
2   Q.   Did he ask you to write that in
3   addition to the other letter?
4   A.   I believe these were written at
5   different times.
6   Q.   Yes, ma'am. I'm asking you, did he
7   ask you to write that on two separate
8   occasions -- two separate letters?
9   A.   Yes.
10  Q.   And I believe -- I assume then the
11  same testimony is -- would be the same
12  that it was so it would be a formal
13  request?
14  A.   I just did what he asked me to do.
15  Q.   Okay.
16  MS. SMITH: Entered. And I
17  don't know whether I did
18  Exhibit 4 also. But I
19  would move -- I'll just
20  finish and move all the
21  exhibits.
22  Let me do this,
23  Exhibit 4 and Exhibit 5

Page 124

1   be admitted into
2   evidence.
3   MR. WILLIAMS: I have no
4   objection.
5   MR. EDDINS: No objection.
6   MS. SMITH: Okay. And I
7   believe I've done 1, 2
8   and 3. But just to make
9   sure there is any
10  objection to either of
11  those?
12  MR. EDDINS: No objection.
13  MR. WILLIAMS: No objection.
14  Q.   Look at Defendant's Exhibit 6, and ask
15  you to look at that document?
16      (The referred-to document was
17      marked for identification as
18      Defendant's Exhibit No. 6.)
19  A.   Yes.
20  Q.   And what's this document, please,
21  ma'am?
22  A.   To be hired as a counselor.
23  Q.   Where?

Page 125

1   A.   It doesn't say specifically. It just
2   says I'm interested in elementary
3   counseling.
4   Q.   All right. And what's the date of
5   that letter?
6   A.   I'm not sure. March the 8th of '91.
7   Q.   And who is addressed to?
8   A.   It's address to Dr. Thwacker.
9   Q.   And what was his position?
10  A.   He was superintendent.
11  Q.   All right?
12  MS. SMITH: With the
13  introduction of that
14  document into evidence.
15  MR. EVANS: No objection.
16  MR. EDDINS: No objection.
17  Q.   Okay. I'll show you Defendant's
18  Exhibit 7, and ask if you can identify
19  that document?
20      (The referred-to document was
21      marked for identification as
22      Defendant's Exhibit No. 7.)
23  A.   Yes.

32 (Pages 122 to 125)

BARBARA M. JEFFERS - 10/15/2007

Page 126

1    Q.    And what is that?
2    A.    Asking to be -- to apply for the
3    counseling position at Ladonia.
4    Q.    All right.  And whose it addressed to?
5    A.    To Dr. Thwacker.
6    Q.    And what is his position?
7    A.    He's superintendent.
8    Q.    And what's the date of that?
9    A.    April 12th of '93.  These, I think,
10   would probably be later.  Because I
11   have written -- because the job has
12   been posted and it says in the job --
13   when they post the job, if you're
14   interested to write a letter.
15   Q.    So, I've shown Exhibit's --
16   Defendant's Exhibit 2 through 7, which
17   in each instance are a written request
18   from you or an acknowledgement of a
19   request by you to go to another
20   position?
21   A.    Correct.
22   Q.    And you did not do this in the
23   situation that you've described of

Page 127

1    asking Ms. Elliot, a board member, to
2    be moved to Oliver?
3    A.    Correct.
4    MS. SMITH:  If I didn't do 7,
5    I meant to do 7, too.
6    Any objection to it as an
7    exhibit?
8    MR. WILLIAMS:  No.
9    MR. EDDINS:  No objection.
10   Q.    All right.  Let's go back to the
11   conversation with Ms. Elliot.  Did you
12   speak with Ms. Elliot more than once
13   about Mr. Nacrelli's activities at the
14   party of July 2005?
15   A.    No.
16   Q.    And you testified earlier that you did
17   ask her not to tell?
18   A.    Yes.
19   Q.    And tell me what she said in response?
20   A.    Well, she was as I said very shocked.
21   She was just like -- she was shocked
22   that he had done that.  And she
23   couldn't believe that he had done

Page 128

1    that.  And she said I hope you sue.
2    And I hope you get every penny you ask
3    for.
4    Q.    Is that exactly what she said or can
5    you remember the exact language that
6    she said?
7    A.    That's pretty close to exact.
8    Q.    Did she tell you to report it?
9    A.    No.
10   Q.    She never told you to report this
11   situation to anyone?
12   A.    Not as I remember.
13   Q.    And her words to you were to -- that
14   she hoped you sued.  And she hoped
15   that you got what?
16   A.    Every penny that I asked for.
17   Q.    Okay.  So when she testified Thursday
18   that she didn't say that she's lying?
19   A.    Well, it's only two choices, either
20   she truly doesn't remember saying or
21   she's lying.
22   Q.    All right.  After the party -- well,
23   let -- you didn't talk to Ms. Elliot

Page 129

1    anymore?
2    A.    Not about Nacrelli's incident.  But I
3    saw -- I saw Ms. Elliot after that and
4    she talked to me.
5    Q.    All right.  Tell me when that was,
6    please, ma'am?
7    A.    It was several days later.  It was
8    after I had talked with Dr. Lee.  And
9    I told Dr. Lee at the end of our
10   conversation that I said -- one last
11   thing, I want to tell you this, I
12   talked to Ms. Elliot about that.
13   Q.    Okay.
14   A.    It was only a couple of days later, I
15   think Ms. Elliot testified, that
16   Dr. Lee called her the next morning.
17   I saw Ms. Elliot.  I believe it was at
18   school.  And she said -- I said hello,
19   Ms. Elliot.  She said you got me in a
20   lot of trouble.  I said how so?  And
21   she said the superintendent was mad as
22   she could be with me.  Because she
23   said I should have reported that to

33  (Pages 126 to 129)

BARBARA M. JEFFERS - 10/15/2007

Page 130

1  her. It's my duty as a board member.
2  And I said well, my intention was not
3  to get you in trouble.
4  Q.  And you think this occurred after you
5  talked to the superintendent?
6  A.  I know it did.
7  Q.  Within several days?
8  A.  (The witness nods head.)
9  Q.  And where were you; were you at
10  Ladonia, you said at the school?
11  A.  I believe I was at school.
12  Q.  Did she say anything else?
13  A.  That's all she said.
14  Q.  Did she say that Dr. Lee had told her
15  that you had told Dr. Lee that you had
16  asked Ms. Elliot to do tell?
17  A.  She didn't say that?
18  Q.  She didn't say that?
19  A.  Huh-uh.
20  Q.  So she was asked last Thursday if she
21  said that?
22  A.  If she said what now?
23  Q.  She -- let me make myself clear?

Page 131

1  A.  Okay.
2  Q.  Did Ms. Elliot, during this meeting --
3  this face-to-face meeting you had with
4  her say to you that Dr. Lee had said
5  to Ms. Elliot that you, Ms. Jeffers,
6  had told Dr. Lee that you had asked
7  Ms. Elliot not to tell?
8  MR. EDDINS: Object to the
9  form. I have no idea
10  what the question is.
11  A.  I don't either. She didn't say that
12  to me. What Ms. Elliot said to me
13  was, you got me in a lot of trouble.
14  And I said how so? And she said Dr.
15  Lee is mad as she can be with me
16  because I did not report what you told
17  me. Because she said as a board
18  member, it was my duty to do so. And
19  I said I'm sorry, Ms. Elliot, my
20  intention was not to get you in
21  trouble. That was it.
22  Q.  That was the whole conversation?
23  A.  That was the conversation.

Page 132

1  Q.  Okay. Okay. Did you talk to
2  Ms. Elliot at any other occasion after
3  that -- about Mr. Nacrelli or this
4  situation?
5  A.  No. No. No.
6  Q.  Have you had occasion to talk with
7  Ms. Elliot at all since that last
8  conversation you just described which
9  you think took place at the school?
10  A.  I've seen Ms. Elliot and said hello.
11  Q.  All right. Have y'all had any
12  conversation of any consequence?
13  A.  No.
14  Q.  All right. After the pool party, when
15  is the next incident that you allege
16  you were sexual harassed by
17  Mr. Nacrelli?
18  A.  After the pool party?
19  Q.  Yes, ma'am.
20  A.  Well, the first thing of sexual nature
21  that he said was on August 10th, is
22  what I have documented in my notes,
23  which was -- if the kids back on the

Page 133

1  eighth, it was like the third day the
2  kids were back. And there was a
3  kindergarten kid who was -- would run
4  out of the room -- didn't want to stay
5  in the room, didn't want to be at
6  school, and I had gone down to check
7  on that child. And Mr. Nacrelli had
8  already gotten down there. And he
9  picked the child up. And
10  Sherry Huckabee, the reading coach,
11  was in the room next to that child.
12  So she was over there, too. And
13  Mr. Nacrelli had picked the child up
14  under his arm like he was carrying a
15  sack of potatoes or something, and the
16  child was kicking, and screaming, and
17  crying, and Mr. Nacrelli turned around
18  and looked like this at me and
19  Ms. Huckabee and said Andrew I can
20  handle you. My wife's breasts weigh
21  more than you do.
22  I was pretty shocked at
23  that.

34  (Pages 130 to 133)

BARBARA M. JEFFERS - 10/15/2007

Page 134

1    Q.   Did you make any response to him?
2    A.   No. I did not.
3    Q.   He was talking to Andrew, the child;
4    right?
5    A.   He addressed the child but he really
6    turned around to say it to us. But
7    the child was under his arm.
8    Q.   And who was the other teacher; I'm
9    sorry?
10   A.   Sherry Huckabee.
11   Q.   Did Ms. Huckabee say anything to him?
12   A.   No. And I didn't say anything to her.
13   Q.   And what's the next incident?
14   A.   September the 6th, there was a
15   incidence.
16   Q.   And what was that?
17   A.   In the afternoons, the daycare riders
18   would come out the front door at that
19   time to get on their daycare buses.
20   And I was in charge of putting them on
21   their daycare buses. And then all the
22   children who were car riders exited
23   through the front door I believe that

Page 135

1    year. And Nacrelli was at the front
2    door and I opened the left side of the
3    door. I was going to put the
4    kickstand down on the door so the
5    children could come out and it was too
6    short to catch. The door would close.
7    And I said to Mr. Nacrelli, I wish
8    you'd get this fixed. It's too short.
9    And he said to me with the children
10   coming out, I don't like it when you
11   talk to me about it being too short.
12   I don't like to hear that and Bill
13   doesn't either.
14   Q.   Okay. Who is Bill?
15   A.   My boyfriend.
16   Q.   Did you say anything in response?
17   A.   Oh, my goodness. And I walked back in
18   the building.
19   Q.   All right. And what's the next?
20   A.   September the 9th.
21   Q.   And what happened then?
22   A.   We had been collecting money pens,
23   change for Katrina victims. And I had

Page 136

1    been in there with a group of students
2    in the conference room -- actually it
3    wasn't a conference room, it was the
4    next room over, the red door room, we
5    call it, I think. And they had -- a
6    bunch of children had been over there.
7    We had been rolling all that money.
8    And I'd finished rolling it and
9    Nacrelli had came in there. And I had
10   it in a strongbox and it was very
11   heavy and I asked him, I said,
12   Mr. Nacrelli, would you pick this
13   strongbox up and carry it to your
14   office? And Kelly Brantley called
15   him, she walked in there too, she was
16   looking for a student file because at
17   that time the student files were kept
18   in that office. And for some reason
19   when I asked him that, he picks me up
20   like this, and I said put me down.
21   I'm too heavy. You're going to hurt
22   your back. And Kelly had looked, but
23   she had turned back around to the file

Page 137

1    cabinet and when she did, he rolls me
2    up and bit me on the right breast.
3    And then he said -- and I screamed.
4    And when I screamed, she turned back
5    around. And he said, I guess I
6    shouldn't have done that.
7    Q.   So when he picked you up, you're
8    facing him; is that correct?
9    A.   Uh-huh.
10   Q.   Well, where does he grab you to pick
11   you up?
12   A.   Back and under my legs like near the
13   back of my thighs.
14   Q.   He bends down to pick up like that?
15   A.   He just picked me up.
16   Q.   How did he get behind your legs?
17   A.   He reached down like this and picked
18   me up in one swoop.
19   Q.   Oh, okay. He didn't pick you up with
20   your feet on the ground?
21   A.   Oh, no -- yeah, he -- no, he picked --
22   picked me up like he was going to
23   carry somebody across the threshold.

BARBARA M. JEFFERS - 10/15/2007

Page 138

1  Q.  I got you. So both your feet were off
2  the ground?
3  A.  Exactly.
4  Q.  And were you holding this strongbox at
5  that time?
6  A.  No.
7  Q.  Were you holding anything?
8  A.  No.
9  Q.  And when he bites you, he bites you on
10 which breast?
11 A.  My right breast.
12 Q.  Is that the breast closest to him or
13 the breast further away?
14 A.  Closest, I believe.
15 Q.  So he would have picked you up with
16 his left arm at your back and his
17 right arm under your knees?
18 A.  Gosh, I don't remember. I don't
19 remember which way he picked me --
20 which hand was -- I don't remember.
21 Q.  What did you have on that day?
22 A.  I have no idea.
23 Q.  When he bit you, did he bite material

Page 139

1  or did he bite skin?
2  A.  It wasn't like he bit me hard. He
3  just reached down and just did like
4  this with his mouth. I mean, there
5  was saliva on my -- it would have been
6  like --
7  Q.  On your clothes?
8  A.  Uh-huh.
9  Q.  So he didn't bite you on bare skin;
10 right?
11 A.  No. No.
12 Q.  All right. And you're pointing to the
13 nipple area, is that where --
14 A.  Uh-huh.
15 Q.  He bit you or put his mouth on you?
16 A.  Yeah.
17 Q.  And you screamed?
18 A.  Uh-huh.
19 Q.  And Ms. Brantley turned around at that
20 time; did she see it?
21 A.  She did not see it because I asked
22 her.
23 Q.  Was anybody else in the room?

Page 140

1  A.  Huh-uh.
2  Q.  The students had already left the
3  room?
4  A.  Right. Right.
5  Q.  And this was on what day?
6  A.  It was on September the 9th.
7  Q.  And what -- you screamed and what else
8  did you say at that point in time?
9  A.  He's said, I guess I shouldn't have
10 done that. And I said, I think not.
11 Q.  Did you say anything else?
12 A.  No.
13 Q.  Did he say anything else?
14 A.  No.
15 Q.  Did he leave the room -- what happened
16 then?
17 A.  I left the room and he picked up the
18 strongbox and took it to the office.
19 Q.  When did you discuss this with
20 Ms. Howard, Kelly Howard?
21 A.  As soon as I left the room.
22 Q.  Did she --
23 A.  No. It wasn't as soon as I left. It

Page 141

1  was maybe 30 or 40 minutes later, I
2  think.
3  Q.  Did she leave the room at the same
4  time you left?
5  A.  I think she left probably a minute or
6  so before.
7  Q.  Did you leave Mr. Nacrelli in the
8  room?
9  A.  Uh-huh.
10 Q.  Did you and he ever discuss that
11 incident again?
12 A.  No.
13 Q.  Did he ever do anything like that
14 apologize for it?
15 A.  No.
16 Q.  Did you ever ask him anything about
17 it?
18 A.  No.
19 Q.  All right. What's the next incident
20 then?
21 A.  With me?
22 Q.  Yes, ma'am.
23 A.  It was on September the 21st.

36 (Pages 138 to 141)

BARBARA M. JEFFERS - 10/15/2007

Page 142

1    Q.    Okay.  What happened then?
2    A.    I had walked in the office and
3    Ms. Fowles, the secretary, was in
4    there and she was complaining about
5    her garage can in the office.  And I
6    was at the copy machine about to make
7    a copy of something, and she said --
8    Mr. Nacrelli was standing there.  She
9    said she had gotten a new garbage can
10   and it's really big, like a -- almost
11   like a kitchen garbage can at the edge
12   of her counter.  And she said I hate
13   this thing.  It's too humongous.  It's
14   just too big.  And Nacrelli looked at
15   me said I hear that all the time about
16   me.
17   Q.    Okay.  Is that all he said?
18   A.    Uh-huh.
19   Q.    Did you say anything to him then?
20   A.    No.  I asked Ms. Fowles I said, did you
21   hear what he said.  She said I heard
22   him.
23   Q.    And what was the date of that again?

Page 143

1    A.    September the 21st.
2    Q.    Okay.  And when is the next time?
3    A.    That was about it.  There was some
4    other incidences I have written down
5    but they didn't involve me directly,
6    except that teachers came to me about
7    things he had said.
8    Q.    And what are those; give me those,
9    please, ma'am?
10   A.    Okay.  On September the 19th, he had
11   had a meeting with Ms. Huckabee and
12   the second grade teachers.  And on
13   that date, the first grade child had
14   brought this picture to school.  And
15   it was like a little Playgirl picture,
16   except that the lady had a penis and
17   she had big breasts.  And I had seen
18   the picture.  Ms. Grant showed me the
19   picture, the assist principal.  And
20   then Ms. Gwen Lewis, who taught the
21   second grade, came to me after the
22   meeting.
23   And -- that year,

Page 144

1    Mr. Nacrelli had hired about six new
2    young teachers, and a couple of them
3    were in second grade.  And he had
4    gotten in the second grade break
5    meeting and he had told them about the
6    picture.  And he had said to them, her
7    breasts were bigger than my wife's and
8    her dick was longer than mine.  And
9    Ms. Lewis, the second grade teacher,
10   came to me and she said, I was so
11   embarrassed.  She said, Ms. Atkins,
12   who was a new teacher, said her ears
13   turned red.
14   And then the next day
15   Ms. Lewis told me that our other --
16   another Ms. Lewis, second grade
17   teacher, had called her that night and
18   asked her did he say what I think he
19   said?
20   Q.    Okay.  That happened on the 19th, I
21   think?
22   A.    Uh-huh.
23   Q.    And that was involving the second

Page 145

1    grade teachers?
2    A.    Uh-huh.
3    Q.    And had Ms. Grant -- when did
4    Ms. Grant show you this picture?
5    A.    That day that -- whatever day she took
6    it up, or he took it up, or whatever.
7    Q.    So that was before the 9th -- before
8    this meeting with the second grade
9    teachers?
10   A.    Right.
11   Q.    And you were not at that meeting?
12   A.    No.
13   Q.    Were you offended when Ms. Grant
14   showed you the picture?
15   A.    Offended?
16   Q.    Yes, ma'am.
17   A.    Well, I wasn't exactly offended.  I
18   mean, Ms. Grant showed me the picture
19   because something like that would be
20   something I might talk with the child
21   about, or called the child's parent,
22   which I didn't.  They took care it.
23   But that would be something that if it

37 (Pages 142 to 145)

BARBARA M. JEFFERS - 10/15/2007

Page 146

1   -- that they might asked me to do.
2   She might have.
3   Q.   All right. Any other instances where
4   other people have related to you
5   actions by Mr. Nacrelli?
6   A.   On September the 20th, Ms. Thornton,
7   who was a fourth grade teacher, told
8   me that he had told her in front of
9   Ms. Parish and Ms. Fowles, he said I
10  can't believe no one has ever charged
11  me with sexual harassment because I
12  know I've done and said inappropriate
13  things.
14  Q.   Okay. And that wasn't said in front
15  of you?
16  A.   No. She told me that.
17  Q.   Any other situations?
18  A.   No.
19  MS. SMITH: I think we're at a
20  stopping place. If y'all
21  want to stop now, before
22  I go into her meeting
23  with Dr. Lee. That will

Page 147

1   take a while.
2   MR. EDDINS: Okay.
3   MS. SMITH: All right. How
4   much time y'all want for
5   lunch? It's about seven
6   till 1:00, this time?
7   MR. EDDINS: 2:00, I guess.
8   MS. SMITH: Okay.
9   (Brief recess was taken at
10  12:54 a.m., and deposition
11  testimony reconvened at
12  2:05 p.m.)
13  Q.   Ms. Jeffers, let me clean up a few
14  things before I start into another
15  area.
16  Did you tell me that you
17  did not tell Ms. Coley not to tell?
18  A.   I didn't tell her.
19  Q.   You didn't tell her not to tell?
20  A.   No, ma'am.
21  Q.   Like you had done with Ms. Elliot --
22  okay.
23  All right. When did you

Page 148

1   first report Mr. Nacrelli's -- what
2   you considered to be sexual
3   harassment?
4   A.   When I went to see Dr. Lee?
5   Q.   Yes, ma'am.
6   A.   I don't remember what the date of that
7   was. I don't have that.
8   MR. EDDINS: You talking about
9   the first report to
10  Dr. Lee or you're talking
11  about the first report?
12  MS. SMITH: I'm trying to get
13  to Dr. Lee.
14  MR. EDDINS: Okay.
15  Q.   If I had told you it was September 20,
16  does that seem right?
17  A.   Yes.
18  Q.   And I believe the 20th was a Tuesday?
19  A.   Yeah. That sounds about right.
20  Q.   Okay. I have Dr. Lee's calendar and
21  it shows an appointment at four
22  o'clock. Does that seem to be the
23  time that you met with her?

Page 149

1   A.   No. It doesn't.
2   Q.   Okay. What time?
3   A.   Actually, Ms. Chaparro and I, I
4   believe we both took a half day off
5   and went down there.
6   Q.   Okay.
7   A.   If I'm remembering correctly.
8   Q.   Okay. So you think it's earlier in
9   the day?
10  A.   Yes, ma'am.
11  Q.   All right. Did you call beforehand
12  and set up an appointment, or did
13  y'all just show up, or what did you
14  do?
15  A.   We had somebody call beforehand.
16  Q.   Okay. Did you request that your name
17  not be put on the calendar?
18  A.   No.
19  Q.   Okay. Who called?
20  A.   I believe Rose Fowles called
21  Barbara Gunner.
22  Q.   Okay.
23  A.   And Barbara set it up. And

38 (Pages 146 to 149)

BARBARA M. JEFFERS - 10/15/2007

Page 150

1    Ms. Chaparro and I took a half day off
2    and went down there. I don't
3    remember.
4    Q.    Was it that day -- for you to take a
5    half day off, you must have planned it
6    in advance; is that correct?
7    A.    No. I believe that Barbara said that
8    we could come on down that afternoon,
9    and we took a half day off. Because
10   we didn't want to have to tell
11   Nacrelli we were going to the
12   superintendent's office.
13   Q.    Okay. All right. If it wasn't at
14   four o'clock and you say it was
15   earlier, what time do you think it
16   was, best you can pinpoint?
17   A.    I really don't remember.
18   Q.    Right after lunch?
19   A.    True. I would think it would have
20   been right after lunch, or
21   two o'clock, or something along those
22   lines.
23   Q.    And Ms. Chaparro went with you?

Page 151

1    A.    Yes, ma'am.
2    Q.    Why did she go?
3    A.    Just morale support. And she had
4    witnessed some things, or heard some
5    things. And you know I talked with
6    her.
7    Q.    Okay. Tell me what you told Dr. Lee
8    on that day?
9    A.    Basically, the points that I went over
10   earlier, what all he had done. I told
11   him about the party and I told him
12   what he had done about picking me up
13   and by biting me on breast.
14   Q.    All right?
15   A.    And --
16   Q.    Now, we -- this morning, we've spent a
17   lot of time discussing different
18   incidences of either things that
19   happened to you or things that you say
20   happened in the front of other people?
21   A.    Uh-huh.
22   Q.    Did you tell her all of those or did
23   you just tell her selective ones?

Page 152

1    A.    Let's see. I started out telling her
2    about the party. And then I told her
3    about him carrying the child under his
4    arm.
5    Q.    Uh-huh.
6    A.    I told her about the doorstop. I told
7    her about him biting me. I told him
8    about the Chicks with dick. I told
9    her about what he said about Ms. Evans
10   being pregnant in her butt. And he
11   told me that his wife was jealous of
12   Ms. Evans.
13   You know what, there is
14   something I forget to tell you, too.
15   I just -- I had not looked at these
16   notes. I told her about an incident
17   that had happened the first -- about
18   the first month that he was principal,
19   I believe. In which he had a
20   videocamera.
21   Q.    Uh-huh?
22   A.    And he went around and he took
23   pictures of Coach Hoppers crouch area,

Page 153

1    and he had taken pictures of
2    Allison Gentry's breasts.
3    Q.    Uh-huh.
4    A.    And later, he decided that instead of
5    us doing the intercom in the morning
6    time, like the counselor's did
7    character Ed on the intercom in the
8    mornings -- announcements; that what
9    he was going to do was have the
10   librarian -- I believe it was the
11   librarian, do a disk -- a CD disk.
12   And that somehow it was going to be --
13   all the teachers were going to have
14   disks. And they were going to play
15   that on their compute gathers the
16   children around the computer screen
17   for the children in the mornings.
18   Q.    Uh-huh?
19   A.    So the first time that they used that
20   disk, Yvonne Amerson, who was teaching
21   there at the time, third grade, she
22   puts the disk on and gathers the
23   children around the computer, and the

39 (Pages 150 to 153)

BARBARA M. JEFFERS - 10/15/2007

Page 154

1  first thing that comes up on the
2  screen are those pictures that he's
3  taken of Hopper and Allison. And
4  Yvonne snatched that disk out and went
5  running up to the office.
6  So then Mr. Nacrelli got
7  busy going around to all the
8  homerooms, trying to take up the disks
9  before everybody -- any of the other
10 children saw it. I told her about
11 that.
12 Q.  Did you see the disk?
13 A.  I saw it later. I told her about what
14 Ms. Thornton had said. And I told her
15 about the remarks he had made in front
16 of Rose Fowles about the garage can.
17 Q.  All right. Anything else you can
18 remember?
19 A.  That's all I can remember that I told
20 her.
21 Q.  Okay. You say that the teacher that
22 had shown the disk ran up. Did she
23 run up to tell Nacrelli?

Page 155

1  A.  I believe she did. Because she
2  panicked. She was -- she was
3  concerned that her children had seen
4  that.
5  Q.  Okay.
6  A.  What they might go home and say.
7  Q.  What did Ms. Chaparro contribute to
8  the conversation; the telling to Dr.
9  Lee?
10 A.  She actually started out the
11 conversation and told Dr. Lee that we
12 had come down there. That I had
13 something to report to her that was of
14 a serious nature. And that it was the
15 kind of thing that is hard to report
16 because you don't ever know when
17 you're going to get left out on a limb
18 by yourself and it was a difficult
19 thing to do. But that I had some
20 things to tell her about Mr. Nacrelli
21 and some of the things that had been
22 going on at school.
23 Q.  Okay. What do you mean by left out on

Page 156

1  a limb by yourself?
2  A.  Well, you know when you report things,
3  sometimes people who know things come
4  back and they all of a sudden don't
5  know, and they didn't say and they
6  didn't do.
7  Q.  Are you saying that happened to you?
8  A.  No. I'm saying it happens in cases.
9  You know after you report
10 things -- people want you to report
11 things, then after you report things
12 nobody wants to get involved.
13 Q.  And, so, Ms. Chaparro was there as a
14 witness to the fact that you reported
15 them; is that what you're saying?
16 A.  She was there as moral support and as
17 a witness to what was said and what
18 went on.
19 Q.  Okay. And she used the comment that
20 it was a very serious matter?
21 A.  Uh-huh.
22 Q.  Is that what she say or did I put
23 words in your mouth? What did she

Page 157

1  say?
2  A.  I believe she said it was a difficult
3  thing to tell.
4  Q.  Okay. And after you said -- you told
5  these things to Dr. Lee, what did she
6  say?
7  A.  He was horrified. She said,
8  Ms. Jeffers, I don't see how you can
9  stand to walk in that building.
10 Q.  Okay. What else did she say?
11 A.  That she would investigate.
12 Q.  Okay.
13 A.  And get back to me.
14 Q.  Did she give you a time frame?
15 A.  No, ma'am.
16 Q.  Did she tell you how she was going to
17 investigate?
18 A.  No, ma'am.
19 Q.  Did she tell you that this is the
20 first time she had heard that?
21 A.  No, ma'am.
22 Q.  Did she indicate that she had heard
23 anything about Mr. Nacrelli before?

40 (Pages 154 to 157)

BARBARA M. JEFFERS - 10/15/2007

Page 158

1    A.   No.
2    Q.   Did she ask you why you hadn't
3  reported this earlier?
4    A.   No.
5    Q.   Did she say anything else that you can
6  remember?
7    A.   No.  Like I said, I told her -- and I
8  said, "I have told this to
9  Ms. Elliot."  She said that's okay.
10   Q.   And you -- I think you told me earlier
11  that you told Dr. Lee you had told
12  Ms. Elliot and asked Ms. Elliot not to
13  tell?
14   A.   I don't know that I told Dr. Lee.  But
15  I asked Ms. Elliot not to tell.  I
16  just told Dr. Lee that I had -- I said
17  by the way, I did tell Ms. Elliot
18  about this.
19   Q.   Okay.  How long were you and
20  Ms. Chaparro in with Dr. Lee?
21   A.   Not that long, maybe 30, 45-minutes.
22   Q.   And after you left, what did the two
23  of you do?

Page 159

1    A.   I went home.  I guess Ms. Chaparro
2  went home, too.
3    Q.   Now, all of the events that you have
4  told me about occurred on or before
5  September 20th, except for one and
6  that was what you related to me about
7  the trash can, Rose Fowles' trash can;
8  is that correct?
9    A.   I think so.  Best I can remember yes,
10  ma'am.
11   Q.   What type of contact --
12   A.   Oh, one other thing that Dr. Lee told
13  me was -- she said stay away from
14  Mr. Nacrelli.
15   Q.   Did you do that?
16   A.   I couldn't stay away from
17  Mr. Nacrelli.  I had duty every
18  morning in the front of the school
19  right in front of his office, and
20  that's where he stood, too.
21   Q.   Beside you?
22   A.   Very close.
23   Q.   Did you have any other contact with

Page 160

1  him besides that morning duty?
2    A.   You know pass him in the hall or
3  whatever, if he had a -- I don't
4  remember that he had any meetings.
5  But just pass him in hall.  I did my
6  best to stay away from him.
7    Q.   From the date you reported it and with
8  the exception of the comment about the
9  trash can, did Mr. Nacrelli say
10  anything in front you or to you that
11  you considered to be a sexual
12  harassing action?
13   MR. EDDINS:  Clarify about --
14  who she reported it to.
15  Are you saying from the
16  date that she reported it
17  to Dr. Lee or the date
18  she reported to the
19  principal, or the date
20  she reported it to the
21  school board member, or
22  just clarify so she can
23  answer your question?

Page 161

1    MS. SMITH:  Dr. Lee.
2    MR. EDDINS:  Okay.
3    MS. SMITH:  She told Dr. Lee
4  on the 20th, the
5  afternoon of the 20th?
6    MR. WILLIAMS:  That's -- that
7  she went back and forth.
8  That's what she said.
9    Q.   Well, when did you tell Dr. Lee?
10   A.   I don't remember the date.  I really
11  don't.
12   Q.   I thought you agreed here --
13   A.   If that's what she had on calendar,
14  you know, I'm saying --
15   Q.   You dispute that date?
16   A.   I don't dispute it.  I don't have any
17  reason to at this point.  But I do --
18  I do think it was like the next
19  morning that she called him down
20  there.
21   Q.   Okay.  She called him down the next
22  morning?
23   A.   (The witness nods head.)

41 (Pages 158 to 161)

BARBARA M. JEFFERS - 10/15/2007

|  | Page 162 |
|---|---|
| 1 | Q.   What time was that? |
| 2 | A.   I don't remember. |
| 3 | Q.   Was this after you had done your bus |
| 4 | duty out at the front? |
| 5 | A.   Yeah. |
| 6 | Q.   Okay.  Was it before lunch? |
| 7 | A.   Before lunch, I believe. |
| 8 | Q.   When did he make the comment about the |
| 9 | trash can? |
| 10 | A.   On the 20th -- let me see.  No, on the |
| 11 | 21st. |
| 12 | Q.   Okay.  That's what I thought you had |
| 13 | told me earlier? |
| 14 | A.   Yeah.  On the 21st. |
| 15 | Q.   Now, you indicate that she called him |
| 16 | down the next day after you met with |
| 17 | her? |
| 18 | A.   I'm not positive about that. |
| 19 | Q.   Well, you just told me that? |
| 20 | A.   Well, I said I think.  I'm not |
| 21 | positive. |
| 22 | Q.   Well, if it wasn't that day, when was |
| 23 | it -- when do you think it might have |

|  | Page 163 |
|---|---|
| 1 | been? |
| 2 | A.   It was in the next couple of days, I |
| 3 | know; one or two days. |
| 4 | Q.   Had she called him down to the office |
| 5 | before he made the comment about the |
| 6 | trash can, if you know? |
| 7 | A.   I don't know. |
| 8 | Q.   Now, let me see if I can make myself |
| 9 | clear.  From the time you talked to |
| 10 | Dr. Lee until Mr. Nacrelli was no |
| 11 | longer at Ladonia, was there any event |
| 12 | that you considered to be sexual |
| 13 | harassing to you, other than the |
| 14 | comment about the trash can? |
| 15 | A.   Not that I remember. |
| 16 | Q.   So after you reported it to Dr. Lee, |
| 17 | from that time until Mr. Nacrelli was |
| 18 | gone, which we'll come back to in |
| 19 | a minute, the only comment that |
| 20 | Mr. Nacrelli made that you considered |
| 21 | to be offensive was the one about the |
| 22 | trash can? |
| 23 | A.   Correct. |

|  | Page 164 |
|---|---|
| 1 | Q.   During that period of time -- well, |
| 2 | let me ask you this:  How many days |
| 3 | did Mr. Nacrelli work at Ladonia after |
| 4 | you reported this situation to |
| 5 | Dr. Lee? |
| 6 | A.   I'm not sure.  It seemed like an |
| 7 | eternity.  But I'm really not sure. |
| 8 | Q.   If I represent to you that based on |
| 9 | Dr. Lee's calendar you met with her on |
| 10 | September 20, and I further represent |
| 11 | to you that that was a Tuesday; and |
| 12 | then you said you went home after you |
| 13 | reported it.  And then I represent to |
| 14 | you that Mr. Nacrelli did not work at |
| 15 | Ladonia after that Friday, does that |
| 16 | seem reasonable to you? |
| 17 | MR. EDDINS:  Object to the |
| 18 | form.  She's already |
| 19 | answered the question. |
| 20 | She said she didn't |
| 21 | remember. |
| 22 | MS. SMITH:  No.  I hadn't ask |
| 23 | her long Mr. Nacrelli |

|  | Page 165 |
|---|---|
| 1 | worked after that. |
| 2 | MR. EDDINS:  All right.  You |
| 3 | can answer. |
| 4 | A.   I don't know.  I don't remember if he |
| 5 | left on a Friday or not. |
| 6 | Q.   I'm trying to refresh your memory. |
| 7 | You told me that you didn't know how |
| 8 | long he had worked.  I'm asking you if |
| 9 | that Friday was his last workday, does |
| 10 | that seem reasonable to you? |
| 11 | A.   It seems reasonable. |
| 12 | Q.   If that Friday -- in the evidence |
| 13 | shows that that Friday was the last |
| 14 | day he was at Ladonia -- |
| 15 | A.   Uh-huh. |
| 16 | Q.   Then you would have been there in his |
| 17 | presence on Wednesday, Thursday and |
| 18 | Friday; is that correct? |
| 19 | A.   If what you're saying is true. |
| 20 | Q.   If that's what the evidence shows? |
| 21 | A.   Yes. |
| 22 | Q.   Okay.  So you would have worked there |
| 23 | three days while he would have been |

42 (Pages 162 to 165)

BARBARA M. JEFFERS - 10/15/2007

Page 166

1  still been at Ladonia?
2  A.  Yes.
3  Q.  Now, somewhere, I can't put --
4  somewhere I can't put my hands on it.
5  I don't know whether it's in your
6  complaint or the EEOC complaint.  You
7  said that you were fearful from him.
8  And that you were forced to remain
9  under his supervision, and that you
10  were fearful.  Were you fearful of
11  him?
12  A.  Yes.
13  Q.  In what way?
14  A.  Well, there were -- you know, after
15  the investigation began and it was
16  done at school.  Of course everyone
17  was talking about it.
18  Q.  Uh-huh?
19  A.  I didn't know if Nacrelli knew who
20  made the complaint or what.
21  Q.  Uh-huh?
22  A.  Yeah.  It was just very tense.  And
23  very -- I was fearful.  I didn't want

Page 167

1  to go in there with him.
2  And like he said to me
3  one morning we were standing there, is
4  it just me or is it getting harder and
5  harder for you to work here every day.
6  Q.  Now, when did he say?
7  A.  On morning duty one morning.
8  Q.  After you had reported it?
9  A.  After I reported it.
10  Q.  And, so, assuming that the facts that
11  I gave you were true it would have had
12  to happened on a Wednesday, Thursday
13  or Friday morning?
14  A.  (The witness nods head.)
15  Q.  Were you fearful of physical harm?
16  A.  No.  I wasn't fearful -- I can't say I
17  was fearful of physical harm.
18  Q.  Were you fearful that -- what?
19  A.  It was more emotional.
20  Q.  Well, what did you think might happen
21  to you?
22  A.  I really -- I really didn't know that
23  physically and emotionally if I could

Page 168

1  stay in that school those days that he
2  was there.
3  I was a wreck.  I didn't
4  know if I was going to have a
5  breakdown or what.
6  Q.  Did you tell that to Dr. Lee when you
7  met with her that you were scared to
8  stay in the school with him?
9  A.  I told her I never wanted to walk back
10  in that school with him again.  I said
11  it has been horrible having to go to
12  school with him there.
13  Q.  And what did she say in response to
14  that?
15  A.  Well, she's the one that said I don't
16  see how you can stand to go in that
17  school with him there.  And I said, I
18  can't.
19  Q.  Well, did y'all discuss you taking a
20  couple of days off?
21  A.  No.  I was hoping she'd bring that up,
22  but she didn't.
23  Q.  Did you ask for it?

Page 169

1  A.  No, I didn't.
2  Q.  You've told me that you and
3  Mr. Nacrelli were out for this bus
4  duty in the morning?
5  A.  It wasn't bus duty.  We were inside
6  the school.
7  Q.  All right.  You said you were standing
8  somewhere and he was in his office?
9  A.  No.  I stood right at the front --
10  there was a line that went down the
11  hall; all the way down the hall for
12  breakfast duty.
13  Q.  Uh-huh?
14  A.  And I was in charge of that breakfast
15  line.  And he stood like right across
16  from me.  I bet as far as I am from
17  you at the lunchroom door.  And at the
18  front door of the school, he was there
19  in the front of the school and so was
20  I -- right there in that pool.
21  Q.  Right.  All right.  Any other time
22  during the day that y'all were placed
23  in that close of proximity to one

43 (Pages 166 to 169)

BARBARA M. JEFFERS - 10/15/2007

Page 170

1    another?
2    A.   Well, passing in the hall.  I don't
3    remember that he came to my office.
4    But I do remember passing in the hall.
5    Q.   Did he say anything to you?
6    A.   He said one time the superintendent
7    has called and said for me get down
8    there immediately -- immediately.
9    Q.   Did he say that specifically to you?
10   A.   He said it in a crowd where I was.
11   Q.   Who else was in that crowd?
12   A.   The secretaries.
13   Q.   Ms. Fowles and who?
14   A.   Probably Alex Parish.
15   Q.   Did he single you out for having
16   anything to do with the superintendent
17   having asked him to come down there?
18   A.   No.
19   Q.   You indicated that he said something
20   to you about is it -- that getting
21   harder for y'all to work together?
22   A.   Uh-huh.
23   Q.   Did he says anything else in your

Page 171

1    presence during the time that he
2    remained in at Ladonia?
3    A.   No.  Not that I remember.
4    Q.   Nothing else, other than the comment
5    about the trash can, the comment that
6    he made in front of you and other
7    people about the superintendent
8    wanting him to get down there, and the
9    comment about working together; those
10   are the three situations that he said
11   something in your presence from the
12   time you reported it to Dr. Lee.  Are
13   there any other things he said?
14   A.   Not that I can remember at this time.
15   Q.   Now, tell me about the investigation?
16   A.   Well, Ms. Baker shows up.
17   Q.   When does she show up?
18   A.   A day or two after I had gone before
19   he had left.
20   And she's calling the
21   employees, all of the ones that I had
22   named that might have any knowledge or
23   that I had heard that he had done --

Page 172

1    made sexual comments or whatever to.
2    And she starts calling them out one at
3    a time and carrying them up there
4    across from the office, in the
5    conference room, and questioning them.
6    Q.   Okay.
7    A.   And then at times some of them came
8    out crying.  And then you know that
9    gets everybody -- all the teachers are
10   wanting to know what's going on.
11   Q.   When they came out did they volunteer
12   what had been discussed?
13   A.   I don't know.  I didn't -- I stayed in
14   my office or tried to.
15   Q.   Did you talk with any of the people
16   that she talked with during that week?
17   A.   Not that I -- no, not that I remember.
18   The only one I talked to was
19   Ms. Baker.
20   Q.   She interviewed also; did she not?
21   A.   I don't remember that she did.  But
22   maybe she did.
23   Q.   Did you give her a written statement?

Page 173

1    A.   Yes.  I wrote it up.  She asked me for
2    a written statement.
3    Q.   But you don't think you talked to her
4    other than that?
5    A.   She came to my office once and talked
6    to me.  But I don't remember that she
7    was asking me what happened.  She was
8    just -- she said she was horrified at
9    the things she'd heard.  And that she
10   had heard some things from other
11   teachers that she considered worse.
12   She told me that.
13   Q.   Okay.  Do you remember when that was?
14   A.   It was before he left.
15   Q.   And none of the other people who she
16   had talked with shared with you what
17   they had discussed?
18   A.   No, ma'am.
19   Q.   When he left, what is last thing --
20   and, again, I understand you don't
21   know the date he left, but the last
22   thing you remember about him being in
23   that building?

44  (Pages 170 to 173)

BARBARA M. JEFFERS - 10/15/2007

Page 174

1    A.    Like I said, I was in my office. I
2    can remember somebody telling me that
3    Nacrelli was leaving. I don't
4    remember seeing him at that particular
5    time.
6    Q.    And that would have been after you had
7    reported it to Dr. Lee?
8    A.    Correct.
9    Q.    I'm going to make another copy of
10   that. But I'm going to ask you, is
11   that the original report that you gave
12   to Ms. Baker?
13   A.    Yes. Yes, ma'am.
14   MS. SMITH: Okay. Let me go
15   ahead and make a copy of
16   that and make it --
17   THE COURT REPORTER: Are we
18   going to mark that?
19   MS. SMITH: An attachment to
20   the deposition.
21   I don't know what
22   you've seen and what you
23   haven't seen, but I'm

Page 175

1    going to mark this as
2    Defendant's Exhibit 8,
3    and introduce it into
4    evidence. Is there any
5    objection?
6        (The referred-to document was
7        marked for identification as
8        Defendant's Exhibit No. 8.)
9    MR. EDDINS: No.
10   Q.    Other than the written statement that
11   you gave Ms. Baker, and other than
12   your comments to Dr. Lee on that
13   afternoon, did you make any comments
14   to anyone in the -- in a supervisory
15   position between the day you talked to
16   Dr. Lee and the date Mr. Nacrelli was
17   gone?
18   A.    Now from what time period to what time
19   period are you asking me?
20   Q.    From the time you talked with Dr. Lee?
21   A.    Uh-huh.
22   Q.    You gave her a comment?
23   A.    Right.

Page 176

1    Q.    And then you gave this written
2    statement to Ms. Baker?
3    A.    Uh-huh.
4    Q.    I'm trying to determine if there's
5    anyone else you spoke with in a
6    supervisory capacity from that time
7    that you talked to Dr. Lee until
8    Mr. Nacrelli was gone?
9    A.    I don't believe so.
10   Q.    All right. I want to switch gears a
11   little bit and ask you about -- I want
12   to go back to this scheduling thing.
13   A.    Uh-huh.
14   Q.    I think we established earlier that
15   you report to work would have been on
16   July 20 of that year?
17   A.    Yes, ma'am.
18   Q.    The party happened before that?
19   A.    Yes, ma'am.
20   Q.    We don't know exactly when, but it did
21   happen before then?
22   A.    Yes.
23   Q.    Now, when does the student handbook

Page 177

1    get released or given to the faculty,
2    was it available when you came on July
3    20?
4    A.    No, ma'am. As a matter of fact, when
5    I came on July 20th, there were two
6    people at the school.
7    Q.    Okay.
8    A.    Ms. Fowles didn't come back that day
9    neither Al Parish.
10   Q.    Okay.
11   A.    Ma. Chaparro was not there that day.
12   There were two people there, me and
13   Charles Nacrelli.
14   Q.    Okay.
15   A.    I stayed in my office away from him.
16   Q.    Okay.
17   A.    And he -- I don't remember that he
18   said anything to me.
19   But the answer to your
20   question is that scheduling and
21   handbook was passed out on the first
22   day that the teachers came back in the
23   first faculty meeting.

45 (Pages 174 to 177)

BARBARA M. JEFFERS - 10/15/2007

Page 178

1 Q. Okay. What are the days the teachers
2 came back?
3 A. It wasn't on inservice. But the first
4 day the teachers were back at Ladonia,
5 whatever day that was.
6 Q. Okay. This calendar shows that on
7 August 3, was the first day for
8 9-month personnel that was institute
9 day, a Wednesday?
10 A. Uh-huh.
11 Q. Does that seem reasonable?
12 A. Seems reasonable to me.
13 Q. And then on the 4th of August, they
14 had an inservice day -- teachers had
15 an inservice day?
16 A. Okay.
17 Q. And then on the 5th, they had teacher
18 workday?
19 A. Okay.
20 Q. And then on the following Monday, the
21 8th that was the first day of school
22 for students?
23 A. Okay.

Page 179

1 Q. Now, when was that first faculty
2 meeting you're talking about?
3 A. It was probably -- the 5th would be my
4 best guess.
5 Q. Okay. Teacher workday?
6 A. Uh-huh. Yes, ma'am.
7 Q. And at that faculty meeting, the
8 handbook was passed out?
9 A. Correct.
10 Q. And that contained your assignment for
11 that year?
12 A. Everybody's.
13 Q. I'm sorry. I'm getting confused?
14 I'm going to show you --
15 I've got the whole document if you
16 have -- if you need to see the whole
17 document. And I've produced this to
18 your attorney.
19 A. Okay.
20 Q. But that is the front page of the
21 Ladonia handbook for, 2005/2006. Was
22 that what was giving out at the
23 institute -- excuse me, at that

Page 180

1 faculty meeting?
2 A. Yes.
3 Q. Okay. Now, I've found in that
4 document this schedule on Page 21?
5 A. Correct.
6 Q. Is that in the document that you have?
7 A. Uh-huh. Yes.
8 Q. Was that -- let me just -- I'm going
9 to mark this as Defendant's Exhibit 9.
10 And I'm going to represent that it's
11 the first page of your teacher
12 handbook 2005/2006. And then Page 21,
13 which contains your schedule for
14 2005/2006, the counselor's schedule;
15 is that correct?
16 (The referred-to document was
17 marked for identification as
18 Defendant's Exhibit No. 9.)
19 A. Correct.
20 Q. And I believe it shows Jeffers odd
21 weeks, the fourth, was that -- what
22 does that mean?
23 A. That meant that on the odd weeks that

Page 181

1 I would be doing -- that on what he
2 called the odd weeks, every other week
3 on the odd week I would be doing the
4 fourth grade classes that he has
5 listed here, every other week, would
6 be on the odd weeks.
7 Q. Okay.
8 A. Which I had never done the fourth.
9 Okay.
10 Q. Now, let's go down to -- let's see.
11 Tuesday -- on Tuesdays at 9:00 to 9:30
12 it says Hornsby/Pool K. What does
13 that mean?
14 A. All right. That's planning where you
15 see 9:00 to 9:30.
16 Q. And --
17 A. 10:35 until 11:50, Hornsby slash K --
18 I mean, Hornsby slash Poole K.
19 Q. Uh-huh?
20 A. That was every week I was supposed to
21 combine two classes, Ms. Hornsby and
22 Ms. Poole's class and teach them from
23 10:35 until 11:15.

46 (Pages 178 to 181)

BARBARA M. JEFFERS - 10/15/2007

Page 182

1    Q.    Okay. Now. Keep looking at that?
2    A.    Okay.
3    Q.    Let's see. On Monday's starting from
4    2:00 to 2:35, it's William and Miles;
5    right?
6    A.    Yes, ma'am.
7    Q.    And is that a combining of the
8    classes?
9    A.    Yes, ma'am.
10    Q.    And under that Giles and Dias?
11    A.    Correct.
12    Q.    Is that combining of the classes?
13    A.    Combining of two classes.
14    Q.    Okay. Then on Wednesday at 11:20 to
15    12:00, we have Robertson Lane; is that
16    combining two classes?
17    A.    Combining -- uh-huh.
18    Q.    Then on Thursday from 12:40 to 1:20,
19    we have Atkins and Bussy; is that
20    combining two classes?
21    A.    Yes, ma'am.
22    Q.    And then from 1:00 to -- 1:20 to 2:00
23    on Thursday you have Loe and E Lewis;

Page 183

1    and that's combining two classes?
2    A.    Correct.
3    MS. SMITH:  Now, I'm going to
4    introduce that as
5    Defendant's Exhibit 9, is
6    there any objection to
7    that?
8    MR. EDDINS:  None.
9    MR. WILLIAMS:  None.
10    Q.    Now, what is -- what's the distinction
11    with teaching two classes versus one?
12    A.    Well, first of all, there were several
13    -- I had several problems with that.
14    Q.    Okay.
15    A.    The first one being that we had not
16    been doing K-1 and two every week. We
17    were supposed to be doing them every
18    other week. Some counselors don't do
19    them but once a month.
20    Q.    Okay.
21    A.    The next problem I had with it was the
22    combination of two classes.
23    Q.    Uh-huh.

Page 184

1    A.    All right. There's nowhere big enough
2    for me to put two classes around
3    tables. And I use -- they have to use
4    their Crayons and some stuff like that
5    oftentimes when I go in there.
6    Q.    Uh-huh.
7    A.    Okay. My curriculum guide from the
8    State says that I am to no larger a
9    ratio then the teacher ratio for large
10    group.
11    Q.    Okay.
12    A.    That was my objection. Because some
13    of these cases it was like 40
14    something kids or more.
15    Q.    Now, I've heard it somewhere that you
16    made the comment it was against the
17    law?
18    A.    I didn't say that. I didn't say it
19    was against the law. I said it was
20    against the State Department
21    Curriculum Guide for Counselors.
22    Q.    Okay. And is there a -- let me write
23    that down. Is there one curriculum

Page 185

1    guide that relates to all counselors,
2    elementary through 12 -- K through 12?
3    A.    (The witness nods head.)
4    Q.    And then it's broken down into the two
5    of them?
6    A.    Three; elementary, middle, high.
7    Q.    Okay. And that's a document put out
8    by the State Department of Education?
9    A.    Yes, ma'am.
10    Q.    So your complaint was that this
11    violated not necessarily a law?
12    A.    Well, the people/teacher ratio that
13    had been established by State
14    Department of Education that K through
15    two -- K through 3 the ratio is one
16    teacher to 18 kids, and -- and four,
17    five and six, it's one to 24.
18    Q.    Okay. How --
19    A.    And I believe that was passed by the
20    Legislature. I'm not sure. But I
21    believe it is in fact a law that it's
22    not supposed to be over this.
23    Q.    Okay. When was it passed by the

47 (Pages 182 to 185)

BARBARA M. JEFFERS - 10/15/2007

Page 186

1    Legislature?
2    A.   Back before '05/'06.
3    Q.   And you're sure it's a law passed by
4    the Legislature; is that right?
5    A.   I think it is.
6    Q.   Okay. I would ask then that you or
7    your counsel provide me with the copy
8    of that law, if it is one?
9    MR. EDDINS:  I would be most
10   pleased to provide it.
11   One of the things I did
12   in lobby for the Smith
13   Act, which established
14   pupil/teacher ratio to
15   all 12 grades. And that
16   was 12 or 15 years ago.
17   Now, it could have
18   changed. The Smith Act
19   has been repealed. There
20   are other laws which
21   definitely -- the
22   pupil/teacher ratio in
23   the Code. And I'll be

Page 187

1    happy to provide it.
2    MS. SMITH: Okay. If you
3    would.
4    MR. EDDINS: It's actually in
5    the Budget Act, I
6    believe.
7    MS. SMITH: I don't see it in
8    the minimum in the
9    foundation program.
10   MR. EDDINS: I think it's
11   actually in the Budget
12   Act.
13   MS. SMITH: If you could
14   furnish me that and the
15   law that sets that?
16   Q.   And what did you say it was again,
17   please, ma'am?
18   A.   One to 18 and K through 3. And one to
19   24, and four five and six.
20   Q.   Okay. And that's in your counseling
21   guide?
22   A.   (The witness nods head.)
23   Q.   All right. When this came out then at

Page 188

1    that faculty meeting, what did do?
2    A.   Sat there flabbergasted.
3    Q.   Okay. Did you a lodge a complaint
4    about it?
5    A.   Ms. Chaparro and I both did later.
6    Q.   When was later?
7    A.   Well, as I told you, we didn't start
8    large groups until September. We were
9    real busy with registration. I
10   probably registered 50 people that day
11   or more.
12   Q.   Uh-huh?
13   A.   I never stopped and that goes on for
14   two or three weeks. So the first
15   opportunity that we had, we told him
16   that, you know -- first of all, it
17   also says that before school starts
18   the principal will sit down with the
19   counselors.
20   Q.   Uh-huh?
21   A.   To work out a schedule.
22   Q.   Uh-huh?
23   A.   And until this time, that's the way it

Page 189

1    had always been.
2    Q.   Uh-huh?
3    A.   But when he passed this out in
4    facility was the first time I knew
5    anything about this.
6    So, see, I would not have
7    even made out my schedule the year
8    before until after all the
9    registration -- after school had
10   started.
11   And I went around and the
12   way I did it, I asked the teachers
13   when would you like for me to come.
14   What's a good time for me to come.
15   Q.   Uh-huh?
16   A.   That's the way I establish my large
17   group and it was every other week for
18   K through 3. As a matter of fact, at
19   that time I only did part of three.
20   Ms. Chaparro part of three and she did
21   four, five and six. Because there
22   aren't as many teachers in four, five
23   and six as there were in K one and

48 (Pages 186 to 189)

BARBARA M. JEFFERS - 10/15/2007

Page 190

```
 1   two.  There was six or seven in each
 2   grade and only four in the higher
 3   grades.
 4   Q.   So you were given there I think we
 5   established on?
 6   A.   Probably the 5th.
 7   Q.   On the 5th.  But you didn't raise any
 8   issues about it until sometime in
 9   September?
10   A.   Until I had a chance, whenever that
11   was.
12   Q.   All right?
13   A.   Probably toward the end of August.
14   Q.   Okay.  And what did you do then when
15   you had -- when you saw it?  What did
16   -- when y'all were -- did you -- did
17   you meet with Ms. Hornsby and
18   Ms. Poole's class together?
19   A.   No.  No.  I didn't start a large group
20   at that time because I was doing
21   registration.
22   Q.   Okay.  When -- at any time, did you
23   ever have Ms. Hornsby and Ms. Poole's
```

Page 191

```
 1   group together?
 2   A.   No.
 3   Q.   Did -- at any time, did you ever have
 4   Ms. Williams and Ms. Miles -- and I'm
 5   assuming all of these are women, and
 6   if they're not, please tell me.  But
 7   did you ever have Ms. William and
 8   Ms. Miles group together?
 9   A.   No.
10   Q.   How about Ms. Giles and Ms. Dias'
11   group together?
12   A.   No.
13   Q.   Roberts and Lane, did you have them
14   together?
15   A.   No.
16   Q.   Atkins and Bussy, did you have them
17   together?
18   A.   No.
19   Q.   Loe, L-O-E, and E Lewis, did you ever
20   have those two classes together?
21   A.   No.
22   Q.   All right.  Well, when did it get
23   changed so that you didn't have these?
```

Page 192

```
 1   A.   Later -- whenever we had the chance,
 2   after the registration, Ms. Chaparro
 3   and I went in and told Mr. Nacrelli
 4   that this was not a satisfactory
 5   schedule.
 6   Q.   Uh-huh.
 7   A.   That he had us with these combined
 8   classes and that we were not -- our
 9   curriculum from the State Department
10   says that we cannot have a ratio
11   that's any different from the
12   teachers.  And he said you'll have to
13   show me in writing.  And I said well,
14   I'll get it and show it to you.
15   Q.   Okay.
16   A.   I got it and showed it to him.
17   Q.   Okay.
18   A.   Got it and showed it to him.
19   Q.   Okay.
20   A.   So then he made out another schedule
21   as I remember, and I don't even
22   remember what it looked like.  But
23   finally he just said, y'all just make
```

Page 193

```
 1   out your schedule like you've done in
 2   the past.  So we made out our
 3   schedule.
 4   Originally, what he had
 5   said about this was that because of
 6   the Alabama Reading Initiative, the
 7   teachers have to have an hour planning
 8   period for Alabama Reading Initiative.
 9   Q.   Uh-huh.
10   A.   So his plan was that we were going to
11   be their planning period.
12   Q.   Okay.  So after you finished
13   registration, then you and
14   Ms. Chaparro went to him and told him
15   that this violated your curriculum
16   from the State Department?
17   A.   Uh-huh.
18   Q.   And he asked to see it and you showed
19   it to him, correct?
20   A.   Uh-huh.
21   Q.   And he made a change?
22   A.   Not a satisfactory change, but he made
23   the change.
```

49 (Pages 190 to 193)

BARBARA M. JEFFERS - 10/15/2007

| Page 194 |
|---|
| 1   Q.   So you were not longer in violation of |
| 2   the curriculum? |
| 3   A.   We ended up with three schedules that |
| 4   year before we got the final schedule. |
| 5   Q.   Okay.  Did you ever work under this |
| 6   schedule? |
| 7   A.   Huh-uh. |
| 8   Q.   Did you ever work under the second |
| 9   schedule? |
| 10   A.   I don't believe so. |
| 11   Q.   And I believe you told me a few |
| 12   minutes ago that he finally just said |
| 13   for you and Ms. Chaparro to make up |
| 14   your schedule and that's the one you |
| 15   worked under? |
| 16   A.   Correct. |
| 17   Q.   Okay.  All right.  Now would all this |
| 18   have occurred before you went to see |
| 19   Dr. Lee -- before you and Ms. Chaparro |
| 20   went to see Dr. Lee? |
| 21   A.   All of what occurred. |
| 22   Q.   The changing of the -- |
| 23   A.   The changing of the schedules? |

| Page 196 |
|---|
| 1   A.   Yes. |
| 2   Q.   Okay.  And have you ever had your |
| 3   salary decreased? |
| 4   Well, let me put it |
| 5   this -- |
| 6   A.   My salary has been decreased before. |
| 7   Q.   All right.  When did that happen? |
| 8   A.   Well, my salary was decreased when I |
| 9   came from 10 and a half back to |
| 10   10 months. |
| 11   Q.   Okay.  When did that happen? |
| 12   A.   When I left the ALC and went to |
| 13   Ladonia. |
| 14   Q.   Okay.  But you requested that |
| 15   transfer, didn't you? |
| 16   A.   Right. |
| 17   Q.   Okay.  As I understand salaries |
| 18   they're on -- they're set by the State |
| 19   and you're on steps or something like |
| 20   that based on your years of experience |
| 21   and your degrees.  And have you always |
| 22   been paid on the appropriate salary |
| 23   level for your experience and degrees? |

| Page 195 |
|---|
| 1   Q.   Yes, ma'am. |
| 2   A.   I believe so. |
| 3   Q.   During the time that -- well, let me |
| 4   ask you this:  Have -- you're tenured, |
| 5   are you not? |
| 6   A.   Yes. |
| 7   Q.   Or on continuing service status? |
| 8   A.   Uh-huh. |
| 9   Q.   Has that ever been changed in any way? |
| 10   Once you obtained tenure you've always |
| 11   had it? |
| 12   A.   Uh-huh. |
| 13   Q.   Continuing service status? |
| 14   A.   Uh-huh. |
| 15   Q.   Have you always received the |
| 16   appropriate benefits; and when I say |
| 17   benefits, I'm talking about personal |
| 18   leave days, the entitlement to |
| 19   insurance, any of those type -- |
| 20   sick days? |
| 21   A.   You talking about just like sick days |
| 22   and stuff? |
| 23   Q.   Yes, ma'am. |

| Page 197 |
|---|
| 1   A.   I hope so.  I mean, one time we got |
| 2   extra money because we were not paid |
| 3   at 100 percent of the matrix. |
| 4   Q.   Okay. |
| 5   A.   You know what I'm talking about? |
| 6   Q.   Yes, ma'am.  But to your knowledge |
| 7   you've never lost any benefits or lost |
| 8   any salary, other than that change |
| 9   from 10 and a half months back to 10? |
| 10   A.   As far as I can remember.  I'm not |
| 11   sure if I've lost salary because of |
| 12   not having sick days to cover or not. |
| 13   Q.   Okay. |
| 14   MS. SMITH:  Exhibit 9, is it |
| 15   floating around? |
| 16   Q.   We talked about your medicals earlier. |
| 17   And you told me that you had the visit |
| 18   to St. Francis, and you told |
| 19   Dr. Chokkar.  Have you had any other |
| 20   hospital-related visits or hospital |
| 21   visits or doctor's visits that you |
| 22   attribute to Mr. Nacrelli's actions? |
| 23   A.   Yes. |

50  (Pages 194 to 197)

BARBARA M. JEFFERS - 10/15/2007

Page 198

1   Q.   And what are those?
2   A.   Back in that spring before I went to
3   hospital I went to see Dr. Law in
4   Auburn.
5   Q.   Uh-huh.  And what was that about?
6   A.   I told her that I was stressed out.
7   And I didn't tell her anything about
8   sexual abuse or anything like that.
9   And she sent me for blood test and all
10  that kind of thing, then put me
11  through some other tests, and put me
12  on Wellbutrin.  And I can't remember
13  if she put me on anything else at that
14  time.
15  Q.   I'm going to show you what was
16  supplied to me by your attorney as
17  medical records.  There's an East
18  Alabama Medical Center, a pharmacy and
19  Auburn Primary Care.  Is Auburn
20  Primary Care where you saw the
21  Dr. Law?
22  A.   It is.
23  Q.   Was that her office?

Page 199

1   A.   It is.
2   Q.   And I'm going to ask you to look at
3   those and see if there's anything
4   that's -- it's hard to say what's
5   missing, but are there any records
6   that you have, other than the
7   St. Francis records that aren't
8   contained in those records?
9   A.   Do I have any records other than the
10  St. Francis and these records?
11  Q.   Right?
12  A.   No, I don't.
13  Q.   Okay.
14  A.   I don't.
15  Q.   All of your medicals then that are
16  related to this case are confined to
17  the St. Francis records that I haven't
18  seen yet and these records?
19  A.   Uh-huh.  Yes.
20  Q.   Okay.
21  MS. SMITH:  I'd like to
22  introduce -- mark those
23  as Defendant's Exhibit 10

Page 200

1   and introduce them into
2   evidence.  Any objection?
3   (The referred-to document was
4   marked for identification as
5   Defendant's Exhibit No. 10.)
6   MR. EDDINS:  No objection.
7   MR. WILLIAMS:  My only
8   objection would be to the
9   extent to which the
10  plaintiff has the burden
11  to any civil case to
12  prove any reasonableness
13  and necessity of medical
14  bills.  If had any bills
15  contained therein, I
16  would object on that
17  bases.  Otherwise, I have
18  no objection.
19  MS. SMITH:  There's not.
20  These are just the
21  records themselves.
22  Let's stick this on
23  there and, Ms. Jeffers,

Page 201

1   you keep --
2   Q.   Now, the first page is East Alabama
3   Medical Center.  And that appears to
4   me to be your blood profile, the tests
5   that were run on the blood that you
6   would have given.  Is that what you
7   understand it to be?
8   A.   That's what it looks like.
9   Q.   All right.  It's dated May 2 of 2005?
10  A.   Okay.
11  Q.   I believe the determination was that
12  you had some high blood pressure -- I
13  mean, excuse me, high cholesterol; is
14  that correct?
15  A.   Yes -- well --
16  Q.   Did she tell you -- let me ask you
17  this:  Did Dr. Law tell you the
18  reports -- her summary or her
19  interpretation of what this blood
20  profile is?
21  A.   I don't remember her going over
22  everything.  But, yeah, we did talk
23  about the cholesterol.

51 (Pages 198 to 201)

BARBARA M. JEFFERS - 10/15/2007

Page 202

1    Q.   Okay. Did she tell you that there was
2    anything else out of the ordinary that
3    was shown by this report on your blood
4    profile?
5    A.   Not that I remember.
6    Q.   Now, are you contending that your high
7    cholesterol numbers are the result
8    Mr. Nacrelli's action?
9    A.   No. As a matter of fact, my high
10   cholesterol puts me at a less than
11   average risk of having a heart attack,
12   is what she had told me, because my
13   high is the good cholesterol.
14   Q.   Puts you at less risk of having a
15   heart attack?
16   A.   Yes. That's what she told me.
17   Q.   Okay. Let's go to Page 4. And that
18   seems to be a refill request for
19   Wellbutrin?
20   A.   Uh-huh.
21   Q.   When did you get put on Wellbutrin?
22   A.   I got put on Wellbutrin I believe back
23   in the spring.

Page 203

1    Q.   Of '05?
2    A.   Yes, ma'am.
3    Q.   Are you still taking it?
4    A.   No, ma'am.
5    Q.   When did you quit taking it?
6    A.   When my prescription ran out.
7    Q.   Well, this shows a refill request
8    September 7, 2005, is that the last
9    prescription you had -- up at the top.
10   Auto fax electronically transmitted,
11   September 7, 2005. Is that your last
12   prescription?
13   A.   I'm not sure. Probably so. I don't
14   know. I'd have to look at all this
15   and study it.
16   Q.   Okay. And down further on the page it
17   says the time before that it had been
18   filled on July 27, 2005.
19   A.   Yes.
20   Q.   And you think you began taking it in
21   the spring?
22   A.   I thought I did.
23   Q.   Okay. Let's go to the next page. Up

Page 204

1    there, it's dated March 14, 2005?
2    A.   Okay.
3    Q.   You got acute bronchitis?
4    A.   Uh-huh.
5    Q.   And left-sided CP. Do you know what
6    that is?
7    A.   I have no idea.
8    Q.   It says you were negative stress test?
9    A.   That was coming from the hospital.
10   Q.   Is this based on the St. Francis?
11   A.   I would think it probably was.
12   Q.   So it would have been in March of '05
13   that you were in St. Francis?
14   A.   Uh-huh. I had been to Dr. Law, but
15   before I went to St. Patrick's. But I
16   don't know if she -- I told her about
17   going to the hospital. And I had, in
18   fact, asked them when I went to the
19   hospital to send the records to her.
20   Q.   Okay. It says over there negative
21   stress test. Where did you have a
22   stress test?
23   A.   Chokkar did it at St. Francis.

Page 205

1    Q.   Okay. All right. So that would have
2    been the diagnosis then of acute
3    bronchitis and left-sided?
4    A.   Whatever.
5    Q.   CP. Go to the next page. This is
6    dated 3/30. And it says that you had
7    a history of depression?
8    A.   It says history of depression?
9    Q.   About a third of the way down, it's
10   got tingling edema. And then it says
11   positive for a history of depression.
12   What does that mean?
13   A.   I don't know.
14   Q.   Did you tell her you had a history of
15   depression?
16   A.   Not that I can remember telling her I
17   had a history of depression.
18   Q.   Okay. Then the diagnosis down there
19   No. 2, is depression. And you got a
20   history of smoking.
21   A.   Uh-huh.
22   Q.   Smoking sensation -- cessation group.
23   They were going to put you in a group

52 (Pages 202 to 205)

BARBARA M. JEFFERS - 10/15/2007

Page 206

1  for that; right?
2  A.  Not that I ever heard anything about.
3  Q.  Okay.  You had acute bronchitis, which
4  had been resolved.
5  A.  Uh-huh.
6  Q.  No. 3, over there?
7  A.  Uh-huh.
8  Q.  And the Wellbutrin.  Would that have
9  been the first time you were
10  prescribed the Wellbutrin in March of
11  '05?
12  A.  I -- I think so.
13  Q.  And you don't recall discussing with
14  her any history of depression, because
15  she's got that --
16  A.  I don't remember discussing with her
17  any history of depression.
18  Q.  All right.  Because she says that's a
19  positive.  Then she says there's a
20  negative for suicidal --
21  A.  Well, thank God for that.
22  Q.  So you didn't have that discussion
23  with her?

Page 207

1  A.  I told her that I was depressed and
2  suffering from anxiety at that time.
3  But, no, I did not discuss a history
4  of depression.
5  Q.  Okay.  The next one is on May 10.  It
6  says, patient returns -- patient here
7  returned to clinic, RTC; feeling fine.
8  Is that what you told her
9  May 10, 2005?
10  A.  Well, she was probably questioning me
11  about how the medication -- how I was
12  feeling on the medication.  I told her
13  I was feeling better.  And I probably
14  did not have bronchitis at the time.
15  Q.  Hyperlipidemia , do you know what is?
16  A.  I have no idea.
17  Q.  Diet and exercise?
18  A.  I don't know what that is either.
19  MR. EDDINS:  She's probably
20  got it noted.
21  Q.  Okay.  Then let's flip on over to the
22  last -- it likes looks like four
23  pages.  There's one on -- it says

Page 208

1  Auburn Primary Care, and it's got a
2  scan of the spine.
3  A.  Uh-huh.
4  Q.  Was that a Dexa scan?
5  A.  I don't know what a Dexa scan is.
6  Q.  It's where they --
7  A.  She did a bone density scan.
8  Q.  That's it.
9  A.  Okay.
10  Q.  A bone density.  Check your calcium?
11  A.  Right.
12  Q.  Okay.  And that's what that is.  It
13  says it's normal.
14  A.  Right.
15  Q.  And the next page is also part of your
16  hip as part of that.  And that says
17  that's normal; is that correct -- part
18  of the bone density test; is that
19  correct?
20  A.  Good.  I hadn't even seen that before.
21  Q.  And then on March 30th of '05, you had
22  a mammogram?
23  A.  Uh-huh.

Page 209

1  Q.  And that apparently was fine, too.  No
2  abnormal -- no abnormality detected.
3  A.  (The witness nods head.)
4  Q.  Okay.  And so these are the only
5  medical records we've got, except for
6  St. Francis?
7  A.  Yes, ma'am.
8  Q.  Have you seen any other doctors?
9  A.  No.  No, ma'am.
10  Q.  Okay.  You quit taking the Wellbutrin
11  after your last prescription ran out?
12  A.  Yes.
13  Q.  Are you under any doctor's care at the
14  present?
15  A.  Dr. Law.
16  Q.  And for what?
17  A.  I just went back for a checkup.  He's
18  my primary care.
19  Q.  And that would be an annual checkup?
20  They do blood work?
21  A.  Oh, I did see another doctor, too.  I
22  see an OB/GYN.  But don't ask me what
23  his name is because I've never seen

53 (Pages 206 to 209)

BARBARA M. JEFFERS - 10/15/2007

Page 210

1  him but once.
2  Q.   How frequently do you see him?
3  A.   Every year.
4  Q.   Are there any -- do you make any claim
5  that anything he has treated you for
6  has anything to do with Mr. Nacrelli's
7  activities?
8  A.   No.
9  Q.   Did you see him for any depression or
10 any of the Wellbutrin?
11 A.   No.
12 MS. SMITH:  Give me just a
13 minute, please, ma'am.  I
14 may be close to being
15 through here.
16 MR. EDDINS:  Praise the Lord.
17 MR. WILLIAMS:  I still got
18 questions.  It's good
19 news and bad news.  I'm
20 going to run the restroom
21 real quick while you do
22 that, if you don't mind.
23 MS. SMITH:  No problem.

Page 211

1  THE COURT REPORTER:  Do you
2  mind if we take about a
3  five-minute recess?
4  MS. SMITH:  Okay.  Let's just
5  take a recess.
6  (Brief recess was taken at
7  3:17 p.m., and deposition
8  testimony reconvened at
9  3:26 p.m.)
10 Q.   Just a couple of more questions then
11 I'll be through with you, Ms. Jeffers.
12 To your knowledge, did
13 anybody other than your co-plaintiff,
14 Ms. Craig, report any sexual
15 harassment claims against
16 Mr. Nacrelli?
17 A.   Not to -- not to a school official.
18 Q.   Okay.  Did you speak with Ms. Craig
19 about your having reported your
20 complaints?
21 A.   No.
22 Q.   Did you know that she was going to
23 report hers?

Page 212

1  A.   No.
2  Q.   Why did you not report these until
3  your meeting -- why did you not report
4  these to Dr. Lee until your meeting
5  with her or any other superintendent?
6  A.   Because it had not escalated to the
7  point that -- as far as it had, as far
8  as him touching me and taking his
9  clothes off.
10 Q.   All right.  And so the escalation
11 began at the party in July; is that
12 correct?
13 A.   As far as it being like physical
14 stuff, like hands on stuff.
15 Q.   Uh-huh.
16 A.   Yes.
17 Q.   And that was a private party was it
18 not?
19 A.   What do you mean?
20 Q.   Was it paid for by school funds?
21 A.   I don't know how he paid for it to be
22 honest with you.
23 Q.   Was it school sponsored, to your

Page 213

1  knowledge?
2  A.   Yes.
3  Q.   It was school sponsored?
4  A.   It seemed to be.
5  Q.   How was it school sponsored?
6  A.   Well, being as how it was everybody at
7  the school that was invited.
8  Q.   Do you know if the administration had
9  approved the party?
10 A.   Not to my knowledge.
11 Q.   Okay.  And do you know if any school
12 funds were used for that party?
13 A.   Not to my knowledge.
14 Q.   Okay.  So is it your testimony then
15 that it began to escalate at that
16 party?
17 A.   The physical part.
18 Q.   All right.  Well, prior to the party,
19 why -- why hadn't you reported the
20 other actions?
21 A.   Because it was not physical.
22 Q.   So you weren't going to report -- so
23 you didn't feel you were going to

54  (Pages 210 to 213)

BARBARA M. JEFFERS - 10/15/2007

Page 214

1   report it -- let me rephrase it.
2   You didn't report it
3   because it wasn't physical?
4   A.   That's correct.
5   Q.   Were there ever occasions when you
6   would go into Mr. Nacrelli's office to
7   meet with him and the door would be
8   shut?
9   A.   Sure. Certainly.
10  Q.   Was that -- was it more frequent that
11  the door would be shut than the door
12  would be left open when you would meet
13  with him?
14  A.   That would be hard for me to say. I
15  mean, when the doors are shut there
16  are windows in the doors.
17  Q.   Okay. Would you and Mr. Nacrelli sit
18  in there and laugh about things?
19  A.   Yeah. Sometimes.
20  Q.   What would y'all laugh about?
21  A.   Gosh, I can't -- something funny had
22  happened with his daughter or somebody
23  at school or something, or he would

Page 215

1   tell funny stories. He had a lot of
2   funny stories he told about his
3   father-in-law.
4   MS. SMITH: I think that's all
5   I have. I'm going to
6   turn it over to
7   Mr. Williams here.
8   MR. WILLIAMS: Thank you very
9   much.
10  EXAMINATION
11  BY MR. WILLIAMS:
12  Q.   This is going to seem like an odd
13  question this late in the day. But
14  what is your full name?
15  A.   Barbara Morris Jeffers.
16  Q.   Is Morris your --
17  A.   Maiden name.
18  Q.   Do you have a middle name?
19  A.   No, I don't.
20  Q.   Where do you currently live?
21  A.   502 Highway 169 South, Seal, Alabama.
22  Q.   What county is that?
23  A.   Russell County.

Page 216

1   Q.   Have you ever lived in Salem, Alabama?
2   A.   Yes.
3   Q.   At 555 Lee Road?
4   A.   251.
5   Q.   What does the 251 stand for?
6   A.   It's mailbox numbers.
7   Q.   Sitting here today, are you under the
8   influence of any medications?
9   A.   No.
10  Q.   Prescription or otherwise?
11  A.   (The witness shakes head.)
12  Q.   Is that a no?
13  A.   That's a no.
14  Q.   And have you ever been diagnosed at
15  any point in your life with any memory
16  problems?
17  A.   No.
18  Q.   You mentioned an OB/GYN whose name you
19  don't know; is that correct?
20  A.   Right.
21  Q.   That you currently treat with you?
22  A.   Right.
23  Q.   All right. How long have you treated

Page 217

1   with that OB/GYN?
2   A.   One time.
3   Q.   Before that who was your OB/GYN?
4   A.   Dr. Goodyear.
5   Q.   And where does Dr. Goodyear practice?
6   A.   The same place as the other one does.
7   Dr. Goodyear left and this one took
8   over.
9   Q.   Where is that place?
10  A.   It's in Columbus. I don't know the
11  address.
12  Q.   Do you know the name of the street?
13  A.   No, I don't.
14  Q.   Do you know the name of the practice?
15  A.   Columbus Obstetrics.
16  Q.   Okay. And how long have you been
17  going to see Mr. Goodyear before you
18  changed?
19  A.   I think I saw him once.
20  Q.   How long had you been going to that
21  particular practice?
22  A.   I've been twice.
23  Q.   Let's go back. Before Columbus

55 (Pages 214 to 217)

BARBARA M. JEFFERS - 10/15/2007

| Page 218 | Page 220 |
|---|---|
| 1   Obstetrics, who did you use for your | 1   Q.  Who's number three? |
| 2   OB/GYN? | 2   A.  Larry Dean Jeffers. |
| 3   A.  James Venable. | 3   Q.  Three boys? |
| 4   Q.  And where is -- you say Venable? | 4   A.  Uh-huh. |
| 5   A.  Venable. | 5   Q.  Is that right? |
| 6   Q.  Where does Dr. Venable practice? | 6   A.  Uh-huh. |
| 7   A.  He's not practicing any more. | 7   Q.  Where does Larry live? |
| 8   Q.  Where did he practice? | 8   A.  He lives here in Phenix City. |
| 9   A.  In Columbus. | 9   Q.  What does Larry do for a living? |
| 10  Q.  Was he at the same location? | 10  A.  He sells cars. |
| 11  A.  He had several different locations. | 11  Q.  For who? |
| 12  Q.  What was the name of his clinic? | 12  A.  Nobody right now. |
| 13  A.  James Venable. | 13  Q.  Last time he sold cars, who did he |
| 14  Q.  What particular location did you go | 14  sell for? |
| 15  to? | 15  A.  Kia. |
| 16  A.  I went to two different ones in | 16  Q.  There's a Kia dealership in Columbus |
| 17  Columbus. | 17  or -- |
| 18  Q.  What roads? | 18  A.  Columbus. |
| 19  A.  Well, I don't know the names of the | 19  Q.  All right. Is Larry currently in |
| 20  roads. | 20  between jobs? |
| 21  Q.  Did someone takeover Dr. Venable's | 21  A.  Yes. |
| 22  practice? | 22  Q.  How old is Larry? |
| 23  A.  No. I don't believe so. | 23  A.  25, about to be 26. |

| Page 219 | Page 221 |
|---|---|
| 1   Q.  What road is Dr. Law located on? | 1   Q.  Do any of your boys live with you? |
| 2   A.  Opelika -- is that Opelika Road? | 2   A.  No. |
| 3   Q.  And what is Dr. Law's first name? | 3   Q.  You have any other children? |
| 4   A.  Rekha. | 4   A.  No. |
| 5   Q.  How do you spell that? | 5   Q.  Are you currently married? |
| 6   A.  R-E-K-H-A. | 6   A.  No. |
| 7   Q.  All right. Do you have any children? | 7   Q.  Have you ever been married? |
| 8   A.  Three. | 8   A.  Yes. |
| 9   Q.  You're like me; hands full. | 9   Q.  To whom were you married? |
| 10  What are your -- the | 10  A.  I was married to Larry Jeffers. |
| 11  names and ages of your children? | 11  Q.  When were y'all married? |
| 12  A.  Jeffrey Morris Jeffers. | 12  A.  1971. |
| 13  Q.  How old is Jeffrey? | 13  Q.  And did that marriage end by death or |
| 14  A.  Jeffrey is -- he was born in '69, so | 14  divorce? |
| 15  he's 38. | 15  A.  Divorce. |
| 16  Q.  Where does Jeffrey live? | 16  Q.  When did y'all divorce? |
| 17  A.  Enterprise, Alabama. | 17  A.  About three years ago. |
| 18  Q.  All right. Who's number two? | 18  Q.  So, 2004? |
| 19  A.  Mathew Morris Jeffers; 27. | 19  A.  Three, maybe. |
| 20  Q.  Where does Mathew live? | 20  Q.  Had you been separated from Larry |
| 21  A.  He is in Americus, Georgia. | 21  before y'all got divorced? |
| 22  Q.  Is that close to Columbus? | 22  A.  Yes. |
| 23  A.  Not really. | 23  Q.  For how long? |

56 (Pages 218 to 221)

BARBARA M. JEFFERS - 10/15/2007

Page 222

1   A.   We had not lived in the same household
2   for about six years.
3   Q.   So since approximately 1997, you had
4   been separated from -- from Larry; is
5   that correct?
6   A.   Uh-huh.
7   Q.   Yes?
8   A.   Yes.
9   Q.   And in 2003, y'all would have filed
10  the paperwork with the courthouse?
11  A.   Uh-huh.
12  Q.   Is that correct?
13  A.   I believe that's correct.
14  Q.   Did y'all have any trial or was it by
15  consent?
16  A.   No.  It was a consent.
17  Q.   Y'all came to terms?
18  A.   Sure.
19  Q.   Did you get any alimony?
20  A.   No.
21  Q.   Did y'all just split it 50-50 in terms
22  of debt and assets?
23  A.   Correct.

Page 223

1   Q.   During the year 2003, were you working
2   at a Ladonia Elementary School?
3   A.   I was.
4   Q.   And was Charles Nacrelli also there?
5   A.   Yes.
6   Q.   In what capacity was Charles Nacrelli
7   working in 2003?
8   A.   Principal, I believe.
9   Q.   And do you know how long he had been
10  principal as of 2003?
11  A.   No, I don't.
12  Q.   Would it have been a matter of years?
13  A.   I don't believe Mr. Nacrelli was
14  principal but like three or
15  four years.  So I don't know what a
16  matter of years it is.
17  Q.   Well, he stopped being principal in
18  2005, and he was principal for three
19  or four years.  That would mean he
20  started either in '01 or 2?
21  A.   Okay.
22  Q.   Is that correct?
23  A.   That's correct.

Page 224

1   Q.   Does that refresh your recollection at
2   all?
3   A.   Yes.  I'd say that was probably about
4   right.
5   Q.   Okay.  Do you remember in 2001 they
6   had the disaster in New York City; do
7   you remember that at all?
8   A.   I do.
9   Q.   Was Mr. Nacrelli principal at the time
10  of that event?
11  A.   I believe he was.
12  Q.   Had he just started?
13  A.   I believe so.
14  Q.   I'm just going ask you this:  Why did
15  you bring that camera to the party in
16  2005, the pool party?
17  A.   Because that was what I was going to
18  give Brenda Coley as a going away
19  present, was take the pictures and
20  give it to her in an autograph book --
21  I mean, an photograph book.
22  Q.   What kind of camera was it?
23  A.   It's a Canon Sure Shot.

Page 225

1   Q.   It wasn't one of those camera's that
2   you'd buy at a store, was it?
3   A.   No.  Not a disposable.
4   Q.   I'm sorry, I mean a --
5   A.   You mean a disposable camera?
6   Q.   Right.  Just a --
7   A.   No.  It was not a disposable camera.
8   Q.   Was it a digital, or did it have
9   regular film?
10  A.   It had regular film.
11  Q.   Do you still have the film?
12  A.   No.
13  Q.   And how many pictures do you have?
14  A.   I'm not sure.
15  Q.   But sitting here today, you have
16  physical possession of the pictures
17  you took at the party?
18  A.   I had -- always get two copies, and I
19  have a copy.
20  Q.   You have a full set?
21  A.   I guess I do.
22  Q.   To whom you did you give the other
23  photos?

57 (Pages 222 to 225)

BARBARA M. JEFFERS - 10/15/2007

Page 226

1  A.  Brenda Coley.
2  Q.  Anybody else?
3  A.  No.
4  Q.  Did you put the photographs in a book?
5  A.  Yes.
6  Q.  And have you ever been arrested?
7  A.  I got a DUI.
8  Q.  When was that?
9  A.  About 11 years ago, I believe.
10 Q.  In 1997, does that sound about right?
11 A.  Yes.
12 Q.  Any other arrests?
13 A.  No.
14 Q.  Did they do a blood test on you, or
15 did they make you blow?
16 A.  I blew.
17 Q.  Do you know what you blew?
18 A.  Yeah.
19 Q.  What did you blow.
20 A.  .09.
21 Q.  I know it's been 11 years, but do you
22 know how much you had to drink to get
23 to .09?

Page 227

1  A.  I think I had probably had like two or
2  three glasses of wine over a period of
3  the evening.  As a matter of fact, I
4  think, at that time, the legal limit
5  was .1.  I was under the legal limit.
6  Q.  Did you plead guilty?
7  A.  Uh-huh.
8  Q.  Is that a yes?
9  A.  Yes.
10 Q.  Did you have to go to the classes?
11 A.  I went for an evaluation.  And at that
12 point, the person that did the
13 evaluation told me that I didn't have
14 to come back.
15 Q.  Did you serve any time in jail?
16 A.  They kept me like six hours.
17 Q.  Any other arrests besides a DUI in
18 1997?
19 A.  No.
20 Q.  Do you have any tattoos on your body?
21 A.  No.
22 Q.  No tattoos of any mouse?
23 A.  No.

Page 228

1  Q.  Did you ever from time to time while
2  you were at Ladonia ever tell a joke
3  about having a tattoo of a mouse on
4  your body?
5  A.  I did.
6  Q.  Can you tell us how that joke went?
7  A.  The joke went that I had a tattoo of a
8  mouse and they would say where and I'd
9  say right here.  And I would do like
10 this (indicating.)  And I'd say do you
11 see?  And they'd no.  And I'd say that
12 pussy eat it already.
13 Q.  And to whom you tell this joke about
14 the mouse?
15 A.  To the females.
16 Q.  Did you ever tell it to Mr. Nacrelli?
17 A.  No.
18 Q.  Did you ever tell it in his presence?
19 A.  No.
20 Q.  Did you tell ever tell it to any other
21 male employee while at Ladonia?
22 A.  No.
23 Q.  And when you were showing me and

Page 229

1  telling me the joke, you said I would
2  do like this, did you mean to indicate
3  that you would put down your pants?
4  A.  Yes.  Like this.  Like it was right
5  here.
6  Q.  How far would you pull down your
7  pants?
8  A.  About two inches.
9  Q.  Was that your -- pretty much your
10 standard to break the ice?
11 A.  It was a joke that I saw an old woman
12 do one time at a party, and I told it
13 to somebody.  And then every time
14 there would be a group of woman
15 around, one of them would say, have
16 you seen Barbara's tattoo.
17 Q.  So they would kind of egged you on
18 into telling the joke?
19 A.  Uh-huh.
20 Q.  Is that correct?
21 A.  Correct.  Yes.
22 Q.  Did you find that joke to be
23 offensive?

58 (Pages 226 to 229)

BARBARA M. JEFFERS - 10/15/2007

Page 230

1    A.    Not to me.
2    Q.    Did it embarrass you at all?
3    A.    No.
4    Q.    When you'd tell the joke, did it
5    embarrass you at all?
6    A.    Not that I know of.
7    Q.    Did anybody ever ask you not to tell
8    that joke?
9    A.    No.
10   Q.    They didn't ever tell you, hey, I
11   thought that was funny but it's
12   offensive and inappropriate?
13   A.    No.
14   Q.    Did you ever tell anybody at Ladonia
15   Elementary School, whether it was a
16   student or a teacher or a principal,
17   that you did not wear underwear?
18   A.    Yes.
19   Q.    To whom would you tell that?
20   A.    Okay. Mr. Nacrelli was talking about
21   panty lines like the panty lines of
22   the thong underwear and that kind of
23   stuff. And he said something about

Page 231

1    panty lines. And I said I don't have
2    any panty lines; I don't wear panties.
3    Q.    Did that embarrass you when you told
4    Mr. Nacrelli that?
5    A.    No. I thought it would shut him up.
6    Q.    Was anybody else present when you told
7    Mr. Nacrelli that you don't wear any
8    panties?
9    A.    Probably so.
10   Q.    Was this in his office?
11   A.    As a matter of fact, I think it was
12   probably in the secretary's office
13   after he was saying the thing about
14   another teacher's panty line.
15   Q.    Would this have been before the July
16   of 2005 party?
17   A.    Yes.
18   Q.    And on how many occasions did you make
19   the remark that you didn't wear
20   panties while working at Ladonia
21   Elementary School?
22   A.    I mean, it wasn't a big topic of
23   conversation for me.

Page 232

1    Q.    Would you have said it more than one?
2    A.    I doubt it.
3    Q.    You were asked the question, and I
4    think it was in the context of after
5    you reported everything to Dr. Lee,
6    October 20, 2005, were you fearful of
7    Mr. Nacrelli. And your answer was
8    physically, no; emotionally, yes.
9    My question to you is:
10   Before that -- before you reported
11   anything to Dr. Lee, were you ever in
12   fear of Mr. Nacrelli from a physical
13   standpoint?
14   A.    Not from a physical standpoint.
15   Q.    And were you ever in fear of him from
16   any other standpoint prior to that
17   time?
18   A.    I was apprehensive and anxious about
19   him; was the way I would put it.
20   Q.    But not fearful?
21   A.    Well, there's a certain amount of fear
22   I think in that.
23   Q.    What was the root of your apprehension

Page 233

1    and anxiety with respect to
2    Mr. Nacrelli before you reported
3    anything to Dr. Lee?
4    A.    Because I didn't like hearing all of
5    his sexual statements and comments and
6    stories.
7    Q.    Any other reason?
8    A.    No.
9    Q.    We all have our jobs. And all of our
10   jobs have a certain culture, you know
11   what I mean, in terms of how people
12   act on the job and people's job
13   cultures will vary from job to job.
14   If you had to describe the job culture
15   at Ladonia Elementary School for the
16   years 2001 to 2005, how would describe
17   it?
18   And I'll give you some
19   examples: was it a happy group, was it
20   a serious group, what kind of group
21   were you-guys, in terms of the
22   teachers, the secretaries, and the
23   administrators?

59 (Pages 230 to 233)

BARBARA M. JEFFERS - 10/15/2007

Page 234

1    MR. EDDINS: Object to the
2    form.
3    A.    That would be hard for me to say. I
4    mean, I -- I can't give you -- there
5    were a group of people who were very
6    unhappy the whole time he was there.
7    There were some people who were happy,
8    I guess.
9    Q.    What group were you in?
10   A.    I don't think I was in either one
11   those groups really. There was --
12   here were other things that he did
13   that I did -- I did not like, so.
14   That I found offensive.
15   Q.    Who were the people there at Ladonia
16   Elementary School that you would hang
17   out with, in terms of eating your
18   lunch and socializing in between work
19   duties, but during the workday?
20   A.    I didn't have -- we don't have time to
21   socialize at school.
22   Q.    Didn't you have a lunch break?
23   A.    30 minutes.

Page 235

1    Q.    And who would you eat lunch with
2    during your lunch break?
3    A.    I usually ate lunch with Rose Fowles
4    and Cill Parish at that time I
5    believe.
6    Q.    Anybody else?
7    A.    Not on a regular basis.
8    Q.    Were you close to Brenda Coley?
9    A.    Yes.
10   Q.    Would y'all socialize outside of work?
11   A.    No.
12   Q.    So y'all would have time during the
13   day; however short of the time period,
14   but you would socialize with
15   Brenda Coley from time to time during
16   the school hours?
17   A.    Sure.
18   Q.    Have you read the complaint -- the
19   actual document that's been filed in
20   this case by your lawyer?
21   A.    I have received copies. Yes. I guess
22   I've read it.
23   Q.    Yeah. There are two plaintiffs,

Page 236

1    yourself and Ms. Craig, correct?
2    A.    Uh-huh.
3    Q.    Do you have any personal knowledge
4    about any allegations made by
5    Ms. Craig?
6    A.    No.
7    Q.    Did you witness any of the incidents
8    alleged in the complaint that relates
9    to Ms. Craig?
10   A.    No, sir.
11   Q.    Did there ever come a time where you
12   and Ms. Craig had a falling out for
13   reasons, other than anything sexual in
14   nature or sexual harassment? Anything
15   from your work or a personal
16   standpoint? Let me qualify that,
17   before July of 2005?
18   A.    We had disagreements.
19   Q.    Let's talk about those. I'm talking
20   about disagreements you had with
21   Mr. Nacrelli before July of 2005.
22   A.    Okay. We had a program by which we
23   chose an employee of the month, which

Page 237

1    would be a teacher, like a support
2    person of the month -- and I'm trying
3    to think if there was anything else.
4    So he had appointed me and
5    Ms. Chaparro and Ms. Coley as the ones
6    to choose those. And the first month
7    or so, we made our choices.
8    And then, like, the next
9    month we made our choice, and he came
10   in my office and Ms. Coley and
11   Ms. Chaparro were in there. And we
12   told him who we had chosen. And it
13   happened to have been a black teacher.
14   And he said that that teacher would
15   never receive employee of the month.
16   And I told him -- I said, well, you
17   know, we have not picked a minority
18   teacher as either one, and I think we
19   should. And he said, no, that we
20   didn't need to pick any minority.
21   That there weren't but about 4 or 5
22   percent minority at Ladonia. We
23   didn't never have to pick a minority

60 (Pages 234 to 237)

BARBARA M. JEFFERS - 10/15/2007

| Page 238 |
|---|
| 1    person. |
| 2    And so I told him, well, |
| 3    in that case, if you're going to be |
| 4    the one that really makes the decision |
| 5    and picks them anyway, you just take |
| 6    them and pick them. So that was a |
| 7    problem. Then -- |
| 8    Q.   I'm sorry. Let me stop you right |
| 9    there. |
| 10    A.   Uh-huh. |
| 11    Q.   What year was that? |
| 12    A.   The first year that he was there. |
| 13    Q.   That would have been 2001? |
| 14    A.   And Brenda Coley was assistant |
| 15    principal, uh-huh. 2001 -- |
| 16    Q.   To 2002? |
| 17    A.   Okay. |
| 18    Q.   Is that correct? |
| 19    A.   Uh-huh. Yes. |
| 20    Q.   Would that have occurred during the |
| 21    fall of 2001? |
| 22    A.   I believe so. |
| 23    Q.   Okay. Tell me about the next |

| Page 240 |
|---|
| 1    faculty meeting in the fall of 2001; |
| 2    is that correct? |
| 3    A.   That's correct. |
| 4    Q.   And just for the record, the reason we |
| 5    ask you to say yes or no -- |
| 6    A.   Uh-huh. |
| 7    Q.   -- is because our court reporter is |
| 8    typing everything we say down. |
| 9    A.   Okay. |
| 10    Q.   And the lawyers and the judge and |
| 11    possibly even a jury will rely upon |
| 12    this deposition later so it's |
| 13    important to know. We all at the |
| 14    table know when you say yes. |
| 15    Six months from now, no one will |
| 16    remember. |
| 17    A.   Okay. |
| 18    Q.   So it's just for -- it's a bookkeeping |
| 19    detail. I'm sorry to badger you about |
| 20    that. |
| 21    A.   That's okay. |
| 22    Q.   But if you don't mind, that would be |
| 23    really helpful. Okay. |

| Page 239 |
|---|
| 1    non-sexual related disagreement you |
| 2    had with Mr. Nacrelli. |
| 3    A.   He made a statement in the faculty |
| 4    meeting that the black children -- |
| 5    that our test results there that the |
| 6    black children don't score as well as |
| 7    white children. And I thought that |
| 8    was inappropriate for him to do. |
| 9    Q.   Was that, in fact, true? |
| 10    A.   You couldn't read it like that because |
| 11    we didn't have a big enough number of |
| 12    black students to make that inference. |
| 13    So, no, it really was not true. |
| 14    Q.   When did he make this statement? |
| 15    A.   He made it in a faculty meeting |
| 16    probably the first part of that year. |
| 17    Q.   The first part of 2001; is that |
| 18    correct? |
| 19    A.   Probably discussing the test results |
| 20    from the year before. |
| 21    Q.   And so he would have made that |
| 22    statement about black children not |
| 23    scoring as well as white children in a |

| Page 241 |
|---|
| 1    Anything else besides |
| 2    employee of the month and the comment |
| 3    about black children vis-à-vis white |
| 4    children and scoring on a test? |
| 5    A.   The DIBELS testing where he let his |
| 6    wife come in and record the scores. |
| 7    Q.   When did that take place? |
| 8    A.   The DIBELS testing I'm sure was in the |
| 9    early fall of that year, too. |
| 10    Q.   Of 2001? |
| 11    A.   Yes. That's the first year we give |
| 12    DIBELS, and I'm not sure if that was |
| 13    the first year or if it was the next |
| 14    year. |
| 15    Q.   Anything else? |
| 16    A.   That I discussed with him? |
| 17    Q.   Yes. |
| 18    A.   Not that I can remember right off. |
| 19    Q.   We got three things that you would |
| 20    have discussed with him. Any other |
| 21    problems you had with him that you |
| 22    would not have discussed with him |
| 23    before July of 2005? |

61 (Pages 238 to 241)

BARBARA M. JEFFERS - 10/15/2007

Page 242

1    A.    There was some other issues of race
2    things that he did about that. And,
3    also, about the way he treated his
4    child at Ladonia.
5    Q.    How old was the child?
6    A.    I did not discuss this with him, but
7    it was a problem for some people.
8    Q.    How old was the child?
9    A.    She started kindergarten there.
10   Q.    Would she have started in '01, when he
11   started?
12   A.    I guess she did.
13   Q.    And how did he treat his child that
14   caused you any kind of anger or
15   problem?
16   A.    Well, like when the other children
17   were waiting outside to come in for
18   breakfast, she and a couple of her
19   friends would have already gone in and
20   sat down in lunchroom and eaten
21   breakfast. And the other child --
22   children -- there were some parents
23   had had problems with that and had

Page 243

1    said something to me about that at the
2    start of the year. And I believe, at
3    that time, an issue also about the
4    breakfast.
5    Q.    Okay. You had mentioned earlier in
6    your testimony specifically that you
7    did have a problem with the fact that
8    Mr. Nacrelli would require the
9    children to report by 8:30, and if
10   they did not, they were tardy as
11   opposed to 8:40; is that correct?
12   A.    Correct.
13   Q.    And did that problem begin in the fall
14   of 2001 as well?
15   A.    I believe so.
16   Q.    And did the favoritism problem you had
17   with Mr. Nacrelli and his child, did
18   that begin in the fall of 2001?
19   A.    It did.
20   Q.    Anything else?
21   A.    Not that I can think of right -- right
22   off. I mean, there was other problems
23   about favoritism. There were other

Page 244

1    problems about -- about the black
2    teachers.
3    Q.    And did all of these problems that
4    were not of a sexual nature, did they
5    become readily apparent to you in the
6    fall of 2001?
7    A.    Not all of them, no.
8    Q.    The ones that you just told me about
9    that, they all become readily apparent
10   to you in the fall of 2001?
11   A.    Yes.
12   Q.    Let me show you what I'll mark as
13   Defendant's Exhibit 11. Can you tell
14   us what that document is, please?
15       (The referred-to document was
16        marked for identification as
17        Defendant's Exhibit No. 11.)
18   A.    It is a letter that he asked me to
19   write for him.
20   Q.    Did you write that letter?
21   A.    I did.
22   Q.    What is the date of that letter?
23   A.    April the 3rd, 2002.

Page 245

1    Q.    And did you sign that letter?
2    A.    I did.
3    Q.    Did you draft the letter yourself?
4    A.    I did.
5    Q.    Are the words that you put in that
6    letter true and accurate?
7    A.    Let me see -- I wrote the letter.
8    Q.    Are the words you put in that letter
9    true and accurate?
10   A.    They are true.
11   MR. WILLIAMS:  Consistent with
12   Sidney's prior practice
13   today, I would like to
14   admit Exhibit -- what is
15   the exhibit?
16   MS. SMITH:  11.
17   MR. WILLIAMS:  11. Is there
18   any objections?
19   MS. SMITH:  No objection.
20   MR. EDDINS:  No objection.
21   Q.    As I understand it, Ms. Jeffers, you
22   cannot remember with any specificity
23   any of the comments that you allege

62  (Pages 242 to 245)

BARBARA M. JEFFERS - 10/15/2007

| Page 246 | Page 248 |
|---|---|
| 1  Mr. Nacrelli made prior to July of | 1  MR. WILLIAMS: That's fine. |
| 2  2005; is that correct? | 2  MR. EDDINS: If she wants to |
| 3  A.  Prior to 2005? | 3  refer to her notes, then |
| 4  Q.  Yes. | 4  that's what she's going |
| 5  A.  No. I can remember some comments he | 5  to do. |
| 6  made prior to 2005. | 6  Q.  Ms. Jeffers, can you tell me with any |
| 7  Q.  And I know you have some notes here | 7  specificity, without referring to your |
| 8  with you today, but without referring | 8  notes, any of the comments that you |
| 9  to your notes, are you able to recall | 9  allege Mr. Nacrelli made to you that |
| 10  with specificity the comments that you | 10  were sexual in nature or inappropriate |
| 11  attribute to Mr. Nacrelli that are of | 11  prior to July of 2005? |
| 12  a sexual nature or that you found | 12  A.  Yes, I can. |
| 13  offensive? | 13  Q.  Please recount those for us. |
| 14  MR. EDDINS: She can refer to | 14  A.  Okay. All details about the sexual |
| 15  her notes if she wants | 15  stuff between Mr. Nacrelli and his |
| 16  to. | 16  wife and how they sat around naked and |
| 17  MR. WILLIAMS: Well, I know | 17  how even they sat around naked after |
| 18  she can, but that wasn't | 18  Charslie was born and that they had |
| 19  my question. The | 19  sex every night and that he had to |
| 20  question was -- | 20  have sex. Those tales. The tales of |
| 21  MR. EDDINS: Well, I'm saying | 21  his father sexually harassing his |
| 22  if she wants to refer to | 22  wife, touching her inappropriately, |
| 23  her notes then that's | 23  how angry that would make Jerry. The |

| Page 247 | Page 249 |
|---|---|
| 1  what she'll do. | 1  tales about working at the pizza place |
| 2  MR. WILLIAMS: Well, my | 2  and having parties and drinking and |
| 3  question is- | 3  sexual stuff after hours, after they |
| 4  MR. EDDINS: I don't care what | 4  had closed that restaurant. |
| 5  your question is. If she | 5  MR. EDDINS: Let the record |
| 6  wants to refer to her | 6  show that she recalled |
| 7  notes, then she's going | 7  without having to refer |
| 8  to do that. | 8  to her notes. |
| 9  MR. WILLIAMS: This is not | 9  Q.  Do you, in fact, have any notes |
| 10  your deposition, and I | 10  concerning those conversation? |
| 11  can ask whatever question | 11  A.  No, I don't. Not with me. |
| 12  I want to. | 12  MR. WILLIAMS: Well, that was |
| 13  MR. EDDINS: Ask whatever you | 13  much ado about nothing, |
| 14  want to. | 14  wasn't it? |
| 15  MR. WILLIAMS: And you can | 15  Q.  Can you tell me a specific date, |
| 16  object if you want to. | 16  Ms. Jeffers, where you recollect |
| 17  But if you're instructing | 17  Mr. Nacrelli telling you that he and |
| 18  her not to answer, we'll | 18  Jerry sat around naked? |
| 19  just take it up with the | 19  A.  No. I cannot tell you a specific |
| 20  Court. | 20  date. But I can tell you that I'm not |
| 21  MR. EDDINS: You can take it | 21  the only one who has heard those |
| 22  up. I'll get you the | 22  tales. |
| 23  phone number right now. | 23  Q.  Do you recall a specific incidence |

BARBARA M. JEFFERS - 10/15/2007

Page 250

```
 1    where you can give me the location
 2    where it took place or the name of
 3    another person who would have
 4    overheard any comment made to you by
 5    Mr. Nacrelli about he and Jerry
 6    sitting around naked prior to July of
 7    2005?
 8    A.    I'd say Allison Gentry, Ms. Coley,
 9    maybe -- maybe Emily Jones.
10    Q.    And during the three-to-four year
11    period that Mr. Nacrelli was the
12    principal at Ladonia and you were also
13    employed there, on how many occasions
14    did you hear Mr. Nacrelli say that he
15    and Jerry sat around naked?
16    A.    I don't have any specific number that
17    I can give you; more than once.
18    Q.    And do you have any specific numbers
19    with respect to the frequency with
20    which it would take place, as opposed
21    to the numerosity?
22    A.    No.
23    Q.    On how many occasions did Mr. Nacrelli
```

Page 251

```
 1    tell you or did you overhear him
 2    telling somebody else that he wanted
 3    sex every night?
 4    A.    I would say that was pretty generally
 5    known by a good number of the faculty.
 6    Q.    That's not my question. Now, my
 7    question is: On how many occasions,
 8    if you remember, did Mr. Nacrelli tell
 9    you or did you overhear him telling
10    somebody else in your presence that he
11    had to have sex every night?
12    A.    I can't tell you a number.
13    Q.    All right. And can you tell me with
14    what type of frequency this comment
15    was made?
16    A.    No.
17    Q.    And can you tell me the name of a
18    single person that was present when
19    this comment was made in your
20    presence?
21    A.    No.
22    Q.    On how many occasions did Mr. Nacrelli
23    made the comment that his father had
```

Page 252

```
 1    sexually harassed his wife?
 2    A.    Three or four.
 3    Q.    Over a three to four-year period?
 4    A.    Uh-huh.
 5    Q.    Is that correct?
 6    A.    Probably.
 7    Q.    And on how many occasions did
 8    Mr. Nacrelli tell you that he had sex
 9    every day at a pizza place?
10    A.    Probably twice.
11    Q.    Over a three-to-four year period?
12    A.    Uh-huh.
13    Q.    I don't want to put words in your
14    mouth. But I have four general
15    categories: we got sex in a pizza
16    place, father harassing wife, having
17    to have sex every night, and sitting
18    around naked with his wife.
19    Are those in total the
20    comments that you remember
21    Mr. Nacrelli making before July of
22    2005 that you claim this lawsuit were
23    inappropriate?
```

Page 253

```
 1    A.    No.
 2    Q.    Let's continue on then with the other
 3    categories.
 4    A.    There would be the category of how the
 5    woman in the health club were lusting
 6    after him, and that Jerry was getting
 7    upset about that. And that he was
 8    losing more weight than she was, and
 9    this was becoming a problem. That
10    they couldn't exercise together, and
11    it was causing problems at home.
12    And --
13    Q.    All right. We'll call that health
14    club jealousy comments. How many of
15    those comments did Mr. Nacrelli make
16    to you or in your presence during the
17    three-to-four year period that he
18    would have been principal and you were
19    employed at Ladonia Elementary School?
20    A.    I can't say.
21    Q.    Can you comment upon the frequency
22    with which those comments were made?
23    A.    No.
```

BARBARA M. JEFFERS - 10/15/2007

Page 254

1   Q.   All right. Any other categories we
2   haven't discussed?
3   A.   Not that I can recall at this time.
4   Q.   You have any notes with you today that
5   would help your recollection
6   concerning any area that we haven't
.7  discussed concerning comments made
8   before July of 2005?
9   A.   No.
10  Q.   The notes that you do have, those are
11  concerning the events from July of
12  2005 on; is that correct?
13  A.   Correct.
14  Q.   Did you make those notes
15  contemporaneously with the incidents
16  as they happened?
17  A.   Yes.
18  Q.   Did you carry the notebook with you?
19  A.   No.
20  Q.   Did you have paper with you when you
21  went to the party?
22  A.   These are notes that I took after the
23  party.

Page 255

1   Q.   When did you make the notes after the
2   party?
3   A.   That school year.
4   Q.   Would it have been before or after you
5   reported the incident to Dr. Lee?
6   A.   Let's see. Some before and I think
7   one after -- maybe two after.
8   Q.   What notes did you make after
9   reporting Mr. Nacrelli to Dr. Lee?
10  A.   I made the note about Rose Fowles' and
11  the garage. And I made the note where
12  Ms. Thornton told me that Mr. Nacrelli
13  told her that he couldn't believe he
14  had never been charged with sexual
15  harassment.
16  Q.   And did you make the other notes?
17  A.   On the dates that I gave.
18  MR. WILLIAMS: Can I get a
19  copy of the notes; do you
20  mind? Can we take a
21  break?
22  MS. SMITH: Yes.
23  MR. EDDINS: Since you

Page 256

1   wouldn't let her refer to
2   them, I don't know if
3   you're entitled to them.
4   MR. WILLIAMS: Yeah.
5   MR. EDDINS: You would be.
6   MR. WILLIAMS: She referred to
7   them during the --
8   MR. EDDINS: That's what I --
9   MR. WILLIAMS: -- on several
10  occasions.
11  MR. EDDINS: This right here.
12  You've already been
13  provided a copy of --
14  MS. SMITH: Is that what
15  you're working from is
16  that statement?
17  MR. EDDINS: That's notes that
18  she was referring to.
19  Now, let me see if
20  there's anything else.
21  MR. WILLIAMS: This has
22  already been marked,
23  hasn't it?

Page 257

1   MS. SMITH: Yeah. That's --
2   MR. WILLIAMS: Do you want me
3   to do like this?
4   THE WITNESS: Yeah. I need a
5   copy.
6   MR. WILLIAMS: Do you want me
7   to let her have a copy
8   over here?
9   MS. SMITH: Unless I made you
10  one.
11  Q.   Ms. Jeffers, my question is with
12  respect to the memo dated, September
13  26, '05 that is typed out, is: When
14  did you make the notes there are in
15  that memorandum?
16  I think you told me about
17  the two notes that you made after you
18  reported to Dr. Lee. And I ask you
19  about when you did you make the other
20  notes and you told me, I made them
21  when I made them. I'm unclear as to
22  the dates you would have made the
23  notes. Was it September 26, '05?

65 (Pages 254 to 257)

BARBARA M. JEFFERS - 10/15/2007

Page 258

1    A.    You're not talking about when I wrote
2    the memo, are you?
3    Q.    Well, I guess two different things.
4    Did you -- did you write this memo
5    from a set of handwritten notes?
6    A.    Yes, I did.
7    Q.    When did you make the handwritten
8    notes?
9    A.    I made -- like, if I said on August
10   the 10th, then I made it on August the
11   10th.  If I made -- said on
12   September the 6th, I made it on
13   September the 6th.  If I said on
14   September the 9th, I made it on the
15   9th.  If I said on September the 19th,
16   I made it on the 19th.
17   Q.    What about the one that said, end of
18   July, Mr. Nacrelli had a party for
19   Brenda Coley.  That's the biggest one.
20   A.    I wrote that up after I had my meeting
21   with Dr. Lee, and she asked me to
22   write this -- or Ms. Baker asked me to
23   write this memo.

Page 259

1    Q.    Do you know what date that was?
2    A.    I wrote the memo on September the
3    26th.
4    Q.    Let me show you what I'll mark as
5    Defendant's Exhibit 12.  What date did
6    you make those notes?
7         (The referred-to document was
8         marked for identification as
9         Defendant's Exhibit No. 12.)
10   A.    I don't know.  I don't know.
11   Q.    Exhibit 12 is that the handwritten
12   version of the September 26th '05
13   typed memo?
14   A.    Yeah, not all of it.
15   Q.    Did you rely at least in part on
16   Exhibit 12 in drafting the
17   September 26th, '05 memorandum?
18   A.    Yes.
19   MR. EDDINS:  Why don't you
20   just ask her what -- for
21   what purpose did she make
22   this Defendant's Exhibit
23   12, and I think that will

Page 260

1    eliminate a lot of this.
2    MR. WILLIAMS:  Well, I think
3    I'm done with it anyway.
4    I just wanted to get the
5    dates down.
6    Q.    All right.  Ms. Jeffers, let's go to
7    July of 2005, the party --
8    A.    Uh-huh.
9    Q.    -- at Mr. Nacrelli's house?
10   A.    Uh-huh.
11   Q.    Is that correct?
12   A.    Uh-huh.
13   Q.    Did you have to go to that party?
14   A.    No.
15   Q.    Did anybody make you go to that party?
16   A.    I didn't want to go to the party.  I
17   had mentioned to Ms. Coley that I
18   didn't want to go to the party.  And
19   she said, I'm going to be very hurt if
20   you don't go.
21   Q.    Did Mr. Nacrelli make you go to that
22   party?
23   A.    No.

Page 261

1    Q.    How much alcohol did you consume at
2    that party?
3    A.    Very little.
4    Q.    Did you ever get drunk at the party?
5    A.    No.
6    Q.    Did you ever urinate in the bushes at
7    the party?
8    A.    No.  I don't believe so, no.
9    Q.    How well do you know Mr. -- I'm sorry,
10   Mr. Coley?
11   A.    Well, we went on a cruise.
12   Q.    Okay.  When was that?
13   A.    Well, there again, I don't remember
14   what year it was.
15   Q.    Okay.  Would it have been before or
16   after this party?
17   A.    It would have been before.
18   Q.    How long was the cruise?
19   A.    It was a week.
20   Q.    Where did y'all go?
21   A.    We went to Aruba, Puerto Rica.
22   Q.    Who all went?
23   A.    I went, Gwen Lewis went, Brenda and

66 (Pages 258 to 261)

BARBARA M. JEFFERS - 10/15/2007

|  | Page 262 |
|---|---|
| 1 | Ken Coley went, Johnny Tensley went, |
| 2 | and Yvonne and Dale Amerson went, |
| 3 | three other couple of Brenda and Ken's |
| 4 | -- that Ken worked with went. It was |
| 5 | a big group. |
| 6 | Q.  Did you get along pretty well with |
| 7 | Ken? |
| 8 | A.  Uh-huh. Yes. |
| 9 | Q.  Did y'all have the type of |
| 10 | relationship where it's appropriate |
| 11 | for y'all to flirt with each other |
| 12 | from time to time? |
| 13 | A.  Yes. |
| 14 | Q.  And do you do that from time to time? |
| 15 | A.  Yes. |
| 16 | Q.  Did you flirt with Ken at the party |
| 17 | that we were talking about? |
| 18 | A.  What do you mean flirt? |
| 19 | Q.  Well, you tell me what you understand |
| 20 | the word "flirt" to mean. And just -- |
| 21 | we went through three questions where |
| 22 | you had no problem with the term? |
| 23 | A.  Yes, sir. |

|  | Page 263 |
|---|---|
| 1 | Q.  And now all of a sudden, it's a |
| 2 | problem. You tell me, to you, what |
| 3 | does the term "flirt" mean? |
| 4 | A.  Well, flirt would have meant that I |
| 5 | probably I hugged his neck, talked |
| 6 | with him; that's what I'd say. |
| 7 | Q.  Would you have been all over him that |
| 8 | night? |
| 9 | A.  No. |
| 10 | Q.  What did you wear to the pool party? |
| 11 | A.  I don't know. I imagine I either wore |
| 12 | like capri pants and a top -- |
| 13 | probably. |
| 14 | Q.  And did you -- were you dating anybody |
| 15 | at the time of the pool party? |
| 16 | A.  Yes. |
| 17 | Q.  And who was that? |
| 18 | A.  Bill Faulk. |
| 19 | Q.  Are you still dating Bill Faulk? |
| 20 | A.  Yes. |
| 21 | Q.  How long have you been dating |
| 22 | Bill Faulk? |
| 23 | A.  About four years -- three years. |

|  | Page 264 |
|---|---|
| 1 | Q.  How do you know Bill? |
| 2 | A.  I've known him a long time. |
| 3 | Q.  How did you first meet Bill? |
| 4 | A.  He was married to someone that worked |
| 5 | with me when I worked at Central High |
| 6 | School in 1978. |
| 7 | Q.  Did you ever work with Bill Faulk? |
| 8 | A.  Yes. |
| 9 | Q.  For how long? |
| 10 | A.  I worked with Bill for -- I still work |
| 11 | for him. For about 10-years. |
| 12 | Q.  What do you do for Bill? |
| 13 | A.  I do some secretarial work. |
| 14 | Q.  What's the name of his business? |
| 15 | A.  Faulk's Auto Parts and Wrecker |
| 16 | Service; Faulk and Son, Inc., is the |
| 17 | legal name. |
| 18 | Q.  Did Bill come with you to that party? |
| 19 | A.  No. |
| 20 | Q.  You had testified earlier to Sidney's |
| 21 | question that Mr. Nacrelli had touched |
| 22 | your backside that night? |
| 23 | A.  Correct. |

|  | Page 265 |
|---|---|
| 1 | Q.  What part of his body touched what |
| 2 | part of your body? |
| 3 | A.  At what time? |
| 4 | Q.  Let's just go through the first time. |
| 5 | A.  Well, his hand touched my rear end. |
| 6 | Q.  Did he grab it or was it a brush? |
| 7 | A.  No. He was like pinching me. |
| 8 | Q.  He pinched your rear end? |
| 9 | A.  Uh-huh. |
| 10 | Q.  Is that correct? |
| 11 | A.  Yes. |
| 12 | Q.  On how many occasions? |
| 13 | A.  Like three. |
| 14 | Q.  Did you ever ask him to stop pinching |
| 15 | your rear end? |
| 16 | A.  He said to me on the third time, you |
| 17 | don't even know what I'm doing. I |
| 18 | said no, I'm trying to ignore you, |
| 19 | hoping you would stop. |
| 20 | Q.  Here's my question now -- I know what |
| 21 | you want to testify to, but my |
| 22 | question is: Did you ever ask him to |
| 23 | stop pinching your rear end? |

67 (Pages 262 to 265)

BARBARA M. JEFFERS - 10/15/2007

| Page 266 |
|---|

1   A.   No.
2   Q.   All right.  Did he touch you in any
3   other way, in terms of your rear end,
4   besides pinching your rear end?
5   A.   No.
6   Q.   Now, the next time he would have
7   touched was when you were on the back
8   porch?
9   A.   On the deck.
10   Q.   Is that correct?
11   A.   Uh-huh.
12   Q.   Correct?
13   A.   Yes.
14   Q.   At that point was Mr. Nacrelli
15   intoxicated?
16   A.   You know I really have not seen him
17   all that much.  After I did not
18   realize that he was intoxicated but
19   some of the people later said he was
20   intoxicated.  I don't know whether he
21   was intoxicated or not; if you want to
22   know the truth.
23   Q.   I do want to know the truth?

| Page 267 |
|---|

1   A.   I don't know.
2   Q.   When he was sitting behind you with
3   his legs on either side of your legs,
4   did you smell anything unusual?
5   A.   No.
6   Q.   I mean, did you smell any alcohol?
7   A.   No.
8   Q.   And how long was he in that position?
9   A.   Long enough to make his wife
10   uncomfortable.
11   Q.   Were you uncomfortable?
12   A.   Yes.
13   Q.   Did you say anything?
14   A.   I didn't have to, she did.
15   Q.   Why didn't you say anything?
16   A.   Well, she's sitting there right by me.
17   You know, I was embarrassed.  I didn't
18   want to embarrass her.
19   Q.   Have you ever been the subject of any
20   sort of sexual harassment either
21   before or after the incident you're
22   complaining about in this lawsuit
23   relative to Mr. Nacrelli?

| Page 268 |
|---|

1   A.   I don't understand what you're asking.
2   Q.   During any other time frame of your
3   life, whether it was -- while you were
4   a student at school, or working as a
5   professional as a teacher or
6   counselor, have you ever been sexually
7   harassed?
8   MR. EDDINS:  Object to the
9   form.  Go ahead.
10   A.   Yes.
11   Q.   Tell me about that.
12   A.   Before I graduated from Auburn
13   University in 1970, as part of my
14   curriculum I had to do an internship
15   in an office.  And I was assigned to
16   the office of the president of the
17   Ralph Drahon Library, and it was
18   Dr. Clyde Cantrell who was the
19   director of the library at the time.
20   I was placed in his office to work a
21   couple of hours a day, and I was
22   sexually harassed by him.
23   Q.   What did he do?

| Page 269 |
|---|

1   A.   He told me dirty jokes.  He chased me
2   around the office and tried to kiss
3   me.  And he was like in his 60's, I
4   think, and I was 21.  And he tried to
5   kiss me at the file cabinet.  He kept
6   asking me to go out to dinner with
7   him, sitting in there when I was
8   supposed to be taking dictation, and
9   he would tell me dirty jokes.
10   Q.   How long did this continue?
11   A.   Now, that was in 1970.  It did not
12   continue all quarter.  It probably
13   lasted about half of the quarter.
14   Q.   Did you ever report it to anybody?
15   A.   His secretary asked me what is he
16   doing in there with you, and I told
17   her.  And she said that's what I
18   thought.  Do not come back here, and I
19   promise you you'll have A in the
20   course.
21   Q.   Did you ever tell him to stop during
22   the time frame of the harassment?
23   A.   I told him, I said, you know I've

68  (Pages 266 to 269)

BARBARA M. JEFFERS - 10/15/2007

### Page 270

```
1    heard of the boss chasing the
2    secretary around the table -- around
3    the office, but this is a bit
4    ridiculous.
5    Q.   Did you ever ask him to stop?
6    A.   Yes.
7    Q.   Did you use the word "stop"?
8    A.   I don't know that I used the word
9    "stop." I don't know what I said to
10   him.
11   Q.   In your mind what you just told me
12   about, your little analogy, was that
13   you telling him to stop?
14   A.   Yes.
15   Q.   Is that your method of communication
16   in terms of saying one thing, but
17   meaning the other? Is that a pattern
18   you use?
19   A.   Well, no. Because if it happens to
20   be, like, someone who is over me in a
21   supervisory position, I have a problem
22   with it. But if they're not in a
23   supervisory position over me, I
```

### Page 271

```
1    probably wouldn't have a problem.
2    Q.   With the behavior that was exhibited
3    by Dr. Cantrell?
4    A.   With telling him to stop.
5    Q.   Oh, I see. Okay. So, if someone
6    whose is your boss, you -- your method
7    communication is to use analogy, just
8    to tell stories that don't directly
9    say something but in the mind, you
10   mean what you're trying to say; is
11   that what you did?
12   MR. EDDINS: I object to the
13   form of the question.
14   Q.   You can answer.
15   A.   I don't really understand what you're
16   saying.
17   Q.   All right. I'll move onto from that.
18   Let's -- let's use more information.
19   From 1970, Dr. Cantrell, when is next
20   time you were sexual harassed?
21   A.   I don't remember being sexual harassed
22   on a job. I mean --
23   Q.   How did it come that you and Bill
```

### Page 272

```
1    started dating while you were working
2    for him?
3    A.   We just started dating.
4    Q.   Did that take place during -- during
5    working hours?
6    A.   What working hours?
7    Q.   The initial attraction when you were
8    working for Bill, did that take place
9    during working hours, when you were
10   working for Bill?
11   A.   No.
12   Q.   Who communicated to who first that one
13   of the other was attracted to the
14   other so that it went from simply
15   working to now dating?
16   MR. EDDINS: Object to the
17   form.
18   Q.   You can answer.
19   A.   It was probably mutual.
20   Q.   Well, certainly it wasn't by osmosis,
21   was it?
22   A.   I don't know what you're asking me.
23   Q.   Who asked out who on a date?
```

### Page 273

```
1    A.   Who asked out who on a date?
2    Q.   Yeah.
3    A.   I don't know. I guess Bill asked me
4    out on a date.
5    Q.   Did he ask you out while you were
6    working on a job?
7    A.   I was already dating Bill -- Bill was
8    a dating a friend of mine, and that's
9    how I had been around him some.
10   And what happened was
11   Bill's daddy was dying of cancer, and
12   he had been keeping -- he'd been doing
13   the books. And his daddy asked me --
14   he knew I had a degree in business
15   administration or office
16   administration. Bill asked me, he
17   said, can you help my daddy out?
18   That's how I stopped -- started
19   working for him. I did the payroll
20   for his daddy.
21   Q.   That was 10 years ago; right?
22   A.   Yeah.
23   Q.   Okay. And you told me under oath here
```

69 (Pages 270 to 273)

BARBARA M. JEFFERS - 10/15/2007

Page 274

1  today that you started about
2  four years, correct?
3    A.   Seriously dating him.
4    Q.   Well, how long were you dating before
5  you were seriously dating?
6    A.   I saw Bill a couple of years before
7  that. I would see him.
8    Q.   When you say you saw Bill, what do you
9  mean by that?
10   A.   I mean, I'd go out to his house and
11 watch a ball game or go out to his
12 house and eat.
13   Q.   Did you consider that dating?
14   A.   Sure.
15   Q.   So whether it was a serious dating or
16 not, how long had you been dating
17 Bill?
18   A.   Probably about -- from when?
19   Q.   From now back?
20   A.   From now back, probably about
21 six years.
22   Q.   Do you live by yourself now?
23   A.   No. I live with Bill.

Page 275

1    Q.   How long have y'all been living
2  together?
3    A.   About two and half years.
4    Q.   Whose house do you live in?
5    A.   Bill's.
6    Q.   Who got the house in the divorce
7  between you and Mr. Jeffers?
8    A.   We sold the house.
9    Q.   Where you were living before you moved
10 in with Bill?
11   A.   At 555 Lee Road 251.
12   Q.   Is that the house where you and
13 Mr. Jeffers lived?
14   A.   Well, he's been gone -- he'd been gone
15 alike seven or eight years.
16   Q.   Did you own that house jointly with
17 Mr. Jeffers?
18   A.   Yes.
19   Q.   The address -- the night of July 20th
20 '05, was Mr. Nacrelli in a mean mood?
21   A.   No. I wouldn't say he was in a mean
22 mood.
23   Q.   Did he ever act angry toward you?

Page 276

1    A.   No.
2    Q.   Was his interaction with you always
3  from a jovial standpoint?
4    A.   Yes.
5    Q.   He said a happy guy, isn't he?
6    A.   Oh, yes.
7    Q.   He's full of life?
8    A.   Yes.
9    Q.   Always telling stories?
10   A.   Uh-huh.
11   Q.   Correct?
12   A.   Yes. Yes.
13   Q.   Always telling jokes?
14   A.   Yes.
15   Q.   Very hands-on, isn't he?
16   A.   Not hands-on.
17   Q.   Is he the type person that if he were
18 to meet you for the first time would
19 he give you a hug?
20   A.   I'd say no.
21   Q.   Do you ever give people hugs when you
22 meet them for the first time?
23   A.   Not usually.

Page 277

1    Q.   Would that be offensive to you?
2    A.   It's not offensive. It's just not
3  something I do.
4    Q.   Is it too close for comfort?
5    A.   Well, I mean, it's not even that.
6  It's just not a practice that I --
7  probably don't. I don't hug people.
8  Did I hug you the first time I met
9  you?
10   Q.   No, you didn't.
11   A.   Okay.
12   Q.   I was deeply offended --
13   A.   Oh.
14   Q.   -- because I'm a hugger.
15   A.   Maybe I'll hug you before you leave.
16   Q.   That would be great.
17 So the whole night July
18 20th '05, Mr. Nacrelli was never angry
19 toward you, correct?
20   A.   Correct.
21   Q.   When he got up, in your words, he
22 stumbled over you. Did you make a
23 realization at that time that

70 (Pages 274 to 277)

BARBARA M. JEFFERS - 10/15/2007

Page 278

1  Mr. Nacrelli may have been drunk?
2  A.  It crossed my mind that he might have
3  been or that he was drinking more than
4  I thought he'd been drinking.  I
5  didn't never see him really drinking
6  anything to be honest.
7  Q.  Was he slurring his speech?
8  A.  I didn't really talk to him that much.
9  I had been talking to Jerry and his
10  daughter.
11  Q.  Did you ever see him take off his swim
12  trunks that night?
13  A.  I did not physically see him take them
14  off.
15  Q.  When you turned around and saw him
16  naked, did you see the swim trunks
17  anywhere?
18  A.  I told you I didn't see anything but
19  that.
20  Q.  And what did you see when you saw
21  that?
22  A.  Him standing three in the nude right
23  behind us.

Page 279

1  Q.  And can you describe for us what you
2  saw?
3  A.  Lord, no.
4  Q.  Do you remember?
5  A.  I remember I saw him standing
6  there naked.
7  Q.  But you can't tell me any of the
8  details of what you saw?
9  A.  I didn't look that long.
10  Q.  Did you see anything unusual?
11  A.  No.
12  Q.  Did you see anything that would
13  distinguish him from any other man?
14  A.  No.
15  Q.  And I think you told Sidney when she
16  was asking you questions that you
17  screamed, correct, at that time when
18  you turned around and saw him naked?
19  A.  (The witness nods head.)
20  Q.  Is that correct?
21  A.  Yes, I did.
22  Q.  Did you say anything else at that
23  moment?

Page 280

1  A.  Huh-uh.  Because about that time is
2  when he jumped over my head.
3  Q.  In order to jump over your head,
4  didn't he -- did he touch any part of
5  your body?
6  A.  Yes, he did.
7  Q.  What part of your body did he touch?
8  A.  He put his hand on top of my head and
9  pushed it down like that.
10  Q.  Did he use one hand or two hands?
11  A.  One hand.
12  Q.  As he was jumping over you, did any
13  other part of his body hit you?
14  A.  I do not know.
15  Q.  Did you suffer any injury as a result
16  of that incident?
17  A.  No.
18  Q.  No neck problems?
19  A.  No.
20  Q.  No bruising?
21  A.  No.
22  Q.  No bleeding?
23  A.  No.

Page 281

1  Q.  And who all was present when
2  Mr. Nacrelli jumped over you?
3  A.  As far as I know just me, Mr. Nacrelli
4  and Jerry.
5  Q.  Did you have your camera with you at
6  the time?
7  A.  No.
8  Q.  Where was your camera?
9  A.  It was in my purse.
10  Q.  Where was your purse?
11  A.  In the house.
12  Q.  Do you smoke?
13  A.  Yes.
14  Q.  What kind of cigarettes do you smoke?
15  A.  Marlboro Light 100's.
16  Q.  How long have you smoked?
17  A.  About 30 years.
18  Q.  You ever tried to quit?
19  A.  No.
20  Q.  Were you trying to quit smoking around
21  the time of this incident?
22  A.  No.
23  Q.  When is the last time you tried to

71  (Pages 278 to 281)

BARBARA M. JEFFERS - 10/15/2007

|  | Page 282 |
|---|---|
| 1 | quit? |
| 2 | A.   I guess when I quit for a year one |
| 3 | time. It's been a while. |
| 4 | Q.   How many years would you say? |
| 5 | A.   Ten. |
| 6 | Q.   When you try to quit, does it cause |
| 7 | you stress in your life? |
| 8 | A.   Yeah. Probably. Yes. I would say -- |
| 9 | I mean, I wear the patch and stuff. |
| 10 | Q.   Was there any other touching that |
| 11 | night besides the three pinches and |
| 12 | when he sat behind you and then |
| 13 | touched your head? |
| 14 | A.   No. |
| 15 | Q.   And was there any other touching at |
| 16 | any time during Mr. Nacrelli touching |
| 17 | you? |
| 18 | A.   Other than the incident at school when |
| 19 | he picked me up and bit me. |
| 20 | Q.   Right. Is that it? |
| 21 | A.   Uh-huh. |
| 22 | Q.   Is that a yes? |
| 23 | A.   Yes. I'm sorry. |

|  | Page 283 |
|---|---|
| 1 | Q.   Do you think at the time that |
| 2 | Mr. Nacrelli leapfrogged you, for a |
| 3 | lack of a better term, we'll call it |
| 4 | the leapfrog incident? |
| 5 | A.   Good words. |
| 6 | Q.   Do you know one way or the other |
| 7 | whether Mr. Nacrelli knew what he was |
| 8 | doing at that point in time? |
| 9 | A.   I don't understand that question. |
| 10 | Q.   That's a fair comment. |
| 11 | Let me put it this way: |
| 12 | Have you ever been so intoxicated you |
| 13 | didn't know what you were doing? |
| 14 | A.   No. |
| 15 | Q.   You've never gotten to the point where |
| 16 | you kind of go to a second level of |
| 17 | consciousness in your whole life? |
| 18 | A.   I have never taken off my clothes or |
| 19 | done anything like that, if that's |
| 20 | what you're asking. I've not |
| 21 | been that drunk. |
| 22 | Q.   So high on alcohol that you do things |
| 23 | that you wouldn't normally do, have |

|  | Page 284 |
|---|---|
| 1 | you? |
| 2 | A.   Probably at some point. I probably |
| 3 | have done something that I wouldn't |
| 4 | have ordinarily done, yes. Probably |
| 5 | anybody that drinks has. |
| 6 | Q.   That's fair. And that's what I'm |
| 7 | asking you. Do you know one way or |
| 8 | the other whether Mr. Nacrelli was in |
| 9 | that state at the time? |
| 10 | A.   I don't know. I promise you I do not |
| 11 | know. I don't know how -- what he had |
| 12 | drunk. I don't know how much he |
| 13 | drank. |
| 14 | Q.   Did the way that he touched you that |
| 15 | night, was it in any way physically |
| 16 | harmful to you? |
| 17 | A.   I did not have any physical effects |
| 18 | from him pushing my head down. But he |
| 19 | did still weigh about 200 pounds. So |
| 20 | when he like leapfrogged over me and |
| 21 | he pushed my head down, I mean, it |
| 22 | wasn't a pleasant feeling. |
| 23 | Q.   But were you physically harmed? |

|  | Page 285 |
|---|---|
| 1 | A.   I was not physically harmed in any |
| 2 | permanent way, no. |
| 3 | Q.   You were embarrassed? |
| 4 | A.   I was very embarrassed. |
| 5 | Q.   Did you suffer any other emotions |
| 6 | besides embarrassment at that point in |
| 7 | time when he leapfrogged you? |
| 8 | A.   At that point in time? |
| 9 | Q.   Yes, ma'am. |
| 10 | A.   I was very embarrassed. I was |
| 11 | embarrassed for myself. I was |
| 12 | embarrassed for his wife. And |
| 13 | immediately I felt like that I did not |
| 14 | -- first thought really after that it |
| 15 | went through my mind was, I don't know |
| 16 | how I'm going to work with this man |
| 17 | the next year. |
| 18 | Q.   And that was -- you were thinking that |
| 19 | the July 20 '05; is that correct? |
| 20 | A.   Or the night of the party. I don't |
| 21 | know what night that was. |
| 22 | Q.   Whichever it is; is that correct? |
| 23 | A.   Yeah. |

72 (Pages 282 to 285)

BARBARA M. JEFFERS - 10/15/2007

| Page 286 | Page 288 |
|---|---|
| 1   Q.   Okay.  Do you have a psychiatrist or a | 1   from him or any words or feeling you |
| 2   psychologist that you've seen in your | 2   got from him that he was out of the |
| 3   lifetime? | 3   ordinary? |
| 4   A.   No. | 4   A.   No. |
| 5   Q.   As a result of the sum total of all | 5   Q.   Or that he was mad at you? |
| 6   the incidences we've talked about | 6   A.   No. |
| 7   today -- your complainants, in terms | 7   Q.   Is it possible that the act of his |
| 8   of Mr. Nacrelli, have you ever gone to | 8   lips touching the area of clothing |
| 9   see a psychiatrist or a psychologist? | 9   around your breast could have been |
| 10   A.   No. | 10   accidental? |
| 11   Q.   The only two physicians you've gone to | 11   A.   No. |
| 12   see are the physicians you told Sidney | 12   Q.   And why do you say that? |
| 13   about, in terms of St. Francis and the | 13   A.   Because he said, I guess I shouldn't |
| 14   other medical records that we've | 14   have done that.  He immediately |
| 15   introduced today; is that correct? | 15   realized he shouldn't have done it. |
| 16   A.   Yes. | 16   Q.   Do you know whether or not he was |
| 17   Q.   All right.  Let's go onto the Katrina | 17   referring to the -- the lips touching |
| 18   incident, when you say Mr. Nacrelli | 18   the cloth around your breast or the |
| 19   bit your breast.  Okay. | 19   actual act of him picking you up? |
| 20   A.   Okay. | 20   A.   He was referred to biting me. |
| 21   Q.   Did Mr. Nacrelli bare his teeth? | 21   Q.   And how do you know? |
| 22   A.   No. | 22   A.   Because he did it and immediately said |
| 23   Q.   Was it more his lips or his teeth that | 23   it. |

| Page 287 | Page 289 |
|---|---|
| 1   touched your clothing? | 1   Q.   Did you have any fear of physical harm |
| 2   A.   Like lips.  He -- there was a little | 2   when he picked you up? |
| 3   nip to it. | 3   A.   No. |
| 4   Q.   Did you have any bruising? | 4   Q.   Did you have any fear of physical harm |
| 5   A.   No. | 5   when his lip touched the cloth around |
| 6   Q.   Any bleeding? | 6   your breast? |
| 7   A.   No. | 7   A.   Physical harm? |
| 8   Q.   Any injury at all? | 8   Q.   Physical harm. |
| 9   A.   No. | 9   A.   No. |
| 10   Q.   Was Mr. Nacrelli being playful when he | 10   Q.   How long did that whole episode take |
| 11   picked you up? | 11   place -- the biting and the oh, no, I |
| 12   MR. EDDINS:  Object to the | 12   shouldn't have done it, all that |
| 13   form. | 13   together -- how long did that take? |
| 14   A.   I suspect so, yeah. | 14   A.   Less than probably 10 seconds, if I |
| 15   Q.   Was he trying to punish you in any | 15   had to guess. |
| 16   way? | 16   Q.   Were you embarrassed? |
| 17   A.   No. | 17   A.   Of course. |
| 18   Q.   Was he being his usual jovial self? | 18   Q.   Any other emotion you felt besides |
| 19   A.   Well, he'd never pick me up in his | 19   embarrassment? |
| 20   usual jovial self. | 20   A.   Humiliated again. |
| 21   Q.   Well, let's put it this way:  Aside | 21   Q.   Any other besides humiliation and |
| 22   from the fact that he picked you up, | 22   embarrassment? |
| 23   was there anything from a vibe you got | 23   A.   I was angry, too. |

73 (Pages 286 to 289)

BARBARA M. JEFFERS - 10/15/2007

Page 290

1  Q.  In dealing with these emotions,
2  embarrassment, humiliation, and anger,
3  what did you say to Mr. Nacrelli?
4  A.  I said, no, you shouldn't have done
5  it.
6  Q.  Anything else?
7  A.  No.
8  Q.  Have you ever touched Mr. Nacrelli?
9  A.  No -- well, touched him how?
10  Q.  In any way?
11  A.  I did kiss him on the cheek one day.
12  I think it was in the lunchroom when
13  he was sitting at the table.  Because
14  I have forgotten what it was that we
15  wanted to do, and I kissed him on the
16  cheek and said thank you.
17  Q.  Was this before July of 2005?
18  A.  Yes.
19  Q.  Have you kissed other coworkers on the
20  cheek?
21  A.  Yes.
22  Q.  Who have you kissed?
23  A.  I've kissed Brenda Coley on the cheek.

Page 291

1  I've probably kissed Nuria Chaparro on
2  the cheek.
3  Q.  Is kissing to you on the cheek, is
4  that a method by which you can show
5  affection?
6  A.  Yes.
7  Q.  Were you fond of Mr. Nacrelli?
8  A.  Fond of him?
9  Q.  Yes.
10  A.  Not at that time.
11  Q.  At any time?
12  A.  I wasn't fond of him, no.  I wouldn't
13  say fond was a good word.
14  Q.  How would you describe your
15  relationship with Mr. Nacrelli before
16  July of 2005?
17  A.  That's a hard question.  I didn't -- I
18  didn't know him that well as a
19  teacher, you know.  I mean, I liked
20  him pretty much as a teacher then.
21  And when Jerry had the baby, when she
22  was pregnant, I was glad they were
23  having a baby.

Page 292

1  And then after that until
2  it got to where the sexual harassment
3  escalated, you know my feelings for
4  him started changing.
5  I was really beginning to
6  get apprehensive about being around
7  him and fearful also.  It seemed that
8  the more weight he lost, the more his
9  sexual harassment escalated, and that
10  began to be a concern for me.
11  Q.  Did the escalation of the sexual
12  harassment coincide with his weight
13  loss?
14  A.  Yes.
15  Q.  Was his weight loss during the summer
16  of '05?
17  A.  No.  It was the year before, too.
18  Q.  Okay.  It would have been the school
19  year, 2004/2005?
20  A.  Correct.
21  Q.  Prior to that time, was there any
22  sexual harassment at all?
23  A.  There was sexual harassment as far as

Page 293

1  the comments and the things he would
2  say about his wife and about his
3  father and about the parties.  It was
4  bragging -- a lot of sexual bragging.
5  Q.  Did you ever engage in sexual
6  bragging?
7  A.  No.
8  Q.  Either with or without Mr. Nacrelli?
9  A.  No.
10  Q.  Even amongst your close friends --
11  female friends at the school?
12  A.  No.
13  Q.  Did you ever see -- I'm sorry, were
14  you physically present when chicks
15  with dicks comment was made?
16  A.  No.
17  Q.  Who told you about the chicks with
18  dicks comment?
19  A.  Glen Lewis.
20  Q.  Glen Lewis?
21  A.  Uh-huh.  Yes.
22  Q.  And the chicks with dicks comment was
23  not directed towards you, was it?

74 (Pages 290 to 293)

BARBARA M. JEFFERS - 10/15/2007

Page 294

1   A.   No.
2   Q.   Had nothing to do with you, did it?
3   A.   No.
4   Q.   You testified on 9-21-05 -- this is
5   pursuant to the notes you made that
6   Mr. Nacrelli made a comment that I
7   hear that all the time in response to
8   another teacher saying that her trash
9   can was to big?
10  A.   Right.
11  Q.   Were you present for that?
12  A.   Yes.  He looked at me and said it.
13  Q.   Who was the teacher?
14  A.   It was Rose Fowles, the secretary.
15  Q.   Did he use any explicit language
16  during that conversation?
17  A.   No.
18  Q.   He didn't describe any male or female
19  genitalia during that conversation?
20  A.   No.
21  Q.   Did he use any foul language?
22  A.   No.
23  Q.   The 9-19-05, what it says about the

Page 295

1   Playgirl picture, was that the dicks
2   with chicks?
3   A.   Yes.
4   Q.   All right.  You were not involved with
5   that, correct?
6   A.   No.
7   Q.   All right.  Is that correct that you
8   were not involved?
9   A.   That's correct.
10  Q.   All right.  The 9-20-05 comment that
11  you attributed to Mr. Nacrelli that I
12  can't believe no one has charged me
13  with sexual harassment.  Because I
14  know I have said the inappropriate
15  things.  Were you present when that
16  statement was made?
17  A.   No.
18  Q.   Was that statement in any way directed
19  toward you?
20  A.   No.
21  Q.   Were you referenced in that
22  conversation at all?
23  A.   No.

Page 296

1   Q.   Who told you about that comment?
2   A.   Minyon Thornton?
3   THE COURT REPORTER:  Say that
4   again?
5   THE WITNESS:  M-I-N-Y-O-N,
6   Thornton.
7   Q.   And who is Minyon Thornton?
8   A.   A fourth grade teacher.
9   Q.   Is she still there?
10  A.   No.
11  Q.   Are you still at Ladonia Elementary
12  School?
13  A.   Yes.
14  Q.   The same building?
15  A.   Yes.
16  Q.   Where all of this took place?
17  A.   Yes.
18  Q.   You work there everyday?
19  A.   Yes.
20  Q.   And you've been working there
21  consistently every day since July -- I
22  guess September of 2005?
23  A.   Yes.

Page 297

1   Q.   All right.  All right.  9-6-05, you
2   testified about a school bus stop
3   being too short.  You were attempting
4   to make the stop fit, and you made a
5   comment about the stop being too
6   short.  Mr. Nacrelli responded, I
7   don't like it when you say I'm too
8   short and Bill does not either.
9   Who was present during
10  that conversation?
11  A.   It wasn't a school bus stop now.
12  Q.   I'm sorry.  Correct me.
13  A.   It was the front door of the school.
14  Q.   A doorstop?
15  A.   A doorstop.
16  Q.   Is that right?
17  A.   Right.
18  Q.   But it was the same incident; right?
19  A.   Right.
20  Q.   The same date?  The same --
21  A.   Right.
22  Q.   Okay.  Who was present during the
23  doorstop about being too short?

75 (Pages 294 to 297)

BARBARA M. JEFFERS - 10/15/2007

Page 298

```
1    A.   He and I, the kids that were going
2    out, and I don't remember specifically
3    who any of the children were. But
4    they were young children --
5    kindergarten children.
6    Q.   Any other adults?
.7   A.   No.
8    Q.   Did he I use any foul language?
9    A.   No.
10   Q.   Did he describe any male or female
11   genitalia?
12   A.   No.
13   Q.   Okay. At any time from beginning to
14   end has Mr. Nacrelli ever asked you
15   for sex?
16   A.   No.
17   Q.   Has he ever tried to kiss you?
18   A.   No.
19   Q.   Has he ever grab your genitalia?
20   A.   No.
21   Q.   All right. The 8-10 incident about
22   little Andrew, who -- if I'm
23   remembering, a kindergarten student?
```

Page 299

```
1    A.   Right.
2    Q.   He was carrying him through the
3    hallway?
4    A.   Right.
5    Q.   You were present for that?
6    A.   Yes.
7    Q.   Who else was present?
.8   A.   Sherry Huckabee.
9    Q.   Did he use any foal language?
10   A.   No.
11   Q.   Did he describe his wife's breast
12   anatomically correct as breasts?
13   A.   Yes.
14   Q.   He didn't use the word boobs or any --
15   A.   No.
16   Q.   Other vulgar terms for female breasts;
17   is that correct?
18   A.   That's correct.
19   Q.   You, yourself, in the past on the
20   school grounds, to other school
21   employees have talked about your
22   genitalia, correct -- or the female
23   genitalia in general; have you not?
```

Page 300

```
1    A.   Are you referring to the joke?
2    Q.   Yes.
3    A.   Yes. Well, I refer to a joke, not --
4    Q.   And when you use the pussy in the
5    joke, you're talking about female
6    genitalia not a pussycat, correct?
7    A.   Right.
8    Q.   Did you call the police the night of
9    July 20, 2005?
10   A.   No.
11   Q.   Were you there when the police arrived
12   at that party?
13   A.   I was there.
14   Q.   Did you talk to the police?
15   A.   No.
16   Q.   Did you even know they were there?
17   A.   No.
18   Q.   But you found out sometime later?
19   A.   I found out that night after the
20   police left.
21   Q.   At any time did you ever call the
22   police to report any incidence you
23   testified to that involved
```

Page 301

```
1    Mr. Nacrelli?
2    A.   No.
3    Q.   When everyone was leaving the party
4    and you, yourself, were attempting to
5    leave with your lawn chair, did
6    Mr. Nacrelli force you to stay?
7    A.   No.
8    Q.   Didn't even ask you to stay?
9    A.   No.
10   Q.   Could you have left at that time if
11   you wanted to?
12   A.   Yes.
13   Q.   At any time was Jerry Nacrelli ever
14   your boss?
15   A.   Was she what?
16   Q.   Ever your boss?
17   A.   No.
18   Q.   Did she ever have the authority to
19   hire or fire with respect to you?
20   A.   No.
21   Q.   Or any employees at Ladonia
22   Elementary?
23   A.   No.
```

76 (Pages 298 to 301)

BARBARA M. JEFFERS - 10/15/2007

Page 302

1  Q.  The DVD incident about the teacher's
2  crouch and the breasts showing up on
3  the first part of the DVD that the
4  kids were watching, you don't think
5  that was intentional on Mr. Nacrelli's
6  part, do you?
7  A.  No.  Not for it to show up on the
8  disk, I don't.
9  Q.  That DVD had nothing to do with you,
10  did it?
11  A.  No.
12  Q.  It wasn't directed at you, was it?
13  A.  No.
14  Q.  He never made you watch it, did he?
15  A.  No.
16  Q.  And you did not appear on that DVD?
17  A.  No.
18  Q.  Did he ever take pictures of your
19  crotch?
20  A.  I hope not.
21  Q.  Do you know if he did?
22  A.  No.
23  Q.  Did he ever take pictures of any other

Page 303

1  part of your body?
2  A.  I'm sure he probably took a picture of
3  me at some time maybe at school for
4  something.  I don't know.
5  Q.  Let's limit it to the incident to the
6  incident that we're about when he went
7  around with the videocamera?
8  A.  No, he did not.
9  Q.  Did he videotape you in any way?
10  A.  No.
11  Q.  What is Sherry Huckabee's position
12  there?
13  A.  She's the reading coach.
14  Q.  Is she still there?
15  A.  Yes.
16  Q.  Did you ever at any time before you
17  went to see Dr. Lee, on whatever date
18  it was -- I think it was September
19  20th, '05, complain to Mr. Nacrelli
20  that he was sexual harassing you?
21  A.  No.
22  Q.  At any time before September 20th '05,
23  when you went to see Dr. Lee, did

Page 304

1  Mr. Nacrelli ever act toward you in
2  any rude or angry?
3  A.  Yes.
4  Q.  Describe those times to me.  How would
5  you describe that -- strike that.
6  The compound question is:
7  Were you --
8  Let me phrase it this
9  way:  Prior to your last -- I'm sorry,
10  September 20th, '05, did Mr. Nacrelli
11  ever act toward you in an angry way?
12  A.  Yes.
13  Q.  Tell me about that?
14  A.  There were a couple of times.  There
15  was once when Mr. Nacrelli was first
16  principal there, there was a student
17  who had multiple disabilities, and his
18  grandmother had custody of him --
19  well, she didn't really have custody,
20  but she was the one that would come up
21  to school.  He was Special Ed.  And
22  there might have been some rules and
23  regulations that weren't being

Page 305

1  followed at the time or something.
2  Mr. Nacrelli said that he -- he was
3  afraid it was going to go to court.
4  And he said to me, if it goes to
5  court, we're going to lie.  I said,
6  no, I'm not.  I'm not going to perjure
7  myself for anybody.  That made him
8  angry with me.
9  Then there was another
10  time later on, probably in the year
11  '04/'05.  And I don't even what the
12  incident was about, except I remember
13  that it took place in the office.  And
14  there were a number of people in the
15  office.  I do remember that -- I
16  believe Ms. Fowles was in there and
17  Deanna Peck, who was a teacher that's
18  not there, she's -- at this time and
19  several other people.
20  And it was another
21  incident like that and he made some
22  comment along those lines.  And I said
23  no, I'm not going to do that.  And he

77  (Pages 302 to 305)

BARBARA M. JEFFERS - 10/15/2007

Page 306

1   said I would have expected you to say
2   that.  And I said I'll take that as a
3   compliment.
4            And then later he came
5   down to my office and said, you know I
6   was just teasing.  And I said no, you
7   weren't teasing not when you said it.
8   Q.   Did you ever report either incident to
9   anybody at that school?
10  A.   No.
11  Q.   Who was present for the first
12  incident?
13  A.   Just me and Mr. Nacrelli.
14  Q.   What about the second incident?
15  A.   Well, like I said, Ms. Fowles,
16  Deanna Peck was in there.  There were
17  four or five people in there.  I don't
18  remember.
19  Q.   But you know Ms. Fowles was?
20  A.   I believe she was.  There were --
21  Q.   And who else besides yourself and
22  Mr. Nacrelli?
23  A.   I do remember Deanna Peck was in

Page 307

1   there.
2   Q.   Chaparro, did she change her name?
3   A.   She did.  Well, Chaparro is her name
4   -- was her married name.
5   Q.   But did she change her first name?
6   A.   She did.
7   Q.   Why did she change her first name?
8   A.   You'd have to ask her that.
9   Q.   Do you know?
10  A.   I believe it has something to do with
11  her meditation.
12  Q.   Did she convert to being a Buddhist or
13  a Muslim?
14  A.   No, she did not.
15  Q.   Well, she legally changed her first
16  name?
17  A.   Uh-huh, Lisa.
18  Q.   What was her original name?
19  A.   Ann -- Ann.
20  Q.   And her maiden name?
21  A.   Murphy.
22  Q.   Is she a good friend of yours?
23  A.   Uh-huh.  She is.

Page 308

1   Q.   Does she still work at the same
2   school?
3   A.   She does.
4   Q.   Same position?
5   A.   Yes.
6   Q.   Is the school still allotted a
7   counselor and a half like it was in
8   '05?
9   A.   Yes.
10  Q.   So, she works a half day?
11  A.   Yes.
12  Q.   In the mornings?
13  A.   Yes.
14  Q.   Just like she did back in '05,
15  correct?
16  A.   Yes.
17  Q.   And you work a full day?
18  A.   Yes.
19  Q.   All right?
20  MR. WILLIAMS:  Sidney, what
21  exhibit is the schedule?
22  MS. SMITH:  9 -- it is the
23  second page of 9.

Page 309

1   THE WITNESS:  I need to take
2   another bathroom break.
3   MR. WILLIAMS:  That's fine.
4   (Brief recess was taken at.
5            5:04 p.m., and deposition
6            testimony reconvened at
7            5:23 p.m.)
8   Q.   Ms. Jeffers, can you tell me how you
9   contend Mr. Nacrelli retaliated
10  against you?
11  A.   Yes.  I feel like he retaliated
12  against me on this schedule that he
13  made for one thing.
14  Q.   Yes, ma'am.
15  A.   By combining those classes, making my
16  schedule instead of letting me make
17  it, giving me grades that I had not
18  had before.  That's -- that's one way
19  I think he did.
20  Q.   Yes, ma'am.  Is there any other way
21  you contend Mr. Nacrelli retaliated
22  against you?
23  A.   Well, another thing that the State

78  (Pages 306 to 309)

Page 310

1  Curriculum Guide says that a counselor
2  should not have any more extra duty
3  assignments than the teacher.
4  You're yawning.
5  Q.  I'm sorry. It's not because -- it's
6  not you. It has nothing to do with
7  you. It's because it's been a long
8  day.
9  A.  Okay. So he had me on what's called
10 the Building Based Committee, which is
11 a B committee. And I was the building
12 test coordinator, which is probably
13 the single most important and time
14 consuming, stressful outside
15 assignment that you can have.
16 I was on the Promotion
17 and Retention Committee. I was in
18 charge of doing Character Ed on the
19 intercom every morning. I had to do
20 the sign outside. And then he had me
21 doing dances. He has the counselors
22 down for that. I also was the
23 building spelling bee coordinator and

Page 311

1  I had the student council.
2  MR. WILLIAMS: Sidney, can you
3  pass me one of these --
4  A.  An Awards Day.
5  Q.  Awards Day?
6  A.  Uh-huh.
7  Q.  Anything else?
8  A.  That's about all I can think of right
9  now.
10 Q.  All these duties were given to you
11 when?
12 A.  Oh, 2005, 2006.
13 Q.  Which would have been -- I guess it
14 was the first date you had to actually
15 do any of these duties if you were to
16 refer to these school calendar?
17 MS. SMITH: The school
18 calendar?
19 MR. WILLIAMS: Yes.
20 MS. SMITH: No. Huh-uh.
21 A.  Well, I had to start doing them
22 immediately with Character Ed and the
23 sign outside.

Page 312

1  Q.  When you say immediately, what day
2  would that have been?
3  A.  The first day the kids came back.
4  Q.  Which was what time?
5  MR. EDDINS: August --
6  A.  The 8th, I believe.
7  Q.  August the 8th?
8  A.  It was the 8th.
9  Q.  And at that point, August the 8th, had
10 you reported anything to Mr. Nacrelli
11 about sexual harassment?
12 A.  To Mr. Nacrelli?
13 Q.  Yes, ma'am.
14 A.  No.
15 Q.  On that date, August the 8th, had you
16 reported anything Dr. Lee about sexual
17 harassment?
18 A.  No.
19 Q.  Do you have any evidence, sitting here
20 today; written, oral, or otherwise
21 that Mr. Nacrelli knew that she had a
22 problem with sexual harassment with
23 him as of August 8, 2005?

Page 313

1  A.  Do I have anything written, or oral?
2  Q.  Or otherwise?
3  A.  That -- or otherwise?
4  Q.  Yes, ma'am.
5  A.  Just that it was done differently than
6  it had been done in the previous years
7  that he's been there since 2001.
8  Q.  And that's it in terms of your
9  knowledge that Mr. Nacrelli knew that
10 you had a problem with him sexually
11 harassing you? It's a hard question?
12 A.  Say it one more time, please?
13 Q.  Is it the sum total of your knowledge
14 and evidence that Mr. Nacrelli, as of
15 August 8, '05, knew that you had a
16 problem with him sexually harassing
17 you, the fact that he changed things,
18 in terms of the way things had been
19 done in the past; is that correct?
20 A.  Correct.
21 Q.  In other words, you never told him
22 Mr. Nacrelli, I've got a problem with
23 you sexually harassing me. And the

79 (Pages 310 to 313)

BARBARA M. JEFFERS - 10/15/2007

Page 314

1  next day all your duties changed?
2  A.  No.
3  Q.  Or has he ever told you, well, I can
4  tell you don't like my advances and
5  I'm going to fix. And then the next
6  day all your duties changed?
7  A.  No.
8  Q.  Are you just assuming that your duty
9  change was in retaliation for -- - I
10  guess for what?
11  A.  I think my duty change --
12  Mr. Nacrelli, after he exposed himself
13  and did that -- it's hard to explain.
14  But that would be -- no, he would not
15  ever admit that he was wrong or have
16  said anything. In fact, he never did
17  mention it. But he would do things
18  like this -- to continue to want to
19  show me that he is the boss; no matter
20  what.
21  Q.  Did you have a problem with him being
22  an authority figure?
23  It's in a vacuum, take

Page 315

1  out all the sexual harassment
2  allegations, take out everything we
3  talked about in terms of the nonsexual
4  harassment problems you had with
5  Mr. Nacrelli, but just one-on-one, did
6  you have a problem with him being your
7  authority figure?
8  A.  No.
9  Q.  Did you ever complain to Mr. Nacrelli
10  after July 20 '05, about the -- him
11  exposing himself to you incident?
12  A.  No.
13  Q.  Did he ever comment about it to you
14  after July 2005?
15  A.  No.
16  Q.  All right. When did the other changes
17  take place, in terms of the extra
18  duties that you told me about?
19  A.  Oh, goodness.
20  Q.  We talked about Awards Day?
21  A.  Yes.
22  Q.  When did that take place?
23  A.  I'm not sure.

Page 316

1  Q.  Was it a spring or fall event?
2  A.  Awards is a spring; end of the school.
3  Q.  It would not have taken place until
4  '06; is that correct?
5  A.  That's correct.
6  Q.  During that time he's already gone?
7  A.  He was gone, yes.
8  Q.  I'm sorry, I was going to fast?
9  By the spring of '06,
10  Mr. Nacrelli was no longer at the
11  Ladonia school?
12  A.  That is correct.
13  Q.  Okay. Student council, when did that
14  start?
15  A.  I actually did that when Mr. Screws
16  was there.
17  Q.  Would that have been a late fall,
18  early spring event?
19  A.  That's an all-year event.
20  Q.  When do they have that?
21  A.  At the end of August.
22  Q.  When is the spelling bee?
23  A.  In the spring. But I have the school

Page 317

1  spelling bee earlier. You have the
2  school spelling bee and then you go to
3  the district spelling and in between
4  you practice with the kids.
5  Q.  What about the building base
6  committee, when did that start?
7  A.  That's an all-year thing.
8  Q.  Did you actually start doing it while
9  Mr. Nacrelli was there?
10  A.  I can't remember when building -- but
11  first that year.
12  Q.  Emotion and retention committee, what
13  is that?
14  A.  When you get together at the end of
15  the year and you look at the kids that
16  the teachers are wanting to retain,
17  and you decide whether or not to
18  retain them or pass them -- promote
19  them.
20  Q.  So that would have been in spring of
21  '06 duty?
22  A.  Correct.
23  Q.  All right. Intercom would have

80  (Pages 314 to 317)

BARBARA M. JEFFERS - 10/15/2007

Page 318

1  started when the kids got back,
2  correct?
3  A.  Correct.
4  Q.  Did you ever complain to the -- the
5  interest groups that he replaced,
6  Mr. DeCruse?
7  A.  Mr. DeCruse replaced Mr. Screws.
8  Q.  Oh, he did?
9  A.  Uh-huh.
10  Q.  Who took over for Mr. Nacrelli?
11  A.  Jacquelyn Grant, who was the assistant
12  principal, was like the acting
13  principal.
14  Q.  All right.  Well, did you ever
15  complain to Ms. Grant about these
16  extra duties after Mr. Nacrelli left?
17  A.  No.
18  Q.  Why not?
19  A.  I didn't think it did any good.  I
20  already had them.
21  Q.  All these extra duties you just told
22  me about were assigned to you before
23  you ever afforded anything to Dr. Lee;

Page 319

1  is that correct?
2  A.  That's correct.
3  Q.  The schedule that you talked about
4  concerning your counselor student
5  ratio for your large groups.  That
6  schedule is posted before you went to
7  report anything to Dr. Lee, correct?
8  A.  Yes.  It was given out at the first
9  teacher meeting.
10  Q.  How many days do you claim -- strike
11  that.  That's a bad question.
12  Aren't you claiming in
13  this lawsuit that you've lost any
14  income during the trial as a result of
15  the sexual harassment alleged by you
16  because of Mr. Nacrelli?
17  A.  No.  I'm not claiming I've lost income
18  per se.
19  Q.  You are going to be asked at some
20  point during the trial in this case to
21  explain to the jury how you've been
22  damaged.  Can you tell me how you've
23  been damaged?

Page 320

1  A.  Yes.  I feel like I have been damaged
2  my self esteem -- my self esteem has
3  been damaged.  I feel like I've been
4  damaged emotionally.  I think it took
5  a physical toll on me.  I think it
6  caused me some health problems.
7  That's basically what I feel.
8  Q.  Is there anything else?
9  A.  Not that I can think of at this point
10  in time.
11  Q.  And did Sidney cover all the health
12  problems that you are complaining of
13  with the medical records?
14  A.  Yes.
15  Q.  Can you describe for me the physical
16  toll?  Was that the same as the health
17  problem?
18  A.  That's the same.
19  Q.  All right.  The self esteem and the
20  emotional history, are those one in
21  the same or are they two separate
22  items in this case?
23  A.  One in the same.

Page 321

1  Q.  Have you gone to -- and I know I've
2  asked you about psychologists and
3  psychiatrist.  But have you gone to
4  any other counselors, ministers, or
5  pastures to seek treatment for your
6  emotional and self esteem problems
7  you're claiming you've lost?
8  A.  I have talked with Nuria Chaparro on
9  my occasions.  She was a clinical
10  psychologist at one point.
11  Q.  Anybody else?
12  A.  (The witness shakes head.)
13  Q.  Sorry, we're almost done.  The
14  sessions with -- is it Chaparro?
15  A.  Yes.  Chaparro.
16  Q.  With Ms. Chaparro, did you pay for
17  those sessions?
18  A.  No. I did not.
19  Q.  And those were conversations you had
20  with her as a friend?
21  A.  Exactly.
22  Q.  How are you doing now?
23  A.  I'm doing okay.

81 (Pages 318 to 321)

BARBARA M. JEFFERS – 10/15/2007

Page 322

1   Q.   Emotionally, physically?
2   A.   As far as I know.
3   MR. WILLIAMS:  That's all I
4   got.
5   MS. SMITH:  I've got just one
6   follow up.
7   EXAMINATION
8   BY MS. SMITH:
9   Q.   You listed these extra duty
10  assignments.  Let me go over them?
11  How long or when were you first
12  assigned to the BBSST?
13  A.   I've always been on the BBSST because
14  there has to be a counselor on the
15  BBSST.
16  Q.   When you say always would that have
17  been while you were under Mr. Screws,
18  too?
19  A.   Uh-huh.
20  Q.   Okay.  The building test coordinator,
21  how long have you been that?
22  A.   I've always been that.
23  Q.   So that would have been under

Page 323

1   Mr. Screws also?
2   A.   Right.
3   Q.   Promotion and retention committee?
4   A.   I've always been on that, too.
5   Q.   So that's again under Mr. Screws?
6   A.   Right.
7   Q.   Character Education of the intercom,
8   when did that begin?
9   A.   I did that for Mr. Screws.
10  Q.   Screws?
11  A.   Uh-huh.
12  Q.   Had to do the sign outside, when did
13  that begin?
14  A.   Nacrelli.
15  Q.   When?
16  A.   Probably -- 2004/2005.
17  Q.   Okay.  2004/2005?
18  A.   That's a guess.
19  Q.   All right.  It was prior to the
20  2005/2006 school year.  Had you done
21  it at least a year before that?
22  A.   Yes, I think so.
23  Q.   Okay.  Dances, how long have you

Page 324

1   been --
2   A.   That was the first time I had seen
3   dance by my name.
4   Q.   All right.  And what does dance
5   entail?
6   A.   Oh, he wanted the student council --
7   he wanted me to have dances to raise
8   money to sell pizza, and drinks, and
9   dances after school.
10  Q.   Okay.  And that was part of the
11  student council?
12  A.   Well, not really.  But -- No. I
13  wouldn't say it was part of the
14  student council.
15  Q.   Did you have any of those dances?
16  A.   No.  He had the dances or he did -- I
17  don't know who had the dances.  I
18  didn't have the dances this year, I
19  know.  Because --
20  Q.   You didn't have them in 2005/2006?
21  A.   No.  Not after he left, we didn't have
22  them, I don't think.
23  Q.   All right.  How about 2004/2005, did

Page 325

1   you do any dancing?
2   A.   There were dances, yes.
3   Q.   Did you do them?
4   A.   I don't believe I did them that year.
5   Q.   Okay.  Spelling --- - building spelling
6   bee coordinator, when did you first
7   begin that?
8   A.   I think I began that with
9   Mr. Nacrelli.
10  Q.   When?  What year?
11  A.   I don't remember.
12  Q.   Have you done it 2004/2005?
13  A.   Yes.
14  Q.   Had you done in 2003/2004?
15  A.   Yes.
16  Q.   How about 2002/2003?
17  A.   I don't remember doing it that year.
18  Q.   You do remember doing it 2003/2004,
19  2004/2005?
20  A.   Right.
21  Q.   Did you continue to do that in
22  2005/2006?
23  A.   Yes.

82  (Pages 322 to 325)

BARBARA M. JEFFERS - 10/15/2007

Page 326

1  Q.  Under Ms. Grant?
2  A.  Yes.
3  Q.  Okay.  Which I believe you've
4  testified in response to Mr. Williams'
5  question that you never complained to
6  Ms. Grant, correct?
7  A.  I don't remember ever complaining to
8  her.
9  Q.  All right.  When did you begin to do
10 Awards Day?  Would that have been
11 under Mr. Screws?
12 A.  When you say -- well, I did present
13 some certificates and stuff when
14 Mr. Screws was there on Awards Day.
15 Q.  Uh-huh.  Well, how did your duties
16 change?  How did Mr. Nacrelli --
17 A.  We did not get to this point on that
18 year.  I don't remember if my name was
19 on Awards Day the year before.  It
20 probably -- it probably was.
21 Q.  For 2004/2005, it probably was on
22 Awards Day?
23 A.  I'm not sure if it was or not; to be

Page 327

1  honest with you.
2  Q.  Okay.  And you didn't get that far you
3  said on 2005/2006; is that --
4  A.  Huh-uh.  And I did not -- no.  Let's
5  see.
6  Q.  Well, what specifically did he add to
7  your duties in retaliation for your
8  believing that he had sexually
9  harassed you?
10 A.  I believe he added that sign -- the
11 outside sign, the dances.  That's what
12 I believe he added.
13 Q.  All right.  But you said -- you told
14 me just a few minutes ago you began
15 the sign in 2004/2005, so you'd been
16 doing that for a year?
17 A.  Uh-huh.
18 Q.  And you said you never had to do the
19 dances?
20 A.  I didn't do the dances because he was
21 not here.
22 Q.  Okay.
23 A.  And we didn't do dances.

Page 328

1  Q.  Okay.  So then that brings us to the
2  only thing that is left had to do the
3  signs outside and you began that in
4  2004/2005?
5  A.  Right.
6  MS. SMITH:  Okay.  Thank you,
7  ma'am.  That's all I
8  have.
9  MR. EDDINS:  I'm going to have
10 a few for you.
11 EXAMINATION
12 BY MR. EDDINS:
13 Q.  In addition to the dancing, were you
14 assigned other classes by Mr. Nacrelli
15 for 2005/'06?
16 A.  Yes.
17 Q.  Okay.  Mr. Williams asked a question
18 about did Mr. Nacrelli use the
19 appropriate term breasts in front of
20 the child to describe his wife's
21 anatomy.  As an educator is it, in
22 your opinion, appropriate for a
23 principal to state in front of the

Page 329

1  elementary school that his -- how
2  exactly would he say it?
3  A.  That his -- you're not -- you're not
4  hurting me.  My wife's breasts weigh
5  more than you.
6  Q.  Is that appropriate statement for a
7  student?
8  A.  No, sir.
9  Q.  Did he ever say something about his
10 own anatomy?
11 A.  No.  No, sir.
12 Q.  That wasn't related to the drawing,
13 was it?
14 A.  (The witness nods head.)
15 Q.  Did you ever tell the joke about the
16 mouse on your back in front of the
17 children?
18 A.  No.
19 Q.  Is that a generally common among
20 woman?
21 A.  Yes, sir.
22 Q.  For the record now, was the biting of
23 your breasts by Mr. Nacrelli

83 (Pages 326 to 329)

BARBARA M. JEFFERS - 10/15/2007

Page 330

1  consensual?
2  A.   No.
3  Q.   Was the pinching of your behind
4  consensual?
5  A.   No.
6  Q.   Was his appearing naked consensual?
7  A.   No.
8  Q.   Was his pushing your head down and
9  jumping over you naked consensual?
10  A.   No.
11  Q.   Were his crude jokes consensual?
12  A.   No.
13  Q.   Now, Ms. Smith presented -- let me see
14  the exhibits just a second?
15  MR. EDDINS:  Dr. Lee's
16  calendar, did you offer
17  that?
18  MS. SMITH:  No.
19  MR. EDDINS:  Did you just make
20  reference?
21  MR. SMITH:  I think I had
22  supplied it to you at
23  some point in time.

Page 331

1  MR. EDDINS:  Well, I need you
2  to --
3  MS. SMITH:  I did not offer it
4  into evidence.
5  MR. EDDINS:  Okay.
6  Q.   Well, Dr. -- I mean, Ms. Smith
7  represented that on the 20th that
8  Dr. Lee's calendar indicated that you
9  saw -- she saw you and you were at
10  four o'clock, I think.  Was that in
11  error?
12  A.   I believe we saw her earlier.
13  Q.   Now, do you believe that the -- that
14  the dates could be in error, too?
15  A.   It could be.
16  Q.   Now, why do you believe that?
17  A.   It seemed like that he was there like
18  at least about a week and a half or so
19  after I had talked with her.  But I
20  could be wrong about that.  It seemed
21  like that.
22  Q.   Well, the other day -- I'm sorry, I'm
23  jumping around.  But the other day

Page 332

1  Ms. Elliot testified I think that you
2  -- you specifically requested a
3  transfer to Oliver.  Now, would you
4  explain why you did that?
5  MS. SMITH:  Object to the form
6  of the question.  I don't
7  know whether that --
8  whether that's exactly
9  what she testified to.  I
10  don't believe she said
11  that Ms. Jeffers
12  specifically requested a
13  transfer to Oliver?
14  MR. EDDINS:  Okay.  Well,
15  just --
16  MS. SMITH:  Just note my
17  objection.
18  A.   She said that at the time I'd asked
19  that they had already filled the
20  position on that Tuesday night.  I
21  believe is what she said.
22  But the fact of the
23  matter was, I didn't know that the

Page 333

1  position had been filled.
2  And the second thing was,
3  was that that counselor had had brain
4  surgery and actually was not at school
5  for the beginning of the year, at any
6  rate.  And I don't remember when she
7  came back.  But I didn't know that she
8  had been hired, not did I know whether
9  she was in fact, returning from that
10  brain surgery or not.
11  Q.   Well, did you in fact believe that
12  that was the only opening for a
13  counselor in the system at that time?
14  A.   Yes.  I did.  Yes, sir.
15  Q.   Now, when you had transferred
16  previously.  I think Ms. Smith offered
17  some -- indicated that you had written
18  letters requesting a transfer.  Now,
19  in each of those cases, did something
20  proceed the letter writing?
21  A.   Yes.
22  Q.   And what was that?
23  A.   It was the posting of a job opening

84  (Pages 330 to 333)

BARBARA M. JEFFERS - 10/15/2007

Page 334

1  that told you to write a letter.
2  Q.  Did you discuss each of those job
3  offerings with --
4  A.  Yes, I did.
5  Q.  With the administrator?
6  A.  I did, prior to.
7  Q.  Okay.  And once you discussed it the
8  administrator, what were you told?
9  A.  To write a letter requesting the
10  position.
11  Q.  When you discussed it with Ms. Elliot,
12  did she tell you to write a letter?
13  A.  No, sir.
14  Q.  What did she tell you?
15  A.  She told me that Ms. -- oh, gosh.  I
16  can't even think of her name -- no.
17  She told me that the counselor had
18  already been hired.  That she had
19  already been put over there.  She had
20  done transferred -- this counselor had
21  been transferred from the middle
22  school to Oliver.
23  Q.  Did she tell you that she would look

Page 335

1  in and see -- look in and if there was
2  a possibility to transfer?
3  A.  Yes.
4  Q.  Did she ever get back with you?
5  A.  No, sir.
6  Q.  When school started, where did you go?
7  A.  I went to Ladonia.
8  Q.  Back with the man who battered you and
9  exposed himself to you?
10  MR. WILLIAMS: Objection.
11  A.  Yes, sir.
12  Q.  Ms. Smith asked you did ask Dr. Lee
13  about taking a couple of days off when
14  you talked with her.  Did you have any
15  idea in the world how long the
16  investigation might take?
17  A.  No, sir.
18  Q.  For all you knew it might take
19  six-weeks or a year; is that correct?
20  A.  That's correct.
21  Q.  Now, for the record, your office was
22  where in relation to Mr. Nacrelli?
23  A.  It's on the same hallway in the same

Page 336

1  building.  His office, and then you
2  had a teacher's lounge.  And then the
3  janitor's closet and then my room.
4  Q.  Okay.  How many feet would you say it
5  was?
6  A.  40 feet -- 45.
7  Q.  Ms. Smith and Mr. Williams has talked
8  totally in terms of sexual harassment.
9  Does your lawsuit allege that
10  Mr. Nacrelli committed an assault and
11  battery against you when he pinched
12  your behind several times, when he bit
13  your breast, when he pushed your head
14  down and jumped over you naked?
15  MR. WILLIAMS: Object to the
16  form of the question.
17  A.  Is that -- is that --
18  Q.  We're always --
19  A.  Assault and battery, yes.
20  Q.  Okay.  Other incidences, which we
21  discussed earlier that were not
22  discussed here today involved a
23  Jamie Evans.  Now, at the party, what

Page 337

1  were you told Mr. Nacrelli did to
2  Ms. Evans in addition to pushing her
3  in the pool with her clothes on?
4  MS. SMITH: Now, Wait a
5  minute.  We've asked her
6  anything.  I've asked her
7  to tell me everything
8  that has happened.
9  MR. EDDINS: To her.  This
10  didn't happen to her.  It
11  happened to Ms. Evans.
12  MS. SMITH: I think we've
13  asked her for that too,
14  but go ahead.
15  Is it going to be
16  anything else that she
17  hasn't told us?
18  THE WITNESS: No, ma'am.  I
19  don't believe you have
20  ask me about any of the
21  allegations of what he
22  did to other people.
23  MS. SMITH: Okay.

85 (Pages 334 to 337)

BARBARA M. JEFFERS - 10/15/2007

Page 338

1   A.   He allegedly pulled off her bathing
2   suit bottoms and top and chased her
3   with her trying to get them back on.
4   Q.   Okay.  Did she ever ask you did -- had
5   the administration approved this
6   party?
7   To your knowledge, has
8   your principal and new principal of
9   Oliver Elementary, have they both
10  approved the party?
11  A.   Huh-uh.
12  Q.   Were they aware of it?
13  A.   Yes.
14  Q.   Did they both in fact, invite you to
15  the party?
16  A.   Yes.
17  Q.   Okay.  Mr. Williams was asking you
18  about damages.  And you noted stress
19  and humiliation, and those kind of
20  things?
21  Were you discriminated
22  against based upon the facts you're a
23  woman?

Page 339

1   MR. WILLIAMS:  I object to the
2   form of the question to
3   the extent that we
4   covered that previously
5   to the testimony and
6   coaching.  And also to
7   the extent that it calls
8   for a legal conclusion
9   with that objection --
10  MR. EDDINS:  Just go ahead and
11  answer the question.
12  A.   What's the question again?
13  Q.   Were you discriminated because you're
14  a woman?
15  A.   Yes, sir.
16  Q.   Okay.  For the record, did you report
17  the incident when Mr. Nacrelli
18  appeared naked in front of you, pushed
19  your head down and jumped over you,
20  pinched you on the behind several
21  times to Principal Coley the night it
22  happen?
23  A.   Assistant Principal Coley?

Page 340

1   Q.   Coley?
2   A.   I did.
3   Q.   And you're not certain whether she was
4   the principal or assistant principal?
5   A.   Oh, yeah, that's right.
6   Q.   Is that correct?
7   A.   That's correct.
8   Q.   Did you report it -- that incident and
9   requested a transfer board member
10  Elliot within a week of it happening?
11  A.   Yes, sir.
12  Q.   Subsequent to those reports, did the
13  events concluding -- did the event of
14  his biting your breast, did that
15  happen after you reported the previous
16  harassment?
17  Okay.  Maybe I didn't
18  make myself clear.
19  Did he bite you on the
20  breast after you had already reported
21  him doing these other things to
22  Ms. Elliot and Principal Coley?
23  A.   Yes.  I'm getting so tired.

Page 341

1   Q.   Did you report that -- several of
2   incidences we've gone over previously
3   to Dr. Lee?
4   A.   Yes.
5   Q.   After you reported them to Dr. Lee,
6   did she send you right back in the
7   same school with the person who had
8   done all the battering and harassing?
9   MS. SMITH:  Object to the form
10  of the question.  She
11  did.
12  MR. EDDINS:  That's all I
13  have.
14  MR. WILLIAMS:  I've got just a
15  few.
16  EXAMINATION
17  BY MR. WILLIAMS:
18  Q.   The incident with Jamie Evans you
19  talked about where, in your own
20  testimony, she was allegedly chased by
21  Mr. Nacrelli, did you actually witness
22  that incident?
23  A.   No.

86 (Pages 338 to 341)

BARBARA M. JEFFERS - 10/15/2007

| Page 342 | Page 344 |
|---|---|

**Page 342**

1  Q.  Did that incident have anything to do
2  with you?
3  A.  No.
4  Q.  You were not chased around the pool?
5  A.  No.
6  Q.  You never took off any of your
7  clothes?
8  A.  No.
9  Q.  At any time over the four-year period?
10  A.  No.
11  Q.  Who told you about the Jamie Evans
12  incident?
13  A.  I'm not sure; to be honest with you.
14  I don't remember now.
15  MR. WILLIAMS:  That's all I
16  got.
17  EXAMINATION
18  BY MS. SMITH:
19  Q.  Let me introduce this as -- mark this
20  as Defendant's Exhibit 13 and ask you
21  if you know what that is, please,
22  ma'am?
23  (The referred-to document was

**Page 343**

1  marked for identification as
2  Defendant's Exhibit No. 13.)
3  A.  It looks like a sexual harassment
4  policy that is in a policy manual.
5  Q.  And the second page, does it say that
6  it's in the Russell County Board of
7  Education Policy Manual?
8  A.  Where do you see that?
9  Q.  Source, Russell County Board of
10  Education, Phenix City, Alabama?
11  A.  Yes.
12  Q.  Have you ever seen this policy before?
13  A.  No, ma'am.
14  Q.  You've never seen the sexual
15  harassment policy of the
16  Russell County Board of Education?
17  A.  No, ma'am.
18  Q.  Now, I understand that you're very
19  familiar with the laws of FERBER, the
20  laws of DIBELS, and all this stuff.
21  But you've never read the board policy
22  manual?
23  A.  No, ma'am.  But the other things

**Page 344**

1  relate children, and students, and
2  their educational rights.  And I've
3  been sent to conferences for that.
4  Q.  Okay.  This doesn't relate to your
5  rights?
6  A.  It -- it definitely does.
7  Q.  All right.  Let me ask you to look at
8  the bottom of Page 1, Roman Numeral
9  III, Reporting Procedures?
10  A.  Uh-huh.
11  Q.  Read that to me, please, ma'am, for
12  the record?
13  A.  (As read:)  Any employee who feels he
14  or she has been sexually harassed by
15  another employee or student of the
16  school system, should present the
17  complaint directly to the school
18  system Title 9 coordinator, personnel
19  director.  The complaint should be
20  filed as soon as possible after the
21  incident or the latest occurrence, if
22  a series of incidents are involved.
23  Q.  All right.  Did you report this to the

**Page 345**

1  personnel director?
2  A.  No, ma'am.
3  Q.  Is Ms. Coley the personnel director?
4  A.  No.
5  Q.  Is Ms. Elliot the personnel -- the
6  personnel director?
7  A.  No.
8  Q.  Does it say anywhere in here that you
9  can report it to a board member or a
10  -- or a principal of another school?
11  A.  No, ma'am.
12  Q.  All right?
13  A.  Do you know when this was written?
14  Q.  No, ma'am.  I don't.  Are you
15  contending that it has not been
16  adopted until recently?
17  A.  Well, in our teacher handbook for that
18  year when it comes to the part about
19  sexual harassment, there's nothing
20  like that in it.
21  Q.  Okay.  Let's get the teacher handbook
22  for that year.  What page?
23  A.  Page 39A and 39B.

BARBARA M. JEFFERS - 10/15/2007

Page 346

1    Q.   All right. Look at the top of
2  Page 39A --
3    A.   Uh-huh.
4    Q.   And tell me what the subject of this
5  memorandum is?
6    A.   It says student-to-student sexual
7  harassment.
8    Q.   All right. Does it say anything about
9  student -- about employee sexual
10  harassment?
11    A.   No, ma'am. But as a matter of fact,
12  there's nothing in our teacher
13  handbook that we're given about that
14  sort of thing.
15    Q.   Are you disputing that the Russell
16  County Board of Education had a policy
17  on sexual harassment for the year
18  2005/2006?
19    A.   I'm just asking a question.
20    Q.   No, ma'am. I'm asking you. I'm
21  asking the questions? Are you --
22    A.   I don't know. I don't know. That's
23  why I asked.

Page 347

1    Q.   All right. Are you saying that the
2  board did not have a policy for
3  2004/2005?
4    A.   I don't know.
5    Q.   But you're telling me today and it's
6  going to be your testimony in court
7  that you've never seen a sexual
8  harassment policy?
9    A.   That's correct.
10    Q.   Okay.
11  MS. SMITH: Let me introduce
12  that into evidence.
13  MR. WILLIAMS: No objection.
14  MS. SMITH: All right.
15  MR. EDDINS: No objection.
16  MS. SMITH: I have no further
17  questions.
18  EXAMINATION
19  BY MR. EDDINS:
20    Q.   Okay. Ms. Jeffers, I'm going to
21  direct your attention to something
22  that is called -- would you just read
23  what is on the cover of this booklet?

Page 348

1    A.   Student Academic Plan of Statement of
2  Responsibilities. It's a handbook for
3  school personnel, parents and
4  students, 2007-2008.
5    Q.   Do y'all get one of these each year?
6    A.   Yes, sir.
7    Q.   And I'm not going to introduce the
8  entire booklet. And, of course, this
9  is the wrong year. But we're going --
10  this is the most recent one and we'll
11  be starting at trial without all of
12  the years?
13       (The referred-to document was
14        marked for identification as
15        Plaintiff's Exhibit No. 1.)
16  MS. SMITH: And I'm going to
17  object to the
18  admissibility of the
19  booklet that's not for
20  the year in question.
21    Q.   Okay. Could you just -- if you would
22  then, I'll just ask you -- or I asked
23  for ever policy that related to sexual

Page 349

1  harassment?
2  MS. SMITH: Uh-huh.
3  MR. EDDINS: And I did not
4  receive this. I had to
5  get it through my
6  clients.
7  MS. SMITH: Okay.
8  MR. EDDINS: Will you get me
9  one for 2005/2006?
10  MS. SMITH: Does it contain a
11  policy on sexual
12  harassment?
13  MR. EDDINS: It has the very
14  same language.
15  MS. SMITH: That is in this
16  one?
17  MR. EDDINS: No. I'm going to
18  read right now.
19  MS. SMITH: Okay. All right.
20  MR. EDDINS: If you'll bring
21  that, we can introduce it
22  during Ms. Craig's
23  testimony tomorrow.

88 (Pages 346 to 349)

BARBARA M. JEFFERS - 10/15/2007

| Page 350 |
|---|
| 1    (The referred-to document was |
| 2       marked for identification as |
| 3       Defendant's Exhibits |
| 4       Nos. 14 and 15.) |
| 5    MS. SMITH:  Okay. |
| 6    MR. EDDINS:  But we're going |
| 7    to go ahead and read it |
| 8    right now. |
| 9    Q.    I'm going to represent to you that |
| 10   this is on Page 37 of Handbook For |
| 11   School Personnel and Parent and |
| 12   Students? |
| 13   Now, I have marked the |
| 14   paragraph.  Would you just read that |
| 15   paragraph? |
| 16   A.    Same person, employee or student who |
| 17   alleges sexual harassment by a staff |
| 18   number or a student in the school |
| 19   district may file a complaint with the |
| 20   principal. |
| 21   Q.    With the principal?  Okay.  Go ahead? |
| 22   A.    In addition, each school shall |
| 23   designate one male and one female |

| Page 352 |
|---|
| 1    A.    To the principal. |
| 2    MR. EDDINS:  I'm going to |
| 3    offer this as Plaintiff's |
| 4    Exhibit 1. |
| 5    MS. SMITH:  And I'm going to |
| 6    object until we determine |
| 7    that it's in the book |
| 8    that's -- for the year in |
| 9    question. |
| 10   MR. EDDINS:  Could we just |
| 11   substitute it tomorrow? |
| 12   MS. SMITH:  All right. |
| 13   Q.    Ms. Jeffers, would you have felt |
| 14   uncomfortable reporting the sexual |
| 15   harassment to the person who was doing |
| 16   the harassing? |
| 17   A.    Yes, sir. |
| 18   Q.    Do you think it would be futile to |
| 19   report that? |
| 20   A.    Yes, sir. |
| 21   Q.    So you reported it to other people |
| 22   because of that? |
| 23   A.    Yes, sir. |

| Page 351 |
|---|
| 1    employee to whom complaints may be |
| 2    made. |
| 3    The districts shall |
| 4    publish policy and the |
| 5    student/facility handbooks annually. |
| 6    Following a complaint or otherwise |
| 7    reported, sexual harassment will not |
| 8    reflect upon the individual status, |
| 9    nor will it effect future employment, |
| 10   grades or job assignments. |
| 11   Q.    So it references a teacher's handbook. |
| 12   And what does the teacher's handbook |
| 13   say? |
| 14   A.    To whom? |
| 15   Q.    To whom does the teacher's handbook -- |
| 16   A.    Sexual? |
| 17   Q.    The only thing about sexual |
| 18   harassment? |
| 19   A.    Is the principal? |
| 20   Q.    And what -- who does this policy -- |
| 21   it's in a handbook for school |
| 22   personnel.  Who does that say that you |
| 23   should report? |

| Page 353 |
|---|
| 1    MR. EDDINS:  I don't have any |
| 2    other questions. |
| 3    MS. SMITH:  All right.  We're |
| 4    done. |
| 5    |
| 6    (The deposition of BARBARA M. JEFFERS |
| 7    concluded at approximately 5:06 p.m. |
| 8    on October 15, 2007.) |
| 9    |
| 10   |
| 11   |
| 12   |
| 13   |
| 14   |
| 15   |
| 16   |
| 17   |
| 18   |
| 19   |
| 20   |
| 21   |
| 22   |
| 23   |

89  (Pages  350 to 353)

BARBARA M. JEFFERS - 10/15/2007

Page 354

```
 1   * * * * * * * *
 2   REPORTER'S CERTIFICATE
 3   * * * * * * * *
 4
 5   STATE OF ALABAMA
 6   COUNTY OF AUTAUGA
 7
 8        I, Mishan Williamson,
 9   Certified Shorthand Reporter and
10   Notary Public in and for the State of
11   Alabama at Large, do hereby certify
12   that on October 15, 2007, pursuant to
13   notice and stipulation on behalf of
14   the Defendant, I reported the
15   deposition of BARBARA M. JEFFERS, who
16   was first duly sworn by me to speak
17   the truth, the whole truth, and
18   nothing but the truth, in the matter
19   of BARBARA M. JEFFERS and JOAN K.
20   CRAIG, Plaintiff, versus RUSSELL
21   COUNTY BOARD OF EDUCATION AND CHARLES
22   NACRELLI, Defendant, Civil Action
23   Number 3:06CV685-CSC, now pending in
```

Page 355

```
 1   the United States District Court for
 2   the Middle District of Alabama; that
 3   the foregoing 353 typewritten pages
 4   contains a true and accurate
 5   transcription of the examination of
 6   said witness by counsel for the
 7   parties set out herein; that the
 8   reading and signing of said deposition
 9   was waived by witness and counsel for
10   the parties.
11
12        I further certify that I am
13   neither of kin nor of counsel to the
14   parties to said cause, nor in any
15   manner interested in the results
16   thereof.
17
18        This 30th day of October, 2007
19
20
21
22   Mishan Williamson, ACCR# 417
     Reporter and Notary Public
23   State of Alabama at Large
```

# EXHIBIT "C"

# BARBARA M. JEFFERS and JOAN CRAIG

## v.

# RUSSELL COUNTY BOARD OF EDUCATION and CHARLES NACRELLI

## JOAN K. CRAIG

### October 16, 2007

Reagan Reporters, LLC
Phone: 334.262.7556
Fax: 334.262.4437

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA


BARBARA M.
JEFFERS and
JOAN K. CRAIG,
Plaintiff,

vs.                    CIVIL ACTION NO.
3:06CV685-CSC
RUSSELL COUNTY
BOARD OF
EDUCATION AND
CHARLES NACRELLI,
Defendant.

              *      *      *      *      *      *


DEPOSITION OF

JOAN K. CRAIG,

taken pursuant to notice and

stipulation on behalf of the

Defendant, in the Law Offices of

Smith & Smith, 1503 Broad Street,

Phenix City, Alabama, before Mishan

Williamson, Certified Shorthand

Reporter and Notary Public in and for

the State of Alabama at Large, on

October 16, 2007, commencing at

10:23 a.m.

JOAN K. CRAIG - 10/16/2007

| Page 2 | | Page 4 |
|---|---|---|

Page 2

1    APPEARANCES
2
3    FOR THE PLAINTIFFS:
4        W. DON EDDINS, ESQ.
5        Attorney at Law
6        337 E. Magnolia Avenue
7        Auburn, Alabama 36830
8
9    FOR THE DEFENDANT RUSSELL COUNTY BOARD
10   OF EDUCATION:
11       SIDNEY SMITH, ESQ.
12       Smith & Smith
13       1503 Broad Street
14       Phenix City, Alabama 36867
15
16   FOR THE DEFENDANT CHARLES NACRELLI:
17       MATTHEW C. WILLIAMS, ESQ.
18       3800 Colonnade Parkway
19       Suite 330
20       Birmingham, Alabama 35243
21
22   ALSO PRESENT:
23       BARBARA M. JEFFERS
         REBECCA LEE

Page 4

1    hereto and the witness, that the
2    signature of the witness to this
3    deposition is hereby waived.
4
5
6    * * * * * * *
7
8    INDEX
9
10   EXAMINATION              Page
11   MS. SMITH...................... 12
12   MR. WILLIAMS................... 217
13   MS. SMITH...................... 257
14   MR. EDDINS..................... 261
15   MS. SMITH...................... 265
16
17
18   EXHIBITS                 Page
19
         1    (Russell County School    133
20   Calendar, 2005/2006)
         2    (Employee Evaluations     182
21   for Ms. Craig)
         3    (Medical Records of       188
22   Ms. Craig)
         4    (DOT Physicals of         197
23   Ms. Craig)

Page 3

1    STIPULATIONS
2
3        It is stipulated and agreed
4    by and between counsel representing
5    the parties that the deposition of
6    JOAN K. CRAIG may be taken before
7    Mishan Williamson, Certified Shorthand
8    Reporter and Notary Public in and for
9    the State of Alabama at Large, without
10   the formality of a commission; and all
11   formality with respect to other
12   procedural requirements is waived;
13   that objections to questions, other
14   than objections as to the form of the
15   questions need not be made at this
16   time, but may be reserved for a ruling
17   at such time as the deposition may be
18   offered in evidence or used for any
19   other purpose by either party as
20   provided by the Federal Rules of Civil
21   Procedure.
22       It is further stipulated and
23   agreed by and between the parties

Page 5

1        Ms. Craig)
2        6    (Document Prepared by     204
     Mr. Rudd)
3
4    (The following exhibits were
     previously marked in Barbara Jeffers'
5    deposition and referred to at the
6    following pages:)
     ...............................
7    14.............................. 6
8    15.............................. 8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

JOAN K. CRAIG - 10/16/2007

Page 6

1    MS. SMITH: I'm going to mark
2    as Defendant's Exhibit 14
3    to Jeffers' deposition
4    what I believe to be the
5    Student Academic Plan and
6    Statement of
7    Responsibilities, which
8    was distributed to the
9    students, and parent, and
10   school personnel for the
11   year -- school year,
12   2004-2005.
13       (The referred-to document was
14       marked for identification as
15       Defendant's Exhibit No. 14.)
16   MR. EDDINS: Which also is
17   entitled, A Handbook For
18   School Personnel, Parents
19   and Students.
20   MS. SMITH: Okay. And then
21   I'm going on to mark as
22   Defendant's Exhibit 15 to
23   Jeffers' deposition, the

Page 7

1    same named document,
2    Student Academic Plan and
3    Statement of
4    Responsibilities, A
5    Handbook For School
6    Personnel, Parents and
7    Students, which I believe
8    to be for the school year
9    2005-2006.
10   On Page 37 of
11   Exhibit 15 is the
12   statement of sexual
13   harassment. And it is
14   the position that this
15   relates to students.
16   It was not furnished
17   to Mr. Eddins. His
18   request for production is
19   for a copy of Russell
20   County Board of Education
21   Employee Handbook in
22   effect during the past
23   five years that relate to

Page 8

1    sexual harassment of any
2    school system employee.
3    It's the position of my
4    client the Russell County
5    Board of Education that
6    these relate to students.
7    The same thing
8    applies to Jeffers --
9    Exhibit 14 to the
10   Jeffers' deposition.
11       (The referred-to document was
12       marked for identification as
13       Defendant's Exhibit No. 15.)
14   MR. EDDINS: And, of course,
15   we would add that there's
16   a statement of sexual
17   harassment policy that's
18   specifically includes
19   employees as well as
20   students.
21   It says -- it states
22   that (as read:) The
23   Russell County Board of

Page 9

1    Education is committed to
2    maintain a educational
3    environment clear of
4    sexual harassment. In
5    keeping with this
6    commitment, the board
7    will not tolerate
8    harassment of the
9    employee or student by
10   anyone, including
11   supervisors, teachers,
12   students, and other
13   customers.
14   And it goes on to
15   say, in each of these
16   two years, it is the
17   responsibility of all
18   school employees to
19   report any sexual
20   harassment.
21   MS. SMITH: And we take the
22   position that it relates
23   to students.

3 (Pages 6 to 9)

JOAN K. CRAIG - 10/16/2007

Page 10

```
 1    It says in the
 2    fourth paragraph
 3    (as read:) In this role
•4    the responsibilities of
 5    all board supervisors and
 6    managers include, but are
 7    not limited to the
 8    following: Assure that
 9    students are not required
10    to endure insulting and
11    degrading or exploitative
12    sexual treatment; and,
13    number two, immediately
14    report any complaints
15    concerning sexual
16    harassment received from
17    students to the principal
18    or appropriate school
19    official. Any student
20    experiencing or
21    witnessing sexual
22    harassment shall
23    immediately notify the
```

Page 11

```
 1    school's secretary, any
 2    teacher, any assistant
 3    principal, or the
 4    principal.
•5    So it's the position
 6    that these relate to the
 7    reporting of sexual
 8    harassment claims by
 9    students. It does not,
10    as Mr. Eddins states,
11    provide for the vehicle
12    for reporting of sexual
13    harassment claims of --
14    by employees.
15    MR. EDDINS: It says that all
16    employees have
17    responsibility to
18    immediately report any
19    sexual harassment. She
20    can editorialize and
21    state her opinion, but
22    that's what the policy
23    says.
```

Page 12

```
 1    MS. SMITH: The policy will
 2    speak for itself.
 3    All right. Do you
 4    object to the
 5    introduction of these two
 6    documents?
 7    MR. EDDINS: Absolutely not.
 8    MR. EDDINS: Okay. That leaves
 9    us that.
10    THE COURT REPORTER: Usual
11    stipulations?
12    MS. SMITH: Uh-huh.
13    MR. WILLIAMS: That's fine.
14    MR. EDDINS: Yes.
15
16        JOAN K. CRAIG, of lawful
17    age, having first been duly sworn,
18    testified as follows:
19    EXAMINATION
20    BY MS. SMITH:
21    Q.   Ms. Craig, if you would, please,
22    ma'am, give me your full name.
23    A.   Joan Catrine Newman Craig.
```

Page 13

```
 1    Q.   And how long have you been an employee
 2    -- a full-time employee of that
 3    Russell County Board of Education?
 4    A.   15 years.
 5    Q.   Do you recall what year you were hired
 6    as a full-time employee?
 7    A.   '92 and '93.
 8    Q.   Were you hired at the beginning of the
 9    '92/'93 school year?
10    A.   Yes.
11    Q.   We're going to have to speak up. And
12    then answer yes or no for this lady to
13    take it down.
14    Now, during the time that
15    you have been employed by the Russell
16    County Board of Education, have you
17    gone by other names?
18    A.   Yes.
19    Q.   And what are those names, please,
20    ma'am?
21    A.   Joan Elliot. When I was hired.
22    Shortly after I was divorced, I went
23    back to my maiden name, which is
```

4 (Pages 10 to 13)

JOAN K. CRAIG - 10/16/2007

Page 14

1   Joan Newman.
2   Q.   Okay.
3   A.   And after that I remarried, so now I'm
4   Joan Craig.
5   Q.   Okay.
6   A.   But I go by Joanie.
7   Q.   Joanie?
8   A.   Yes, ma'am.
9   Q.   So when we furnish the personnel file
10  to your attorney that had information
11  on Elliot -- on the last name Elliot
12  and Newman, that would have been
13  applicable to you?
14  A.   Yes, ma'am.
15  Q.   All right. If you would, please,
16  ma'am, describe your duties as a
17  school bus driver?
18  A.   I carry the kids to and from school,
19  morning and evening.
20  Q.   Yes, ma'am.
21  A.   I did do field trips.
22  Q.   Okay.
23  A.   I've done football, sports. And I've

Page 15

1   done after school -- what it is, they
2   was having classes for kids that
3   needed help. So I done afterschool
4   runs. And I don't know how you put
5   it, but that's what I did.
6   Q.   Okay.
7   A.   And I did introduce the schools to bus
8   safety; me and a lady, Ms. McDaniels,
9   another driver, would go to Ladonia
10  and spend the day, and go through each
11  class from K through 6, take them out
12  to the buses and show them how to ride
13  the correct way, the emergency
14  evacuations, the correct way to load
15  and unload if you had to leave the bus
16  for accident or anything. We
17  demonstrated -- because there's some
18  kids that can't -- that don't ride a
19  bus unless they're going on a field
20  trip. And they need to know how to be
21  safely evacuated.
22  Q.   Now, I guess going began to initial
23  duty then is to pick up the students

Page 16

1   in the morning and deliver them to the
2   school?
3   A.   Right.
4   Q.   And then pick them up in afternoon at
5   the school and deliver them home?
6   A.   Right. Excuse me. I also worked
7   there as a custodian.
8   Q.   Now, during -- from '92/'93 to the
9   present, have you always performed the
10  initial duty of picking up the
11  students and taking them to school,
12  and picking them up from school and
13  taking them home?
14  A.   Yes, ma'am.
15  Q.   Now, you mentioned sports, what --
16  what does that entail?
17  A.   I would go to the high school or
18  junior high and pick up kids after
19  school, and carry them to football
20  games. I've done that also.
21  Q.   So, you would go to high school or the
22  junior high school and pick up I guess
23  the players, or the students, or whom?

Page 17

1   A.   The football players.
2   Q.   And take them to games?
3   A.   Yes, ma'am.
4   Q.   Were you paid extra for that?
5   A.   Yes, ma'am.
6   Q.   When did you do that?
7   A.   I don't recall.
8   Q.   When did you stop doing that?
9   A.   When -- probably when Mr. Rudd had
10  some drivers down at the high school
11  -- that was Mr. Owens started carrying
12  them to and from.
13  So, he had drivers that
14  was taking them from the high school
15  that drove the high school route. And
16  then he got to where he was letting
17  the substitute drivers carry them.
18  Instead of us drivers being off and
19  having a sub come in and drive our
20  regular routes. He just started the
21  ones that was trained to sub, he'd let
22  them do it. And I don't recall what
23  year he started doing all that.

5 (Pages 14 to 17)

JOAN K. CRAIG - 10/16/2007

Page 18

1  Q.  Well, that was Mr. Rudd's decision to
2  make that change?
3  A.  Oh, yeah, I guess.
4  Q.  You talked about these after school
5  tutor runs.  What was that?  Were you
6  doing the actual tutoring of the
7  student or were you carrying them back
8  and forth?
9  A.  I was taking them home.
10  Q.  Taking them home?
11  A.  They stayed after school.
12  Q.  And what years did you do that?
13  A.  2000.
14  Q.  Okay.  Any other years?
15  A.  It might have been 2000/2001, when
16  they had it.  Me and Ms. Oaks done
17  them.
18  Q.  Oaks?
19  A.  Oaks.
20  Q.  O-A-T-E-S or O-A-K?
21  A.  O-A-K.
22  Q.  Okay.  So you did that in the year
23  2000?

Page 19

1  A.  Yes, ma'am.
2  Q.  And you think it might have carry over
3  to the -- would it have been in the
4  spring of 2000 or the fall?
5  A.  Yes.  The year --
6  Q.  2000/2001?
7  A.  Correct.  Yes.
8  Q.  Was that only a one year situation?
9  A.  I don't -- I think they done it the
10  next year.  I'm not sure.  I believe
11  they did, though.
12  Q.  How did that responsibility either get
13  assigned to you or you volunteered for
14  that job?
15  A.  They'd asked and we'd accept it.
16  Q.  Were you paid extra for that?
17  A.  Yes, ma'am.
18  Q.  Did they ask you for the 2001-2002
19  school year?
20  A.  I don't recall.
21  Q.  You don't recall.  Do you recall if
22  they ever asked and you refused the
23  offer?

Page 20

1  A.  To do the drive the after school
2  route?
3  Q.  The tutoring route?
4  A.  Probably so.  If they did it, I was
5  asked.  If they done it for 2002 to
6  2003, I would have been asked.  And I
7  did turn it down if I was asked.
8  Q.  And why did you turn it down?
9  A.  Because I started trying to avoid
10  Mr. Nacrelli.
11  Q.  And that's 2002 and 2003?
12  A.  Yes.
13  Q.  Now, you say that if you were asked
14  you turned it down.  Do you have any
15  proof, any evidence that you were
16  asked?
17  A.  Like on paper?
18  Q.  Yes, ma'am.  Or can you -- you
19  apparently cannot remember.  Do you
20  have anything that evidences the fact
21  that you were asked?
22  A.  If the school system was going to have
23  it, I would be asked.

Page 21

1  Q.  By whom?
2  A.  The school.
3  Q.  Who -- what school representative
4  would ask you that?
5  A.  I would be asked by the bus shop.
6  Q.  Okay.  Who in the bus shop would ask
7  you to take that route?
8  A.  Either -- back then it would have been
9  Patsy Prescott or Tina Smice.  I think
10  I'm saying her name right.  I don't
11  know.
12  THE COURT REPORTER:  Repeat
13  that again?
14  THE WITNESS:  What, the name?
15  THE COURT REPORTER:  Tina --
16  THE WITNESS:  Tina Smice, I
17  think.
18  Q.  And --
19  A.  She's Temple now.
20  Q.  Okay.  What was Patsy's job at the bus
21  stop -- shop, excuse me?
22  A.  She was one of Mr. Rudd's secretaries,
23  I guess you'd say.  That's what both

6 (Pages 18 to 21)

JOAN K. CRAIG - 10/16/2007

Page 22

1    of them was.
2    Q.   All right.  And Tina was also one of
3    Mr. Rudd's secretaries?
4    A.   Uh-huh, correct.
5    Q.   So they would have done the asking of
6    you to take these after school routes?
7    A.   Right.
8    Q.   Did they ask you in 2000 to take them,
9    when you did take them?
10   A.   We held a meeting because that they
11   was going to have this extra schooling
12   for the kids that needed it.  With all
13   the drivers and Nacrelli, and I
14   believe it was Bonnie Curry then,
15   sitting in as assistant principal at
16   Ladonia.
17   Q.   Curry not Coley?
18   A.   Not Coley.  She wasn't in there yet.
19   She was a teacher.
20   Q.   All right.
21   A.   And they had these -- this meeting,
22   and they was going to get it to go in
23   to have these kids after school to get

Page 23

1    the help they needed tutoring.  And
2    they needed two drivers to carry them
3    home after they finished their regular
4    route, and me and Ms. Oaks done it.
5    Q.   Did you volunteer or did they ask you?
6    A.   They ask.  And we said we yes, we'll
7    do it.
8    Q.   Did they -- you?
9    A.   They asked us if we would and we said
10   yes.
11   Q.   So, you had described it as a meeting
12   of everyone, who -- who was?
13   A.   The drivers, the other drivers, and
14   Mr. Rudd.
15   Q.   And was this at Ladonia?
16   A.   Yes.
17   Q.   Was it the other drivers at Ladonia?
18   A.   Yes.
19   Q.   Was it any other drivers, other than
20   those who serviced Ladonia?
21   A.   Uh-huh.
22   Q.   That was the year 2000?
23   A.   Uh-huh.  Yes.  Yes.

Page 24

1    Q.   Would it have happened in the -- at
2    the beginning of the school year, or
3    during that summer, or do you recall?
4    A.   Right after school got started in
5    August, September, somewhere around
6    there.
7    Q.   Do you -- that would have been for the
8    fall of 2000.  Do you recall if it
9    occurred in the spring of 2001 of that
10   school year?
11   A.   We done it the whole year.
12   Q.   And how many routes did you run?
13   A.   I did that one.  And then I done --
14   Q.   The tutoring routes?
15   A.   I did the tutoring route.  I done my
16   regular morning route and afternoon
17   route.  But I had two morning routes
18   and two afternoon routes.
19   Q.   That was for the year 2000?
20   A.   2000/2001.
21   Q.   When did you pick up the two routes
22   for the morning and the two routes for
23   the evening -- on or before, excuse

Page 25

1    me, when did that begin?  What year?
2    A.   2003 -- I mean, '99 -- '93.
3    Q.   '93?
4    A.   Uh-huh.
5    Q.   So -- so you began in '92/'93?
6    A.   Right.
7    Q.   And you ran a morning route and a --
8    A.   Double -- double.
9    Q.   You ran a double route?
10   A.   Uh-huh.
11   Q.   Both morning and evening?
12   A.   Yes, ma'am.
13   Q.   Do you still continue to run a double
14   route?
15   A.   No, ma'am.
16   Q.   When did the double route cease?
17   A.   When John Rudd put some more drivers
18   up there at Ladonia.
19   Q.   Do you recall when that was?
20   A.   It was -- Mr. Screws was
21   superintendent.  He left in '99.
22   Q.   Principal?
23   A.   Mr. Screws.  Larry Screws was the

7 (Pages 22 to 25)

JOAN K. CRAIG - 10/16/2007

| | |
|---|---|
| Page 26 | Page 28 |

**Page 26**

1  principal of principal up there.
2  Q.  Okay.  You said superintendent?
3  A.  Well, I meant principal.  And he left
4  in '99 and went to ALC.  So it had to
5  be in -- I want to say '98, because we
6  brought in new drivers before he left.
7  Q.  So, it was while Mr. Screws was
8  principal at Ladonia that the double
9  routes ceased?
10  A.  Right.
11  Q.  And Mr. Rudd put on additional
12  drivers?
13  A.  Right.  And then in '99, I drove two
14  routes in the evening, but not in the
15  morning.
16  Q.  And how long did that go on?
17  A.  Various -- different years because of
18  the load capacity.
19  Q.  Let me ask you this:  Does your pay
20  vary according to the number of routes
21  you drive, not on field trips, or
22  sports, or anything else that you get
23  extra pay for, but does it vary if

**Page 27**

1  you're driving double morning and
2  double afternoon routes?
3  A.  Of course.
4  Q.  All right.  How are you paid?
5  A.  I'm the top pay.
6  Q.  Okay.
7  A.  I'm tenured.  I've been there 15
8  years, and I think the category goes
9  up to seven years.
10  Q.  Okay.
11  A.  And they have ABC and D scales.
12  Q.  Okay.
13  A.  So, I'm on the top.
14  Q.  Yes, ma'am.
15  A.  All right.  If I drove that afternoon
16  route and morning route, you get so
17  much I think a mile.  It's based on
18  the mileage you run.
19  Q.  Okay.
20  A.  If you run 50 miles in one day --
21  anything over 50 miles is extra money.
22  Q.  Okay?
23  A.  All right.  If you don't, then your

**Page 28**

1  money decreases.
2  Q.  All right.  So, in the years that you
3  were running the two morning and two
4  afternoon routes from -- I think you
5  said it began like that in '92/'93
6  until '99, when Mr. Screws left.  Are
7  you -- let me make sure.  Are you
8  saying --
9  A.  '98.
10  Q.  '98, what?
11  A.  In 1998, we went and got new buses.
12  984 was my bus.  I drove a brand new
13  bus.  When I drove that brand new bus,
14  Mr. Rudd had hired for that year two
15  new drivers at Ladonia.
16  Q.  Okay.
17  A.  A Deborah Hensley and a
18  Clifford Simpson.
19  Q.  Okay.
20  A.  They come to work that year.  I gave
21  Deborah Hensley my second run -- is
22  what they called -- in the morning.  I
23  gave her that route and I kept my

**Page 29**

1  original, which is by my house on
2  Woodland Drive and Sanford Road.
3  Q.  When you say you gave it to her?
4  A.  Rudd asked me which route did I want
5  to give up.
6  Q.  Okay.  So, he --
7  A.  And I told him.
8  Q.  All right.  So he asked you which one
9  you wanted to give up?
10  A.  Right.
11  Q.  Okay.  And, so, in '98, when you got
12  the new bus -- that's a '98/'99 school
13  year; is that right?
14  A.  Right.
15  Q.  You were only running two routes?
16  A.  I was running two in the morning and
17  two in the evening.
18  Q.  All right.  When did you give up the
19  two in the morning?
20  A.  The one morning and one in the
21  afternoon.
22  Q.  All right.
23  A.  I gave them up the year of -- the year

8 (Pages 26 to 29)

Case 3:06-cv-00685-WKW-CSC    Document 43-5    Filed 12/17/2007    Page 11 of 70

## Page 30

1   span of '98 when he hired -- '97/'98
2   year -- '97/'98, when he hired on them
3   to come in, he put the two new drivers
4   up there for that year. So, I give up
5   one of my routes and Mr. Dutton, which
6   was employed then, he give up one of
7   his.
8   Q.   And was that morning and evening
9   routes?
10  A.   Uh-huh.
11  Q.   So, for the year -- school year '97,
12  '98, you were driving just one route
13  in the morning and one route in the
14  evening?
15  A.   Correct.
16  Q.   From your normal regular assignment;
17  is that correct?
18  A.   Correct.
19  Q.   You were running a morning and an
20  evening route?
21  A.   Okay. I drove the morning -- I gave
22  up one of them.
23  Q.   Yes, ma'am.

## Page 31

1   A.   Then I drove the evening. I gave up
2   one of them. But in that year, I
3   split my route and made two runs in
4   the evening.
5   MR. WILLIAMS: I need a chart.
6   Q.   You split your route?
7   A.   Right.
8   Q.   You split your evening route from one
9   route into two routes?
10  A.   Right.
11  Q.   And that was for '97/'98?
12  A.   Correct.
13  Q.   And who authorized or who asked you to
14  do that?
15  A.   I presented it to John Rudd.
16  Q.   Okay.
17  A.   Because I was hauling 101 students. I
18  was overloaded.
19  Q.   Uh-huh.
20  A.   So, he asked me how did I want to do
21  it. I told him -- I says, well, I can
22  go down, drop Somersett, go on down
23  Woodland Drive, and make a U-turn in

## Page 32

1   Woodland Christian School -- church --
2   Woodland Church, and come back up. In
3   10, 15 minutes, I could be back to
4   pick up the kids. So that's the way
5   we did it.
6   Q.   Did that result in more mileage for
7   you and more pay?
8   A.   I don't know if it -- it was more
9   mileage. But like I said, they got a
10  pay back bracket. If you run say for
11  instance a pay bracket is like from
12  30 miles to 50 miles. And you're in
13  that little range right there and your
14  pay stays the same. But anything over
15  that would bring it up, see.
16  Q.   Okay. Gotcha. Now, for the '99 --
17  excuse me, the '98 -- '99 school year,
18  how many routes did you run?
19  A.   One in the morning and one in the
20  afternoon -- two in the afternoon.
21  Q.   Two in the afternoon?
22  A.   I believe.
23  Q.   And is that the situation you

## Page 33

1   described for the year '97/'98 that
2   you had too many students on the bus
3   and you Mr. Rudd discussed whether to
4   run one or who routes?
5   A.   Correct.
6   Q.   Now, '99/2000, how many routes did you
7   run?
8   A.   One in the morning and two in the
9   evening.
10  Q.   And is that --
11  A.   That's after school.
12  Q.   That's -- all right. So '99/2000?
13  A.   Huh-uh. That was one in the
14  afternoon.
15  Q.   One in the afternoon?
16  A.   Right.
17  Q.   So, '99/2000, you ran one in the
18  morning and one in the afternoon?
19  A.   Right.
20  Q.   And the situation that you had had in
21  the two previous years of needing to
22  split your route in the afternoon
23  because of the number of students

9 (Pages 30 to 33)

JOAN K. CRAIG - 10/16/2007

Page 34

1  apparently didn't exist for that year?
2  A.  Correct, I guess.
3  Q.  And '99/2000 is when you began the
4  tutoring runs?
5  A.  Yes.
6  Q.  All right.  The year 2000/2001, how
7  many of the, for lack of a better
8  term, regular bus routes did you run?
9  When I use the term regular I mean,
10  picking up in the morning and taking
11  them to school -- picking up from
12  school and taking them home?
13  A.  Rephrase -- re ask me.
14  Q.  Okay.  2000/2001 --
15  A.  Uh-huh.
16  Q.  How many routes did you run?
17  A.  One in the morning and two in the
18  evening.
19  Q.  And why did you go back to two in the
20  evening that year?
21  A.  We done a after school tutoring.
22  Q.  Okay.  So, the two was because of the
23  after school tutoring?

Page 35

1  A.  Correct.
2  Q.  Had you not been -- for the year
3  1999/2000, had you not doing after
4  school tutoring runs?
5  A.  I'd only done my regular run.
6  Q.  Okay.  One in the morning and one in
7  the evening?
8  A.  Other than field trips and stuff.
9  Q.  Right.  We're going to come back to
10  those.
11  A.  Okay.
12  Q.  All right.  2000/2001 you said that
13  you did the one in the morning and two
14  in the afternoon.  And that second one
15  in the afternoon was because of the
16  tutoring run; is that correct?
17  A.  What year?
18  Q.  2000/2001?
19  A.  Correct.
20  Q.  Okay.  2001/2002, how many routes --
21  regular routes did you run?
22  A.  2001/2002 is the year you asked?
23  Q.  Yes, ma'am?

Page 36

1  A.  All right.  I got to get it and pulled
2  back up.
3  Q.  I understand.
4  A.  One in the morning and one in the
5  evening.
6  Q.  You didn't run the tutoring route in
7  the afternoon?
8  A.  No.
9  Q.  Were they still running that route?
10  A.  I don't recall right now.
11  Q.  You're positive that it ran for two
12  school years; '99/2000 and 2000/2001
13  the tutoring route?
14  Are you positive that it
15  ran those two years?
16  A.  I know it was 2000/2001 for sure.
17  Q.  Okay.
18  A.  Definitely was 2000/2001.
19  Q.  How about the school year '99/2000;
20  are you sure that it ran then?
21  A.  Let me look at something.  Just one
22  second.
23  Q.  Feel free.

Page 37

1  A.  '99 and 2000 positive.
2  Q.  So, we're positive about '99/2000 and
3  2000/2001; positive about those, are
4  we?
5  A.  February of 2000, I know for sure.
6  And October of '99 I know for sure,
7  definite, are those.
8  Q.  I'm getting confused a little bit?
9  A.  Oh, you're confusing me, too.
10  Q.  I understand.  And I'm not trying to
11  trick you.  I'm just trying to get to
12  the dates.
13  A.  I9 understand that.
14  Q.  That we did these things.  And --
15  So we're still positive?
16  A.  '99 and 2000, definitely.
17  Q.  For the whole year?
18  A.  Correct.
19  Q.  And 2000 and 2001 for the whole year?
20  When you came back and
21  said February of 2000, I didn't know
22  whether you were limiting it or not.
23  A.  I know I did after school tutoring

10  (Pages 34 to 37)

JOAN K. CRAIG - 10/16/2007

Page 38

```
 1    run.  I know I done it the first year
 2    definitely.
 3    The second year it was
 4    presented that they were going to it
 5    and I refused it.  I wouldn't do it.
 6    Q.    The second year?
 7    A.    The second time that I was going to do
 8    it, correct.
 9    Q.    All right.  Would your pay stubs
10    reflect this?  Your pay records for
11    those years?
12    A.    My check stubs?
13    Q.    Yes, ma'am.
14    A.    I don't keep them, but --
15    Q.    No.  If we pulled them from the
16    system?
17    A.    Oh, it should.
18    Q.    Okay.  2001/2002 you told me you ran
19    an a.m. run and a p.m. run and that
20    was it; a morning and an evening?
21    A.    When.
22    Q.    2001/2002?
23    A.    A.m. -- p.m.
```

Page 39

```
 1    Q.    Did you run any tutoring that year?
 2    A.    2001/2002?
 3    Q.    Yes, ma'am?
 4    A.    I done, '99 -- no, if that was the
 5    second year they was doing tutoring
 6    no, I didn't.
 7    Q.    Okay.  2002/2003, how many runs -- how
 8    man y regular runs did you have?
 9    A.    One in the morning and one in the
10    evening.
11    Q.    2003/2004 how many regular runs?
12    A.    One in the morning and one in the
13    evening.
14    Q.    2004/2005?
15    A.    One and one.
16    Q.    Okay.  And 2005/2006?
17    A.    One and one.
18    Q.    Okay.  Now, the tutoring routes, tell
19    me who asked you to run it and who
20    were you told no to for that second
21    year, or whenever it was that you quit
22    running the tutoring routes?
23    I want to know who asked
```

Page 40

```
 1    you to run that route and who did you
 2    tell no, you weren't going to run the
 3    route?
 4    A.    Okay.  They brought it up about going
 5    to have the tutoring again.
 6    Q.    And who is they brought it up?
 7    A.    I know Ms. Oaks brought it up.  And I
 8    said I wasn't doing it this year.  And
 9    then Teresa or Patsy Prescott from the
10    bus shop called and said that they
11    were going to have -- they were going
12    to try and have the after school
13    tutoring again at Ladonia, would I be
14    interested this year like I did last
15    year.  And I told them no, I wasn't
16    doing it -- wasn't doing none.
17    Q.    Did you tell them why?
18    A.    No.
19    Q.    You did not give a reason why?
20    A.    (The witness nods head.)
21    Q.    What was your reason?
22    A.    I tried to stay away from
23    Mr. Nacrelli.
```

Page 41

```
 1    Q.    Stay away from Mr. Nacrelli?
 2    A.    Correct.
 3    Q.    Did he ride those routes?
 4    A.    He rode my bus one time.
 5    Q.    And when was that?
 6    A.    One morning in 2000 -- somewhere --
 7    might have been -- or 2001.  See, my
 8    route changed.  I had a little
 9    extended on it -- extension on it.
10    Instead of making two runs, I just
11    carry the kids that I had off of
12    Woodland Drive and Sanford Road, out
13    of Highway 80, and go pick up this
14    little short area and bring them in
15    altogether.  And I was having problems
16    over there in that area at a certain
17    bus stop with the kids and the
18    parents.
19    Q.    And that's when he rode your route?
20    A.    Yes.  But there was no kids on the
21    bus.
22    Q.    We'll come back to that after while.
23    All right.  When you -- then you said
```

11 (Pages 38 to 41)

JOAN K. CRAIG - 10/16/2007

Page 42

1   declined the offer to run the tutoring
2   routes because you wanted to stay away
3   from Mr. Nacrelli. Stay away from him
4   how, he didn't ride your routes?
5   A.    We had contact with the principals,
6   and the assistant principals, and the
7   teachers at Ladonia.
8   Q.    Well, what type of contact did you
9   have with Mr. Nacrelli on these
10  tutoring routes?
11  A.    After school runs. We would come up
12  there sometimes and he would come out
13  there where we was parked, bring a
14  kid, or tell us about a certain kid,
15  or whatever. Like they do now. If
16  they have a problem with a kid or
17  something, they'll come out there and
18  talk to us.
19  Q.    And will it be more than just you
20  there?
21  A.    Sometimes, yeah.
22  Q.    And who else?
23  A.    Or if we had a problem with a student,

Page 43

1   and -- or if we was having problems
2   with a student and we didn't pull off
3   when it was time like we was both
4   loaded ready to go or all of us was
5   loaded ready to go. And if we sat
6   there then the principal, or assistant
7   principal, or whichever teacher was
8   out there would come to the bus to see
9   what the problem is. That's the kind
10  of contact.
11  Q.    Okay. All right. Then let's go back
12  to the bus safety. You said that you
13  did that?
14  A.    Correct.
15  Q.    Was that something you received extra
16  pay for?
17  A.    No.
18  Q.    And you and Ms. McDaniels did that?
19  A.    Correct.
20  Q.    Did y'all volunteer for that?
21  A.    Mr. Rudd asked us if we would be
22  interested in going in there and
23  discussing safety with the kids, and

Page 44

1   going over the safety rules with the
2   teachers and the students, and we told
3   them yes.
4   So we would go pick up
5   our kids that morning, drop them off
6   at school, we'd unload, then we'd stay
7   at school all day that day to go from
8   class to class to class.
9   Q.    Okay. So you'd go to each class and
10  discuss?
11  A.    And we'd take the class out and load
12  them on the bus and unload them.
13  Q.    Do you do that now?
14  A.    I've gotten back into it. Doing the
15  safety program, I started back last
16  year.
17  Q.    And did you get out it at some point?
18  A.    Yes.
19  Q.    When?
20  A.    About 2002 -- 2003.
21  Q.    That school year you stopped doing it?
22  A.    Yes, ma'am. Ms. McDaniels --
23  Q.    Ms. McDaniels what?

Page 45

1   A.    We stopped; both of us.
2   Q.    Both of you stopped?
3   A.    Yes.
4   Q.    And how long did you stay -- did you
5   do it -- let me rephrase that. Excuse
6   me.
7   You didn't do it for the
8   2002/2003 school year? Did you do it
9   for the 2003/2004 school year?
10  A.    No.
11  Q.    Were you asked to do it?
12  A.    No. Because Mr. Rudd has gotten a
13  little bus committee thing going now,
14  and they brought a bus -- a little
15  miniature bus, remote control. And
16  he's got several people that's doing
17  it, and they're getting paid for it
18  now.
19  Q.    So, that began in the 2003/2004 school
20  year?
21  A.    Probably so. When they bought Buster.
22  And they go from all the schools now;
23  Ladonia, Dixie, Oliver, Mount Olive.

12  (Pages 42 to 45)

JOAN K. CRAIG - 10/16/2007

| Page 46 | Page 48 |
|---|---|
| 1 Because I went last year for the week. | 1 doing it, I'm not. |
| 2 Q. And you get paid extra for that? | 2 Q. And did you tell her why you weren't |
| 3 A. Correct. | 3 doing it? |
| 4 Q. Now? | 4 A. No. I just told her I wasn't going to |
| 5 A. Now, yeah. | 5 do it. I did not come out and tell |
| 6 Q. Then we got Buster. I've seen Buster. | 6 her that I was -- was avoiding |
| 7 He's pretty cute. | 7 Nacrelli, as far as sexual. I just |
| 8 A. Oh, yeah. | 8 told her I wasn't going to do it this |
| 9 Q. So, it's your best recollection that | 9 year. |
| 10 you did the safety only for the school | 10 Q. So, you didn't tell her it was because |
| 11 year 2002/2003? | 11 of Mr. Nacrelli? |
| 12 A. We done the bus safety when Mr. Screws | 12 A. Huh-uh. No. |
| 13 was there, '99, 2000, 2001 -- me and | 13 Q. And in 2003/2004 is when they went to |
| 14 Ms. McDaniels has done everything | 14 Buster, I think? |
| 15 pertaining to Ladonia when they needed | 15 A. I believe that was when Buster was |
| 16 extra buses. | 16 brought in the system. |
| 17 Q. Is Ms. McDaniels still at Ladonia? | 17 Q. Now, you told me you served as a |
| 18 A. No. She retired this year. | 18 custodian, when was that? |
| 19 Q. End of the -- | 19 A. I don't recall. |
| 20 A. End of -- | 20 Q. Was it at any time while Mr. Nacrelli |
| 21 Q. '06, '07 school year? | 21 was the principal -- the principal at |
| 22 A. She didn't come back -- she didn't | 22 Ladonia? |
| 23 come back this year. | 23 A. I believe it was in -- okay. Let me |

| Page 47 | Page 49 |
|---|---|
| 1 Q. All right. Last spring; May or June? | 1 see. Let me see if -- |
| 2 A. Right. She didn't come back in | 2 Q. Can you remember who the principal was |
| 3 August. She went and retired. | 3 when you did -- when you were the |
| 4 Q. Now, is it your position that you | 4 custodian? |
| 5 stopped doing the safety because you | 5 A. I believe it might have been |
| 6 were attempting to avoid any contact | 6 Mr. Screws and Ms. Lewis was the |
| 7 with Mr. Nacrelli? | 7 assistant, I think. |
| 8 A. Correct. | 8 Q. And how long did you -- |
| 9 Q. Explain that to me, please, ma'am? | 9 A. Just that year. |
| 10 A. Whenever I would go to Ladonia for any | 10 Q. And why did you stop? |
| 11 reason, Mr. Nacrelli if he was in the | 11 A. Because they said that you couldn't |
| 12 hallway or what, he would approach me. | 12 work. Mr. Rudd sent out a thing |
| 13 I had bad experience with | 13 stating that you couldn't drive a bus |
| 14 Mr. Nacrelli approaching me on my bus. | 14 and work at school, as -- I guess |
| 15 So, I just tried to stay away from | 15 might say like full-time employee. |
| 16 him. | 16 Q. Okay. Did that have -- did your |
| 17 Q. Were you ever asked to do the safety | 17 stopping being the custodian have |
| 18 while Mr. Nacrelli was the principal | 18 anything to do with Mr. Nacrelli? |
| 19 and turn it down? | 19 A. No. |
| 20 A. Me and Ms. McDaniels probably was | 20 Q. All right. I think we've covered all |
| 21 asked in 2003 or 2002, and we said no. | 21 of your positions, except for field |
| 22 I told her I wasn't doing | 22 trips. So, let's go to field trips. |
| 23 it. She says well, if you're not | 23 A. All right. |

13 (Pages 46 to 49)

JOAN K. CRAIG - 10/16/2007

Page 50

1  Q.  Tell me about your field trips. First
2  of all, what kind of field trips would
3  they be?
4  A.  School field trips, different places
5  to the zoos, to Coca-Cola Space
6  Center, to Callaway Gardens, to you
7  name it, whenever Ladonia kids went,
8  we'd take them.
9  Q.  Okay. So, it was the Ladonia
10  children. It wasn't students -- it
11  wasn't any other school?
12  A.  It was just Ladonia.
13  Q.  And when did you start doing those
14  field trips?
15  A.  When did I start?
16  Q.  Start doing field trips?
17  A.  The year I started.
18  Q.  '92/'93?
19  A.  Correct.
20  Q.  And did you do them every year?
21  A.  Oh, yes.
22  Q.  All right. When did you stop?
23  A.  Probably -- I think the last field

Page 51

1  trip I took was to Rudd's Tree Farm,
2  me and Ms. McDaniels, in 2003.
3  Q.  To Mr. Rudd's Tree Farm?
4  A.  Or 2002. One of them years. It was
5  the last field trip, me and Ms. Diane
6  McDaniels and I didn't take it no
7  more.
8  Q.  Now, would you each drive a bus?
9  A.  Uh-huh. Correct.
10  Q.  Separate buses?
11  A.  Correct.
12  Q.  2002 or 2003, whatever the records
13  show?
14  A.  Right.
15  Q.  Is that last -- is that trip to
16  Mr. Rudd's farm?
17  A.  Patterson's farm.
18  Q.  And why did you stop those field
19  trips?
20  A.  To avoid being around Mr. Nacrelli.
21  Q.  Did Mr. Nacrelli ever ride with you?
22  A.  On field trips, no.
23  Q.  Did he go on the field rips?

Page 52

1  A.  He's come to the field trip and pick
2  up a student that was irate, him and
3  Cele Parish.
4  Q.  He didn't ride the bus. He didn't go
5  on the field trips?
6  A.  (The witness nods head.)
7  Q.  But you say he came to a field trip
8  and pick up an irate student?
9  A.  Phenix City Library.
10  Q.  When was that?
11  A.  I believe it was in 2001. It was --
12  the child was Ivy Minton. She
13  normally rode my bus regularly morning
14  and afternoon route. Mainly morning
15  because she went to daycare in the
16  evenings. Every now and then they
17  would ride. And she was irate in the
18  library. They called Nacrelli. And
19  him and Cele Parish come to the
20  library, Phenix City Library, the new
21  one.
22  Q.  Uh-huh.
23  A.  And picked her up. And all she wanted

Page 53

1  to do was stay on bus with me. After
2  -- they brought her out, she was fine.
3  We sat out there and cracked pecans
4  and she kept cracking them and I kept
5  eating them. And it was me and
6  another driver -- two more drivers
7  there. And that's all she wanted to
8  do was stay on the bus. She didn't
9  want to go in there. But that was --
10  Q.  Had she ridden your bus out to the
11  library that morning?
12  A.  I believe she did from Ladonia.
13  Q.  Yes, ma'am?
14  A.  Yes. I believe she did.
15  Q.  And there were three buses there?
16  A.  Two or three. I believe it -- I don't
17  want to say three for sure. I know
18  there was two. It was me and a lady
19  named Julie Hearn. She was a Ladonia
20  driver. And Ms. Hornsby is the
21  kindergarten teacher that brought her
22  back out to the bus because she
23  wouldn't behave in the library;

14 (Pages 50 to 53)

JOAN K. CRAIG - 10/16/2007

Page 54

1    screaming, crying and everything, and
2    asked me if I would keep her out there
3    with me; that Mr. Nacrelli and -- was
4    on his way on get her.
5    Q.    Okay.  So she had a problem while she
6    was in the library.  Do you know what
7    started that?
8    A.    No, ma'am.
9    Q.    And then you say Ms. Hornsby brought
10   her out to your bus?
11   A.    Yes, ma'am.
12   Q.    To keep her?
13   A.    Yes, ma'am.
14   Q.    Did Mr. Nacrelli pick her up from your
15   bus?
16   A.    Yes, ma'am.
17   Q.    Tell me the conversation you and
18   Mr. Nacrelli had during that period of
19   time when he came to pick up Ivy from
20   your bus?
21   A.    Him and Cele Parish pulled up and he
22   come to the bus and asked me if I had
23   Ivy Minton, and I told him, yeah.  And

Page 55

1    I said come on Ivy, and she went to
2    crying and screaming, begging to stay.
3    And he grabbed her and they put her in
4    the car.  Cele Parish had to get in
5    the back seat and hold her down to get
6    her back to Ladonia.
7    Q.    And what did Mr. Nacrelli say to you?
8    A.    He asked me if I had any problem, and
9    I told him no.  He just --
10   Q.    What?
11   A.    You know with her out there with me.
12   I said no, we're eating pecans.  So,
13   he says come on.  He was more
14   interested in getting the student and
15   taking her back where she come from,
16   Ladonia.
17   Q.    At that time, did he say anything
18   inappropriately to you?
19   A.    Nope.
20   Q.    Did he touch you inappropriately on
21   that occasion?
22   A.    No.
23   Q.    Was there any other occasion that

Page 56

1    Mr. Nacrelli was present during a
2    field trip?  When I say present, I
3    mean, there at any point during the
4    field trip?
5    A.    Before we'd leave the school
6    grounds --
7    Q.    Okay.
8    A.    With the kids, he would be present.
9    Q.    Okay.  Would he be present while you
10   were out at whatever you were going?
11   A.    Nope.
12   Q.    Except for this one time?
13   A.    That one time.
14   Q.    Would he be present when you would
15   bring the children back to school?
16   A.    Yes.
17   Q.    Would this be during school hours or
18   did these field trips --
19   A.    School hours.
20   Q.    Did all the field trips occur during
21   school hours?
22   A.    Yes, ma'am.
23   Q.    So, y'all would leave during school

Page 57

1    hours?
2    A.    Sometimes they would have them that
3    would be over -- stay overs.  But I
4    didn't do none of them.
5    Q.    Stay-overs, meaning an overnight?
6    A.    Uh-huh.
7    Q.    Okay.  You never --
8    A.    4-H camp, stuff like that.  I didn't
9    do them.
10   Q.    Now, how -- how many drivers serviced
11   Ladonia?
12   A.    All right.  Let me count them on my
13   fingers.
14   In the beginning --
15   Q.    All right.
16   A.    There was four.  All right.  Then six
17   come in.
18   Q.    And did that happen that year you got
19   the new bus; the '98 -- your bus 98-4?
20   A.    Within hat time frame, somewhere
21   about.  Yeah.  I think the other two
22   come in.
23   Q.    All right.  Did it change again?

15 (Pages 54 to 57)

JOAN K. CRAIG - 10/16/2007

Page 58

1    A.    Uh-huh.
2    Q.    When did it change again?
3    A.    Let me count them. There was -- in --
4    I'll say maybe four years ago.
5    Q.    Okay. What happened, did it go up or
6    down?
7    A.    More drivers.
8    Q.    Four years ago -- four school years
9    ago?
10    A.    Yeah.
11    Q.    Are we counting this school year?
12    A.    Yeah. Cause -- 2000 -- this is
13    seven-eight, six-eleven, five-six
14    four-five. '04/'05?
15    It might have been
16    '03/'04, somewhere about there. But
17    --
18    Q.    How many did you go to?
19    A.    There's seven of us.
20    Q.    Are they're still seven now?
21    A.    Right today; yes, ma'am.
22    Q.    When you started there were four, then
23    we added two more?

Page 59

1    A.    Uh-huh.
2    Q.    Then we added another one?
3    A.    Uh-huh.
4    Q.    A total of seven?
5    A.    Yes, ma'am. See, there have been so
6    many different drivers up there.
7    Q.    Uh-huh.
8    A.    Some that come in to replaced the ones
9    that's gone, stuff like that.
10    Q.    Yes, ma'am.
11    A.    So, you know, you have to kind of
12    figure time frame, it's hard to say.
13    Q.    I understand. The increase I'm
14    assuming would be due to increase
15    student enrollment -- number of kids
16    you had to transport?
17    A.    I don't know. I suppose. I don't
18    know. I can't really say. I know how
19    my route runs, as far as how it
20    fluctuates, give or take a few.
21    Q.    Who sets up those routes each year?
22    A.    Make out our runs?
23    Q.    Yes, ma'am.

Page 60

1    A.    John Rudd.
2    Q.    Does he consult with you about your
3    runs?
4    A.    What are you -- what are you talking
5    about when you say consult and I'll
6    tell you.
7    Q.    Okay. Well, let me just use an
8    example. For this year --
9    A.    Uh-huh.
10    Q.    '07/'08 school year --
11    A.    Uh-huh.
12    Q.    He set up your route?
13    A.    Pretty much.
14    Q.    Did you have any -- did you give him
15    any suggestions or have anything to --
16    that influenced that route?
17    A.    Any input on it?
18    Q.    Yes, ma'am?
19    A.    I sure did.
20    Q.    Okay. And did he incorporate or do
21    you --
22    A.    Me and Ms. -- me and Ms. Oaks had to
23    go down to bus shop in July of this

Page 61

1    year before we picked our buses up in
2    August and go over the route
3    descriptions with them.
4    Q.    Okay.
5    A.    So, I guess that's consult; right?
6    Q.    Yes, ma'am.
7    A.    All right.
8    Q.    Did -- did -- were any changes made
9    when y'all went down to the bus stop?
10    A.    Oh, yeah.
11    Q.    Okay. Is that -- has that type of
12    process been used every year?
13    A.    Sometimes and sometimes not.
14    Q.    All right. When it wasn't used, what
15    would be the process to establish a
16    bus route?
17    A.    How he'd give us our routes?
18    Q.    Yes, ma'am.
19    A.    Okay. He give us a piece of paper
20    where we was going to run. Mine is
21    Woodland Drive from Sanford Road, from
22    this point A to B point. I turn
23    around and I start coming back and

16 (Pages 58 to 61)

JOAN K. CRAIG - 10/16/2007

Page 62

1  pick up everything and anything
2  standing outside the road; whether
3  it's the high school or elementary.
4  Because they're standing there for a
5  bus. And we're not allowed to leave
6  them beside the road having to pick
7  them up.
8  Q.  When you say he, are you referencing
9  Mr. Rudd?
10  A.  John Rudd.
11  Q.  Has Mr. Rudd been the bus supervisor
12  the entire time that you have been --
13  A.  He hired me.
14  Q.  Okay. And he's always maintained that
15  position?
16  A.  Superintendent of all bus driver's
17  routes.
18  Q.  Did Mr. Nacrelli ever have any input
19  into your bus routes?
20  A.  Discipline on the routes area, yes.
21  Q.  Did he have any input, for lack of a
22  better term -- did he have any say so
23  about where you stopped on each route?

Page 63

1  What I'm trying to
2  establish is, did Mr. Nacrelli have
3  any involvement with you and Mr. Rudd
4  to establish your bus route for each
5  year?
6  A.  Okay. Let me explain it like this to
7  you.
8  Q.  Okay.
9  A.  All right. How do I want to say this?
10  If we was -- for instance, if we're
11  picking up the kids -- loading and
12  unloading kids at their house, and the
13  student is not out there. For
14  instance, I'm going -- I'm going to
15  put in lay terms.
16  All right. The students
17  not outside at their bus sop.
18  Q.  Yes, ma'am?
19  A.  Right. And you go by and you stop,
20  open and close the door, and proceed.
21  Well, that student is not out. So you
22  discuss it with Mr. Nacrelli, or the
23  -- whoever is going to do the

Page 64

1  discipline for that day; whether it's
2  Nacrelli, Ms. Grant, or Mr. Harper,
3  whoever is going to do the discipline
4  on the kids you discuss it with them.
5  They tell you well, don't pick them
6  up. If they're not out there, don't
7  pick them up.
8  Then you got somebody
9  over here telling you, you stop at
10  that stop and that child is not out
11  there, do your normal thing of picking
12  up a student, and you pop your brake,
13  open your door. If they're not there
14  you put your door -- don't shut it,
15  you pull it because you break in and
16  shut it and then go.
17  All right. Nacrelli does
18  have a little say when you take it in
19  there and present it to him. So,
20  yeah, I guess you could say he does
21  have a little bit of say about the bus
22  stops.
23  Q.  Okay. But that's his only involvement

Page 65

1  then is what goes on at a bus stop?
2  A.  Once you unload, he can't -- he can
3  tell you -- when he unloads -- when
4  you unload the kids -- once the kids
5  unload and safely away from the bus,
6  then it's not Russell County's
7  responsibility.
8  When you pick them up,
9  from the time you get them until you
10  drop them off to their mom and daddy's
11  you're totally responsible for them.
12  Q.  Okay. My question is --
13  A.  If it's unsafe bus stop and you take
14  it to him yeah, he has a say so, well,
15  don't do that. Yeah, he'll have a
16  say.
17  Q.  Did he ever meet with you and Mr. Rudd
18  to you knowledge, or -- well, when you
19  and Mr. Rudd were together, did Mr.
20  Nacrelli ever meet with the three of
21  you-all to discuss what route -- the
22  two of you-all discuss what route you
23  would have for that year?

17 (Pages 62 to 65)

JOAN K. CRAIG - 10/16/2007

Page 66

1    A.   I don't recall.
2    Q.   You don't recall or you don't know
3    whether he met with -- he didn't, or
4    you just don't recall?
5    A.   I don't recall.  We've had so many
6    meetings for different things and
7    stuff.  It's hard to say specifically.
8    Your asking a specific question.  So I
9    don't recall.
10   Q.   Now, the field trips, how are they
11   assigned?
12   A.   To the drivers?
13   Q.   Yes, ma'am?
14   A.   All right.  The field trips goes
15   through a chain-of-command and
16   different folks have to sign off on
17   it.  The teachers does it -- starts it
18   and then it passes, and passes.
19   Okay.  Then when it's
20   related to the bus shop, they tell
21   them how many drivers they need.  Then
22   Teresa Smice or Patsy Prescott would
23   called me and tell me, Joanie, Ladonia

Page 67

1    is having a field trip.  They need
2    four drivers.  I'll say okay, I'll get
3    them for you.  So, when I'd go to
4    school that afternoon -- because they
5    called during the day, I'd go to the
6    school because we all congregate
7    together and we'd stand and I'll say
8    they're needing four drivers on field
9    trips, who wants to take it.  Anybody
10   could say I do, I do.  And if the say
11   well, are you going to take it?  I'll
12   say yeah, I'm taking it.
13   All right.  I will take
14   it.  Ms. McDaniels will take it,
15   Deborah Hensley would take it,
16   Julie Hearn would take it.  If they
17   needed four.  You know, whoever said
18   they wanted it, would go.
19   Well, then, the next go
20   around -- now, that's like if we was
21   going on a big one.  The next one
22   going around -- if it was a big one,
23   I'd go to them and say look, I'm not

Page 68

1    going to take one.  I'll let one of
2    y'all take it, whoever wants it.  And
3    then, whoever wanted to take it, is
4    the way we would do it.
5    Q.   Would the procedure or the process was
6    it that Teresa or Patsy would call you
7    and tell you that they needed
8    delivers?
9    A.   It wasn't a procedure or a process.  I
10   guess you would say it was something
11   that they go every field trip.
12   Q.   Every field trip then --
13   A.   The secretary of John Rudd calls a
14   certain bus driver at the school
15   system, whichever one it is.
16   Like right now, Tina is
17   calling Ms. Oaks.  And Ms. Oaks comes
18   out there and tells whoever about a
19   field trip.
20   Q.   Okay.  Well, from how many years did
21   -- were you the person they called?
22   How many years were you the contact?
23   A.   From the year I started it.

Page 69

1    Q.   From '92/'93 -- all right.  When did
2    Ms. Oaks become the person they
3    called?
4    A.   The last field trip I took is either
5    2002/2003 to Patterson Tree Farm Road.
6    And then after that, I ain't done
7    another one.  But I'm doing one this
8    Friday.  It's not a field trip though.
9    I'm doing a special run.
10   Q.   My question though is --
11   A.   When I quit doing them.
12   Q.   After the trip to --
13   A.   Patterson's Farm.
14   Q.   Did anybody from the bus shop call you
15   to tell you to set up -- that you had
16   -- you needed so many drivers?
17   In other words, when did
18   you seize to be or stop being the
19   person that the bus shop called to
20   arrange the drivers at Ladonia?
21   A.   When I probably went down there after
22   Patterson's Tree Farm -- went down
23   there for my monthly, I think Ladonia

18 (Pages 66 to 69)

JOAN K. CRAIG - 10/16/2007

Page 70

```
 1    had another field trip, and I told
 2    Tina -- I don't know her last name.
 3    It used to be -- I can't pronounce it,
 4    so I'm not going to try too.
 5    Q.   What did you tell Tina?
 6    A.   I told her -- she said, Joan, I got a
 7    field trip going from Ladonia if you
 8    want to take it.  I said I ain't
 9    taking no more trips.  I -- I ain't
10    taking no more.
11    And I told Ms. McDaniels.
12    And they called her and asked her.
13    And she told no, she wasn't taking
14    none.  And she told them the reason
15    she wasn't taking none for the simple
16    reason she started her -- I guess
17    Social Security retirement.
18    Q.   Uh-huh.
19    A.   And started getting that, so she quit
20    doing them, too.
21    Q.   Did you tell Tina why you weren't
22    doing them anymore?
23    A.   No.  Sure didn't.  Just told her I
```

Page 71

```
 1    wasn't taking them anymore.
 2    Q.   Did you tell Mr. Rudd?
 3    A.   No.  I didn't take it no more.
 4    Q.   So, it's your testimony for the jury
 5    that from 1992 to 1993 school year
 6    until the trip to Rudd's or
 7    Patterson's farm, you were the person
 8    -- the contact person to determine who
 9    would take what bus -- what bus driver
10    would take a field trip at -- from
11    Ladonia?
12    A.   Re -- re-say that again?
13    Q.   From 1992, 1993 school year?
14    A.   Uh-huh.
15    Q.   From that period of time until the
16    trip to Patterson Farm you were the
17    person that the bus shop would contact
18    and ask to arrange drivers for field
19    trips?
20    A.   Not ask me to arrange -- to ask me to
21    find out who would do it.
22    Q.   Okay.  All right.
23    A.   They asked me if I wanted it, I would
```

Page 72

```
 1    tell them yeah.  If they ask me if I
 2    wanted it and I would tell them no.
 3    There was some trips I'd take, some
 4    trips I wouldn't to give the other
 5    drivers a chance.  I didn't hog them.
 6    Q.   Right.  I understand.
 7    A.   I tried to spread it around equally to
 8    everybody who wanted it.  Stenson, we
 9    asked him every time.  He never took
10    the field trips.  He said no, I don't
11    want none.  Hensley started taking
12    them.  She drives for Dixie now.  And
13    she does a lot of nursery.
14    Q.   So the -- but my question is:  From
15    '92/'93 until the Patterson, you were
16    the contact person?
17    A.   They could -- they'd call me and get
18    hold of me, and say, Joanie, we need
19    some drivers.  I would go to the
20    school that day and ask, yes.
21    Q.   Any and then after the trip to Rudd --
22    A.   Either in 2002 or 2003, I haven't done
23    any more.
```

Page 73

```
 1    Q.   And you told Tina?
 2    A.   I wasn't doing no more.
 3    Q.   But you didn't give her a reason?
 4    A.   No.  I just didn't want no more, is
 5    what I told her.
 6    Q.   And you didn't give Mr. Rudd a reason?
 7    A.   I don't think so.  He's never asked.
 8    Q.   How were you paid for field trips?
 9    A.   Truthfully, I don't know.  They just
10    put on my chair.
11    Q.   You don't know if it was mileage or
12    hours?
13    A.   We had to keep our mileage and we
14    would write down what time we pulled
15    out and what time we got back.  And a
16    teacher whoever was riding our bus had
17    to sign and we'd turned it in.  And
18    ever how the system does, is what I
19    took.  So I don't know.
20    Q.   And is that why you gave everybody an
21    opportunity --
22    A.   I give everybody an opportunity if
23    they wanted it; they could make a
```

19 (Pages 70 to 73)

JOAN K. CRAIG - 10/16/2007

Page 74

1    little extra money.
2    Q.   You let them take the bigger longer
3    trips at times apparently?
4    A.   I would try to share with everybody.
5    I didn't want to be hoggish.
6    Q.   Okay. That's fine.
7    MS. SMITH: Y'all want to take
8    a break for a minute?
9    MR. WILLIAMS: Yeah.
10
11       (Brief recess was taken at
12        10:43 a.m., and deposition
13        testimony reconvened at
14        10:57 a.m.)
15    Q.   All right. Now, Ms. Craig, you met
16    with me in January of '06, and I asked
17    you then to give me all of the
18    instances of what you consider to be
19    sexual harassment or creation of a
20    hostile work environment?
21    MR. EDDINS: I'm going to
22    object to anything from
23    that meeting. We just

Page 75

1    asked for records and I
2    haven't received
3    anything.
4    MS. SMITH: Well, let me
5    finish my question.
6    MR. EDDINS: Okay. Go ahead.
7    Q.   All I was going to say to you is that
8    I want to go back over those and you
9    just tell me again?
10    I said that to say that I
11    know she's having to repeat what she's
12    told me already, but I want it on the
13    record. And I'm not going to ask her
14    about these notes. These are my
15    notes, I think. Since I prepared
16    them, I think there's question but
17    they're my work product. Do you have
18    a belief that they're not? That's why
19    I didn't furnish.
20    MR. EDDINS: I mean, if you
21    want to introduce them
22    into evidence it won't be
23    no problem.

Page 76

1    MS. SMITH: Okay. Well, I
2    want to -- I want her to
3    now go back. It's just
4    on paper. You're worried
5    about the time.
6    Q.   Start at the first, Ms. Craig, and
7    tell me the first incident involving
8    Mr. Nacrelli that you perceive to be
9    of a sexual harassment nature or
10    sexual nature?
11    A.   All right. You're asking -- ask me
12    again.
13    Q.   Okay. I'm asking you to describe the
14    first time -- the first incident that
15    you contend Mr. Nacrelli sexual
16    harassed you or more acted
17    inappropriately to create a hostile
18    work environment for you?
19    A.   The very first time that I can recall
20    was the morning I was having trouble
21    on my bus and he got on it and rode
22    with me over to Hancock Place,
23    Hancock Avenue -- place -- off of 80.

Page 77

1    Q.   Okay. That's the first incident you
2    can recall?
3    A.   Right.
4    Q.   Do you recall when that was -- what
5    school year, or if you have a month,
6    or a date?
7    A.   It was in -- I'm thinking. It might
8    have been in the year that I went over
9    into Hancock. Instead of having two
10    runs I extended my route -- he --
11    Mr. Rudd extended my route. Let me
12    see that was in --
13    Q.   Now, earlier this morning you told me
14    that beginning in 2001/2002 you were
15    only running a morning route and an
16    evening route, one of each?
17    A.   When, 2001?
18    Q.   2002?
19    A.   All right. The year before that. It
20    -- let me see. Okay. Mr. Screws left
21    in '99. And when he left Nacrelli
22    come in. That was in August of '99.
23    That would be '99 and 2000; right?

20  (Pages 74 to 77)

JOAN K. CRAIG - 10/16/2007

Page 78

•1   Ain't that what you're considering a
2    year.
3    Q.   No.  I was looking at 2001/2002 based
4    on what you had told me earlier this
5    morning as the numbers of routes you
6    ran.  You said it was the time that
7    Mr. Rudd made it into one route?
8    Well, let's see.  You
9    told me in '99/2000 that you went back
10   to one afternoon route, but you were
11   also running the tutoring route then?
12   A.   It's --
13   MR. EDDINS:  Yesterday we sort
14   of indicated that --
15   somebody did,
16   Mr. Nacrelli wasn't
17   principal until 2001 and
18   2002.  That was the line
19   of questioning.
20   MS. SMITH:  I remember that.
21   I don't remember when he
22   came either.  I don't
23   have that in front of me.

Page 79

1    MR. EDDINS:  I've got out in
2    the car.  She can answer
3    if she can recall a date.
4    THE WITNESS:  No.  I can't
5    recall it.  But it was
6    the day he rode the bus
7    to Hancock Place.
8    Q.   Now, you indicated you were having --
9    A.   Problems.
10   Q.   What kind of problems?
11   A.   All right.  You pull up in there --
12   and I wanted the kids to stand over
13   here by the light pole.  That was
14   their bus stop.  Okay.  And then I'd
15   load them.
16   All right.  In the
17   evenings I had to back up and turn
18   around in that spot.  So the way I
19   wanted to do it in the afternoons was,
20   when I pulled up, I wanted to be able
21   to back up and be ready to leave and
22   unload the kids then, and have them go
23   in front of the bus like they were

Page 80

1    supposed to.
2    All right.  The parents
3    was calling complaining about it to
4    Mr. Nacrelli because of the way I was
5    doing the kids.  They didn't
6    understand why I was being so
7    persistent in how to -- where I was
8    unloading them kids.  I was making
9    them a designated bus stop, is what I
10   was trying to do.
11   I had talked to John Rudd
12   about it.  I had talked to Nacrelli.
13   They was calling Nacrelli complaining.
14   That morning there he come out and he
15   told me after I unloaded the kids, he
16   wanted to go see what I was doing,
17   where I was doing it at.  So I took
18   him and showed him how it was -- how
19   they was -- the parents wanted me to
20   open the door and the run behind the
21   bus, whatever, and I wouldn't do it.
22   So I showed them that
23   wanted the kids to stand at the pole.

Page 81

1    I pick them up, then I would back up
2    after I loaded them.
3    In the afternoon I would
4    pull in and back up and then unload
5    for their safety.  And, so, we went
6    over there -- me and him, and I showed
7    him and explained it to him.  And he
8    said that was no problem, fine.
9    That's the way it would be done; is
10   what Nacrelli said.  And I believe
11   that he sent a memo home to the
12   parents about the bus stop that day.
13   I think there was about
14   11, 12 that got on there.
15   Q.   Okay?
16   A.   I have who it was that lived there
17   then.
18   Q.   What time of day was this that you --
19   that he rode the bus over there with
20   you?
21   A.   That morning when I unloaded my
22   morning load.
23   Q.   Roughly, what time would that be?

21 (Pages 78 to 81)

JOAN K. CRAIG - 10/16/2007

Page 82

1    A.   I was always the last bus to pull in
2    to unload.  So, I'd say about --
3    somewhere around 8:15 -- 8:00.
4    Q.   Is that Eastern time?
5    A.   That's Georgia time.
6    Q.   Okay.  8:15 Georgia time?
7    A.   Yes, ma'am.
8    Q.   That's why I was laughing because I
9    didn't know which time we were going
10   to end up with?
11   A.   I'm strictly Georgia time.
12   Q.   Okay.  For all your times today is
13   going to be on Georgia?
14   Who -- was anyone else on
15   the bus besides you and Mr. Nacrelli?
16   A.   Me and Mr. Nacrelli.
17   Q.   How did -- was he waiting for you out
18   there to get on the bus?
19   A.   He was waiting out there at the
20   unloading area, yes, ma'am.
21   Q.   Did you ever get off of the bus that
22   morning or did you just stay on the
23   bus and him get on it?

Page 83

1    A.   No. I got off.  I always -- I usually
2    always get off with my kids and stand
3    by the door while they unload, and
4    then I get back on.  Sometimes I sit
5    on bus.  It depends on if there's a
6    bus behind me and if it was
7    Ms. McDaniels I'd get off and if I
8    felt -- if I was going to talk to her,
9    I'd get off and go back there.
10   A lot of days I'd sit on
11   the bus and just stay there and let
12   the kids unload.
13   Q.   All right.  What happened that day?
14   A.   He was standing out there.  The kids
15   was unloading.  And so I told him that
16   I was still -- he asked me how -- he
17   -- he was sanding -- that day there he
18   come on the bus.  He come out there
19   and he asked me how things was going.
20   And I told him, I said now, I'm still
21   having problems with these kids just
22   going crazy.
23   He said what do mean?

Page 84

1    And I says, I open the door and they
2    won't do like they're supposed to.
3    They won't cross in front.  You have
4    parents standing out there yelling at
5    them to come on, come on.  I said, and
6    I'm scared to pull off because I don't
7    -- I can't keep up with them.  When
8    they step off that bus, you got some
9    going in the front, some going beside
10   the bus.  I said, and I'm scared to
11   pull out because I'm afraid one may be
12   under.
13   He says, where's this at?
14   I said right down here off of 80 in
15   Hancock.  He said, how far?  I told
16   him.  And he says well, come on.
17   Let's ride around there.  So that's
18   the morning we rode around there.  And
19   I showed him how I would like to do
20   it.  And he said all right.
21   So then when we was
22   sitting there and I showed him.  I
23   said, I -- I says what I want to do --

Page 85

1    and I stopped the bus -- and I said I
2    want the kids to come across in front,
3    them to stand there and wait where I
4    can keep my eyes on them.  And as I
5    turn my bus out, my mirror is on them,
6    and I'm watching them and I can leave.
7    He said all right.  Because as they
8    get off, I count them.  And they -- if
9    there's 13 on there, they need to be
10   standing.  If not, I'm not full.
11   So, he says that's no
12   problem.  He says what's that; two or
13   three seconds.  I said that's it.  So
14   I told him and everything.
15   And then we was heading
16   back, I closed the door.  We was
17   heading back to go to the school and
18   he was standing there at the
19   stairwell.  And that's when he told me
20   whew, you sure do got some nice legs.
21   Then I told him man, don't even
22   go there.  And he says whew, and he
23   started rubbing my legs telling me how

22 (Pages 82 to 85)

JOAN K. CRAIG - 10/16/2007

Page 86

1  soft they were. I told him I said
2  man, keep your hands to yourself,
3  Mr. Nacrelli. I said this is about
4  these kids.
5  All right. And then --
6  so, I told -- he -- we were going back
7  on -- to the -- Ladonia. When we get
8  back up in the parking lot and I open
9  the door and he reached there and he
10  closed it, and he says what's wrong,
11  you what me to get off. I said yeah,
12  we're at school you can get off now.
13  And he said I thought me and you go
14  somewhere else and I go no. I said
15  look. I said it ain't this. I said
16  I'm driving a bus. I wanted you to --
17  you wanted me to show you. I showed
18  you where the stop is. I said I need
19  it fixed for safety.
20  I -- and he said --
21  talking about my legs and stuff, he
22  put his hands back on and I pushed his
23  hand back off and told him to keep his

Page 87

1  hands to his self. And I told him he
2  needed to get himself off the bus.
3  And when he got off, I went on home.
4  So, from that point there
5  is I guess you'd consider sexual
6  advances.
7  Q.   On that occasion, did -- and I think
8  you said he made a comment about your
9  legs while he was standing in the
10  stairwell. And he comes over and puts
11  his --
12  A.   He leans over.
13  Q.   All right. And puts what hand on what
14  leg?
15  A.   He was -- all right. He was standing
16  in the stairwell. He had his hand on
17  here and he reached over and started
18  rubbing with his right hand on my
19  inner leg.
20  Q.   On your inner leg?
21  A.   And I pushed his hand off.
22  Q.   All right. Inner left or inner right
23  leg?

Page 88

1  A.   Right.
2  Q.   And you've told me everything you've
3  said to him in response to that?
4  A.   I told him to keep his hands to his
5  self, yeah. Yes.
6  I have a question? Yeah,
7  counts as yes; right?
8  Q.   Yes, ma'am?
9  A.   Okay.
10  Q.   And tell me again where you were
11  located when this situation occurred,
12  were you back at the school?
13  A.   Not when he put his hands on the first
14  time.
15  Q.   Okay. Were you stopped out or were
16  you moving?
17  A.   I had just pulled away from the bus
18  stop and stopped at the stop sign when
19  he put his hands on me.
20  Q.   And can you remember anything else
21  that was said between you or him
22  during that bus ride?
23  A.   We talked about the kid's stop.

Page 89

1  Q.   I'm talking about of a sexual nature?
2  A.   And he was talking about my legs. And
3  he talked about how he'd like to get
4  with me. That me and him could have a
5  good time. About how he would --
6  could turn me every which way but
7  loose, stuff like that.
8  Q.   All that occurred at this time on that
9  -- on that bus ride; is that correct?
10  A.   Pretty much, yeah.
11  Q.   Can you think of anything else he said
12  to you or did to you on that
13  particular bus ride?
14  A.   We left there at the stop sign when we
15  got back to Ladonia, and when I opened
16  the door and told him to get off he
17  closed the door and he told me that I
18  knew I really didn't want him to get
19  off. That I wanted him. I don't like
20  talking about this.
21  Q.   And I understand that but you've got
22  to tell me this morning about
23  everything that happened?

23 (Pages 86 to 89)

JOAN K. CRAIG - 10/16/2007

Page 90

1   A.   And I told him I said, Mr. Nacrelli, I
2   said, just get off of the bus. I need
3   to go home. Then he reached over and
4   put his hands on my hair talking about
5   what pretty hair I had -- have and all
6   this and how he'd like to get me in
7   bed.
8   So I went home and I
9   called my best friend and I told her
10  and she come over.
11  Q.   Who is your best friend?
12  A.   Cheryl Garry, but she's married. Her
13  name is Cheryl Turk.
14  Q.   And what did you and she discuss?
15  A.   I told her about Mr. Nacrelli and what
16  he'd done. And she wanted me to --
17  she told me that I should call and
18  report it. And I told her no, I
19  couldn't, I'd lose my job.
20  So we talked about it.
21  She stayed at the house with me until
22  it was time for me to go do my
23  afternoon run.

Page 91

1   Q.   Is there anything else you can
2   remember that Mr. Nacrelli --
3   A.   I remember a lot. I mean, I don't
4   remember specific dates, times. I
5   know where they happened, when they
6   happened. Some of it I remember the
7   dates.
8   Q.   Yes, ma'am. And what I'm trying to
9   establish is to have you tell me what
10  you're going to testify to at the time
11  we try this case. I believe in March?
12  I've asked you the
13  question and I want you to tell me
14  everything that you're going to say
15  about that incident?
16  A.   That one incident?
17  Q.   Yes, ma'am. I want you to tell me --
18  here today, everything you're going to
19  say about that one incident when we
20  get in the courtroom?
21  A.   We talked about how sick he was me.
22  And my friend, Cheryl, talked about
23  how sick Nacrelli was. And she told

Page 92

1   me that I should call and talk to
2   somebody. I told her no, I couldn't.
3   She says, well, why don't you call
4   your doctor and talk? I said no, you
5   can't do that.
6   Q.   Why couldn't you call your doctor?
7   A.   Because they'd probably want to put me
8   on pills and you can't take pills and
9   drive a bus.
10  Q.   Is there anything else you can
11  remember that Mr. Nacrelli said to
12  you?
13  A.   That day?
14  Q.   Yes, ma'am?
15  A.   That was it.
16  Q.   And you -- have you told me everything
17  that you said --
18  A.   That I can remember and everything I
19  told him.
20  Q.   You've told me everything that you can
21  remember that you told him that day?
22  A.   I told him to get off and leave me
23  along. I told him to keep his hands

Page 93

1   to his self. He just wouldn't.
2   Q.   You said he it put on -- put his hand
3   on his -- on your inner thigh. Did he
4   put it anywhere else on you that day?
5   A.   He kept trying to rub it up toward my
6   crotch, but I wouldn't let it. I kept
7   pushing his hand and he'd laugh and
8   told me that I knew I wanted him.
9   Q.   And what did you say to him?
10  A.   I told him no. I said, please get off
11  my bus, Mr. Nacrelli, I got to go
12  home.
13  Q.   All right. That's all we can -- you
14  can remember about that incident?
15  Let's go to the next one.
16  When was the next time Mr. Nacrelli,
17  in your opinion, sexual harassed you
18  or put you in a hostile work
19  involvement?
20  MR. EDDINS:  Object to the
21  form.
22  Q.   Let me rephrase it then?
23  When is the next time

24 (Pages 90 to 93)

JOAN K. CRAIG - 10/16/2007

Page 94

1   that Mr. Nacrelli said anything
2   inappropriate to you, or touched you
3   inappropriate, or said anything
4   inappropriate in your presence?
5   A.   It was a while after that incident
6   that he rode the bus because I tried
7   to avoid him.
8   And then -- I don't know.
9   Maybe a couple of weeks he was
10  standing out there with one of the
11  teachers, I think it was, or might --
12  it was either Coach Ross or
13  Mr. Harper, he was a teacher then, and
14  I pulled up to unload my kids. And I
15  -- I -- like I said, I was just about
16  always the last bus to you pull in and
17  unload. And he stepped over there to
18  the bus. And he asked me how was
19  things going? I told him everything
20  was going fine. But he didn't do
21  nothing or make any gestures that day.
22  It was like he was checking things out
23  to see if everything was all right.

Page 95

1   Do you know what I'm saying? I don't
2   know if you understand. And he left.
3   He turned around and I pulled on off
4   and I went home.
5   And it might have been --
6   Q.   Let me ask you about this: He -- he
7   -- his only comment to you was, is
8   everything all right?
9   A.   How -- how's it going; everything all
10  right? I said yes, sir, everything's
11  fine. My bus runs smooth. I
12  Q.   And what do you -- do you think he was
13  asking about -- and you seem to think
14  he had some underlying intent with
15  that question; what do you think?
16  A.   I felt like he was checking on the
17  kids with Mr. Harper there, as he done
18  periodically other times, check on
19  other buses, other kids -- everything
20  is all right? I said yes, everything
21  is fine. My bus runs smooth. I
22  closed the door and I went home.
23  Q.   And how -- why do you perceive that to

Page 96

1   be an incident of sexual harassment?
2   A.   Not that.
3   Q.   Okay?
4   A.   The other was before that, is what I'm
5   saying. He done it, then he come and
6   checked everything is all right? Kids
7   all right? Yeah, everything is fine.
8   I felt like he was
9   checking to see if I was going to be
10  hostile towards him, or you know what
11  I'm saying? You know violate towards
12  him with another teacher standing
13  there. I wasn't saying nothing. So,
14  I went home. And --
15  Q.   When was the next event that you
16  considered to be a form of sexual
17  harassment to you by Mr. Nacrelli?
18  A.   Maybe a couple of weeks -- he was back
19  out there waiting on the buses with
20  the kids to unload. And before I
21  could unload my bus I was having
22  problems with tis boy named -- a
23  little bit of problem with this boy

Page 97

1   named Jonathan Rose.
2   And so he stepped on my
3   bus and he asked Jonathan what was the
4   problem? And Jonathan told him that
5   he didn't have no problem. And he
6   asked me and I told him I says well, I
7   just moved him to the front seat
8   because that's the only place Jonathan
9   could ride. And he wanted to sit in
10  the two seats back. And I told him --
11  kept telling him no, he wasn't. He
12  was going to have to say in his front
13  seat. He was wanting to be
14  argumentative with me a little bit.
15  Mr. Nacrelli said well, if you don't
16  do like Ms. Craig says, I'll take you
17  off this bus. And Jonathan says, I
18  didn't get up and move. I stayed
19  right here where she told me, front
20  seat, which he did but he was wanting
21  to argue.
22  And Nacrelli knew there
23  was something because we wasn't

25 (Pages 94 to 97)

JOAN K. CRAIG - 10/16/2007

Page 98

1  getting -- the kids wasn't getting off
2  like they normally do; soon as we get
3  there I open the door and they go to
4  getting off. And I was getting on to
5  Jonathan so that's when he come over
6  there and got on the bus.
7  Instead of him getting
8  off the bus, he stayed on the bus and
9  had all the kids get off -- while he
10 would stay on the bus while they're
11 unloading? I thought, oh, my God.
12 And then he was sitting
13 there talking to Jonathan because
14 Jonathan was still on the bus and he
15 was talking to Jonathan. And then he
16 told Jonathan, he says all right, you
17 can go on and go. So Jonathan gets up
18 and he goes off and Nacrelli is
19 standing on the bus. And I looked in
20 the mirror at him and I said, you can
21 go on and get off, too, Mr. Nacrelli.
22 He says yeah, I will. He says pull up
23 there.

Page 99

1  And what I mean by, pull
2  up there, I parked. The way Ladonia
3  is they have -- have this awning.
4  Q.    Uh-huh?
5  A.    All right. I was parked at the back
6  towards the gym. But he wanted me to
7  pull further up to -- towards the
8  Woodland Drive exit. And I told him,
9  I said no, I'm not pulling up there
10 until I pull up to leave. You need to
11 get off here. And he said, no, you
12 just go on and pull up to the other
13 gate. I'm going up through the
14 walkway. Instead of going like up
15 where they got off at, to go up and
16 into the buildings, and he wanted to
17 get off at that front little side gate
18 and walk up the sidewalk on the
19 outside up to the office.
20 And so he's sitting
21 there. And I pulled up to the -- that
22 gate and he -- he was standing there
23 -- he was standing there, had one foot

Page 100

1  on the stairs and was standing on a
2  regular platform. So -- so he had his
3  right foot on the stairwell, the first
4  step and had his left foot like this.
5  But he had more weight on his right
6  leg. It was like he was standing with
7  his leg cocked. And he was holding
8  onto where you hold the door handle.
9  And he put his hand back here and
10 started rubbing my neck and all. And
11 told me how he would like to just get
12 me in the bed and caress my breast,
13 and that I had nice breasts. And then
14 he leaned over -- he still had his
15 left hand in on my neck and leaned
16 over and started rubbing my leg, and I
17 started crying. And I pushed his hand
18 and I said, please let me go home.
19 He says, you ain't told
20 on me yet, have you because you really
21 want it, didn't you? And I says no, I
22 just don't to lose my job, is what I
23 told him. And I says, please, get off

Page 101

1  the bus, Mr. Nacrelli.
2  And so he started to get
3  down and he told me -- he says, well,
4  I'll see you next time; right? And I
5  just looked at him and rolled my eyes.
6  And I didn't say nothing to him. He
7  says Johnny knows you want me. He
8  heard about us Italian men; like that.
9  I said please, leave me alone. And he
10 says look, he says I know you got a
11 wild streak in you and he says I sure
12 would like to tame you.
13 Q.    Did you say anything back to him in
14 response to that comment?
15 A.    Yeah.
16 Q.    What did you say?
17 A.    Yeah, I bet you would.
18 Q.    Did you say anything else?
19 A.    I told him to get off my bus.
20 Q.    And what did he do then or say?
21 A.    He says, I'll see you around. I said
22 yeah, right here. The only around
23 you'll see me is at this school.

26 (Pages 98 to 101)

JOAN K. CRAIG - 10/16/2007

Page 102

1    And he told me that he
2    sure would really like to get with me.
3    Q.    Anything else he said?
4    A.    That's basically it that day?
5    Q.    Basically, you mean that's -- that's
6    it; that's what you remember from that
7    day?
8    A.    Like I said I remember a lot.  And
9    it's hard to put dates, and times and
10   places.
11   It's like you have all
12   the things that he's done to you and
13   said to you, and it's hard to put them
14   in perspective.
15   Q.    I'm just trying --
16   A.    I know what you're trying to do.  And
17   I'm trying my best to give it to you
18   like you want it.
19   Q.    Okay?
20   A.    I really am.
21   Q.    Is there anything else you can
22   remember about that day?
23   A.    Nothing out the ordinary, no.

Page 103

1    Q.    Did you leave and go home?
2    A.    Pretty much, yeah.
3    Q.    Did you come back and get your
4    afternoon route?
5    A.    Yeah.
6    Q.    Did you talk to your friend again?
7    A.    I talk to her every day.
8    Q.    Did she tell you -- did you tell her
9    about this incident?
10   A.    (The witness nods head.)
11   Q.    And what was her response to that?
12   A.    She was going to call Channel 9 news.
13   Q.    And what did you say?
14   A.    I begged her not to.
15   Q.    Did she again suggest to you that you
16   report it?
17   A.    Uh?
18   Q.    Did she tell you that time that you
19   should report it?
20   A.    She said I needed to be exposed him.
21   Q.    Did you report it to anybody?
22   A.    No.
23   Q.    What's the next instance you remember?

Page 104

1    A.    Periodically he'd be out there, like I
2    said, and he'd check with other
3    drivers just like he checked with me.
4    I don't know if he done other drivers
5    like he done me.  I can't say because
6    I'm not them.
7    And whenever he was
8    outside -- if he was out there waiting
9    on the buses, he would always come to
10   my bus door and stand.  When the kids
11   unload he would through his gestures.
12   He would grab himself and pull up on
13   it like -- I don't know what you'd
14   call it.  Maybe he was adjusting it in
15   his pants.  I don't know.
16   Q.    How many times did that happen?
17   A.    Truthfully?
18   Q.    Yes, ma'am?
19   A.    I don't recall.  It was more than
20   once.
21   Q.    And what you're describing is him --
22   A.    Putting his hand on his -- on his
23   pants at his privates and like pulling

Page 105

1    up, like -- I don't know what -- how
2    you'd say it; adjusting his penis.  I
3    don't know.
4    Q.    More than once?
5    A.    Oh, yes.
6    Q.    And this was --
7    A.    Several different times.
8    Q.    And would this happen while you were
9    on the bus and he was standing in the
10   doorway; is that what you said?
11   A.    Sometimes he'd be standing on the bus
12   and he's done in the hallway at
13   Ladonia.
14   Q.    To just you or to other people?
15   When he's done it in the
16   -- let me rephrase that.
17   When he's done it in the
18   hallway in Ladonia, have you been the
19   only person present?
20   A.    There might have been a kid or two out
21   there.
22   Q.    Was any other adults present?
23   A.    He's done it in his office.

27  (Pages 102 to 105)

JOAN K. CRAIG - 10/16/2007

Page 106

1    THE COURT REPORTER:  Was that
2    a no, were there any
3    adults?
4    THE WITNESS:  No.  Was there
5    any adults, no.
6    Q.    Then you said he's done it in his
7    office?
8    A.    Yes.
9    Q.    When you were in his office?
10   A.    Yes, ma'am.
11   Q.    All right.  You said that he did that
12   on more than one occasion.  And how
13   many times did he do it in his office?
14   A.    I don't recall.
15   Q.    What would be the situation that you
16   would be in his office?
17   A.    I would have wrote up a student.
18   Q.    Okay.  Now, when he would pull up his
19   genitals, would he say anything to
20   you?
21   A.    It depended on where he was at.
22   Q.    Well, tell me what he would say where?
23   A.    In his office he'd asked me if I

Page 107

1    wanted it, and I'd say no, thank you.
2    And I'd tell Mr. Nacrelli I'm here to
3    discuss this student.
4    And sometimes he'd say --
5    he'd hold it and say, you remember
6    what I told.  You know about us
7    Italian men, we're studs; Italian
8    stallion.
9    Q.    Did he say those -- you've
10   described --
11   A.    Numerous different times, yeah.
12   Q.    Would he make those -- those same
13   comments numerous times; is that what
14   you're saying?
15   A.    Correct.  Yes, ma'am.
16   Q.    How many times did it happen in your
17   -- in his off if you recall?
18   A.    I don't recall.
19   Q.    More than one?
20   A.    Once I think in his office.
21   Q.    And where did the other comments occur
22   -- which comment occurred in his
23   office?

Page 108

1    A.    When he grabbed it and asked me,
2    didn't I want that -- didn't I want
3    it?  And I just turned -- and I laid
4    my thing on his desk, then I walked
5    out.  And I walked down the hall and I
6    went down towards Ms. Bass and
7    Ms. Amerson's class.  And Ms. Amerson
8    and Ms. Bass was standing out there.
9    And I told Ms. Amerson and Ms. Bass I
10   wish that somebody -- I says no -- I
11   says one day I'm just going to haul
12   off and cold cock that son of a bitch,
13   is what I said.
14   I told Ms. Bass and
15   Ms. Amerson that standing in the
16   hallway talking.
17   Q.    Did you tell them why?
18   A.    I had already told Ms. Bass.
19   Q.    When did you tell Ms. Bass?
20   A.    I didn't actually tell her in words.
21   I said as far as, I didn't come out
22   and say Ms. Bass, Mr. Nacrelli is
23   sexual harassing me.  I didn't come

Page 109

1    out and say that.  I told her that
2    Mr. Nacrelli was -- I said how -- I'll
3    tell you how I told her.  I said God,
4    that man needs to get a life.  I said
5    he's wanting some kind of woman, is
6    what I said.
7    I didn't say me because I
8    was ashamed.  I didn't want nobody to
9    know that this man was hitting on me
10   or was making sexual gestures to me.
11   I was ashamed of it.  But in a sense I
12   was crying out for help, but I didn't
13   go out and ask.  I didn't go up and
14   say I need help.  I got this man
15   making sexual gestures.  No, I didn't
16   do that.
17   I said man, somebody --
18   this man needs desperately to find him
19   a woman somewhere because he runs
20   around here like he's horny or
21   something.  I might have said horny.
22   But when he'd do it --
23   that day he done it, I walked down

28  (Pages 106 to 109)

JOAN K. CRAIG - 10/16/2007

Page 110

1  there -- they asked me why, what did
2  he say?  What did he do?  And I says,
3  oh, nothing.  Just forget it.  I
4  wouldn't tell them.  I couldn't tell
5  them.
6  Q.  Did you ever tell Ms. Bass anything
7  else?
8  A.  I would throw slurs.  But I never
9  would actually come out and say he was
10  doing sexual gestures or advances to
11  me.  I never would say that.
12  Q.  What kind of slur?  When you say a
13  slur, what do mean by that?
14  A.  Mr. Nacrelli thinks he's a woman's
15  man, stuff like that, you know.
16  Q.  All right.  We've talked about --
17  A.  I might even told them that
18  Mr. Nacrelli must not be getting none
19  at home.  I might have told them that;
20  to be honest.  I know one time I told
21  them that he needed to go to the
22  bathroom.
23  Q.  You told him or them?

Page 111

1  A.  I told Yvonne Amerson that that man
2  needed to go to the bathroom and do
3  his thing.  You know, like that.
4  Q.  Did you mean masturbate?
5  A.  Yes, ma'am.
6  Q.  Did you use that term?
7  A.  No.  I told her that he needed to go
8  jack-off.  That's the word I said,
9  jack-off.  Because he needed to go get
10  his rocks off.
11  Q.  What other kind of things of that
12  nature did you tell other people?
13  A.  I didn't tell nobody else nothing like
14  that.  I told Yvonne because me and
15  Yvonne grew up together.  I lived here
16  and her mamma lived there.  My mamma
17  lived here and her mamma lived there.
18  I used to go down and sit on her
19  mamma's porch with her and watch her
20  and big sister play Barbie dolls but I
21  couldn't play, they wouldn't let me.
22  Q.  Did you ever tell her?
23  A.  No.

Page 112

1  Q.  Okay?
2  A.  Because she was a teacher.  I wasn't
3  about to tell her that.
4  Q.  All right.  We've talked about the
5  morning on the bus.  And then a couple
6  of weeks later, I think out by the bus
7  where you let the children off.  And
8  then a couple of weeks later him
9  coming on the bus.  Then you talked
10  about him pulling up his genitals.
11  What other things have occurred in
12  sequence, as best you can remember?
13  A.  Then in -- excuse me.  All right.
14  Then me and my nephew we went up and
15  to Ladonia to eat lunch with his two
16  boys.  One was in Ms. Bevins' class,
17  second grade, and the other one was in
18  Ms. Crenshaw, second grade.  And they
19  ate lunch about -- near about the same
20  time sequence.  So we went up there;
21  me and Little Man.  That's my nephew.
22  We went up there to eat lunch.  And I
23  had on a do-rag because I ride a

Page 113

1  motorcycle.
2  All right.  And when we
3  get up there and we go in the
4  lunchroom and we eat lunch with Chance
5  and Chase.  And we're getting ready to
6  leave after eating, Mr. Nacrelli comes
7  out of his office and he walked over
8  there to me and pats me on the butt
9  and tells me you can't do that.  I
10  said what?  He says the do-rag.  I
11  said, oh, yes, I can.  I'm not on my
12  job, and I'm riding a motorcycle is
13  what I said.
14  Oh, you're on your
15  motorcycle?  I said, yeah.  So he goes
16  out the door with us to look at the
17  motorcycle.
18  All right.  So we're out
19  there looking at the motorcycle me,
20  him and my nephew and we're standing
21  there and he's talking about the bikes
22  and how he likes them and all this.
23  And I cut my lights on to show him

29 (Pages 110 to 113)

JOAN K. CRAIG - 10/16/2007

Page 114

1 that I have running lights under it,
2 and he ask me when was I going to take
3 him for a ride. And I laughed. I
4 said, man, I can't take you for a
5 ride. Mine is a solo bike. It's a
6 single seater. Oh, but I can still
7 ride with you, Ms. Craig. I said, no,
8 you can't; even if it was a
9 two-seater, I wouldn't let you ride
10 with me. I said, I only ride myself.
11 All right. So I'm in the
12 in process of putting my helmet on,
13 and as I'm putting it on, Little Man
14 puts his on and he's standing there
15 laughing.
16 Q.   Who is he?
17 A.   My nephew.
18 Q.   Is laughing?
19 A.   Laughing. Because Nacrelli is saying
20 but you could still ride somebody on
21 it. And Little Man is laughing. And
22 he says no, it's a solo, man. She
23 just told you, you know. And I get on

Page 115

1 my bike. Little Man cranks his. And
2 I'm in the process -- when I crank
3 mine, I have to cut mine on. And I
4 have to wait for my oil light to go
5 off before I start it. But
6 Little Man's you don't, or you might
7 supposed too, but he never did. But I
8 do mine by the book. The way they
9 told me too.
10 All right. So I cut my
11 switch on and I bent over cutting my
12 switch on, and as I raise up, Nacrelli
13 is still standing on my right side and
14 I'm standing -- sitting like this and
15 I'm watching my gauge for my oil light
16 to go out, and it -- and I'm standing
17 there and I went to push the button,
18 he goes I could ride on and hold you
19 by the breast. I can sit on the seat
20 and you can sit on my lap. And
21 Little Man was running his
22 motorcycle -- Nacrelli don't start
23 this here. And Little Man turned and

Page 116

1 looked and he goes, let's just go.
2 So when we left and went
3 home, we get home and everything,
4 Little Man says Aunt Jo-Jo, what did
5 he say to you? I says nothing,
6 Little Man. He said yeah, he did.
7 Your face turned red. I says no, it
8 didn't. He says I know it did. What
9 did he say Aunt Jo-Jo? I said
10 nothing. He goes I know what it is
11 that man has got the hots for you,
12 ain't he? I says no. He goes yeah,
13 he does. I go no, he don't. I didn't
14 want my nephew to know. So I never
15 would say nothing to them about it.
16 And then I had to go up
17 -- I had went up there to -- Chance
18 and Chase are in second -- was in
19 second grade. They were doing a
20 Christmas program.
21 Q.   Let me ask -- just ask: How old was
22 your nephew that was riding the
23 motorcycle?

Page 117

1 A.   29. He's grown.
2 Q.   Okay. Go ahead?
3 A.   The -- they was in second grade. They
4 was doing -- all right. This here
5 happened -- that happened after what
6 I'm fixing to tell you. See, the
7 sequence --
8 Q.   The motorcycle thing happened?
9 A.   After what I'm going to tell you about
10 the Christmas.
11 Q.   Okay?
12 A.   They're in the Christmas program for
13 the second grade. All right.
14 Little Man was out of town working,
15 and he dropped them at Maw-Maw
16 Booker's.
17 THE COURT REPORTER: At where?
18 THE WITNESS: At Maw-Maw
19 Booker.
20 THE COURT REPORTER: Booker?
21 THE WITNESS: Booker,
22 B-O-O-K-E-R.
23 A.   So is he dropped them off there

JOAN K. CRAIG - 10/16/2007

Page 118

1  because he had to leave at 4:30 that
2  morning. Okay. He didn't leave no
3  money, but their lunch money.
4  Ms. Booker takes them -- Maw-Maw takes
5  them to school. And I get home off my
6  bus, she calls me. She says Joanie,
7  you know Chance and Chase got a
8  program tonight? I said yes. She
9  says Little Man didn't leave me no
10 money and Ms. Crenshaw told me that
11 they had to wear a shirt, like a
12 sweatshirt, Christmassy, for the --
13 for the program. She said I don't
14 have the money to go get them nothing
15 and I don't know what to get them. I
16 said look, I'll take care of it.
17 So I left and ran all
18 over Phenix City hunting sweatshirt
19 and I found two -- two blue
20 sweatshirts. I was trying to find red
21 or green and never could. So finally
22 I found two blue ones. I couldn't
23 find a white one.

Page 119

1  So I brought them home.
2  And I bought all these little ointment
3  looking things and I hot glued them on
4  the sweatshirt. And I'd never ran a
5  hot glue gun, and when I was doing it,
6  I burned this hand because I was
7  squeezing it and it got on this hand.
8  And I didn't realize grabbing it with
9  hand was going to be hot when I went
10 to pull it off and it was going to
11 stick to this hand. So I burned both
12 of my fingers -- my fingers on both of
13 my hands is what I burnt fixing them.
14 So that evening they rode
15 the bus home with me. All right. I
16 got them dressed and we went straight
17 back up to the school when I finished
18 my route. I got them dressed ready
19 for their program, took them back up
20 to the school and we was at school on
21 the program. And Mr. Nacrelli come up
22 to me after the program and put his
23 arm around me.

Page 120

1  And he's standing there
2  and he put his arm around me. And I
3  thought, oh, my God, he's fixing to
4  start up. And so I was standing there
5  -- I think I was standing like this,
6  you know, smiling because I didn't
7  want people to think we was having an
8  affair.
9  And I was self conscious
10 of him getting close to me. So -- but
11 he didn't do anything, other than come
12 up and you know put his arm around me
13 out of the -- you know he didn't do
14 anything other than that out of the
15 ordinary. He didn't pinch me on the
16 butt or nothing. And he didn't say
17 let's me you -- you want me? He
18 didn't say nothing like that that day.
19 He just come up and it made me
20 uncomfortable.
21 Okay. And then after
22 that Christmas, then in March is when
23 we went up there and eat with the boys

Page 121

1  and rode our motorcycles.
2  Q.  Okay. Well, let's -- let's do this?
3  A.  Okay.
4  Q.  Since you know that they were in the
5  second grade?
6  A.  Uh-huh.
7  Q.  Let's try to establish what Christmas
8  it was?
9  A.  All right.
10 Q.  What grade are they in now?
11 A.  Fifth. I'm pretty -- I trying -- I
12 think it's the fifth. They were in
13 second grade.
14 All right. It was in '04
15 because my motorcycle was an '04 --
16 '05. It was the year '04.
17 THE COURT REPORTER:  Your
18 motorcycle is an '05?
19 THE WITNESS:  Uh-huh -- or a
20 --
21 Q.  It's an '05. The motorcycle is an
22 '05. And when did you buy it? You
23 said you went up to school in March.

31  (Pages 118 to 121)

JOAN K. CRAIG - 10/16/2007

Page 122

1  When had you bought the motorcycle?
2  A.  Let me back up.  I had a -- back there
3  was a '04 motorcycle.  It -- it was
4  March of '04, I was on my Yamaha.
5  Then I bought the A83 the '05 in
6  May -- first part of May.  And May is
7  when he come out them and told me he
8  wanted to ride with me.
9  Q.  May of '05?
10  A.  '04.  I bought it -- okay.  It was in
11  '04, but I had bought it May of '04.
12  But it was an A83 '05 model.  Because
13  they come out in March.  The '05, come
14  out in March.  And I bought mine in
15  May -- March or April is when they
16  come out with the '05.
17  Q.  Okay.  Let me make sure I understand?
18  A.  Okay.  In March when I went up there
19  on my motorcycle it was a Yamaha.  All
20  right.  He just walked out there and
21  looked at it.  He didn't say nothing
22  out of the way.
23  Q.  And --

Page 123

1  A.  That was '04.
2  Q.  That wasn't during the event that you
3  went up to eat with your nephews?
4  A.  No.
5  Q.  Okay.  March '04 you had a Yamaha?
6  A.  Right.
7  Q.  All right.  And then in --
8  A.  That same year, May, I had bought an
9  '05 Sportster A83.
10  Q.  Okay?
11  A.  That's when he come out -- that's when
12  me and Little Man went up there and
13  ate with the boys was in May.
14  Q.  Of 2004?
15  A.  Right.
16  Q.  Now, you said the Christmas then
17  happened before?
18  A.  It was '03.
19  Q.  So, it was 2003 was the Christmas
20  thing?
21  A.  Right.
22  Q.  Okay.  All right?
23  A.  Okay.  All right.  Then --

Page 124

1  Q.  Okay?
2  A.  That was in May.
3  Q.  Yes, ma'am?
4  A.  All right.  August of '04 and '05-year
5  start.
6  Q.  Okay?
7  A.  We had what they called inservice day
8  of '04, '05.  We had to go to Russell
9  Middle School lunchroom.
10  Q.  Okay.
11  A.  All right.  You have all your
12  driver's, maintenance; all these
13  people Dr. Lee, Ms. Baker, all them,
14  they come over there to eat lunch.
15  They have a luncheon for us.
16  Q.  Okay.  I don't mean to interrupt.
17  Were these teachers too or just
18  transportation?
19  A.  The teachers goes to the high school
20  and do their thing.
21  Q.  So, this was inservice day for the
22  support personnel of the
23  transportation department?

Page 125

1  A.  Transportation and whatever.
2  Q.  Okay?
3  A.  All right.  Then after we have our
4  inservice where we have our little
5  training course of things to do and
6  not to do with the kids, and what you
7  can and can't do.
8  All right.  The -- you
9  get with your principal and your
10  assistant principal.  Each -- each
11  school gets in a group -- each bus
12  driver that drives for Ladonia gets in
13  a group.  And we're spread out all
14  throughout the lunchroom.
15  All right.  And you're
16  all in your group.  Then your
17  principals and your assistant
18  principals comes over there and goes
19  over your dos and don'ts, and how
20  they're going to work with you, and
21  discipline and stuff like that; is
22  what they're going over with you
23  and --

32  (Pages 122 to 125)

JOAN K. CRAIG - 10/16/2007

Page 126

```
.1    All right.  So we're all
 2    in there, and Mr. Rudd gets finished
 3    with all of us.  This here is -- he
 4    tells us -- all right.  All Ladonia
 5    drivers get in y'all's group.  And
 6    your principals and assistant
 7    principals come over.
 8       Okay.  So we're all
 9    sitting in these chairs -- individual
10    chairs, and we're sitting there.  And
11    I'm sitting here.  It was me,
12    Ms. McDaniels.
13    Q.    To your right?
14    A.    To my right.  There was nobody on my
15    left.  Ms. Baker, another driver, and
16    I think it was Donny Hendricks and --
17    and there was Ms. Oaks, Ms. Allen and
18    Ms. Grant was sitting on this side.
19       All right.  Nacrelli
20    comes up there to talk to all of us --
21    all of us drivers, and when he comes
22    up, he comes up and walks up and
23    stands on -- at the corner of my
```

Page 127

```
 1    chair.  And the chairs that they use
 2    are little plastic fold chairs.
.3    They're not as -- they're not this
 4    big.  And he was in my space standing
 5    right here, and I was sitting here
 6    like this, and he comes up and if I
 7    had turned around, it would have been
 8    like he could have pulled it out and
 9    put it my mouth.  So I lean over and I
10    looked at Ms. McDaniels-- I said man,
11    I wish you'd get off of me; is what I
12    tell her.
13    Q.    And we're talking about his penis; he
14    could pull it out and put it --
15    A.    Put it in my mouth.  He never moved
16    from this spot until he as through
17    talking.  And I turned like this to
18    Ms. McDaniels, I go God, I wish he'd
19    get off of me.  And she goes yeah,
20    it's getting worse, like that.  And I
21    sit like this and I leaned like this
22    in my seat when he was talking.  And I
23    said okay, man, I want to ask you
```

Page 128

```
 1    something.  That's what I said.  I
 2    said so, you're saying to us -- in
 3    other words, if she takes them off the
 4    bus -- suspends them, then you could
 5    -- you're going to come right around
 6    there and put them on the bus?  He
 7    goes, if I want too.  I said good
 8    then, we'll play strictly by the book.
 9    That's exactly what I did.  And he
10    looked at me funny.
11       That there was my warning
12    to him that we was going by the books.
13    Because we was introduced this book in
14    that meeting.  And then was introduced
15    something about a grievances that was
16    going to be Mr. Rudd's office and I
17    was going to go by the books that
18    year.
19    Q.    And you're talking about the books in
20    terms of transportation or what --
21    what books are you talking about?
22    A.    Mr. Rudd told us in the meeting that
23    -- that if we wanted to file a
```

Page 129

```
 1    grievance on somebody for anything, he
 2    would have the -- whatever book it is,
 3    in his office available for us to go
 4    look at and read and see -- you know
 5    what I'm saying?
 6    Q.    Yes, ma'am?
 7    A.    The thing.
 8       All right.  Then he told
 9    us that we was -- that there was some
10    things come up about sexual harassment
11    and strip search, and all that.  This
12    here was in our meeting that year
13    about the strip search, and charges
14    and all this stuff.  So they were
15    presenting us with this new book.
16    Q.    Okay?
17    A.    And he wanted us to read it.
18       And we had a -- they had
19    a -- what you call it -- meeting after
20    lunch.  I think it was going to around
21    two o'clock, but he told us we didn't
22    have to stay for it.  And I wasn't
23    staying because I wasn't going to be
```

33 (Pages 126 to 129)

JOAN K. CRAIG - 10/16/2007

Page 130

1    keyed out to be having a problem.
2    Because I didn't want no anybody to
3    know at that time.
4    Q.    Do you have that book?
5    A.    What?
6    Q.    That book you say -- the new book that
7    was given out; do you have it?
8    MR. EDDINS: That's 2006,
9    2007?
10   MS. SMITH: Uh-huh. Yes, sir.
11   Q.    You told me this happened -- this is
12   '06, '07 handbook. I'm trying to get
13   the one that Mr. Rudd gave you in
14   August of '04?
15   A.    '05 -- August of '05, is when he come
16   up there and stood over me.
17   Q.    Okay. You had told me '04, but you're
18   talking about -- you're revising that
19   to say August of '05. And it's the
20   2005/2006 school year?
21   A.    This is the book we got last year.
22   Q.    Okay?
23   A.    That's it.

Page 131

1    Q.    That's the one you just showed me?
2    A.    '06, '07.
3    Q.    Okay?
4    A.    All right. Let's how -- okay. '06,
5    '07.
6    '05 and '06.
7    Q.    So, that's when you had -- I had a
8    calendar earlier?
9    This was the calendar we
10   had yesterday. I noted you were
11   agreeing with some of those dates.
12   That the '05, '06 school year. Is
13   that the one we're talking about?
14   A.    August the 3rd, we went and picked our
15   bus up.
16   Q.    Okay?
17   A.    '05.
18   Q.    Of '05, you picked up the bus?
19   A.    Right.
20   Q.    Okay?
21   A.    '05 -- it wasn't last school year. It
22   was the school year before.
23   Q.    All right. Last year would have been

Page 132

1    '06, '07?
2    A.    Right.
3    Q.    So, '05, '06; is that when we're
4    talking about?
5    A.    Yeah. Because, see, the first day of
6    school was August the 8th.
7    Q.    Okay. And I saw nodding in agreement;
8    with that yesterday?
9    A.    Right. Right.
10   So, this year -- this
11   here is when he stood over me.
12   Q.    Okay?
13   A.    This year here.
14   Q.    Okay?
15   A.    And the reason I say because
16   August the 8th was my
17   ex-sister-in-law's birthday. '08 --
18   her's was 8-8 and my mama was 8-4.
19   Q.    Okay. Let me just mark this as --
20   A.    All right. So, that's the year he
21   stood over me.
22   Q.    Wait just a minute?
23   MS. SMITH: I'm going to mark

Page 133

1    it as Defendant's
2    Exhibit 1 to Craig and
3    introduce it. Is there
4    any objection? This is a
5    '05/06 school calendar.
6        (The referred-to document was
7        marked for identification as
8        Defendant's Exhibit No. 1.)
9    MR. WILLIAMS: No objection.
10   MR. EDDINS: I have no
11   objection.
12   Q.    Now, you got your buses on the third
13   then. So what day -- is that the same
14   day you had the inservice that you're
15   talking about?
16   A.    Uh-huh.
17   Q.    Okay. All right?
18   MR. WILLIAMS: Is that a yes?
19   A.    Yes. Yes. I'm sorry.
20   Q.    Okay. So you had inservice on
21   August 3, '05?
22   A.    Yes.
23   Q.    And that's the situation you were

34 (Pages 130 to 133)

JOAN K. CRAIG - 10/16/2007

Page 134

1 describing about him standing by you?
2 A. Right. Right.
3 Q. Okay. And then tell me again what you
4 said about going by the book? I sort
5 of lost you?
6 A. Okay. Mr. Rudd said something about
7 filing grievances and stuff.
8 Q. Okay?
9 A. All right. So, I -- when he said that
10 about filing grievances that was
11 opening a door for me. I felt like.
12 Because I never knew where none of
13 that stuff was -- never was presented
14 with none of that stuff.
15 Okay. So, I asked him,
16 Nacrelli, if Ms. Grant took the kids
17 off, was he going to put them right
18 back on? Because if she took them off
19 for punishment, was he going to stick
20 them right back on?
21 Q. Ms. Grant is that -- is she --
22 A. Assistant principal.
23 Q. At that time?

Page 135

1 A. Right.
2 Q. All right. Go ahead. Excuse me. I
3 didn't mean to interrupt?
4 A. And he looked at me and he said I
5 probably will, yeah. And I said well,
6 good then. We'll go strictly by the
7 book.
8 In other words, I was
9 letting him know that anything that he
10 done, whether sexual or anything like
11 that I was going to turn him in. I
12 wasn't going to take it no more. I
13 was letting him know that him coming
14 on to me, putting his hands on me that
15 I wasn't going to let him do it. I
16 was wasn't going to tolerate -- in
17 other words. Because I was a better
18 person then. I could -- I felt like I
19 could -- I had to tell somebody to get
20 him off of me. It felt like he was a
21 spider and I just couldn't stand it.
22 I felt like I was going crazy.
23 Q. Okay. In your opinion, did he seem to

Page 136

1 understand what you were telling him?
2 A. No.
3 Q. You don't think he did?
4 A. I know he didn't.
5 Q. Okay. Why do you know he didn't?
6 A. August the 8th, we started school. We
7 went to school that day. We picked up
8 our kids and we hauled them to Ladonia
9 and we dropped them off.
10 I didn't know at that
11 time that during the July sometime of
12 that year, Ms. Oaks and I think it was
13 Ms. Baker -- but I had been out of
14 town. I usually go out of town every
15 summer. So, I'd been out of town --
16 that they got together with Mr. Rudd
17 and went over our routes. And they
18 made a few changes. Mine didn't, as
19 far as to what my run and all, mine
20 didn't change. But some of their's
21 changed. Some got this many -- some
22 of this person's kids and this one
23 here got some of this person's

Page 137

1 driver's kids. So, they switched them
2 up just a tad -- roadway or something.
3 I don't know. So, they done that.
4 Well, we went to school
5 the first day. That afternoon the
6 teacher brings her kids out. We load
7 up. And some of them didn't get home
8 like they were supposed to. So, I
9 guess somebody is in trouble. In
10 other words, parents calling because
11 their baby ain't got there.
12 Well, it kindly got next
13 to Mr. Rudd about it. And Ms. Oaks
14 told him that you was there. You know
15 the change was made and it wasn't --
16 it was a communication problem between
17 Rudd, Oaks, and Ladonia and whoever.
18 Because I wasn't in it.
19 All right. So they
20 called a meeting. John Rudd did at
21 Ladonia and he wanted get it straight.
22 All right. So he brought the big
23 county map, a big one. And we do

35 (Pages 134 to 137)

JOAN K. CRAIG - 10/16/2007

Page 138

1    color coordinate. I'm purple. All
2    right. And we all pick out our
3    colors. So what he wanted us to do is
4    to make our route description, so we
5    did.
6    All right. It was
7    John Rudd, me, Ms. McDaniels, all of
8    us drivers for Ladonia, Nacrelli and
9    Ms. Grant. All right. They got a
10   table like this sitting in a
11   conference room. There's a chair
12   there, two here, two there one there.
13   Ms. Grant was sitting here, Nacrelli
14   was sitting here and John Rudd was
15   standing -- standing at -- he was
16   sitting at that end down there. All
17   right. We all come in and Sara Allen
18   was there, I think Ms. McDaniels and
19   Ms. Baker, and I --
20   Q.   We're talking about bus driver, Ms.
21   Baker; not --
22   A.   Not that one.
23   Q.   Okay?

Page 139

1    A.   This here is the driver Baker,
2    Shirley Baker.
3    Q.   Okay?
4    A.   We all go in and as I come in,
5    Nacrelli stands up and says here, you
6    can sit here, Ms. Craig. So I walked
7    around behind Ms. Grant to sit down.
8    Al right. When I sit down they have
9    these chairs with arms and the chair
10   is on wheels. He gets behind me and
11   starts massaging my shoulders. So, I
12   just take his hand and kindly just
13   throw it off of me like that. Like,
14   get off of me.
15   Well, he walks around and
16   he goes over there where they have
17   these -- a love seat sitting over
18   here. So, he goes around there and he
19   sits over there. And Ms. Oaks she's
20   kindly talking and cutting up to him
21   and going over -- Mr. Rudd and all of
22   us sitting there talking and
23   everything, then we went over our

Page 140

1    routes.
2    All right. So, after
3    that that was the next time.
4    Q.   All right. Let me say -- that was on
5    August 8th or was it after that?
6    A.   It was after the eighth.
7    Q.   Okay. Do you recall, was it still in
8    August?
9    A.   It was either the ninth -- ninth or
10   10th. It was either the day after --
11   let me -- let me explain it like this
12   to you. We done the kids -- took them
13   home. And like I said, they didn't
14   get home like they was supposed to.
15   Q.   Right?
16   A.   So, I don't know if it was the next
17   day that we met or it was the next
18   weekday. Because it might have fell
19   on the weekend. See, that's what I'm
20   trying to say.
21   Q.   Okay. August '05, the eighth was a
22   Monday. So, it would have happened
23   that week then?

Page 141

1    A.   So that -- it was probably that
2    Tuesday.
3    Q.   Okay. Did Mr. Nacrelli do anything
4    other than massage your shoulders?
5    A.   No. Because I reached up -- I took my
6    hand like this and done like that.
7    Q.   Did he say anything's to you?
8    A.   Huh-uh.
9    Q.   Did you say anything to him?
10   A.   Huh-uh.
11   MR. WILLIAMS:  Is that no,
12   just for the record?
13   THE WITNESS:  No. No. No.
14   No.
15   Q.   Okay. And then what's the next time
16   then?
17   A.   That was the last.
18   MR. WILLIAMS:  I'm about to
19   eat this table soon.
20   MS. SMITH:  Uh?
21   MR. WILLIAMS:  If that's a
22   good stopping point, I
23   would suggest it's a

36 (Pages 138 to 141)

JOAN K. CRAIG - 10/16/2007

Page 142

1  great time to do it.  But
2  I'll leave it up to you.
3  MS. SMITH:  Okay.
4  A.    That was the last.
5  Q.    That was the last.  So, that would
6  have happened about August 9 or 10?
7  Okay.  And you've told me
8  -- I'll do this:  I'll ask you when we
9  get back, if you remember any other
10 instances.  But I think we've -- at
11 that point, we've covered everything
12 you can remember?
13 A.    That was pretty much --
14 Q.    Okay?
15 A.    To the best of my knowledge.
16 Q.    Okay?
17 MS. SMITH:  Y'all want me to
18 give y'all the Minnie's
19 address?
20 MR. WILLIAMS:  Yeah.
21 MS. SMITH:  Let me do that so
22 y'all can go find it.
23

Page 143

1         (Brief recess was taken at
2          12:24 p.m., and deposition
3          testimony reconvened at
4          1:35 p.m.)
5  Q.    Okay.  Ms. Craig, while we're on our
6  lunch break, did you think of any more
7  incidents of times when you felt that
8  Mr. Nacrelli had sexual harassed you?
9  A.    That was the last.
10 Q.    Okay.  So you didn't think of anything
11 else?
12 A.    No.
13 Q.    Now, did you report these allegations
14 to the school system?
15 A.    Well -- all right.  After I -- after
16 that meeting in August is around the
17 second to the last week of August when
18 I seen Ms. Baker at Ladonia, this
19 superintendent acting, assistant --
20 right now, this Ms. Baker.
21 Q.    Uh-huh.  Right.  Right.  Okay.
22 Ms. Lillian Baker?
23 A.    Lillian Baker, right.

Page 144

1  Q.    Okay?
2  A.    All right.  I seen her.  And I'd been
3  in Ms. Grant's office talking to her,
4  and she told me that I could go on in
5  there and talk to Ms. Baker.  So --
6  because she was in Mr. Nacrelli's
7  office, and I don't know where he was.
8  So I went in there and she was sitting
9  in Mr. Nacrelli's chair behind the
10 desk and I told her I needed to talk
11 to her.
12 Then -- so, I told her
13 that I felt like I was being -- that I
14 had been sexually harassed.  And she
15 asked me by who and I told her
16 Mr. Nacrelli.  And I was telling her
17 some of the incidents and stuff about
18 sitting in that room with Ms. Grant
19 and everybody and him putting his
20 hands on me there.  And I told her
21 about him standing in front of me at
22 that meeting on August the 3rd.  And so
23 while I was telling her, she's sitting

Page 145

1  in the chair, and it was like -- I
2  don't know if she was comprehending
3  what I was saying that -- when
4  somebody is telling you something like
5  that you need to stay awake; to me
6  it's important.
7  Q.    Uh-huh?
8  A.    And she sit there and nod off.  And I
9  told Ms. Baker -- I said to her, I
10 said Ms. Baker, I says I don't know
11 what to do.  She says -- she says,
12 Ms. Craig, she says I'll check into
13 all this and I'll get back with you.
14 So, I left assuming that she was going
15 to get back with me.  Well, nothing
16 occurred.  All right.  And --
17 Q.    Why was -- let me just stop you there?
18 A.    I don't know what she was doing, why
19 she was there, but she was.
20 Q.    Was this --
21 A.    It was in August.
22 Q.    August of '05?
23 A.    Right.

37 (Pages 142 to 145)

JOAN K. CRAIG - 10/16/2007

Page 146

1    Q.    Okay. Do you know roughly when in
2    August early, late?
3    A.    It was in -- closer towards September.
4    Q.    Okay. Okay. Go ahead. Excuse me?
5    A.    All right. So in September I hadn't
6    heard nothing. So -- all right. In
7    October I come to the central
8    office -- wait a minute -- wait a
9    minute. Let me back that up.
10    I went in there and I was
11    talking to Ms. Grant. I didn't come
12    out and tell her nothing that I had
13    told Ms. Baker and I didn't tell
14    Ms. Grant what I went through. I told
15    Ms. Grant that I wanted to know who
16    was the steward rep for the Union.
17    And she said that she believed it was
18    Barbara Jeffers, or I could go ask
19    Ms. Jeffers, or whatever, or
20    Ms. Parish; Ida. Is it Illa or Ida?
21    Q.    Illa?
22    A.    Illa Parish. All right. So I went in
23    the front office and asked Ms. Parish

Page 147

1    because I knew that she used to be it
2    up at Ladonia. All right. And I
3    asked her -- I said Ms. Parish, are
4    you still the steward rep for the
5    Union. She says huh-uh.
6    Gwendolyn Lewis. I says all right.
7    She says you got a problem? I said
8    no. That's all right. I was just
9    wondering who it was. So, I walked
10    down to Ms. Lewis' room.
11    And I can't recall if
12    Coach Ross was either in there or he
13    come in there while me and her were
14    talking. I think he might have been
15    in there. And when me and her were
16    talking, I was telling her about it.
17    And she told me to call Dr. Lee. I
18    said okay.
19    She said go call Dr. Lee
20    -- go talk to Dr. Lee. So --
21    Q.    When was this, best you can place it;
22    August, September, October, when?
23    A.    I believe it was the first part of

Page 148

1    October.
2    Q.    Okay?
3    A.    Because I hadn't heard back from
4    Ms. Baker.
5    All right. So, I went to
6    Dr. Lee's office and she wasn't there.
7    She was gone.
8    All right.
9    Barbara Gunter set me up an
10    appointment for Wednesday.
11    Q.    What day?
12    A.    The 12th.
13    Q.    October 12?
14    A.    Right.
15    Q.    Okay?
16    A.    All right. October the 12th -- and
17    the reason I know it was October the
18    12th that was mine and my ex-husband's
19    anniversary. October the 12th, I went
20    down there -- no. No. No.
21    Q.    Okay?
22    A.    Okay. October the 12th, I was on my
23    school bus. And John Rudd called me

Page 149

1    on the bus radio that the whole county
2    hears -- and tells me that I need to
3    call Barbara down at central office
4    before I go down there.
5    Q.    Does he say anything else, other than
6    to tell you to call Barbara at the
7    central office before you go down
8    there?
9    A.    I said 10-4.
10    Q.    Okay?
11    A.    So, I called her. And she says to me
12    -- she says Joanie, I'm sorry, Dr. Lee
13    is not in, but I can set you up
14    another appointment. And I says all
15    right. She says is there anybody else
16    you can see? I didn't feel like there
17    was anybody else I needed to see. I
18    done talked to Ms. Baker earlier.
19    Q.    Okay?
20    A.    So, I said no. She says well, you can
21    talk -- I says no, I'll talk to
22    Dr. Lee; is what I told her. So, she
23    set me up for Friday at nine o'clock.

38 (Pages 146 to 149)

JOAN K. CRAIG - 10/16/2007

Page 150

1  So, I go back down there
2  Friday. And I was there about 10 till
3  9:00. And Barbara come walking up the
4  little hill and turned the corner and
5  there I was standing. She goes, oh,
6  my God, I totally forget. And I
7  looked at her and I said yeah, that's
8  mighty strange you just up and forget.
9  I said I done told you I need to see
10  her. Well, she gets on the phone --
11  well, I'll be, right there at that
12  woman's desk and calls down at the
13  place by the bus shop; that office.
14  Q.    Okay?
15  A.    And tells Dr. Lee that she was sorry
16  she was forget that she had an
17  appointment with me, and she forgot to
18  tell her. And Dr. Lee said something
19  and Barbara -- I said look, I can go
20  see her now.
21  And Barbara goes well,
22  she can come on down there and see
23  you. And Dr. Lee said something.

Page 151

1  Barbara says well, how long would it
2  take you get there? I said I can be
3  there in less than 15 minutes; is
4  w2hat I told her. Well, she says
5  okay, okay, okay answering to Dr. Lee.
6  All right. Okay. She
7  says -- she gets off the phone, she
8  says Joanie, she says that Dr. Lee is
9  in conference or whatever down there.
10  She said she told me to tell you that
11  she would meet with you. For me to go
12  ahead and set you up an appointment as
13  soon as possible. I said -- as she's
14  available. I said all right.
15  So, we go in there and
16  she's looking on the little calendar
17  at that desk and I'm standing there.
18  And she says I can put you in Tuesday.
19  I says, all right. She said it will
20  be Tuesday the 25th -- 19th, I think
21  that's what it was. I said all right.
22  She says nine o'clock. I said okay.
23  So, I left.

Page 152

1  And -- let me see how it
2  went. She cancelled three
3  appointments. And see at that time we
4  was parked down here at this place at
5  the bottom where the canopy are; the
6  long canopy, where the cars goes now
7  at Ladonia, we was parked down there.
8  And the teachers bring the kids out.
9  And Ms. Lewis come to my bus when she
10  bring her kids out, and she says
11  Ms. Craig, have -- did you get to see
12  Dr. Lee yet? I said, no. I got an
13  appointment, like that. And she says
14  okay. Well, let me know how it goes.
15  I said okay, you know.
16  Well, a couple of days
17  later she come out there and asked me,
18  she says, have you seen Dr. Lee? I
19  says no. It's so convenient she
20  canceled.
21  Well, then when the third
22  appointment come I felt like just
23  because I'm a bus driver, my problems

Page 153

1  is as important -- should be as
2  important to you, as it is if I was on
3  of your teachers or somebody. Because
4  after all, I do haul the kids to and
5  from school. So, I was felt like she
6  was avoiding me.
7  All right. So, finally,
8  I go meet with her.
9  Q.    And what --
10  A.    October the 25the, is when I get my
11  meeting.
12  Q.    Why was the 19th --
13  A.    I have no idea.
14  Q.    Well, how did you find out it was
15  cancelled?
16  A.    Barbara called.
17  Q.    Barbara called you?
18  A.    (The witness nods head.)
19  Q.    When did Barbara call you?
20  A.    During the day -- that day -- the day
21  before I think.
22  Q.    Okay?
23  A.    All right.

39 (Pages 150 to 153)

JOAN K. CRAIG - 10/16/2007

Page 154

1  Q.   Did she tell you why?
2  A.   No. She just said that -- that she
3  would have to reschedule. That
4  Dr. Lee wouldn't be in the office.
5  Q.   All right. Excuse me. I didn't mean
6  to interrupt. Go ahead?
7  A.   All right. So, I go meet with Dr. Lee
8  on the 25th. But I told Barbara that
9  I didn't care if I seen her in the
10  office or wherever that I'd go to a
11  board meeting and just let everybody
12  know that I was fed up. I needed to
13  see her; is what I said.
14  All right. So, I did get
15  to see her, but it wasn't one-on-one.
16  She asked if I mind if this lady sit
17  in there with us, named Walmack or
18  something like that. I didn't have a
19  problem with it because I needed to
20  let somebody know what I've been going
21  through. I mean, I was to the point I
22  had to let somebody know.
23  Q.   What time of day did y'all meet?

Page 155

1  A.   Well, we were supposed to meet at nine
2  o'clock. But according to her, I got
3  there early, and I did get there
4  early. I got there at 8:30, quarter
5  till. Because as soon as I dropped my
6  bus at the house, I hopped straight in
7  my vehicle, went straight down there.
8  Because I was in urge to see her. And
9  so I had to sit out in the little
10  waiting room until she finished. So,
11  I believe I got in her office about 10
12  after 9:00. But she let me know I was
13  early that -- for my appointment. But
14  then on the book I think it said that
15  I was supposed to be there at 11:30.
16  Q.   Okay. So, you met with her about
17  9:10; right?
18  A.   Between 9:00 and 9:30, yeah -- yes,
19  yes.
20  Q.   Was it 9:10, or --
21  A.   Around 9:10 she called me. I think
22  took me to her office.
23  Q.   Okay. And you say Ms. Walmack was

Page 156

1  there?
2  A.   Uh-huh. Yes, ma'am.
3  Q.   Janet Walmack?
4  A.   Yes, ma'am. I guess that's her name.
5  Q.   How long where you in there; if you
6  can recall?
7  A.   Long enough for me to tell her some of
8  the incidences. And she told me she'd
9  get back with me.
10  Q.   Tell me as best you can what that --
11  what she said and what you said, and
12  did Walmack -- did Dr. Janet Walmack
13  say anything?
14  A.   She just sat there.
15  Q.   Okay. So, we can say that --
16  Dr. Walmack didn't participate?
17  A.   She didn't.
18  Q.   She just listened?
19  A.   No. She just listened.
20  Q.   Okay. All right. Well, what did --
21  what did you tell Dr. Lee and what --
22  A.   I told Dr. Lee that I was having
23  problems with Mr. Nacrelli. And that

Page 157

1  I felt like I was being sexual
2  harassed. And she asked me how and I
3  told her about him getting on the bus
4  rubbing my leg. I told her about him
5  saying the things -- excuse me --
6  about having -- about getting me in
7  bed and doing them things and stuff
8  like that. And then I told her about
9  him standing in front of me and how
10  embarrassing and humiliated I was at
11  our -- in session day -- him standing
12  over me making me feel humiliated, and
13  everybody was looking at us wondering
14  gee, I bet they're having an affair
15  and all that. And she told me that
16  she would check into it and that she
17  would get back with me.
18  And then a couple of days
19  later I go over to the bus shop to
20  have my bus inspected. The informal
21  conversation between me and John Rudd
22  -- I was standing out at the bus stop,
23  outside smoking. John Rudd steps out

40 (Pages 154 to 157)

JOAN K. CRAIG - 10/16/2007

Page 158

1    there and he says what did you want --
2    what was you going down to meet with
3    Dr. Lee for?  And I looked at him and
4    I said, about Mr. Nacrelli.  Oh, I
5    don't want to hear nothing about that.
6    I said fine, you won't then.  So is
7    that the same answer I'd got two years
8    ago, he didn't want to hear it?  Could
9    have; don't know.  So, I didn't say
10   nothing else about it.
11   Q.    To Mr. Rudd?
12   A.    Yeah.
13   Q.    And you're saying then that had you
14   tried to tell him two years ago, he
15   wouldn't have listened?
16   A.    If he didn't want to hear it then.
17   Q.    Is that what you assume?
18   A.    That's the way I felt, yeah.  When I
19   told him that about Mr. Nacrelli, I
20   don't want to hear it.  Well, that
21   made me feel like if I went to them
22   two years before that he'd felt that
23   way.

Page 159

1    Q.    Okay.  But you don't have to say?
2    A.    No.  I don't have going to say that
3    that's what it was or nothing, no.
4    That's the way I felt.  That's like
5    Nacrelli standing over me, I felt like
6    everybody was looking at me gawking at
7    me, thinking bad things about me.  I
8    mean, you know, you -- people can make
9    you feel that way and it lowers your
10   self esteem.  And it just -- it does
11   something to you.
12   Q.    You don't know that people were
13   gawking at you or thinking things
14   about you, you're just saying that's
15   how you felt?
16   A.    With him standing over me?
17   Q.    Yes, ma'am?
18   A.    That's it.
19   Q.    Let me ask you this:  You told me
20   earlier that when it first started you
21   didn't want to report because you were
22   afraid you were going to lose your
23   job?

Page 160

1    A.    Right.
2    Q.    What happened between then and August
3    or September -- August of 2005 that
4    made you feel that you could report it
5    and not lose your job?
6    A.    Well, I don't know that I can't lose
7    my job; to be honest with you.  But I
8    knew it was either going to be me
9    losing my mind by keeping it in or
10   just go ahead and let it out.
11   I couldn't deal with the
12   fact of this man putting his hands on
13   me, talking sexual remarks to me,
14   making me feel like I was trash,
15   because I'm not.
16   Q.    So, by that time you then didn't care
17   if you lost your job; is that what
18   you're saying?
19   A.    When I told?
20   Q.    Yes, ma'am?
21   A.    I do care if I lose my job.  Because I
22   enjoy my job.  I love driving these
23   kids to and from school.  And I know

Page 161

1    when I'm driving them, they're safe.
2    Q.    But what I'm trying to establish is
3    that when it first started, your
4    mindset apparently was that I'm not
5    going to tell because I'm afraid I'll
6    lose my job?
7    A.    Not I'm not; I can't.
8    Q.    Okay?
9    A.    There's a difference there.
10   Q.    I can't tell?
11   A.    I can't tell.
12   Q.    Because you're afraid you're going to
13   lose your job.  And so that's your
14   mindset when it happens the first
15   time?
16   A.    (The witness nods head.)
17   THE COURT REPORTER:  Yes?
18   THE WITNESS:  Yes.  I'm sorry.
19   Q.    And tell me then, what your mindset
20   was in August of 2005 when you began
21   to report it?
22   A.    When he come up behind -- when he told
23   me -- he says here, Ms. Craig, you

41 (Pages 158 to 161)

JOAN K. CRAIG - 10/16/2007

Page 162

1   can sit here. I walked around there
2   and set, and he put his hand on my
3   shoulder and I done like this. It
4   felt like somebody just ripped my
5   chest out of me. And I just sat there
6   and I mean, I just felt so humiliated
7   and I thought this can't go on.
8   So, I went home. I
9   thought about it. I prayed about it.
10  I talked to my husband again about it.
11  And he told me that he wasn't going to
12  tell me one way or the other. That it
13  would be my decision. That I could do
14  -- go ahead and turn him in or leave
15  it as it is, but the next time he puts
16  his hands on me and I come home and
17  said anything, then I guess he might
18  have taken matters in his own hands.
19  I don't know. He didn't say that but,
20  you know.
21  Q.   You're talking about your husband now?
22  A.   Oh, yeah. Some people don't -- don't
23  want other men putting their hands on

Page 163

1   their wives.
2   Now, my brother he was a
3   different story. My brother said if
4   he was able, he wouldn't have to worry
5   about putting his hands on something.
6   Q.   What did your brother mean by that?
7   A.   He'd go up there and whip his butt
8   probably, whatever. But he's
9   disabled. He can't do nothing.
10  Q.   When did you tell your brother about
11  it?
12  A.   I told him -- oh, not long after it
13  started. I told him about the
14  incident of him getting on the bus,
15  riding over to that bus stop. And
16  then I didn't tell him all the
17  details. I just told him that
18  Mr. Nacrelli was talking about my
19  legs, wanting to rub on me. And I
20  pushed him off of me. And I left it
21  at that. Because I know how my
22  brother is. He's always been a high
23  strung person. And so, I didn't want

Page 164

1   to get him all in a big uproar about
2   it. And I kept it from my husband for
3   a long time; probably the first year
4   because I was scared that he might
5   think I was provoking him. So, I
6   wouldn't tell him. Because a lot of
7   times you know if you tell somebody
8   something they take it the wrong way
9   and he takes things in a manner that
10  he's not a jealous person. He's never
11  been. Which I've never given him a
12  reason too. But he just -- he wants
13  -- how do I say it? All right. He
14  would probably have went up to the
15  school. I felt like he would have
16  went up to the school and caused a
17  scene with Mr. Nacrelli, questioning
18  him. Not that he would fight him
19  because he's not a fighter. He's a
20  taker. He rather talk things out then
21  than go to that extreme. He's not --
22  he doesn't believe in fighting and
23  stuff.

Page 165

1   So, I feel like he might
2   have went up there and talked to
3   Mr. Nacrelli to find out what was
4   going on. And that would put him in
5   -- put -- I felt like that would be
6   getting him involved, and then I would
7   lose my job because he went on my job
8   talking to my -- to one of my bosses.
9   And so I didn't tell him.
10  And then one day we was
11  sitting around talking and I said
12  Paul, I really have something I need
13  to talk to you about. And he said
14  what. I said well -- I said, I don't
15  know how to tell you, but I've been --
16  sexual advances is being made to me.
17  By who? I said I'll tell you that all
18  after I tell you. I said let's just
19  talk. So we talked about it and I
20  told him. And he says he's doing that
21  to you? I says, yeah. He says well,
22  I'm not going to tell you what to do.
23  He says you need to pray about it and

42 (Pages 162 to 165)

JOAN K. CRAIG - 10/16/2007

| Page 166 | Page 168 |
|---|---|
| 1  see where you need to go.  He says | 1  her? |
| 2  because I can't tell you one way or | 2  A.  Right. |
| 3  the other.  And he wouldn't.  And he | 3  Q.  Nothing happened in September? |
| 4  hasn't.  But since I told him and I | 4  A.  No. |
| 5  told him that I -- what I was doing, | 5  Q.  And then in October -- first part of |
| 6  he backs me. | 6  the October, you talked to |
| 7  Q.  And when was this you told your | 7  Gwendolyn Lewis, I believe? |
| 8  husband? | 8  A.  Right. |
| 9  A.  About a year after it started; | 9  Q.  When you talked to Ms. Lewis in |
| 10  probably '93. | 10  October, was Mr. Nacrelli already |
| 11  Q.  '93 you told your husband? | 11  gone? |
| 12  A.  Somewhere around there. | 12  A.  I don't -- I didn't -- I don't know if |
| 13  Q.  Now, let me go back to when you spoke | 13  he was gone. |
| 14  with Ms. Baker -- Ms. Lillian Baker? | 14  Q.  When was the last time you saw |
| 15  A.  Right. | 15  Mr. Nacrelli at the school? |
| 16  Q.  You told me you don't know why she was | 16  A.  I don't recall. |
| 17  at Ladonia? | 17  Q.  When you talked to Ms. Gwendolyn Lewis |
| 18  A.  (The witness nods head.) | 18  the first part of October, were you |
| 19  THE COURT REPORTER:  No, you | 19  then aware that Ms. Jeffers had made |
| 20  don't know? | 20  allegations against Mr. Nacrelli? |
| 21  THE WITNESS:  No.  No, I don't | 21  A.  No. |
| 22  know. | 22  Q.  When did you first become aware that |
| 23  Q.  And it was the latter part of August | 23  Ms. Jeffers had made some allegations? |

| Page 167 | Page 169 |
|---|---|
| 1  of 2005? | 1  A.  When Ms. Jeffers called me. |
| 2  A.  Uh-huh. | 2  Q.  And when was that? |
| 3  Q.  Had you talked to Ms. Jeffers prior to | 3  A.  I don't recall.  It was after I talked |
| 4  talking Ms. Baker -- Ms. Lillian | 4  to Ms. Lewis, though. |
| 5  Baker? | 5  Q.  Was it after you talked to Dr. Lee? |
| 6  A.  Before I talked to Ms. Baker? | 6  A.  I think it was. |
| 7  Q.  Yes, ma'am? | 7  Q.  Was Mr. Nacrelli gone from the school |
| 8  A.  No. | 8  at that point in time? |
| 9  Q.  Did you have any idea that Ms. Jeffers | 9  A.  I'm not sure.  I don't know when |
| 10  had or intended to make some | 10  Mr. Nacrelli left. |
| 11  allegations about Mr. Nacrelli? | 11  Q.  What did Ms. Jeffers call you about? |
| 12  A.  No. | 12  A.  I think at that time she was calling |
| 13  Q.  Y'all had not discussed it at all? | 13  to talk to my husband or Bill Farr |
| 14  A.  No. | 14  about that building.  My husband had |
| 15  Q.  How long -- let me say this:  At the | 15  put up a building for Bill Farr. |
| 16  time Ms. Baker was out there and | 16  That's what work he does.  And he |
| 17  Mr. Nacrelli was the principal and | 17  wanting some more or something.  And I |
| 18  Ms. Grant was the assistant principal? | 18  think it started -- she called wanting |
| 19  A.  Right. | 19  Paul.  And me and her just got to |
| 20  Q.  And you've described to me what you | 20  talking. |
| 21  told her? | 21  Q.  During that phone conversation? |
| 22  A.  Right. | 22  A.  Yeah.  She asked me how things were |
| 23  Q.  Then you expected to hear back from | 23  going.  I told her things was all |

43 (Pages 166 to 169)

JOAN K. CRAIG - 10/16/2007

| Page 170 | Page 172 |
|---|---|
| 1 right. And she asked me if I had seen<br>2 Ms. Lewis and I started laughing. I<br>3 said yeah, I went and seen Ms. Lewis.<br>4 I said why? She says well, Joanie --<br>5 she says, Ms. Lewis called me -- I<br>6 don't know if she said she called her<br>7 or went to her room and told her that<br>8 I had left her room upset. And I says<br>9 yeah. I said I come to see you. And<br>10 she says, I knew there was something<br>11 bothering you when you stepped in my<br>12 office. I said I wasn't going to talk<br>13 to you because I didn't know -- I<br>14 don't know that lady. I don't know<br>15 who -- I don't know who the lady is<br>16 that was in there. I says -- but I<br>17 says yeah. I come to talk to you. I<br>18 said because I needed to talk to<br>19 somebody and you're a counselor. I<br>20 said and I feel like I need one. She<br>21 asked me -- she says, and why is that?<br>22 And while I was talking to her I broke<br>23 down on the phone and told her that I | 1 what I had to tell her. That I felt<br>2 like I was important.<br>3 Q. Did you go to see Ms. Jeffers that<br>4 day?<br>5 A. Yeah. I walked to her room first to<br>6 see her. But there was a woman in<br>7 there. And I don't know who the lady<br>8 was, but she was doing stuff with this<br>9 woman and talking to this woman. So I<br>10 asked her how was she doing. She said<br>11 fine. I said well, good.<br>12 And then -- excuse me. I<br>13 left there and went from her room down<br>14 to Ms. Lewis.<br>15 Q. Now, when in relation to that did<br>16 Ms. Jeffers call your house?<br>17 You've told me you met<br>18 with Dr. Lee on October 25th?<br>19 A. Right.<br>20 Q. Did you talk with Ms. Jeffers before<br>21 you met with Dr. Lee?<br>22 A. I'm thinking. I -- I don't think I<br>23 talked to her until after I talked to |

| Page 171 | Page 173 |
|---|---|
| 1 was being harassed sexually by<br>2 Nacrelli. And that I just couldn't<br>3 take it no more. And she asked me if<br>4 I reported it. And I told her yes.<br>5 And I told her -- I says, I don't know<br>6 what else to do.<br>7 Q. And you had reported it on Dr. Lee by<br>8 this time?<br>9 A. I hadn't -- I reported to Lee and<br>10 Baker first.<br>11 Q. Right. But I'm trying to get the<br>12 sequence of when you talked to with<br>13 Ms. Jeffers?<br>14 A. It was before I -- I don't recall.<br>15 Q. All right. Let me ask you this: You<br>16 talked to -- you told me that you<br>17 spoke with Gwendolyn Lewis around the<br>18 first part of October?<br>19 A. I told her about it. I went to her<br>20 room because I felt like the day that<br>21 I talked to Ms. Baker and she hadn't<br>22 got back with me, I felt like it was<br>23 as if I were -- it wasn't important | 1 Dr. Lee. I'm not positive about it.<br>2 I'm not -- I don't recall. I'm not<br>3 sure.<br>4 Q. You said that Ms. Jeffers told you<br>5 that Gwendolyn Lewis had told<br>6 Ms. Jeffers that you had been by to<br>7 see Gwendolyn Lewis; is that correct?<br>8 A. Right.<br>9 Q. Did Gwendolyn Lewis tell Ms. Jeffers<br>10 why you had been by?<br>11 A. I don't know.<br>12 Q. Did Ms. Jeffers say anything that<br>13 indicated that she knew why you had<br>14 been by?<br>15 A. No. Because when she -- she said that<br>16 Ms. Lewis said that I had been upset.<br>17 That I had come to see her. Ms. Lewis<br>18 said Ms. Craig had come to see you but<br>19 you were busy. And she come down and<br>20 was talking to me and she was upset.<br>21 So, let me see how she said it now.<br>22 And then she said -- she said<br>23 Ms. Lewis said that you come to see |

44 (Pages 170 to 173)

JOAN K. CRAIG - 10/16/2007

## Page 174

1  her because I was busy. And I said,
2  yeah. And she says Ms. Lewis said
3  that you were upset the other day? I
4  says yeah, I was. I said very upset.
5  And she says would you like to talk
6  about it? Maybe I can help. I says
7  well, you know what Ms. Jeffers, I
8  says you're a counselor; right? She
9  says, yeah. I says and you help
10  people grieving and stuff like that --
11  kids and stuff. She said, yeah. I
12  said, yeah, maybe you can help me. I
13  said I need to know if I've done
14  something wrong. And she said what
15  are you talking about? And I told
16  her. I said I was sexual harassed by
17  Mr. Nacrelli. She said, oh, my God.
18  That's how our conversation -- as far
19  as me telling her, that's when I told
20  her she said, oh, my God, no you
21  weren't? So I told her.
22  Q.   You told her everything or basically
23  everything you've told me?

## Page 175

1  A.   Basically everything I've told you.
2  Q.   Did she share with you she felt that
3  she had been sexual harassed during
4  that phone conversation?
5  A.   I don't know if that was -- if he told
6  me that then or if it was the next day
7  she called me and told me she needed
8  to talk to me. I think it was that
9  same day that I told her I was.
10  Q.   What did she relate to you?
11  A.   I told her and he said, oh, my God.
12  She says what makes you feel like you
13  were. I was crying. I told her. She
14  said, well, Ms. Craig, I'm going to
15  tell you something. She says, I know
16  it's hard for you to feel this way but
17  you don't need to feel like you've
18  done something. You don't need to
19  feel dirty because it's nothing you've
20  done because you're not the only one
21  he's done that, too.
22  Do what?
23  There's others. When he

## Page 176

1  was doing that to you, he's trying to
2  do them, because I'm one. That's how
3  it got started.
4  Q.   So during that first conversation with
5  you then, she called your house to
6  talk about the building she wanted
7  him?
8  A.   Bill wanted her to call to get Paul to
9  come over there because somebody run
10  into the side. She wanted to know if
11  Paul had extra sheets, which he does
12  because he stock piles, to come take
13  that down and put up a new side.
14  Q.   During that conversation, did
15  Ms. Jeffers tell you she had reported
16  any allegations against Mr. Nacrelli?
17  A.   No. She didn't say she reported it.
18  She just said don't feel bad because
19  you're not the only one that he was
20  harassing. And I said, there's more?
21  She says, I can speak for myself. I
22  was one -- I'm one, was what she says.
23  I says yeah.

## Page 177

1  Then we talked a few
2  minutes about it. And then she didn't
3  say then that she had talked to
4  anybody. She didn't say she made any
5  claims or reports to anybody. She
6  just said she was one, that he had
7  made sexual harassment advances to
8  her.
9  Q.   When did you first learn she had
10  reported any allegations?
11  A.   When did I learned that?
12  Q.   When did you learn that she had
13  reported it?
14  A.   I know. It's been a long day.
15  Q.   When did you first learn that
16  Ms. Jeffers had reported allegations?
17  A.   I don't recall. I'm trying to think.
18  Q.   Do you recall how you learned it?
19  A.   How I learned -- I don't recall.
20  Q.   Now, I'm going to ask you this -- I
21  don't want you to tell me any
22  conversation you had with Mr. Eddins.
23  But did you -- did you meet with

45  (Pages 174 to 177)

JOAN K. CRAIG - 10/16/2007

Page 178

1   Mr. Eddins?
2   A.   I remember going to him.
3   Q.   Who directed you to Mr. Eddins?
4   MR. EDDINS:  I mean, it's
5   pretty much obvious
6   they're entitled to legal
7   representation.  You're
8   not going to get anywhere
9   there.  There was no
10  devious conduct on their
11  part.  They have a right
12  to legal representation.
13  MS. SMITH:  I'm asking her a
14  statement -- question,
15  who told her to contact
16  you or who directed --
17  MR. EDDINS:  And she's already
18  said she went to the AEA
19  rep to tell her about it.
20  Q.   Is it your testimony that
21  Ms. Gwendolyn Lewis told her to come
22  see you?
23  A.   Why is that important?

Page 179

1   Q.   Do you recall?
2   A.   I don't recall.
3   Q.   Who told you?
4   A.   I don't recall.
5   Q.   Who told you to contact Mr. Eddins?
6   A.   I don't recall.
7   Q.   If you recall between now and the time
8   this case is tried, I would appreciate
9   you letting me know.
10  A.   Yes, ma'am.
11  Q.   Is Mr. John Rudd your supervisor?
12  A.   Over the transportation, yes.
13  Q.   Who evaluates you each year?
14  A.   Okay.  John Rudd always evaluated up
15  until the year Ms. Coley became
16  assistant principal.  First year,
17  Ms. Coley evaluated, she put down that
18  I was aggressive and --
19  MR. WILLIAMS:  Let me just
20  offer a suggestion to
21  speed up the
22  deposition --
23  Q.   The question is simply:  Who

Page 180

1   evaluated?
2   A.   Mr. Rudd used to.  But Coley lets us
3   do it and comes up and goes over it
4   with you.
5   Q.   Did Mr. Nacrelli ever sexually harass
6   you?
7   A.   No.
8   MS. SMITH:  Now, what I would
9   like to do in an effort
10  to expedite.  I would
11  like to have her evaluate
12  -- I think just about
13  every -- I'd like to
14  admit them into evidence
15  as an exhibit to her
16  deposition.
17  Do you have a
18  problem?  Do you want me
19  to go over each one of
20  them, or you want to
21  allow me to just
22  introduce them into
23  evidence?

Page 181

1   MR. EDDINS:  You can introduce
2   them.  I have no
3   objections.
4   MR. WILLIAMS:  No objection.
5   MR. EDDINS:  I'll object at
6   the proper time as to
7   relevance of them.  We're
8   here about horrific
9   conduct by this man, not
10  her evaluations.
11  And let me -- can I
12  take a break?  There's no
13  reason.  Y'all told us
14  you weren't going to take
15  that long with.
16      (Brief recess was taken at
17      3:26 p.m., and deposition
18      testimony reconvened at
19      3:28p.m.)
20  MS. SMITH:  Okay.  What's --
21  I'm going to mark and
22  what has been no
23  objection into evidence

46 (Pages 178 to 181)

JOAN K. CRAIG - 10/16/2007

Page 182

1  the -- as Defendant's
2  Exhibit 2 to Ms. Craig's
3  deposition are
4  evaluations that were in
5  her personnel file and
6  which were furnished to
7  her counsel.
8  The ones I have are
9  19 -- a February of 1993,
10  an April of 1993, a 1995,
11  a 1996, a 1997, a 2001,
12  2002, 2003, 2004, 2005,
13  2006, and 2007.
14      (The referred-to document was
15      marked for identification as
16      Defendant's Exhibit No. 2.)
17  MS. EDDINS: No objection.
18  Q.   Ms. Craig, you're welcome to look at
19  these evaluations. I'm sure you've
20  seen them. Have you ever received
21  what you considered a bad evaluation?
22  A.   Not really. He -- he'd go over and
23  read it to us and then we sign it.

Page 183

1  Q.   Yes, ma'am. Now, early on there were
2  some comments about -- I think
3  handling the bus or keeping it clean
4  -- no, apparently you were keeping it
5  clean right off the bat?
6  A.   Oh, yeah.
7  Q.   About some instructions and stuff
8  there were comments about some things
9  that were constructive?
10  A.   Like what?
11  Q.   This was 19 -- February 1993, has made
12  comments or given instruction that are
13  not totally clear to students
14  resulting in misinformation being
15  passed onto parents?
16  And then in the
17  recommendation I think the same type
18  of thing about make sure your
19  instructions are clear. But as I read
20  them and I'll allow you to look at
21  them, to me there are generally
22  positive. He talks about -- he, being
23  Mr. Rudd talks about you being a good

Page 184

1  bus driver, keeping a clean bus later
2  on -- or keeping a clean bus all
3  along, taking good care of your
4  students, things of that nature.
5  That's what I get from them as an
6  overall impression.
7  Are you -- do you feel
8  the same or do you feel like those are
9  negative evaluations in any way?
10  A.   Well, when you verbally speak to kids
11  they interpret -- interpret it from
12  you to the parents. That don't mean
13  that you told the parents that. The
14  kids could be the ones who have stated
15  something wrong.
16  Q.   Yes, ma'am. I understand that. But
17  my question to you is? My impression
18  is that these evaluations are overall
19  positive and very complimentary of
20  you?
21  A.   Oh, yeah.
22  Q.   Is that what your impression of them
23  is?

Page 185

1  A.   That's the way -- that's the way it's
2  supposed to be. I know I do my job
3  like I'm supposed to.
4  Q.   And Mr. Rudd in his evaluations of you
5  has recognized that fact?
6  A.   (The witness nods head.)
7  THE COURT REPORTER: Yes?
8  THE WITNESS: Yes.
9  Q.   I believe you'll find that Ms. Coley
10  evaluated you one year?
11  A.   Right.
12  Q.   And then I -- you say that after that
13  y'all went to evaluating yourself?
14  A.   The first year she had a little
15  negative about me. Then the second
16  year she understood that I wasn't
17  aggressive. It's just the way I
18  appear to be in the tone of voice
19  because I'm a loud spoken person.
20  Q.   Okay. She's overall positive?
21  A.   Oh, yeah. Right. Right.
22  Q.   And I believe you told me a few
23  moments ago that Mr. Nacrelli never

JOAN K. CRAIG - 10/16/2007

Page 186

1    evaluated you?
2    A.   He didn't do this.
3    Q.   Okay.
4    A.   Which when she done it, Mr. Rudd was
5    there with her.
6    Q.   When Ms. Coley did it?
7    A.   Correct.
8    Q.   Okay.  And that's -- I just want to
9    introduce them in as --
10   A.   But then after that he started letting
11   us.  He sent up a sheet and we're to
12   grade ourselves on it.  And then he'd
13   come up and go over it with us.
14   The first time he done it
15   we all -- I assumed that I do my job
16   to the best of my ability.  So I put
17   all 10.  And he told us no, we
18   couldn't all 10's because we do need
19   to improve.  But, I mean, I felt like
20   I -- I'm a perfect driver, hadn't had
21   no accidents, nothing like that.  So?
22   Q.   Okay.  And I think you told me may be
23   earlier this morning that you're at

Page 187

1    the top of the pay scale?
2    A.   I think that's what he told me.
3    Q.   On your -- for transportation?
4    A.   Correct.  Well, for the mileage and
5    stuff I drive and all, correct.
6    He said that mine --
7    after seven years it don't climb no
8    more or something.  He showed us that
9    sheet, a time scale thing.
10   Q.   Okay.
11   A.   But I don't understand too much of it.
12   I just go by what he said.
13   Q.   Have you got the same benefits now
14   that you've always had?  And when I
15   say benefits --
16   A.   My insurance?
17   Q.   Right.  To participate in insurance or
18   retirement system?
19   A.   Correct.  Correct.  Correct.
20   Q.   None of those have changed over a
21   period of time?
22   A.   No.
23   Q.   In response to or request for medical

Page 188

1    treatment I've been supplied by
2    Mr. Eddins with a set of documents,
3    which I'm going to mark as Defendant's
4    Exhibit 3 to the Craig deposition.
5    And let you look at those.
6    And let me ask you, are
7    these all of the medical records that
8    you have to supply relative to any
9    issues that you claim to have suffered
10   as a result of Mr. Nacrelli's actions?
11        (The referred-to document was
12        marked for identification as
13        Defendant's Exhibit No. 3.)
14   A.   So, this here is from my medical
15   doctor?
16   Q.   Yes, ma'am?
17   A.   Right.
18   Q.   And as I said, I asked Mr. Eddins to
19   furnish to me all of your medical
20   records that relate to any medical
21   condition resulting from
22   Mr. Nacrelli's actions.  And this is
23   what I was furnished.  And I wanted

Page 189

1    you to tell me if that's all there is
2    or if -- if there's others, I want you
3    to tell me what those are?
4    A.   I supposed it is.
5    Q.   Have you been hospitalized or seen any
6    other doctors about treatment as a
7    result of Mr. Nacrelli's actions that
8    you don't see here?
9    A.   No.  Dr. Winton is my doctor.
10   Q.   Okay.  Now, I believe there have been
11   some on-the-job injuries?
12   A.   Correct.
13   Q.   Over a period of time?
14   A.   Correct.
15   Q.   Tell me how you have you been affected
16   by Mr. Nacrelli's actions in response
17   -- by Mr. Nacrelli's actions in
18   relation to your physical, emotional
19   or mental health?
20   A.   I got shingles from it, from the
21   stress.
22   Q.   When did you get shingles?
23   A.   In '03.

48  (Pages 186 to 189)

JOAN K. CRAIG - 10/16/2007

Page 190

1    Q.   And who treated you there?
2    A.   The emergency -- Saint Francis. And I
3    went two or three different times to
4    them. Because it was so severe I
5    could not stand the pain of it.
6    And I them in the -- in
7    the back of my head and right there at
8    base of the spine. So it was pretty
9    bad.
10   And I guess you'd say
11   like -- like today, I'm going over it
12   and everything. And it's -- just gets
13   me all tore up and nervous and stuff
14   like that. Loss -- I guess you can
15   say I lost some wages and -- because I
16   didn't -- I quit doing field trips.
17   Q.   Okay. We're going to come back to
18   wages in a minute. I'm talking about
19   just health.
20   You've told me that you
21   had to go to Saint Francis for
22   shingles?
23   A.   Correct.

Page 191

1    Q.   Have you had any other medical
2    problems as a result of Mr. Nacrelli's
3    actions toward you?
4    A.   I guess you say nerves.
5    Q.   Has any doctor treated you for nerves?
6    A.   My -- Dr. Winton.
7    Q.   And what kind of treatment have you
8    gotten for nerves?
9    A.   Well, he prescribed me some Xanax to
10   take three times a day. But I don't
11   take them three times a day because I
12   don't want to lose my job. Every now
13   and then if I get to feeling depressed
14   about it, I'll take one when I -- to
15   go to sleep with. But as far as
16   taking them continuous no, I don't do
17   that.
18   Q.   And when did he prescribe those?
19   A.   I don't remember.
20   Q.   You know --
21   A.   I might have been on Wellbutrin. I
22   think I took some Wellbutrin or
23   whatever them things are called. I

Page 192

1    don't -- I don't remember. It was --
2    I don't recall.
3    Q.   I don't see any medical records here
4    that discuss Xanax or Wellbutrin?
5    A.   Yeah. It was after that. After --
6    Q.   All right. I've asked --
7    A.   Well, I didn't start taking Xanax --
8    it probably -- might have been from it
9    sometime last year.
10   Q.   Last year being the '06, '07 school
11   year?
12   A.   Yeah.
13   Q.   But it's your claim that that relates
14   to Mr. Nacrelli's treatment of you?
15   A.   Correct. Because I have what they
16   called -- I don't know how you would
17   put it into medical terms. Like he
18   said, but what he meant is, I was
19   beginning to get the rash again.
20   Shingles is recurrence. They can come
21   back if you stay under a lot of
22   stress. So it was like it was wanting
23   to come back. So, I went to him and

Page 193

1    told him. And that's when he give me
2    the Xanax.
3    MS. SMITH: Now, Mr. Eddins, I
4    had asked for all of her
5    medical records. I'd
6    like to receive a copy of
7    those then. If those are
8    going to relate to
9    anything involving
10   Mr. Nacrelli?
11   MR. EDDINS: I will see. I
12   thought I gave you all
13   that I had to give you.
14   THE WITNESS: Well, I didn't
15   get an up to date -- I
16   mean, when I sent them --
17   them was up to date. But
18   I haven't -- I go to him
19   all the time because he's
20   my medical doctor and he
21   treats me for high blood
22   pressure. But I didn't
23   think about getting a

49 (Pages 190 to 193)

JOAN K. CRAIG - 10/16/2007

Page 194

1   current one from them.
2   Q.   Okay. Well, if you contend that the
3   current problems stem from the
4   situation involving Mr. Nacrelli, then
5   I'd like to have them?
6   A.   I can get it for you. I mean --
7   Q.   You talk about high blood pressure,
8   how long have you had high blood
9   pressure?
10  A.   21 years.
11  Q.   Do they have you on some type of
12  medication for it?
13  A.   (The witness nods head.)
14  Q.   And what do you take?
15  A.   Ziac once a day.
16  THE COURT REPORTER: What?
17  THE WITNESS: Ziac once a day.
18  Q.   Is that what you've always taken?
19  A.   (The witness nods head.)
20  Q.   What have you taken?
21  A.   I took Atiprosin when I first was
22  diagnosed until they found out I was
23  pregnant, and it could kill the fetus.

Page 195

1   So they -- my OB/GYN doctor
2   discontinued it and put on Aldomet. I
3   took Aldomet for years. And then it
4   got to where it wasn't working. So
5   then they put me Ziac.
6   Q.   Now, do you contend that
7   Mr. Nacrelli's actions have anything
8   to do with your high blood pressure?
9   A.   I've been on high blood pressure
10  medicine for years and never had
11  problems until year before last when
12  we was going back to school. I didn't
13  passed my physical in July because of
14  my blood pressure. So, I had to go to
15  medical doctor three different times
16  to get my blood pressure down to the
17  level it's supposed to be in order to
18  pass my physical.
19  Q.   Okay. And what year was that?
20  A.   Not this year, but -- I passed it this
21  year -- last year's.
22  '05, '06, something like
23  that. I didn't actually get my

Page 196

1   physical passed until right before the
2   day of getting the bus or something
3   like that. I was off the bus I think.
4   Q.   Was that '06, '07 or '05, '06?
5   A.   What date is the physical on? Last
6   year -- this year here I went
7   July 5th.
8   Q.   Then is that the one you didn't
9   passed?
10  A.   No. I passed it.
11  Q.   That's '07/'08?
12  A.   I passed it.
13  Q.   Did you not pass '06/'07?
14  A.   One of them. '06/'07 -- '05/'06,
15  something like that?
16  MS. SMITH: I'm going to mark
17  this as Defendant's
18  Exhibit 4 to Ms. Craig's
19  deposition. And ask you
20  to look at that. And is
21  that your medical
22  examination?
23  (The referred-to document was

Page 197

1   marked for identification as
2   Defendant's Exhibit No. 4.)
3   MR. WILLIAMS: Those are DOT
4   physicals?
5   THE WITNESS: DOT is correct.
6   Q.   For July of '05?
7   A.   All right. I'm going to turn it over
8   and see what the other one is.
9   All right. This is my
10  blood pressure. You got another one
11  of these?
12  Q.   Not for '05?
13  A.   No. What about '06?
14  Q.   No, ma'am. I didn't see that in your
15  file?
16  A.   '05/'06?
17  Q.   Now, that is '05/'06?
18  Well, let me -- let me do
19  it this way --
20  A.   It was real high when I went in there
21  to get the physical. So, they made me
22  lay down and they took it. So, I had
23  to go back to my medical doctor.

JOAN K. CRAIG - 10/16/2007

Page 198

1  Q.  Okay.
2  A.  And I don't know if this one is it or
3  not.  Because I know 129 over 78 is a
4  little elevated.  But it's not enough
5  to keep you from doing anything.
6  That's why I'm saying --
7  Q.  All right.  I think, on the last page
8  of it, he said that you met the
9  standards, is the way Dr. --
10 A.  Right.  So I passed that one.
11 Q.  All right?
12 A.  It was the other one.
13 MS. SMITH:  And use that as
14 Exhibit 4 to Craig's
15 deposition.  Any
16 objection?
17 MR. WILLIAMS:  No.
18 MR. EDDINS:  No objection.
19 MS. SMITH:  All right.  No. 3,
20 the medical records.  Is
21 there any objection, I
22 don't think to that?
23 MR. WILLIAMS:  Only to the

Page 199

1  extent there are any
2  bills.
3  MR. EDDINS:  I have no
4  objections.
5  MS. SMITH:  Mr. Eddins, any
6  objection to those
7  medical records?
8  THE COURT REPORTER:  He said
9  no.
10 MS. SMITH:  Okay.  Mr. Eddins,
11 I would ask you this
12 also, if she contends
13 that she did not pass the
14 physical for whatever
15 year because of this, I
16 believe I'm entitled to
17 that under my request for
18 production.  I don't see
19 it in her personnel file.
20 I'll try to locate it,
21 too.
22 MR. EDDINS:  I don't have it
23 either.  I wonder if we

Page 200

1  can those, whatever those
2  are for every year?
3  Those are the records
4  that should show it.
5  MS. SMITH:  I'll be happy to
6  mark these.
7  MR. EDDINS:  I was just making
8  myself a note to try to
9  find it.  But --
10 MS. SMITH:  These are the ones
11 that were in the
12 personnel files that were
13 furnished to you.  I'll
14 mark these as Craig
15 Exhibit 5 -- and
16 Composite Exhibit 5.  And
17 state that they are the
18 physical exams for August
19 of '92, August of '93.  I
20 have one for May of '95,
21 July of '96.  This one
22 seems to be July of '98,
23 June of '97.  August of

Page 201

1  '99, and November of
2  2001.  I'll introduce
3  those as exhibits to the
4  deposition, No. 5.  Any
5  objection?
6      (The referred-to document was
7      marked for identification as
8      Defendant's Exhibit No. 5.)
9  MR. EDDINS:  No objection.
10 MR. WILLIAMS:  None.
11 MS. SMITH:  Okay.  And if you
12 will then get me the one
13 that indicates that she
14 didn't pass the first
15 time.
16 Q.  All right.  Have you -- other than
17 what you described to me, Ms. Craig,
18 have you seen a psychiatrist for any
19 type of treatment as a result of
20 Mr. Nacrelli's action?
21 A.  No.
22 Q.  Have you seen a psychologist?
23 A.  No.

JOAN K. CRAIG - 10/16/2007

Page 202

1   Q.   Have you seen any other type of
2   counselor as a result of your
3   allegations against Mr. Nacrelli?
4   A.   No.
5   Q.   Any other medical doctors you've seen,
6   other than what you testified to?
7   A.   No.
8   Q.   Okay.  So you've told me everything
9   then about your physical and emotional
10  health as it relates to the
11  allegations of the treatment you
12  received from Mr. Nacrelli; is that
13  correct?
14  A.   As far as my knowledge.
15  Q.   Now, you started to tell me about loss
16  of wages.  Tell me about that?
17  A.   Well, I quit doing field trips to
18  avoid being around Mr. Nacrelli.
19  Q.   What else?
20  A.   That's basically what I quit doing.  I
21  mean, I done my regular route, go up
22  there and unload my kids and go pick
23  them up.

Page 203

1   Q.   So, the only thing that has affected
2   your income as a result of
3   Mr. Nacrelli's actions is your
4   testimony that the stopping of doing
5   field trips is the only thing that's
6   affected your income?
7   A.   Yeah.  Because that's -- I mean, I do
8   my regular route.  So, yeah, field
9   trips I quit doing them.
10  Q.   And I believe you've told me earlier
11  in the day that you did that on your
12  own volition; it was your choice to
13  take yourself off of field trips; is
14  that correct?
15  A.   (The witness nods head.)
16  Q.   Yes?
17  A.   Yes.  To stay away from him.
18  Q.   I believe this document was furnished
19  to your attorney.  And we haven't --
20  it was prepared by Mr. Rudd, and he's
21  not testified to it, but I'm going to
22  show it to you.
23  And it's my

Page 204

1   understanding, the amount of money
2   that you would have received in excess
3   of your regular salary, beginning with
4   the years '99/2000 and going through
5   2005/2006, and I'm going to keep those
6   away.  Mark it as Defendant's Exhibit
7   6 to the Craig.
8   Let you look at it.
9       (The referred-to document was
10      marked for identification as
11      Defendant's Exhibit No. 6.)
12  MR. WILLIAMS:  I'm certainly
13  going to object to the
14  instructions.  I haven't
15  been provided this
16  information.  Although I
17  did ask for it.
18  MS. SMITH:  Mr. Rudd can
19  testify to it at trial?
20  MR. EDDINS:  Yeah.  Of course,
21  he presented some
22  testimony to the EEOC
23  about it, too.

Page 205

1   Q.   It appears to me to show that
2   '99/2000, you received some extra
3   income.  Some of it is for tutoring,
4   which I'm assuming is that taking the
5   kids home in the evening?
6   A.   Uh-huh.
7   Q.   And then other amounts, which I assume
8   resulted from the field trips.  I
9   haven't added up that column.  But do
10  those appear to be correct amounts, as
11  best you know?
12  MR. EDDINS:  I'd object to --
13  I don't even know what
14  this thing says.  I don't
15  have a clue.
16  MS. SMITH:  Okay.
17  MS. EDDINS:  It's got two and
18  a half, three and a half,
19  eight and a half.
20  MS. SMITH:  And I don't know
21  that either.  I'm just
22  asking her to tell me if
23  that seems to accurately

JOAN K. CRAIG - 10/16/2007

Page 206

1   reflect that in 1999,
2   2000, she received income
3   from the transportation
4   of tutoring and for field
5   trips. And then for the
6   subsequent years they
7   seem to be very nominal
8   amounts for 2000/2001
9   through 2002/2003. And
10  then 2003 through 2006,
11  it seems there was no
12  amounts. Does that seem
13  to reconcile with what
14  you remember?
15  MR. EDDINS: Let's see --
16  A.   Okay. This 2006 was last year.
17  Q.   Okay. All right. And it goes for
18  part of the year?
19  A.   Well, I got -- I should have got extra
20  pay that year because I done Buster
21  last year.
22  Q.   Now, I'm talking about your driving of
23  the buses, as far as field trips, the

Page 207

1   extra tutoring, things of that nature.
2   MR. EDDINS: Did you show
3   where anything is on
4   there on that chart about
5   driving the routes?
6   MS. SMITH: Well, let me
7   just --
8   MR. EDDINS: If you asked the
9   question.
10  MS. SMITH: I'm going to
11  withdraw that.
12  Q.   Let me just ask you this: When was
13  the last year you received any income
14  for driving a route for field trips?
15  A.   According to him, I don't know.
16  Because he's got $39 in 2003 for the
17  whole year.
18  Q.   No. I'm not asking you -- your
19  attorney has objected to this and I'm
20  going to withdraw this exhibit?
21  I'm asking you from your
22  memory, when was the last time you
23  received any money for driving for

Page 208

1   field trips?
2   A.   I don't recall.
3   Q.   Okay. When was the time you received
4   any income from driving for tutoring?
5   And when I say tutoring, I mean taking
6   the kids home after they were tutored?
7   A.   I -- I don't recall. I guess -- I
8   mean, '99. I don't recall.
9   THE COURT REPORTER: Craig 6
10  is withdrawn?
11  MS. SMITH: Yes, ma'am.
12  Q.   How did Mr. Nacrelli retaliate against
13  you?
14  A.   I don't know.
15  MR. EDDINS: Objection. That
16  calls for a legal
17  conclusion and she
18  doesn't know the law.
19  MS. SMITH: What?
20  MR. EDDINS: Ms. Craig is not
21  learned in the law.
22  Q.   All right. In your complaint, which
23  was filed -- it looks like -- it's

Page 209

1   dated August 8 of 2006, by the clerk
2   of the court. In Count 4 you say
3   tangible actions sexual harassment
4   against Plaintiff Craig?
5   Now, you signed this
6   right here?
7   A.   Right. Right.
8   Q.   On August 2nd, 2006?
9   Well, what do you mean by
10  tangible action sexual harassment
11  against plaintiff Craig?
12  MR. EDDINS: Objection. That
13  calls for a legal
14  opinion. She can't
15  answer that.
16  Q.   Okay. What does she -- what are her
17  allegations -- what are your
18  allegations against Mr. Nacrelli in
19  this Count 4?
20  MR. EDDINS: Read the count
21  for her.
22  Q.   Well, what are you saying there? What
23  do you understand it to be saying?

53 (Pages 206 to 209)

JOAN K. CRAIG - 10/16/2007

Page 210

```
 1    MR. EDDINS: Read that.
 2    A.   I often drove routes of transportation
 3    student on field trips. I've done
 4    extracurricular trips; however, sexual
 5    harassment Nacrelli become so
 6    unbearable I couldn't do my work. I
 7    felt like safely. The more time I had
 8    to be around him, the more nervous I
 9    got and scared. So, I avoided doing
10    field trips. In substance stay away
11    from him. I'd go do my morning run
12    and my afternoon run because I didn't
13    want to get upset and end up having an
14    accident and killing innocent children
15    because of this man harassing me.
16    MR. WILLIAMS: Move to strike
17    as nonresponsive.
18    Q.   All right. Is there any other action
19    of that nature that should be added to
20    that Count 4?
21    A.   I don't know.
22    MR. EDDINS: Objection.
23    That's a legal opinion.
```

Page 211

```
 1    No plaintiff writes their
 2    own complaint.
 3    MS. SMITH: She signed it.
 4    MR. EDDINS: She signed it.
 5    MS. SMITH: I'm assuming you
 6    explained to her and let
 7    her know what her
 8    allegations were. Does
 9    you not? Does she not
10    know what she's claiming?
11    MR. EDDINS: I can't testify.
12    I can object.
13    MS. SMITH: Okay. And what is
14    your objection?
15    MR. EDDINS: That you're
16    asking for a legal
17    opinion and she's not a
18    lawyer.
19    Q.   Okay. Do you understand what an
20    adverse affect on your job would be?
21    Do you understand what
22    would -- if I used -- if I say to you,
23    what bad effects did you suffer on
```

Page 212

```
 1    your job as a result of Mr. Nacrelli's
 2    actions -- alleged anxiety?
 3    MR. EDDINS: Objection.
 4    You've asked about five
 5    times and answered five
 6    time. She quit doing
 7    field trips.
 8    MS. SMITH: Okay.
 9    MR. EDDINS: That was the
10    tangible action.
11    MS. SMITH: Okay. And you're
12    giving that testimony.
13    MR. EDDINS: Yeah. I'm
14    testifying.
15    MS. SMITH: Well, you objected
16    to my use of the term
17    tangible job action. You
18    said that called for a
19    legal conclusion.
20    MR. EDDINS: Right.
21    Q.   Is the stopping of doing field trips
22    the only thing that was a bad -- had a
23    bad effect on your job?
```

Page 213

```
 1    MR. EDDINS: What context are
 2    you asking that in? I
 3    mean, she's testified
 4    many bad things. It's
 5    sort of bad when you come
 6    in and start feeling
 7    somebody that tries to
 8    put your hand in their
 9    crotch. That's bad. But
10    I don't understand what
11    you're asking?
12    MS. SMITH: All right. I'm
13    trying to ask her what
14    tangible action resulted
15    to her job?
16    Now, you've objected
17    to me using those terms.
18    And I'm trying to get her
19    to testify in a way that
20    you don't object to for
21    her to tell me what bad
22    happened to her relative
23    to her job, in terms of
```

54 (Pages 210 to 213)

JOAN K. CRAIG - 10/16/2007

Page 214

1  monetary things?
2  MR. EDDINS: Okay. Monetary
3  things?
4  A.  I say --
5  Q.  Money. Money. Tell me how much money
6  you lost?
7  A.  Well, all right. I -- field trips
8  Ladonia takes -- they take several
9  field trips a year, different grades.
10  All right. I average
11  maybe a field trip -- $20 a trip.
12  Q.  Okay. And did -- all I'm asking you
13  is the stop -- when you stopped taking
14  field trips, is that the only money
15  you have lost as a result of
16  Mr. Nacrelli's actions that you allege
17  he did; yes or no?
18  A.  Yes. Field trips -- special --
19  Q.  You haven't lost any money from any
20  other --
21  A.  Not from my -- from my regular
22  transportation, no, I haven't.
23  Q.  All right. Field trips?

Page 215

1  A.  Special occasions yeah.
2  Q.  Field trips? I'm asking just field
3  trips?
4  A.  Field trips.
5  Q.  What are the special occasion then?
6  A.  I'm just saying, for instance. I
7  didn't say it was. I just said for
8  instance.
9  Q.  Well, if there is a special occasion
10  tell me what it is?
11  A.  A -- field trips.
12  Q.  Okay. Just give one minute and I may
13  be through?
14  Oh, one other thing. You
15  had said in something that I read or
16  when you talked to me that there were
17  health issues within your family over
18  several years. What were you
19  referencing there?
20  A.  Well, what are you talking about, like
21  health issues?
22  Q.  Were there any health issues in your
23  family that prevented you from doing

Page 216

1  your regular job?
2  When I say regular job
3  that's that standard pick up and --
4  A.  Well, when my mother passed away, I
5  took -- when she was dying, I took a
6  couple of weeks off to be with her
7  until she did die. And then as soon
8  as we buried her, I went right back to
9  work.
10  Q.  Okay. What -- when was that? What
11  was the date of death of your mother?
12  A.  November the 13th of '01, I think.
13  Q.  All right. Were there any other
14  family illness that resuscitated you
15  being away from your job?
16  A.  Well, my brother had surgery and I was
17  off -- I was off to be with him when
18  he had his surgery and then after he
19  had his surgery. And as far as being
20  off a long period of time, no, no more
21  than what any normal person would take
22  off to be with their close relative;
23  brother, sister, mama or daddy.

Page 217

1  Q.  Okay. When did your brother have the
2  surgery?
3  A.  I believe November of 2002.
4  Q.  Do you recall how long you were off
5  then?
6  A.  A couple of days.
7  Q.  So, it's your testimony that you
8  weren't off for any length of time?
9  A.  The only time I was off for a long
10  period of time, like I said when my
11  mamma died.
12  Q.  Okay. All right?
13  A.  I stayed right there.
14  MS. SMITH: I think that's all
15  I have.
16  MR. WILLIAMS: Do y'all want
17  to push forward or take a
18  break?
19  MR. EDDINS: Finish.
20  MR. WILLIAMS: On we will
21  push.
22  EXAMINATION
23  BY MR. WILLIAMS:

55 (Pages 214 to 217)

JOAN K. CRAIG - 10/16/2007

Page 218

1    Q.    All right. Ms. Craig, during a
2    typical day, how much time would you
3    spend unloading the children at
4    Ladonia Elementary School?
5    A.    Regular day?
6    Q.    Regular day?
7    A.    Five minutes at the most.
8    Q.    All right. And then once you would
9    unload the children, would you then
10   leave the premises of Ladonia?
11   A.    A lot of times, unless we had to go
12   in.
13   Q.    Just a regular day?
14   A.    Yes.
15   Q.    All right. And I take it -- I may
16   have missed this. But did you during
17   your entire 15-year period, were you
18   dedicated to Ladonia?
19   A.    Oh, yes. That's the only --
20   Q.    That's the only school you go to every
21   day?
22   A.    That's the only school.
23   Q.    All right. So, again, back to the

Page 219

1    regular day you would be at the school
2    for five minutes and you'd leave, and
3    you could do whatever you pleased,
4    correct?
5    A.    Right.
6    Q.    How many minutes would you spend at
7    the school when you would pick the
8    kids up in the afternoon; again,
9    regular day?
10   A.    Okay. We have to be on the school
11   grounds at three o'clock and kids
12   don't come out until 3:30.
13   But it takes longer to
14   load them because they come out in
15   groups. The kindergartners sits on
16   the bus 15 minutes before we're fully
17   loaded ready to leave.
18   Q.    What time do you think you would pull
19   out, regular day? You got there at
20   three o'clock, the kids get out there
21   at 3:30, you pull out at 3:45, four
22   o'clock?
23   A.    Between 10 till 4:00.

Page 220

1    Q.    All right. So, roughly 50 minutes to
2    an hour you're actually on school
3    premises?
4    A.    Correct. Correct.
5    Q.    And that's every day?
6    A.    Every day.
7    Q.    Monday through Friday?
8    A.    Yeah.
9    Q.    Now, are you a nine-month, or
10   10-month, or 11-month employee?
11   A.    I'm nine-month, I believe. I get paid
12   year around. But I think it's
13   nine-month.
14   Q.    All right. You start when the kids
15   start?
16   A.    Start when they start and leave when
17   they leave. That's it.
18   Q.    All right. Did you ever have any
19   interaction with Mr. Nacrelli outside
20   of your job? You ever see him outside
21   of you being a bus driver for Ladonia
22   Elementary School?
23   A.    Like in town somewhere or something,

Page 221

1    no.
2    Q.    And during a typical week, how many
3    times would you see Mr. Nacrelli?
4    A.    I can't answer that because it would
5    -- it varied.
6    Q.    Would it vary from week to week?
7    A.    Uh-huh.
8    Q.    Would there be weeks where you
9    wouldn't see him at all?
10   A.    Correct.
11   Q.    And there would be weeks where you'd
12   see him every day?
13   A.    Possible.
14   Q.    And it was just hit or miss, correct?
15   A.    That's it.
16   Q.    All right. But you have no way to
17   quantify, sitting here today, over
18   say, a one-year period how many times
19   you would have physically seen
20   Mr. Nacrelli?
21   A.    In one year?
22   Q.    Yes, ma'am?
23   A.    No. I sure can't.

56 (Pages 218 to 221)

JOAN K. CRAIG - 10/16/2007

Page 222

1   Q.   How many field trips would you take
2   during a year when you were given
3   field trips?
4   And I'm going to play
5   this game with you. Using a ballpark
6   figure, was it more than five, less
7   than five?
8   A.   It would be more than five, I believe.
9   Q.   Would it be more than 10?
10  MR. EDDINS: Talking about per
11  year?
12  MR. WILLIAMS: Yes, sir.
13  MR. EDDINS: How much per
14  year?
15  MR. WILLIAMS: Average for a
16  year?
17  A.   Okay. Well, it might not have been
18  that many. But I believe more than
19  five.
20  Q.   I understand. If you don't remember.
21  I'm not trying to hold you to a
22  specific number?
23  A.   I don't -- I don't remember.

Page 223

1   Q.   I also need various --
2   A.   In between. It varies. Right.
3   Correct. Between 10 and five -- five
4   and 10.
5   Q.   Between five and 10, correct?
6   A.   Uh-huh.
7   Q.   Okay.
8   A.   Correct.
9   Q.   And I'm talking faster. I'm trying to
10  hurry it up. But if we could -- you
11  and I -- it's fault too?
12  A.   Okay.
13  Q.   If we could avoid talking over each
14  other?
15  A.   All right.
16  Q.   Please do. It's just impossible for
17  her to get it down?
18  A.   All right.
19  Q.   So, I'll wait for you, you'll wait for
20  me, all right?
21  A.   Yes.
22  Q.   Very good. How long have you known
23  Ms. Jeffers?

Page 224

1   A.   I've been knowing of her at Ladonia
2   every since I went -- ever since I've
3   been at Ladonia. But as far as
4   knowing, knowing her, I think I really
5   sat down and talked to her in '97,
6   when I went to her and told her that
7   she needed to talk to my niece -- my
8   great niece about my sister's just
9   passing away.
10  Q.   It was a tough time for your niece --
11  your great niece?
12  A.   Yeah.
13  Q.   Did you consider Ms. Jeffers a friend
14  from that point on?
15  A.   I felt like she knew what she was
16  doing. And because -- it seemed like
17  she helped my little niece.
18  Q.   Would y'all socialize at all outside
19  of school from '97 on?
20  A.   Not -- I mean, if we seeing each other
21  and talking and all. But as far as
22  going places and doing things, no.
23  Q.   Do you consider her a friend now, as

Page 225

1   we sit here today?
2   A.   Oh, yeah. I mean, I consider all of
3   you my friend.
4   Q.   Okay. All right. And was it
5   Ms. Jeffers that directed you to
6   Mr. Eddins as an attorney in this
7   case?
8   MR. EDDINS: She's not going
9   to answer anything about
10  her contact with me. You
11  are you restricted.
12  MR. WILLIAMS: Are you
13  instructing her not to
14  answer?
15  MR. EDDINS: Absolutely.
16  MR. WILLIAMS: If you'll just
17  certify that.
18  Q.   All right. Ms. Craig, I think you
19  testified earlier -- I just want to
20  make sure that we're clear about this?
21  A.   Yes.
22  Q.   In October of '05, this is around the
23  time frame that you would have been

57 (Pages 222 to 225)

JOAN K. CRAIG - 10/16/2007

Page 226

1   talking -- you were trying to get the
2   appointment with Dr. Lee?
3   A.   Correct.
4   Q.   To report the harassment that you're
5   alleging in this case?
6   A.   Correct.
7   Q.   You don't remember during that time
8   frame that Mr. Nacrelli was no longer
9   at Ladonia Elementary School; is that
10  correct?
11  A.   No.
12  Q.   And sitting here today, you can't tell
13  me a specific date or even a time
14  frame that you remember Mr. Nacrelli
15  no longer being at Ladonia Elementary
16  School; is that correct?
17  A.   That's correct.
18  Q.   Did Mr. Nacrelli at any time cause you
19  physical harm to your body?
20  A.   Leaving marks, no.
21  Q.   So, did he cause physical harm to your
22  body at any time in any other way?
23  A.   Emotionally, yes. But as far as

Page 227

1   leaving marks or anything, no.
2   He left scars in my mind.
3   Q.   Have you sought any help from anybody
4   about your emotional problems in this
5   lawsuit?
6   A.   No.
7   Q.   And how are you doing today about your
8   emotional problems?
9   A.   I don't -- truthfully, I don't know.
10  I mean, sitting here going over it and
11  everything, it's hard. It really is.
12  I try -- I try to keep it back.
13  Q.   Assuming you're not in a deposition?
14  A.   Huh?
15  Q.   Assuming you're not in a deposition --
16  take the day out of it, how you using
17  generally, in terms of your emotional
18  problems and what not?
19  A.   I stay busy.
20  Q.   Are you doing better today than you
21  were back in '05?
22  A.   When I -- I -- I don't know. I can't
23  answer that. I don't --

Page 228

1   Q.   Fair enough. Back when you were
2   diagnosed with shingles --
3   A.   Uh-huh.
4   Q.   Was there anything else going on in
5   your life that would have caused you
6   stress?
7   A.   Not really.
8   Q.   Nothing from a family standpoint?
9   A.   No.
10  Q.   No other personal matters?
11  A.   No.
12  Q.   Have you ever been arrested?
13  A.   Yes.
14  Q.   Tell me about that?
15  A.   Me and my daughter, she was living in
16  Lee County and she called me up
17  arguing and carrying on. And I guess
18  the mamma come out in me. And I told
19  her, I'd come over there and whip her
20  ass. And I guess she told me what --
21  what her retaliation could be, she had
22  me put in jail.
23  Q.   Was it for harassment?

Page 229

1   A.   Uh-huh.
2   Q.   What year was that?
3   A.   '90 -- I really -- it would have been
4   in the 90's. And it would be -- it --
5   it was after my sister died in '97,
6   may be '98.
7   Q.   And who was it that you were accused
8   of harassing?
9   A.   Her.
10  Q.   What was her name?
11  A.   Lynn.
12  Q.   Lynn who?
13  A.   Elliot.
14  Q.   Is Lynn Elliot is she associated at
15  all with Ladonia Elementary School?
16  A.   She went to Ladonia.
17  Q.   How old is Lynn Elliot?
18  A.   27.
19  Q.   Were you convicted of harassment?
20  A.   No.
21  Q.   Did you serve any time?
22  A.   No. I just went down there and signed
23  and got -- and I guess I had a -- i

58 (Pages 226 to 229)

JOAN K. CRAIG - 10/16/2007

Page 230

1    had a bondsman go with and sign it and
2    leave. And the judge I think throwed
3    it out because I didn't have to pay
4    nothing or anything.
5    Q.    Any other times during your life that
6    you've been arrested?
7    A.    No.
8    Q.    Ever been sued?
9    A.    No.
10   Q.    Besides this lawsuit, have you ever
11   sued anybody else?
12   A.    In a car wreck.
13   Q.    Tell me about that?
14   A.    Me and my sister -- this here is back
15   in '75. They come to Albany, Georgia
16   and picked me up. Her -- her
17   brother-in-law and sister-in-law, they
18   come to Albany and picked me up to
19   bring me home. Because I was down
20   there spending with my aunt.
21   And on our way home, this
22   drunk driver hit us head on. And we
23   all was in hospital and suffered a

Page 231

1    fibroid tumor of the breast. And it
2    swelled up real big and they had to
3    take it out.
4    And in 90 -- hold on.
5    Let's see, 1993 -- '92 or '93, the
6    year I come to work here. I drove all
7    that year. And that summer I was --
8    Lewis stopped -- this car in front of
9    us was making a left turn. We was in
10   -- between Knoxville, Tennessee and
11   here.
12   All right. This man ran
13   up in the back end and I had just had
14   a hysterectomy on the 29th of June.
15   This here was July the 10th of '93.
16   The man hit us and then the seat
17   embedded in me.
18   Q.    Any other lawsuits?
19   A.    No.
20   Q.    All right. The 70's lawsuit, did you
21   go to trial or did you settle your
22   case?
23   A.    The attorneys settled.

Page 232

1    Q.    The second lawsuit, did you go to
2    trial?
3    A.    No.
4    Q.    Did you give a deposition in that case
5    like you're giving here today?
6    A.    With a bunch of lawyers, no.
7    Q.    Did you have to answer any questions
8    under oath?
9    A.    Yes.
10   Q.    As a result of that?
11   A.    To the insurance company.
12   Q.    Did you actually file a lawsuit or did
13   you settle before then by a lawsuit?
14   A.    I think they settled.
15   Q.    Who was your attorney?
16   A.    Michael -- oh, in 1997?
17   Q.    Yes?
18   A.    I mean, three -- Michael J. Bellamy.
19   He's a judge here.
20   Q.    Testifying to several occurrences that
21   you realize were sexual harassment
22   involving you and Mr. Nacrelli. I
23   want to take you back to the first one

Page 233

1    that you say occurred on a bus ride
2    that you took with him to Hancock to
3    show him where you were having the
4    problem in turning around the bus?
5    A.    Correct.
6    Q.    Are you with me?
7    A.    Yes.
8    Q.    Okay. Was anybody with you when that
9    -- besides Mr. Nacrelli when those
10   acts took place?
11   A.    No, there wasn't.
12   Q.    All right. Was anyone there, whether
13   it was during the time frame you were
14   actually at the Hancock site or when
15   you left or came back to Ladonia
16   parking lot, was anyone there besides
17   you and Mr. Nacrelli to overhear
18   anything that was said?
19   A.    No.
20   Q.    Did you make any notes -- written
21   notes about what happened that day?
22   A.    I don't recall if I did.
23   Q.    Do you keep a journal?

JOAN K. CRAIG - 10/16/2007

Page 234

1   A.   Periodically.
2   Q.   Do you still have that journal?
3   A.   I don't know if I would or wouldn't.
4   Q.   All right.  Do you have more than one
5   journal?
6   Some people call it a
7   diary, do you know what I'm talking
8   about?  That book where you write down
9   your thoughts?
10  A.   No.
11  Q.   You don't have one?
12  A.   Huh-uh.
13  Q.   Is that a no?
14  A.   No.
15  Q.   Sitting here today, you don't remember
16  taking any notes concerning this
17  incident?
18  A.   I don't remember.
19  Q.   Okay.  As a result of taking that trip
20  to the Hancock bus stop, did
21  Mr. Nacrelli take action to make sure
22  that the children were going to line
23  up the way you wanted them to?

Page 235

1   A.   Yes, he did.
2   Q.   Was that problem resolve to your
3   satisfaction?
4   A.   Yes, it was.
5   Q.   The next occurrence you reported to,
6   sitting here today in deposition I,
7   was that sometime later Nacrelli came
8   to you and asked if you had any
9   problem, and you said no.  I think you
10  testified that you felt like he was
11  trying to check up on how you would
12  react to see if you were going to tell
13  on him in front of other people; is
14  that correct?
15  A.   That's the way I felt.
16  Q.   During that particular episode where
17  he asked you if you had any problem
18  and you said no, did he touch you in
19  any way?
20  A.   No.
21  Q.   Did he use any inappropriate words in
22  terms of a sexual nature?
23  A.   No.

Page 236

1   Q.   And is all he said to you, do have any
2   problem?
3   A.   He asked me was everything going all
4   right?  Did I have any problems.  I
5   said no, everything is fine.
6   Q.   Has he ever asked you that before any
7   of this happened?
8   A.   Yeah.  If there was somebody out there
9   and he would come -- if he was out
10  there, he would ask.
11  If there was another
12  school official out there, in other
13  words, standing around, he'd ask how's
14  -- how's it going, stuff like that.
15  Q.   So, he had asked a similar question
16  before there was anything to do with
17  any allegation of sexual harassment,
18  correct?
19  A.   He would asked if there was other
20  people standing there.
21  Q.   And this would have occurred before
22  the Hancock trip, correct?
23  A.   Huh?

Page 237

1   Q.   This would have occurred before the
2   Hancock trip when he had asked on
3   occasion if everything was okay?
4   A.   He asked all of us if we had any
5   problems; not just me.
6   Q.   I understand that.  But the time
7   frame --
8   A.   Yeah.  Any time.  I mea, that's
9   automatic.  He would ask, how was
10  things going.
11  Q.   All right.  Did Mr. Nacrelli at any
12  time threaten to terminate you from
13  your job as a school bus driver?
14  MR. EDDINS:  Object to the
15  form.  Mr. Nacrelli
16  didn't have the authority
17  to terminate her.
18  MR. WILLIAMS:  That's no
19  reason for you to object
20  to the question.
21  MR. EDDINS:  Just because it
22  can't be done.
23  MR. WILLIAMS:  I'm just trying

JOAN K. CRAIG - 10/16/2007

Page 238

1   to shorten stuff. I'm
2   not trying to --
3   MS. SMITH: Okay. Can we
4   stipulate then that
5   Mr. Nacrelli did not have
6   the authority to
7   terminate her?
8   MR. EDDINS: Absolutely.
9   MR. WILLIAMS: All right.
10  That solved that.
11  Q.   All right. The third incident you
12  testified to would be where -- it was
13  a couple of weeks later you were
14  unloading kids and there was some
15  problems with a Jonathan Rose; is that
16  correct?
17  A.   Yes, sir.
18  Q.   Did he touch you on that occasion?
19  A.   Not until all the kids got off.
20  Q.   And where did he touch you?
21  A.   Okay. He was standing on the bus and
22  he wanted me to pull up. He touched
23  my leg, my inner thigh and rubbed me

Page 239

1   on the back of my neck, and rubbed --
2   and started rubbing my hair and stuff,
3   talking about my breasts.
4   Q.   Did you tell him to stop?
5   A.   Yes, I did.
6   Q.   Did he stop?
7   A.   No. He told me I knew I wanted -- he
8   told me that he -- he said you know
9   you know you want me. You want me.
10  And I told him, please get off the
11  bus. I'm going home.
12  Q.   And did he get off the bus?
13  A.   Finally got off. I started crying.
14  Q.   Did you testify that typically you
15  were the last bus to arrive; is that
16  correct?
17  A.   Correct.
18  Q.   That would be in the morning?
19  A.   Morning. And I was the last bus in
20  the afternoon. And I'm still the last
21  bus in the afternoon.
22  Q.   Do you still work as a bus driver at
23  Ladonia?

Page 240

1   A.   Yes, I do.
2   Q.   All right. Let's move onto the
3   Christmas program in December of 2003.
4   You testified he put his arm around
5   you. There were other people there,
6   correct?
7   A.   Yes, sir.
8   Q.   Was there anything sexual about the
9   way he put his arm around you?
10  A.   Like I said early?
11  Q.   No, ma'am. The question was simply
12  this: Was there anything sexual about
13  the way he put his arm around you?
14  A.   Yes, to me.
15  MR. EDDINS: Object to the
16  form. She's already
17  answered.
18  Q.   Tell me -- tell me about that.
19  A.   He's already made all these other
20  sexual gestures. So I felt like he
21  was coming over there making another
22  sexual statement with his body
23  language.

Page 241

1   Q.   What was it about his body language
2   that was sexual?
3   A.   Putting his arms around me after I had
4   done told him not to be touching me.
5   And I'd tell him to stop, keep his
6   hands off of me.
7   Q.   What part of his body did he touch
8   with his arm?
9   A.   I'm standing here, he's standing here;
10  and he ain't much taller than me,
11  maybe just -- he's a little taller
12  than me and he takes his arm and wraps
13  it around me. So, his arm went around
14  my shoulder and maybe part of my arm.
15  I don't recall.
16  Q.   Are those the only parts of your body
17  that he touched on that occasion?
18  A.   He was standing close so his body
19  probably touching my body and on my
20  leg by standing close, I guess.
21  Q.   Anything else?
22  A.   (The witness shakes head.)
23  THE COURT REPORTER: No?

61  (Pages 238 to 241)

JOAN K. CRAIG - 10/16/2007

|  | Page 242 |
|---|---|
| 1 | THE WITNESS: No. No. |
| 2 | Q. During the motorcycle incident when |
| 3 | your nephew was there, did he touch |
| 4 | your body in any way? |
| 5 | A. He popped me on my butt because I had |
| 6 | a do-rag on. |
| 7 | Q. That was later in the school? |
| 8 | A. Right. Right there by the door. Me |
| 9 | and Little Man was leaving. And I |
| 10 | don't know where -- he had come out |
| 11 | his office and -- and he come up the |
| 12 | hall, and we was standing there and he |
| 13 | pops me and he says hi, Ms. Craig, you |
| 14 | know you ain't supposed to have that |
| 15 | on. |
| 16 | Because really I guess in |
| 17 | a sense, it might have been against |
| 18 | the dress code for the kids and all. |
| 19 | But I wasn't there as an employee at |
| 20 | that time. I was visiting my nephews. |
| 21 | So, I -- |
| 22 | Q. You think he may have been trying to |
| 23 | get your attention when he popped you |

|  | Page 243 |
|---|---|
| 1 | on the butt? |
| 2 | A. Not -- I -- you could answer that in |
| 3 | two ways. |
| 4 | MR. EDDINS: Just if you know. |
| 5 | THE WITNESS: Huh? |
| 6 | MR. EDDINS: Just answer if |
| 7 | you know. |
| 8 | A. I don't know. |
| 9 | Q. Was there anything sexual about the |
| 10 | way he popped you on the butt? |
| 11 | A. Coming from him, yes. |
| 12 | Q. All right. The inservice meeting you |
| 13 | talked about in August of '05, did he |
| 14 | ever touch you on that occasion? |
| 15 | A. Well, let me remember. As far as |
| 16 | actually putting his hands on me. But |
| 17 | he -- he stood right up against me and |
| 18 | the chair and his leg was right up |
| 19 | against my leg. But literally |
| 20 | reaching out touching me with his |
| 21 | hands, I don't recall. |
| 22 | Q. All right. Was there anything sexual |
| 23 | about the way he was standing close to |

|  | Page 244 |
|---|---|
| 1 | you on that occasion? |
| 2 | A. Coming from him, yeah. I took it as |
| 3 | it was. |
| 4 | Q. And when you say coming from him, are |
| 5 | you talking about the past history |
| 6 | that you're claiming you had with him |
| 7 | in terms of the incident that you |
| 8 | testified to today? |
| 9 | A. Right. Because of him grabbing his |
| 10 | self asking me if I -- telling me that |
| 11 | had I heard about Italian men, they're |
| 12 | Italian Stallions. And him holding |
| 13 | his penis like you want it. Yeah, I |
| 14 | took it sexual. Truthfully, I sure |
| 15 | did. |
| 16 | Q. But from I guess an outsider looking |
| 17 | in, there was nothing overtly sexual |
| 18 | about him standing next to you? He |
| 19 | wasn't holding his penis, was he, at |
| 20 | that time? |
| 21 | MR. EDDINS: Object to the |
| 22 | form. |
| 23 | Q. The inservice meeting when he was |

|  | Page 245 |
|---|---|
| 1 | standing next to you, was he holding |
| 2 | his penis? |
| 3 | A. I turned and looked away. So, I don't |
| 4 | know if he did or not. |
| 5 | Q. When he rubbed your shoulders in the |
| 6 | meeting in August '05, was there |
| 7 | anything overtly sexual about that |
| 8 | that you're aware of? |
| 9 | A. I took it as it was. |
| 10 | Q. Again, the same reason we talked about |
| 11 | before? |
| 12 | A. Yes. |
| 13 | Q. Did he touch any part of your body |
| 14 | aside your legs, your shoulder, and |
| 15 | your arms at any time? |
| 16 | A. Ask me again. |
| 17 | Q. Did Mr. Nacrelli ever touch any part |
| 18 | of your body besides your neck, your |
| 19 | arms and your legs? |
| 20 | A. Yes. |
| 21 | Q. And your butt? |
| 22 | A. He touched -- |
| 23 | Q. I forgot your butt? |

62 (Pages 242 to 245)

JOAN K. CRAIG - 10/16/2007

Page 246

1  A.  I'm sorry. Okay. As long as you
2  stipulate that he touched my butt.
3  I'm just saying -- you didn't say it.
4  So, that's when I asked.
5  Q.  Aside from your rear end, arms,
6  shoulders and your legs, did
7  Mr. Nacrelli touch --
8  A.  My inner thighs.
9  Q.  Okay. Your inner thighs. Any other
10  part of your body at any time?
11  THE COURT REPORTER: No? Yes?
12  THE WITNESS: I'm thinking.
13  THE COURT REPORTER: Okay.
14  A.  Not that I can recall.
15  Q.  Are you taking any medication, sitting
16  here today?
17  A.  Yes.
18  Q.  What are those?
19  A.  I take Ziac for high blood pressure.
20  Premarin.
21  Q.  What is that for?
22  A.  That is for hormone from a
23  hysterectomy.

Page 247

1  Q.  All right?
2  A.  And I take Vi -- Vytorin. It's a
3  cholesterol pill and Nexium.
4  Q.  What is the Nexium for?
5  A.  Acid reflux.
6  Q.  How long have you been taking Nexium?
7  A.  Oh, I don't know. It's been a while.
8  No, it's not with this.
9  Q.  Before Mr. Nacrelli?
10  A.  Yes.
11  Q.  All right. When is the last time you
12  had shingles?
13  A.  Oh, it's not -- it's like little
14  outbreaks but they're not -- they're
15  -- I don't know how to tell you. But
16  it's -- it's the -- the occurrence can
17  come and go. I think last year maybe.
18  Q.  2006?
19  A.  I really -- somewhere around there. I
20  can't say for sure.
21  Q.  Were you had shingles, did you always
22  go to Saint Francis to the emergency
23  room to seek treatment?

Page 248

1  A.  Yes.
2  Q.  That's over in Columbus, Georgia?
3  A.  Yes.
4  Q.  We pinned down the date of some
5  occurrences that you testified to in
6  terms of your -- is it your nephews?
7  Are they twins?
8  A.  Huh-huh.
9  Q.  Chase and Chance?
10  A.  No.
11  Q.  Are they the same age?
12  A.  No.
13  Q.  How far a part are they?
14  A.  I guess 11 months, somewhere around
15  there.
16  Q.  Are they both boys?
17  A.  Uh-huh.
18  Q.  Al right. They're in the same grade
19  though, correct?
20  A.  Right.
21  Q.  And they're in the 5th grade now?
22  A.  Should be, yeah.
23  Q.  All the occurrences you talked about

Page 249

1  from -- starting with the Hancock trip
2  and ending with the -- what were we
3  talking about -- the meeting with the
4  -- was it other bus drivers that were
5  there around the conference table in
6  August of '05?
7  A.  Correct.
8  Q.  That was the last occurrence you're
9  alleging in this lawsuit, correct?
10  A.  Yeah. I think --
11  Q.  Over what period of time are we
12  talking about? How much time elapsed
13  from the very first occurrence to the
14  very last occurrence? Was it over a
15  year?
16  A.  Oh, yeah.
17  Well, wait a minute. Let
18  me -- now, what are you asking me?
19  You're wanting to know how long it was
20  from the first time to the last time?
21  Q.  That's correct?
22  A.  And --
23  Q.  How much time went by?

JOAN K. CRAIG - 10/16/2007

Page 250

```
 1    A.   And nothing in the middle.
 2    Q.   The question is simply this -- let me
 3  just ask it this way:  When did the
 4  first occurrence take place; that's
 5  what I'm trying to figure out?  We
 6  know --
 7    A.   The Hancock place.
 8    Q.   In August of '05 -- let me finish my
 9  question.  All right?
10    A.   Okay.
11    Q.   In August '05?
12    A.   Right.
13    Q.   You worked back from there and tell me
14  when the first incident was?
15    A.   Somewhere around 2000 -- it would have
16  been -- it was around 2001/2002, I
17  believe.
18    Q.   All right.  Ma'am, you sat here all
19  day yesterday and listened to the
20  testimony of Ms. Jeffers?
21    A.   Uh-huh.
22    Q.   Were you witness to any of the
23  allegations that she put forth in
```

Page 251

```
 1  terms of Charles Nacrelli?
 2    A.   No.
 3    Q.   You have no personal knowledge
 4  concerning those allegations that she
 5  set forth yesterday?
 6    A.   No.
 7    Q.   When did your mom pass away?
 8    A.   2001.
 9    Q.   And when did your brother have his
10  surgery?
11    A.   In 2002.
12    Q.   Did you have any family crisis since
13  your brother's surgery required you to
14  take time off from work to be with
15  your family?
16    A.   December 2005.  But I only took
17  one day off cause I was at the
18  hospital.  My daughter was in a car
19  wreck on 185 with her best friend that
20  was driving she was killed instantly.
21  So, I stayed at the hospital over
22  night.  Because I got the call.  As
23  soon as I finished my bus run that
```

Page 252

```
 1  evening and went straight up there and
 2  stayed until the next day.  And they
 3  let her out and I went home, then I
 4  drove my bus the next day.
 5    But -- and I might -- I
 6  think I might have been out one day
 7  when my nephew's wife had a baby and
 8  it was still born.  I stayed out to --
 9  I was with them at the hospital when
10  the baby was born.  And then I went
11  and done the funeral with them.  That
12  was it.
13    Q.   During the relevant time period '01
14  through '06, were you working any
15  second jobs outside of being a bus
16  driver?
17    A.   My husband owns his business -- runs a
18  business, so I really don't work.  I
19  just run and do payroll, pick it up
20  for him and bring it home.  He does
21  all of that.
22    And then in '05, I had a
23  tax service.  But I didn't miss nary
```

Page 253

```
 1  day of work.  I was at work every day.
 2  I was driving the bus.  I had with my
 3  daughter.  It was like a branch.
 4    Q.   What's the name of your tax service?
 5    A.   Fast Fax.
 6    Q.   And what's the name of your husband's
 7  company?
 8    A.   It's under Paul Craig.
 9    Q.   He's in the business of putting up
10  buildings; is that what you said?
11    A.   He's an iron erector.  He puts up
12  metal buildings, structural steel,
13  stuff like that -- schools.
14    Q.   All right.  Do you from time to time
15  keep notes about your life occurrences
16  that might be in a journal or a diary
17  that you just keep loose around?
18    A.   Like where I jot things down?
19    Q.   Right?
20    A.   It's possible.
21    Q.   Do you keep those notes?
22    A.   Well, I might have something that I
23  jot down here and it might stay there.
```

64 (Pages 250 to 253)

Page 254

1  I can't say. I don't know.
2  Q.   You don't have any notes here today
3  that related to the allegations that
4  you're testifying to here today
5  relating to Mr. Nacrelli, do you?
6  A.   I don't recall.
7  Q.   If you do recall, will you let me know
8  or let your lawyer know?
9  A.   Yes, I will.
10  Q.   This is just for clarification
11  purposes. Ms. Craig, you testified
12  earlier when Sidney was asking you
13  questions about when you told your
14  husband. I think you testified in
15  1993. Did you actually mean 2003?
16  A.   While --
17  Q.   I'm sorry. Were you zoning out? I
18  have from time to time today?
19  You were answering
20  questions from Sidney earlier today
21  about when you told your husband --
22  A.   Right.
23  Q.   About the Nacrelli allegations. And I

Page 255

1  think you testified that it was 1993.
2  Did you mean 2003?
3  A.   Correct, 2003.
4  Q.   When is the last time you took any
5  Xanax?
6  A.   Oh, I started to take one last night,
7  but I didn't.
8  Q.   Was that in anticipation for today?
9  A.   I think so. I'll take one today. I
10  don't recall.
11  Q.   When is last time you took a
12  Wellbutrin?
13  A.   I don't take them no more. That's --
14  I've been taking -- I haven't had
15  them.
16  Q.   Is that a matter of years?
17  A.   See, I think what I -- what he was
18  doing when I got on them, he was going
19  to help me quilt smoking. If that's
20  -- if that's what's that's for, it
21  don't work.
22  Q.   How long have you smoked?
23  A.   Truthfully, since I was nine years

Page 256

1  old.
2  Q.   That's why we're today for the truth?
3  Did you attempt to quit
4  smoking at any time from 2001 through
5  2006?
6  A.   I don't recall if I have or not. I
7  tried to quit every time I put one
8  out.
9  Q.   How many times in your life time how
10  many times have you actually tried to
11  quit smoking?
12  A.   Actually, actually tried?
13  Q.   Like really put your heart into it,
14  got the detached, the whole nine
15  yards?
16  A.   Zero.
17  Q.   When you try to quit, what do you --
18  how long does it last?
19  A.   Until I go back outside and smoke
20  another one. I mean, I -- I enjoy it.
21  I really do. That's the only thing I
22  do, do.
23  Q.   So, you've never had an occasion where

Page 257

1  you tried to quit smoking to the point
2  where you had withdrawals and symptoms
3  that affected your life?
4  A.   No.
5  Q.   To try to quit smoking, everybody gets
6  out of the way because they know it's
7  going to be a disaster. Has this ever
8  happened to you?
9  A.   No.
10  Q.   Okay. All right.
11  MR. WILLIAMS: That's all I
12  got.
13  MS. SMITH: I got a couple of
14  clean up questions and I
15  promise it will be short.
16  EXAMINATION
17  BY MS. SMITH:
18  Q.   You just said that the Wellbutrin was
19  given to you to help you stop smoking;
20  is that why?
21  A.   Yeah. I -- I haven't -- that there --
22  the Wellbutrin that had nothing to do
23  with this.

JOAN K. CRAIG - 10/16/2007

Page 258

1   Q.   The Wellbutrin had nothing to do with
2   Mr. Nacrelli?
3   A.   Right.
4   Q.   Okay.  Now, just to make sure, you
5   told me that you reported this
6   situation to Ms. Baker?
7   A.   Correct.
8   Q.   And to Dr. Lee?
9   A.   Correct.
10  Q.   But you didn't report it to Mr. Rudd
11  because you didn't -- he wasn't
12  interested?
13  A.   I didn't actually report -- I didn't
14  go to Mr. Rudd and say, oh, Mr. Rudd,
15  I'm being sexual molested, no.
16  But when he asked me
17  about going to see Dr. Lee, he wanted
18  to know why and I was going to tell
19  him why, and he didn't want to hear
20  it; is what I said.
21  Q.   Yes, ma'am.  So, you never did
22  reported it him at all?
23  A.   No.  I wouldn't have felt comfortable

Page 259

1   telling him.
2   Q.   Did you report it to anyone else that
3   was in a supervisory capacity?
4   A.   I reported it to Lee and Baker.
5   Didn't report it to Rudd, and Nacrelli
6   was one of my supervisors.  No.
7   Because it surely wouldn't do no good
8   to tell Nacrelli what he was doing, as
9   far as reporting it, because he
10  already knew what he was doing.
11  Q.   Okay.  Did you ever discuss it with
12  any of the Russell County Board
13  members?
14  A.   In October, Keith Mitchell come up to
15  the school that morning to bring John
16  some lunch.  And I was unloading the
17  bus, and I told him that I had me an
18  appointment to see Dr. Lee about
19  Nacrelli.  And I really don't recall
20  what he said.
21  Q.   All right.  What did he say in
22  response to that?
23  A.   I said I don't recall what he said.

Page 260

1   Q.   Okay.  You don't recall any of that
2   conversation?
3   A.   It was real quick.  Because like I
4   said, I was unloading the kids, and he
5   brought John's lunch.  So, I don't
6   recall that.
7   Q.   Did you tell him what about
8   Mr. Nacrelli or did you just say, I'm
9   going to see Dr. Lee about
10  Mr. Nacrelli?
11  A.   I told him I was going to see Dr. Lee
12  about Mr. Nacrelli's sexual abuse.
13  Q.   Do you recall if he said anything in
14  response?
15  A.   I don't recall what he said because
16  the kids was getting off the bus.
17  Q.   Did you tell him any details?
18  A.   No. I didn't go through nothing with
19  him.
20  Q.   This was before you had seen Dr. Lee?
21  A.   (The witness nods head.)
22  THE COURT REPORTER: Yes?
23  THE WITNESS: Yes.

Page 261

1   Q.   Was this after you had spoken with
2   Ms. Baker?
3   A.   Right.  Because I didn't know -- oops
4   -- I assumed, I don't know.  But I
5   felt like by me already talking --
6   telling Ms. Baker, that him being a
7   board member, who knows, maybe I felt
8   like he already knew it.  You know
9   what I'm saying?  Because the times
10  they have the board meetings and then
11  they go in that closed session, so
12  maybe I thought -- maybe I felt like
13  she had already told them.  I don't
14  know.
15  Q.   Okay.
16  A.   But I did mention it.
17  MS. SMITH: Okay.  That's all
18  I have.
19  EXAMINATION
20  BY MR. EDDINS:
21  Q.   Okay.  Just so that we're absolutely
22  clear, with regard to Mr. Rudd,
23  Ms. Smith was asking you about a

66 (Pages 258 to 261)

JOAN K. CRAIG - 10/16/2007

Page 262

1  conversation that was after it had
2  been reported, I believe. At some
3  point before that did you talk with
4  Mr. Rudd about your being
5  uncomfortable around Mr. Nacrelli?
6  A.    Yes.
7  Q.    Just tell -- tell us exactly what was
8  transpired in that conversation?
9  A.    Okay. Well, like we'll all -- say,
10  for instance, you're standing at the
11  bus shop when you're getting your bus
12  serviced for the month and just
13  standing around. Mr. Rudd come up and
14  say, how's things at Ladonia? And you
15  say whatever you want to say. It was
16  informal and stuff. And I'd say,
17  everything is going all right at
18  Ladonia. And I just feel
19  uncomfortable around Mr. Nacrelli.
20  And he wouldn't go into details
21  wanting to know why. He'd say, how
22  you holding Ladonia down? I'd go, all
23  right, I guess. How is things on that

Page 263

1  end and different things? Okay.
2  And then he'd say well,
3  you know -- I've told him I said -- we
4  were standing there talking and I said
5  Mr. Rudd, I don't feel comfortable
6  around Mr. Nacrelli. And we'd get to
7  talking. He wouldn't ask why, how
8  come you didn't feel comfortable. And
9  I'd tell him I didn't like
10  Mr. Nacrelli. Because he didn't do
11  things the way he should do things.
12  He didn't discipline the kids the way
13  he should discipline them. And I felt
14  like he wasn't -- I would make up
15  reasons why -- for him to ask
16  questions about well, how come he
17  makes you feel uncomfortable. But he
18  never would. So -- but I have told
19  him I felt uncomfortable around
20  Mr. Nacrelli.
21  Q.    Okay. Now, in your meetings, how are
22  you instructed if an incident occurs
23  at school; to whom were you instructed

Page 264

1  to report that incident to?
2  A.    To the Ladonia school, to the
3  principal.
4  Q.    All right. In your case, I know
5  Ladonia principal. But in general to
6  whom are the bus drivers instructed
7  report incidents to -- if an incident
8  happens at a school?
9  A.    To our supervisor at the school,
10  whoever is in charge of that school.
11  Q.    Would that be normally the principal?
12  A.    The principal.
13  Q.    Okay. Now, prior to sexual harassment
14  training that was held after this
15  lawsuit that you filed, had you ever
16  received any instructions whatsoever
17  from Russell County Board of Education
18  for what constitutes sexual harassment
19  on the job?
20  A.    No.
21  Q.    Had you ever received any training
22  whatsoever as to whom you were --
23  should report sexual harassment if you

Page 265

1  experience it on the job?
2  A.    No.
3  Q.    Okay.
4  MR. EDDINS: I don't any
5  further questions.
6  That's all I have.
7  MS. SMITH: Let me go back
8  then.
9  EXAMINATION
10  BY MS. SMITH:
11  Q.    I'm somewhat concerned. I know you're
12  giving me your best effort. But I've
13  asked you twice about Mr. Rudd. And
14  twice you have told me that you never
15  discussed it with him. And now you're
16  saying that you told him you were
17  uncomfortable?
18  A.    I have told him I'm uncomfortable.
19  I've never come out and said,
20  Mr. Rudd, Mr. Nacrelli is sexually --
21  no, I did not. I had told him I was
22  uncomfortable around Nacrelli.
23  Q.    And have you ever explained to

67 (Pages 262 to 265)

JOAN K. CRAIG - 10/16/2007

Page 266

1  Mr. Rudd what you meant by
2  uncomfortable?
3  A.   No.
4  Q.   Okay.  So I can go home here today and
5  know that --
6  A.   I don't know if you can or not.
7  Q.   Know that you never told Mr. Rudd
8  anything, except you were
9  uncomfortable?
10  A.   Uncomfortable.  Other than when he
11  asked what was I going to see -- well,
12  Dr. Lee.
13  Q.   Uh-huh?
14  A.   When I told him about Nacrelli and he
15  didn't want to hear it.  So, fine.
16  That's it.
17  Q.   Okay.  And that was during the time
18  frame that you were trying to set up
19  an appointment with Dr. Lee; right?
20  A.   Correct.
21  Q.   Okay.
22  A.   Yes.
23  Q.   That's all.  I'm going to rest

Page 267

1  comfortable tonight then?
2  A.   Well, I tried to give you the best.
3  Q.   I know you did.
4  MR. EDDINS:  Is that it?
5  MS. SMITH:  Uh-huh.
6  THE COURT REPORTER:  Is that
7  it?
8  MS. SMITH:  That's it.
9  THE COURT REPORTER:
10  Mr. Williams?
11  MR. WILLIAMS:  Yes, I'm done.
12  Thank you very much.
13
14  (The deposition of JOAN K. CRAIG
15  concluded at approximately 5:20 p.m.
16  on October 16, 2007.)
17
18
19
20
21
22
23

Page 268

1  * * * * * * * * * * * *
2  REPORTER'S CERTIFICATE
3  * * * * * * * * * * * *
4
5  STATE OF ALABAMA
6  COUNTY OF AUTAUGA
7
8       I, Mishan Williamson, Certified
9  Shorthand Reporter and Notary Public
10  in and for the State of Alabama at
11  Large, do hereby certify that on
12  October 16, 2007, pursuant to notice
13  and stipulation on behalf of the
14  Defendant, I reported the deposition
15  of JOAN K. CRAIG, who was first duly
16  sworn by me to speak the truth, the
17  whole truth, and nothing but the
18  truth, in the matter of BARBARA M.
19  JEFFERS and JOAN K. CRAIG, versus
20  RUSSELL COUNTY BOARD OF EDUCATION AND
21  CHARLES NACRELLI, Defendant, Civil
22  Action Number 3:06CV685-CSC, now
23  pending in the Circuit Court for

Page 269

1  Russell County, Alabama; that the
2  foregoing 167 typewritten pages
3  contains a true and accurate
4  transcription of the examination of
5  said witness by counsel for the
6  parties set out herein; that the
7  reading and signing of said deposition
8  was waived by witness and counsel for
9  the parties.
10
11       I further certify that I am
12  neither of kin nor of counsel to the
13  parties to said cause, nor in any
14  manner interested in the results
15  thereof.
16       This 30th day of October, 2007.
17
18
19  Mishan Williamson, ACCR #417
     Reporter and Notary Public
20  State of Alabama at Large
21
22
23

68  (Pages 266 to 269)