**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION**

| | | |
|---|---|---|
| BARBARA JEFFERS and | ) | |
| JOAN CRAIG, | ) | |
| Plaintiffs, | ) | |
| v. | ) | CASE NO. 3:06-cv-685-WKW |
| RUSSELL COUNTY BOARD OF | ) | |
| EDUCATION, *et al.,* | ) | |
| Defendants. | ) | |

**PLAINTIFFS' RESPONSE TO SUMMARY JUDGMENT MOTIONS
FILED BY DEFENDANT RUSSELL COUNTY BOARD OF EDUCATION
AND DEFENDANT CHARLES NACRELLI**

COME NOW THE PLAINTIFFS and submit this response to Motions for Summary Judgment by defendants Russell County Board of Education and Charles Nacrelli. Plaintiffs respectfully ask the Court to deny the motions and issue an Order setting the case for trial on all issues discussed herein.

**INTRODUCTION/FACTS**

After each plaintiff timely filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission, plaintiffs Barbara Jeffers and Joan Craig filed a complaint in United States District Court for the Middle District of Alabama, Eastern Division, on August 3, 2006. The complaint against the Russell County Board of Education alleged violation of Title VII of the 1964 Civil Rights Act, as amended, relating to sexual harassment actionable under vicarious liability standards. Both plaintiffs suffered both hostile environment and tangible action sexual harassment. The complaint also alleged torts of assault and battery and outrage defendant by Nacrelli against both plaintiffs.

Jeffers and Craig are now and were at the time of the conduct complained of, employees of the Russell County Board of Education. Both work at Ladonia Elementary School where Jeffers is a school counselor and Craig a bus driver at Ladonia and where

1

Nacrelli was their principal/supervisor before the Russell County Board of Education voted to fire him for the sexual harassment violations.

The complaint details conduct the women were subjected to by their male supervisor, principal Nacrelli. For years Nacrelli made crude statements and told off-color jokes, but in the spring of 2005, Nacrelli began working out and losing weight. He bragged about his sexual prowess and his Italian pedigree. He made a video of a female teacher's breasts that was accidentally shown to a school class. He repeatedly talked about women's anatomy, including their breasts and buttocks. He rubbed Craig's legs and told her he wanted to have sex with her. He appeared naked in front of Jeffers at a school party, where he pulled down the top and bottom of another teacher's two-piece swim suit. Nacrelli squeezed Jeffers' and another teacher's buttocks at the school party. Later at Ladonia, Nacrelli picked Jeffers up and bit her breast at school. His conduct was pervasive and rose to the level of sexual harassment under Title VII of the Civil Rights Act of 1964, as amended. (Exhibits A & K, affidavits of Jeffers and Craig, respectively.)

Plaintiff Jeffers confided in supervisor and Assistant Principal Brenda Coley about the comments in the spring of 2005 and Coley herself heard off-color statements. Despite the report to the supervisor, nothing was done about Nacrelli's offensive conduct. (Exhibit A)

After months of making the inappropriate comments, Nacrelli held a school party at his home in July 2005 to which only persons who worked for Ladonia Elementary School and their guests were invited. The purpose of the party was to honor fellow supervisor Coley, who had been promoted to principal at another elementary school within the system. Coley started her job as principal at Oliver Elementary in June 2005, about a month prior to the party, and had previously served as assistant principal under Nacrelli at Ladonia for four years. (Exhibit A, Jeffers affidavit, and Exhibit D, Coley deposition, pp. 14 and 39)

At the school party, Nacrelli touched Jeffers' buttocks several times, even though Jeffers repeatedly rebuffed his advances. He attempted to pull the swimming suit off another educator, Jamie Evans, and grabbed still another, Cile Parish, on the buttocks. He grabbed the crotch of a male educator. Toward the end of the event, Jeffers was sitting on the pool steps talking with Nacrelli's wife when Nacrelli approached and put his legs

around Jeffers' waist. She pushed his leg away and he stood up and when she looked around he was naked. Then he hurdled over her, touching her as he went over her head, into the pool. (Exhibit A)

On the way home, Jeffers was so distraught that she had to pull the car over. She called Principal Coley, who left after Nacrelli grabbed and kissed her, and reported the incident to Principal Coley. (Exhibit A)

A few days later, Jeffers called Dewilda "Dillie" Elliott, an elected member of the Russell County Board of Education, and reported the incident and requested a transfer to a different school in order to get away from Nacrelli. (Exhibit A)

Despite the reports, nothing was done and Jeffers was forced in August 2005 to report back to work at Ladonia Elementary School where Nacrelli was her immediate supervisor. Since she was a school counselor, Jeffers reported earlier than teachers, so for more than a week, Jeffers and Nacrelli were the only certified employees at the school in the fall of 2005.

When Jeffers' schedule for the year was given her, it was substantially different from previous schedules. In prior years, she and other counselors had been allowed to draft their own schedules but this year, after Jeffers rebuffed his advances, Nacrelli set her schedule. He made her a schedule teaching double classes, resulting in a class size which did not comport with state regulations. (Exhibit A)

After perpetrating the illegal schedule, Nacrelli continued creating the abusive and hostile environment in which Jeffers was forced to work. Carrying an elementary student down the hall, Nacrelli commented aloud that he could handle the student because "my wife's breasts weigh more than you do." (Exhibit A)

Also that September 2005, a child brought a pornographic photograph to school titled, "Chicks with Dicks." Nacrelli told a group of second-grade teachers that afternoon that the photograph's subject had a larger penis than he did and breasts larger than his wife's. (Exhibit A)

When Jeffers complained that the door stop at school was inadequate to restrain the door, Nacrelli told Jeffers that he didn't like it when she talked about it being "too short." When a school secretary, Rose Fowles, complained that her new garbage can was "humongous," Nacrelli told Jeffers that women often said that about him. (Exhibit A)

3

In September 2005, Jeffers was subjected to a particularly disgusting incident by Nacrelli. Ms. Jeffers and a teacher were in an activity room counting donations for Hurricane Katrina victims when Nacrelli approached and actually lifted her up and bit her on her breast. (Exhibit A)

After the incident, Ms. Jeffers made a report of abuse by Nacrelli to a third Russell County Board of Education official. School secretary Rose Fowles, well aware of Nacrelli's conduct, made an appointment for Jeffers to meet with Superintendent Rebecca Lee. Jeffers told Lee of the incidents at the school party, the breast biting and other abusive actions by Nacrelli. (Exhibit A)

Dr. Lee asked Assistant Superintendent/Personnel Director Lillian Baker to investigate the allegations. Although the Russell County Board of Education has numerous school campuses to which Jeffers could have been assigned temporarily, Jeffers was forced to remain at the school with Nacrelli as her supervisor while the investigation was on-going. Baker talked with numerous teachers and employees during the investigation. Nacrelli finally was confronted by Superintendent Lee, but was sent back to the school after their meeting, even though he was being suspended. Nacrelli testified that Superintendent Lee told him to keep the matter quiet. (Exhibit B, Nacrelli deposition, p. 104-5)

The Russell County Board of Education, including Elliott, voted to terminate Nacrelli's employment on November 1, 2005 and he eventually resigned rather than exercise his right to a hearing before an impartial arbitrator appointed through the Federal Mediation and Conciliation Service. Nacrelli had received good evaluations and administrators testified during depositions that the only reason his employment was terminated was because of the sexual harassment of Jeffers and Craig. (Exhibit C, Lee deposition, pp. 46-7, and Exhibit G, Baker deposition, pp. 154-5)

Nacrelli's abuse was not limited to Jeffers, nor Evans the teacher whose swim suit he partially ripped off, nor Parrish whose buttocks he felt of, nor the group of teachers he told that the child's drawing depicted breasts larger than his wife's and a penis larger than his own, nor Alison Gentry, whose breasts he photographed and put on a video. During the same period of time, Nacrelli also was harassing and propositioning school bus driver Craig.

4

During the entire time Nacrelli was Ladonia principal, Craig was a Ladonia school bus driver. She did her job well and earned good evaluations from her supervisors.

Nacrelli's harassment of Craig apparently began not long after he became principal in November 1999, although she has difficulty recalling dates of incidents.

She remembers in about 2002 complaining to him, as school supervisor, about a dangerous situation at a bus stop on Hancock Street. He volunteered to ride over with her and when they started to come back, Nacrelli told Craig what "nice legs" she had and started rubbing her inner thigh. When they arrived back at school, Craig attempted to open the door but he closed it and told her that they could go "somewhere else." Nacrelli put his hands back on Craig's legs and she pushed them away again and told him to get off the bus, but he told her that she really wanted him sexually. (Exhibit K)

Not long thereafter, Nacrelli got on the bus to discipline a student and when all students were gone, started rubbing Craig's neck and leg. She began crying and asked him to go . He told Craig that she hadn't told anyone about his abuse because "you want it." She told him no, but she didn't want to lose her job. (Exhibit K)

From then on, periodically Nacrelli would show up at her bus and grab his crotch and pull on it. He did the same thing toward Craig in the hallway at Ladonia. Once when she was in his office to report an unruly student, he grabbed his crotch and asked her if she wanted it. (Exhibit K)

Nacrelli's conduct was pervasive and abusive and unwelcomed. On many occasions from soon after he became principal until he was suspended and lost his job in 2005, Nacrelli made inappropriate advances and comments to Craig, who feared losing her job if she spoke out against her principal. She even attempted to change her looks to dissuade him. He would stroke her hair and tell Craig how much he liked her long her, so Craig cut her hair short. (Exhibit K)

About 2003 Craig stopped taking field trips to avoid Nacrelli. He often would come to her bus during loading or unloading for field trips. Craig needed the extra income from the field trips but she stopped taking them in order to avoid Nacrelli. The trips paid about $20 each and even five trips in a month would mean $100 in extra income – a significant amount for a driver making about $15,000 a year. She has resumed taking the trips now. (Exhibit K)

Craig was subjected to an incident in the spring of 2004 when she and her adult nephew, Lamar Booker, Jr., rode their motorcycles to school to eat lunch with his sons. Nacrelli approached her in the hall and told her she couldn't wear a bandana at school, but she informed him that she was off duty. As Nacrelli walked them to their motorcycles outside he put his arm around Craig's shoulders and when she shrugged it off, his arm dropped and he grabbed Craig's buttocks as his arm slid down – an incident witnessed by Booker. (Exhibit L) After Booker cranked his motorcycle, Nacrelli stood by Craig's cycle and told her that he would like to ride with her and hold on by her breasts. (Exhibit K)

At a school in-service in August 2005 at the beginning of the 2005-06 school year, Craig attended a systemwide meeting of bus drivers. When the session concluded, drivers from the various schools broke up into individual groups. Principal Nacrelli conducted the Ladonia meeting. He started out standing in front of the group but moved beside Craig, so close that his legs were against hers. Nacrelli's crotch area was inches from her face. Two other bus drivers, Shirley Baker and Dianne McDaniel, vividly recall the incident. (Exhibits M & N)

After school started that year, some students had problems getting on the right bus at Ladonia, so Rudd and Nacrelli called a meeting of drivers to discuss the problem. Nacrelli directed Craig to sit in a certain chair for the meeting and then he started to massage her shoulders. She was embarrassed had to remove his hands from her shoulders. (Exhibit K)

About that time, Craig decided she could not tolerate Nacrelli's abusive conduct any longer. She remembers talking with Assistant Superintendent Lillian Baker at Ladonia in late August, but nothing ever came of the conversation. (Exhibit K) Craig called Superintendent Rebecca Lee's office and asked for an appointment, which had to be rescheduled. When Craig finally sat down with Dr. Lee, Nacrelli already had been suspended.

## ARGUMENT IN RESPONSE TO DEFENDANT RUSSELL COUNTY BOARD OF EDUCATION'S MOTION FOR SUMMARY JUDGMENT

### SUMMARY JUDGMENT STANDARD

A court may grant a motion for summary judgment when there exists no genuine issue of material fact. Rule 56, Fed.R.Civ.P. The U.S. Supreme Court in *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133 (2000) noted that under Rule 56, "the court must review all of the evidence in the record, cf., e.g., Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587, drawing all reasonable inferences in favor of the nonmoving party, but making no credibility determinations or weighing any evidence, e.g., Lytle v. Household Mfg., Inc., 494 U.S. 545, 554-555. The latter functions, along with the drawing of legitimate inferences from the facts, are for the jury, not the court. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255."

### ARGUMENT

### SEXUAL HARASSMENT STANDARD

The Russell County Board of Education does not deny that its supervisor and principal Charles Nacrelli committed egregious acts against plaintiffs Jeffers and Craig that, if proven, rise to the level of sexual harassment. Further, school system officials acted upon apparent belief in the allegations when the Russell County Board of Education voted in November 2005 to terminate Nacrelli's employment with the school system. The decision to fire the administrator, who had good evaluations, was based solely upon the findings of an investigation into allegations of sexual harassment, according to deposition testimony of then-Superintendent Rebecca Lee. (Exhibit C, p.47) In fact, the notice proposing Nacrelli's termination sent to Principal Nacrelli and the

Russell County Board of Education stated that Nacrelli's actions had risen to the level that "presumably violated the constitutional rights of certain employees of the Russell County Board of Education." (Exhibit I).

Nacrelli's acts were so numerous that the deposition testimony of Assistant Superintendent Lillian Baker, who conducted the investigation, consumed twenty-five pages, just of recollecting conduct described to her by six employees. (Exhibit G, Baker deposition, pp-117 through 141) Superintendent Lee interviewed others.

The Board voted to fire Nacrelli after investigating the sexual harassment allegations. Under state law, §16-24-1, et seq., Code of Alabama 1975, Nacrelli was entitled to a hearing before a fair and impartial arbitrator, but instead of taking the case to a hearing, Nacrelli resigned. (Exhibit I)

While not denying that Nacrelli's conduct was improper and violated laws and policy, the Board denies liability for the actions of its supervisor, basically arguing that neither Jeffers nor Craig followed the employer's established reporting procedure. However, Jeffers reported to supervisors and a board member and the board failed to distribute any sexual harassment policy it had in place and failed to inform employees that it even had a sexual harassment policy.

Craig, a support person, never had any instruction on sexual harassment reporting and was unaware that the school system even had a policy. (Exhibit K) Another bus driver, Shirley Baker, confirmed that bus drivers never had any sexual harassment reporting instructions, nor even knew a policy existed. (Exhibit N)

The board is vicariously liable, under the law, for the offensive treatment by its supervisor, Nacrelli.

On the same day in 1998, the U.S. Supreme Court issued landmark decisions on actionable sexual harassment under the Title VII of the Civil Rights Act of 1964. Confirming and expanding existing case law, *Faragher v. City of Boca Raton,* 524 U.S. 778, 118 S.Ct. 2278 (1998) and *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257 (1998) recognized two ways that an employer could be held liable under the law.

First was so-called "hostile environment" sexual harassment, while the second was for "tangible action" harassment. In *Faragher*, the Court stated the basic framework the law on employer liability:

> "In order to accommodate the principle of vicarious liability for harm caused by misuse of supervisory authority, as well as Title VII's equally basic policies of encouraging forethought by employers and saving action by objecting employees, we adopt the following holding in this case and in *Burlington Industries, Inc. v. Ellerth…*also adopted today: An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. When no tangible employment action is taken a defending employer may raise an affirmative defense of liability or damages, subject to proof by preponderance of evidence, see Fed. Rule. Civ. Proc. 8(c). The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer to avoid harm otherwise."

In the same paragraph, the Court noted that "no affirmative defense exists" for tangible action sexual harassment.

An application of the principles for both hostile environment and tangible action sexual harassment demonstrates that the Russell County Board of Education faces vicarious liability in the present case.

## HOSTILE ENVIRONMENT RELATING TO JEFFERS

""*And they took it as a joking matter at first, but it continued. You know it just never stopped. It just got worse and worse.*" Deposition testimony (**Exhibit** G, p. 122) of Lillian Baker, then assistant superintendent and personnel director for the Russell County Board of Education who conducted the investigation of charges of sexual harassment against Charles Nacrelli, principal/supervisor with the school district.

Jeffers faced a constant barrage of sexual comments and innuendos from her supervisor, defendant Nacrelli, for years. At first Jeffers attempted to ignore them as jokes but the unwanted conduct escalated in the spring of 2005, when Nacrelli had realized a weight loss of close to 100 pounds and bragged of his sexual prowess. Jeffers estimates that Nacrelli made off color comments and gestures, in addition to exposing his penis to her, grabbing her buttocks and biting her breast, at least 25 times from the spring of 2005 through late September 2005, when he was suspended and then let go from his job with the Russell County Board of Education. (Exhibit A, Jeffers' affidavit) Examples of incidents Jeffers details include (See her affidavit attached hereto as Exhibit A):

*Nacrelli stated that his Italian pedigree gave him substantial sexual powers and even said his father had touched his (Principal Nacrelli's) wife's breasts and buttocks;

*Nacrelli constantly made comments about women's anatomy to Jeffers;

*During a meeting in Jeffers' office involving Jeffers, Nacrelli and then-Assistant Principal Brenda Coley, Nacrelli stared at Coley's buttocks and commented how nice she looked in the pants Coley was wearing. When he left, Jeffers and Coley discussed the fact that he had had an erection in his pants;

*He frequently talked about young teacher Jamie Evans in a sexual manner. However, when Ms. Evans became pregnant, he told Jeffers that it seemed that she had become pregnant "in her butt."

*He told Ms. Jeffers that another teacher, Alison Gentry, was "losing it" sexually and was jealous of Ms. Evans, who was younger. Yet one day when Ms. Gentry wore a top with an inscription, Nacrelli told her that his had would fit perfectly in the breast area where the inscription was located.

*A character video was being designed to show to students and Nacrelli took close-up shots of Ms. Gentry's breasts, which somehow was incorporated into the video. When it was shown in the first class, the teacher was distraught and Nacrelli was forced to run down the hallways taking up copies of the video.

\*Nacrelli made Jeffers listen to stories about his past sexual escapades, telling her that he worked in a pizza parlor in college and that employees often would have sex in the store after closing.

\*Nacrelli told Jeffers that he and his wife sat around naked at home and had to have sex every night.

Those comments were made during the spring of 2005. Jeffers frequently confided in Coley, the assistant principal, about the abuse, but Coley failed to report to higher ups. Coley admitted to being aware of Nacrelli's conduct. She recalled Nacrelli's bragging about being an "Italian stud" and his own father touching his (Nacrelli's wife) inappropriately. (Exhibit D, Coley deposition, pages 84-5) She recalls the distribution of a school video in which Nacrelli zoomed in on the breasts of teacher Alison Gentry and an offensive remark Nacrelli made in a staff meeting indicating that black students at the school were not as strong as whites. (Exhibit D, Coley deposition p. 52-3) But supervisor Coley did not report any of the offensive conduct in the spring of 2005. Soon the abuse would escalate.

Toward the end of the second semester in 2005, Coley was promoted to principal of Oliver Elementary School, another Russell County Board of Education school located in Seale. Nacrelli announced at school that a party would be held in Coley's honor. He planned the party at school (Exhibit H, Chaparro affidavit, and Exhibit B, Nacrelli deposition, p. 38) and agreed to hold the school party at his house for which school employees of Ladonia Elementary and their guests were invited. During his deposition, asked if anyone was there who was not an employee of the Russell County Board of Education nor a guest of an employee, Nacrelli replied, "If you weren't a guest or employee, you would have just been a stranger who crashed the party. So the answer would have been 'no.'" (Exhibit B, p. 47)

In her affidavit (Exhibit A), Jeffers described the conduct she was subjected to by her supervisor, Principal Nacrelli, at the school party:

"…During the evening, Mr. Nacrelli on more than one occasion squeezed my buttocks and I had to move his hand and express my displeasure with his conduct. I tried to avoid him but he would show up behind me. I don't think Mr. Nacrelli had had very much to drink when he first touched my behind. I witnessed him chasing Cile Parish around the house, trying to squeeze her buttocks and on occasion being successful. I heard about him pulling the top and bottom of Jamie Evans' two-piece bathing suit down. I was about to leave when Jerri Nacrelli, Mr. Nacrelli's wife, asked me to come outside to speak with her about a comment she had made about a teacher who was leaving Ladonia Elementary. We sat on the steps at the pool and Mr. Nacrelli appeared and sat down behind me and put his legs around me. As tactfully as I could with his wife sitting there, I tried to push his legs aside. He stood up and I turned around and he was naked. I screamed and he leap-frogged me into the pool, pushing my head down as he went. I went into the house to retrieve my items and he appeared there with his swim suit on inside-out and his wife told her adult daughter that she was 'not going to believe' what Mr. Nacrelli had done, to which the daughter replied something like this, 'What? Did he get naked again?'"

Jeffers had gone to the party only at the urging of and out of respect for Coley to begin with. (Exhibit D, Coley deposition, p. 40) After Nacrelli exposed himself, Jeffers left the party but was so shaken she had to pull over on the way home. She called Principal Coley to report the incident. (Exhibit A, Jeffers's affidavit, and Exhibit D, Coley's deposition testimony.) Coley also witnessed and was victim of Nacrelli abuse that night. She stated that she witnessed Nacrelli grab teacher Cile Parrish's buttocks and grab educator Jason Hopper's crotch (Exhibit D, Coley's deposition testimony, p. 50-51), and was "shocked" when Nacrelli kissed her on the lips (Exhibit D, Coley's deposition testimony, p. 46)

Stressed even more by the party incident, Jeffers did not know whether she could bear going back to school and working under Nacrelli's supervision, so she called Dillie Elliott, a member of the Russell County Board of Education, a few days after the school party. She reported the pervasive abuse to Elliott and asked for a transfer. (Exhibit A, Jeffers' affidavit and Exhibit F, Elliott's deposition testimony.)

Despite the reports to an administrator and a member of the board, which is the governing body for the school district, no disciplinary action was taken against Nacrelli and Jeffers was not transferred. When Jeffers reported for school, with her and Nacrelli being the only certificated employees there for about the first week, the abuse continued. She relates the following incidents which happened after school began that year, 2005-06 (Exhibit A):

*Nacrelli was carrying a student to be disciplined down the hall, cradling the student under his arms, when he said in a voice Jeffers could hear, "Andrew, I can handle you. My wife's breasts weigh more than you do."

*In September 2005, Jeffers had duty in a hallway near the door and told Nacrelli that the door stop was not long enough to adequately restrain the door, to which Nacrelli replied, "I don't like it when you talk to me about it being too short."

*In September 2005, Nacrelli picked Jeffers up and bit her on the breast. She described the incident in her affidavit:

"I remember another incident which occurred on September 9, 2005. I was in a room with Kelly Brantley Howard counting money students had donated for Hurricane Katrina victims. Mr. Nacrelli came in and I asked him if he would carry a heavy strongbox filled with change to his office. At that point, he picked me up and rolled me forward toward him and bit me on the right breast. I screamed and he put me down and apologized. I did not, as one defendant's pleading with the court indicates, at any time dare him to pick me up. And despite what was stated in the same pleading, the breast biting was not accidental, as I explained during my deposition. He would not have told me, as he did, "I guess I should not have done that," if the biting had been accidental. Ms. Howard told me she saw him pick me up but apparently she could not witness the breast biting from where she was standing."

*About a week later another embarrassing incident occurred. A child brought a pornographic photo, titled "Chicks with Dicks," of a woman with breasts and a penis. I was shown the photo by new Assistant Principal Grant. Mr. Nacrelli disciplined the child and during a meeting of second-grade teachers that day described the subject in the photo as having "breasts bigger than my wife's and her dick was longer than mine." The elementary teachers were astonished by the statement.

13

Nacrelli admitted that "Chicks with Dicks" incident but stated that he used the term penis. (Exhibit B, Nacrelli deposition, pp. 78-80) Relative to conduct at the party, Nacrelli admitted that he kissed Coley (Exhibit B, Nacrelli deposition, p. 54). Although he remembers that kiss, Nacrelli does not remember sticking his hand down Alison Gentry's shirt but doesn't deny it (Exhibit B, Nacrelli deposition, p. 55-6), does not recall pulling down the top or bottom of teacher Jamie Evans' swim suit (Exhibit B, Nacrelli deposition, p. 56), does not recall appearing naked in front of Jeffers, nor squeezing her buttocks (Exhibit B, Nacrelli deposition, p. 57), and does not recall grabbing administrator Jason Hopper's crotch (Exhibit B, Nacrelli deposition, p. 57) Nacrelli's explanation was that he was drunk. (Exhibit B, Nacrelli deposition, p. 56)

Nacrelli does recall picking Jeffers up and rolling her forward and his lips making contact with Jeffers' breast. "I could have nipped her shirt," but "don't remember chomping down," he testified. (Exhibit B, Nacrelli deposition, pp. 76-7)

Nacrelli's conduct affected Jeffers' working conditions. She avoided him, even if she needed to meet with him. She took all the sick and annual leave days she could. She quit staying after school to work, but left as quickly as possible. (Exhibit A)

Jeffers had complained to then-Assistant Principal Coley and later to Coley after she had become principal. She reported the abuse to board member Elliott and asked for a transfer. But she got no results, so not long after the "Chicks with Dicks" incident, Rose Fowles, the school secretary, called the office of Superintendent Rebecca Lee to set up an appointment for Jeffers to meet with Lee. Another counselor, Nuria Chaparro, sat in. (Exhibit H, Chaparro affidavit)

Lee expressed surprise with the allegations and ordered an investigation. Yet while the investigation was on-going (from Tuesday through Friday according to Lee's records), Jeffers was sent back to work at Ladonia School, where the accused abuser was her supervisor, even though Russell County has numerous school locations that she could have worked in temporarily. Jeffers had exhausted her sick leave trying to avoid being around Nacrelli, so she had to go back to the school site. The investigation was conducted at Ladonia Elementary creating a very stressful situation for Jeffers (Exhibit A):

"The days of the investigation were horrible for me. Ms. Lillian Baker, the assistant superintendent, conducted the investigation at Ladonia. Teachers who were

interviewed were coming out of the room crying. Mr. Nacrelli was always around. At one point that week he made the statement to me that it sure was getting difficult to work around there."

The abuse continued, even as the investigation was continuing, as Jeffers explained in her affidavit (Exhibit A): "On September 21, I remember Mr. Nacrelli making still another offensive statement. We were in Ms. Fowles office and she had gotten a new garbage can and she was complaining that it was too big, was 'humongous.' Mr. Nacrelli looked at me and made the comment, "I hear that all the time about me."

Nacrelli was suspended from his job, but even after he met with Superintendent Lee on September 23, 2005, at the conclusion of the investigation and she informed him of the suspension, Nacrelli was allowed to go back to Ladonia Elementary. He explained in his deposition (Exhibit B, pp. 104-5): "…She told me it will be an out-of-sight/out-of-mind thing and we'll investigate it, and this thing will be fine and it'll blow over. I'm sure we can come to, you know, terms with this or whatever and I will call you up. And that was a Friday afternoon, maybe about two o'clock. I went back to work. She told me to go ahead and just go on back to work, don't say anything to anybody, and then just go ahead and go home at the regular time at the end of the day, and that's what I did…"

Nacrelli's suspension apparently began after school that day, September 23, 2005. The Russell County Board of Education voted on November 1, 2005 to cancel his employment contract and Nacrelli resigned on February 15, 2006, rather than exercise his right to a hearing before an arbitrator. (Exhibit I)

The abuse Jeffers was forced to endure rose to a level which allows her to hold her employer vicariously liable. "We have made clear that "[t]o prove sexual harassment under Title VII, a plaintiff must show (1) that she belongs to a protected group; (2) that she has been subjected to unwelcome sexual harassment; (3) that the harassment was based on her sex; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that a basis for holding the employer liable exists." *Hulsey v. Pride Rests., LLC*, 367 F.3d 1238, 1244 (11th Cir. 2004).

Jeffers is a member of a protected group; she is a woman. She was subjected to unwelcome sexual harassment. (Exhibit A) She was harassed because of she is a woman.

15

The harassing conduct was of a sexual nature and forced her into a less than envious position in that she could not perform her job normally because she avoided her direct supervisor at all costs. (Exhibit A) The harassment altered the terms of her employment, forcing her to avoid her own supervisor and even use the bulk of her sick leave to avoid him. (Exhibit A) And a basis for holding the employer liable exists because after she reported the abuse to a school district supervisor (Coley) and board member (Elliott), no action was taken. She did not unreasonably fail to take advantage of an employer's protective and reporting devices. In addition, she was subjected to a tangible employment action, for which the *Faragher/Ellerth* affirmative defense does not apply.

Little question exists as to whether Jeffers' abuse meets the first three criteria. The case clearly meets the other two as well.

Jeffers was forced to endure a hostile work environment. "To be actionable under Title VII, a hostile work environment must be both 'objectively and subjectively offensive, one that a reasonable person would find hostile and abusive and one that the victim in fact did perceive to be so.'" *Faragher* 524 at 787.

"In assessing whether harassment is objectively severe and pervasive, courts typically look to (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct was physically threatening and humiliating or just a mere utterance; and, (4) whether the conduct unreasonably interferes with the employee's work performance." *Faragher* 524 U.S. at 787-88.

In Jeffers' case, the conduct was severe and pervasive – an estimated 25 or more instances from the spring of 2005 through Nacrelli's suspension on September 23, 2005 and included not only verbal abuse, but unwanted touching of her buttocks, exposing of genitals and biting of her breast. Jeffers considered it abusive (Exhibit A) and any reasonable person would have.

In *Hulsey*, the 11th Circuit found approximately eighteen incidents over a period of about 2 ½ weeks to be sufficiently severe and pervasive to hold the employer liable. Jeffers was exposed to more than twice as many instances of abuse over a longer period of time.

In addition, Jeffers perceived the abuse to be severe and pervasive. "We have said that sexual harassment is subjectively severe and pervasive if the complaining party

perceived it to be at the time." *Hulsey*, quoting *Johnson v. Booker T. Washington Broad. Serv.*, 234 F.3d 501 at 509 (11th Cir. 2000).

Even with severe and pervasive harassment, such as that suffered by Jeffers, an employer has available an affirmative defense if it is demonstrated that the employee failed to take advantage of an effective sexual harassment policy which includes a reporting system.

> "… When no tangible employment action is taken a defending employer may raise an affirmative defense of liability or damages, subject to proof by preponderance of evidence, see Fed. Rule. Civ. Proc. 8(c). The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer to avoid harm otherwise." *Faragher* at 807-8.

