IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

BARBARA M. JEFFERS, *et al.*,       )
                                     )
        Plaintiffs,                  )
                                     )
v.                                   )      Case No. 3:06-cv-0685-WKW [wo]
                                     )
RUSSELL COUNTY BOARD OF              )
EDUCATION, *et al.*,                 )
                                     )
        Defendants.                  )

## MEMORANDUM OPINION AND ORDER

This cause is before the court on Defendant Russell County Board of Education's ("School Board") Motion for Summary Judgment (Doc. # 39) and Defendant Charles Nacrelli's ("Nacrelli") Motion for Summary Judgment (Doc. # 43). The two plaintiffs, Barbara Jeffers ("Jeffers") and Joan Craig ("Craig"), bring sexual harassment claims against the School Board under Title VII of the Civil Rights Act of 1964, state tort claims of outrage and assault and battery against Nacrelli, and assault and battery against the School Board under a theory of vicarious liability. (Compl.) For the reasons set forth below, both motions for summary judgment are due to be denied in part and granted in part.

## I. FACTS AND PROCEDURAL HISTORY

### A.    *Introduction*

Nacrelli was the principal of Ladonia Elementary School ("Ladonia") from the fall of 1999 until the fall of 2005. During this time both plaintiffs were employed at Ladonia by the School Board – Jeffers as a guidance counselor and Craig as a bus driver – and remain

so to this day. Both plaintiffs allege they were subjected to sexual harassment by Nacrelli during his tenure as principal.

**B.     *Barbara Jeffers***

Jeffers claims that Nacrelli made "off-color jokes and comments" on a regular basis from the time he became principal at Ladonia. (Jeffers Aff. ¶ 3.) By 2005, the comments had escalated to a point that she felt was "unbearable," which affected her work and led her to take much of her sick leave in order to get away from him. (*Id.*) Jeffers alleges that the sexual harassment to which she was subjected by Nacrelli consists of the following:

1.     Undated – Jeffers alleges she heard Nacrelli make offensive comments at various times while he was principal and describes them as follows:[1]

    a.     "[C]onstantly bragged about he and his wife sitting around naked every night and having to have sex every night."

    b.     "[T]old stories about his working in a pizza parlor when he was in college and the employees having sex in the store."

    c.     "[B]ragged that his Italian background gave him sexual prowess."

    d.     "[S]aid that his father would harass and touch [Nacrelli's] wife in a sexual manner."

    e.     Frequently made comments about the anatomy of female teachers.

    f.     Said that one teacher was "losing it" sexually.

_____

[1] Jeffers also claims that during 2005, Nacrelli made twenty-five or more offensive comments to her, but she does not provide any further details. (Jeffers Aff. ¶ 17.)

g.   Commented that a pregnant teacher "appeared to be pregnant in her buttocks." (Jeffers Aff. ¶ 3.)

2.   July 2005 – Nacrelli hosted a pool party at his house to celebrate the recent promotion of Ladonia's assistant principal, Brenda Coley ("Coley"), to principal of another elementary school. (Jeffers Aff. ¶ 8.) At least some of the party was planned at school, and invitations were sent to teachers, counselors, and administrators of Ladonia. (*Id.*) During the course of the party, Nacrelli squeezed the buttocks of Jeffers and another teacher "on more than one occasion." (*Id.*) Later, as Jeffers sat next to Nacrelli's wife on the pool steps, Nacrelli came up behind Jeffers and sat down with his legs around her. (*Id.*) When she pushed his legs away, he stood up, and Jeffers realized he was naked. (*Id.*) As she screamed, a nude Nacrelli "leap-frogged [her] into the pool, pushing [her] head down as he went." (*Id.*; Jeffers Dep. 280:1-14.) Although she did not witness it, Jeffers heard that Nacrelli also pulled the top and bottom of another female teacher's bathing suit down, and put his hand down another female teacher's shirt. (Jeffers Aff. ¶ 8.) Nacrelli claims he does not remember any of these events because he was drunk. (Nacrelli Dep. 55:16-57:11.)

3.   Early Fall 2005 – As Nacrelli carried an unruly child down the hall in front of Jeffers and another teacher, he stated something to the effect of, "Andrew I can

3

handle you.  My wife's breasts weigh more than you do."  (Jeffers Aff. ¶ 13.)

4.    September 2005 – When Jeffers told Nacrelli that a doorstop was not long enough to adequately restrain the door, he responded, "I don't like it when you talk to me about it being too short."  (Jeffers Aff. ¶ 14.)

5.    September 9, 2005 – Nacrelli picked Jeffers up, rolled her toward him, and "bit [her] on the right breast."  (Jeffers Aff. ¶ 15.)  Nacrelli acknowledges he picked her up and that her breast made contact with his lips, but he denies "chomping down on her" and writes it off as "one of those, oh-crap type of things." (Nacrelli Dep. 76:4-77:3.)  However, he admits to the possibility that he "could have nipped at her shirt."  (*Id.* at 76:12-13.)

6.    Mid-September 2005 – A student brought a pornographic picture to school entitled, "Chicks with Dicks,"  and  during a meeting with second grade teachers about the picture, Nacrelli allegedly made the statement that "her breasts were bigger than my wife's and her dick was longer than mine." (Jeffers Aff. ¶ 16.)  Nacrelli admits to making a substantially similar version of this statement (Nacrelli Dep. 79:9-80:9), although Jeffers did not actually hear him make this comment and only heard about it from others.  (*See* Jeffers Aff. ¶ 16; Jeffers Dep. 143:10-145:12.)

7.    September 21, 2005 – As a secretary was complaining about her garbage can being "too humongous" and "just too big," Nacrelli looked at Jeffers and said

"I hear that all the time about me." (Jeffers Aff. ¶ 19; Jeffers Dep. 142:2-16.)

Jeffers claims that she first reported Nacrelli's conduct to Coley immediately after the pool party as she was driving home. (Jeffers Dep. 90:7-22.) She pulled her car over and called Coley on the phone to tell her about Nacrelli taking his clothes off at the party. (*Id.*) Coley admits that the phone call occurred and substantiates the gist of the phone call in all material ways but one: Coley claims that Jeffers made her swear not to tell anyone about it. (Coley Dep. 47:5-48:19.) Jeffers claims this is untrue and that she never asked Coley to keep it to herself. (Jeffers Dep. 91:19-92:3.)

Jeffers reported Nacrelli's conduct a second time to Dewilda Elliot ("Elliot"), a member of the School Board, just a few days after the pool party. (Jeffers Aff. ¶ 10.) Jeffers claims that during this phone call she requested to be transferred to Coley's new school away from Ladonia. (*Id.*; Jeffers Dep. 106:23-107:22.) Jeffers admits she asked Elliot not to tell anyone of their conversation. (Jeffers Dep. 106:20-107:5.)