Jeffers reported the unwelcome sexual comments to supervisor Coley on numerous occasions in the spring of 2005 and Coley was well aware of events of which she had personal knowledge but Nacrelli was not disciplined. Jeffers reported to supervisor Coley the fact that he exposed himself to her at the school party in July 2005 and Coley was well aware of other events she witnessed at the party. Nacrelli was not disciplined. Jeffers called board member Elliott in early August 2005 to report the repeated abuse and ask for a transfer. Nacrelli was not disciplined. Jeffers reported the sexual harassment to superintendent Lee in September 2005. An investigation was conducted at Ladonia Elementary, but while the investigation was on-going Nacrelli stayed on the job with an office just 30 feet or so from Jeffers'. The supervisor continued the off-color remarks even as the investigation was on-going. (Exhibit A)

Under the circumstances, the employer did not exercise "reasonable care to prevent and correct promptly any sexually harassing behavior."

But even if it had, the Russell County Board of Education cannot escape liability because Jeffers did not unreasonably fail "to take advantage of any preventive or corrective opportunities provided by the employer to avoid harm otherwise."

The Russell County Board of Education's claim to the affirmative defense is based upon its assertion that it had an effective sexual harassment policy in place and that its contention that Jeffers' first report under the policy was when she met with Dr. Lee on

September 20 – months after she had begun reporting to school system administrator and Assistant Principal Coley and had reported to board member Elliott.

Assistant Superintendent/Personnel Director Lillian Baker testified during depositions that in 2005, the Russell County Board of Education had in place Policy GAJDBH, relating to sexual harassment. The policy (Exhibit E) at section I.A.C. states that: "Each administrator shall be responsible for promoting understanding and acceptance of, and assuring compliance with, state and federal laws and board policy and procedures governing sexual harassment within her or his school or office."

That would place a burden upon administrator Coley to take steps to stop, while reporting to higher ups, Nacrelli's abusive conduct toward Jeffers in the spring of 2005 and to have reported his exposing himself to Jeffers and other intentional acts at the pool party in July 2005.

At III. A. "Reporting Procedures," the policy states that, "Any employee who feels he/she has been sexually harassed by another employee(s) or student(s) of the School System should present the complaint directly to the School System Title IX Coordinator (Personnel Director)."

Because of that statement, the Russell County Board of Education argues that Jeffers' complaints to Coley and Elliott were ineffective. Yet, Title IX coordinator Baker admitted that she never could recall informing school system employees who the Title IX coordinator was. (Exhibit G) Even Nacrelli admitted that he did not know who the Title IX coordinator was. (Exhibit B, p. 24)

Moreover, Jeffers testified that she never had been given any training in sexual harassment or the reporting of harassment during the 30 years she has worked with the school system until 2006, after this lawsuit was filed. (Exhibit G) Jeffers' testimony was bolstered by that of school board member Elliott who testified during the 13 years she worked for the Russell County Board of Education ending in 1999, she never had any training on reporting of discrimination in general and couldn't remember any on sexual harassment. (Exhibit F, p. 45-6)

Assistant superintendent and personnel director Baker testified that the only school district sexual harassment training she could recall, other than the 2006 class after the lawsuit was file, was for principals in 2005. (Exhibit G, p.165-7 ). Superintendent Lee

stated that she could not remember any training specifically on sexual harassment for Russell County Board of Education employees, stating that the policy was in the manual. (Exhibit C, p. 14). While the policy states that the report "should" be made to the Title IX coordinator at the Central Office, Dr. Lee stated that employees should report sexual harassment "at their particular local site first." (Exhibit C, p. 21) She stated the principal would be the person in charge at the school level and stated that assistant principals are administrators who can receive reports also. (Exhibit C, p. 22):

> "A. Assistant principals are considered administrators.
>
> "Q. So if the principal is absent or the one doing the harassing, couldn't they report it to the assistant principal?
>
> "A. If each administrator is responsible (in reference to the language so stating in the policy), I guess they could."

Later in the deposition (Exhibit C, p. 31), Dr. Lee bolstered that previous testimony: "…If the principal was involved, then I would assume the assistant principal would then take it to the next level and report it to a central administrator, someone at central office."

Of course, Assistant Principal/Principal Coley did not make the report to central office personnel, as required, and Lee admitted that failure to make a report violated proper school system procedure. (Exhibit C deposition, p. 54):

> "A. Well, I think her (Coley's) obligation was not to try to figure out what the degree was occurring, but she obviously didn't do that. Again –
>
> "Q. It was her obligation to report it to you or Ms. Baker?
>
> "A. Well, I guess what I'm saying is in my conversation with Ms. Coley, I got the impression that she didn't feel, for whatever reason, that it was not serious enough to report it. Was it serious enough and was there harassment? Well, that's not a call necessarily that we should try to figure out.
>
> "Q. So what should she have done?
>
> "A. She probably should have reported it."

Lee, the superintendent when the abuse took place, also admitted that it is proper for an employee to lodge a complaint with a board member and that the board member "should

then refer that to the superintendent to investigate." (Exhibit C, p. 34) Of course Elliott failed to report Jeffers' complaint to Lee.

Policy GAJDBH is the official school system policy. Each school has a manual, which Lee said normally is kept in the front office (Exhibit C, p. 25) that has the policy within it. Asked if that's principal's office, she replied that it could be or the manual could be kept in the media center.

Separate from the official policy is a booklet titled, "Student Academic Plan & Statement of Responsibilities" and subtitled, "A Handbook for School Personnel Parents & Students." That document is given to teachers and parents each year and includes a policy on sexual harassment, although Baker argued that the policy was not the official policy of the district. (Exhibit G at p. 24-5)

Title IX coordinator, personnel director and Assistant Superintendent Baker stated that the handbook policy is different from the official policy and "We've got to fix it" and that the sexual harassment policy "needs to be in compliance with Board policy." (Exhibit G, at p. 24-5)

The handbook policy is titled "Sexual Harassment Policy for Students," but forbids sexual harassment of employees and students and states, "Any person, employee, or student, who alleges sexual harassment by a staff member or student in the School District may file a complaint with the principal. In addition, each school shall designate one male and one female employee to whom complaints may be made." (Exhibit E, "official" and "unofficial" policies)

Thus, the official policy states that reports are only to be made to the Title IX coordinator, but the unofficial policy given to employees is primarily for students, but states that complaints can be made to the principal, although that would have been impractical in Jeffers' case. The unofficial policy requires schools to designate one male and one female to report abuse to, but that was not done for Ladonia.

Moreover, Lee testified that reports could be made to an assistant principal, such as Coley, or a board member, such as Elliott, which Jeffers did.

The situation is similar to the *Faragher* case in that the employer failed to disseminate its policy to employees. Moreover, the report in *Faragher* was to an intermediate manager.

The Russell County Board of Education wants to argue that grabbing of Jeffers' buttocks and exposing of his genitals was at a purely social gathering rather than an official school function. The party was planned at school as witnessed by counselor Chaparro (Exhibit H) and confirmed by Nacrelli (Exhibit B, p. 38) and was only for Russell County Board of Education employees and their guests. (Exhibit B, p. 47) It served purely a school function, to recognize Coley's promotion. (Exhibit D, p. 39) Coley and Nacrelli obviously were not close friends who would be throwing parties for each other, since she accused him of lying about support for her for assistant principal. (Exhibit D, p. 39) In addition, Coley, an African-American, found "inappropriate" (Exhibit D, p. 53) Nacrelli's statement at a faculty meeting that "the black students were not academically as strong as white students." (Exhibit D, p. 52) Asked if he considered Coley a friend, Nacrelli responded that his relationship with Coley was "more of a work relationship." (Exhibit B, p. 34)

The party was a school function, but regardless, noteworthy is the fact that in the great number of sexual harassment cases, at least part of the harassment takes place at a location different from the work setting.

One case defendant Russell County Board of Education relies on is *Baldwin v. Blue Cross*, USCA 05-15619 (11th Cir. 2007). In that case much of the alleged abuse took place off-premise at social gatherings. The Court found that Baldwin did not meet her burden, due in part to testimony of fellow employees and the fact that Blue Cross' investigation failed to reveal non-consensual, abusive conduct. In the instant case, Jeffers' complaint was bolstered by the statements of fellow employees during the investigation, which led to Nacrelli's employment termination. In *Blue Cross*, the company investigation found no sexual harassment, while in the Jeffers case, Nacrelli was fired for sexually harassing employees. In addition, Assistant Superintendent Baker, who investigated, could find no evidence that Jeffers promoted or consented to any of Nacrelli's conduct. (Exhibit G, 162-3)

The off-premise harassment is addressed in *Griffin v. City of Opa-Locka*, 261 F.3d 1295 (11th Cir. 2001). Griffin was harassed by the city manager and her reports fell on deaf ears. A musician, she performed at a Rotary Club event one night. Griffin had arranged for a ride home, but the city manager, Earnie Neal, canceled it and took her. When they arrived, he picked up her instrument and carried it in for her and then raped her.

The city claimed it was not liable under Title VII and otherwise because Neal acted outside the scope of his employment and because the incident occurred after a social gathering, rather than on the job. The 11th Circuit rejected the argument: "…We do not believe that under the facts of the case that we are required to view the sexual assault in isolation or ignore Neal's persistent abuse of authority leading up to the assault in making our color of law determination. Rather, we believe that the entire pattern of abuse and harassment against Griffin that eventually culminated in her rape is relevant to our color of law analysis. In other words, Neal's official interactions with Griffin as her boss during and after work hours, his continual sexual harassment of her during those interactions, and the ultimate sexual assault constitute an indivisible, ongoing series of events. *Doe v. Independent School District*, 15 F.3d 443, 461 (5th Cir., cert. denied, 513 U.S. 815, 115 So.Ct. 70, 130 L.Ed. 2d 25 (1994)."

Numerous other cases have recognized that part of the abuse takes place away from the business. For instance, in *Crowley v. L.L. Bean, Inc.,* 303 F.3d 387 (1st Cir. 2002), among the acts Crowley complained of was that a co-worker curiously massaged her feet at a company pool party. The Court refused to overturn the District Court's verdict.

Even Lee, superintendent when the abuse took place, admitted that a supervisor's calling an employee after work and proposing her could amount to sexual harassment in violation of school board policy. (Exhibit C, pp. 50-51) Would not after-hours exposing his genitals rise to the level of a call, when the victim who received the call could simply hang up?

The issue is not where a single incident took place because like in *Griffin*, Nacrelli's conduct constituted "an indivisible, ongoing series of events." Courts consider the totality of the circumstances.

Although Nacrelli cannot be sued individually under Title VII, his summary judgment response accused Jeffers of "flirting with men" at the party and stated that she had told a joke at school. The age-old "blame the victim" approach fails, however. In her affidavit, Jeffers states: "One brief filed in this case accuses me of flirting at the pool party. I did not flirt with men at the party. I hugged the neck of Ken Coley, Brenda Coley's husband, and congratulated them on her promotion. I have known both of them for many years. I did not hug him or anyone else in a sexual manner. Reference also was made to the "mouse" joke. That is a joke that was going around with women teachers at the time. I never told it in Mr. Nacrelli's presence, but only to female teachers. Reference was made to a "fuzzy visa" joke also. That was a joke told by a friend who now is deceased. I was asked to tell it by other teachers once or twice and I did, but not in Mr. Nacrelli's presence. I would never do that."

Jeffers hugging or telling an off-color joke would only be relevant to show consent. Jeffers strongly denies she ever consented to any of Nacrelli's abusive conduct (Exhibit A) and the third party who did the investigation, Assistant Superintendent Baker, stated she found no evidence whatsoever of any consensual conduct on Jeffers' part. As Baker put it, "…From all indications, she was not the only person that he did sexual things to or said sexual things about. So I can't say she prompted his because there was so many others involved." (Exhibit G, p. 161-2)

"The gravamen of sexual harassment cases is whether the conduct complained of was "unwelcomed." *Meritor Savings Bank v. Vinson, et al.,* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed. 2d 49 (1986), In Jeffers' case, Nacrelli's advances were not welcomed.

Based upon the foregoing, the Russell County Board of Education's affirmative defense fails on each of the two prongs in that the employer Russell County board failed

to exercise reasonable care to prevent and correct promptly any sexually harassing behavior. In addition, Jeffers did not unreasonably fail to take advantage of any preventive or corrective opportunities provided by the employer. She reported the abuse in a manner acceptable to the superintendent and in accordance with the "unofficial" policy provided employees and described by administrators. Only on her report to a third administrator did the employer institute an investigation.

## **TANGIBLE ACTION RELATING TO JEFFERS**

"As defined by the Supreme Court, a tangible employment action is 'a significant hiring, firing, failing to promote, assignment with significant different responsibilities, or a decision causing a significant change in benefits.'" *Hulsey* quoting *Ellerth* t 761, 118 S.Ct. at 2268.

As a tenured educator, Jeffers enjoys job protection under the Alabama Teacher Tenure Act, §16-24-1, et seq., Code of Alabama 1975. She was not subjected to a demotion or employment termination for reporting or rebuffing Nacrelli's advances. Jeffers was given an assignment in the fall of 2005 with "significant different responsibilities." Traditionally counselors at Ladonia had drawn up their own schedules, Nacrelli assigned her double classes with more than 30 students in 2005-06 in violation of Alabama law which capped early grade pupil teacher ratio at 18-to-1. (Exhibit A)

Jeffers and counselor Chaparro protested and the schedule was changed. It still was unacceptable and was changed again, but only after Nacrelli was confronted. "I believe Barbara and Ms. Chaparro sat down and redid it more so or – and I believe I was part of that too. I did back off on a lot of it. Yeah, we had a good heated discussion, I think, a little bit about it. I was trying to set it." (Exhibit B, p. 88).

Then-Superintendent Lee testified that she ordered more structured schedules for counselors for 2005-06 and stated that state guidelines allowed some deviation from the 18-student target, but admitted that double classes would have been excessive (Exhibit C, pp. 43-4):

"Q. Could they have two classes, a counselor teach two elementary classes if the teacher – one teacher had 16 students and the other had 18, could a counselor then have 34?

"A. Well, I don't think you would want to do that. I'm just saying you could exceed the 18…"

Jeffers stated that she believed Nacrelli imposed the illegal schedule on her because he wanted to show her he still was in control, even if she had reported his prior acts. (Exhibit A) That discretion rose to the level of creating a hostile work environment and amounted to a tangible employment action as well.

## EEOC CHARGE OF DISCRIMINTATION ISSUE

Defendants Russell County Board of Education and Nacrelli each point out, without explanation, that Jeffers' first Charge of Discrimination filed with the U.S. Equal Employment Opportunity Commission (EEOC) was dismissed.

The charge of discrimination was received by the EEOC regional office on December 23, 2005 and dismissed six days later on the basis that Jeffers complained of conduct which first started at least four years earlier. (**Exhibit** J) Apparently, the EEOC official took the position that if the first instance of the continuing abuse is not reported immediately, the victim could never complain. At any rate, the EEOC could not possibly have investigated to determine whether the Russell County Board of Education had a viable policy which Jeffers unreasonably fail to avail herself of, since the Board office was closed for the holidays during the six-day period in which the complaint was before the EEOC.

Jeffers filed a Motion for Reconsideration (Exhibit I), explaining that the conduct had escalated in the spring of 2005 and that she had reported to Assistant Principal/Principal Coley, Board Member Elliott, and Superintendent Lee. The Charge was reinstated and ultimately a neutral Right to Sue notice was issued because the EEOC was unable to investigate within 180 days. (Exhibit I) The Notice of Right to Sue was issued on May 10, 2006 (Exhibit I) and the lawsuit was timely filed on August 3, 2006.

**<u>HOSTILE WORK ENVIRONMENT RELATING TO CRAIG</u>**

In the interest of brevity, plaintiff Craig readopts all previous paragraphs with regard to summary judgment standards and statutory and case law provisions relating to sexual harassment, except to restate for the record that the U.S. Supreme Court recognized hostile environment and tangible action sexual harassment in *Faragher v. City of Boca Raton,* 524 U.S. 778, 118 S.Ct. 2278 (1998) and *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257 (1998).

The harassment against Craig also was egregious, occurring an estimated two dozen or more times over a three-year period ending only with Nacrelli's suspension in September 2005 and included propositioning for sex and crude statements and gestures.

Defendants assert that Nacrelli was not Craig's supervisor, but rather she was supervised by John Rudd, the systemwide transportation supervisor. That, however, conflicts with assertions in affidavits of Craig (Exhibit J) and fellow bus drivers Dianne McDaniel (Exhibit K) and Shirley Baker (Exhibit L). In addition, it conflicts with statements in the bus driver manual which direct bus drivers to give discipline information to the principal and not to use the bus for any reason except to transport students to and from school, without express approval of the principal or superintendent. (Exhibit J, Exhibit 1 thereto)

Regardless, a hostile work environment can be perpetrated by a supervisor or a fellow employee. "The supervisor does not have to be the harasser for this (hostile work environment) this kind of sexual harassment to occur, although experience has proven that he often will be." *Hulsey.*

The issues then relate to whether the employee, Craig, was subjected to pervasively hostile work environment and, if so, whether she failed to advantage of an effective sexual harassment policy. The facts demonstrate that she was exposed to a hostile environment and that the *Faragher/Ellereth* affirmative defense fails, because the Russell County Board of Education did not distribute its "official" policy to support employees and never even informed the support employees that a policy existed. In addition, she was subjected to tangible action sexual harassment.

The sexual harassment was pervasive under the *Faragher/Ellerth* standards. Craig estimates that during a period of about three years from about 2002 forward, Nacrelli subjected her to improper and unwanted sexual advances, touchings and obscene gestures and statements "two dozen times or more." (Exhibit D)

In her affidavit, Craig recounts some of the harassment:

*Principal/supervisor Nacrelli offered to ride with her to the Handcock Street pickup in 2002. As they were leaving, he rubbed her legs and told her how soft her legs were. She told him, "Don't even go there," but he kept telling her how he would like to get with her for sex. When they got back to school, when she opened the door for him to get off, he closed it and started rubbing her hair and her legs up toward her crotch. Craig continuously pushed his hands away, but he would laugh and tell her that she wanted him.

*A few weeks later, Nacrelli came on the bus to discipline a student. After the student exited, leaving them alone, Nacrelli started rubbing her neck and leaned over and started rubbing her legs. He told her she had nice breasts and he would like to get her in bed and caress them. He made a reference to the sexual prowess of Italian men.

*Numerous times in the next few years, Nacrelli would grab his pants and squeeze his penis. He did it at her bus and in the hallway and in his office at school. He would brag about Italian men and tell her he was a "woman's man."

*In March 2004, Craig and her nephew rode their motorcycles to school to eat with her grandnephews. Nacrelli followed them to their bikes and put his arm around her as they were walking. She shrugged it off, but as it slid down her back-side, he squeezed her buttocks. That unwanted touching was witnessed by her nephew. (Exhibit L) When they got out to their motorcycles and cranked them, Nacrelli told her that he wanted her to take him for a ride and that he would hold on by her breasts.

*In August 2005 during an inservice before the school term started, school bus drivers had a systemwide meeting. Transportation supervisor Rudd conducted the overall meeting and Nacrelli ran the break-out meeting for Ladonia Elementary. Nacrelli was standing in front of the Ladonia drivers when the meeting started, but he moved over and was standing so close to Craig that their legs touched. His crotch was a few inches from her face. Two other bus drivers witnessed the odd behavior. (See Exhibits M & N)

27

*After school started in 2005, some students were having difficulty getting on the right bus, so a meeting of Ladonia drivers was held to discuss routes. Nacrelli directed Craig to sit at a particular spot and during the meeting stood behind her and rubbed her shoulders. She had to take his hand off her. (Exhibit K)

Craig indicates that she saw Assistant Superintendent/Personnel Director Baker at Ladonia one day around the end of August and mentioned the harassment to her but Baker "did not seem really interested." (Exhibit K) Although she did not experience any embarrassing incidents during the time after she spoke with Baker, Craig very much continued to be subjected to a hostile work environment until Nacrelli was suspended. She avoided her principal, even if she needed to make a report to him on a student disciplinary or safety issue. (Exhibit G)

The sexual harassment was pervasive and altered Craig's working environment. In her affidavit she states:

"In fact, from the time Mr. Nacrelli started that harassment, it affected my ability to do my job and the way I did my job. The harassment lowered my self esteem and I did not want to go to work, even though I needed to. I avoided Mr. Nacrelli at all costs. I would not go to the office and report student matters relating to discipline or safety or anything else to my principal because I feared that he might start in on me again." (Exhibit G)

"To be actionable under Title VII, a hostile work environment must be both 'objectively and subjectively offensive, one that a reasonable person would find hostile and abusive, and one that the victim perceives to be." *Faragher*, 524 U.S. at 787, 118 S.Ct. at 2283. Certainly a reasonable person may well conclude, as plaintiff Craig does, that the abuse she endured was objectively and subjectively offensive. It met the *Faragher* four-prong test in that it was frequent, severe, humiliating and interfered with her work performance.

Even so, the employer Russell County Board of Education could escape liability if it can show that Craig it had an effective policy relating to sexual harassment in place and employee Craig unreasonably failed to avail herself of it.

Assistant Superintendent Baker testified that the official sexual harassment policy of the school system was policy GAJDBDH, which states that a report of sexual

harassment should be made to the system's Title IX coordinator (Exhibit G, p. 42) She also states that the school system's student handbook, given teachers and employees, has a section on sexual harassment, but that it conflicts with the official policy that the handbook policy is different from the official policy and "We've got to fix it" and that the sexual harassment policy "needs to be in compliance with Board policy." (Exhibit G, at p. 24-5)

The Russell County Board of Education argues that Craig should have reported the abuse to her supervisor, Rudd. But the policy states otherwise and the handbook conflicts with the policy, as Baker states.

Moreover, Russell County Board of Education school bus drivers never have received any training on sexual harassment.

In her affidavit, Craig states, "This entire matter made me scared because I am just a bus driver and Mr. Nacrelli was a principal. I didn't know who to report it to. I never even knew the Russell County Board of Education had a sexual harassment policy. During the 15 years I have worked for the Russell County Board of Education, we never had any instruction on sexual harassment or the reporting of it until 2006 after this case was filed and then the training was offered on a voluntary basis. If there was a manual in the Ladonia principal's office telling us how to report sexual harassment, as Dr. Lee said in her deposition, I didn't know anything about it. I have a high school education and have received good evaluations in my job, but I didn't know anything about reporting sexual harassment and never had any classes on it until after our lawsuit was filed." (Exhibit D)

Craig's statement is bolstered by the testimony of Ms. Elliott, member of the Russell County Board of Education, the governing body for the school system. Before being elected to the board and a two-year intermittent job with the county, Elliott worked as a secretary for the Russell County Board of Education. She was a non-classified or support person, just like Craig in her 13 years on the job. During her deposition (Exhibit F, p. 45-6), Elliott testified:

"Q. Okay. Do you recall any training that you had as an employee on reporting of discrimination of any sort?

"A. I never received any training.

"Q. Do you recall receiving any training on the reporting of a sexual harassment complaint?

"A. While I was an employee o the Russell County Board of Education?

"Q. Right.

"A. No.

"Q. You never received any?

"A. Not that I remember, no."

Craig's statement is further bolstered by the affidavit of fellow bus driver Shirley Baker (Exhibit N): "During the time I have worked for the Russell County Board of Education, I have never had any training in sexual harassment or the reporting of sexual harassment. I was not even aware that the school system had a sexual harassment policy."

Those three persons' statements are further bolstered by deposition testimony of Superintendent Lee, Assistant Superintendent/Personnel Director Baker and even Principal Nacrelli. Lee, superintendent when the abuse occurred, said she could not recall a training session specifically on sexual harassment. (Exhibit C, p. 14). Baker said sexual harassment training was given to administrators in 2005-06 and to all employees for the 2006-07 year (after the lawsuit was filed) (Exhibit G, pp. 156-7). Nacrelli, who worked for the Russell County Board of Education from 1991 through 2005, stated that he could never recall any training on sexual harassment by his employer. (Exhibit B, p. 21).

Nacrelli's harassment of Craig was severe and pervasive such that a reasonable person would have found it offensive. Moreover, it cannot be stated that "the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior" nor that "the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer to avoid harm otherwise." *Faragher*

The affirmative defense fails.


**TANGIBLE ACTION SEXUAL HARASSMENT RELATING TO CRAIG**

A second way to show that a person was a victim of sexual harassment in violation of Title VII of the Civil Rights Act of 1964, as amended, is to demonstrate that the person was subjected to a tangible work action defined as "a significant hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Ellerth*, 524 U.S. at 761, 118 S.Ct. at 2268.

Craig was not terminated from employment with the Russell County Board of Education but rather remains in good standing with the body. She, however, was constructively discharged from an opportunity with her employer that allowed her to earn extra money driving for Ladonia Elementary School field trips.

She explained the process in her affidavit (Exhibit K):

"Under an informal system, for several years I was the person who made field trip assignments. The transportation office would call me and tell me about upcoming trips for Ladonia classes. I would take some trips and ask other drivers if they wanted other trips. I tried to be fair and spread them around, but I just stopped taking them altogether to avoid contact with Mr. Nacrelli. The amount we were paid for the trips varied, depending on how far we had to go and how much time it took, but I think we got paid on average about an extra $20.00 per trip. Just a few trips in a month would help me out."

To be successful in a constructive discharge claim, a plaintiff must show that her working conditions were "so difficult…that a reasonable person would have felt compelled to resign." *Pipkins v. City of Temple Terrace Fla.*, 267 Fo. Ed 1197, 1201 (11th Cir. 2001) as quoted in *Walton v. Johnson & Johnson Services, Inc.*, No. 02-12520 (11th Cir. 2003).

Craig has detailed two egregious incidents which involved his entering her bus and proposing her while rubbing her legs around the time she quit taking the field trips. She also has details incidents in which he grabbed his crotch and made crude remarks and grabbed her buttocks and stood so close to him in a meeting that his crotch was just inches from her face.

Transportation Supervisor Rudd was well aware that Craig stopped taking the field trips. In his affidavit that is part of the Russell County Board of Education's evidentiary submission, Rudd states that, "…it was assumed that Ms. Craig quit taking

extra-curricular trips because of personal family reasons and did not have the time. Ms. Craig has had to deal with family members' illness over the past years."

Rudd also verified the informal arrangement under which Craig scheduled trips. "…it is true that Mrs. Craig would inform me of extra-curricular trips at Ladonia Elementary School and would also tell me which drivers wanted to take a particular trip. Although the assignment is my responsibility, I would usually follow her suggestions."

Craig lost money because of Nacrelli's conduct. She was subjected to a constructive discharge due to the egregious conduct of her supervisor. A jury may well decide that it was reasonable that Craig felt compelled to resign.

## **STATE LAW CLAIMS**

## **STANDARD OF REVIEW FOR SUMMARY JUDGMENT MOTIONS IN THE STATE CASES**

The standard for summary judgment under Rule 56, Ala.R.Civ.Proc., is essentially the same as for the federal rule:  "When reviewing a trial court's summary judgment, this Court must determine whether there were any genuine issues of material fact and whether the movant was entitled to a judgment as a matter of law. See Ex parte Atmore Cmty. Hosp., 719 So.2d 1190, 1193 (Ala. 1998). The movant has the initial burden of making a prima facie showing that there is no genuine issue of material fact; if the movant makes that showing, the burden then shifts to the nonmovant to present substantial evidence of each element of the claim challenged by the movant. Id. Substantial evidence is "'evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.'" Lolley v. Charter Woods Hosp., Inc., 572 So.2d 1223, 1224 (Ala. 1990) (quoting West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala. 1989)).

## <u>ASSAULT & BATTERY BY DEFENDANT NACRELLI AGAINST JEFFERS</u>

The Alabama Supreme Court restated the standard of proof in cases involving assault and battery in *Harper v. Winston County and Sandra Wright*, 892 So.2d 346 (Ala. 2004): The plaintiff in an action alleging assault and battery must prove "(1) that the defendant touched the plaintiff; (2) that the defendant intended to touch the plaintiff; and (3) that the touching was conducted in a harmful or offensive manner." Atmore Cmty. Hosp., 719 So.2d at 1193. In Atmore Community Hospital, the plaintiff presented evidence indicating that the defendant "touched her waist, rubbed against her when passing her in the hall, poked her in the armpits near the breast area, and touched her leg." 719 So.2d at 1194. The plaintiff also presented evidence indicating that "each of these touchings was intentional, was conducted with sexual overtones, and was unwelcome." Id. We held that these factual assertions constituted substantial evidence that the defendant had committed a battery."

"An actual injury to the body is not a necessary element of a civil assault and battery. *Ex parte International Bennett v. State,* 57 Ala.App. 568, 571, 329 So.2d 627 (1976)," as quoted in *Surrency v. McNally-Pittsburg Manufacturing Corp.*, 489 So.2d 1097 at 1104 (Ala. 1986).

Plaintiff Jeffers, in her affidavit (Exhibit A) and through corroborative testimony herein, has listed at least three incidents of substantial, intentional assault and battery by defendant Nacrelli, all such incidents having sexual overtones:

*At a pool party in July 2005, Nacrelli squeezed her buttocks on several occasions.

*At the same party in July 2005, Nacrelli wrapped his legs around her in front of his wife and Jeffers had to remove them.

*At Ladonia Elementary School in September 2005, Nacrelli picked Jeffers up and bit her on the breast.

Nacrelli explains his actions at the pool party by claiming that he was drunk. (Exhibit B, p. 56) That is not a legal excuse recognized under the civil law. The argument is akin to that of a drunk driver contending he was not liable for killing a pedestrian because he was drunk. Regardless, Jeffers' affidavit indicates that the unwanted touching started early in the evening and, even if he did have too much to drink later, he was not inebriated when the first touching began. (Exhibit A)

Nacrelli was at work at Ladonia Elementary School when the third offensive touching occurred. He picked Jeffers up, rolled her toward him, and bit her on the breast. (Exhibit A) A witness, Kelly Brantley Howard, saw Nacrelli pick Jeffers up. According to Assistant Superintendent Lillian Baker, who conducted the investigation that led to Nacrelli's firing for sexual harassment, Ms. Howard saw Nacrelli pick up Jeffers but not the actual biting. "She (Howard) said she turned her back when he picked her up because, I guess, she didn't want to see what was happening." (Exhibit G, p. 124)

Nacrelli admitted to picking her up and stated that his lips "could have nipped at her shirt…I went, ooh, you know, oh, crap, sorry, but, you know, that was it. As far as I know, I didn't remember, like I say, chomping down on her…" (Exhibit B, pp. 76-77) Nacrelli admitted that the conduct was not appropriate for a principal. (Exhibit B, p. 77)

Jeffers stated that the biting was intentional and not accidental, noting that Nacrelli immediately apologized for the act committed in the presence of a witness. (Exhibit A)

In his brief in support of summary judgment, Nacrelli argues that Jeffers should be barred from recovery because she failed to report the abuse for three months. The law does not require immediate reporting, but she reported the buttocks squeezing the night it happened and the breast biting within days of the incident.