Jeffers claims that when she returned to work at Ladonia in the fall of 2005, Nacrelli assigned her a class load much larger than what had normally been assigned in previous years. (Jeffers Aff. ¶ 12.) After she and another counselor complained to Nacrelli that the class load was contrary to state policy, Nacrelli developed another schedule for them. (*Id.*) Jeffers and her co-counselor again complained of the revised work load, and Nacrelli eventually let them develop their own schedule in the same way it had been done in years past. (*Id.*)

5

After Nacrelli's conduct resumed and intensified during the fall semester of 2005, Jeffers finally reported Nacrelli's conduct to the school superintendent on Tuesday, September 20, 2005. (Lee Aff. at 1.) The next day an investigation began and by the end of Friday, September 23, 2005, Nacrelli was placed on indefinite paid leave and instructed not to have contact with the staff at Ladonia. (*Id.* at 2.) During the meeting in which he was put on indefinite paid leave, Nacrelli claims the superintendent told him "it'll be an out-of-sight/out-of-mind thing and we'll investigate it, and this thing will be fine and it'll blow over." (Nacrelli Dep. 104:17-22.) Nacrelli was later given a chance to respond to the allegations during another meeting with the superintendent on Thursday, September 29, 2005. (Lee Aff. at 2.) On November 9, 2005, the superintendent made a recommendation to the School Board to terminate Nacrelli, which the School Board accepted unanimously. (*Id.*) Although Nacrelli initially contested the termination, a settlement was negotiated, and he resigned on February 15, 2006, effective March 19, 2006. (*Id.*)

## C.    *Joan Craig*

Craig alleges that the sexual harassment to which she was subjected by Nacrelli consists of the following:

1.    2002 – While riding with Craig to inspect a bus stop location, Nacrelli told her she had "nice legs," and then proceeded to rub them and tell her how soft they were. (Craig Aff. ¶ 3.) Even though she pushed his hand away and said, "Don't even go there," Nacrelli "kept talking about how he would like to get

6

with me." (*Id.*)  After they arrived back at Ladonia, she tried to open the door, but he closed it, saying they could "go somewhere else." (*Id.*)  He began to rub her hair and "kept rubbing up toward [her] crotch." (*Id.*)  She continued to push his hands off, but he just laughed and said she "wanted him." (*Id.*)

2.    2002 – A few weeks later, when Nacrelli and Craig were left alone on the bus, he again began to rub her legs and her neck, and told her she had "nice breasts" and that he would like to "get [her] in bed and caress them." (*Id.* ¶ 4.) Craig claims she told him she did not want to lose her job and for him to leave her alone. (*Id.*)  He also made reference to the sexual prowess of Italian men. (*Id.*)

3.    2002-04 – Without providing any specific dates, Craig asserts that "numerous times" during this period Nacrelli would "grab his pants and squeeze his penis," "pull on his penis like he was adjusting it," again reference the sexual prowess of Italian men, and tell Craig that he was "a woman's man." (*Id.* ¶ 5.)

4.    December 2003 – Nacrelli put his arm around Craig, which made her feel uncomfortable because she thought "he's fixing to start up" and was afraid people would think they were having an affair. (*Id.* ¶ 8; Craig Dep. 119:21-120:8.)

5.    March 2004 – While Craig was off-duty, she drove her motorcycle to Ladonia to have lunch with her grand-nephews.  As she was leaving, Nacrelli put his

arm around her and, after she shrugged it off, "his arm slid down [her] backside and he squeezed [her] butt." (Craig Aff. ¶ 7.) After she started her motorcycle, Nacrelli told her that "he would like to ride with [her] and hold on by [her] breasts." (*Id.*) Craig's nephew saw Nacrelli touch her buttocks, but he was unable to hear the conversation because of the noise from the motorcycles. (Booker Aff. ¶¶ 7-10.)

6.    August 3, 2005 – As Nacrelli spoke to a group of bus drivers during an in-service meeting, he stood so close to Craig that "his leg was touching [her] leg and his crotch was just inches from [her] face." (Craig Aff. ¶ 9.) Two other bus drivers noticed how close he stood to her. (McDaniel Aff. ¶ 4; Shirley Baker Aff. ¶ 4.)

7.    August 9, 2005 – During a meeting with five or six other people, Nacrelli came up behind Craig and began to massage her shoulders. (Craig Aff. ¶ 10; Craig Dep. 139:10-13.) Craig quickly removed his hand. (Craig Aff. ¶ 10.)

Craig claims that by the end of August 2005 she "had had enough" and went to Lillian Baker ("Baker"), the school district's Assistant Superintendent for Personnel, to tell her about Nacrelli's harassment. (Craig Aff. ¶ 11.) Craig claims that Baker was "busy and did not seem really interested," and told her she would get back to her. (*Id.*) On the other hand, Baker claims she is "sure" that she never spoke with Craig about Nacrelli. (Baker Dep. 88:14-89:8.)

In September 2005, Craig claims she learned of Jeffers's allegations from Ladonia's Alabama Education Association representative. (Craig Aff. ¶ 12.) She then decided to inform the superintendent of her harassment by Nacrelli and scheduled an appointment for October 19, 2005. (Lee Aff. at 2.) After the appointment was cancelled, Craig rescheduled and finally met with the superintendent on October 25, 2005, at which time she informed her of Nacrelli's harassment. (*Id.*) By this time, Nacrelli had already been placed on indefinite leave as a result of his harassment of Jeffers, but he had not yet been terminated.

**D.    *School Board's Sexual Harassment Policy***

The School Board has at least three publications concerning sexual harassment: (1) an official sexual harassment policy ("Official Policy") adopted by the School Board and known as Policy GAJDBH (Doc. # 49-3, at 19-20); (2) a separate statement of the Official Policy ("Policy Statement") that is described by the superintendent as a "summary of the Board's sexual harassment policy dealing mainly with sexual harassment of students, but also addressing all employees in general terms" (Lee Aff. at 1); and (3) a brief section on harassment in general found in the Transportation Department Handbook ("Transportation Handbook") (Doc. # 41, at 22-23).

The Policy Statement is in a publication entitled, "Student Academic Plan & Responsibilities: A Handbook for School Personnel[,] Parents & Students" ("Handbook").[2] (Doc. # 49-3, at 21-22.) According to the School Board, copies of the Handbook are

---

[2] The language of the Policy Statement was identical in the 2004-05 and the 2005-06 Handbook. (*See* Doc. # 41, at 11-15.)

9

distributed to employees and parents at the beginning of each academic year. (Lee Aff. at 1.) The Official Policy is not distributed to everyone, but rather one copy is placed in each school (usually in the principal's office or the media center) with instructions for the principal to familiarize the staff with it. (*Id.*; Lee Dep. 24:17-25:13.) The School Board also claims that each year an in-service training session (dealing in part with sexual harassment) is held for all bus drivers and that the Transportation Handbook is distributed to them. (Rudd Aff. at 2.)