Nacrelli also argues that Jeffers provoked Nacrelli to bite her breast by telling him that he couldn't pick her up. She denies telling him that (Exhibit A) but even if she had, such would not amount to provocation to bite an intimate body part. Such dare, which Jeffers denied, would have related to his picking her up, not biting her breast.

A jury could conclude, and indeed a jury of reasonable people should conclude that Nacrelli committed an assault and battery against Jeffers. The acts of grabbing

Jeffers' buttocks, putting his legs around her when he was wearing a bathing suit, and biting her breast, were intentional and egregious. Coupled with comments and other conduct described herein, it is apparent the acts were done with sexual overtones. Moreover, the acts were unwelcome. (Exhibit A) Thus, the legal standard quoted in *Harper* was met.


## ASSAULT & BATTERY BY DEFENDANT NACRELLI AGAINST CRAIG


The Alabama Supreme Court restated the standard of proof in cases involving assault and battery in *Harper v. Winston County and Sandra Wright*, 892 So.2d 346 (Ala. 2004):     The plaintiff in an action alleging assault and battery must prove "(1) that the defendant touched the plaintiff; (2) that the defendant intended to touch the plaintiff; and (3) that the touching was conducted in a harmful or offensive manner." Atmore Cmty. Hosp., 719 So.2d at 1193. In Atmore Community Hospital, the plaintiff presented evidence indicating that the defendant "touched her waist, rubbed against her when passing her in the hall, poked her in the armpits near the breast area, and touched her leg." 719 So.2d at 1194. The plaintiff also presented evidence indicating that "each of these touchings was intentional, was conducted with sexual overtones, and was unwelcome." Id. We held that these factual assertions constituted substantial evidence that the defendant had committed a battery."

"An actual injury to the body is not a necessary element of a civil assault and battery. *Ex parte International  Bennett v. State,* 57 Ala.App. 568, 571, <u>329 So.2d 627</u> (1976)," as quoted in *Surrency v. McNally-Pittsburg Manufacturing Corp.*, 489 So.2d 1097 at 1104 (Ala. 1986).

In her affidavit (Exhibit K), Craig cites at least six offensive incidents of assault and battery committed against her between 2002 and 2005. The statute of limitations for the tort of assault and battery under law Alabama is six years, so the complaint was filed well within the period. §6-2-34(1), Code of Alabama 1965.

The incidents, detailed above, of unwelcome touchings by Nacrelli of Craig include (Exhibit K):

*His coming on her bus in about 2002 at the Handcock Street bus stop in Ladonia in and rubbing her legs and telling her how soft and nice her legs were.

*Upon the return to Ladonia Elementary that day, Nacrelli rubbed her hair and her legs up toward the crotch area.

*A few weeks later, Nacrelli came on her bus at Ladonia Elementary to discipline a student and when all students had exited, he started rubbing her neck and leg. Nacrelli told Craig that she had nice breasts and would like to get her in bed and commented about what good lovers Italian men are.

*In 2004, Nacrelli followed Craig and her nephew to their motorcycles parked in front of Ladonia Elementary. He placed his arm around her and when she shrugged it off, he squeezed her buttocks at the hand slid down her backside. This incident was witnessed by her nephew, Garnett Lamar Booker, Jr. (Exhibit L) However, due to the volume of sound of the motorcycles, Booker was unable to hear Nacrelli tell Craig that he would like to ride with her and hold on by her breasts.

*Nacrelli stood so close to her that his leg touched her at a meeting of bus drivers at Russell County Middle School near Seale, Alabama in August 2005. His crotch was only a few inches from her face. Two other bus drivers, Shirley Baker and Dianne McDaniel, noticed the unusual behavior. (Exhibits M & N)

*At a meeting at Ladonia on August 8, 2005, Nacrelli asked Craig to sit in a certain seat for another bus drivers' meeting and then proceeded to rub her shoulders during the meeting, forcing her to take his hand off her.

These acts were intentional and were extremely stressful to Craig. In her affidavit (**Exhibit K**), Craig detailed the stress she was placed under by Nacrelli's offensive conduct: "All Mr. Nacrelli's improper conduct of a sexual nature toward me was unwelcome. I never consented to any of it and told him I didn't. I am happily married and did not want Mr. Nacrelli messing with me. His conduct was disgusting to me. It lowered my self esteem and caused me to be depressed. I even cut my hair after he stroked my hair and told me how much he liked long hair. The entire matter made me scared because I am just a bus driver and Mr. Nacrelli was a principal."

A reasonable jury could conclude that Nacrelli committed assault and battery against Craig, not only because of the six unwanted touchings, but because those batteries

were coupled with the crude statements and propositions for sex. The evidence is clear "(1) that the defendant touched the plaintiff; (2) that the defendant intended to touch the plaintiff; and (3) that the touching was conducted in a harmful or offensive manner." *Atmore Cmty. Hosp.*, 719 So.2d at 1193.


### TORT OF OUTRAGE COMMITTED BY NACRELLI AGAINST JEFFERS

Title VII of the 1964 Civil Rights Act does not allow a sexual harassment victim to recover against an individual perpetrator. However, Alabama recognizes the tort of outrage for egregious sexual harassment, such as that suffered by Jeffers and Craig.

"…this Court has recognized the tort of outrage in only three limited circumstances: (1) wrongful conduct within the context of family burials; (2) an insurance agent's coercing an insured into settling an insurance claim; and (3) egregious sexual harassment. The Carraway entities also point out that in order to establish a successful tort-of-outrage claim, a plaintiff must show that 'the defendant's conduct caused emotional distress so severe that no reasonable person could be expected to endure it.' *Stabler v. City of Mobile*, 844 So.2d 555, 560 (Ala. 2002)."

Nacrelli's offensive conduct is detailed herein.

For years Nacrelli made crude statements and told off-color jokes to Jeffers. He bragged about his sexual prowess and his Italian pedigree. He made a video of a female teacher's breasts that was accidentally shown to a school class. He repeatedly talked about women's anatomy, including their breasts and buttocks. He appeared naked in front of Jeffers at a school party, where he pulled down the top and bottom of another teacher's two-piece swim suit and squeezed Jeffers and another teachers' buttocks. He picked Jeffers up and bit her breast at school. The list goes on. Jeffers was victimized 25 times or more over a period of about six months starting in the spring of 2005. (Exhibit A)

Jeffers was under such stress by Nacrelli's offensive acts that she expended every sick and personal leave day available to avoid her supervisor. She explained how it affected her in her affidavit (Exhibit A): "I considered Mr. Nacrelli's many statements of a sexual nature very offensive. I found his touching my buttocks and exposing himself to

me extremely offensive, as I did his picking me up and biting me on the breast. I did not consent to the conduct. It was embarrassing and humiliating to me. It made me feel less than whole and affected my self esteem. Mr. Nacrelli knew that I did not consent to the conduct, but it was all about control to him. He expected me and others to submit and not complain because he was our supervisor…"

Nacrelli's conduct so egregious as to meet the high standards of the law: The conduct was (1) intentional (2) extreme and outrageous and (3) caused emotional distress so severe that no reasonable person could be expected to endure it. *Peterson v. BMI Refractories*, 132 F.3d 1405 (11th Cir. 1998)

Nacrelli's conduct was outside the bounds of decency and a jury of reasonable persons could and should find that Nacrelli committed the tort of outrage against Craig.

## TORT OF OUTRAGE COMMITTED BY NACRELLI AGAINST CRAIG

Title VII of the 1964 Civil Rights Act does not allow a sexual harassment victim to recover against an individual perpetrator. However, Alabama recognizes the tort of outrage for egregious sexual harassment, such as that suffered by Jeffers and Craig.

"…this Court has recognized the tort of outrage in only three limited circumstances: (1) wrongful conduct within the context of family burials; (2) an insurance agent's coercing an insured into settling an insurance claim; and (3) egregious sexual harassment. The Carraway entities also point out that in order to establish a successful tort-of-outrage claim, a plaintiff must show that 'the defendant's conduct caused emotional distress so severe that no reasonable person could be expected to endure it.' *Stabler v. City of Mobile*, 844 So.2d 555, 560 (Ala. 2002)."

Nacrelli's offensive conduct is detailed herein.

In her affidavit (Exhibit K), Craig notes that she was subjected to a constant barrage of gestures, such as Nacrelli grabbing his penis, and off-color comments, including propositions for sex. She notes at least six unwanted touchings by Nacrelli (Exhibit K):

*Nacrelli's coming on her bus in about 2002 at the Handcock Street bus stop in Ladonia and rubbing her legs and telling her how soft and nice her legs were.

*Upon the return to Ladonia Elementary that day, Nacrelli rubbed her hair and her legs up toward the crotch area and propositioned her.

*A few weeks later, Nacrelli came on her bus Ladonia Elementary to discipline a student and when all students had exited, he started rubbing her neck and leg. Nacrelli told Craig that she had nice breasts and would like to get her in bed and commented about what good lovers Italian men are.

*In 2004, Nacrelli followed Craig and her nephew to their motorcycles parked in front of Ladonia Elementary. He placed his arm around her and when she shrugged it off, he squeezed her buttocks at the hand slid down her backside. This incident was witnessed by her nephew, Garnett Lamar Booker, Jr. (Exhibit L) Nacrelli told Craig that he would like to ride with her and hold on by her breasts.

*Nacrelli stood so close to her that his leg touched her at a meeting of bus drivers at Russell County Middle School near Seale, Alabama in August 2005. His crotch was only a few inches from her face. Two other bus drivers, Shirley Baker and Dianne McDaniel noticed the unusual behavior. (Exhibits M & N)

*At a meeting at Ladonia on August 8, 2005, Nacrelli asked Craig to sit in a certain seat for another bus drivers' meeting and then proceeded to rub her shoulders during the meeting, forcing her to take his hand off her.

Craig's affidavit (Exhibit K) states that Nacrelli was guilty of two dozen or more offensive comments and acts over a three year period beginning in 2002, including the six incidents of physical touchings.

In her affidavit (Exhibit K), Craig detailed the stress she was placed under by Nacrelli's offensive conduct: "All Mr. Nacrelli's improper conduct of a sexual nature toward me was unwelcome. I never consented to any of it and told him I didn't. I am happily married and did not want Mr. Nacrelli messing with me. His conduct was disgusting to me. It lowered my self esteem and caused me to be depressed. I even cut my hair after he stroked my hair and told me how much he liked long hair. The entire matter made me scared because I am just a bus driver and Mr. Nacrelli was a principal."

Nacrelli's conduct was outside the bounds of decency and a jury of reasonable persons could and should find that Nacrelli committed the tort of outrage against Craig.

## SUMMARY & REQUESTED ORDER

Both plaintiffs Craig and Jeffers were subjected to horrendous conduct of a sexually insulting manner by their supervisor, Principal Charles Nacrelli. For reasons stated herein, the *Faragher/Ellerth* affirmative defense fails and defendant Russell County Board of Education is vicariously liable for the egregious actions of its supervisor, Nacrelli. In addition, all legal standards have been met and Nacrelli is liable to Jeffers and Craig for the torts of assault and battery and outrage.

Plaintiffs respectfully ask the Court to enter an order denying defendants' motions for summary judgment on all counts detailed herein and enter an Order setting the case for trial.

## CERTIFICATE OF SERVICE

I hereby certify that on 10th day of January, 2008, I have electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

Sydney S. Smith, Esq.
Attorney for defendant Russell Co. Board of Education
Ssmith4843@aol.com

Matthew C. Williams, Esq.
Attorney for defendant Charles Nacrelli
Matt@esw-law.com

/s/W. Don Eddins (ASB-1424-S65W)
Attorney for plaintiffs
337 E. Magnolia Avenue
Auburn, AL 36830
(334) 821-9981
Facsimile (334) 826-7700
doneddins@charter.net

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION**

BARBARA JEFFERS and )
JOAN CRAIG, )
    Plaintiffs, )
v. )        CASE NO. 3:06-cv-685-WKW
RUSSELL COUNTY BOARD OF )
EDUCATION, *et al.,* )
    Defendants. )

**PLAINTIFFS' EVIDENTIARY SUBMISSIONS IN RESPONSE TO SUMMARY
JUDGMENT MOTIONFILED BY DEFENDANT RUSSELL COUNTY BOARD
OF EDUCATION AND DEFENDANT CHARLES NACRELLI**

Exhibit A      Affidavit of plaintiff Jeffers.

Exhibit B      Excerpts from deposition testimony of defendant Nacrelli.

Exhibit C      Excerpts from deposition testimony of former superintendent Lee

Exhibit D      Excerpts from deposition testimony of Principal Coley

Exhibit E      Policy GAJDBH and student handbook excerpts

Exhibit F      Excerpts from school board member Elliott's deposition

Exhibit G      Excerpts from Assistant Superintendent Baker's deposition

Exhibit H      Affidavit of counselor Nuria Chaparro

Exhibit I      Documents relating to Nacrelli employment termination

Exhibit J      EEOC file documents

Exhibit K      Affidavit of plaintiff Craig

Exhibit L      Affidavit of Garnett Lamar Booker, Jr.

Exhibit M      Affidavit of bus driver Dianne McDaniel

Exhibit N      Affidavit of bus driver Shirley Baker

# Exhibit A

# Affidavit of Plaintiff Jeffers

RUSSELL COUNTY      )
STATE OF ALABAMA    )

### <u>AFFIDAVIT OF BARBARA M. JEFFERS</u>

**BE IT ACKNOWLEDGED**, that the undersigned deponent, being the age of majority and of sound mind, does hereby depose and say under oath as follows:

1. My name is Barbara M. Jeffers and I am a resident of Russell County, Alabama.

2. I am employed by the Russell County Board of Education as a school counselor at Ladonia Elementary School and have worked for the Russell County Board of Education in various capacities for more than 30 years. From about 1999 through 2005 Charles Nacrelli was my principal and supervisor at Ladonia Elementary.

3. From the time that he became principal, Mr. Nacrelli would make off-color jokes and comments of a sexual nature. At first I attempted to just ignore the jokes and comments, but in 2005, the comments became unbearable and affected me emotionally and affected my ability to do my job. I took just about every sick leave day or any other opportunity to get away from Mr. Nacrelli. He constantly bragged about he and his wife sitting around naked every night and having to have sex every night. He told stories about his working in a pizza parlor when he was in college and the employees having sex in the store. He bragged that his Italian background gave him sexual prowess and even said that his father would harass and touch his (Principal Nacrelli's) wife in a sexual manner. He frequently made comments about the anatomy of women teachers. He said that one teacher, Alison Gentry, was "losing it" sexually and was jealous of another teacher, Jamie Evans. However, when Ms. Evans became pregnant, he commented that she appeared to be pregnant in her buttocks. Unfortunately, as school counselor my office was in

1

close proximity to Mr. Nacrelli's and I heard all these things with my own ears.

4. Mr. Nacrelli is a short man and by his own admission weighed more than 250 pounds at one time. On physician's orders, he began working out and losing weight and got down to under 200 pounds in 2005. At that point his unwanted conduct escalated and he bragged about his sexual prowess and said that his wife, Jerri, was jealous and that they could not go to the gym together.

5. Ladonia had two supervisors in 2005, Mr. Nacrelli and Assistant Principal Brenda Coley. I frequently confided in Ms. Coley about Mr. Nacrelli's off-color statements and she was well aware of them but nothing was done about his conduct. One day when Ms. Coley and Mr. Nacrelli were in my office and she turned her back on him, Mr. Nacrelli was staring at her buttocks area and made the comment that she certainly looked good in the pants she was wearing. When he left, Ms. Coley and I discussed the fact that he appeared to have had an erection in his pants.

6. All the conduct described above relates to things he told me personally or I personally observed. There were other disgusting matters which everyone at the school, including Ms. Coley, were well aware of. For instance, a video was being made for classes to show at the beginning of school one day. Mr. Nacrelli used the camera to (unknowingly to her) take a shot of Ms. Gentry's breasts and that shot somehow was incorporated in the video. When a teacher showed it to students she was shocked and Mr. Nacrelli had to rush around the school and take up copies. Rose Fowles, the school secretary, frequently heard his off-color remarks and has knowledge of these events.

7. All this conduct described above negatively affected my ability to perform my job. I stayed away from Mr. Nacrelli as much as possible. I did not take matters needing his attention to

him because I did not want to be around him. I took sick leave and personal leave to avoid being around him. Normally, I work long hours to do the very best job I can, but when he got so bad with his comments, I got out of the building as quickly as I could each day. But things soon got even worse.

8. Around the end of the school term in May or June 2005, Ms. Coley was promoted to principal of Oliver Elementary School in Seale, Alabama. Mr. Nacrelli announced that there would be a party held in her honor and the party was discussed at the school. Mr. Nacrelli planned the party while on duty at Ladonia Elementary School, although he decided to hold the school party at his house. Invitations were sent to the teachers, counselors and administrators of Ladonia Elementary. I absolutely did not want to attend this school party because I did not want to be around Mr. Nacrelli. I spoke with Ms. Coley about it and she said that her feelings would be hurt if I did not attend, so I went. School matters were talked about frequently at the party. During the evening, Mr. Nacrelli on more than one occasion squeezed my buttocks and I had to move his hand and express my displeasure with his conduct. I tried to avoid him but he would show up behind me. I don't think Mr. Nacrelli had had very much to drink when he first touched my behind. I witnessed him chasing Cile Parish around the house, trying to squeeze her buttocks and on occasion being successful. I heard about him pulling the top and bottom of Jamie Evans' two-piece bathing suit down. I heard about him putting his hand down Alison Gentry's shirt. I was about to leave when Jerri Nacrelli, Mr. Nacrelli's wife, asked me to come outside to speak with her about a comment she had made about a teacher who was leaving Ladonia Elementary. We sat on the steps at the pool and Mr. Nacrelli appeared and sat down behind me and put his legs around me. As tactfully as I could with his wife sitting there, I tried to push his legs aside. He stood up and I turned around and he was naked. I screamed and he leap-frogged me into the

3

pool, pushing my head down as he went. I went into the house to retrieve my items and he appeared there with his swim suit on inside-out and his wife told her adult daughter that she was "not going to believe" what Mr. Nacrelli had done, to which the daughter replied something like this, "What? Did he get naked again?"

9. I was an emotional wreck by the end of the 2005 school year, but this incident was particularly upsetting. When I was driving home I was shaking so badly that I had to pull over. I called Principal Coley and reported the incident to her. I was scared to death.

10. I didn't know if I could go back to Ladonia and work around Mr. Nacrelli any more, so just a few days later, I called Dillie Elliott, a member of the Russell County Board of Education who worked at Ladonia Elementary before Mr. Nacrelli became principal there. I reported the incident and Mr. Nacrelli's conduct to Ms. Elliott and asked her if I could transfer to another school. I worked well with Ms. Coley and since there had been an opening for a counselor at Oliver Elementary, I asked to be transferred there.

11. Despite the reports, nothing was done about Mr. Nacrelli, nor my request for a transfer. A week or so later, I was forced to report back to Ladonia Elementary before teachers came back. Mr. Nacrelli and I were the only certified employees at the school for the first few days of the new year. I stayed in my office and avoided him the very best I could.

12. Soon thereafter, I learned that Mr. Nacrelli had given me a schedule that was totally unbearable and illegal. He asked me to teacher double classes on social skills to students to give regular teachers a duty free period as required by the law. I was told that I would have to have two teachers' classes several times a week. That schedule was in violation of state guidelines which state that counselors' classes cannot be larger than classroom teachers'. When me and another counselor, Nuria Chaparro, protested, he developed another schedule for us, but it still

was unacceptable. Finally, a third schedule was developed. In the past, we Ladonia counselors had developed our own schedules, which include individual and group counseling and teaching skills classes. I felt like he developed the illegal schedule for me in order to show me that he was still in charge, regardless of the incident in which he had exposed himself to me.

13. I recall another embarrassing incident early in the 2005-06 school year. Mr. Nacrelli went to a kindergartner's room and picked an unruly child up and was carrying him down the hall, cradled under his arm like he was carrying a sack of potatoes. Mr. Nacrelli stated in front of me and teacher Sherry Huckabee something to the effect, "Andrew I can handle you. My wife's breasts weigh more than you do."

14. In September 2005, I remember when I had bus duty and Mr. Nacrelli was standing out by the front door and when I complained to him that the doorstop was too short to stop the door effectively, he answered, "I don't like it when you talk to me about it being too short."

15. I remember another incident which occurred on September 9, 2005. I was in a room with Kelly Brantley Howard counting money students had donated for Hurricane Katrina victims. Mr. Nacrelli came in and I asked him if he would carry a heavy strongbox filled with change to his office. At that point, he picked me up and rolled me forward toward him and bit me on the right breast. I screamed and he put me down and apologized. I did not, as one defendant's pleading with the court indicates, at any time dare him to pick me up. And despite what was stated in the same pleading, the breast biting was not accidental, as I explained during my deposition. He would not have told me, as he did, "I guess I should not have done that," if the biting had been accidental. Ms. Howard told me she saw him pick me up but apparently she could not witness the breast biting from where she was standing.

16. About a week later, another embarrassing incident occurred. A child had brought a

small pornographic picture titled, "Chicks with Dicks," to school. The photo showed a woman with a penis. I was shown the picture by Ms. Grant, the assistant principal. That afternoon, Mr. Nacrelli discussed the matter at a meeting of second grade teachers and reportedly made the statement that "her breasts were bigger than my wife's and her dick was longer than mine." (During his deposition, Mr. Nacrelli admitted to the incident, but said he used the term "penis" because he does not use the term "dick." P. 79) We had about six new second grade teachers that year and they were astonished.

17. I would estimate that during the spring, summer and fall of 2005, Mr. Nacrelli made 25 or more offensive statements to me, in addition to exposing himself, grabbing my buttocks and biting my breast. Yet, my discussions with then-Assistant Principal Coley during the spring and the report to Principal Coley after Mr. Nacrelli exposed himself at the school party and my report and request for transfer from board member Elliott produced no results.

18. Mr. Nacrelli's conduct was pervasive and was of general knowledge at the school. Rose Fowles, the school secretary, agreed to call and make me an appointment with Dr. Rebecca Lee, then-superintendent of the Russell County Board of Education. I was accompanied by Ms. Chaparro, part-time counselor at Ladonia who also was well-aware of Mr. Nacrelli's conduct.

19. Dr. Lee indicated that she did not know how I could bear to work there with that type abuse going-on. Russell County has numerous school sites and offices, yet even after the report, Dr. Lee sent me back to Ladonia to work with Mr. Nacrelli – while the investigation was on-going there. I recall that it was more than a week before Mr. Nacrelli was suspended, but Dr. Lee's calendar apparently shows that we met on September 20 and the he was suspended on September 23. The days of the investigation were horrible for me. Ms. Lillian Baker, the assistant superintendent, conducted the investigation at Ladonia. Teachers who were interviewed were

coming out of the room crying. Mr. Nacrelli was always around. At one point that week he made the statement to me that it sure was getting difficult to work around there. On September 21, as the investigation was on-going at the school, I remember Mr. Nacrelli making still another offensive statement. We were in Ms. Fowles office and she had gotten a new garbage can and she was complaining that it was too big, was "humongous." Mr. Nacrelli looked at me and made the comment, "I hear that all the time about me."

20. I considered Mr. Nacrelli's many statements of a sexual nature very offensive. I found his touching my buttocks and exposing himself to me extremely offensive, as I did his picking me up and biting me on the breast. I did not consent to the conduct. It was embarrassing and humiliating to me. It made me feel less than whole and affected my self esteem.

21. Mr. Nacrelli knew that I did not consent to the conduct, but it was all about control to him. He expected me and others to submit and not complain because he was our supervisor. When he gave me the illegal double class schedule, to me he was letting me know that he was still in charge, even after the incident in which he exposed himself.

22. I reported this abuse in a timely manner. Frequently, I reported it to Ms. Coley, the assistant principal. I reported the incident of his exposing himself to Ms. Coley, who by then was a principal in the system. I reported his abuse also to Ms. Elliott, the board member, and asked for a transfer. When I got no results, I reported to the superintendent, who sent me right back to the same school working under the supervision of the person who was doing the harassment. The investigation finally resulted in Mr. Nacrelli's losing his job because of the sexual harassment.

23. It has been practice in the Russell County school system to report abuse to administrators, particularly assistant principals and principals. I never have been given any instruction about reporting sexual harassment. In the 30 years with the Russell County Board of

Education I never had a class in reporting or instruction in sexual harassment, until 2006, after this lawsuit was filed. If there was or is a policy in a manual in principals' offices, as Ms. Baker stated in her deposition, I knew nothing of it. Until 2006, no one ever told me that sexual harassment reports had to be made to the Title IX coordinator.

24. I do agree with the deposition statements of Ms. Baker, Ms. Coley and Dr. Lee that reports can be made to any administrator and I reported first to the only supervisor at my school, Assistant Principal Coley, other than the person who was guilty of the sexual harassment. Later, I reported it to Principal Coley and Board Member Elliott, but my reports fell on deaf ears.

25. One brief filed in this case accuses me of flirting at the pool party. I did not flirt with men at the party. I hugged the neck of Ken Coley, Brenda Coley's husband, and congratulated them on her promotion. I have known both of them for many years. I did not hug him or anyone else in a sexual manner.

26. Reference also was made to the "mouse" joke. That is a joke that was going around among women teachers at the time. I never pulled my pants down below just under my waist line. I never told it in Mr. Nacrelli's presence, but only to female teachers. Reference was made to a "fuzzy visa" joke also. That was a joke told by a friend who now is deceased. I was asked to tell it by teachers once or twice and I did, but not in Mr. Nacrelli's presence. I would never do that.

I make this Affidavit under oath, on personal knowledge and of my own free will. And I affirm that the foregoing is true to the best of my knowledge.

Witness my hand under the penalties of perjury this _____7th___ day of _January_____, 2008.

*Affiant*

*Barbara M. Jeffers*

**Barbara M. Jeffers**

COUNTY OF _LEE_____ )
STATE OF ALABAMA                   )

**Sworn and subscribed** before me this ___7th___ day of _January_____, 2008.

Notary Public
My Commission Expires___2/24/08___

9

# Exhibit B

# Excerpts from deposition testimony of defendant Nacrelli

**American Court Reporting**
**toll-free (877) 320-1050**

Page 21

1    Q.    Do you ever recall any training

2    that was given to teachers, support

3    people, counselors, or staff members

4    specifically on sexual harassment while

5    you were employed by the Russell County

6    Board of Education?

7    A.    No, sir, not that I recall.

8    Q.    To you, what constitutes sexual

9    harassment from your training as an

10   administrator?

11          MR. WILLIAMS:    I object to the

12   form of the question to the extent that it

13   calls for a legal conclusion.    But with

14   that, you can answer.

15          A.    I always assumed sexual

16   harassment would have been asking for

17   sexual favors of an employee.    I guess

18   it's called, what, quid pro quo, if that's

19   correct to use that terminology, or the

20   fact that you are harassing a person, that

21   they just -- you know, they have told you,

22   hey, I don't like your comments or I don't

23   like your jokes or I don't like your

Page 24

1    couldn't handle it.

2            Q.    During the time that you were

3    principal and assistant principal at

4    Ladonia, could you tell me who the Title

5    IX coordinator for the school system was?

6            A.    No, I could not.

7            Q.    Okay.  I'm just going to ask

8    you some people and ask you if you know

9    them, and if so, I want you to tell me how

10   you know them.  Do you know Jamie Evans?

11           A.    I do.

12           Q.    How do you know her?

13           A.    Jamie is a teacher at

14   Ladonia -- or, I assume, was a teacher at

15   Ladonia, taught fourth grade, taught first

16   grade, and she was a rotating teacher.

17   She was one of the teachers that would

18   shift up a grade with a whole entire class

19   and then would shift back the next year.

20   So she would have the same class for two

21   years.

22           Q.    Do a lot of teachers at Ladonia

23   do that?

**American Court Reporting**
**toll-free (877) 320-1050**

Page 34

1        Q.    Do you know Brenda Coley?

2        A.    I do.

3        Q.    How do you know her?

4        A.    Brenda was a teacher at Ladonia

5 Elementary, and then she was an assistant

6 principal also at Ladonia Elementary.

7        Q.    Now, was she assistant

8 principal during the period that you were

9 principal?

10       A.    Yes, sir.

11       Q.    During the entire period?

12       A.    Yes, sir.

13       Q.    Do you consider her to be a

14 friend?

15       A.    I think that my definition of

16 friend and yours may be different, okay?

17 I have work friends, people that I'm --

18 you know, I enjoy seeing at work.  But

19 friends that I see outside of work,

20 they're not like that.  They're two

21 different type -- so I guess you would

22 call it work relationships.  So I would

23 say Brenda is more of a work relationship.

Page 38

1    contract, so she would still be there.

2         Q.    Was that conversation at the

3    school?

4         A.    Probably, or it could have been

5    at lunch.  It could just have been a

6    conversation -- because we didn't really

7    socialize outside of school except there.

8    It was just casual, just talking about

9    something, so --

10        Q.    So, then, would it have been at

11   school?

12        A.    Possibly, yes, sir.

13        Q.    Okay.  Go ahead.

14        A.    And we just talked about that,

15   and I went home and said something to my

16   wife and said that, you know, we've never

17   had, you know, a function at the house

18   where I invited people that I work with

19   and other people, and let's go ahead and

20   invite them.  And we chose a time in July

21   after I had got back from vacation from

22   seeing my parents and just had a pool

23   party, and we invited -- just sent out

1    guest of an employee of the Russell County

2    Board of Education that is not related to

3    you?

4         A.    If you weren't a guest or

5    employee, you would have just been a

6    stranger who crashed a party.  So the

7    answer would have been no.

8         Q.    So it was a party for employees

9    and their guests?

10        A.    It was a party for Brenda Coley

11   to celebrate her being promoted.

12        Q.    Okay.  Did y'all bring any

13   chairs or tents or anything?

14        A.    I had gotten a -- borrowed a

15   pop-up tent from a friend of mine down the

16   street, so that way, we'd have cover.  I

17   got chairs from the house.

18             MR. WILLIAMS:  I think he was

19   asking you a different question.

20             THE WITNESS:  Okay.

21             MR. WILLIAMS:  You kind of cut

22   him off.