Both plaintiffs dispute the School Board's portrayal of the distribution and promulgation of its sexual harassment publications. Jeffers claims that in her thirty years of employment with the School Board, she was never instructed on how to report sexual harassment, never knew where the Official Policy was located, and was never told the identity of the person to whom reports should be made.[3] (Jeffers Aff. ¶ 23.) Similarly, Craig claims that in her fifteen years of employment with the School Board, she never received instruction on sexual harassment, did not know how to report it, and did not even know there was a sexual harassment policy. (Craig Aff. ¶ 20.) Furthermore, two other support personnel, one a bus driver and the other a former secretary now serving on the School Board, also state they never received any training on sexual harassment. (Shirley Baker Aff. ¶ 8; Elliot Dep. 45:16-46:6.)

---

[3] This person was the School Board's Title IX coordinator. Even Nacrelli, perhaps unsurprisingly, admits he did not know who the Title IX coordinator was. (Nacrelli Dep. 24:2-6.)

The Official Policy provides that "[n]o employee . . . shall be subjected to sexual harassment" and that "[e]ach administrator shall be responsible for . . . assuring compliance with . . . state and federal laws and board policy and procedures governing sexual harassment within her or his school or office."  (Doc. # 49-3, at 19.)  The Official Policy also defines sexual harassment, sets forth reporting and investigation procedures, and provides for sanctions.  (*Id.* at 19-20.)  The reporting procedure of the Official Policy states that "[a]ny employee who feels he/she has been sexually harassed by another employee(s) . . . should present the complaint directly to the School System Title IX Coordinator (Personnel Director) . . . as soon as possible after the incident or the latest occurrence if a series of incidents are involved."  (*Id.*  at 19.)

The Policy Statement, while similar in many ways, does not track the language of the Official Policy word for word and diverges in significant ways.  For example, the Policy Statement provides for a more liberal and open reporting procedure: School Board supervisors and managers must "immediately report any complaints concerning sexual harassment received from students to the principal or appropriate school official" and students "should immediately notify the school secretary, any teacher, any assistant principal or the principal."[4]  (Doc. # 41, at 12.)  The Policy Statement does not provide guidance for

---

[4]  The plaintiffs quote a much different reporting procedure in their brief:  "Any person, employee, or student, who alleges sexual harassment by a staff member or student in the School District may file a complaint with the principal.  In addition, each school shall designate one male and one female employee to whom complaints may be made."  (Pls.'s Resp. Br. 20.)  However, upon a thorough examination of the source cited by the plaintiffs, the court is unable to find this statement in the 2004-05 or 2005-06 Handbooks.  It appears this statement instead is

*employees* who wish to report sexual harassment, although portions of the Policy Statement encompass employee harassment.[5]  The Policy Statement also makes clear what the Official Policy does not:  "In third-party situations, sexual harassment may also be present if one individual is offended by the sexual interaction, conduct, or communications between others."  (*Id.*)

The Transportation Handbook deals with harassment in general, but it also includes "unwarranted activities or comments based on . . . gender and personal attributes . . . as determined in local policy."  (Doc. # 41, at 23.)  Its reporting procedure instructs bus drivers that "[a]ctual or suspect harassment is to be reported to the school principal as soon as possible."  (*Id.*)

### E.    *Procedural History*

Jeffers filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") on December 23, 2005.  The EEOC initially dismissed the claim, but it later revoked the dismissal after Jeffers filed a motion for reconsideration.  (Doc. # 49-4, at 33.)  Finally, on May 10, 2006, the EEOC issued a Right to Sue letter to Jeffers.  (Doc. # 1-2.)  Craig filed her EEOC charge on January 19, 2006, and received her Right to Sue Letter

---

found in the 2006-07 Handbook, which was not in effect at the time the alleged harassment took place.  (Jeffers Dep. 347:20-351:10.)

[5]  For example, the Policy Statement provides that "the Board will not tolerate harassment of employees or students by anyone, including supervisors, teachers, students, vendors, or other customers of the Board."  (Doc. # 41, at 12.)  When asked if the Policy Statement relates to "just about anybody that's at the school," Baker, the Assistant Superintendent for Personnel and the School Board's Title IX Coordinator, testified that it did.  (Baker Dep. 27:5-28:9.)

on May 26, 2006.  (Doc. # 1-3.)  Jeffers and Craig filed their Complaint with this court on

August 3, 2006.  (Doc. # 1.)  The School Board filed its summary judgment motion (Doc. #

39) on December 14, 2007, and Nacrelli filed his on December 17, 2007 (Doc. # 43).  The

plaintiffs responded (Doc. # 49) to both motions, and only the School Board replied (Doc.

# 44).

## II.  JURISDICTION AND VENUE

Because four of the plaintiffs' claims arise under Title VII of the Civil Rights Act of

1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), the court exercises subject matter jurisdiction

over these claims pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343 (civil

rights). The court exercises supplemental jurisdiction over the state law claims under 28

U.S.C. § 1367.  The parties do not contest personal jurisdiction or venue, and the court finds

adequate allegations supporting both.

## III.  STANDARD OF REVIEW

Summary judgment should be granted only "if the pleadings, the discovery and

disclosure materials on file, and any affidavits show that there is no genuine issue as to any

material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(c).  Under Rule 56, the moving party "always bears the initial responsibility of informing

the district court of the basis for its motion." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323

(1986).  "[T]he court must view all evidence and make all reasonable inferences in favor of

the party opposing summary judgment." *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir.

1995).  The movant can meet this burden by presenting evidence showing there is no genuine

issue of material fact, or by showing the non-moving party has failed to present evidence in

support of some element of its case on which it bears the ultimate burden of proof.  *Celotex*

*Corp.*, 477 U.S. at 322-23.

Once the moving party has met its burden, "an opposing party may not rely merely on

allegations or denials in its own pleading; rather, its response must – by affidavits or as

otherwise provided in this rule – set out specific facts showing a genuine issue for trial."

Fed. R. Civ. P. 56(e)(2).  To avoid summary judgment, the nonmoving party "must do more

than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita*

*Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  A genuine factual dispute

exists if a "'reasonable jury could return a verdict for the non-moving party.'"  *Damon v.*

*Fleming Supermarkets of Fla., Inc.,* 196 F.3d 1354, 1358 (11th Cir. 1999) (quoting *United*

*States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991)).  After the

nonmoving party has responded to the motion for summary judgment, the court must grant

summary judgment if there is no genuine issue of material fact and the moving party is

entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).

## IV.  DISCUSSION

### A.     *Title VII Sexual Harassment Claims*

Title VII makes it unlawful for an employer "to discriminate against any individual

with respect to his compensation, terms, conditions, or privileges of employment, because

of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

In order to establish a sexual harassment claim under Title VII, a plaintiff must show the

following elements:

> (1) that she belongs to a protected group; (2) that she has been subjected to
> unwelcome sexual harassment; (3) that the harassment was based on her sex;
> (4) that the harassment was sufficiently severe or pervasive to alter the terms
> and conditions of employment and create a discriminatorily abusive working
> environment; and (5) that a basis for holding the employer liable exists.