23             THE WITNESS:  I'm sorry.

## American Court Reporting
### toll-free (877) 320-1050

Page 54

1      A.      Not off the top of my head.

2  Slacks and a shirt.

3      Q.      Okay.  How about Jamie Evans?

4  Do you remember what she was wearing?

5      A.      She wore shorts and a shirt.  I

6  think she also was swimming, so she had a

7  bathing suit on also.

8      Q.      Do you recall what color the

9  shirt was?

10      A.      No, sir.

11      Q.      Do you remember what your wife

12  was wearing?

13      A.      No, sir.  I -- no.

14      Q.      There have been a lot of

15  allegations about your conduct that night.

16  I'm just going to ask you some specific

17  things, and I want you to tell me if you

18  did or did not do them and whether you

19  remember or whatever.

20          Ms. Coley testified that you

21  kissed her out by the pool.  She said that

22  under oath.  Is that true or false?

23      A.      That is true.

Page 55

1       Q.      Okay.  Tell me about it.  What

2   did you do and why did you do it?

3       A.      I believe it's after -- toward

4   the end of the party, and she and her

5   husband were leaving, and my wife gave her

6   husband Ken a kiss and a hug goodbye, and

7   we were congratulating them, and I did the

8   same thing to Brenda.

9       Q.      Your wife kissed Mr. Coley?

10      A.      Yes.

11      Q.      Did she kiss him on the mouth

12  or on the lips?

13      A.      Probably.

14      Q.      You don't remember?

15      A.      Specifically, no.

16      Q.      Okay.  Did you stick your hand

17  down Allison Gentry's blouse or top?

18      A.      No, not that I remember.

19      Q.      Not that you remember.  You

20  just said you had five or six drinks.

21      A.      Yes, sir.

22      Q.      Were you drunk?

23      A.      Yes, sir.

1        Q.      You were drunk?

2        A.      Yes, sir.  I believe that would

3    be a good way to describe it, yes, sir.

4        Q.      Okay.  In that case, you

5    wouldn't deny that you stuck your hand

6    down Allison Gentry's top?

7        A.      You're asking me to make a

8    guess at something I do not remember one

9    way or the other.  So I'm not able to say

10   yes or no.

11       Q.      *All right.  I'm just asking you*

12   would you deny that you stuck your hand

13   down Ms. Gentry's top?

14       A.      I'm not going to deny it, no.

15       Q.      Okay.  Do you recall pulling

16   the top down on Jamie Evans' swimsuit?

17       A.      I do not recall that, no.

18       Q.      Do you recall attempting -- or

19   pulling the bottom down on her two-piece

20   swimsuit?

21       A.      I do not recall that, no.

22       Q.      Okay.  Do you recall grabbing

23   Jason Hopper in the crotch that evening?

**American Court Reporting**
**toll-free (877) 320-1050**

Page 57

1      A.      I do not.

2      Q.      Do you recall squeezing Barbara

3 Jeffers' buttocks one or more times during

4 the evening?

5      A.      I do not, no.

6      Q.      Do you recall appearing naked

7 in Ms. Jeffers' presence that evening?

8      A.      I do not.

9      Q.      Do you recall jumping over her

10 into the pool without your clothes on?

11     A.      No, I do not.

12     Q.      Okay.  Other than your wife or

13 your attorneys -- I'm talking about any

14 attorney, previous attorney or

15 Mr. Williams -- do you recall talking with

16 anybody about the events of the party,

17 what went on at the party anytime after

18 the party that evening?

19           MR. WILLIAMS:  You understand

20 he does not want to know, nor is he

21 entitled to know, anything that you've

22 told me or Jerry or Bill Patty, who was

23 your lawyer before me.

**American Court Reporting**
**toll-free (877) 320-1050**

1        A.    Right.  You know, I guess is

2    that -- you know, how you hold her up with

3    two arms like that.

4        Q.    And do you recall at some point

5    in time her breast making contact with

6    your lips?

7        A.    I do.

8        Q.    And did you do that

9    intentionally?

10        A.    No, sir.

11        Q.    Did you bite her?

12        A.    Not that I'm aware of.  I could

13    have nipped at her shirt.  I remember the

14    incident, because I remember it was like

15    one of those, oh-crap type of things.  I

16    guess that's the best way to put it.

17    Like, you know, you did that and like --

18    and it wasn't an intentional thing, and I

19    remember -- because I remember Barbara

20    going, you know, Nick -- she called me

21    Nick -- and go like this and go like this

22    and laughing some.  I went, ooh, you know,

23    oh, crap, sorry, but, you know, that was

EXHIBITS

1    it.  As far as I know, I don't remember,

2    like I say, chomping down on her or

3    anything like that, no, sir.  But how I

4    did that, I do not have an answer.   It

5    just --

6         Q.    Is that appropriate conduct for

7    a principal to be picking up a school

8    counselor and cradling her and rolling her

9    to the point where you touch her breast

10   with your lips?

11        A.    No.  That would not be, for a

12   principal and a counselor.

13        Q.    Do you remember Ms. Jeffers

14   screaming at any point?

15        A.    Screaming?

16        Q.    When your lips touched her

17   breast.

18        A.    I remember her saying Nick and,

19   like, laughing or something like that, and

20   that's all I remember.  Never --

21        Q.    Okay.  Do you remember an

22   incident that happened, I think, later

23   that month in September 2005 in which a

**American Court Reporting**
**toll-free (877) 320-1050**

1    young man brought a drawing to school that

2    had something on it, apparently was a

3    drawing of a female with a penis?

4         A.    It was.

5         Q.    And it was titled "Chicks with

6    Dicks."  Do you remember that?

7         A.    I remember that.

8         Q.    Tell us everything you remember

9    about it first.

10        A.    I remember a -- and I do not

11   remember the teacher's name.  It was her

12   first year there.  It was an older lady.

13   She had just started first grade, and she

14   brought me the picture, and it was a

15   picture out of a magazine, and it was a

16   picture that a young boy in first grade

17   had brought to school.  And, you know, I

18   just saw it, and she handed it to me, and

19   the picture was folded up, and there's a

20   woman with -- you know, that was well

21   built and no clothes on.  Then when you

22   opened it up, it was a man that was well

23   built with no clothes on, and that's why

**American Court Reporting**
**toll-free (877) 320-1050**

1    it was entitled -- and I remember that.

2    And I remember -- actually, it was after

3    school at a staff meeting we were talking

4    about it.  We were talking about different

5    things, and I made the comment that poor

6    Ms. Such and Such, you know, got her

7    education, you know, and I mentioned the

8    picture, that, you know --

9        Q.    Ms. Jeffers said that your

10   comment was her breasts were bigger than

11   my wife's and her dick was bigger than

12   mine.  Do you remember that comment?

13       A.    No.  I know that I don't use

14   the word dick.

15       Q.    Okay.

16       A.    You know, I may have said

17   penis.  Now, I may have said that.  I may

18   have said that, yes -- you know, the

19   picture, I said, yeah -- I said, they're

20   better than -- you know, bigger than my

21   wife's or the penis was larger than mine,

22   but I don't use the word dick, no.

23       Q.    Okay.  Well, the title of the

**American Court Reporting**
**toll-free (877) 320-1050**

Page 80

1     picture was "Chicks with Dicks."

2         A.    "Chicks with Dicks," right.  I

3     understand that.

4         Q.    Okay.  Did you make a similar

5     statement to that which you've just

6     described in a teacher's meeting that

7     afternoon?

8         A.    Yes.  That's where that

9     statement was made, yes, sir.

10         Q.    Okay.  What magazine was that

11     out of?

12         A.    I do not know.

13         Q.    Do you subscribe to any

14     pornographic magazines?

15         A.    I do not.

16         Q.    Was this, like, a centerfold?

17         A.    It was just a -- it looked like

18     the little boy had cut it out of a

19     magazine, a picture.  So I don't think it

20     was a whole-page size.  It may have only

21     been maybe that size, like a picture of

22     a -- you know, like a picture size.

23         Q.    Which would be about a

**American Court Reporting**
**toll-free (877) 320-1050**

EXHIBITS

1    required.  So schedules would change some.

2    So, yes, I might have made it up

3    sometimes, but that didn't mean Barbara

4    would let me keep it.

5         Q.    Well, in this particular year,

6    after the discussion with Ms. Jeffers, did

7    the schedule change?

8         A.    Yes.

9         Q.    And how did it change?

10        A.    I believe Barbara and

11   Ms. Chaparro sat down and redid it more so

12   or -- and I believe I was part of that

13   too.  I did back off on a lot of it.

14   Yeah, we had a good heated discussion, I

15   think, a little bit about it.  I was

16   trying to set it.

17             MR. EDDINS:  Do y'all want to

18   take a break?

19             MR. WILLIAMS:  Yeah, about five

20   minutes.

21             (Brief recess.)

22        Q.    (By Mr. Eddins)  I think you

23   testified earlier that you knew a

Page 104

EXHIBITS

1    was told of anything.

2         Q.    That was on September 23, 2005?

3         A.    I'll take your word on that,

4    yes, sir.  If that was a Friday, then,

5    yes, that was the day.

6         Q.    Give us your best recollection

7    of what happened in that meeting with

8    Dr. Lee.

9         A.    That particular meeting was on

10   a Friday.  Dr. Lee called me to her

11   office.  I went there, and she said

12   that -- that's when she had told me that

13   there was a -- some, you know, sexual

14   harassment there, the charges made by a

15   staff member and that she was going to go

16   ahead and suspend me out of school, off

17   the job just temporarily.  She told me

18   it'll be an out-of-sight/out-of-mind thing

19   and we'll investigate it, and this thing

20   will be fine and it'll blow over, I'm sure

21   we can come to, you know, terms with this

22   or whatever and I will call you up.  And

23   that was on a Friday afternoon, maybe

Page 105

EXHIBITS

1     about two o'clock.  I went back to work.

2     She told me to go ahead and just go on

3     back to work, don't say anything to

4     anybody, and then just go ahead and go

5     home at the regular time at the end of the

6     day, and that's what I did, except I did

7     call my wife on the way home and let her

8     know what was going on.

9          Q.    So after the meeting with

10    Dr. Lee, you actually went back to

11    Ladonia?

12         A.    Yes, sir, I did.

13         Q.    Did you report for work the

14    following Monday?

15         A.    No, sir.

16         Q.    Did you go back to the school

17    anytime after that meeting?

18         A.    I never went back to the

19    school, except in March, April, I believe

20    it was, something like this, to retrieve

21    items out of my office at the time.  I

22    never went back to school after that.

23         Q.    Okay.  Did anyone accompany you

# Exhibit C

# Excerpts from deposition testimony of former superintendent Lee

**American Court Reporting**
**toll-free (877) 320-1050**

Page 13

1  lawsuit had been filed. But while you were
2  superintendent, do you ever recall a class
3  on sexual harassment?
4       A.  Well, again, we covered it
5  usually on institute day where all the
6  employees were there and everybody would
7  have been given the benefit of that.
8       Q.  There was a specific class in
9  2006. Did you have one in 2004 or 2005?
10      A.  When you say specific class,
11  what do you --
12      Q.  An hour or so with literature
13  dedicated specifically to sexual harassment?
14      A.  Well, employees were given
15  information on it. It was addressed in the
16  policy manual and it was addressed in the
17  handbook.
18      Q.  Well, I asked for documents from
19  any sexual harassment seminars that y'all
20  had had in Russell County in the last -- I
21  can't remember -- but I didn't receive any
22  from the time that you were superintendent.
23  Did Ms. Smith overlook something?

Page 14

1       A.  Well, I don't know. All I can
2  tell you is that we would typically address
3  it during institute where you have various
4  speakers. While everyone was in the general
5  session or all employees were there, we
6  would typically cover it in that way. But
7  to have a separate session, I don't recall
8  doing that.
9       Q.  If you run across any material
10  or anything that was handed out at any time
11  while you were state superintendent, would
12  you give it -- not state -- I mean --
13      A.  I wish I were.
14      Q.  I mean, Russell County
15  superintendent. Are you sure you wish you
16  were?
17      A.  It's a challenge.
18      Q.  If you run across any of that or
19  if you will look for it, would you give it
20  to Ms. Smith to give to me?
21      A.  I will.
22      Q.  Now, do you know, when you were
23  Russell County superintendent, if the

Page 15

1  Russell County Board of Education had a
2  policy on sexual harassment, had a specific
3  policy?
4       A.  Yes, there was a policy.
5       Q.  On discovery Ms. Smith presented
6  me with --
7            MR. EDDINS:  Would you mark that
8  Plaintiffs' Exhibit 1?
9            (Whereupon, a document was
10  marked as Plaintiffs' Exhibit 1 and is
11  attached to the original transcript.)
12      Q.  (By Mr. Eddins)  What we marked
13  as Plaintiffs' Exhibit 1, would that be the
14  sexual harassment policy that was in place
15  while you were Russell County
16  superintendent?
17      A.  It looks like the correct
18  policy.
19      Q.  Would you look at the second
20  page? It says this was a -- I thought
21  someplace it said it was adopted in 1995.
22  But, at any rate, this is the policy that
23  Russell County Board of Education had on

Page 16

1  sexual harassment; is that correct?
2       A.  Yes.
3       Q.  And it's listed as file number
4  or policy number GAJDBH; is that correct?
5       A.  That's correct.
6       Q.  And in Paragraph 1A, it says no
7  employee of the school system shall be
8  subjected to sexual harassment. Just tell
9  me in lay terms what that means.
10      A.  Tell me where you're referring
11  again. Where on here?
12      Q.  Where it says 1A -- actually,
13  the second sentence. Just generally tell me
14  -- what I'm asking is what the sexual
15  harassment policy states.
16      A.  The policy, as best I can tell,
17  is saying that no employee should be
18  subjected to sexual harassment on the job,
19  that it shouldn't be permitted.
20      Q.  Does this policy relate to both
21  students and employees or just employees?
22      A.  This policy was employees, as
23  far as I know. Now, we have -- the students

4  (Pages 13 to 16)

## American Court Reporting
## toll-free (877) 320-1050

Page 21

1 was not an option, they could always come to
2 central office and report it. They could go
3 to the next level.
4     Q. So it's your testimony they
5 should report it at the school level first?
6     A. Well, if they felt they could,
7 because the principals were in charge of
8 their schools.
9     Q. If the principal were the one
10 doing the harassing at the school, could
11 they report it to the assistant principal,
12 for instance?
13     A. The system administrator?
14     Q. The assistant principal at the
15 school.
16     A. Well, typically, the procedure
17 would have said to report it to the person
18 in charge. The principal would be the
19 person in charge at the school level. And
20 then if that was not a workable thing, then
21 you would go to the next level.
22     Q. Read Paragraph C. It says each
23 administrator. Would an assistant principal

Page 22

1 be an administrator?
2     A. Well, I guess that's --
3     Q. That's a yes or no question.
4 They're either an administrator or not an
5 administrator.
6     A. Assistant principals are
7 considered administrators.
8     Q. So if the principal is absent or
9 is the one doing the harassing, couldn't
10 they report it to the assistant principal?
11     A. If each administrator is
12 responsible, I guess they could.
13     Q. Let's go on to the second page.
14 This relates to the investigation. If you
15 would, just take a few moments and look at
16 Paragraph IV, investigation hearing
17 procedures. Would you just review that and
18 tell me exactly what it means.
19     A. (Witness reviews document.)
20 Okay.
21     Q. Now, does this policy GAJDBH set
22 up a system for investigating complaints
23 sexual harassment?

Page 23

1     A. It does.
2     Q. And how is that procedure
3 spelled out in the policy?
4     A. Well, you're supposed to have
5 someone assigned to be the Title IX
6 coordinator, and that is usually a designee.
7 In our case, it was the personnel director.
8     Q. Who was that?
9     A. Lillian Baker.
10     Q. And was -- do you ever recall
11 sending out any information to staff or
12 employees or support people and teachers,
13 counselors, whatever, relative to who the
14 Title IX coordinator was for the Russell
15 County Board of Education?
16     A. Yes. They receive that through
17 the handbook. It's listed in there.
18     Q. What handbook is that that
19 you're referring to?
20     A. The student handbook, which also
21 would go to the -- now, this is an older
22 one.
23     Q. Are you referring to what is

Page 24

1 marked each year -- normally titled each
2 year, Student Academic Plan and Statement of
3 Responsibilities, a Handbook for School
4 Personnel, Parents, and Students?
5     A. Correct.
6     Q. Did the teachers get one of
7 those every year?
8     A. Yes.
9     Q. Did all the parents in the
10 system get one?
11     A. Yes.
12     Q. Does that pretty much summarize
13 the policies of the school system?
14     A. Well, it summarizes the
15 procedures, which we would hope would be in
16 line with the policies.
17     Q. The policies of the system, are
18 they kept in a separate place?
19     A. The policies are in a policy
20 manual. But policy manuals are available at
21 each of the sites.
22     Q. Each school has a policy manual?
23     A. Yes.

## www.AmericanCourtReporting.com
## October 30, 2007

**American Court Reporting**
**toll-free (877) 320-1050**

Page 25

```
1      Q.  Do they have more than one?
2      A.  No.  I would imagine they only
3  have one.
4      Q.  Where is that manual normally
5  kept?
6      A.  In the central -- in the front
7  office.
8      Q.  Principal's office?
9      A.  It's either there, or it could
10 be kept in the media center.  I couldn't
11 tell you at each school what they chose to
12 do, but there should have been one in the
13 building.
14     Q.  Okay.  Let's get back to that
15 policy now, relating to the investigation.
16 Now, I think everybody knows that we're here
17 today because of some allegations of sexual
18 harassment that were brought by Ms. Jeffers
19 and Ms. Craig against Mr. Nacrelli.  When
20 you learned of those allegations, did you
21 begin an investigation?
22     A.  Yes.
23     Q.  And who did you put in charge of
```

Page 26

```
1  that investigation?
2      A.  Lillian Baker.
3      Q.  Was she the personnel director
4  at the time?
5      A.  Correct.
6      Q.  She is the interim
7  superintendent now?
8      A.  Correct.
9      Q.  Was she assistant
10 superintendent?
11     A.  She was assistant superintendent
12 for personnel.
13     Q.  Okay.  Now, did you speak with
14 anybody before you told Ms. Baker to go and
15 investigate?  Did you speak with anybody
16 else about it?
17     A.  No.
18     Q.  Let's just start -- I understand
19 that, at some point in time we'll get to
20 later, Ms. Jeffers came to your office and
21 talked with you about it?
22     A.  Correct.
23     Q.  And how long after Ms. Jeffers
```

Page 27

```
1  came there was it before you started an
2  investigation?
3      A.  As I recall, I spoke with
4  Lillian Baker that same afternoon, in terms
5  of initiating -- going ahead and initiating
6  the investigation so that it would have
7  started the following day.
8      Q.  Did you speak with anyone else
9  that day?  Do you recall?
10     A.  No.
11     Q.  So Ms. Baker started the
12 investigation.  And under the policy, she
13 was the superintendent's designee, I am
14 assuming.  She was both the Title IX
15 coordinator and the designee.  Now, do you
16 recall how long it took her to conduct the
17 investigation?
18     A.  As I recall, it took a couple
19 days, because we had a number of people that
20 she had to speak with.
21     Q.  Did she -- the next day after
22 you talked to her, did she go to the school?
23     A.  She did.
```

Page 28

```
1      Q.  At the particular time while the
2  investigation was ongoing, was Mr. Nacrelli
3  still principal?
4      A.  He was.
5      Q.  Was Ms. Jeffers still counselor
6  at Ladonia during that period of time?
7      A.  Correct.
8      Q.  And, Ms. Craig, was she still
9  driving -- well, at this time you hadn't --
10     A.  I had not spoken with Ms. Craig
11 at this point.  Correct.
12     Q.  At some point in time -- Item B
13 under investigation says that when the
14 investigation is completed, the person
15 conducting the investigation shall report
16 the findings to the superintendent.  Did at
17 some point in time Ms. Baker do that?
18     A.  She did.
19     Q.  The next sentence says the
20 findings of the investigation shall then be
21 reduced to writing and copies presented to
22 the complainant, who would be Ms. Jeffers,
23 and the accused employee, who would be
```

7 (Pages 25 to 28)

**www.AmericanCourtReporting.com**
**October 30, 2007**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 29

1  Mr. Nacrelli. Did you do that?
2      A. I don't recall giving copies of
3  that to them, no.
4      Q. The next paragraph says
5  superintendent or investigating officer
6  shall meet with the complainant and accused
7  employee to attempt to resolve the
8  complaint. Do you recall doing that?
9      A. I know I saw Mr. Nacrelli after
10 this. That's when he was placed on paid
11 leave and removed from the school. I don't
12 recall meeting with Ms. Jeffers after that,
13 because we had removed Mr. Nacrelli. And so
14 we felt at that point that the problem, from
15 her perspective, had been handled. So I
16 don't recall meeting with her after that.
17     Q. And the next item, Item C, says
18 that you will conduct a hearing before the
19 board on the matter. Did Ms. Jeffers ever
20 get a chance to present anything to the
21 board?
22     A. If the complaint -- it says
23 clearly that if it can't be resolved, then

Page 30

1  you do that. Now --
2      Q. Was it resolved?
3      A. Well, we felt it was.
4      Q. Then it says if the complaint
5  cannot be resolved by the board, the
6  complainant may seek redress in the
7  appropriate court. So the policy actually
8  gives her an opportunity to go to court,
9  doesn't it?
10     A. The policy states that.
11     Q. Now, you testified earlier, I
12 think, that an assistant principal is an
13 administrator and that this assistant
14 principal would have an obligation under the
15 policy to report sexual harassment. Is that
16 correct, if it was reported to him or her?
17     A. That is correct.
18     Q. Surely you wouldn't have a
19 policy that said they don't have an
20 obligation to report it. Now, who should
21 that assistant principal report to if they
22 learn of sexual harassment?
23     A. Well, under -- in certain

Page 31

1  circumstances if the principal were not
2  involved, I would assume the assistant
3  principal would report to the principal. If
4  the principal was involved, then I would
5  assume the assistant principal would then
6  take it to the next level and report it to a
7  central administrator, someone at central
8  office.
9      Q. Would that be the Title IX
10 coordinator or superintendent?
11     A. I would say it could be either.
12     Q. Do you know Ms. Dillie Elliot?
13     A. Dillie Elliot is a board member
14 for Russell County. Yes, I know her.
15     Q. Was she a board member when you
16 were superintendent?
17     A. Yes.
18     Q. Do you recall at some point in
19 time in the summer of 2005, did you speak
20 with Ms. Elliot about a report of sexual
21 harassment regarding Ms. Jeffers?
22     A. I do not recall talking with
23 Ms. Elliot about that specific thing. Now,

Page 32

1  I had numerous conversations with
2  Ms. Elliot, as I did all board members. But
3  I don't recall specifically that topic with
4  her.
5      Q. She recalled it very clearly
6  that she spoke with you.
7      A. She may have. I'm just telling
8  you that I don't recall specifically getting
9  into talking with her about it.
10     Q. Okay. You don't recall -- do
11 you recall any conversation relating to
12 Ms. Jeffers that Ms. Dillie Elliot might
13 have conveyed to you about Ms. Jeffers
14 wanting a transfer away from Ladonia?
15     A. I remember Ms. Jeffers, when she
16 came in, one of the things that she said was
17 that she had had a conversation with Dillie
18 Elliot about this. I do recall that. I
19 just don't recall having a follow-up
20 conversation with Dillie Elliot about that.
21     Q. Well, that conversation would
22 have been before Ms. Jeffers came in, I
23 think. Ms. Jeffers and Ms. Elliot testified

**www.AmericanCourtReporting.com**
**October 30, 2007**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 33

1  that the conversation was in late July or
2  early August, and you spoke with Ms. Jeffers
3  the September.
4        MS. SMITH: Object to the form
5  of the question.
6        A. I just don't recall. I don't
7  recall.
8        Q. I understand. Well, let me ask
9  you this: Would you consider -- who has the
10  ultimate responsibility for the policymaking
11  in Russell County with the Russell County
12  Board of Education?
13        A. Policymaking?
14        Q. Right.
15        A. It's the board's responsibility.
16        Q. Who has the authority to hire
17  and fire a superintendent?
18        A. The board.
19        Q. Okay. Would you consider a
20  complaint to a board member to be a valid
21  complaint? If a teacher or support person
22  made a complaint to a board member, would
23  you consider that to be a valid complaint?

Page 34

1        MS. SMITH: Object to the form
2  of the question.
3        A. An employee can complain to
4  whomever they wish. As superintendent, I
5  couldn't control that. So could they
6  complain to them? Yes.
7        Q. If they complained -- if an
8  employee complained to a board member, what
9  should the board member properly do?
10        A. Well, properly, they should then
11  refer that to the superintendent to
12  investigate.
13        Q. Okay. I'm going to just ask you
14  do you know these people. Barbara Jeffers?
15        A. Yes.
16        Q. How do you know Ms. Jeffers?
17        A. She is -- I knew her as a
18  counselor at Ladonia Elementary School.
19        Q. Did you know her before you
20  became Russell County superintendent?
21        A. No.
22        Q. How about Joanie Craig?
23        A. Bus driver for Russell County.

Page 35

1        Q. Did you know her before she came
2  to your office to complain about this
3  matter?
4        A. No.
5        Q. Charles Nacrelli?
6        A. Principal at Ladonia.
7        Q. Did you know him before you were
8  superintendent at Russell County?
9        A. No.
10        Q. Now, did you at some point
11  investigate the allegations brought by
12  Ms. Craig relating to sexual harassment by
13  Mr. Nacrelli?
14        A. Yes, we did. At that point,
15  Mr. Nacrelli was already removed from the
16  school, but we did follow up with it in
17  questioning folks that were -- would have
18  had some knowledge about the situation.
19        MR. EDDINS: Mark this as
20  collective Plaintiffs' Exhibit 2.
21        (Whereupon, a document was
22  marked collectively as Plaintiffs' Exhibit 2
23  and is attached to the original transcript.)

Page 36

1        A. (Witness reviews documents.)
2        Q. (By Mr. Eddins) Okay. Let's
3  look at the top page of this exhibit.
4  Actually, the last two pages, could you
5  identify the top page dated September 23,
6  2005 to Mr. Nacrelli?
7        A. That's correct.
8        Q. What is that?
9        A. This is a memo to him concerning
10  placing him on paid administrative leave.
11        Q. Who is it from?
12        A. It's from me.
13        Q. As superintendent?
14        A. Yes.
15        Q. Is that your signature on it?
16        A. It is.
17        Q. And it says: This letter is to
18  officially inform you that you're placed on
19  indefinite paid administrative leave pending
20  the outcome of allegations made against you
21  by members of your staff at Ladonia
22  Elementary. These allegations relate to
23  sexual harassment.

9  (Pages 33 to 36)

**www.AmericanCourtReporting.com**
**October 30, 2007**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 41

1    schedule had been changed at the beginning
2    of the 2005-2006 year?
3         A.   I think she referenced that,
4    yes.
5         Q.   Did your investigation indicate
6    that that charge was substantial?
7         A.   There would have been a change
8    that year with counselors in all the
9    elementary schools. So I'm sure hers was
10   also changed as well, because she was
11   counselor at elementary.
12        Q.   What changes would have been
13   made by all?
14        A.   What we had looked at in the
15   elementary schools -- and I had addressed
16   this with the elementary principals prior to
17   this. We were looking at a more structured
18   schedule for counselors in trying to provide
19   -- in Russell County because we are not a
20   wealthy district, we didn't have a lot of
21   support personnel. So we were trying to
22   assure that all of the children were
23   receiving the counseling services that we

Page 42

1    felt like they needed. So there was more of
2    a structured schedule than the counselors
3    had been used to before that.
4         Q.   Well, specifically, Ms. Jeffers
5    had taught skills classes in previous years,
6    hadn't she? Do you know?
7         A.   I'm sure she had, yes.
8         Q.   In this particular year, her --
9    the number of students that she had
10   basically was doubled, and I think her
11   complaint was that it was -- that she was
12   forced to teach classes larger than are
13   allowed by law. Do you remember or do you
14   recall anything about that?
15        A.   I don't recall specific numbers
16   on the class size that Ms. Jeffers had. I
17   will say this. In terms of numbers for
18   classes, the way that the state looks at it
19   is, if you're within your -- if you've got
20   your earned units in place, then class caps
21   are flexible. In other words, there's not
22   an automatic cutoff for how many -- and this
23   would apply for teachers as well. In other

Page 43

1    words, if the class cap says 18 but you've
2    got all your units in place, they can have
3    more than that, and you're not in violation.
4         Q.   In a particular class. Is that
5    what you're saying? School-wide, if you
6    have 18, then one class could have 20 and
7    one class 16. Is that what you're saying?
8         A.   You would want to balance that
9    if that was the case. But what I'm saying
10   is, teachers or counselors, if the person
11   had more than their 18 that the law -- that
12   the provision -- it's within the
13   administrative code. If it would -- if they
14   had more than 18, which is the preferred
15   class cap in K through 3, they could. They
16   could have that.
17        Q.   Could they have two classes, a
18   counselor teach two elementary classes if
19   the teacher -- one teacher had 16 students
20   and the other had 18, could a counselor then
21   have 34?
22        A.   Well, I don't think you would
23   want to do that. I'm just saying you could

Page 44

1    exceed the 18. It was not unusual for
2    teachers and/or counselors to have more than
3    the 18, depending on the staff available. I
4    think you would reach a point that would be
5    excessive, that you would not want to go
6    above.
7         Q.   Would you say double classes
8    would be excessive?
9         MS. SMITH: Object to the form
10   of the question.
11        A.   I'd have to know -- rather than
12   -- what number are we talking about? Then
13   you can deal with it a little more
14   effectively.
15        Q.   Okay. In Paragraph 4 it says:
16   Your actions have presumably violated the
17   constitutional rights of certain employees
18   of Russell County Board of Education. Now,
19   what did you mean by that?
20        A.   There appeared that there had
21   been a violation of laws that govern, at the
22   federal level, sexual harassment.
23        Q.   Okay. Your notice goes on to

11 (Pages 41 to 44)

**www.AmericanCourtReporting.com**
**October 30, 2007**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 45

1  inform Mr. Nacrelli that the board will have
2  a meeting on the proposed cancellation and,
3  of course, that he had certain rights under
4  the teacher tenure act that he could -- he
5  had a right, for instance, to a conference
6  with the board. Do you know if he had a
7  conference with the board? This says the
8  board hearing would have been November 15,
9  2005 at 5:30 p.m.
10     A. That meeting was not held.
11     Q. Okay. Did the board -- at that
12 hearing or at that meeting on November 15,
13 2005, did the board vote to terminate
14 Mr. Nacrelli's employment?
15     A. As I recall, there were
16 negotiations going on with Mr. Nacrelli.
17     Q. There was a vote. Before those
18 negotiations started, there was a vote.
19     A. There was a vote.
20     Q. I believe under the law
21 Mr. Nacrelli had the right to take the board
22 -- to appeal the board's decision or to
23 contest the board's decision before an

Page 46

1  independent arbitrator; is that correct?
2     A. Correct.
3     Q. Did he avail himself to that
4  opportunity?
5     A. He did.
6     Q. Was there a hearing before an
7  arbitrator?
8     A. I was not involved with a
9  hearing before the arbitrator.
10     Q. Well, look at the back page,
11 then, February 15, 2006 from Mr. Nacrelli to
12 you.
13     A. He resigned.
14     Q. So if he resigned, there
15 wouldn't be any hearing before an
16 arbitrator, would there?
17     A. I guess he didn't choose to go
18 through with it. He had the opportunity,
19 however.
20     Q. That's right. Is there any
21 reason whatsoever, other than the
22 allegations of sexual harassment, that you
23 would -- that you proposed the termination

Page 47

1  of employment of Charles Nacrelli as
2  principal at Ladonia Elementary?
3     A. No.
4     Q. And, in fact, he had had good
5  evaluations that you had given him, hadn't
6  he?
7     A. Correct.
8     Q. Do you know Brenda Coley?
9     A. I do.
10     Q. How do you know Ms. Coley?
11     A. Ms. Coley was the assistant
12 principal at Ladonia, and she is currently,
13 as far as I know, the principal at Oliver
14 Elementary.
15     Q. Was she assistant principal at
16 Ladonia while Mr. Nacrelli was principal?
17     A. She was.
18     Q. Did you at any time discuss with
19 Ms. Coley any improper sexual conduct
20 towards Ms. Jeffers?
21     A. After the investigation had been
22 carried out by Ms. Baker, yes, I did have a
23 conversation with Ms. Coley.