*Hulsey v. Pride Rests., LLC*, 367 F.3d 1238, 1244 (11th Cir. 2004). The School Board does

not contest that the plaintiffs belong to a protected group or that the harassment was based

on their sex. (Sch. Bd.'s Mot. Summ. J. Br. 9.) Although the School Board claims to contest

that the plaintiffs were subjected to unwelcome sexual harassment, the court must believe the

evidence of the non-movants and the plaintiffs have presented ample evidence of being

subjected to sexual harassment. Furthermore, even the School Board concedes that

Nacrelli's conduct was unwelcome.[6] Therefore, only the fourth and fifth elements remain

at issue, and they will be examined together.

There are two ways in which sexual harassment can alter the terms and conditions of

employment, both of which may form the basis for an employer's vicarious liability; a

plaintiff may show she was subjected to either a tangible employment action or a hostile

---

[6] The School Board admits that "Jeffers and Craig found the alleged harassment to be
subjectively offensive." (Sch. Bd.'s Mot. Summ. J. Br. 9.)

work environment. *Hulsey*, 367 F.3d at 1245-46. The *Faragher/Ellerth*[7] affirmative defense is only available to an employer under the hostile work environment theory of liability. *Hulsey*, 367 F.3d at 1245.

### 1.    **Tangible Employment Action**

A tangible employment action is defined by the Supreme Court as "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Ellerth*, 524 U.S. at 761. In general, "only a supervisor, or other person acting with the authority of the [employer], can cause this sort of injury" because they have been "empowered by the [employer] as a distinct class of agent to make economic decisions affecting other employees under his or her control." *Id.* at 762. Whether the employer is aware of the supervisor's tangible employment action and whether the employee took advantage of a reporting system is irrelevant. *Hulsey*, 367 F.3d at 1245.

Jeffers asserts that the type of tangible employment action to which she was subjected was a reassignment with significantly different responsibilities. (Pls.'s Resp. Br. 24.) Traditionally, guidance counselors at Jeffers's school were allowed to create their own schedules. (Jeffers Aff. ¶ 12.) However, Jeffers claims that after she reported Nacrelli's harassment, he gave her "a class load so unbearable . . . that the assignment violated state

---

[7] *Faragher v. City of Boca Raton,* 524 U.S. 775 (1998); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998).

law." (Compl. ¶ 55.) Due to the reassignment, Jeffers claims she "had to work additional hours for which she was not paid." (*Id.*) The proposed reassignment consisted of teaching a social skills class made up of two other teachers' classes several times a week. (Jeffers Aff. ¶ 12.) Jeffers and another counselor protested the schedule to Nacrelli and argued it violated state guidelines. (*Id.*) Nacrelli then developed another schedule which Jeffers again found unacceptable. (*Id.*) Finally, Nacrelli relented and told Jeffers to "make out your schedule like you've done in the past," which Jeffers then did. (Jeffers Dep. 192:20 - 193:3.)

The School Board's superintendent claims that she "initiated the changes in the schedules for the elementary school counselors" and that Nacrelli's schedule changes would have been a result of her directives. (Lee Aff. at 3.) Regardless of which person was responsible for the proposed reassignment, Jeffers admits to having never worked under either of the schedules proposed by Nacrelli. (Jeffers Dep. 193:12 - 194:16.) Because the proposed schedules were never actually implemented,[8] Jeffers cannot show she was subject to a tangible employment action and cannot rely upon this as a basis for holding the School Board liable for sexual harassment.

Craig alleges that the tangible employment action to which she was subjected was a constructive discharge from voluntarily driving school field trips, which was an opportunity for her to earn extra money from her employer. (Pls.' Resp. Br. 31.) She claims that she quit

---

[8] The proposed schedules are analogous to proposed offers to transfer, which the Eleventh Circuit has held does not constitute an employment action. *See Baldwin v. Blue Cross/Blue Shield of Ala.*, 480 F.3d 1287, 1300 (11th Cir. 2007).

17

taking the extra field trips in the 2002-03 school year in order to avoid contact with Nacrelli. (Craig Aff. ¶ 15.) She continued to decline field trips for about two years but has since resumed taking them. (*Id.*)

Even assuming that Craig was constructively discharged, her claim fails because it was not presented to the EEOC within the period prescribed by statute. A plaintiff in Alabama must file a charge of discrimination with the EEOC within 180 days of the occurrence of a discrete act of discrimination. *Ledbetter v. Goodyear Tire & Rubber Co.*, __ U.S. __, 127 S. Ct. 2162, 2169 (2007); 42 U.S.C. § 2000e-5(e)(1). Examples of discrete acts of discrimination include "'termination, failure to promote, denial of transfer, [and] refusal to hire.'" *Ledbetter*, 127 S. Ct. at 2169 (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002)). Like termination, constructive discharge constitutes a discrete act of discrimination. *See, e.g.*, *Cigan v. Chippewa Falls Sch. Dist.*, 388 F.3d 331, 334 (7th Cir. 2004) (agreeing with other circuits that the time to file an EEOC charge starts with the events that constitute constructive discharge); *Scott v. Lee County Youth Dev. Ctr.*, 232 F. Supp. 2d 1289, 1297 (M.D. Ala. 2002) (holding the "discrete act of constructive discharge cannot move forward as the Plaintiff's discharge also occurred outside of the 180-day filing window"); *Scott v. Dismas Charities, Inc.*, No. 05-3267, 2007 WL 2746697, at *14 (N.D. Ga. Sept. 17, 2007) (holding constructive discharge, among other adverse employment actions, to be a discrete act of discrimination that is time barred).

According to her affidavit, Craig places the date of her constructive discharge as no

later than about May 2003 (Craig Aff. ¶ 15), and yet she did not file her EEOC charge until January 19, 2006 – almost three years later and long after the required 180-day time period expired. Therefore, because Craig did not file her charge of discrimination with the EEOC within 180 days of being constructively discharged, the School Board's motion for summary judgment is due to be granted with respect to her sexual harassment claim based on a theory of tangible employment action.

###      2.      Hostile Work Environment

A hostile work environment "must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher,* 524 U.S. at 787. Because the School Board concedes both plaintiffs found the behavior subjectively offensive, the court need only conduct an objective analysis. (Sch. Bd.'s Mot. Summ. J. Br. 9.) Under a totality of the circumstances approach, courts consider the following four factors when assessing the objective severity and pervasiveness of the conduct: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct was physically threatening and humiliating or just a mere utterance; and (4) whether the conduct unreasonably interferes with the employee's work performance." *Hulsey*, 367 F.3d at 1247-48.

Both plaintiffs were subjected to numerous instances of inappropriate conduct at the hands of their principal. Jeffers alleges she heard at least twenty-five offensive comments, and specifically identifies at least ten of them. There is further evidence that comments were

so pervasive that they "were of general knowledge at the school." (Chaparro Aff. ¶ 4.)
Jeffers was also subjected to at least four instances of offensive physical contact: Nacrelli bit
her breast, grabbed her buttocks, wrapped his legs around her while he was nude, and pushed
her head down while jumping over her head in the nude. While his comments occurred
throughout his tenure as principal, it appears his behavior intensified during 2005, and almost
all of Jeffers's allegations occurred during a three-month period of that year.