Page 48

1     Q. Did Ms. Coley indicate to you
2  that Ms. Jeffers had called her one night in
3  July after a party at Mr. Nacrelli's house?
4     A. She did.
5     Q. What did she say? Just tell us
6  what she told you.
7     A. She discussed some of the events
8  -- she said Ms. Jeffers informed her of some
9  events that took place at the party.
10     Q. Did those events include
11 Mr. Nacrelli taking his bathing suit off and
12 appearing naked in front of Ms. Jeffers?
13     A. I think jumping in the pool or
14 something to that effect.
15     Q. Right. Is that a yes?
16     A. Yes, that's a yes.
17     Q. Did she tell you that
18 Ms. Jeffers told her that Mr. Nacrelli had
19 squeezed her buttocks at the party? Do you
20 recall?
21     A. I recall her telling me several
22 things that occurred that would have been
23 inappropriate.

12  (Pages 45 to 48)

**www.AmericanCourtReporting.com**
**October 30, 2007**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 49

1    Q.   What are some of those things?
2    A.   The thing about the pool.  I
3  definitely remember that.  And just
4  inappropriate touching.  I couldn't tell you
5  a specific on the --
6    Q.   Did it involve several teachers?
7    A.   According to Ms. Coley, what she
8  had been told by Ms. Jeffers, yes.
9    Q.   How did you react to that when
10  she told you that?
11    A.   Well, as superintendent, I had
12  to try to be objective on the situations.
13  In other words, Ms. Jeffers has rights, but
14  so did Mr. Nacrelli.  So I was trying to be
15  fair.  So in investigating, I talked -- as
16  we've talked about, I talked with Ms. Coley
17  after that.  So I was very concerned if that
18  kind of behavior had occurred.  My primary
19  focus, though, was within the workplace.
20  The issue that I really had to a great
21  extent with this was a lot of what I was
22  getting from Ms. Coley about -- from
23  Ms. Jeffers, had to do with that party that

Page 50

1  they had, which we maintained from the very
2  beginning was a private party; that it was
3  not a school function; that it was not
4  sanctioned by the school system; that this
5  was something that they chose to do from a
6  private standpoint.
7    Q.   So you're saying that any
8  conduct that's outside the actual school
9  setting would not be covered by Title VII?
10    A.   I'm just saying that when you're
11  talking about the workplace, there are
12  private settings that I don't think always
13  are going to impact the workplace.  As
14  superintendent, I felt like I had to be more
15  in tune with that, as opposed to getting
16  into what folks do on their own time.
17    Q.   If a principal after hours from
18  his own house called a teacher after hours
19  at her own house and said, I want you to
20  have sex with me or I'm going to do
21  something, I'm going to report you for
22  something or something like that, would that
23  be a violation of --

Page 51

1    A.   That would be inappropriate,
2  yes.
3      MS. SMITH:  Object to the form
4  of the question.
5    Q.   Would it be a violation of your
6  policy?
7    A.   The way I viewed it is, if the
8  private setting then impacted the workplace,
9  if there was a connection, then it became
10  more of a problem for us to have to deal
11  with.  So from what you're giving me as a
12  scenario, I would say that that would
13  probably impact the workplace.
14    Q.   Okay.  You said you were
15  concerned about the type of conduct
16  Ms. Coley was describing that Mr. Nacrelli
17  had been -- apparently had done.  Were you
18  concerned that Ms. Coley did not report this
19  to you?
20    A.   Well, in any conversations that
21  I had, like, with Ms. Coley, she was
22  communicating, again, what Ms. Jeffers was
23  telling her.  So it wouldn't have been

Page 52

1  firsthand knowledge on her part.  Should
2  she --
3    Q.   Do you know, the kissing of her,
4  would that have been firsthand knowledge?
5    A.   In my conversation with
6  Ms. Coley, what I got from her was that at
7  the time that it was occurring -- now, this
8  was what I took from what she told me about
9  her situation -- was that she did not take
10  it in a serious manner at the time, and that
11  she didn't get overly upset about it.  So as
12  we investigated, a lot of information came
13  out that different people seemed to take it
14  different ways.  I'm not excusing any of
15  it.  I'm just saying that was the impression
16  I got in talking with some of employees,
17  like Ms. Coley.  She just said that she felt
18  that that was kind of the way Mr. Nacrelli
19  was, and she didn't take it seriously.  Now,
20  what Ms. Jeffers was telling her, obviously,
21  was a little different.
22    Q.   Ms. Coley testified under oath
23  previously that she saw Mr. Nacrelli grab

13  (Pages 49 to 52)

**www.AmericanCourtReporting.com**
**October 30, 2007**

# Exhibit D

# Excerpts from deposition testimony of Principal Coley

Page 13

1    A.   Yes.
2    Q.   Okay?
3    A.   And then after one year, I
4  transferred to Ladonia as a second-grade
5  teacher.  And I taught at Ladonia for
6  twelve years as a second-grade teacher.
7    Q.   Okay.  And then what happened?
8    A.   After twelve years, I became
9  the Assistant Principal at Ladonia, and I
10 was assistant principal at Ladonia for
11 four years.
12   Q.   Okay.  Then you were named
13 principal at Oliver?
14   A.   Yes.  This is going into my
15 third year.
16   Q.   That would have been 2005-'06
17 you were named principal?
18   A.   Right.
19   Q.   What date did you become
20 principal on?  Do you remember the --
21   A.   I think it was --
22   Q.   The academic year goes from
23 July the 1st to June the 30th.  Is that

Page 14

1  the date -- is July the 1st the date that
2  you became principal?
3    A.   July?
4    Q.   Uh-huh.
5    A.   I believe it was June that I
6  actually -- I was transferred actually in
7  June.  I actually officially started
8  early.  I started in June.
9    Q.   Okay.  Did you actually go to
10 Oliver physically in June of 2005 and --
11   A.   Yes.
12   Q.   -- start work there?
13   A.   I did.
14   Q.   Now, a principal is on a what
15 month contract?
16   A.   We are on eleven months.  But
17 that's what I said Miss -- Dr. Lee gave
18 me directions to start early.  I didn't
19 finish out the full term at Ladonia.
20   Q.   So did you work virtually the
21 entire summer?
22   A.   Yes.
23   Q.   Okay.  And you are paid all

Page 15

1  twelve months regardless of -- even those
2  years that you were on an eleven-month
3  contract, were you paid for the full
4  twelve years -- well, you were never on
5  an eleven-month contract before that,
6  were you?
7    A.   But I did get an extra
8  supplement for that because I started
9  early.  So I was paid for the extra time.
10   Q.   Okay.  When you were a
11 teacher, were you paid in twelve
12 different months?
13   A.   Yes.
14   Q.   Okay.  And did you have health
15 insurance through the Public Education
16 Employment Health Insurance Board for all
17 twelve months?
18   A.   Yes.
19   Q.   And were you in the retirement
20 system for all twelve months?
21   A.   Yes.
22   Q.   And did you pay Social
23 Security to the Federal Government for

Page 16

1  all twelve months?
2    A.   Yes.
3    Q.   Okay.  Now, under Alabama law
4  are you automatically re-employed for the
5  following year unless the Board votes to
6  terminate your employment?
7    A.   Yes.
8    Q.   So you don't -- you don't have
9  to go before the Board every year and ask
10 to be re-employed or anything like that?
11   A.   No.
12   Q.   Now, this is your third year,
13 did you say?
14   A.   I'm going into my third year.
15 I've completed two years.
16   Q.   Did you have -- are you on a
17 three-year contract or --
18   A.   I'm currently on a three-year
19 contract.
20   Q.   So this is the last year of
21 the contract?
22   A.   No.  This is the beginning of
23 a three-year contract.

4  (Pages 13 to 16)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 37

1  something that maybe I probably would not
2  have said.  But I can't say it was -- did
3  you use the word sexual harassment, or
4  did you say sexual comment?
5      Q.    Just sexual comments.  I
6  didn't ask about physical touching or --
7  but did you hear him talk any about --
8  any teacher's anatomy, for instance, her
9  breast or behind or anything like that?
10     A.    Breast or behind.  I just
11 can't tell you a specific comment that --
12 I just can't recall a specific comment
13 that he's made.
14     Q.    Okay.  You're not saying,
15 though, that he did not make those type
16 of comments.  You're just -- are you just
17 saying you can't remember any
18 specifically?
19     A.    I can't tell you that he did
20 make the comment, but I can't recall or
21 tell you that he -- you know, that I can
22 recall a comment that he's made.
23     Q.    Okay.  At some point in time,

Page 38

1  do you recall going to a party at
2  Mr. Nacrelli's house?
3      A.    Yes.
4      Q.    In the Summer of 2005, was it?
5      A.    Yes.
6      Q.    Where does Mr. Nacrelli live?
7      A.    Was he there?
8      Q.    Where does Mr. Nacrelli live?
9  I'm sorry.  I need to speak up.
10     A.    He lives in Opelika, Alabama.
11     MR. EDDINS:  Off the record.
12     (Off-the-record discussion)
13     Q.    Okay.  About what time did
14 that party happen -- I mean, occur?
15 Would it -- do you remember --
16     A.    I think it was -- I was late
17 arriving, so -- because my husband had to
18 work.  So I think I arrived before it was
19 dark, so it was maybe six or seven, I
20 believe.
21     Q.    What day of the week was it?
22 Do you remember?  Was it a Friday or a
23 Saturday or a Thursday or...

Page 39

1      A.    I just don't remember.
2      Q.    Okay.  What was the occasion
3  of the party?
4      A.    It was a celebration.
5      Q.    A celebration of what?
6      A.    Ms. Coley leaving, my new job.
7      Q.    Was everybody proud that
8  Ms. Coley was leaving, or were they
9  celebrating something that Ms. Coley had
10 done?
11     A.    I don't know.  It depends on
12 who you are talking to.
13     Q.    Was the party held because
14 you'd been named Principal at Oliver
15 Elementary School?
16     A.    That's what I was told.
17     Q.    Do you remember talking with
18 Ms. Jeffers before the party?
19     A.    Yes.
20     Q.    And what did y'all discuss?
21     A.    We talked a lot, so, I mean, I
22 don't know.  We discussed a lot, so -- I
23 mean, we talk a lot.  About the party?

Page 40

1  Do you want to be more specific?
2      Q.    Did she indicate to you that
3  she didn't want to attend the party?
4      A.    Yes.
5      Q.    And why did she say that she
6  didn't want to attend?
7      A.    She said that -- well, I think
8  she said to me something like that.  It
9  may not be her exact words.  But she
10 asked me if she didn't come, would, you
11 know, I be, like, upset or would, you
12 know, my feelings be hurt if she didn't
13 come.  And I told her that I would be,
14 that I did want her to come.
15     Q.    What all -- and she did come,
16 didn't she?
17     A.    She did.
18     Q.    What all sort of refreshments
19 were served at that party?
20     A.    Refreshments?
21     Q.    Yeah.  What did you have to
22 eat and drink?
23     A.    I remember, I think, like

10  (Pages 37 to 40)

**www.AmericanCourtReporting.com**
**October 17, 2007**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 45

1  didn't stay very long at the party, so it
2  was -- I would consider that early.
3      Q.   Did Mr. Nacrelli -- when he
4  was sitting there talking to you or
5  standing --
6      A.   He was standing.
7      Q.   -- there talking to you giving
8  you these accolades, did he seem lucid or
9  did he seem drunk or how did -- how would
10  you describe his general demeanor?
11      A.   He was out of character a
12  little.  You know, I think he -- you
13  know, I'm assuming he had been drinking.
14      Q.   Did he seem totally drunk?
15      A.   No.  I don't think he was
16  totally drunk, because, I mean, he knew
17  me.  He was -- no.
18      Q.   He was talking more or less
19  normally.  Is that what you're saying?
20      A.   Well, he seemed out of
21  character because he was...
22      Q.   He'd had a little too much to
23  drink --

Page 46

1      A.   Right.  He was talking a lot.
2      Q.   Yeah.  Okay.
3      A.   But I'm not going to say he
4  was drunk.  I mean, he was just -- he
5  wasn't totally disoriented or anything
6  because he was alert.
7      Q.   And did you welcome the kiss,
8  or did you feel offended by it or what?
9      A.   I didn't welcome the kiss.  I
10  was just kind of surprised.  Shocked, I
11  guess, is a better way to describe it.
12      Q.   Did he do anything else
13  inappropriate towards you --
14      A.   No.
15      Q.   -- touch you in any manner?
16      A.   No.
17      Q.   Make any sexual comments?
18      A.   No.
19      Q.   What time would you say it was
20  that you left?
21      A.   I'm just kind of bad with
22  time.  I just don't remember the time,
23  but I know I didn't stay very long.

Page 47

1      Q.   And you arrived late you said?
2      A.   Right.
3      Q.   The party was for you?
4      A.   That's correct.
5      Q.   Do you remember -- after the
6  party do you recall having a telephone
7  conversation with Ms. Jeffers?
8      A.   Yes.
9      Q.   Where were you when you had
10  that conversation?
11      A.   I was in bed.
12      Q.   You were already in bed?
13      A.   Yes.
14      Q.   Okay.  And tell us if you
15  would the gist of that conversation.
16      A.   She called -- and, of course,
17  my husband and I were in bed -- and she
18  said, Brenda, I have something I have to
19  tell you.  She said, you are not going to
20  believe this.  She said, but you have to
21  swear that you're not going to tell
22  anyone, that you're going to say anything
23  about this.  And I said -- and she said,

Page 48

1  you've got to promise me; you've got to
2  swear that you're not going to tell
3  anyone.
4      And I said, well, do you
5  mind -- I have to tell Ken.
6      And she said okay; it's okay;
7  you can tell Ken.  And then she proceeded
8  to tell me that after I left, after most
9  of the guests had left, that Mr. Nacrelli
10  had stripped.  And I just kind of
11  laughed.  And I said, are you serious;
12  what?  And she said, I just -- you know,
13  she just went on to kind of tell me,
14  like, she was in shock, you know, that
15  she was upset about what he had done.
16  And then I asked her where was his wife,
17  and she said she was there.  And I just
18  don't remember the whole conversation,
19  but that was basically what was said.
20      Q.   Do you recall her saying that
21  she was shaking so hard that she was
22  having difficulty driving?
23      A.   I don't -- no, I don't recall.

12  (Pages 45 to 48)

**www.AmericanCourtReporting.com**
**October 17, 2007**

# American Court Reporting
## toll-free (877) 320-1050

Page 49

1    Q.   Okay.  Did you personally
2  observe Mr. Nacrelli doing anything
3  improper to anybody other than
4  Ms. Jeffers or yourself the night of the
5  party?
6        MS. SMITH:  Object to the form
7  of the question.
8        You can go ahead.  Whatever
9  you consider improper.
10   A.   Well, he -- well, I did
11  observe him -- Jason Hopper -- I observed
12  him -- he grabbed him between his legs.
13   Q.   He grabbed Mr. Hopper between
14  the legs?
15   A.   Uh-huh.  He was joking.  He
16  was making some kind of joke or
17  something, and I don't remember what it
18  was.  But I did notice that he grabbed
19  Jason Hopper.
20   Q.   Where were they when this
21  happened?
22   A.   We were all standing outside
23  near the pool.

Page 50

1    Q.   What prompted him to grab
2  Mr. Hopper's -- did he grab his genitals?
3    A.   Yes.
4    Q.   What prompted him to do that?
5    A.   They were -- I don't remember.
6  He was -- they were joking or something
7  with one another and -- I don't know what
8  led up to it, but I just remember seeing
9  that he did grab him.
10   Q.   What was Mr. Hopper wearing?
11   A.   I believe he had on shorts.  I
12  mean, I -- also, I think I noticed that
13  he -- Ciel (phonetic) -- I believe it was
14  Ciel Parrish.  He was -- I noticed him
15  touching Ciel.
16   Q.   How did he touch Ms. Parrish?
17   A.   He was, like, touching her,
18  you know, making (indicating) -- you
19  know, just kind of like jokes or
20  whatever.
21   Q.   Where did he touch her?
22   A.   Like on her behind.
23   Q.   Pardon me?

Page 51

1    A.   Like on her behind.
2    Q.   On her buttocks?
3    A.   Buttocks.  That's the right
4  word.  Yes.
5    Q.   Did he touch her any other
6  place that you observed?
7    A.   No.
8    Q.   Now, do you remember an
9  incident that occurred at the school
10  involving a CD that was given out and had
11  to be taken up that was played --
12  apparently played by a teacher that had a
13  classroom that had some maybe
14  inappropriate material on it for second
15  graders?
16   A.   I remember a discussion about
17  it.  I didn't actually see it myself.
18   Q.   You didn't ever see the CD.
19  Just tell us what you remember about it.
20   A.   It's just kind of hearsay.  I
21  don't, you know --
22   Q.   Well, that's fine in this
23  setting.

Page 52

1    A.   Okay.  I just remember
2  Ms. Gentry was the teacher, I believe,
3  and I think they had a camera in,
4  apparently -- I don't know whether it was
5  Mr. Nacrelli.  I don't know who did it,
6  but, apparently, they were zooming in on
7  her breasts.  And then I guess there was
8  a -- we used to have the morning -- the
9  kind of morning announcements or the
10  morning character-ed or something in the
11  mornings, and I guess apparently they put
12  in the wrong CD, and I guess it was a
13  quick flash of that video instead of the
14  morning character-ed.
15   Q.   Now, was there a -- on the
16  video was there a shot of Ms. Gentry's
17  breasts?  Is that what you're saying?
18   A.   Yes.
19   Q.   She was -- do you know what
20  she was wearing or if --
21   A.   I don't remember what she was
22  wearing.
23   Q.   Was there a shot of Coach

13 (Pages 49 to 52)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 53

1  Hopper's crotch or something? Do you
2  remember that?
3      A.  I don't remember that.  I just
4  remember about Ms. Gentry.
5      Q.  Do you recall a statement that
6  Mr. Nacrelli made in a faculty meeting
7  that some African-American educators may
8  have found offensive relating to student
9  testing or student test scores?
10     A.  Yes.
11     Q.  Okay.  Tell us about that.
12  What do you remember?
13     A.  Basically what he said was
14  that the black students were not
15  academically as strong as the white
16  students.
17     Q.  What percentage of students at
18  Ladonia are black about?  Do you know?
19     A.  At that time I believe it was
20  probably maybe 20 percent, 10 -- maybe 20
21  percent.
22     Q.  In your opinion, were the
23  black students pulling the white students

Page 54

1  down at Ladonia, their test scores?
2      MR. WILLIAMS:  Object to the
3  form of the question.  You can answer it.
4      MS. SMITH:  You -- go ahead.
5  You can answer it.
6      A.  You said in my opinion?
7      Q.  Right.
8      A.  I think what he was saying --
9  and maybe it was just a matter of the way
10  that he worded it and I thought it was
11  inappropriate.  What he was saying was
12  that when he looked at the data, he was
13  saying that the black students' test data
14  reflected that they weren't achieving as
15  high as the white students.  But, in my
16  opinion, it was just a matter of the
17  choice -- I mean, the way that he
18  presented it.
19     Q.  Okay.  Ms. Baker just
20  mentioned a while ago that when
21  Mr. Nacrelli would leave school he would
22  often leave a white teacher in charge of
23  the school rather than a black

Page 55

1  administrator.  Do you recall that
2  occurring?
3      A.  Do you mean like if he --
4  during my tenure there?
5      Q.  If he was going to be gone.
6  Do you recall that occurring?
7      A.  Most of the times he would
8  use -- yeah -- Ms. Brantley or
9  Ms. Parrish.  And there was another
10  teacher, Ms. White, that had her
11  administrative certification, and she
12  would get upset because he would not use
13  her.
14     Q.  Is Ms. White a teacher?
15     A.  Yes.
16     Q.  Is she black or white?
17     A.  She's black.
18     Q.  Did that offend you?
19     A.  Well, I thought it was unfair.
20     MR. EDDINS:  Let me talk with
21  them just a minute.
22          2:50 PM
23          (Short recess)

Page 56

1          3:00 PM
2      MR. EDDINS:  We can go back on
3  the record now.
4      Q.  (BY MR. EDDINS)  Ms. Coley,
5  did you frequently -- for the record, did
6  you frequently observe Mr. Nacrelli going
7  down to the area where the buses loaded
8  and unloaded in the morning and
9  afternoon?
10     MS. SMITH:  Object to the form
11  of the question.  Use of the term
12  frequently.
13     MR. EDDINS:  Okay.
14     Q.  Did you ever observe
15  Mr. Nacrelli going down to the area where
16  the buses loaded and unloaded at Ladonia
17  Elementary School?
18     A.  Have I ever --
19     Q.  Right.
20     A.  If there was a need to go down
21  there.  You know, I just don't remember.
22     Q.  Did you ever go down there?
23     A.  In the mornings?  Mostly in

14  (Pages 53 to 56)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 81

1  the entire time you worked at Ladonia?
2      A.   I had a lot of concerns about
3  that.
4      Q.   Were you shocked when he
5  decided to throw you a party when you got
6  promoted to go to the other elementary
7  school?
8      A.   Was I shocked?
9      Q.   Yeah.
10     A.   I had mixed feelings about it.
11     Q.   Do you think he probably liked
12  you more than you liked him?
13     A.   I'm sorry?
14     Q.   You know how sometimes you
15  have a friend that you get this feeling
16  they like you more than you like them.
17  Is that the situation with you and
18  Mr. Nacrelli, where he probably perceived
19  you as more of a friend than you
20  perceived him a friend?
21         MR. EDDINS:  Object to the
22  form.
23     A.   I don't think he perceived me

Page 82

1  as a friend.
2      Q.   Did you perceive him as a
3  friend?
4      A.   No, not a true friend.
5         MR. WILLIAMS:  Thank you.
6  That's all I've got.
7         THE WITNESS:  Okay.
8         MR. EDDINS:  I've got a couple
9  of others.
10  CONTINUED EXAMINATION BY MR. EDDINS:
11     Q.   Just for clarification, I
12  think you responded to a question by
13  Mr. Williams about -- when he asked you
14  did you -- did Mr. Nacrelli ever touch
15  you inappropriately.  When he kissed you,
16  did he touch you inappropriately with his
17  lips?  I think you were talking about his
18  hands.
19     A.   Yes.
20     Q.   Now, the mouse joke that we've
21  talked about, did you find that
22  offensive?
23     A.   No.

Page 83

1      Q.   The fuzzy Visa joke, did you
2  find that offensive?
3      A.   No.
4      Q.   Mr. Williams was asking you
5  about a number of things about the
6  bantering, that sort of thing that
7  occurred at the school.  The alleged
8  biting of the breast to Ms. Jeffers, was
9  that a joke?  Would you consider that to
10  be a joke?
11     A.   I wasn't there when that
12  happened.
13     Q.   Well, you weren't there when a
14  lot of the jokes were told, were you?
15     A.   Right.  Okay.  What are you
16  asking me about?
17     Q.   Is that a joking matter for a
18  Principal to bite a counselor on the
19  breast?
20         MR. WILLIAMS:  Object to the
21  form of the question.  It assumes facts
22  not in evidence.  But you can answer it.
23         MR. EDDINS:  The facts are in

Page 84

1  evidence.
2      A.   No.  I wouldn't think that
3  would be a joke.
4      Q.   What about him exposing his
5  penis to a counselor?  Would that be a
6  joking matter?
7      A.   No.
8      Q.   What about him going on a bus
9  and rubbing the legs of Ms. Craig and
10  talking about that he's an Italian stud
11  and wants to get with her?  Would that be
12  a joking matter?
13     A.   No.
14     Q.   Do you ever recall him talking
15  about the fact that he was Italian and
16  Italians had certain sexual prowess?
17     A.   Yes.
18     Q.   And what did he say about
19  that?
20     A.   I just remember those terms
21  and him saying, you know, I'm Italian;
22  you know, I'm a stud or whatever.  But...
23     Q.   Did he ever mention the fact

21  (Pages 81 to 84)

**www.AmericanCourtReporting.com**
**October 17, 2007**

## American Court Reporting
### toll-free (877) 320-1050

Page 85

1  that he was a chip off the old block,
2  that his father was just like him, a
3  sexual stud?
4       A.   I remember conversations that
5  he had about his father.
6       Q.   Do you remember him talking
7  about his father touching his wife,
8  touching Mrs. Nacrelli?
9       A.   Yes.
10      Q.   Where did he say that his
11  father touched her?
12      A.   On her buttocks.
13      Q.   Okay.
14          MR. EDDINS:  Okay.  I don't
15  have any additional questions.
16          MR. WILLIAMS:  That's all I've
17  got.  Thank you so much.
18
19              3:25 PM
20
21      FURTHER THE DEPONENT SAITH NOT
22
23

Page 86

1       C E R T I F I C A T E
2
3  STATE OF ALABAMA )
4  COUNTY OF LEE    )
5
6          I hereby certify that the
7  above and foregoing deposition was taken
8  down by me in stenotype, and the
9  questions and answers thereto were
10  transcribed by means of computer-aided
11  transcription, and that the foregoing
12  represents a true and correct transcript,
13  to the best of my knowledge, of the
14  deposition given by said witness upon
15  said hearing.  I further certify that I
16  am neither of counsel nor of kin to the
17  parties to the action, nor am I in
18  anywise interested in the result of said
19  cause.
20
21  KRISTEN DYKES, CERTIFIED COURT REPORTER
22  My Commission expires
23  June 6, 2008

22  (Pages 85 to 86)

# Exhibit E

# Policy GAJDBH and student handbook excerpt

# SEXUAL HARASSMENT

I.   **POLICY**

  A.   It is the policy of the Board to maintain a learning and working-environment that is free from sexual harassment. No employee of the School System shall be subjected to sexual harassment.

  B.   It shall be a violation of this policy for any employee of the School System to harass another staff member or student through conduct or communications of a sexual nature as defined in Section II below.

  C.   Each administrator shall be responsible for promoting understanding and acceptance of, and assuring compliance with, state and federal laws and board policy and procedures governing sexual harassment within her or his school or office.

  D.   Violations of this policy or procedure will be cause for disciplinary action.

II.   **DEFINITION**

  A.   Sexual harassment means unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature when:

   1)   submission to such conduct is made either explicitly or implicitly a term or condition of a person's employment or advancement or of a student's participation in school programs or activities; or

   2)   submission to or rejection of such conduct by an employee or student is used as the basis for decisions affecting the employee or student; or

   3)   such conduct has the purpose or effect of unreasonably interfering with an employee's or student's performance or creating an intimidating, hostile, or offensive work or learning environment.

  B.   Sexual harassment, as set forth in Section II-A, may include, but is not limited to, the following:
       1. verbal harassment or abuse; 2. pressure for sexual activity; 3. repeated remarks with sexual or demeaning implications; 4. unwelcome touching; and 5. sexual jokes, posters, etc. suggesting or demanding sexual involvement, accompanied by implied or explicit threats concerning one's grades, job, etc.

III.   **REPORTING PROCEDURES**

  A.   Any employee who feels he/she has been sexually harassed by another employee(s) or student(s) of the School System should present the complaint directly to the School System Title IX Coordinator (Personnel Director). The complaint should be filed as soon as possible after the incident or the latest occurrence if a series of incidents are involved.

  B.   The complaint should be made to the Title IX Coordinator (Personnel Director) and may be made in person or in writing. If the initial complaint is made in person, the

complainant will then be responsible for preparing a signed, written complaint detailing the events/occurrences giving rise to the sexual harassment charge.

C.    Such complaint of sexual harassment will not reflect upon the complainant's status, nor will it affect future employment, or work assignments.

IV.    INVESTIGATION - HEARING PROCEDURES

A.    The Title IX Coordinator (Personnel Director) or the Superintendent's designee will promptly initiate an investigation of the allegation. Due process shall be accorded to all parties involved in the allegation throughout the investigation. The person(s) accused will be given an opportunity to present a written, signed statement detailing his/her recall of the events/occurrences leading to the sexual harassment complaint against him/her.

B.    When the investigation is completed the person conducting the investigation shall report the findings to the Superintendent. The findings of the investigation shall then be reduced to writing and copies presented to the complainant and the accused employee(s). The Superintendent and investigating officer shall meet with the complainant and accused employee to attempt to resolve the complaint.

C.    If the complaint cannot be resolved as noted above, the Superintendent shall report the matter to the Board. The Board will conduct a hearing in accordance with applicable laws and attempt to resolve the complaint.

D.    If the complaint cannot be resolved by the Board, the complainant may seek redress in an appropriate court.

E.    In all situations, the confidentiality of the complainant and the accused will be respected consistent with the School System's legal obligations and with the necessity to investigate fully any allegations of misconduct and to take corrective action when it is determined that sexual harassment has occurred.