Craig's allegations took place over a longer period of time than Jeffers, but the
harassing conduct occurred on a fairly continual basis, contained much unwanted physical
contact that was overtly sexual in nature and involved numerous direct sexual propositions.
It included Nacrelli rubbing her legs, and closing the bus door and suggesting they could go
somewhere alone in order to have sex – all despite her many times removing his hand
forcibly and demanding that he stop his behavior. In addition to the detailed instances of
harassing conduct, Craig also alleges generally that Nacrelli made over two dozen harassing
remarks and gestures between 2002 and his suspension in 2005.

Much of Nacrelli's conduct toward both plaintiffs occurred in the presence of other
colleagues, and in one instance a family member, thereby amplifying the humiliation. Craig
was concerned that others would think she was having an affair because of the way he
touched her and stood with his crotch close to her face in staff meetings. Nacrelli also
grabbed her buttocks in front of her nephew. The conduct to which Jeffers was subjected at
the pool party was not only in front of her co-workers, but also Nacrelli's wife. Although

Nacrelli's conduct does not appear to be physically threatening, it goes far beyond a "mere utterance" and would greatly humiliate any objectively reasonable person.

As to the fourth factor, Jeffers claims that Nacrelli's conduct led her to take much of her sick and personal leave so that she would not have to be around him and that she quit staying late to work at school – both of which interfered with her work performance. (Jeffers Aff. ¶ 7.) Instead of being able to take matters to her supervisor as an employee would normally, she was forced to avoid him in order to minimize his conduct toward her. Craig's work performance was also affected when she quit taking field trips so that she would not have to be in the presence of Nacrelli any more than necessary. (Craig Aff. ¶ 15.) She also alleges that she did not report student discipline matters that occurred on her bus like normal because she was afraid he would harass her again if she went to him. (*Id.* ¶ 14.) It is probable that the pervasiveness of Nacrelli's conduct would have been much worse had the plaintiffs not been forced to evade him when they could. Under the totality of the circumstances and considering the above four factors, the court finds that both Jeffers and Craig have established *prima facie* claims of hostile work environment sexual harassment under Title VII.

Despite the establishment of a *prima facie* case of harassment, under the *Faragher/Ellerth* affirmative defense an employer can avoid liability for a hostile work environment claim if (1) it "exercised reasonable care to prevent and correct promptly any sexually harassing behavior" and (2) the employee "unreasonably failed to take advantage

of any preventative or corrective opportunities [the employer] provided." *Faragher*, 524

U.S. at 807. The defendant bears the burden of establishing both elements. *Nurse "BE" v.*

*Columbia Palms W. Hosp. Ltd. P'ship*, 490 F.3d 1302, 1309 (11th Cir. 2007).

Material issues of fact prevent the School Board from establishing the two elements

of the affirmative defense with respect to Jeffers's claim for hostile work environment. In

order to establish that it exercised reasonable care to prevent harassment, the School Board

must "show that its sexual harassment policy was effectively published, that it contained

reasonable complaint procedures, and that it contained no other fatal defect." *Frederick v.*

*Sprint/United Mgmt. Co.*, 246 F.3d 1305, 1314 (11th Cir. 2001). The School Board's

promulgation of conflicting statements regarding sexual harassment rendered its policy

unclear. On one hand, the School Board had an official policy stating employees "should"

notify the Title IX Coordinator of sexual harassment. This policy was admittedly not widely

published with only a single copy kept in the front office with the principal at each school.

On the other hand, there was a widely distributed Policy Statement that was given to all

employees (and students) which contained a very open procedure that allowed reporting "to

the principal or appropriate school official." (Doc. # 41, at 12.) Although the Policy

Statement was geared toward students, it contained a section that also prohibited sexual

harassment of employees.

The School Board's Title IX Coordinator, the very person to whom employees were

supposed to report sexual harassment under the Official Policy, admits that the Policy

22

Statement was not in compliance with the Official Policy and that "we've got to fix it." (Baker Dep. 23:19-24:22.)  The Title IX Coordinator further undermined the clarity of the School Board's sexual harassment policy by testifying that a teacher who is subjected to sexual harassment by another teacher should "[r]eport to the principal" rather than report to her as provided for by the Official Policy.  (*Id.* 22:21-23:5.)

Like *Frederick*, here there are material issues of disputed fact with regard to whether the School Board's policy was reasonable, whether it was effectively published, and even what the sexual harassment policy was.  *Frederick*, 246 F.3d at 1315.  Furthermore, whether an employee reasonably took advantage of an employer's sexual harassment policy depends on the factual determination of which reporting procedures employees were supposed to follow under the School Board's sexual harassment policy [9] and whether there were any "extenuating circumstances that might explain why [the employee] failed to timely use the complaint procedures."[10]  *Id.* at 1316.  Therefore, because Jeffers has established a *prima facie* claim, and material issues of disputed fact prevent the School Board from successfully

---

[9]  Indeed, the reporting of both plaintiffs would likely be considered timely under the Official Policy because it states a report should be made "as soon as possible after the incident *or the latest occurrence if a series of incidents are involved*."  (Doc. # 49-3, at 19 (emphasis added).)  Hostile work environments are by their nature composed of a series of incidents, and both plaintiffs claim to have suffered harassment less than a month before reporting it.

[10]  For example, if the employee can only access her employer's official sexual harassment policy in the office of her sexual harasser and has had no training on the matter, she might be excused for not complying with its reporting procedure, especially in the face of a much more widely publicized procedure that describes a more open reporting procedure.  Also, if the person to whom she is supposed to report is her harasser, then she might also be excused for not strictly complying with the policy.

asserting the *Faragher/Ellerth* affirmative defense, the School Board's motion for summary judgment is due to be denied with respect to Jeffers's claim of sexual harassment under a hostile work environment theory.

In addition to the two publications regarding sexual harassment previously discussed, bus drivers like Craig received another publication containing a third statement that is also inconsistent with the Official Policy. In the reporting procedure of the Transportation Handbook, it instructs bus drivers that "[a]ctual or suspect harassment is to be reported to the school principal as soon as possible." (Doc. # 41, at 23.) There are no instructions for what to do when the principal is the harasser, nor is there any indication as to which of the three sexual harassment publications bus drivers are expected to follow. Additionally, despite the School Board's contention that transportation employees received sexual harassment training of some sort, Craig disputes this (Craig Aff. ¶ 20) and proffers evidence of two other support personnel (including one current member of the School Board) who corroborate her claim that sexual harassment training was not conducted. (Shirley Baker Aff. ¶ 8; Elliot Dep. 45:16-46:5.) Therefore, there exist genuine issues of material fact as to whether the School Board's sexual harassment policy was effectively published and contained reasonable complaint procedures for Craig to follow. The School Board's motion for summary judgment with respect to Craig's Title VII hostile work environment claim is also due to be denied.[11]

---

[11] The defendants argue that any allegation of the plaintiff that took place more than 180 days before their EEOC charges were filed are time barred under *Ledbetter* because each

**B.    State Law Claims**

In addition to their Title VII claims against the School Board, each plaintiff brings a state tort claims of (1) assault and battery and (2) outrage against Nacrelli, and (3) a claim that the School Board is vicariously liable for Nacrelli's assault and battery.  (Compl. ¶¶ 74-108.)