V.    SANCTIONS

A substantiated charge against an employee of the School System shall subject that employee to disciplinary action, up to and including discharge.

VI.    NOTIFICATION

This policy will be placed in the School System policy manual.

SOURCE:                Russell County Board of Education, Phenix City, AL
ADOPTED:
LEGAL REF.:            The Code of Alabama: 16-8-23; Meritor Savings Bank FSB v. Vinson, 477
                      U.S. 57 (1986); Civil Rights Act of 1964, Title VII; EEOC Guidelines. Equal
                      Employment Opportunities Commission (EEOC), Minnesota Department of
                      Education; and Programs for Educational Opportunity (PEO), Univ. of
                      Michigan, Ann Arbor, Michigan;

Page 2 of 2

# *Student Academic Plan*
## *&*
# *Statement of Responsibilities*

2005-2006



# A Handbook for
# School Personnel
# Parents & Students

RUSSELL COUNTY BOARD OF EDUCATION

## STATEMENT OF SEXUAL HARASSMENT POLICY

*Anti-Harassment Policy*

The Russell County Board of Education is committed to maintaining an educational environment free of sexual harassment.  In keeping with this commitment, the Board will not tolerate harassment of employees or students by anyone, including supervisors, teachers, students, vendors, or other customers of the Board.  Sexual harassment violates Title VII of the Civil Rights Act of 1964, as amended, and is unlawful and contrary to Board policy.  Any Board employee or student who engages in sexual harassment violates this policy and the law.

Unwelcome sexual advances, requests for sexual favors and any other physical, verbal, or visual conduct of a sexual nature is sexual harassment when such conduct creates an intimidating, hostile, or offensive educational environment.

Sexual harassment may include, but is not limited to, unwelcome sexual propositions; sexual innuendoes; suggestive remarks; vulgar or sexually explicit comments, gestures, or conduct; obscene or sexually explicit pictures; sexually oriented "kidding," teasing, or practical jokes; and physical contact, such as patting, pinching, or brushing against another's body.  In third-party situations, sexual harassment may also be present if one individual is offended by the sexual interaction, conduct, or communications between others.

All Board employees are responsible for maintaining an educational environment free of sexual harassment and intimidation.  In this role, the responsibilities of all Board supervisors and managers include, but are not limited to, the following:

1.  Assure that students are not required to endure insulting, degrading, or exploitative sexual treatment.
2.  Immediately report any complaints concerning sexual harassment received from students to the principal or appropriate school official.

Any student experiencing or witnessing sexual harassment should immediately notify the school secretary, any teacher, any assistant principal or the principal,

The confidentiality of all harassment complaints is guaranteed.  Personnel violating confidentiality will be disciplined appropriately.  Communications will be made to others only on a limited "need to know" basis. There will be no retaliation against a student for filing complaints of sexual harassment.

Sexual harassment offenses allegedly committed by adults against students will be promptly investigated within 30 days and/or will be reported to appropriate law enforcement officials.

Sexual harassment offenses allegedly committed by students may be classified as minor, intermediate, or major offenses under the provisions of the Code of Student Conduct.  The Student Code of Conduct procedures will be followed in deciding the appropriate discipline for such offenses.

The right of confidentiality, both of the complainant and of the accused, will be respected consistent with the Board's legal obligations, and with the necessity to investigate allegations of misconduct.  All allegations of sexual harassment shall be investigated fully and appropriate corrective or disciplinary action shall be initiated. Appropriate documentation shall be maintained on all allegations of sexual harassment.  A substantial charge against an employee shall subject such person to disciplinary action, including discharge.  A substantiated charge against a student shall subject that student to disciplinary action including suspension or expulsion.

# Exhibit F

# Excerpts from deposition of school board member Elliott

**American Court Reporting**
**toll-free (877) 320-1050**

Page 45

1    superintendent because you failed to

2    report it?

3         A.    No.  I don't remember that at

4    all.

5         Q.    Okay.

6         A.    My memory is that Barbara and

7    I had not discussed this since the night

8    that she spoke with me.

9         Q.    Okay.  When you were an

10   employee of the Board -- now, did you

11   resign when you were elected?  Is that

12   when you --

13        A.    No.  I left two years before I

14   ran for the school board.  I went to work

15   for the county commissioner.

16        Q.    Okay.  Do you recall any

17   training that you had as an employee on

18   reporting of discrimination of any sort?

19        A.    I never received any training.

20        Q.    Do you recall receiving any

21   training on the reporting of a sexual

22   harassment complaint?

23        A.    While I was an employee of the

Page 46

1    district?

2          Q.     Right.

3          A.     No.

4          Q.     You never received any?

5          A.     Not that I remember, no.

6          Q.     Okay.

7                 MR. EDDINS:  That's all I

8    have.

9                 MR. WILLIAMS:  I have just a

10   few questions.

11   EXAMINATION BY MR. WILLIAMS:

12         Q.     Ms. Elliot, my name is Matthew

13   Williams.  I represent Charles Nacrelli.

14   I want to take you back to the August '05

15   conversation you had with Ms. Jeffers

16   where she reported the pool party.

17         A.     Yes.

18         Q.     Is that the only time she's

19   ever reported anything to you concerning

20   Charles Nacrelli?

21         A.     No, sir, it was not the only

22   time.

23         Q.     Tell me about the other

# Exhibit G

# Excerpts from deposition of Assistant Superintendent Baker

## American Court Reporting
## toll-free (877) 320-1050

Page 117

1    it.
2        Q.    Okay.  And you interviewed
3    several people in connection with this
4    investigation; is that correct?
5        A.    Several teachers.  Teachers
6    and one administrator.  Yes.
7        Q.    And who would those people be?
8        A.    Jamie Evans, Brantley Howard,
9    Alison Gentry, Beth Gaskin, Barbara
10   Jeffers, Rose Fowles.  Did I mention
11   Brenda Coley?
12       Q.    Jason Hopper, did you mention
13   him?
14       A.    I didn't mention Jason's name,
15   but I did interview with Jason.
16          MS. WILLIAMS:  How do you say
17   his last name?
18          THE WITNESS:  Hopper,
19   H-O-P-P-E-R.
20       Q.    I have Alison Gentry,
21   Jamie Evans, Beth Gaskin, Brenda Coley,
22   Jason Hopper, Kelly Howard, and Rose
23   Fowles.  Did you interview anybody else?

Page 118

1        A.    No.
2        Q.    You said you interviewed one
3    administrator.  That would be Mr. Hopper?
4        A.    That's Hopper -- so that's two
5    administrators.  Hopper and Coley were --
6        Q.    Right.
7        A.    -- administrators.
8        Q.    Now, Alison Gentry, what does
9    she do?
10       A.    Alison Gentry was a teacher at
11   Ladonia.
12       Q.    Is she still there?
13       A.    Alison is gone.
14       Q.    Do you know where she went?
15       A.    No.
16       Q.    She was a teacher at Ladonia
17   in 2005 and '06 -- 2004-'05 and '05-'06;
18   is that correct?
19       A.    Yes.
20       Q.    Okay.  Now, what did
21   Ms. Gentry tell you that she knew
22   relating to Ms. Jeffers' complaint?
23       A.    Alison Gentry said to me that

Page 119

1    she had observed Mr. Nacrelli making
2    comments that had sexual demeanor.  She
3    had listened to him make remarks
4    regarding people -- women's' breasts.
5        Q.    Who -- now, be as specific as
6    you can.  You just made a statement about
7    women's' breasts.  What did Ms. Gentry
8    say?
9        A.    Ms. Gentry said to me -- is
10   this Ms. Gentry we're talking about,
11   Alison?  I don't remember exactly what
12   Alison said to me.  I do remember her
13   saying to me that she had overheard
14   conversations with him making reference
15   to some of the teachers' breasts at the
16   school.
17       Q.    Okay.  At the school.  And
18   what -- whose breasts was he making
19   reference to?
20       A.    I don't know exactly whose
21   breasts Ms. Gentry mentioned to me.
22       Q.    You don't remember any of the
23   people --

Page 120

1        A.    I don't remember exactly whose
2    breasts she mentioned.  She did mention
3    that he had made sexual remarks regarding
4    women's butts and -- well, teachers'
5    butts she said.  And --
6        Q.    Okay.  What teachers' butts?
7        A.    Well, it seems like she said
8    there was a seemingly crush on Jamie
9    Evans and the fitting of her clothing.
10       Q.    Ms. Gentry indicated that she
11   felt that Mr. Nacrelli had a crush on
12   Jamie Evans?
13       A.    Yes, she did.  She says -- I
14   think -- well, I don't think.  She said
15   that she had observed that from the time
16   that Jamie had been hired.
17       Q.    Okay.  Did Ms. Gentry say
18   anything about Mr. Nacrelli touching her
19   breasts?
20       A.    I don't recall.
21       Q.    Okay.  Rose Fowles, what did
22   she say?
23       A.    Rose Fowles said that -- she

30  (Pages 117 to 120)

# American Court Reporting
## toll-free (877) 320-1050

Page 121

1  had been secretary of Ladonia for a
2  while -- I mean, like -- I think it was
3  like seven years, seven or eight years,
4  and prior to that she was secretary in
5  the district. But she mentioned that
6  Nacrelli had said a lot of sexual things
7  in the office that were very unbecoming
8  to her. She also mentioned that she had
9  gone to a party at Mrs. Whatley's place
10  and that Mr. Nacrelli came there with his
11  wife and that as they were there, he was
12  talking to her, and then he came and sat
13  beside his wife and said that, I can make
14  these go up and down, up and down
15  (indicating) and reached up and got her
16  bra strap and up, down, up down, and say,
17  I can make money with Jerrie, you know,
18  with this kind of act. And then she also
19  said that --
20      Q.   Was that -- I'm sorry. Let me
21  interrupt you just a second. Was that at
22  Ann Whatley's --
23      A.   Ann Whatley's place.

Page 122

1      Q.   Would that be in Lee County?
2      A.   Yes, in Lee County.
3      Q.   Go ahead. I'm sorry.
4      A.   And then she said that she had
5  been at the garbage -- I mean, not the
6  garbage can, but the print -- the copier
7  and said something about -- no. It was
8  at the door. And she mentioned to
9  Mr. Nacrelli she was using the doorstop
10  and said, this is short. And he made
11  sexual remarks like, mine is longer or
12  something like that. And she said that
13  he would always make sexual remarks to --
14  in the office. And they took it in a
15  jokingly manner at first, but it
16  continued; you know, it just never
17  stopped. It just got worse and worse.
18          Another incident, she said she
19  was talking to Jerrie and was going out
20  the door and Jerrie happened to have told
21  her that Chick, which was -- she referred
22  to Chick as Mr. Nacrelli -- did not like
23  tall women, and that somewhat offended

Page 123

1  her because Mr. Nacrelli had said to her
2  earlier when he came back as a principal
3  that I'll marry you -- I like tall women
4  or something like that -- when I divorce
5  my second wife. And so it really
6  embarrassed her when Jerrie made the
7  remarks and made the remarks twice that
8  Chick does not like tall women, so she
9  just went back into her office.
10      Q.   Is Ms. Fowles relatively tall?
11      A.   Yes.
12      Q.   How tall would you say she is?
13      A.   Well, I'm 5 foot 2 and she's
14  taller than me, so she must be about 5
15  feet 6.
16      Q.   Ms. Baker, everybody is above
17  you, aren't they?
18          The acts that Alison Gentry
19  described, if they were proven to be
20  true, would they violate the Russell
21  County Board of Education's policy on
22  sexual harassment?
23      A.   Yes. Because if he did those

Page 124

1  things in a school setting, that's a
2  violation.
3      Q.   The actions Ms. Fowles
4  described, if they are proven to be true,
5  would they violate the Russell County
6  Board of Education's sexual harassment
7  policy?
8      A.   Yes. The connotation of
9  comments that he made.
10      Q.   Now, Kelly Howard, what did
11  she tell you?
12      A.   Kelly Howard said she was in
13  the room with Ms. Jeffers when
14  Mr. Nacrelli came in the day that they
15  had collected the money. And
16  Mr. Nacrelli came in and she said, get
17  it. And the it referred to the money.
18  She also witnessed him picking up
19  Ms. Jeffers. She said she turned her
20  back when he picked her up because, I
21  guess, she didn't want to see what was
22  happening.
23          And then as they left -- they

31 (Pages 121 to 124)

# American Court Reporting
## toll-free (877) 320-1050

Page 125

1 exited the room, Ms. Jeffers went to her
2 and asked her, did you see what happened?
3 And then Ms. Jeffers told her that he
4 picked me up and bit my breast. And then
5 Kelly said on one occasion she had worn a
6 top and it had like handprints or
7 something writing on each area in the
8 breast part and that Mr. Nacrelli came
9 toward her one day with his hands in this
10 motion (indicating) and said to her will
11 my hands fit or something to that effect.
12 And she was offended by that.
13    Q.  Did she indicate that she told
14 Mr. Nacrelli that she was offended?
15    A.  She didn't say to me that she
16 told me she was offended.
17    Q.  Okay.  Jason Hopper, what did
18 he tell you?
19    A.  Okay.  I questioned Jason
20 because --
21    Q.  Let me ask you this first and
22 then we'll get to that.  The conduct that
23 Ms. Howard described, would that -- if

Page 126

1 proven, would that violate the Russell
2 County Board of Education's sexual
3 harassment policy?
4    A.  Yes.  Him making those motions
5 towards her breasts, yes.
6    Q.  Okay.  Mr. Hopper, what did he
7 say?
8    A.  I questioned Hopper because
9 his name came up -- and Alison may have
10 said this -- that they had a dance and
11 that someone had videoed the dance and --
12 Alison may not have said this, but,
13 anyway, one of the teachers said that he
14 had zoomed in on her breasts and also
15 zoomed in on the administrator, his
16 zipper part, his private area, and that
17 Mr. Nacrelli was in his office viewing
18 the video and laughing about what had
19 happened and that one of the teachers was
20 really upset about it.
21    So I went to Mr. Hopper to ask
22 him if he -- if you -- were you aware of
23 what happened to the zooming in on, you

Page 127

1 know, your private area.  And
2 reluctantly, he just acted like it never
3 happened.
4    Q.  What teacher was upset about
5 that?
6    A.  Ms. Alison Gentry was very
7 upset, because he had zoomed in on her
8 breasts.  And I think this was -- this
9 video was in connection with a student
10 council video.  And when that had been
11 shown, then this part came up with the
12 teacher's breast being videoed.  She was
13 offended, so she went to Mr. Nacrelli and
14 asked him not to show that.  She also
15 called Mr. Robertson, who was over the
16 student council and had the video
17 regarding the student council to collect
18 all of those disks that had gone out
19 because she was embarrassed.  And she
20 also told him how embarrassed she was and
21 wanted him to collect those -- the video
22 that had been given out because she did
23 not want that to be seen.

Page 128

1    And he was laughing about what
2 had happened.  So when she got home, she
3 shared that with her husband, and her
4 husband, in dismay, called him and was
5 very upset about it, about what had
6 happened and asked that it not happen
7 again.
8    Q.  Do you know if that video was
9 shown to any students?
10    A.  I think one of the teachers
11 was showing the video, and not knowing it
12 was there when the part of the student
13 council completed, this part came up.
14 And I think that's how Ms. Gentry knew
15 about it.  I think Alison told Ms. Gentry
16 what had happened.
17    Q.  What teacher was showing it?
18 Do you know?
19    A.  Alison.
20    Q.  Okay.  Alison was showing it
21 herself and all of a sudden she saw her
22 breasts on the video?
23    A.  Well, when the part ended with

32  (Pages 125 to 128)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 153

1    A.   I did not investigate with
2  Mr. Nacrelli. I don't know what he
3  admitted to.
4    Q.   Okay. And I'm assuming as far
5  as bizarre things that happened at the
6  party, you don't know anything that you
7  haven't previously told me today?
8    A.   I think I've told you as much
9  as I know about what happened at the
10 party.
11   Q.   Okay.
12   A.   As much as was told to me.
13 Now, I don't know any of it to be true.
14   Q.   Now, do you know if the
15 Russell County Board of Education voted
16 to terminate Mr. Nacrelli's employment?
17   A.   Yes.
18   Q.   Do you know why the Russell
19 county Board of Education voted to
20 terminate his employment?
21   A.   As recommended by the
22 Superintendent.
23   Q.   Pardon me?

Page 154

1    A.   As recommended by the
2  Superintendent.
3    Q.   Okay. And you're the
4  personnel director. Could you tell us
5  why the Superintendent recommended the
6  termination of his employment?
7    A.   It was all of the allegations
8  that were brought upon him, and I'm sure
9  she presented this to the Board of
10 Education. I would find it hard for them
11 not to.
12   Q.   Was there any other reason
13 that you know of that Mr. Nacrelli was
14 noticed for termination of employment
15 other than the allegations of sexual
16 harassment and the allegations from
17 Ms. Jeffers and Ms. Craig?
18   A.   There is nothing in his
19 personnel file that would verify there
20 was something else other than this -- the
21 allegations, the sexual allegations.
22   Q.   As a matter of fact,
23 Mr. Nacrelli had very good evaluations as

Page 155

1  principal, other than this sort of stuff.
2  Didn't he?
3    A.   Yes.
4    Q.   At any time when you were
5  discussing this with Dr. Lee -- this
6  matter before you actually conducted the
7  investigation -- did she at any moment
8  indicate that she feared that this could
9  result in a lawsuit?
10   A.   She had a strong belief that
11 it might go into litigation.
12   Q.   Okay.
13   A.   And she shared that with me.
14   Q.   Did you get any information
15 about this case from Barbara Gunter?
16   A.   Barbara Gunter, no.
17   Q.   Okay. Can you recall anytime
18 that -- since you've been employed with
19 the Russell County Board of Education
20 that the Board conducted sexual
21 harassment training for Board employees?
22   A.   We've had sexual harassment
23 training.

Page 156

1    Q.   Okay. When was that?
2    A.   We had it in '05-'06. And
3  then Dr. Lee gave sexual harassment
4  training as a Superintendent to the
5  administrators.
6    Q.   With the administrators?
7    A.   Uh-huh.
8    Q.   See if you can just identify
9  that document. The training that you
10 said that you had in '05-'06 --
11   A.   Yes, I remember this document.
12   Q.   Well, the training that you
13 referred to in '05-'06, was that
14 conducted by Attorney Smith?
15   A.   I believe Attorney Smith did
16 one in '05-'06 -- it wasn't this school
17 term, so it was last year. '06-'07 she
18 did some training and I believe did some
19 training in '05-'06.
20   Q.   And did Dr. Lee's training,
21 was that for the administrators?
22   A.   Yes. She did one with the
23 administrators.

39 (Pages 153 to 156)

Page 21

1 principals have substantial
2 responsibility in Russell County for
3 operation of their schools?
4        MS. SMITH: Object to the form
5 of the question.
6        Go ahead.
7    A.   Principals have -- a principal
8 is the leader of the school and has
9 responsibilities.
10   Q:   What duties do the principals
11 have?
12   A.   As responsibilities?
13   Q.   Uh-huh.
14   A.   First of all, the principal is
15 the instructional leader of the school.
16 Everything that happens in the school,
17 the principal is over it, curriculum --
18   Q.   Okay. That's instruction.
19   A.   Curriculum, extracurricular,
20 personnel, buses, students.
21   Q.   Students --
22   A.   With the parents.
23   Q.   What if there is a problem at

Page 22

1 the school involving a student? Who
2 would -- who is the proper person for the
3 problem to be reported to at the school?
4    A.   If students have problems --
5 repeat your question.
6    Q.   What if there is a problem
7 involving students? Say two students are
8 fighting.
9    A.   Okay.
10   Q.   Who would that be reported to?
11   A.   Reported to the teacher or any
12 personnel who's close by, in close
13 proximity of the fight. But the student
14 has a responsibility to report it.
15   Q.   Okay. And so who would the
16 teacher report it to?
17   A.   The teacher reports to the
18 principal or the -- to the
19 administration. It could be the
20 assistant principal.
21   Q.   What if there is a problem
22 involving a teacher? Say two teachers
23 were having a -- well, just say one

Page 23

1 teacher accused another teacher at a
2 school of sexual harassment, of
3 improperly touching her or him. Who
4 would that be reported to?
5    A.   Report to the principal.
6    Q.   Okay. Does all -- do all
7 teachers and support people in the school
8 system have a responsibility to report
9 any violation of Board policy that
10 they --
11   A.   Well, they have a privilege to
12 do so.
13   Q.   Do they have a responsibility
14 under --
15   A.   Yes.
16   Q.   -- any of these policies?
17        You would agree that they do
18 have a responsibility.
19        Now, these handbooks, is this
20 the official policy of Russell County
21 Board of Education?
22   A.   That is not the official
23 policy. It should be in accordance with

Page 24

1 the policy.
2    Q.   It's in accordance with
3 official policy?
4    A.   Yes.
5    Q.   Okay. Is there anything in
6 here that you know of that would be
7 adverse to the official policy of the
8 Russell County Board of Education?
9        MS. SMITH: Now, are you
10 referring to the 2007-2008 or --
11   Q.   (BY MR. EDDINS) In any of the
12 handbooks that they get every year, can
13 you ever think of --
14   A.   I have noticed --
15        MS. SMITH: Object to the form
16 of the question.
17        Go ahead.
18   Q.   Okay. You can answer.
19   A.   And we've got to fix it.
20 There was one regarding sexual harassment
21 in that policy that needs to be in
22 compliance with Board policy.
23   Q.   Okay. How is this policy --

6 (Pages 21 to 24)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 25

1  this document that's distributed to the
2  teachers, how is it not in compliance?
3      MS. SMITH: Object to the form
4  of the question, in that you need to
5  designate which book, which year.
6      Q.  Okay.  You just said that you
7  needed to fix something relating to
8  sexual harassment.  Tell me what you need
9  to fix.
10     A.  The section that deals with
11 the reporting.
12     Q.  Okay.  How does that -- how
13 does it need fixing?
14     A.  It needs to be in accordance
15 with the Board policy.
16     Q.  Okay.  And how is it not in
17 accordance?
18     A.  It's different.  I can't give
19 you the exact words, but it's different.
20 And I know it is different because I have
21 observed that.  But...
22     Q.  When did you observe it?
23     A.  It's been a while back.  But

Page 26

1  I've looked at the policy and noticed
2  that there was some differences.
3      Q.  Would you say that a while
4  back would have been a year or three
5  years?
6      A.  No.  It couldn't have been a
7  year.  That just came out recently, I
8  mean, for this school year before?
9      Q.  This one -- wouldn't you agree
10 that this sexual harassment policy in
11 this manual, since you've reviewed them,
12 is different from the year?
13     A.  Before it is not in accordance
14 with the Board policy.
15     Q.  Well, isn't it different from
16 2006-'07?
17     A.  2006 into '07 and '07-'08 read
18 basically the same.
19     Q.  What about 2005?
20     A.  There was a difference.
21     Q.  So you did fix it; right?
22     A.  No.  We haven't fixed it.
23 That's what I said to you earlier.

Page 27

1      Q.  You changed it.  But you
2  didn't fix it?
3      A.  It's not fixed in accordance
4  to Board policy is what I said to you.
5      Q.  Okay.  Let me tell you,
6  yesterday Ms. Smith introduced, on behalf
7  of the Board, certain documents that she
8  represented were taken from the handbook,
9  the school personnel and parents and
10 students handbook for -- this one is
11 marked 2005-2006.  And I'm going to call
12 your attention to page 37 of that
13 document, which relates to sexual
14 harassment.
15     Now, would you just -- I've
16 highlighted some portions.  What does
17 that page -- I believe it's page 37 --
18 how is it titled at the top?
19     A.  The statement of sexual
20 harassment policy.
21     Q.  Now, does that sexual
22 harassment policy relate to parents and
23 students and employees or anybody that's

Page 28

1  on school campus?  You can take a moment
2  to --
3      A.  It relates to including
4  supervisors, teachers, students, vendors,
5  and other customers of the Board.
6      Q.  So it relates to just about
7  anybody that's at the school, doesn't it?
8  Isn't that correct to say?
9      A.  Yes.
10     Q.  Okay.  Just read the part that
11 I've highlighted.
12     A.  All Board employees are
13 responsible for maintaining an
14 educational environment free of sexual
15 harassment and intimidation.  In this
16 role, the responsibilities of all Board
17 supervisors and managers include, but are
18 not limited to, the following:  First,
19 assure that students are not required to
20 endure insulting, degrading, or
21 exploitative sexual treatment.
22     Number two, immediately report
23 any complaints concerning sexual

**www.AmericanCourtReporting.com**
**October 17, 2007**

## American Court Reporting
## toll-free (877) 320-1050

Page 41

1    Q.   So you wouldn't argue that the
2  DHR law would not relate to teachers,
3  would you?
4    A.   I wouldn't argue.
5    Q.   It does relate to adults,
6  doesn't it?
7    MS. SMITH:  Object to the form
8  of the question.  She said she didn't
9  know.
10    Q.   If you know.
11    MS. SMITH:  She's already
12  testified she doesn't know.
13    Q.   (BY MR. EDDINS) Okay.  I'm
14  going to ask you to identify this
15  document that Ms. Smith offered yesterday
16  and represented was the official Board
17  policy on sexual harassment, the one
18  that's not distributed to the teachers.
19  But it is supposedly the official Board
20  policy.
21    MS. SMITH:  I object to your
22  editorial comments in your question.
23    MR. EDDINS:  Okay.

Page 42

1    Q.   Could you just identify that
2  and read it and tell me if it is official
3  Board policy?
4    A.   It says Board policy.
5    (Witness reviews document)
6    Board policy.
7    Q.   Ma'am?
8    A.   Board policy.
9    Q.   Look at the second page to
10  make certain --
11    A.   Okay.
12    (Witness reviews document)
13    Q.   All right.  Would you read the
14  style, the headline on that document?
15    A.   Sexual harassment.
16    Q.   Now, what is the number of the
17  policy?  Doesn't it -- isn't it
18  identified by --
19    A.   File: GAJDBDH.
20    Q.   Could you tell me when that
21  policy was adopted by the Board?
22    A.   It should be on this sheet
23  when it was adopted.  I'm looking for it.

Page 43

1  I'm not sure of the year that this policy
2  was adopted.  I thought it would have had
3  the date here.
4    MR. EDDINS:  Could we find
5  that out somehow, Sydney?
6    THE WITNESS:  I think I may be
7  able to find out.  I'm not sure.
8    MS. SMITH:  We're going to
9  have to go back and go through Board
10  minutes.  I don't know that we can find
11  that out today.
12    THE WITNESS:  I'm not sure.
13    Q.   (BY MR. EDDINS) Do you know
14  definitively has it been changed since
15  2005?
16    A.   This Board policy?
17    Q.   Right.
18    A.   I don't know.  I'll have to
19  check and see.
20    Q.   Okay.  This policy reads in
21  number I-A, it is policy of the Board to
22  maintain a learning and working
23  environment that is free of sexual

Page 44

1  harassment.  No employee of the School
2  Board shall be subjected to sexual
3  harassment.  Is that the official policy
4  of the Board?
5    A.   Yes.  That is Board policy.
6    Q.   In part B, it says it shall be
7  violation of this policy for any employee
8  of the School System to harass another
9  staff member or student through conduct
10  or communications of a sexual nature as
11  defined in Section II below.
12    I'm going to give you some
13  allegations of things that happened to my
14  two clients, and I want you to tell me if
15  under the policy -- under Board policy
16  that would constitute sexual harassment.
17    Would a fellow employee's
18  taking his clothes off and exposing his
19  genitals to a fellow employee constitute
20  sexual harassment under the policy?
21    A.   In what situation?
22    MS. SMITH:  Let me object to
23  the form of the question -- and you go

11  (Pages 41 to 44)

## www.AmericanCourtReporting.com
## October 17, 2007

**American Court Reporting**
**toll-free (877) 320-1050**

Page 129

1   the student council, then this part came
2   up.
3       Q.   So Alison saw her own
4   breasts --
5       A.   No.  Ms. Gentry --
6   Ms. Gentry's breasts were the ones zoomed
7   in on.
8       Q.   Yeah.  But what teacher saw
9   it?
10      A.   Ms. Alison was showing the
11  video, if I remember well --
12      Q.   Ms. Alison --
13      A.   Uh-huh.
14      Q.   -- what's her first name?
15          Ms. Anderson you mean?
16      A.   Alison.  Ms. Gentry was
17  showing the --
18      Q.   Would it have been Ms. Ivana
19  Anderson (phonetic)?  How do you spell
20  her last name?
21      A.   A-L-I-S-O-N.
22      Q.   Okay.
23      A.   But, anyway, let me get back.

Page 130

1   When Ms. Gentry heard about it, that's
2   when she became upset and just wanted all
3   of them to be collected because it was
4   embarrassing to her.
5       Q.   How old is Ms. Gentry?  Do you
6   know?
7       A.   She's not anywhere near as old
8   as I name.  She may be -- I believe she's
9   in her late 40s -- in her 40s.
10      Q.   Okay.  Brenda Coley, what did
11  she tell you?
12      A.   Brenda Coley said that she
13  went to a party that was given for her
14  because she had been moved up to
15  principal at Oliver.  And it was at
16  Mr. Nacrelli's home in Opelika, and it
17  was a pool party.  And she said that her
18  husband had gone to the party with her
19  and had -- and she had called Ms. Jeffers
20  and encouraged Ms. Jeffers to go, and
21  Ms. Jeffers really did not have any
22  intention to go to the party.  But she
23  did tell her, I'll go because of you and

Page 131

1   only you.  And when she got to the
2   party --
3       Q.   And why did Ms. Jeffers not
4   have any intention of going?
5       A.   I don't know.
6       Q.   She didn't relay that?
7       A.   No.  And I didn't ask her.
8       Q.   Okay.  I'm sorry.  Go ahead.
9       A.   Ms. Coley -- her husband did
10  go with her to the party, and it was a
11  pool party.  And to her surprise -- well,
12  let me just back up now.  I understand
13  that Mr. Nacrelli was like bear-hugging
14  people as they came in.  And this could
15  have been his way of greeting them.  And
16  when Brenda got there, he came up -- he
17  bear-hugged her, picked her up, and
18  kissed her in the mouth.  That's what she
19  said.
20          And she was so disgusted --
21  she was really upset as to whether or not
22  my husband saw what had happened, and she
23  was just dumbfounded and scared.  You

Page 132

1   know, she said that to me.  And I said,
2   huh.  And she went on, and I think she
3   told one of the other teachers that was
4   there what had happened and asked her --
5       Q.   Who was that?
6       A.   I believe she told Ms. Gentry
7   what had happened.  And she was really
8   upset about it.  And she wanted to know
9   where was her husband at that time.  But,
10  anyway, he was somewhere else and did not
11  see what happened.  But she got ready to
12  go immediately.  After that happened she
13  was ready to go -- she was ready to leave
14  the party.
15      Q.   Did she tell you anything
16  about a conversation -- a phone
17  conversation she had later that evening
18  with Ms. Jeffers?
19      A.   She said Ms. Jeffers -- she
20  had spoken with Ms. Jeffers.
21      Q.   And what did Ms. Jeffers --
22  what was the gist of that conversation?
23      A.   Ms. Jeffers told her, I

33  (Pages 129 to 132)

**www.AmericanCourtReporting.com**
**October 17, 2007**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 133

1  believe, that, you missed it; that you
2  missed it; that Mr. Nacrelli stripped to
3  the nude. And she was -- Ms. Jeffers
4  seemingly was upset, she said, in her
5  voice. And she talked with her about
6  what happened.
7      Q.   Now, if -- if the conduct
8  Ms. Coley described as bear-hug and kiss
9  is proven to be true, would that be a
10  violation with the Russell County Board
11  of Education sexual harassment --
12      A.   Now, if that had happened on
13  school property, yeah, that would have
14  been a violation. But from what I knew,
15  this was not on school property.
16      Q.   Well, was it a school event?
17  I guess --
18      A.   This was not a school event.
19      Q.   Okay. I guess we could argue
20  about that. But do you know how
21  Mr. Nacrelli was dressed when he
22  bear-hugged her and kissed her?
23      A.   He had on his swim trunks.