**1.    <u>Assault and Battery</u>**

Under Alabama law, a "plaintiff in an action alleging assault and battery must prove '(1) that the defendant touched the plaintiff; (2) that the defendant intended to touch the plaintiff; and (3) that the touching was conducted in a harmful or offensive manner.'" *Harper v. Winston County*, 892 So. 2d 346, 353 (Ala. 2004) (quoting *Ex parte Atmore Cmty. Hosp.*, 719 So. 2d 1190, 1193 (Ala. 1998)).  As to each plaintiff, Nacrelli only contests the third element and insists his touching was not conducted in a harmful or offensive manner.

In his defense against both plaintiffs, Nacrelli relies most heavily on *Simmons v. Mobile Infirmary Medical Center*, 391 F. Supp. 2d 1124 (S.D. Ala. 2005).  In addition to other claims against her employer, the plaintiff in *Simmons* brought an assault claim against her supervisor under state law.  *Simmons*, 391 F. Supp. 2d at 1127.  The *Simmons* plaintiff alleged that her supervisor (1) touched her breasts four to five times during a six-month

---

allegation is a discrete act.  (Sch. Bd.'s Mot. Summ. J. Br. 17.)  However, a hostile work environment claim is not based on a discrete act but rather "a series of separate acts that collectively constitute one 'unlawful employment practice.'" *Morgan*, 536 U.S. at 117 (quoting 42 U.S.C. § 2000e-5(e)(1)).  Therefore, as long as "an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." *Id.*; *see also Ledbetter*, 127 S. Ct. at 2175 (reaffirming *Morgan*'s distinction between discrete acts of discrimination and a hostile work environment).

period; (2) put his hands on her hips, said something in her ear, and pressed his body against hers; and (3) pulled his chair next to hers and touched her leg with his leg.[12]  *Id.* at 1128. Two months passed after the last alleged incident of harassment before Simmons complained to her employer's human resource department.  *Id.* at 1130.  The court expressed doubt that the alleged conduct was perceived by the plaintiff as offensive and ultimately determined the assault claim was barred by the statute of limitations.  *Id.* at 1131.

Nacrelli's reliance on *Simmons* for its analysis of a plaintiff's subjective perception of offensiveness is misplaced for multiple reasons.  First, even though the *Simmons* court expressed doubt that the plaintiff subjectively perceived the conduct to be offensive, it ultimately grounded its holding on the statute of limitations.[13]  *Id.* at 1131 ("Even if it could

---

[12]  Although the *Simmons* plaintiff also alleged in her complaint that her supervisor "sexually harassed her through remarks, a grabbing of her buttocks and other sexual advances through unwanted conduct," it appears the court did not take this into consideration.  *Simmons*, 391 F. Supp. 2d at 1127.  These alleged actions are not mentioned in the court's analysis and, in fact, the court later states that the supervisor "never said anything to Simmons of a sexual nature."  *Id.* at 1128.

[13]  The *Simmons* court also applied the incorrect statute of limitations for an assault claim. In Alabama, "[a]n action alleging assault and battery must be brought within six years after the accrual of the cause of action."  *Travis v. Ziter*, 681 So. 2d 1348, 1350 n.1 (Ala. 1996); Ala. Code § 6-2-34 (1975) ("The following must be commenced within six years: (1) Actions for any trespass to person or liberty, such as . . . assault and battery.").  However, the *Simmons* court applied the general two year statute of limitations and cited *Wright v. Wright*, 654 So. 2d 542, 544 (Ala. 1995), as support.  *Simmons*, 391 F. Supp. 2d at 1131; Ala. Code § 6-2-38(*l*) ("All actions for any injury to the person or rights of another not arising from contract and not specifically enumerated in this section must be brought within two years.").  While *Wright* does appear to imply the general two-year statute of limitations applies to assault claims, this proposition cannot be reconciled with the explicit terms of § 6-2-34 or other Alabama Supreme Court cases.  *See Travis*, 681 So. 2d at 1350 n.1; *Archie v. Enterprise Hosp. & Nursing Home*, 508 So. 2d 693, 694 n.2 (Ala. 1987) (explaining how personal injury actions enumerated in § 6-2-34 are not subject to the two-year statute of limitations of § 6-2-38); *see also Burroughs v.*

26

be said that a question of material fact existed regarding whether Roberts' conduct was offensive or harmful, Simmons['s] claim for assault/battery is barred by the applicable statute of limitations."). Nacrelli touched both Craig and Jeffers on several occasions in the six years prior to filing this lawsuit, and the statute of limitations does not serve as a bar to their assault and battery claims against Nacrelli.

Second, even if the court's analysis was not dicta, significant differences between the allegations in *Simmons* and against Nacrelli remain. The court determined that Simmons's harasser "never said anything to [her] of a sexual nature." *Id.* at 1128. On the other hand, Nacrelli made numerous sexually charged comments in Jeffers's presence and directly propositioned Craig on multiple occasions.

The *Simmons* court also gave weight to the fact that Simmons presented "no evidence that she was physically threatened or humiliated" by the conduct of her supervisor.[14] *Id.* at 1131. Jeffers states in her affidavit that she found Nacrelli's contact with her "extremely offensive" and that "[i]t was embarrassing and humiliating." (Jeffers Aff. ¶ 20.) Craig was

_____

*Smurfit Stone Container Corp.*, 506 F. Supp. 2d 1002, 1021 n.34 (S.D. Ala. 2007) ("The court cannot reconcile the seemingly inconsistent cite to [Ala. Code § 6-2-38(*l*) in *Wright*] for support that the statute of limitations had run on the assault and battery claim.").

[14] Although the *Simmons* court considered the absence of a physical threat in its analysis and Nacrelli argues such in his brief (Nacrelli's Mot. Summ. J. Br. 16-18), "an actual injury to the body is not a necessary element for an assault-and-battery claim." *Harper*, 892 So. 2d at 353. As the Alabama Supreme Court explains, "'[t]he wrong here consists, not in the touching, so much as in the manner or spirit in which it is done, and the question of bodily pain is important only as affecting damages.'" *Id.* (quoting *Surrency v. Harbison*, 489 So. 2d 1097, 1104 (Ala. 1986) (emphasis omitted)).

also "very embarrassed" and worried that others would think they were having an affair. (Craig Aff. ¶ 9.) She also physically removed his hand from her body on more than one occasion, and even told him to leave her alone. (*Id.* ¶¶ 3-4.) Nacrelli argues that certain threatening statements Craig made about Nacrelli are "disingenuous" and belie her claim that she was offended by the conduct. (Nacrelli's Mot. Summ. J. Br. 20.) To the contrary, Craig's admission that she told a friend she was so angry she was going to hit Nacrelli one day is strong evidence that his conduct was unwelcome and highly offensive. (*Id.*; Craig Aff. ¶ 5.)