Page 134

1      Q.   Did he have on a top?
2      A.   She didn't say he had on one,
3  but I remember Ms. Jeffers saying that he
4  was wearing just his bottom.
5      Q.   Okay. Beth Gaskin, what did
6  she tell you?
7      A.   Beth said that Jamie had
8  asked -- they were at the party. Jamie
9  had asked her to go into the house
10  because she needed to use the bathroom.
11  So she went inside with Jamie and waited
12  in the living room while Jamie used the
13  bathroom. When Jamie came out of the
14  bathroom, Mr. Nacrelli, apparently,
15  pulled her into another room and was
16  trying to pull down her bottoms, the
17  bottom part of her swimsuit. Of course,
18  he got it down far enough to expose her
19  backside of it.
20      And Jamie was trying to get to
21  Beth in order to get out of the house.
22  And finally Beth -- she got Beth's hand,
23  and Beth led her out of the house. She

Page 135

1  ran to the truck and wanted to know where
2  her husband was, and, of course, he was
3  somewhere else. She didn't see him right
4  then. But immediately after then she
5  left the party, and she told her husband
6  what had happened as they left the party
7  to go home.
8      Q.   Can you think of anything else
9  that Ms. Gaskin relayed to you?
10      A.   No more than saying that --
11  this is to the best of my remembrance and
12  my knowledge as to what happened -- oh,
13  yes, I do. She just said that she
14  thought that Mr. Nacrelli had had too
15  many drinks.
16      Q.   Okay. Now, could you
17  describe where Mr. Nacrelli allegedly
18  tried to pull off Ms. Evans' swimsuit?
19      A.   Describe where they were? Is
20  that what you're asking me? They were
21  inside his house.
22      Q.   Where was Jamie Evans? Was
23  she in the bathroom and come out --

Page 136

1      A.   She came out of the bathroom.
2  And then -- Jamie said he shoved her
3  against the wall into the den area. Beth
4  said that he just pushed her into another
5  room. I guess this was in the same
6  room.
7      Q.   Couldn't the den have been
8  another room?
9      A.   I said another room.
10      Q.   Okay. Did Ms. Gaskin say
11  anything about witnessing Mr. Nacrelli
12  grabbing Mr. Hopper's crotch or anything
13  like that?
14      A.   She didn't say that to me.
15      Q.   Okay. Jamie Evans, now, what
16  did she tell you?
17      A.   Jamie Evans said she attended
18  the party also in support of Mrs. Coley,
19  and she related the incident of her going
20  into the bathroom and Mr. Nacrelli
21  shoving her to the wall, which was the
22  den, and said he was trying to -- he did
23  pull her top down and then pull her
23  bottom down. Jamie had also said to me

34  (Pages 133 to 136)

**www.AmericanCourtReporting.com**
**October 17, 2007**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 137

1  that he would make remarks regarding her
2  -- about the flattery in her clothing
3  that she would wear and her big butt.
4  And then I need to go back because --
5  well, I don't need to go back there, but
6  I want to say it, though.
7       Ms. Brantley reported that at
8  the time that he -- at the time that the
9  incident happened --
10       (Brief interruption)
11       MS. SMITH:  Okay.  Start over
12  with Ms. Brantley.
13       A.   Okay.
14       Ms. Brantley reported also
15  that at the time of the incident that her
16  dog was pregnant and she was also
17  pregnant and said that somehow he made
18  some remark about, your husband is very
19  busy or has been busy or something like
20  that.  And she says, well, I paid two
21  hundred dollars for the stud, and says,
22  well -- Mr. Nacrelli made the remark,
23  well, you know -- I could make some

Page 138

1  money; I'm good for two days.
2       Q.   Where was that remark made, at
3  the school?
4       A.   I'm good for two days and I
5  could work two days and, like, be off
6  some days.
7       Q.   You said Ms. Brantley.  Now --
8       A.   Yes.
9       Q.   -- is Ms. Brantley and
10  Ms. Evans, are they the same person?
11       A.   No.
12       MS. JEFFERS:  Brantley Howard.
13       A.   Brantley Howard.
14       Q.   Oh, Brantley Howard.  I'm
15  sorry.
16       A.   Now, back to Jamie.  Jamie
17  attended the party.
18       MR. WILLIAMS:  I'm sorry.  Is
19  Brantley the same as Kelly; is that
20  right?
21       MS. SMITH:  Yes.
22       THE WITNESS:  Yes, that's
23  right.

Page 139

1       MS. SMITH:  Brantley was her
2  maiden name.
3       MR. WILLIAMS:  Okay.
4       MS. SMITH:  Howard is her
5  married name.
6       A.   Jamie said she attended the
7  party also, but she also said that
8  Mr. Nacrelli had made remarks regarding
9  her big butt and that she had been
10  pregnant twice and he had made some
11  sexual comment regarding that.  But
12  basically --
13       Q.   What sexual comment do you
14  remember?
15       A.   That her butt would get bigger
16  or something like that because of the
17  pregnancy.
18       Q.   Were those comments made at
19  school?
20       A.   Yes.  And then she went on to
21  say that as she asked Beth to go -- Beth
22  Gaskin to go inside the house to use the
23  bathroom, Beth waited in the living room

Page 140

1  until she went into the bathroom.  And
2  when she came out, he grabbed her, pushed
3  her against the wall, and went into the
4  den.  And that's when he pursued to pull
5  down her top and her bottom -- and the
6  bottom part of her swimsuit.  She was
7  trying to get to Beth so that she could
8  get away from him, and finally she did.
9  And then she ran to the truck, and her
10  husband was not there.  And she was
11  hoping, also, that her husband did not
12  see what was happening.  But she left
13  immediately after that happened.  And she
14  says, I never want to be at another party
15  with him; I haven't been and I won't be.
16  And on her way home she shared with her
17  husband what had happened.
18       Q.   Did she share with you what
19  her husband said?
20       A.   He was upset.  She didn't
21  share with me all the things he said, but
22  she said, he was really upset, Ms. Baker.
23       Q.   Did -- Ms. Evans, did she say

35  (Pages 137 to 140)

## American Court Reporting
## toll-free (877) 320-1050

Page 157

1    Q.    In the '06-07 was that for
2    all --
3    A.    Everybody.
4    Q.    -- school employees?
5    A.    All of the employees.  It was
6    mandatory.
7    Q.    Would that be the cover sheet
8    for that training in '06-'07?
9    A.    Yes.
10    Q.    Okay.
11        MR. EDDINS:  Let's mark it as
12    Plaintiffs' Exhibit 6.  And I'll move the
13    admission of it.
14        (WHEREUPON, a document was
15    marked as Plaintiff's Exhibit Number 6
16    and is attached to the original
17    transcript.)
18        MS. SMITH:  No objection.
19        MR. WILLIAMS:  No objection.
20    What is that?
21        MR. EDDINS:  I'm sorry.  Show
22    him that.
23    Q.    (BY MR. EDDINS)  Do you know

Page 158

1    if when you did that -- Dr. Lee did that
2    training in '05-'06, was Mr. Nacrelli
3    present?
4    A.    I believe Mr. Nacrelli was
5    present, because I think it may have come
6    early during the school year.  I believe
7    he was present.
8    Q.    Did y'all go over the School
9    System's policies relating to sexual
10    harassment?  Do you recall?
11    A.    Excuse me?
12    Q.    Did you go over the School
13    System's policies relating to --
14    A.    Did Dr. Lee go over the School
15    System's policy?
16    Q.    Was this policy on -- what we
17    marked as Exhibit 3, the Russell County
18    Board Policy Number GAD -- I'm sorry --
19    GAJDBH, was that in effect when y'all had
20    the training?
21    A.    This was -- is this '05-'06?
22    Q.    Uh-huh.
23    A.    Yes.

Page 159

1    Q.    And y'all went over that
2    policy?
3    A.    I can't remember if she went
4    over the policy in its entirety, but I
5    know that she mentioned we had a policy
6    in place.
7    Q.    Okay.
8    A.    And what she expected of us
9    regarding the policy.
10    Q.    A couple of questions in the
11    last couple of days of my clients,
12    Mr. Williams asked
13    Ms. Jeffers if the first time she and her
14    boyfriend went out on a date if
15    Ms. Jeffers asked him or if he asked
16    Ms. Jeffers.  And yesterday Ms. Smith
17    asked Ms. Craig how she got into this
18    suit; apparently, with the implication
19    that it was -- she was piggybacking on
20    Ms. Jeffers lawsuit as if this were a
21    made up lawsuit, even though all of these
22    things have happened.
23        My question is this:  Does the

Page 160

1    Russell County Board of Education take
2    sexual harassment seriously?
3    A.    Yes.  If it's within the
4    district, we do.  If it's something that
5    happens within the school district, we
6    do.
7    Q.    And the Board doesn't take
8    that tired old position to blame the
9    victim; is that correct?
10    A.    The Board --
11        MR. WILLIAMS:  I'm going to
12    object to the form of the question.
13        But you can answer.
14    Q.    (BY MR. EDDINS)  The Board
15    doesn't take the tired old tradition that
16    they used to do fifty years ago when you
17    blame the victim and say, did you ask
18    so-and-so out on a date, that sort of
19    thing?
20    A.    I don't think that's the Board
21    policy, what happens outside of the
22    school district.  If you asked me for a
23    date outside the school setting, it

40  (Pages 157 to 160)

## www.AmericanCourtReporting.com
## October 17, 2007

**American Court Reporting**
**toll-free (877) 320-1050**

Page 161

1  should not involve -- it shouldn't be
2  part of the Board. That's -- those are
3  individuals who are grown.
4      Q.   Right. Okay. During the
5  course of the investigation, did you
6  uncover any evidence whatsoever that
7  would lead a reasonable person to believe
8  that Ms. Jeffers prompted or coerced or
9  consented to the treatment that she
10 received from Mr. Nacrelli of a sexual
11 nature?
12     A.   Do I -- did I receive any
13 information --
14     Q.   Right.
15     A.   -- that would make me think
16 Ms. Jeffers consented to Mr. Nacrelli's
17 actions toward her?
18     Q.   Consented or did anything to
19 cause him to do it.
20     A.   I don't know what Ms. Jeffers
21 and Mr. Nacrelli did, because I was not
22 at Ladonia and I did not ask them what
23 happened. From all indications, she was

Page 162

1  not the only person that he did sexual
2  things to or said sexual things to. So I
3  can't say she prompted him because there
4  was so many others involved.
5      Q.   But my question was, did you
6  uncover any evidence --
7      A.   No.
8      Q.   Okay. Did you uncover any
9  evidence that would indicate that what
10 Mr. Nacrelli did to Ms. Craig was
11 consensual?
12     A.   I don't know what he did to
13 Ms. Craig. I never was -- that was
14 never shared with me.
15     Q.   Okay. Then the answer would
16 be no; is that right?
17     A.   No.
18     Q.   Okay. If you have any
19 evidence whatsoever of any shape or
20 fashion that would indicate that
21 Ms. Jeffers or Ms. Craig consented to the
22 conduct that you described today that you
23 uncovered in your investigation, I want

Page 163

1  you to tell me now what it is.
2      A.   I don't know anything about
3  Ms. Craig. Okay. I can only speak on
4  the part of Ms. Jeffers. You can ask
5  your question again.
6      Q.   Okay. Do you have any
7  evidence whatsoever that she did anything
8  to prompt Mr. Nacrelli to do --
9      A.   No.
10     Q.   -- this or on her part that it
11 was consensual? I just want you to tell
12 me.
13     A.   There was nothing that made me
14 think she did anything that prompted him
15 to do what he did.
16     Q.   The entire investigation, you
17 didn't recover anything to --
18     A.   No, not on the part of
19 Ms. Jeffers.
20     Q.   Okay.
21          MR. EDDINS: Give me just a
22 minute.
23          1:30 PM

Page 164

1          (Short recess)
2          1:31 PM
3          MR. EDDINS: We don't have any
4  more questions.
5          MR. WILLIAMS: I've got a few
6  questions.
7  EXAMINATION BY MR. WILLIAMS:
8      Q.   Ms. Baker, my name is Matthew
9  Williams. I represent Charles Nacrelli.
10 I have a few questions for you.
11          You had testified earlier
12 concerning the people that you had
13 interviewed as a result of being directed
14 by Dr. Lee to investigate the complaint
15 from Ms. Jeffers. Did Jamie Evans ever
16 make a formal EEOC complaint --
17     A.   No.
18     Q.   -- concerning Mr. Nacrelli?
19     A.   No. None of those people made
20 any complaints until Ms. Jeffers came to
21 see Dr. Lee. This is the first time that
22 the complaint has ever surfaced.
23     Q.   Did Jamie Evans ever make any

41 (Pages 161 to 164)

**www.AmericanCourtReporting.com**
**October 17, 2007**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 141

1  anything about Mr. Nacrelli chasing her
2  around outside the house and trying to
3  catch her?
4      A.   She didn't tell me that.
5      Q.   Okay.  What type of bathing
6  suit did Ms. Evans say that he was
7  wearing that night?
8      A.   Apparently it was a two-piece,
9  because she said he pulled her top down
0  and then he pulled her bottom down.  So
1  I'm assuming it was a two-piece.  I don't
2  know.  I wasn't there.
3      Q.   Did she indicate to you that
4  her breasts were exposed when he pulled
5  down the top?
6      A.   She didn't say her breasts
7  were exposed.  But common sense told me
8  her breasts would have been exposed if he
9  pulled her top down.
0      Q.   Okay.
1          MR. EDDINS:  Sydney, I've got
2  several more questions.  Can we just take
3  a lunch break?  I mean, is that all right

Page 142

1  with everybody?  It's ten to twelve.
2          MS. SMITH:  Uh-huh.  What time
3  do you want to be back?
4          MR. EDDINS:  One o'clock.
5          MS. SMITH:  Okay.
6              11:50 AM
7          (Lunch recess)
8              1:10 PM
9          MR. EDDINS:  We'll go back on
0  the record.
1      Q.   (BY MR. EDDINS) Ms. Baker,
2  let me clarify one thing earlier.  You
3  testified that you've only met one time
4  that you can recall with Ms. Craig; is
5  that correct?
6      A.   I met one time with Ms. Craig
7  regarding a student.
8      Q.   Can you recall any other
9  meetings you've had with her?
0      A.   No.
1      Q.   Now, when was that meeting?
2      A.   It was in '05.
3      Q.   '05.  Did you have a meeting

Page 143

1  earlier this year at the beginning of
2  school with her about the very same
3  student?
4      A.   About the same student?
5      Q.   Yeah.
6      A.   This school year?
7      Q.   Right.
8      A.   About the same student, no.
9      Q.   Okay.  What about last August?
10  Did you have a meeting with her -- a
11  second meeting about the very same
12  student?
13      A.   In '06-07?
14      Q.   Yeah.
15      A.   I can't remember having had
16  one with her in '06-07.
17          MS. SMITH:  Don, right at the
18  close she -- right after we broke, she
19  indicated she had remembered some stuff
20  that one of them had told her.  I don't
21  know which one.  What did --
22          THE WITNESS:  Regarding what?
23          MS. SMITH:  Interviews with

Page 144

1  the people.
2          THE WITNESS:  With the
3  teachers?
4          MS. SMITH:  Yes, ma'am.  You
5  said that you had remembered something.
6          THE WITNESS:  I remember
7  that an incident came up --
8          MS. SMITH:  Well, maybe he'll
9  get to it.  It's not anything that these
10  people have told you during the
11  investigation?
12          THE WITNESS:  It's something
13  that one told me, yes.  Ms. Jeffers told
14  me about an incident.
15          MS. SMITH:  Okay.  I don't
16  think he's gotten to any of Ms. Jeffers.
17      Q.   Okay.  If you could just start
18  and tell me when you did talk with
19  Ms. Jeffers -- we talked some about what
20  she had told you.  Are there other things
21  that she --
22      A.   Yeah.  She told me an incident
23  that a child had brought a picture to

36 (Pages 141 to 144)

**www.AmericanCourtReporting.com**
**October 17, 2007**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 165

1  complaint about sexual harassment against
2  her --
3      A.  Not to me.
4      Q.  -- by Charles Nacrelli?
5      A.  Not to me.
6      Q.  Are you aware of any
7  complaints she's made to the School
8  Board?
9      A.  No.
10     Q.  What about Alison Gentry?  Has
11 she made any complaints to you or to the
12 School Board about sexual harassment --
13     A.  Not until this came up.
14     Q.  -- against her by Charles
15 Nacrelli?
16     A.  No.
17     Q.  Rose Fowles, has she made any
18 complaint to you or to the School Board
19 about any sexual harassment against her
20 by Charles Nacrelli?
21     A.  No.
22     Q.  Brenda Coley, has she made any
23 allegations or report to you about sexual

Page 166

1  harassment against her by Charles
2  Nacrelli to either you or to the Board?
3      A.  No.
4      Q.  What about Jason Hopper?
5      A.  No.
6      Q.  Beth Gaskin?
7      A.  No.
8      Q.  Kelly Howard?
9      A.  No.
10     Q.  Did any of these people we
11 just went through, did they come to you
12 as a part of the investigation, or did
13 you go to them?
14     A.  I went to them.
15     Q.  And the first time you heard
16 anything about the -- from them about
17 Charles Nacrelli was when you
18 affirmatively contacted them; correct?
19     A.  Yes.
20     Q.  Now, you gave a lot of
21 testimony about what each of these
22 individuals told you during the course of
23 your investigation.  Do you have any

Page 167

1  personal knowledge concerning any of
2  those allegations?
3      A.  The only personal knowledge I
4  have is knowledge they shared with me.
5      Q.  You were not a witness to any
6  of the allegations that these people told
7  you about concerning Charles Nacrelli --
8      A.  No.
9      Q.  -- correct?
10     A.  No.
11     Q.  All right.  You did not
12 overhear any of the comments attributed
13 to Mr. Nacrelli by any of the witnesses?
14     A.  Never heard before until I
15 started the investigation.
16     Q.  You didn't go to the pool
17 party; correct?
18     A.  No.  I didn't know about the
19 pool party.  I'm glad I didn't.
20     Q.  You were asked some questions
21 about conduct that's been attributed to
22 Mr. Nacrelli and whether you thought it
23 violated the policy of sexual harassment

Page 168

1  by the School Board.
2      A.  The things that happened at
3  the school violated school policy --
4      Q.  Right.
5      A.  -- but these things that
6  happened at the pool, the School Board
7  was not involved in that, and we had
8  nothing to do with that.
9      Q.  I understand your position on
10 that.
11         Let me ask you this:  If an
12 employee tells another employee the
13 following joke, would you consider it to
14 be a violation of the county's policy on
15 sexual harassment?  And the joke goes
16 like this:  Have you seen my mouse tatoo?
17 And the person says --
18         MR. EDDINS:  Object to the
19 form.
20     Q.  -- no, I haven't seen your
21 mouse tatoo.  The person telling the joke
22 pulls down their pants and shows their
23 rear end and says, my pussy ate it.

**42** (Pages 165 to 168)

# Exhibit H

# Affidavit of counselor Chaparro

COUNTY OF RUSSELL      )
STATE OF ALABAMA       )

## AFFIDAVIT OF NURIA CHAPARRO

**BE IT ACKNOWLEDGED**, that the undersigned deponent, being the age of majority

and of sound mind, does hereby depose and say under oath as follows:

1. My name is Nuria Chaparro and I am a resident of Phenix City in Russell County,

Alabama.

2. For the past ten years I have been employed by the Russell County Board of Education

as a school counselor, seven years working half-days at Ladonia Elementary School.

3. I am aware that the principal, Charles Nacrelli, frequently made comments about

teachers' anatomy and made off-color sexual statements during the four years he was principal.

However, his comments were made more jokingly in the early years, but comments got more off-

color around the spring of 2005. He had lost a lot of weight about that time and his conduct

seemed to get worse.

4. His comments were of general knowledge at the school. I am aware that the assistant

principal, Brenda Coley, had full knowledge of the comments in the spring of 2005. This was

prior to the incident at the school pool party at his home.

5. Ms. Jeffers told me that she called Ms. Coley the night of the pool party and reported

that incident the night it happened. She also called Russell County Board of Education member

Dillie Elliott and reported it a few days after the incident.

6. There was general knowledge before the party that the party was for the purpose of

recognizing the fact that Ms. Coley had been promoted to principal. I have knowledge that the party was planned at Ladonia Elementary School.

7. I accompanied Barbara Jeffers to a meeting in September with Superintendent Lee in which Ms. Jeffers again reported the harassment. I remember Dr. Lee telling her that she didn't understand how you could go back to work there everyday.

I make this Affidavit under oath, on personal knowledge and of my own free will. And I affirm that the foregoing is true to the best of my knowledge.

Witness my hand under the penalties of perjury this ___7___ day of __January__, 2008.

*Affiant*

_Nuria Chaparro_
**Nuria Chaparro**

COUNTY OF LEE          )
STATE OF ALABAMA       )

**Sworn and subscribed** before me this ___7th___ day of __January__, 2008.

Notary Public
My Commission Expires ___7/24/08___

# Exhibit I

# Documents dealing with employment termination of Nacrelli



POST OFFICE BOX 400
PHENIX CITY, ALABAMA 36868-0400
TELEPHONE: (334)298-8791   FAX: (334)448-8825

Dillie Elliott
Alphonso Johnson
Charles Johnson
Keith Mitchell

Dr. Rebecca S. Lee, Superintendent

**Date:**   September 23, 2005

**To:**   Mr. Charles Nacrelli
Principal, Ladonia Elementary

**From:**   Dr. Becky Lee
Superintendent, RCSD

**Re:**   Paid Administrative Leave pending Investigation of Allegations

**Cc:**   Personnel File

This letter is to officially inform you that you are placed on indefinite paid administrative leave pending the outcome of allegations made against you by members of your staff at Ladonia Elementary.  These allegations relate to sexual harassment.

As superintendent, I am obligated to investigate any charges that are brought against you by staff members.  You will be informed of the results of the investigation at the earliest date. While on administrative leave, you should not have contact with the staff at Ladonia, with the exception of Ms. Jacqueline Grant.

*An Equal Opportunity Institution*
*Safe Schools Hotline (888) 728-5437*
*All Schools Accredited by the Southern Association of Colleges and Schools*

Nacrelli/Jeffers
Nacrelli00052







# RUSSELL COUNTY BOARD OF EDUCATION

506-14TH STREET
POST OFFICE BOX 400
PHENIX CITY, ALABAMA 36868-0400
TELEPHONE: (334)298-8791   FAX: (334)448-8825

*Rufus Gordon, President*
*Joseph Williams, Vice-President*
*Kenneth Barnes*
*Dillie Elliott*
*Alphonso Johnson*
*Charles Johnson*
*Keith Mitchell*

Dr. Rebecca S. Lee, Superintendent

## Notice to Board & Employee

TO:   Russell County Board of Education

Mr. Charles Nacrelli
1402 Douglas Street
Opelika, AL 36801

You are hereby given notice of my intention to recommend cancellation of the employment contract of Charles Nacrelli as provided in *Ala. Code § 16-24-8*, et seq., as amended.  The reasons for the proposed cancellation are as follows: insubordination, immorality and other good and just cause.

The facts showing that the termination is taken for one or more of the reasons listed in *Ala. Code § 16-24-8* are as follows:

1. You have failed to follow the Policies of the Russell County Board of Education relating to your actions as a school administrator, specifically as principal of Ladonia Elementary School, and your interactions with your fellow employees and subordinates.

2. You have failed to follow the laws of the state of Alabama and of the United States relating to treatment of one employee by another employee

3. Your actions have affected the work environment for certain employees of the Russell County Board of Education.

4. Your actions have presumably violated the constitutional rights of certain employees of the Russell County Board of Education.

A Board meeting on the proposed contract cancellation shall be held in the Board meeting room of the Russell County Board of Education located at Russell County High School, 4699 Old Seale Highway, Seale, Alabama, 36875, on the 15th day of November, 2005, at 5:30 P.M. [no less than 20 nor more than 30 days after receipt by the employee of this notice.]  The purpose of the meeting is to give Charles Nacrelli the opportunity to have a conference with the Board regarding this recommendation.  In order to request a

*An Equal Opportunity Institution*
*Safe Schools Hotline (888) 728-5437*
*All Schools Accredited by the Southern Association of Colleges and Schools*

conference with the Board, Charles Nacrelli must file a written request with me within 15 days after receipt of this notice. At such conference, which shall be public or private at the discretion of Mr. Nacrelli, Mr. Nacrelli or his representative shall have the opportunity to speak to the Board on matters relevant to such cancellation. The employee has a right to counsel and to have a court reporter record his statement, both at the expense of Mr. Nacrelli. Thereafter, the Board shall determine whether such cancellation shall be effectuated.

Regardless of whether Mr. Nacrelli elects to have a conference, if the Board votes to cancel the contract of Mr. Nacrelli, he will be provided notice of such action and of his right to contest the Board's decision by filing with me a written notice of contest of the action within 15 days after receipt of the decision of the Board. If the contest is not timely taken, the Board's decision shall be final. In the event a notice of contest is filed, it will be heard as provided in *Ala. Code* § 16-24-10, et seq.

This the 17th day of October, 2005.

Rebecca S. Lee
Superintendent



# RUSSELL COUNTY BOARD OF EDUCATION
### 506-14TH STREET
### POST OFFICE BOX 400
### PHENIX CITY, ALABAMA 36868-0400
### TELEPHONE: (334)298-8791   FAX: (334)448-8825

*Rufus Jordan, President*
*Joseph Williams, Vice-President*
*Kenneth Barnes*
*Dillis Elliott*
*Alphonso Johnson*
*Charles Johnson*
*Keith Mitchell*

Dr. Rebecca S. Lee, Superintendent

November 18, 2005

Mr. Charles M. Nacrelli                CERTIFIED 7003-3110-0002-7018-1686
1402 Douglas Street                      RETURN RECEIPT REQUESTED
Opelika, Alabama 36801

Dear Mr. Nacrelli:

You are hereby given notice of the action of the Russell County Board of Education
upholding my recommendation to cancel your employment contract and to determine that
such cancellation shall be effectuated.  You are further informed that you have the right
to contest the board's decision by filing with me a written notice of contest within 15
days of receipt of this notice.  If you do not file the contest within the 15 days, the
board's decision shall be final.

In the event a notice of contest is filed, an arbiter shall be selected as provided in *Ala.
Code §16-24-20(b)* and the contest shall be heard as provided in *Ala. Code §16-24-10.*

*Dr. Rebecca S. Lee*

Dr. Rebecca S. Lee
Superintendent

Russell County Board of Education

Cc:

*An Equal Opportunity Institution*
*Safe Schools Hotline (888) 728-5437*
*All Schools Accredited by the Southern Association of Colleges and Schools*

Nacrelli/Jeffers
Nacrelli00057

# Exhibit J

# EEOC file documents



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Birmingham District Office**

Ridge Park Place
1130 22nd Street, Suite 2000
Birmingham, AL 35205
(205) 212-2100
TTY (205) 212-2112
FAX (205) 212-2105

Our Reference:
Charge No. 130-2006-01374

Barbara M. Jeffers
C/O W. Don Eddins, Attorney at Law
337 E. Magnolia Ave., Suite 3
Auburn, AL 36830

Dear Ms. Jeffers:

As indicated by the Dismissal and Notice of Rights which accompanies this letter, the referenced charge of discrimination has been dismissed by this agency because the facts you have presented in support of the charge, all of which have been accepted as true, do not describe a violation of the law sufficient to warrant further Commission investigation or involvement.

In order to sustain a claim of sexual harassment or a sexually hostile environment, there must be a showing that the Respondent knew of the harassment and failed or refused to act. By your own admission, the alleged harassment continued for approximately four years, yet you did not report it. When you did report it, the Respondent immediately investigated and fired the offending employee. His appeal of his discharge is irrelevant in considering the validity of your claim.

In *Faragher v. City of Boca Raton, 524 U.S. 775*, the U.S. Supreme Court held that if, upon learning of sexual harassment or a sexually hostile environment, the employer takes prompt and appropriate remedial action, then it has no liability. The facts you have presented appear to fit the *Faragher* decision.

At this time, therefore, the Commission will exercise its statutory and procedural authority to determine jurisdiction and the scope or extent of its investigations. This authority is described in the Commission's Procedural Regulations at 29 CFR 1601.18(a) which states:

> *Where a charge on its face, or as amplified by the statements of the person claiming to be aggrieved discloses, or where after investigation the Commission determines that the charge and every portion thereof is not timely filed, or otherwise fails to state a claim under Title VII or the ADA (Americans with Disabilities Act), the Commission shall dismiss the charge.*

The Commission's Dismissal and Notice of Rights is enclosed. The notice provides you with the opportunity to pursue your claim against the employer named in the charge in Federal court if you disagree with the Commission's interpretation of the facts or the applicable law. Should you decide to pursue the claim, you must do so within 90 days from the date you receive the Dismissal and Notice of Rights.