The degree of Nacrelli's alleged conduct is also more severe than that of Simmons's supervisor. While some of their actions are similar (*e.g.*, leg touching, pressing his body against her), Nacrelli's overall conduct goes above and beyond that of Simmons's harasser. As detailed above, Nacrelli's conduct included breast biting, wrapping his legs around Jeffers while he was nude, squeezing Jeffers's and Craig's buttocks, and leg and shoulder rubbing – all taken in the context of numerous sexually provocative comments directed at the plaintiffs.

Nacrelli argues the plaintiffs' delay in reporting his conduct proves they did not find his conduct to be subjectively offensive at the time it occurred. (Nacrelli's Mot. Summ. J. Br. 18-19.) While the length of time between an assault and its report to someone in authority may be a factor to be considered in determining whether it was perceived to be

offensive, this court is unable to locate any authority deeming it to be dispositive.[15] Furthermore, Jeffers undisputedly complained of Nacrelli's conduct at the pool party the very night happened.  While the question of whether she asked Coley to keep her complaint secret is disputed, the fact that she made the phone call and complained of Nacrelli's conduct is not, and at this stage of the proceedings facts must be viewed in a light most favorable to the plaintiffs.  She also reported the breast biting incident to the superintendent less than two weeks after it occurred.  Craig may have a more difficult time explaining her delay in making an official report of her allegations, but that is a fact for the jury to weigh against her contemporaneous statements expressing her opposition to the conduct made directly to Nacrelli and other co-workers.  Both Jeffers and Craig have established there are genuine issues of material fact as to the elements of their assault claims and, therefore, Nacrelli's motion for summary judgment is due to be denied.  *See Harper*, 892 So. 2d at 354 (finding the question of whether a supervisor touched the arm of another employee in a harmful or offensive manner is a question of fact for the jury to decide); *Ex parte Atmore*, 719 So. 2d at 1194 (noting in dicta that an employee's allegations that a supervisor "touched her waist, rubbed against her when passing her in the hall, poked her in the armpits near the breast area, and touched her leg" constitute substantial evidence that the supervisor committed a battery).

### 2.    **Outrage**

Egregious sexual harassment is one of only three circumstances recognized under the

---

[15]  This is not surprising because if it were dispositive, it would render the six-year statute of limitations largely meaningless in instances of workplace assault.

tort of outrage in Alabama. *Stabler v. City of Mobile*, 844 So. 2d 555, 560 (Ala. 2002). The conduct must be "so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society." *Am. Rd. Serv. Co. v. Inmon*, 394 So. 2d 361, 365 (Ala. 1980). In order for a plaintiff to present a jury question, she "must present sufficient evidence that the defendant's conduct (1) was intentional or reckless; (2) was extreme and outrageous; and (3) caused emotional distress so severe that no reasonable person could be expected to endure it." *Thomas v. BSE Indus. Contractors, Inc.*, 624 So. 2d 1041, 1043 (Ala. 1993). Unlike assault and battery, the tort of outrage is governed by the general two-year statute of limitations. *Archie*, 508 So. 2d at 695; Ala. Code § 6-2-38(*l*).

Because the plaintiffs filed this suit on August 3, 2006, any conduct attributable to a claim of outrage must have occurred after August 3, 2004. Craig only alleges two instances of Nacrelli's harassment that took place within this time: (1) standing with his crotch near her face on August 3, 2005; and (2) massaging her shoulders on August 9, 2005. These two instances do not satisfy the high standard of outrageous conduct sufficient to constitute the tort of outrage, and Nacrelli's motion for summary judgment is due to be granted with respect to Craig's claim.

All of Jeffers's allegations, except perhaps the undated verbal comments, took place well within the applicable two year statute of limitations, beginning with the July 2005 pool party until the September 21, 2005 "humongous" comment. Jeffers maintains that she was

30

"an emotional wreck" as a result of the harassment, and that after the pool party she had to

pull her car over because she was shaking so badly.  (Jeffers Aff. ¶ 9.)  Nacrelli maintains

that her allegations are less outrageous than the seventeen allegations of harassment found

in *Busby v. Truswal Systems Corp.*, 551 So. 2d 322, 324 (Ala. 1989), where summary

judgment was granted and upheld.  (Nacrelli's Mot. Summ. J. Br. 24.)  Nacrelli misconstrues

*Busby* because, although the Alabama Supreme Court did uphold summary judgment, it was

for the plaintiffs' employer – not the harassing supervisor.  *Busby*, 551 So. 2d at 324, 328.

As to the supervisor who actually harassed the plaintiffs, the Court stated "[t]he deposition

evidence . . . presents evidence from which a jury could reasonably determine that [the

supervisor's] conduct rose to [the necessary level of outrageousness.]"  *Id.* at 324.

Of the deposition evidence, as laid out in the seventeen allegations of harassment in

*Busby*, only one consists of physical contact: "putting his arm around the plaintiffs, grabbed

their arm, and stroked their neck."  *Id.*  The rest consist almost entirely of lewd remarks and

gestures.  *Id.*  Nacrelli also made lewd remarks and gestures, but went above and beyond that

through his physical contact of biting Jeffers on the breast and pushing her head down while

jumping over her in the nude.   Based on the allegations presented through Jeffers's

deposition testimony and affidavit, and in comparison to the conduct in *Busby*, the court finds

there are genuine issues of material fact that preclude Nacrelli from prevailing on summary

judgment.  Therefore, his motion with respect to Jeffers's outrage claim is due to be denied.

### 3.    **Vicarious Liability**

The School Board argues that it is not vicariously liable under a theory of sovereign immunity, and the plaintiffs do not contest this in their response brief.  Under the Alabama Constitution, "the State of Alabama shall never be made a defendant in any court of law or equity."  Ala. Const. art. I, § 14.  County boards of education are local agencies of the State and enjoy the sovereign immunity established under the state constitution.  *Hutt v. Etowah County Bd. of Educ.*, 454 So. 2d 973, 974 (Ala. 1984) (reaffirming that county boards of education are not subject to tort actions because they enjoy sovereign immunity); *see also Stanley ex rel. L.B. v. Bullock County Bd. of Educ.*, No. 07-681, 2007 WL 4105149 (M.D. Ala. Nov. 15, 2007).   Therefore, the School Board's motion for summary judgment is due to be granted with respect to both plaintiffs' claims for assault and battery against the School Board under a theory of vicarious liability.[16]

### V. CONCLUSION

For the reasons set forth above, it is hereby ORDERED that:

1.    The School Board's Motion for Summary Judgment (Doc. # 39) is

    GRANTED in part and DENIED in part as follows:

      a.    Denied with respect to Jeffers's Title VII sexual harassment

         claim under a theory of hostile work environment (Count One);

---

[16] It should also be noted that many of the events comprising the alleged assault and battery claims occurred beyond the two-year limit provided for by the relevant vicarious liability statute of limitations.  *See* Ala. Code § 6-2-38(n).

b.     Granted with respect to Jeffers's Title VII sexual harassment claim under a theory of tangible employment action (Count Two);

c.     Denied with respect to Craig's Title VII sexual harassment claim under a theory of hostile work environment (Count Three);

d.     Granted with respect to Craig's Title VII sexual harassment claim under a theory of tangible employment action (Count Four);

e.     Granted with respect to Jeffers's state claim of assault and battery through vicarious liability of the School Board (Count Five);

f.     Granted with respect to Craig's state claim of assault and battery through vicarious liability of the School Board (Count Six);

2.     Nacrelli's Motion for Summary Judgment (Doc. # 43) is GRANTED in part and DENIED in part as follows:

a.     Denied with respect to Jeffers's claim of assault and battery (Count 7);

b.     Denied with respect to Craig's claim of assault and battery (Count 8);

    c.       Denied with respect to Jeffers's claim of outrage (Count 9);

    d.       Granted with respect to Craig's claim of outrage (Count 10).