Sincerely,

12/29/05
Date

Allen Gosa
Enforcement Supervisor

Received
1/3/06
WDE

**BEFORE THE U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
BIRMINGHAM REGIONAL OFFICE**

BARBARA M. JEFFERS, CHARGING PARTY
EEOC Charge NO. 130-2006-01374

**MOTION TO RECONSIDER DISMISSAL OF CHARGE**

COMES NOW Barbara M. Jeffers, Charging Party, through counsel, and makes this Motion To Reconsider and states as follows:

1. Barbara M. Jeffers, a school counselor with the Russell County (AL) Board of Education, filed a timely Charge of Discrimination which was received by the Birmingham regional office of the United States Equal Employment Opportunity Commission on December 23, 2005, complaining of Title VII Sexual Harassment.

2. Just six days later, December 29, 2005, the EEOC issued a "Dismissal and Notice of Rights" for the charge indicating: "The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC." (The Charge of Discrimination had the "Sex" box checked in the "Cause" column with a notation that "This is a sexual harassment complaint." Particulars were explained in an "Exhibit A.")

3. In an accompanying letter, Allen Gosa, Enforcement Supervisor, explained: "In order to sustain a claim of sexual harassment or a sexually hostile environment, there must be a showing that the Respondent knew of the harassment and failed or refused to act. By your own admission, the alleged harassment continued for approximately four years, yet you did not report it. When you did report it, the Respondent immediately investigated and fired the offending employee. His appeal of his discharge is irrelevant in considering the validity of your claim."

1

4. The decision to dismiss the Charge is contrary to prevailing authority of Title VII Sexual Harassment law. While the action will not prevent Ms. Jeffers from seeking appropriate relief through the U.S. District Court, it could prejudice her case before the Court and should be corrected.

5. The cover letter cites *Faragher v. City of Boca Raton*, 524 U.S. 775 (U.S. 1998) stating that if "the employer takes prompt and appropriate remedial action, then it has no liability." The letter added, "The facts you have presented appear to fit the *Faragher* decision."

6. Apparently, the letter is an attempt to cite what is known as the "Faragher-Ellerth defense." But that defense fails here for several reasons.

7. First, Ms. Jeffers, in her charge, cites an adverse employment action. When she refused the advances of her supervisor, her schedule was changed. She was forced to house two elementary classes simultaneously, contrary to state law on pupil-teacher ratio.

8. An employer can be held vicariously liable for both "tangible employment action" and "hostile environment" sexual harassment under Title VII. However, in *Hulsey v. Pride Restaurants, L.L.C.,* No. 03-11060 (11Cir. 04/27/2004), an Alabama case, the 11th Circuit noted that the Faragher-Ellerth defense is not available whenever a plaintiff can demonstrate that she was subjected to an adverse employment action:

> "Where the distinction between the two types of sexual harassment cases does find its importance is in connection to the affirmative defense created by the Supreme Court to shield employers from liability when they maintain effective anti-sexual harassment policies which the plaintiff employee fails to use. This the 'Faragher-Ellerth defense'. It applies only to employer liability based upon a hostile environment theory. *It has no effect upon employer liability based upon a*

2



*tangible action theory.* (Emphasis added.) *Faragher*, 524 U.S. at 808, 118 S.Ct. at 2293; *Ellerth*, 524 U.S. at 765, 118 S.Ct. at 2270."

9. Based upon these decisions of the United States Supreme Court and the U.S. 11th Circuit Court of Appeals, an investigation by the EEOC to determine whether Ms. Jeffers was subjected to an adverse or tangible employment action is in order, as opposed to an outright dismissal.

10. Moreover, even for hostile environment sexual harassment, the Faragher-Ellerth affirmative defense is available only when the employer has demonstrated that the employer 1) has an effective anti-discrimination policy in place and 2) that the employee/plaintiff has failed to avail herself of the protections afforded by that policy.

11. The Russell County Board of Education made no showing that it had such a policy because the EEOC failed to investigate the Charge of Discrimination.

12. *Faragher* and *Ellerth*, handed down the same day in 1998, established the criteria for vicarious liability. In *Faragher*, the Court stated:

"…An employer is subject to vicarious liability to a victimized employee for actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employer. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence, see Fed. Rule. Civ. Proc. 8(c). The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior; and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise…No affirmative defense is available, however, when the supervisor's harassment culminates in a tangible employment action, such as

3

discharge, demotion, or undesirable reassignment."

13. Ms. Jeffers' Charge of Discrimination was stamped received by the EEOC on December 23, 2005. It was dismissed on December 29, 2005. The Russell County Board of Education was closed for the Christmas/New Year holiday season during the period from December 23, 2005 through December 29, 2005. Thus, the Russell County Board of Education could not have possibly demonstrated by preponderance of the evidence that it had an effective anti-sexual harassment policy in place of which Ms. Jeffers failed to avail herself.

14. As with the victims in *Faragher*, the hostile environment discrimination against Ms. Jeffers took place over a period of time. The letter from Mr. Gosa indicates the four-year period she cites demonstrates that Ms. Jeffers did not report the harassment in a timely manner.

15. However, the Charging Party expects the evidence to show that she attempted to ignore the lewd comments to the extent possible. Yet, the Charge clearly indicates that when the harassment worsened to the point of genital exposure and physical assault, she reported it. "Exhibit A" and the "Amended Exhibit A" to the document state that Charles Nacrelli, the principal/supervisor who was the perpetrator, appeared naked before Ms. Jeffers in July 2005, bit her on the breast at school in September 2005 and assigned her the double classes at the beginning of the school year after she rebuked his previous advances. Those three incidents were within 180 days of the filing of the Charge of Discrimination and standing alone, without the previous lewd comments which demonstrate a pattern of abuse, constitute actionable sexual harassment.

16. The letter detailing reasons for the dismissal states that the Russell County Board of

4

Education took "prompt and appropriate remedial action" when the discrimination was reported by Ms. Jeffers. Under *Faragher* and *Ellerth* such action would not even be relevant if adverse employment action is shown. Even so, the Charging Party expects the evidence to show that the school district did not take prompt and appropriate action.

17. Ms. Jeffers reported the Principal's misconduct to at least three supervisors/officials, who failed to take prompt, appropriate action:

A. Barbara Coley, who was assistant principal and the only other supervisor at the school, was made aware of Mr. Nacrelli's conduct numerous times over the past few years and, in fact, the evidence will show that Ms. Jeffers called Ms. Coley on night that Mr. Nacrelli appeared naked in front of her. Ms. Coley was by then a principal in the system, but took no action, such as reporting the incident, and other prior incidents, to the superintendent. Of course, Ms. Coley was a victim of harassment herself.

B. Dellie Elliott, an elected member of the Russell County Board of Education, was told of the harassment by Ms. Jeffers in late-July or early-August of 2005. In fact, Ms. Jeffers called Ms. Elliott to request a transfer and explained that she wanted get away from the abusive principal, but Ms. Elliott failed to take any action, such as speaking with the superintendent, about the principal's conduct. Because of the board member's inaction, Ms. Jeffers was forced to remain at the school and daily face Mr. Nacrelli who had appeared naked in front of her and grabbed her buttocks at the party just weeks earlier and bit her breast long after the report to Ms. Elliott.

C. When reports to the assistant principal/principal and board member yielded no results, Ms. Jeffers reported the misconduct to the superintendent, Dr.

5



Rebecca Lee, who initiated an investigation. However, rather than take immediate, appropriate action, such as separating the two, Dr. Lee sent Ms. Jeffers back to the school with Mr. Nacrelli for about a week-and-a-half while the investigation was on-going. While teachers were being interviewed daily in connection with the complaint, Ms. Jeffers had to work with Mr. Nacrelli.

18. EEOC's decision to dismiss the case without an investigation was premised upon the fact that Ms. Jeffers did not report the verbal abuse when it first began. To use that reasoning, a person who failed to report a first lewd joke would be forever barred from justice, regardless of the extent to which the harassment escalated.

19. Such is not now and never has been the law under Title VII of the 1964 Civil Rights Act and applicable case law.

20. The Commission's Dismissal was clearly premature and not based upon an investigation. In fact, it was contrary to decisions of the U.S. Supreme Court and the 11th Circuit Court of Appeals. Yet, the Dismissal could create unjustifiable prejudice against Ms. Jeffers' case during the litigation stage.

WHEREFORE, Barbara M. Jeffers, the Charging Party, moves that the Commission reconsider the Dismissal and conduct a thorough investigation or, in the alternative, issue a neutral finding stating that the EEOC is unable to conclude that the law has been violated but has been unable to determine that the respondent is compliance with the law.

6

Respectfully,

W. Don Eddins (1424 S65W)
Attorney for Ms. Jeffers
337 E. Magnolia Ave., Suite 3
Auburn, AL  36830
(334) 821-9981
Facsimile (334) 826-7700
Email: doneddins@charter.net


## CERTIFICATE OF SERVICE

I hereby certify that I am serving the foregoing document by  first class mail, postage prepaid, upon the following counsel of record:

Hon. Sydney S. Smith
Attorney for Russell County Board of Education
1503 Broad Street
Phenix City, AL 36867

Done this ___18th___ day of ___JANUARY___, 2006.

W. Don Eddins (1424 S65W)

7



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Birmingham District Office**

Ridge Park Place
1130 22nd Street, Suite 2000
Birmingham, AL 35205
(205) 212-2100
TTY (205) 212-2112
FAX (205) 212-2105

Charge No:    130-2006-01374

Ms. Barbara M. Jeffers
C/O Don Eddins, Attorney at Law
337 E. Magnolia Ave., Suite 3
Auburn, Alabama 36830                            **Charging Party**

Russell County Board of Education
P.O. Box 400
Phenix City, Alabama 36867                       **Respondent**

<u>**RECONSIDERATION NOTICE**</u>

<u>**AND**</u>

<u>**REVOCATION OF NOTICE OF RIGHT TO SUE**</u>

This is to advise you that pursuant to the Commission's Procedural Regulations, 29 CFR 1601, we intend to re-examine the merits of and reconsider the Dismissal and Notice of Rights issued on the above-referenced case. Therefore, effective this date, the Dismissal and Notice of Rights issued on December 29, 2005 is revoked.

Upon completion of this re-examination and reconsideration, you will be notified in writing of the Commission's final determination in this matter. If you should have any questions regarding this matter, please contact Samuel Hall, Supervisory Investigator, at (205) 212-2068.

On Behalf of the Commission:

01/26/2006
Date

*Bernice W. Kimbrough*

Bernice Williams-Kimbrough
Director
Birmingham District Office



**U.S. Department of Justice**

Civil Rights Division
NOTICE OF RIGHT TO SUE
WITHIN 90 DAYS

---

CERTIFIED MAIL
5055 8598

*950 Pennsylvania Avenue, N.W.*
*Karen Ferguson, EMP, PHB, Room 4239*
*Washington, DC 20530*

May 10, 2006

Ms. Barbara M. Jeffers
c/o W. Don Eddins, Esquire
Attorney at Law
337 E. Magnolia Ave., Ste. 3
Auburn, AL  36830

Re:  EEOC Charge Against Russell County Board of Education
     No. 130200601374

Dear Ms. Jeffers:

   Because you filed the above charge with the Equal Employment
Opportunity Commission, and the Commission has determined that it
will not be able to investigate and conciliate that charge within
180 days of the date the Commission assumed jurisdiction over the
charge and the Department has determined that it will not file any
lawsuit(s) based thereon within that time, and because you through
your attorney have specifically requested this Notice, you are
hereby notified that you have the right to institute a civil action
under Title VII of the Civil Rights Act of 1964, as amended, 42
U.S.C. 2000e, et seq., against the above-named respondent.

   If you choose to commence a civil action, such suit must be
filed in the appropriate Court within 90 days of your receipt of
this Notice.

   This Notice should not be taken to mean that the Department of
Justice has made a judgment as to whether or not your case is
meritorious.

                          Sincerely,

                          Wan J. Kim
                     Assistant Attorney General
                       Civil Rights Division

              by     *Karen L. Ferguson*
                          Karen L. Ferguson
                     Supervisory Civil Rights Analyst
                     Employment Litigation Section

cc:  Birmingham District Office, EEOC
     Russell County Board of Education

# Exhibit K

# Affidavit of plaintiff Craig

COUNTY OF RUSSELL       )
STATE OF ALABAMA       )

### AFFIDAVIT OF JOAN K. CRAIG

**BE IT ACKNOWLEDGED**, that the undersigned deponent, being the age of majority

and of sound mind, does hereby depose and say under oath as follows:

1. My name is Joan K. Craig and I am a resident of Russell County, Alabama.

2. For the past 15 years I have been employed by the Russell County Board of Education

as a bus driver at Ladonia Elementary School. From about 1999 until he was removed as

principal in 2005, Charles Nacrelli was my principal and supervisor at Ladonia. Bus drivers were

told that we were to take instructions from John Rudd, the supervisor at the bus shop in Seale,

about an hour's drive from Ladonia, and to take instructions from school principals when we

were at school sites.

3. In about 2002, I encountered an embarrassing and humiliating incident involving my

principal, Mr. Nacrelli. Some students at the Handcock Street stop were mulling about and not

gathering properly, creating a potentially dangerous situation. I spoke with Mr. Nacrelli about it

and he told me that we would drive over to the site in my bus. I showed him the area and he

agreed with my suggestions for grouping the students for loading and unloading. Just after we

had left the site, he was standing in the bus stairwell and began making improper statements. He

told me I had some nice legs and reached over and started rubbing my leg and telling me how

soft my legs were were. I pushed his hand off and told him, "Don't even go there." He kept

talking about how he would like to get with me. When we got back to school, I opened the door

but he closed it and said we could go some where else. He put his hand back on me and started

rubbing my hair and I pushed his hand off and told him to keep his hands to himself, but he kept rubbing up toward my crotch. I kept pushing his hand away and he'd laugh and say that I wanted him.

4. Just a few weeks after that incident, Mr. Nacrelli came on my bus to discipline a student. When the student got off, only Mr. Nacrelli and I were left on the bus. He started rubbing my neck with one hand and then leaned over and started rubbing my leg. He told me that I had nice breasts and he would like to get me in bed and caress them. I told him that I did not want to lose my job and for him to leave me alone. He made a reference to "Italian men," how good they were at sex or something like that.

5. Numerous times after that over the next few years, Mr. Nacrelli would come to my bus and make gestures. He would grab his pants and squeeze his privates. He would pull on his penis like he was adjusting it. He even did it in the hallway at school and in his office when I wrote up a student. Several times he would tell about Italian men and how good they were at sex. He would tell me that he was a woman's man. I was so angry one day that I told two teachers, Ms. Bass and Ms. Yvonne Anderson, that I was just going to "cold cock" (hit) him one day. I didn't tell them the details but I told them that he needed to find him a woman.

6. His harassment of making remarks and gestures occurred frequently from about 2002 to 2005 when Mr. Nacrelli was let go. He did something improper probably two dozen times or more over that period.

7. I remember another physical incident which occurred in 2004. My nephew and I went to Ladonia Elementary to eat with his sons, my grand-nephews. I call my nephew by his nickname, Little Man, but his name is Garnett Lamar Booker, Jr. When we were leaving, Mr. Ncarelli approached and said that I should not be wearing a bandana at school and I explained

that I was off duty and Little Man and I were on our motorcycles. Mr. Nacrelli walked out with

us and put his arm around me. When I shrugged it off, his arm slid down my backside and he

squeezed my butt. My nephew witnessed this. (See Booker affidavit) Nacrelli followed me on to

the bikes and when they were cranked he told me that he would like to ride with me and hold on

by my breasts.

8. That happened in about March 2004 and I remember at the school Christmas party that

year that Nacrelli had put his arm around me in front of people and I had to take it off.

9. I remember in August of 2005, at the in-service right before the start of the 2005-06

school year, all the bus drivers had a meeting at Russell Middle School to go over plans for the

year. Mr. Rudd conducted the meeting and then when we broke out into individual school

groups, Mr. Nacrelli conducted our Ladonia meeting. Mr. Nacrelli was standing out in front of

everyone when he just moved over by my chair and stood so close that his leg was touching my

leg and his crotch was just inches from my face. He was so close to me that other bus drivers on

the row had to lean out to even see him. It was very embarrassing to me and I wondered if other

drivers thought we were having an affair. Another bus driver, Dianne McDaniel, was seated next

to me and another one, Shirley Baker, was seated next to Ms. McDaniel. They both noticed how

close he was to me. (See their affidavits, Exhibits M & N)

10. School started back the first week in August and we had to have a meeting at Ladonia

Elementary on August 8, 2005 because some children were confused about what buses to ride.

When I came in, Mr. Nacrelli told me to sit in a particular seat and during the meeting he rubbed

my shoulder and I had to take his hand off. It was really embarrassing.

11. By then I had had enough. I saw Ms. Lillian Baker, the assistant superintendent for

Russell County schools at Ladonia one day. I told her that Mr. Nacrelli was harassing me, but she

was busy and did not seem really interested. She told me she would get back with me. That was toward the end of August 2005.

12. I went to talk with a teacher, Gwen Lewis, who is the building representative for the Alabama Education Association in September 2005. She told me about the problem Ms. Barbara Jeffers was having. I also started calling Superintendent Rebecca Lee's office for an appointment. The first one was cancelled by her. On my third call, I finally got an appointment. By then, Mr. Nacrelli already was gone.

13. No other embarrassing incidents happened after the bus drivers' meeting on August 8th, but I was very much in a hostile environment until Mr. Nacrelli was suspended. I avoided talking to him, even when I needed to about a discipline or safety issue. I stayed away from him and I feared him until the day he left.

14. In fact, from the time Mr. Nacrelli started that harassment, it affected my ability to do my job and the way I did my job. The harassment lower my self esteem and I did not want to go to work, even though I needed to. I avoided Mr. Nacrelli at all costs. I would not go to the office and report student matters relating to discipline or safety or anything else to my principal because I feared that he might start in on me again.

15. Mr. Nacrelli's harassment of me also cost me money. As a support person, I was earning about $15,000 a year, or about $1,200 per month, but I could supplement that with extra earings for field trips. I gave up the field trips in the 2002-03 school year, although I have resumed taking the extra trips now. For about two years or longer I missed out of field trips because I did not want to be around Mr. Nacrelli.

16. Most field trips I took were during the school day between morning and afternoon routes. I stopped taking the field trips because I just didn't want to be around Mr. Nacrelli. He

would come out to the bus to tell students to behave during trips and I would sometimes have to report students' behavior after trips, so it was necessary for me to see him when I took the field trips.

17. Under an informal system, for several years I was the person who made field trip assignments. The transportation office would call me and tell me about upcoming trips for Ladonia classes. I would take some trips and ask other drivers if they wanted other trips. I tried to be fair and spread them around, but I just stopped taking them altogether to avoid contact with Mr. Nacrelli.

18. The amount we were paid for the trips varied, depending on how far we had to go and how much time it took, but I think we got paid on average about an extra $20.00 per trip. Just a few trips in a month would help me out.

19. All Mr. Nacrelli's improper conduct of a sexual nature toward me was unwelcome. I never consented to any of it and told him I didn't. I am happily married and did not want Mr. Nacrelli messing with me. His conduct was disgusting to me. It lowered my self esteem and caused me to be depressed. I even cut my hair after he stroked my hair and told me how much he liked my long hair.

20. This entire matter made me scared because I am just a bus driver and Mr. Nacrelli was a principal. I didn't know who to report it to. I never even knew the Russell County Board of Education had a sexual harassment policy. During the 15 years I have worked for the Russell County Board of Education, we never had any instruction on sexual harassment or the reporting of it for bus drivers until 2006 after this case was filed and then the training was only offered on a voluntary basis. If there was a manual in the Ladonia principal's office telling us how to report sexual harassment, as Dr. Lee said in her deposition, I didn't know anything about it. I have a

high school education and have received good evaluations in my job, but I didn't know anything about reporting sexual harassment and never had any classes on it until after our lawsuit was filed.

21. School bus drivers for the Russell County Board of Education are given notebooks which include procedures we are to follow. Among pages in the notebook in effect for many years are those relating to the responsibility of the principal. (Exhibit 1 to this document) The principal supervises bus drivers on discipline and over-sees various drills on safety.

22. Under the section for bus drivers relating to the use of the bus, it is stated that buses can be used only to transport children to and from school, except "under specific direction from the School Superintendent or from the Principal of the school." (Exhibit 1 to this document) We always have been instructed as bus drivers to take order from the principals of our schools.

I make this Affidavit under oath, on personal knowledge and of my own free will. And I affirm that the foregoing is true to the best of my knowledge.

Witness my hand under the penalties of perjury this _____ day of _____, 2008.

*Affiant*

**Joan K. Craig**

COUNTY OF _____ )
STATE OF ALABAMA            )

**Sworn and subscribed** before me this _____ day of _____, 2008.

Notary Public
My Commission Expires _____

# RESPONSIBILITIES OF THE PRINCIPAL

I.  The school Principal shall ensure, under the direction of the School Superintendent, that all laws and regulations, state and county relating to transportation, are observed by transported pupils and transportation employees.

II.  The responsibilities relating to transported pupils are as follows:

A.  The principal is responsible for disciplinary matters concerning bus conduct. The school bus driver must give the principal enough verifiable information on the Bus Conduct Report form for the principal to take appropriate action.

B.  The principal may suspend any transported pupil from the privilege of riding on a school bus for a period not to exceed ten days for willful disobedience, for the use of profane language, or for other continued misconduct and to report such suspension in writing to the School Superintendent and to the parent. The use of the Bus Conduct Report form will suffice for notification to the parent.

C.  To develop and carry into effect plans and programs for educating pupils regarding traffic and transportation safety.

D.  The principal should assign an appropriate number of teachers to supervise both the loading and unloading of students. The teachers on "Bus Duty" should ensure that the students stay out of the road and load promptly.

E.  The principal should ensure that all students are instructed in school bus safety and the student's responsibilities in the formation of the bus safety program. School bus evacuations must be practiced twice per school year. Principals should monitor the practice evacuations and document the school's training program.

III.  Relating to the Use of Equipment

A.  Transportation equipment can only be used for special trips as outlined by Board Policy. The Principal must request the use of the transportation equipment 10 working days prior to the trip and the trip must be approved by the School Superintendent.

7

B.    To maintain order and discipline, under the direction of the school principal, of every pupil/passenger on his bus. Seats will be assigned based on loading order. Load two to a seat from front to rear. When all seats are full, assign the third person to a seat from rear to front. Drivers and principals are allowed to modify this arrangement to accommodate discipline problems. Once the seating arrangement has been established, **drivers will post the students'** names over their seat window. Students are expected to go to their seat everyday.

C.    To permit a child to leave the bus only at a regular stop, except upon written request of parents or direction of the School Principal.

D.    To supervise the activities of children leaving the bus until they have crossed the highway.

E.    To ensure, except at those stops where authentic traffic control is provided, that children leaving the bus cross the highway in front of the bus under his direction only after approaching vehicles have stopped.

F.    When a situation arises that requires the driver to take an item or object from a student, that item or object must be either turned in to the principal or returned to the student. Examples of items: unopened soft drinks, yo-yos, radios (walkman), etc. The driver has the authority to ask for any items that is used to create a disturbance or is hendering the safe operation of the bus. Once these items are taken, the driver must report the incident on a bus conduct form to the principal. Drivers should not use another student to take an item away from a particular student.

IV.    Relating to the Use of the School Bus

A.    To use the bus only to transport children to and from school, except under specific direction of the School Superintendent or from the Principal of the school, upon the written authorization by the School Superintendent.

B.    To transport in the school bus nothing which would make the bus objectionably for school use.

C.    The bus will not be used as personal transportation. It will not be used to run errands, do personal business, or to stop at the store

9

# Exhibit L

# Affidavit of Garnett Lamar Booker, Jr.

COUNTY OF LEE                          )

STATE OF ALABAMA                       )

### AFFIDAVIT OF GARNETT LAMAR BOOKER, JR.

**BE IT ACKNOWLEDGED**, that the undersigned deponent, being of legal age and sound mind, does hereby depose and say under oath as follows:

1. My name is Garnett Lamar Booker, Jr., although my friends call me "Little Man," and I am a resident of the Bleeker community in Lee County, Alabama.

2. Previously I lived in Russell County and my two sons, Chance and Chase Booker, attended Ladonia Elementary School.

3. I am the nephew of Joan Craig, who is a plaintiff in the lawsuit, *Jeffers et al. vs. Russell County Board of Education, et al., CV-03:06cv685, Middle District of Alabama.*

4. In March 2004, my aunt and I rode our motocyles to Ladonia Elementary to eat lunch with my sons. As we were leaving, Mr. Charles Nacrelli walked out with us and told my aunt, Joan Craig, that the head band she was wearing was not appropriate school attire.

5. My aunt explained to him that she was not on duty, but had come to the school to eat with her grand-nephews and that she and I had ridden our motorcycles.

6. As we were walking out, I was behind Mr. Nacrelli and my aunt, Joan Craig, and I observed Mr. Nacrelli put his right arm around my aunt's shoulders as they walked. My aunt shrugged her shoulders in an effort to have Mr. Nacrelli take his arm off her shoulder.

7. As he took his arm from her shoulder, I observed his arm slide down her back and his hand touch her buttocks.

8. I observed them continue to talk as I cranked my motorcycle but I could not hear the entire conversation.

9. My aunt later asked if I had seen him touch me and whether I had heard the conversation.

10. Although I witnessed Mr. Nacrelli touch her buttocks, I could not hear their conversation with the bikes cranked.

1

11. I did later tease my aunt about Mr. Nacrelli having a crush on her.

12. I make this Affidavit under oath, on personal knowledge and of my own free will. And I affirm that the foregoing is true to the best of my knowledge.

Witness my hand under the penalties of perjury this *21st* day of *December*, 2007.

*Affiant*

**Garnett Lamar Booker, Jr.**

STATE OF ALABAMA    )
LEE COUNTY    )

**Sworn and subscribed** before me this *21st* day of *December*, 2007.

Notary Public
My Commission Expires *2/24/08*

2

# Exhibit M

# Affidavit of bus driver Dianne McDaniel

COUNTY OF LEE                    )
STATE OF ALABAMA                 )

## AFFIDAVIT OF DIANNE MCDANIEL

**BE IT ACKNOWLEDGED**, that the undersigned deponent, being of legal age and sound mind, does hereby depose and say under oath as follows:

1. My name is Dianne McDaniel and I am a resident of Phenix City in Russell County, Alabama.

2. I was employed by the Russell County Board of Education for 12 years as a bus driver and retired in August 2007. I drove for Ladonia Elementary School, along with Joni Craig and other drivers.

3. I recall an incident which occurred in August 2005 at Russell County Middle School. Bus drivers from throughout the school system had a meeting and then we had break-out sessions with the principals of our schools.

4. Our principal at Ladonia Elementary was Charles Nacrelli. During the meeting, Mr. Nacrelli was standing awfully close to Ms. Craig. He was standing so close that his leg was up against hers. He didn't stand close to any of the rest of us. He was extremely close to her, leaning over her, although he was talking to the whole group.

5. I recall Joni leaning over to me and saying, "I wish he would get out of my face."

6. When we drove buses, Mr. Nacrelli established a system under which buses were to arrive in intervals in the morning rather than all at one time. Joni was the last to come in and I was next to last.

7. When I was on school grounds, I was instructed that Mr. Nacrelli, the principal, was my boss. Otherwise, Mr. John Rudd, transportation supervisor, was my supervisor.

8. Mr. Rudd did my evaluation most of the time, but the assistant principal at Ladonia Elementary, Ms. Brenda Coley, did my evaluation one year. She did my evaluation about the last year that she served as assistant principal.

9. Mr. Nacrelli or Mr. Coley would handle discipline related matters on my bus and safety

1

issues were handled by Mr. Rudd.

      10. For several years, we had a system under which Joni informally scheduled field trips. The bus shop would contact Joni when a trip was going to be available. Joni would ask us if any of us wanted to take the trips for extra money.

      11. Mr. Nacrelli frequently would come out to my bus and board and caution students about their behavior when I drove for field trips. That is the only time he came on my bus.

      12. I make this Affidavit under oath, on personal knowledge and of my own free will. And I affirm that the foregoing is true to the best of my knowledge.

      Witness my hand under the penalties of perjury this _28th_ day of _December_, 2007.

*Affiant*

**Dianne McDaniel**

STATE OF ALABAMA    )
LEE COUNTY         )

      **Sworn and subscribed** before me this _28th_ day of _December_, 2007.

Notary Public
My Commission Expires _2/24/08_

2

# Exhibit N

# Affidavit of bus driver Shirley Baker

COUNTY OF RUSSELL )
STATE OF ALABAMA )

## AFFIDAVIT OF SHIRLEY BAKER

**BE IT ACKNOWLEDGED**, that the undersigned deponent, being the age of majority and of sound mind, does hereby depose and say under oath as follows:

1. My name is Shirley Baker and I am a resident of Phenix City in Russell County, Alabama.

2. For the past six years I have worked with the Russell County Board of Education as a bus driver, including the last four years at Ladonia Elementary School. During the firt two years, I was a sub and utility driver and drove routes at various schools.

3. I recall at meeting of bus drivers and principals with the Russell County Board of Education at Russell County Middle School in August 2005. After the joint meeting, we broke out into school meetings conducted by the principal of each school.

4. During the smaller meeting, Ms. Craig was sitting at the end of the table. Another bus driver, Dianne McDaniel, was seated next to her and I was seated next to Ms. McDaniel. I was taking notes and looked up and Mr. Nacrelli was standing awfully close to Ms. Craig. He moved from his spot at the head of the table to stand next to her. He was standing so close to her that I had to lean out to see him.

5. The bus drivers, including myself, considered Mr. Nacrelli to be our boss when we were at the school. Mr. John Rudd, the transportation supervisor, was our boss otherwise.

6. Mr. Nacrelli developed a system under which the buses arrived one at a time, rather than all at once. I was second to arrive in the mornings and Joni's was the last of six buses.

7. When I took field trips, Mr. Nacrelli often would come out to my bus and board and talk with the students about behaving on the trip.

8. During the time I have worked at the Russell County Board of Education, I have never had any training in sexual harassment or on the reporting of sexual harassment. I was not even aware that the school system had a sexual harassment policy.

I make this Affidavit under oath, on personal knowledge and of my own free will. And I affirm that the foregoing is true to the best of my knowledge.

Witness my hand under the penalties of perjury this __8__ day of _JAN_____, 2008.

*Affiant*

*Shirley Baker*
**Shirley Baker**

COUNTY OF LEE          )
STATE OF ALABAMA       )

**Sworn and subscribed** before me this __8th__ day of _JANUARY_____, 2008.

Notary Public
My Commission Expires __2/24/08__