Therefore, Counts One, Three, Seven, Eight, and Nine remain and the parties shall prepare for trial.

DONE this 13th day of February, 2008.

                /s/  W.  Keith Watkins
                UNITED STATES DISTRICT JUDGE

A copy of this checklist is available at the website for the USCA, 11th Circuit at www.ca11.uscourts.gov
Effective on April 9, 2006, the new fee to file an appeal will increase from $255.00 to $455.00.

## CIVIL APPEALS JURISDICTION CHECKLIST

1.  **Appealable Orders:** Courts of Appeals have jurisdiction conferred and strictly limited by statute:

    (a)  **Appeals from final orders pursuant to 28 U.S.C. § 1291:** Only final orders and judgments of district courts, or final orders of bankruptcy courts which have been appealed to and fully resolved by a district court under 28 U.S.C.§ 158, generally are appealable. A final decision is one that "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." Pitney Bowes, Inc. v. Mestre, 701 F.2d 1 365, 1 368 ( 11th Ci r. 1 983). A magistrate judge's report and recommendation is not final and appealable until judgment thereon is entered by a district court judge. 28 U.S.C. § 636(c).

    (b)  **In cases involving multiple parties or multiple claims,** a judgment as to fewer than all parties or all claims is not a final, appealable decision unless the district court has certified the judgment for immediate review under Fed.R.Civ.P. 54(b). Williams v. Bishop, 732 F.2d 885, 885- 86 (11th Cir. 1984). A judg ment which resolves all issues except matters, such as attorneys' fees and costs, that are collateral to the merits, is immediately appealable. Budinich v. Becton Dickinson & Co., 486 U.S.196, 201, 108 S.Ct. 1717, 1721-22, 100 L .Ed.2d 178 (1988); LaChance v. Duffy's Draft House, Inc., 146 F.3d 832, 837 (11th Cir. 1998).

    (c)  **Appeals pursuant to 28 U.S.C. § 1292(a):** Appeals are permitted from orders "granting, continuing, modifying, refusing or dissolving injunctions or refusing to dissolve or modify injunctions . . ." and from "[i]nterlocutory decrees . . . determining the rights and liabilities of parties to admiralty cases in which appeals from final decrees are allowed." Interlocutory appeals from orders denying temporary restraining orders are not permitted.

    (d)  **Appeals pursuant to 28 U.S.C. § 1292(b) and Fed.R.App.P. 5**: The certification specified in 28 U.S.C. § 1292(b) must be obtained before a petition for permission to appeal is filed in the Court of Appeals. The district court's denial of a motion for certification is not itself appealable.

    (e)  **Appeals pursuant to judicially created exceptions to the finality rule:** Limited exceptions are discussed in cases including, but not limited to: Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541, 546, 69S.Ct. 1221, 1225-26, 93 L.Ed. 1528 (1949); Atlantic Fed. Sav. & Loan Ass'n v. Blythe Eastman Paine Webber, Inc., 890 F.2d 371, 376 (11th Cir. 1989); Gillespie v. United States Steel Corp., 379 U.S. 148, 157, 85 S.Ct. 308, 312, 13 L.Ed.2d 199 (1964).

*Rev.: 4/04*

2.    <u>Time for Filing</u>: The timely filing of a notice of appeal is mandatory and jurisdictional. <u>Rinaldo v. Corbett</u>, 256 F.3d 1276, 1278 (11th Cir. 2001). In civil cases, Fed.R.App.P. 4(a) and (c) set the following time limits:

    (a)    **Fed.R.App.P. 4(a)(1):** A notice of appeal in compliance with the requirements set forth in Fed.R.App.P. 3 must be filed in the district court within 30 days after the entry of the order or judgment appealed from. However, if the United States or an officer or agency thereof is a party, the notice of appeal must be filed in the district court within 60 days after such entry. **THE NOTICE MUST BE RECEIVED AND FILED IN THE DISTRICT COURT NO LATER THAN THE LAST DAY OF THE APPEAL PERIOD – no additional days are provided for mailing.** Special filing provisions for inmates are discussed below.

    (b)    **Fed.R.App.P. 4(a)(3):** "If one party timely files a notice of appeal, any other party may file a notice of appeal within 14 days after the date when the first notice was filed, or within the time otherwise prescribed by this Rule 4(a), whichever period ends later."

    (c)    **Fed.R.App.P. 4(a)(4):** If any party makes a timely motion in the district court under the Federal Rules of Civil Procedure of a type specified in this rule, the time for appeal for all parties runs from the date of entry of the order disposing of the last such timely filed motion.

    (d)    **Fed.R.App.P. 4(a)(5) and 4(a)(6):** Under certain limited circumstances, the district court may extend the time to file a notice of appeal. Under Rule 4(a)(5), the time may be extended if a motion for an extension is filed within 30 days after expiration of the time otherwise provided to file a notice of appeal, upon a showing of excusable neglect or good cause. Under Rule 4(a)(6), the time may be extended if the district court finds upon motion that a party did not timely receive notice of the entry of the judgment or order, and that no party would be prejudiced by an extension.

    (e)    **Fed.R.App.P. 4(c):** If an inmate confined to an institution files a notice of appeal in either a civil case or a criminal case, the notice of appeal is timely if it is deposited in the institution's internal mail system on or before the last day for filing. Timely filing may be shown by a declaration in compliance with 28 U.S.C. § 1746 or a notarized statement, either of which must set forth the date of deposit and state that first-class postage has been prepaid.

3.    <u>Format of the notice of appeal:</u> Form 1, Appendix of Forms to the Federal Rules of Appellate Procedure, is a suitable format. <u>See</u> also Fed.R.App.P. 3(c). A <u>pro se</u> notice of appeal must be signed by the appellant.

4.    <u>Effect of a notice of appeal:</u> A district court loses jurisdiction (authority) to act after the filing of a timely notice of appeal, except for actions in aid of appellate jurisdiction or to rule on a timely motion of the type specified in Fed.R.App.P. 4(a)(4).